UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SIMON PROPERTY GROUP, INC., a
Delaware corporation,

        Plaintiff,

v.

Case No.  6:11-cv-1598-Orl-31KRS

LYNNETTE LAURIA, individually and
d/b/a Marketing Resource Network, XLM
Marketing, Excell Services, XLM Excell and
PR Works; ROBERT JAMES LAURIA,
individually and d/b/a Marketing Resource
Network, XLM Marketing, Excell Services,
XLM Excell and PR Works; SARAH LAGI,
individually and d/b/a XLM Marketing;
RACHAEL LAURIA, individually and
d/b/a PR Works; TIMOTHY HERMAN,
individually and d/b/a EDL Management,
Florida Tourism Distribution Services,
Target Distribution and TJI; RYAN
DEMING, individually and d/b/a Florida
Tourism Distribution Services, Kids Eat
Free Card, Target Distribution and TJI;
DALE TAKIO, individually and d/b/a Kids
Eat Free Cards; RJL SERVICES, LLC, an
inactive Florida limited liability company;
ARNELL, INC., an inactive Nevada
corporation, and d/b/a XLM Marketing;
and SNOUTHOUND ENTERPRISES, LLC,
a Florida limited liability company; IMAGE
MARKETING OF FLA, INC., a Florida
corporation; IMAGE MARKETING OF
FLORIDA, LLC, an inactive limited
liability company; IMAGE MARKETING
GROUP, INC., an inactive Florida
corporation; EVENT PLANNERS USA,
INC., an inactive Florida corporation; DT
PRINTING SOLUTIONS, LLC, an inactive
Florida limited liability company; HAT
MARKETING, LLC, a Florida limited
liability company; POINTE
DISTRIBUTION, LLC, an inactive Florida
limited liability company; and TAKITIK,

INC., an inactive Florida corporation;

Defendants.

## AMENDED COMPLAINT

Plaintiff, SIMON PROPERTY GROUP, INC. ("Simon"), sues Defendants, LYNNETTE LAURIA ("Ms. Lauria"), individually and d/b/a Marketing Resource Network, XLM Marketing, Excell Services ("Excell"), XLM Excell and PR Works; ROBERT JAMES LAURIA ("Mr. Lauria"), individually and d/b/a Marketing Resource Network, XLM Marketing, Excell, XLM Excell and PR Works; SARAH LAGI ("Ms. Lagi"), individually and d/b/a XLM Marketing; RACHAEL LAURIA, individually and d/b/a PR Works; TIMOTHY HERMAN ("Herman"), individually and d/b/a EDL Management ("EDL"), Florida Tourism Distribution Services ("Florida Tourism"), Target Distribution and TJI; RYAN DEMING ("Deming"), individually and d/b/a Florida Tourism, Kids Eat Free Card ("Deming Kids Eat Free"), Target Distribution and TJI; DALE TAKIO ("Takio"), individually and d/b/a Kids Eat Free Cards ("Takio Kids Eat Free"); RJL SERVICES, LLC ("RJL"), an inactive Florida limited liability company; ARNELL, INC. ("Arnell"), an inactive Nevada corporation, and d/b/a XLM Marketing; SNOUTHOUND ENTERPRISES, LLC ("Snouthound"), a Florida limited liability company; IMAGE MARKETING OF FLA, INC. ("Image Inc."), a Florida corporation; IMAGE MARKETING OF FLORIDA, LLC ("Image LLC"), an inactive limited liability company; IMAGE MARKETING GROUP, INC. ("Image Marketing Group"), an inactive Florida corporation; EVENT PLANNERS USA, INC. (a/k/a "EP USA") ("Event Planners"), an inactive Florida corporation; DT PRINTING SOLUTIONS, LLC ("DT Printing"), an inactive Florida limited liability company; HAT MARKETING, LLC (a/k/a "ATTRACTIONS MARKETING COMPANY, LTD.") ("Hat Marketing"), a Florida limited liability company; POINTE DISTRIBUTION, LLC

("Pointe Distribution"), an inactive Florida limited liability company; and TAKITIK, INC. ("Takitik"), an inactive Florida corporation, and alleges as follows:

1. This is an action for Breach of Fiduciary Duty, Aiding and Abetting Breach of Fiduciary Duty, Fraud, Civil Conspiracy, Conversion, Civil Theft, violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and violation of the Florida Antiphishing Act, § 668.703, Fla. Stat.

## PARTIES

2. Simon is a Delaware corporation that maintains its principal place of business at 225 W. Washington Street, P.O. Box 7033, Indianapolis, Marion County, Indiana, 46207.

3. Ms. Lauria is an adult Florida citizen residing at 1632 Orangethorpe Lane, Clermont, Lake County, Florida 34711.

4. Mr. Lauria, the husband of Ms. Lauria, is an adult Florida citizen residing at 1632 Orangethorpe Lane, Clermont, Lake County, Florida 34711.

5. Ms. Lauria and Mr. Lauria retain an interest in Defendants RJL, Arnell and Snouthound, and conduct business in their individual capacities under the names Marketing Resource Network, XLM Marketing, Excell, XLM Excell and PR Works.

6. Ms. Lagi, a daughter of Ms. Lauria and Mr. Lauria, is an adult Florida citizen residing at 1847 Bachman Way, Winter Park, Orange County, Florida 32792. Ms. Lagi retains an interest in Defendant Arnell and conducts business in her individual capacity under the name XLM Marketing.

7. Rachael Lauria, another daughter of Ms. Lauria and Mr. Lauria, is an adult Florida citizen residing at 3358 Hamlet Loop, Winter Park, Orange County, Florida 32792.

Rachael Lauria retains an interest in Defendant Snouthound and conducts business in her individual capacity under the name PR Works.

8.      Herman is an adult Florida citizen residing at 200 Flame Avenue, Maitland, Orange County, Florida 32715.  Herman conducts business in his individual capacity under the names EDL, Florida Tourism, Target Distribution and TJI.

9.      Deming is an adult Florida citizen residing at 13560 Turtle Marsh Loop, Unit 324, Orlando, Orange County, Florida 32837.  Deming conducts business in his individual capacity under the names Florida Tourism, Kids Eat Free Card, Target Distribution and TJI.

10.     Takio is an adult Florida citizen residing at 11222 Oakshore Lane, Clermont, Lake County, Florida 34711.  Takio conducts business in his individual capacity under the name Kids Eat Free Cards.

11.     RJL is an inactive Florida limited liability company with  two Members, Ms. Lauria and Mr. Lauria, both of whom are adult Florida citizens residing at 1632 Orangethorpe Lane, Clermont, Lake County, Florida 34711.

12.     Arnell is an inactive foreign corporation, incorporated under the laws of Nevada, with its previous principal place of business at 4327 S. Highway 27, Clermont, Lake County, Florida, 34711.   Arnell is also the registered owner of the fictitious business entity XLM Marketing.

13.     Snouthound is a Florida limited liability company with  one Member, Rachael Lauria, an adult Florida citizen residing at 3358 Hamlet Loop, Winter Park, Orange County, Florida 32792.

14.     Image Inc. is a Florida corporation with its principal place of business at 7021 Grand National Drive, Suite 105, Orlando, Orange County, Florida 32819.

15.     Image LLC is an inactive limited liability company with two Members, Herman, an adult Florida citizen residing at 200 Flame Avenue, Maitland, Orange County, Florida 32715, and Deming, an adult Florida citizen residing at 13560 Turtle Marsh Loop, Unit 324, Orlando, Orange County, Florida 32837.

16.     Image Marketing Group is an inactive Florida corporation with its previous principal place of business at 7081 Grand National Drive, Suite 101, Orlando, Orange County, Florida 32819 (for purposes herein, Image Inc., Image LLC and Image Marketing Group collectively referred to as "Image Marketing," unless otherwise noted).

17.     Event Planners is an inactive Florida corporation with its previous principal place of business at 7081 Grand National Drive, Suite 101, Orlando, Orange County, Florida 32819

18.     DT Printing is an inactive Florida limited liability company with one Member, Takitik, an inactive Florida corporation with its previous principal place of business at 3224 Dante Drive, Suite 201, Orlando, Orange County, Florida, 32835.

19.     Hat Marketing is a Florida limited liability company with two Members, Takitik, an inactive Florida corporation with its previous principal place of business at 3224 Dante Drive, Suite 201, Orlando, Orange County, Florida, 32835 and Kevin Brett, an adult Florida citizen residing at 3224 Dante Drive, Suite 201, Orlando, Orange County, Florida, 32835.

20.     Pointe Distribution is an inactive Florida limited liability company with one Member, Takitik, an inactive Florida corporation with its previous principal place of business at 3224 Dante Drive, Suite 201, Orlando, Orange County, Florida, 32835.

21.     Takitik is an inactive Florida corporation with its previous principal place of business at 3224 Dante Drive, Suite 201, Orlando, Orange County, Florida, 32835.[1]

## JURISDICTION

22.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, through 18 U.S.C. § 1964(c), as this action arises under the laws of the United States in that Simon has been injured in its business or property by reason of violations of 18 U.S.C. § 1962.

23.     The also Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

## VENUE

24.     Venue is proper in the United States District Court for the Middle District of Florida pursuant to 18 U.S.C. § 1965(a), as all Defendants reside, are found, have an agent or transact their affairs within this district.

25.     Venue is also proper in the United States District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1391(b), as this action is not founded solely on diversity of citizenship, and a substantial part of the events or omissions giving rise to the claims alleged herein occurred within this district.

### FACTUAL ALLEGATIONS UNDERLYING ALL COUNTS

### Ms. Lauria's Position with Simon

26.     Simon is a publicly traded real estate company that owns and operates Malls and Retail Centers throughout the United States, including Florida and Puerto Rico.

---

[1] For purposes herein, Image Marketing, DT Printing, EDL, Event Planners, Florida Tourism, Hat Marketing, Deming Kids Eat Free, Takio Kids Eat Free, Pointe Distribution, Takitik, Target Distribution, and TJI collectively referred to as the "Image Companies," unless otherwise noted.

27.     Ms. Lauria is a former employee of Simon.  Initially, Ms. Lauria was employed by Simon as a Marketing Director for the Mall of New Hampshire in Manchester, New Hampshire.  In 2000, Simon moved her to the Florida Mall in Orlando, Florida, where she continued to serve as Marketing Director.  In 2005, Simon promoted Ms. Lauria to the position of Regional Director of Marketing for Florida.  On or about June 7, 2007, Simon again promoted Ms. Lauria to Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.  Ms. Lauria held the Vice-President, Mall Marketing position until July 2011, when Simon terminated her employment for the acts set forth herein.

28.     As the Vice-President, Mall Marketing for the Florida and Puerto Rico Regions, Ms. Lauria was responsible for overseeing a large territory for marketing and advertising regarding all aspects of Simon's operations in Florida and Puerto Rico.  Part of Ms. Lauria's job description was to locate outside marketing and advertising companies to provide general marketing services, Internet advertisements, brochure rack distribution, concierge services, and to represent Simon's Florida and Puerto Rico regions at trade shows globally; to negotiate service agreements with such companies; and to oversee the outside marketing and advertising efforts for Simon in Florida and Puerto Rico.

29.     As the Vice-President, Mall Marketing for the Florida and Puerto Rico Regions, Ms. Lauria was in a position of trust and confidence with Simon.  Not only was Ms. Lauria in a corporate supervisory role, but Simon also relied upon Ms. Lauria to comply with its policies and procedures; to provide assessments, opinions, and work to hire new marketing and advertising companies under terms beneficial to Simon; to ensure that services were properly being performed by those companies; and to verify that the proper payments were being made for work performed.

## Simon's Policies and Procedures

30.     As a requirement of her employment, Ms. Lauria agreed to comply with Simon's various corporate policies and procedures.  These policies and procedures were memorialized in writing and were made known to Ms. Lauria throughout her employment.  Among the various corporate policies and procedures Ms. Lauria agreed to abide by were Simon's Code of Business Conduct and Ethics; Competitive Bidding for Field Purchases; Service Agreement Policy; and Field Purchasing Card Procedures (for purposes herein collectively "Simon's Policies and Procedures," unless otherwise noted).

31.     Simon's Code of Business Conduct and Ethics ("Code of Ethics") required Ms. Lauria to avoid a variety of conflicts of interest in performing her duties to Simon.  Potential conflicts of interest expressly included, but were not limited to the ownership or management in corporate customers, contractors or suppliers; transacting business with related persons; receiving compensation from any vendors or customers; entering into any relationships that might impair the employee's judgment; or accepting gifts that would appear to improperly influence the employee in the performance of her duties to Simon.  The Code of Ethics also required Ms. Lauria to deal fairly with vendors and suppliers and follow competitive bidding policies, by among other things, not attempting to circumvent the standards set forth therein by acting through someone else, such as a family member or friend.

32.     Simon's Competitive Bidding for Field Purchases Procedures ("Competitive Bidding Procedures") required Ms. Lauria to follow certain processes to effectively satisfy Simon's requirements to competitively control cost, provide quality, and ensure timely delivery of marketing and advertising services.  The Competitive Bidding Procedures were also meant to clearly document the steps Ms. Lauria followed in deciding to award marketing and advertising

work to all vendors and suppliers as well as the logic behind the purchasing decisions she made on behalf of Simon.

33.   Simon's Competitive Bidding Procedures required Ms. Lauria to comply with certain processes for products and services sought for Simon that were valued up to $5,000, more strict processes for products and services valued between $5,000 and $10,000, and even more strict processes for products and services valued over $10,000.

34.   With respect to products and services valued up to $5,000, Ms. Lauria was not required to obtain a formalized Request for Proposal ("RFP"), but was required to document and support all decisions made, including why vendors and suppliers were chosen, by attaching any proposals, emails or other written documentation to the purchase order or service agreement.

35.   With respect to products and services between $5,000 and $10,000, the Competitive Bidding Procedures required Ms. Lauria to adhere to the foregoing requirements, and additionally, to gather a minimum of three competitive bids for every product and service procured for Simon.  The Competitive Bidding Procedures also required Ms. Lauria to price check vendors and suppliers with other comparable quotes for products and services every time the vendor renewed its Purchase Order or Service Agreement, and further required Ms. Lauria to price check all vendors and suppliers a minimum of once every three years.

36.   Additionally, Simon's Service Agreement Policy required Ms. Lauria to create a Service Agreement with vendors or suppliers when products and services they were to provide exceeded $5,000, and also required her to complete a Project Approval Request Package for the work awarded to the vendor or supplier.

37.   With respect to products and services over $10,000, the Competitive Bidding Procedures required Ms. Lauria to adhere to all of the foregoing requirements, and additionally,

required her to use a formal competitive bidding process.  To the extent that Ms. Lauria was unable to obtain at least three competitive bids for any product or service, irrespective of its value, the Competitive Bidding Procedures required her to prepare a written statement explaining why she could not obtain competitive bids for the products and services sought.

38.     Simon provided Ms. Lauria with access to a company credit card to pay suppliers and vendors for products and services procured pursuant to the Competitive Bid Procedures and Service Agreement Policy.

39.     Ms. Lauria was to use her company credit card to streamline and simplify Simon's accounts payable function in order to pay suppliers within three days, rather than have them wait the 30 to 45 days that would have been required if they were paid by company check.

40.     Simon's Field Purchasing Card Procedures ("Purchasing Card Procedures") required that Ms. Lauria use her company credit card solely for legitimate company purchases. Among the requirements for Ms. Lauria to use her company credit card, the Purchasing Card Procedures required her to receive an invoice for all products and services procured, sign a receipt or invoice for purchases exceeding $100, and then give the receipt or invoice to the approving supervisor for appropriate coding.  The Purchasing Card Procedures stated that, without the approval of Simon's Accounts Payable Department ("Accounts Payable"), Ms. Lauria had a $5,000 spending limit per transaction and a $60,000 monthly spending limit on her company credit card to pay for all vendor and supplier invoices.  Accounts Payable, however, had to approve all transactions exceeding $5,000.  The Purchasing Card Procedures prohibited Ms. Lauria from splitting a transaction into two separate purchases to avoid her transaction spending limit of $5,000.  The Purchasing Card Procedures also stated the intentional misuse of the company credit card would subject Ms. Lauria to disciplinary action, including termination.

**The Lauria Companies**

41.     Despite her agreement to avoid potential conflicts of interest with Simon, as provided by the Code of Ethics, and adhere to strict guidelines for awarding work to suppliers and vendors, as provided by the Competitive Bidding Procedures, Ms. Lauria, with her husband, Defendant Mr. Lauria, and her two daughters, Defendants Ms. Lagi and Rachael Lauria, established or retained an interest in numerous shell businesses consisting of a corporation, limited liability companies and registered and unregistered fictitious business entities.  These businesses included Marketing Resource Network, RJL, Arnell, Excell, XLM Excell, XLM Marketing, Snouthound, and PR Works (for purposes herein, all entities associated with Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria collectively referred to as the "Lauria Companies," unless otherwise noted).

42.     Contrary to the Code of Ethics, Ms. Lauria never disclosed to Simon her interest in the Lauria Companies or that of her family members in the Lauria Companies.  Additionally, Simon never knew about or approved Ms. Lauria's interest in the Lauria Companies or that of her family members in the Lauria Companies.

43.     Over the course of her employment, Ms. Lauria awarded the Lauria Companies with significant "marketing and advertising" work which the Lauria Companies purportedly performed on behalf of Simon, which consisted of distribution of brochures to racks along interstate highways and in hotels throughout Florida to advertise Simon's Malls, representation of Simon at concierge hotel events, public relations services, printing services and representation at trade shows globally.

44.     Based upon a fraudulent scheme to induce Simon to enter into Service Agreements and other marketing and advertising work with the Lauria Companies, Simon made

payments in excess of $1,125,000 to the Lauria Companies.  To date, Simon has been unable to document any legitimate marketing or advertising services that the Lauria Companies allegedly provided to Simon in exchange for payments to the Lauria Companies.

### *Marketing Resource Network*

45.     Mr. Lauria registered "Marketing Resource Network" as a fictitious business entity with the Florida Department of State on August 19, 2002.

46.     Ms. Lauria and Mr. Lauria did business in their individual capacities under the name Marketing Resource Network.

47.     In her prior position as the Regional Director of Marketing for Florida, Ms. Lauria awarded Marketing Resource Network with marketing and advertising work, which included, among other things, distribution of brochures to racks along Interstates 4 and 95, and also with "consulting" work.

48.     On occasion, Marketing Resource Network invoiced the services purportedly provided to Simon to entities associated with the Image Companies.[2]   In turn, the Image Companies then invoiced Simon for the work purportedly provided by Marketing Resource Network.  The Image Companies, however, failed to provide marketing and advertising services to Simon or charged exorbitant fees for little to no services.

49.     Ms. Lauria approved costs invoiced from Marketing Resource Network and the Image Companies on behalf of Marketing Resource Network in her capacity as Marketing Director of the Florida Mall and Regional Director of Marketing for Florida.

50.     Marketing Resource Network received monthly payments from Simon from approximately July 2002 through January 2006 for marketing and advertising services allegedly performed, totaling in excess of $309,000.  Marketing Resource Network, however, failed to

---

[2] *See supra*, note 1.

perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services to Simon, such that Ms. Lauria and Mr. Lauria received an improper financial gain, causing injury to Simon.

51.     At all times, Ms. Lauria, Mr. Lauria and the Image Companies were aware that Marketing Resource Network failed to perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services.

### RJL

52.     On January 20, 2006, Ms. Lauria and Mr. Lauria organized RJL as a limited liability company under Florida law.  "RJL" corresponds with the initials for Mr. Lauria's legal name, "Robert James Lauria."

53.     In her prior position as the Regional Director of Marketing for Florida, Ms. Lauria awarded RJL with marketing and advertising work similar to that previously invoiced by Marketing Resource Network, which included, among other things, the distribution of brochures purportedly created by Image Marketing, and, non-party, J & S MULTIMEDIA, INC. ("J & S Multimedia").

54.     On occasion, RJL invoiced services directly to entities associated with the Image Companies, as did Marketing Resource Network, and to J & S Multimedia.  In turn, the Image Companies and J & S Multimedia then invoiced Simon for the work purportedly provided by RJL.  The Image Companies, however, failed to provide marketing and advertising services to Simon or charged exorbitant fees for little to no services.

55.     Ms. Lauria approved costs invoiced from RJL, the Image Companies and J & S Multimedia on behalf of RJL in her capacity as Regional Director of Marketing for Florida and

her subsequent position as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

56.     RJL received monthly payments from Simon from approximately January 2006 to March 2008 for marketing and advertising services RJL alleged performed, totaling in excess of $480,000.[3]  RJL, however, failed to perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services to Simon, such that Ms. Lauria and Mr. Lauria received an improper financial gain, causing injury to Simon.

57.     At all times, Ms. Lauria, Mr. Lauria and the Image Companies were aware that RJL failed to perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services.

58.     As the sole members of RJL, Ms. Lauria and Mr. Lauria dominated and controlled RJL to such an extent that its independent existence was in fact non-existent.  Significantly, RJL began to invoice the Image Companies, and received payment for services allegedly provided to Simon, prior to the date upon which Ms. Lauria and Mr. Lauria organized RJL under Florida law.  In addition, Ms. Lauria and Mr. Lauria held no Board of Director meetings on behalf of RJL, and engaged in improper conduct by commingling their personal finances with the corporate finances of RJL.  Ms. Lauria and Mr. Lauria used the corporate form of RJL for their own personal benefit and for that of Ms. Lagi, her husband and Rachael Lauria to mislead or perpetrate fraud upon Simon, thus rendering RJL a mere instrumentality of Ms. Lauria and Mr. Lauria.

### *XLM Marketing, Excell and XLM Excell*

---

[3] This amount also includes monthly payments from Simon to XLM Marketing from approximately October 2007 to May 2011, and from Simon to XLM Excell from approximately May 2010 to July 2010.

59.     XLM Marketing's dealings with Simon originated in late 2007, merely four months after Simon promoted Ms. Lauria to her position as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

60.     XLM Marketing's website self-described it as a "leader in tourism marketing for over 10 years" with "over 20 employees covering Central, South and Southwest Florida" that was a "subsidiary of the well-known Las Vegas tourism marketing company Richards, Jackson and Lawson Services."

61.     Coincidentally, "Richards, Jackson and Lawson Services" corresponds with "RJL Services," and also with Mr. Lauria's initials, "RJL."

62.     Discovery has shown that XLM Marketing's website and that "Richards, Jackson and Lawson Services" is a non-existent entity which Ms. Lauria and/or Ms. Lagi created to circumvent Simon's Policies and Procedures and/or to conceal her and her family's interest in the Lauria Companies.

63.     XLM Marketing had no formal corporate structure and made no filings with the Florida Department of State until on or about June 7, 2010, when Arnell registered XLM Marketing as a fictitious business entity which Arnell owned.  By that time, XLM Marketing had been doing business in Florida for approximately three years.

64.     Emails from XLM Marketing to Ms. Lauria, XLM Marketing invoices dated as early as January 9, 2009 and its Service Agreements with Simon identified "Susan Thomas" as the owner of XLM Marketing  and "Roberto Jimenez" as its President, and associated the business with the address 4327 S. Highway 27, Clermont, Florida 34711, the same address associated with Arnell.

65.     As with "Richards, Jackson and Lawson Services," Ms. Lauria ultimately admitted that "Susan Thomas" is a non-existent persona that she created to do business with Simon, which allowed her to circumvent Simon's Policies and Procedures and conceal her and her family's interest in the Lauria Companies.  Ms. Lauria even randomly selected an address for "Susan Thomas," which was actually a private residence located in Fort Myers, Florida that was not associated with anyone named Susan Thomas or the Lauria Companies.

66.     Additionally, "Roberto Jimenez," an individual coincidentally sharing at least two of Mr. Lauria's initials, is also a non-existent persona created by Ms. Lauria to circumvent Simon's Policies and Procedures.

67.     Ms. Lauria awarded XLM Marketing various marketing and advertising work and Service Agreements with Simon, including rack brochure distribution programs, tourism trade show representation, and design and printing services.

68.     Ms. Lauria approved costs invoiced from XLM Marketing in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

69.     XLM Marketing received monthly payments from Simon for marketing and advertising services allegedly performed.[4]  XLM Marketing, however, failed to perform the marketing and advertising work awarded by Ms. Lauria or the work required under the Service Agreements, or charged exorbitant fees for little to no services to Simon, such that Ms. Lauria, Mr. Lauria and Arnell received an improper financial gain, causing injury to Simon.

70.     At all times, Ms. Lauria, Mr. Lauria and Arnell were aware that XLM Marketing failed to perform the marketing and advertising work which Ms. Lauria awarded to it, or that XLM Marketing charged exorbitant fees for little to no services.

---

[4] *See supra*, note 3.

71.     XLM Marketing failed to follow the corporate form of Arnell.  Ms. Lauria, Mr. Lauria, Arnell and Ms. Lagi used XLM Marketing for their own personal use and conducting business under the name XLM Marketing.

72.     Simultaneous to her dealings with XLM Marketing, Ms. Lauria began Excell in June 2009, and awarded it work that was duplicative of the services purportedly provided by XLM Marketing, including brochure rack distribution in the International Drive area of Orlando, along Route 192 in Kissimmee, along Interstates 75 and 95, and tourism trade show representation.

73.     Excell is an unregistered fictional business entity owned by or associated with Ms. Lauria and Mr. Lauria that made no filings with the Florida Department of State, and otherwise has no corporate structure.

74.     Ms. Lauria and Mr. Lauria conducted business in their individual capacities under the name Excell.

75.     Although Excell's owner was identified as the "Peterson" family, whom had been in business for over 20 years in Florida, its business address was the same as that associated with XLM Marketing, 4327 S. Highway 27, Clermont, Florida 34711, also the same address associated with Arnell.

76.     Like the fictitious persons invented by Ms. Lauria with respect to XLM Marketing, the "Peterson" family is also a persona that Ms. Lauria created to circumvent Simon's Policies and Procedures and conceal her and her family's interest in Excell.

77.     As with XLM Marketing, Ms. Lauria approved costs invoiced from Excell in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

78.     Excell received monthly payments from Simon from approximately June 2009 to May 2010 for marketing and advertising services allegedly performed, totaling in excess of $86,000.  Excell, however, failed to perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services to Simon, such that Ms. Lauria and Mr. Lauria received an improper financial gain, causing injury to Simon.

79.     At all times, Ms. Lauria and Mr. Lauria were aware that Excell failed to perform the marketing and advertising work which she awarded to Excell, or that Excell charged exorbitant fees for little to no services.

80.     On May 25, 2010, "Susan Thomas" informed Simon, through Ms. Lauria via email, that it was acquiring Excell.  The email further stated that the "Peterson" family, was in the process of retiring, and that the two businesses had "started the process of reconciling [their] billing procedures and soon all invoices would be processed by XLM Marketing."  This email communication, however, was authored by Ms. Lauria and transmitted to herself which she printed out for placement in her files for Excell.

81.     In the interim when XLM Marketing and Excell were apparently merging together, Simon, through Ms. Lauria, received invoices from XLM Excell for services that were duplicative of those purportedly provided by XLM Marketing, including tourism brochure rack distribution along Interstates 75 and 95 in Florida and advertising in shopping guides and on the Internet.

82.     XLM Excell is an unregistered fictional business entity owned by or associated with Ms. Lauria and Mr. Lauria that made no filings with the Florida Department of State, and otherwise has no corporate structure.

83.     Ms. Lauria and Mr. Lauria conducted business in their individual capacities under the name XLM Excell.

84.     Like XLM Marketing, XLM Excell's invoices and Service Agreements identified the non-existant "Susan Thomas" as its owner, and associated the business with the address 4327 S. Highway 27, Clermont, Florida 34711, the same address associated with Arnell.

85.     Ms. Lauria approved costs invoiced from XLM Excell in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

86.     XLM Excell received monthly payments from Simon for marketing and advertising services allegedly performed.[5]   XLM Excell, however, failed to perform the marketing and advertising work awarded by Ms. Lauria or charged exorbitant fees for little to no services to Simon, such that Ms. Lauria and Mr. Lauria received an improper financial gain, causing injury to Simon.

87.     At all times, Ms. Lauria and Mr. Lauria were aware that XLM Excell failed to perform the marketing and advertising work which Ms. Lauria awarded to it, or that XLM Excell charged exorbitant fees for little to no services.

88.     XLM Excell stopped invoicing Simon in July 2010, at which point all remaining marketing and advertising work it received from Simon was billed by XLM Marketing.

89.     In February 2011, the non-existent "Susan Thomas" mailed Simon a letter, via U.S. Mail, which Ms. Lauria received, stating that "RJ Services Group" decided to sell XLM Marketing, and that Pointe Distribution, an entity associated with the Image Companies, had "purchased the rack brochure display locations owned by XLM [Marketing] and will be servicing those moving forward."   The letter further advised that all XLM Marketing billing would now come through "RJ Services Group" as of the date of the letter.

---

[5] *See supra*, note 3.

90.    Contrary to the February 2011 letter, none of the businesses encompassed by the Lauria Companies owned any brochure rack locations which were allegedly sold to Pointe Distribution, including XLM Marketing, Excell and XLM Excell.

*Arnell*

91.    The Florida Department of State authorized Arnell, a foreign corporation, to conduct business in Florida on March 11, 2010. Although known as "Arnell" in Florida, it was known as "RJL Services, Inc." in Nevada, its state of incorporation.

92.    On or about March 22, 2010, Arnell filed an Affidavit naming Ms. Lagi as its Vice-President, and directed the Florida Department of State to direct all correspondence concerning Arnell to the non-existent "Susan Thomas," the fictional owner of XLM Marketing.

93.    Ms. Lauria awarded Arnell Service Agreements for marketing and advertising work that was duplicative of that allegedly provided by XLM Marketing, including "bi-monthly rack brochure distribution in proprietary hotels and rest stop rack locations" along Interstates 4 and 95 and along Route 2A and 2B. Ms. Lauria also awarded Arnell additional work in which Arnell would purportedly print items such as vertical notepads and coffee mugs displaying Simon's logo and would represent Simon at concierge conferences in Orlando, Miami, and San Diego.

94.    Arnell's Service Agreements were signed by "S. Elizabeth Laggoon" as Vice-President of Distribution Services for Arnell. Coincidentally, "S. Elizabeth Laggoon" also has the same initials, "S.E.L.," as Ms. Lagi. Although "S. Elizabeth Laggoon" is identified as Vice-President of Distribution Services, Arnell's corporate records identify Ms. Lagi as the sole Vice-President of Arnell.

95.     "S. Elizabeth Laggoon" is yet another fictional persona invented by Ms. Lauria and/or Ms. Lagi to allow Ms. Lauria and Arnell to circumvent Simon's Policies and Procedures and conceal her and her family's interest in the Lauria Companies.

96.     On June 7, 2010, Ms. Lagi filed an application on behalf of Arnell to register the fictitious business entity "XLM Marketing" with the Florida Department of State, which identified Arnell as the owner of XLM Marketing.

97.     Ms. Lauria approved costs invoiced from Arnell in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

98.     Arnell received monthly payments from Simon for marketing and advertising services allegedly performed from approximately March 2010 to July 2011, totaling in excess of $95,000.  Arnell, however, failed to perform the work pursuant to the Service Agreements or the various additional work awarded by Ms. Lauria, or charged exorbitant fees for little to no services, such that Ms. Lagi, Ms. Lauria and Mr. Lauria received an improper financial gain, causing injury to Simon.

99.     At all times, Ms. Lauria, Mr. Lauria and Ms. Lagi were aware that Arnell failed to perform the marketing and advertising work which Ms. Lauria awarded Arnell, or that Arnell charged exorbitant fees for little to no services.

100.    As an officer of Arnell, Ms. Lagi dominated and controlled Arnell to such an extent that its independent existence was in fact non-existent.  Significantly, Arnell began to invoice Simon for services allegedly provided prior to the date upon which Arnell was authorized to conduct business in Florida.  Ms. Lagi held no Board of Director meetings on behalf of Arnell, and engaged in improper conduct by commingling her personal finances with the corporate finances of Arnell.  Ms. Lagi also used the corporate form of Arnell for her own

personal benefit to mislead or perpetrate fraud upon Simon, thus rendering Arnell a mere instrumentality of Ms. Lagi.

101.     Arnell paid Ms. Lauria and/or Ms. Lagi kickbacks in exchange for the exorbitant fees Arnell received from Simon for little to no services.

102.     Ms. Lagi ultimately admitted that she did not provide any of the marketing and advertising services Arnell invoiced to Simon.

### *Snouthound*

103.     Rachael Lauria and Anthony Michael Edwards ("Edwards") organized Snouthound on September 27, 2005.  Ms. Lauria and Mr. Lauria also retained an interest in Snouthound.

104.     Rachael Lauria filed an Article of Amendment on July 14, 2009 to remove Edwards as the Managing Member of Snouthound, leaving Rachael Lauria as the sole member of Snouthound to date.

105.     Ms. Lauria awarded marketing and advertising work to Snouthound, which included services for printing holiday gift guides, photography, editing and public relations work in Europe, Canada and South America.

106.     Ms. Lauria approved costs invoiced from Snouthound in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

107.     Snouthound received monthly payments from Simon for marketing and advertising services allegedly performed from approximately June 2007 to July 2011, totaling in excess of $75,000.  Snouthound, however, failed to perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services to Simon, such that

Rachael Lauria, Ms. Lauria and Mr. Lauria received an improper financial gain, causing injury to Simon.

108.    At all times, Ms. Lauria, Mr. Lauria and Rachael Lauria were aware that Snouthound failed to perform the marketing and advertising work which Ms. Lauria awarded Snouthound, or that Snouthound charged exorbitant fees for little to no services.

109.    As the sole Member of Snouthound, Rachael Lauria dominated and controlled Snouthound to such an extent that its independent existence was in fact non-existent.  Rachael Lauria held no Board of Director meetings on behalf of Snouthound, and engaged in improper conduct by commingling her personal finances with the corporate finances of Snouthound. Rachael Lauria also used the corporate form of Snouthound for her own personal benefit to receive an improper financial gain to mislead or perpetrate fraud upon Simon, thus rendering Snouthound as a mere instrumentality of Rachael Lauria.

110.    Snouthound paid Ms. Lauria and/or Rachael Lauria kickbacks in exchange for the exorbitant fees Snouthound received from Simon for little to no services.

111.    Rachael Lauria ultimately admitted that she received payments on for marketing and advertising services that Snouthound never performed on behalf of Simon.

### PR Works

112.    PR Works is an unregistered fictitious business entity owned by or associated with Snouthound and Rachael Lauria.  Ms. Lauria and Mr. Lauria also retained an interest in Snouthound.

113.    Snouthound's website self-described Snouthound as being "established in 2001" with an "experienced staff of 6 Public Relations Specialist[s]."  PR Works also shares the same address as Snouthound and Rachael Lauria, 3358 Hamlet Loop, Winter Park, Florida, 32792.

114.    Contrary to its website's self-description, PR Works has no employees. Additionally, Ms. Lauria and/or Rachael Lauria created the website to give the appearance of legitimacy to PR Works, as to circumvent Simon's Policies and Procedures and conceal her and her family's interest in PR Works.

115.    Ms. Lauria awarded PR Works Service Agreements and various "marketing and advertising" work which was duplicative of work she awarded to Snouthound, including but not limited to public relations services in Columbia, Venezuela, Puerto Rico, Brazil, Chile, Peru and the United Kingdom.

116.    PR Works' Service Agreements with Simon identified "Andrea Rodriguez" as the owner of PR Works, who signed the Service Agreements on behalf of PR Works.  "Andrea Rodriguez," however, is yet another fictional persona created by Ms. Lauria or Rachael Lauria to give PR Works the appearance of legitimacy to circumvent Simon's Policies and Procedures to conceal Ms. Lauria and her family's interest in PR Works.

117.    Ms. Lauria approved costs invoiced from PR Works in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

118.    PR Works received monthly payments from Simon for marketing and advertising services allegedly performed from approximately October 2007 to March 2010, totaling in excess of $86,000.  PR Works, however, failed to perform the marketing and advertising work awarded by Ms. Lauria, or charged exorbitant fees for little to no services to Simon, such that Ms. Lauria, Mr. Lauria, Rachael Lauria and Snouthound received an improper financial gain, causing injury to Simon.

119.     At all times, Ms. Lauria, Mr. Lauria Rachael Lauria and Snouthound were aware that PR Works failed to perform the marketing and advertising work which Ms. Lauria awarded PR Works, or that PR Works charged exorbitant fees for little to no services.

## The Image Companies

120.     Ms. Lauria engaged Herman, Deming and Takio on the basis that the Image Companies would provide marketing and advertising services on behalf of Simon, including brochure rack distribution, concierge events, printing services, website advertising and representation at trade shows.  The marketing and advertising work was duplicative of services already provided by other vendors or allegedly provided by the Lauria Companies.

121.     Simon paid Image Marketing on a monthly basis for various marketing and advertising services allegedly performed from approximately January 2004 until Simon terminated Ms. Lauria, totaling in excess of $1,000,000.  Services invoiced by Image Marketing, such as a Service Agreement Ms. Lauria valued at $18,000/annum for a vehicle signage package on two separate vans wrapped with the Florida Mall logo, and the alleged brochure rack distribution advertising Simon's Malls at rest areas along Interstates 4, 75, 95 and Routes 2A and 2B, and in hotels located in tourist areas of Florida, were either not performed, non-existent or Image Marketing charged Simon exorbitant fees for little to no services.

122.     Simon paid Event Planners on a monthly basis for various marketing and advertising services allegedly performed from approximately January 2005 to May 2008, totaling in excess of $286,000.  Despite the exorbitant fees Event Planners invoiced to Simon, Event Planners never commenced operations after incorporation, and never performed any of the services invoiced to Simon.  Herman and Deming intended Event Planners to be a company that

provided theme park tickets and services for guests.  Event Planners, however, had no phone number associated with it, no printed materials, such as business cards, and had no employees.

123.    Simon paid DT Printing on a monthly basis for various marketing and advertising services allegedly performed from approximately July 2008 to June 2009, totaling in excess of $44,000.  Services invoiced by DT Printing Solutions were either not performed, non-existent or the DT Printing Solutions charged Simon exorbitant fees for little to no services.

124.    Simon paid Hat Marketing on a monthly basis for various marketing and advertising services alleged performed from approximately January 2005 to July 2011, totaling in excess of $167,000.  Services invoiced by Hat Marketing were either not performed, non-existent or Hat Marketing charged Simon exorbitant fees for little to no services.

125.    Simon paid Pointe Distribution on a monthly basis for various marketing and advertising services alleged performed from approximately January 2009 to July 2011, totaling in excess of $107,000.   Services invoiced by Pointe Distribution, such as brochure rack distribution, were either not performed, non-existent or Pointe Distribution charged Simon exorbitant fees for little to no services.

126.    Simon paid Takitik on a monthly basis for various marketing and advertising services allegedly performed from approximately May 2008 to July 2011, totaling in excess of $191,000.  Services invoiced by Takitik, such as Takio Kids Eat Free, were either not performed, non-existent or the Image Companies charged Simon exorbitant fees for little to no services.

127.    Simon paid EDL on a monthly basis for various marketing and advertising services alleged performed from approximately March 2010 to July 2010, totaling in excess of $11,000.  EDL never performed any of the services invoiced to Simon.  Significantly, EDL existed solely to provide asphalt and paving services, which have no relation to services Simon

would be interested in acquiring.  EDL accepted payment from Simon for services EDL did not perform, purportedly so that Herman could hide the monies received from Simon from Deming and Takio, Herman's business partners.  EDL contemporaneously drafted checks to Herman individually for the monies received from Simon.

128.   Simon paid Florida Tourism on a monthly basis for various marketing and advertising services alleged performed from approximately January 2005 to April 2008, totaling in excess of $407,000.  Services invoiced by Florida Tourism were either not performed, non-existent or Florida Tourism charged Simon exorbitant fees for little to no services.

129.   Simon paid Target Distribution on a monthly basis for various marketing and advertising services alleged performed from approximately January 2011 to June 2011, totaling in excess of $17,000.  Services invoiced by Target Distribution were either not performed, non-existent or Target Distribution charged Simon exorbitant fees for little to no services.

130.   Simon paid TJI on a monthly basis for various marketing and advertising services alleged performed from approximately December 2007 to March 2010, totaling in excess of $80,000.  Services invoiced by TJI were either not performed, non-existent or TJI charged Simon exorbitant fees for little to no services.

131.   Herman, Deming and/or Takio individually, or by and through the Image Companies, paid Ms. Lauria and/or the Lauria Companies significant "kickbacks" in exchange for the marketing and advertising work that Ms. Lauria awarded to the Image Companies.

132.   At all times, Ms. Lauria was aware that the Image Companies did not perform the marketing and advertising services which she awarded the Image Companies.  Nonetheless, Ms. Lauria authorized payment to the Image Companies.

133.    For each and every business encompassed by the Image Companies in which Herman, Deming and/or Takio served as a Director/Officer, Herman, Deming and/or Takio dominated and controlled each business to such an extent that its independent existence was in fact non-existent.  Herman, Deming and/or Takio engaged in improper conduct by commingling their personal finances with the corporate finances of certain entities encompassed by the Image Companies, or improperly diverted funds to themselves which were paid to the Image Companies by Simon for little to no services.  Herman, Deming and/or Takio also used the corporate form of the Image Companies for their own personal benefit to receive an improper financial gain to mislead or perpetrate fraud upon Simon, thus rendering the Image Companies a mere instrumentality of Herman, Deming and/or Takio.

<u>**Deming Kids Eat Free and Takio Kids Eat Free**</u>

134.    Deming, through Image Marketing of Florida, LLC, established Deming Kids Eat Free in February 2008 and Takio, through Takitik, established Takio Kids Eat Free in October 2009 as a service whereby restaurants were targeted as locations where children could eat free when an adult paid for a meal at each respective restaurant listed on a card issued by Deming Kids Eat Free or Takio Kids Eat Free.

135.    Restaurants paid Image Marketing and/or Takitik for participation in Deming Kids Eat Free and Takio Kids Eat Free, or the restaurants already permitted children to eat free with a paying adult without the Deming Kids Eat Free card or the Takio Kids Eat Free card. Customers then purchased the cards from Image Marketing and/or Takitik.

136.    Despite that Simon operates no restaurants, Image Marketing and/or Takitik invoiced Simon exorbitant fees for Deming Kids Eat Free and/or Takio Kids Eat Free on a

quarterly basis until Ms. Lauria's termination, such that Ms. Lauria, Mr. Lauria, Deming and Takio received an improper financial gain, causing injury to Simon.

137.    Ms. Lauria approved costs invoiced from Image Marketing and Takitik in her capacity as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

138.    At all times, Ms. Lauria, Mr. Lauria, Deming and Takio were aware that Deming Kids Eat Free and Takio Kids Eat Free provided no services to Simon for the payments they received from Simon.

139.    Image Marketing and Takitik paid Ms. Lauria and/or the Lauria Companies kickbacks in exchange for the exorbitant fees they received for no services to Simon.

## The Fraudulent Schemes

140.    During her tenure with Simon in her positions as the Regional Director of Marketing for Florida and Vice-President, Mall Marketing for the Florida and Puerto Rico Regions, Ms. Lauria engaged in a pattern and practice of fraudulent activities designed to misappropriate and steal funds from Simon in direct violation of her fiduciary duties to Simon and Simon's Policies and Procedures.  Ms. Lauria also conspired with the other Defendants to commit these unlawful acts.

141.    The Defendants all participated in the fraudulent schemes to improperly divert funds from Simon.  The fraudulent schemes were accomplished by and through using the Lauria Companies and the Image Companies.  In July 2008, Ms. Lauria announced her "Tourism" program, which was mandatory for all of Simon's Malls that she managed.  The Tourism program included services allegedly to be provided by the Lauria Companies and the Image Companies.

142.     The Marketing Directors from each Simon Mall that Ms. Lauria managed had either no control or limited spending authority on the tourism budget established by Ms. Lauria. Additionally, Ms. Lauria controlled how the tourism budgets were spent and what businesses were paid by Simon.  Ms. Lauria charged almost every expense from the Lauria Companies and the Image Companies as a shared expense allocated between the Malls she managed.

143.     Ms. Lauria generally valued marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies at less than $5,000 per transaction as to avoid heightened scrutiny for approval of her transactions pursuant to the Competitive Bidding Procedures and the Purchasing Card Procedures.

144.     Ms. Lauria did not engage in the competitive bidding process as required by Competitive Bidding Procedures and did not document why she chose the Lauria Companies or the Image Companies to provide marketing and advertising services to Simon.  On occasion, Ms. Lauria drafted letters to her personal files alleging that the competitive bidding process could not be used with certain vendors, such as XLM Marketing, Excell, XLM Excell and Pointe Distribution, because these companies purportedly owned exclusive rights to the racks they owned at rest areas along Interstate highways and in hotels located in tourist areas in Florida. The companies, however, did not own any racks and did not have proprietary rights to distribute any brochures to the racks located at rest areas along Interstate highways and in hotels located in tourist areas in Florida.

145.     At all times, Ms. Lauria was aware that the Lauria Companies and Image Companies did not own any racks and did not have proprietary rights to distribute any brochures to the racks located at rest areas along Interstate highways and in hotels located in tourist areas in

Florida because she had awarded legitimate Service Agreements for these same services to non-parties to this action.

146.    Ms. Lauria directed Herman, Deming and/or Takio to establish new business entities or utilize the existing Image Companies as shell entities to receive payments from Simon for marketing and advertising work alleged performed.   The shell entities ultimately paid kickbacks to the Lauria Companies.

147.    On occasion, Ms. Lauria provided Herman, Deming and/or Takio with her company credit card authorization information and directed the individuals as to how to run and allocate the charges through her company credit card for the marketing and advertising services the Image Companies allegedly performed for Simon.

148.    Subsequent to her termination from Simon, Ms. Lauria admitted that Herman established the numerous entities associated with the Image Companies to "run money" for income tax evasion purposes.  Ms. Lauria further admitted that Herman requested that she forge Service Agreements for the marketing and advertising work she awarded to the Image Companies to "legitimize" the numerous entities Herman, Deming and/or Takio were using to invoice Simon.

149.    To carry out Herman's request and the fraudulent schemes, Ms. Lauria created fabricated Service Agreements by cutting the signature block of Ms. Lauria's superior from a valid and approved Service Agreement and pasting it onto Service Agreements with the Lauria Companies and the Image Companies.  Ms. Lauria would then photocopy the Service Agreement to avoid suspicion that the signature was a forgery.

150.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio created fraudulent invoices on computers, and submitted same to Simon, via U.S. Mail and

email, for payment for marketing and advertising services awarded by Ms. Lauria. Each time the Lauria Companies or the Image Companies submitted invoices for payment,Ms. Lauria would use her company credit card to make payment or authorize a company check to pay for such services in violation of Simon's Policies and Procedures.

151. Ms. Lauria, Mr. Lauria, Ms. Lagi and/or Rachael Lauria also created merchant accounts through PIPELINE DATA, INC. and SECUREPAY.COM, INC. that were linked to the bank accounts of Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, RJL, Arnell and/or Snouthound in order to receive electronic payments from Ms. Lauria's company credit card for marketing and advertising services allegedly performed by the Lauria Companies.

152. Following her termination from Simon, Ms. Lauria admitted that she used funds fraudulently obtained from Simon to pay operating expenses on an office building owned by non-party, ORANGE THORPE INVESTMENTS, LLC, a Florida limited liability company operated by, among others, Ms. Lauria and Mr. Lauria.

## Simon's Discovery of the Fraudulent Schemes

153. On or about June 27, 2011, Simon received an email from a former employee of Image Marketing, alleging numerous improper and fraudulent activities by Ms. Lauria, the Lauria Companies and the Image Companies.

154. The former employee alleged that Image Marketing was charging Simon up to ten times as much for its services as it charged other clients for comparable services, and that Ms. Lauria received kickbacks from the Image Companies for her role in awarding the Image Companies marketing and advertising services which they allegedly provided to Simon.

155. Upon receiving the email, Simon began an investigation into Ms. Lauria, all Services Agreements for marketing and advertising services that she awarded to any vendor or

supplier in Florida or Puerto Rico, the businesses allegedly performing these services and all purchases Ms. Lauria authorized on her company credit card.

156.    During the investigation, Simon discovered Ms. Lauria's interest in the Lauria Companies, the forged and fraudulent Service Agreements with the Lauria Companies and the Image Companies, the forged and fraudulent invoices from the Lauria Companies and the Image Companies and the damages Simon had sustained through the wrongdoing of the Defendants.

157.    Based upon the fraud uncovered during Simon's investigation of Ms. Lauria, Simon initially suspended and subsequently terminated Ms. Lauria in August 2011 for her role in the schemes to defraud Simon.

158.    Simon has performed all general and statutory conditions precedent hereto or such conditions have occurred or been waived.

159.    Simon has retained the law firm of Baker & Hostetler LLP and has agreed to pay it a reasonable fee for its services.  Simon is entitled to recover its attorneys' fees and costs.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (Ms. Lauria)

160.    Simon reincorporates by reference Paragraphs 1 through 159 above, as if fully stated within this Count.

161.    Ms. Lauria had no employment contract with Simon.

162.    Simon reposed a high level of trust and confidence in Ms. Lauria.  By virtue of her position as Vice-President, Mall Marketing for the Florida and Puerto Rico Regions, Ms. Lauria had a fiduciary relationship with Simon.  In performing duties of her position, Ms. Lauria agreed to abide by Simon's Policies and Procedures.

163.     Ms. Lauria breached the fiduciary duty she owed to Simon when she failed to disclose her or her family's interest in the Lauria Companies; awarded marketing and advertising services to be allegedly provided by the Lauria Companies and the Image Companies when she knew the Lauria Companies and the Image Companies would either not provide any of the services or charge exorbitant fees for  little to no services; created fraudulent invoices and Service Agreements on behalf of the Lauria Companies; created fraudulent Service Agreements on behalf of the Image Companies; authorized payment to the Lauria Companies and the Image Companies for marketing and advertising services that were not provided to Simon; and paying for fraudulent invoices and Service Agreements on her company credit card and by company check, which represented marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies.

164.     Ms. Lauria's breach of her fiduciary duty was the proximate cause of damages to Simon in excess of $3,000,000.

**WHEREFORE**, Plaintiff, SIMON  PROPERTY  GROUP,  INC., demands judgment against Defendant, LYNNETTE LAURIA, for damages, interest, costs, and such further relief as the Court deems just and proper.

### COUNT II
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Mr. Lauria, Ms. Lagi, Rachael Lauria,
Herman, Deming, Takio, RJL, Arnell, Snouthound)**

165.     Simon reincorporates by reference Paragraphs 1 through 164 above, as if fully stated within this Count.

166.     At all times, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming, Takio, RJL, Arnell and Snouthound had knowledge that Ms. Lauria breached the fiduciary duty she owed to Simon.

167.    Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming, Takio, RJL, Arnell and Snouthound provided substantial assistance or encouragement to Ms. Lauria by acting with severe recklessness or conscious intent to aid Ms. Lauria in her efforts to breach the fiduciary duty she owed to Simon.   More specifically, the Defendants created fraudulent invoices for marketing and advertising services alleged provided by them on behalf of Simon and/or received payment for marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies while having knowledge that the Lauria Companies or the Image Companies did not provide any services to Simon or provided little to no services in exchange for exorbitant fees.

**WHEREFORE**, Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, TIMOTHY HERMAN, RYAN DEMING, DALE TAKIO, RJL SERVICES, LLC, ARNELL INC. and SNOUTHOUND ENTERPRISES, LLC for damages, interest, costs, and such further relief as the Court deems just and proper.

### COUNT III
### FRAUD
### (All Defendants)

168.    Simon reincorporates by reference Paragraphs 1 through 159 above, as if fully stated within this Count.

169.    To perpetrate the fraud on Simon, the Defendants made numerous false statements concerning a specific material fact.   The Defendants established shell companies incorporated or organized under Florida law and established registered and unregistered fictitious business entities under Florida law solely as a vehicle by which to receive payments from Simon for marketing and advertising services allegedly provided that were either not performed, non-

existent, or were performed for exorbitant fees for little to no services.  The Defendants also created numerous false invoices and/or Service Agreements, including a forged signature by Ms. Lauria's superior, to receive payment for marketing and advertising services allegedly provided to Simon, such as distribution of brochures to racks along interstate highways and in hotels throughout Florida to advertise Simon's Malls, representation of Simon at concierge hotel events, public relations services, printing services and representation at trade shows globally. Additionally, the Defendants invented fictional personas in an effort to give the appearance that the Lauria Companies were not associated with Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria.

170.   The Defendants made all false statements concerning a specific material fact with the knowledge that each representation was false.  At all times, the Defendants were aware that they did not perform the marketing or advertising services allegedly provided by Simon, that they charged Simon exorbitant fees for little to no services or that they sought duplicative payments from Simon for marketing and advertising services allegedly provided.

171.   The Defendants intended that Simon rely on each false representation concerning a specific material fact.  More specifically, the Defendants intended and expected that Simon make payment for the fraudulent invoices and Service Agreements which they knew represented marketing or advertising services allegedly provided by Simon or represented fees for little to no services to Simon.

172.   Simon sustained consequent damages in excess of $3,000,000 by justifiably acting in reliance on each false representation concerning a specific material fact approved or directed by Ms. Lauria in her positions as Regional Director of Marketing for Florida and Vice-President, Mall Marketing for the Florida and Puerto Rico Regions.

173.    The fraud perpetrated by the Defendants improved their respective personal financial conditions.  The funds obtained from the fraudulent schemes were deposited into bank accounts held by the Lauria Companies or the Image Companies, which Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming or Takio then withdrew or transferred to their own personal bank accounts.

**WHEREFORE**, Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, TIMOTHY HERMAN, RYAN DEMING, DALE TAKIO, RJL SERVICES, LLC, ARNELL INC. and SNOUTHOUND ENTERPRISES, LLC for damages, interest, costs, and such further relief as the Court deems just and proper.

## COUNT IV
## CIVIL CONSPIRACY
### (All Defendants)

174.    Simon reincorporates by reference Paragraphs 1 through 159 above, as if fully stated within this Count.

175.    The Defendants by and through their actions as stated herein are parties to a civil conspiracy and agreed and conspired to do unlawful acts by unlawful means by defrauding and improperly diverting funds from Simon through the purported performance of marketing and advertising services for Simon.

176.    The Defendants intended to and did take overt averts in furtherance of the conspiracy, including but not limited to when:

(a)    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio created fraudulent invoices on computers to request and receive payment from Simon for marketing and advertising services purportedly

performed, with the knowledge that such services had never been performed or were charged to Simon for exorbitant fees for little to no services;

(b) Ms. Lauria forged, submitted and approved Service Agreements on behalf of the Lauria Companies and the Image Companies;

(c) The Lauria Companies and the Image Companies sought duplicative payments for marketing and advertising services purportedly performed or were charged to Simon for exorbitant fees for little to no services;

(d) Ms. Lauria, Mr. Lauria, Ms. Lagi and/or Rachael Lauria created false personas, including "Susan Thomas," "Roberto Jiminez," "S. Elizabeth Laggoon," and "Andrea Rodriguez," and created false websites for Arnell, Snouthound and PR Works in an effort to defraud Simon by making it appearas though Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria has no interest in the Lauria Companies;

(e) Ms. Lauria, Mr. Lauria, Ms. Lagi and/or Rachael Lauria established a merchant account for the sole purpose of receiving money from Simon through the fraudulent acts set forth herein;

(f) The Lauria Companies and the Image Companies received payment from Simon which Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio then diverted to their own personal bank accounts.

177.    The overt actions taken by the Defendants in furtherance of the conspiracy caused damages to Simon in excess of $3,000,000.

**WHEREFORE**, Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI,

RACHAEL LAURIA, TIMOTHY HERMAN, RYAN DEMING, DALE TAKIO, RJL SERVICES, LLC, ARNELL INC. and SNOUTHOUND ENTERPRISES, LLC for damages, interest, costs, and such further relief as the Court deems just and proper.

**COUNT V**
**CONVERSION**
**(All Defendants)**

178.    Simon reincorporates by reference Paragraphs 1 through 159 above, as if fully stated within this Count.

179.    Simon has been deprived of money rightfully belonging to it by the unauthorized fraudulent actions of the Defendants as set forth herein.

180.    The Defendants wrongfully converted and exercised ownership over money belonging to Simon that was wrongfully paid by Simon for marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies.  Simon paid money to the Lauria Companies and the Image Companies for each fraudulent invoice or fraudulent Service Agreement authorized by Ms. Lauria at one time, by one act and in one mass.  Simon paid money to the Lauria Companies and the Image Companies that is specific and identifiable based upon the transaction records of Ms. Lauria's company credit card, the company checks she authorized on behalf of the Lauria Companies and the Image Companies and the bank accounts owned or maintained by the Defendants.

181.    The Defendants took Simon's money with no intention of providing the promised consideration or with the intention that the Lauria Companies or the Image Companies would charge exorbitant fees for little to no services.

182.     Simon has a definite and immediate right to possess the money which the Defendants wrongfully received for marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies.

183.     Simon demanded that the Defendants return the money it wrongfully paid for marketing and advertising services allegedly provided or such demand would be futile

184.     Simon has been damaged in excess of $3,000,000 by the Defendants' deprivation of money rightfully belonging to Simon.

**WHEREFORE**, Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, TIMOTHY HERMAN, RYAN DEMING, DALE TAKIO, RJL SERVICES, LLC, ARNELL INC. and SNOUTHOUND ENTERPRISES, LLC for damages, interest, costs, and such further relief as the Court deems just and proper.

### COUNT VI
### § 772.11 FLORIDA STATUTES
### CIVIL THEFT
### (Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria)

185.     Simon reincorporates by reference Paragraphs 1 through 159 and Paragraphs 179 through 184 above, as if fully stated within this Count.

186.     Simon has been injured by reason of Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria's violation of § 812.014, Fla. Stat. and Ms. Lauria's violation of § 812.019, Fla. Stat.

187.     Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria, in violation of § 812.014, Fla. Stat.,  knowingly obtained, used, or endeavored to obtain or use property valued at $100,000 or more belonging to Simon, with felonious intent to permanently deprive Simon of a right to the property or to appropriate the property for their own use.

188. Ms. Lauria, in violation of § 812.019, Fla. Stat., initiated, organized, planned, financed, directed, managed or supervised the theft of Simon's property and trafficked in such stolen property by distributing money fraudulently obtained from Simon to Mr. Lauria, Ms. Lagi and Rachael Lauria.

189. Simon has a legally recognized interest in the property stolen by Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria.

190. Simon is entitled to threefold the actual damages sustained by reason of Ms. Lauria, Mr. Lauria, Ms. Lagi and Rachael Lauria's violation of § 812.014, Fla. Stat. and Ms. Lauria's violation of § 812.019, Fla. Stat, and reasonable attorneys' fees and costs.

**WHEREFORE**, Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI and RACHAEL LAURIA for damages, interest, costs, and such further relief as the Court deems just and proper.

**COUNT VII**
**18 U.S.C. §1964(c) / 18 U.S.C. §1962(c)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria,**
**Herman, Deming and Takio)**

191. Simon reincorporates by reference Paragraphs 1 through 159 above as if fully stated within this Count.

192. Simon was injured in its business or property by reason of Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio's violation of 18 U.S.C. § 1962(c) as described herein.

193. Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio are persons within the meaning of 18 U.S.C. §1961(3).

194.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio were employed by or associated with an enterprise in a continuing business unit for the common purpose of profiting from fraudulent actions perpetrated upon Simon.

195.    The enterprise was an association-in-fact within the meaning of 18 U.S.C. §1961(4), consisting of Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio, the Lauria Companies, the Image Companies and Takio Kids Eat Free.

196.    At all times relevant, the conduct and activities of the enterprise affected interstate commerce.

197.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio directly or indirectly participated in the operation or the management of the enterprise's affairs through a pattern of racketeering activity, consisting of at least two predicate acts occurring within 10 years of each other.

198.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 to implement numerous predicate acts.  Each violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 represents a separate and distinct violation of 18 U.S.C. § 1962(c).

199.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio violated 18 U.S.C. § 1341 and deceived Simon by knowingly and intentionally using the mails for the purpose of executing a fraudulent scheme or artifice to defraud Simon or by knowingly and intentionally using the mails incident to an essential part of the scheme to defraud Simon. More specifically and without limitation:

(a) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio mailed fraudulent invoices and/or Service Agreements to Simon, the

Lauria Companies, the Image Companies and/or other non-parties to this action, such as J &S Multimedia;

(b) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio mailed information to the Florida Secretary of State to incorporate and organize shell companies under Florida law that existed solely to achieve the fraudulent schemes causing injury to Simon.

200.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio violated 18 U.S.C. § 1343 and deceived Simon by knowingly and intentionally using interstate wires for the purpose of executing a fraudulent scheme or artifice to defraud Simon or by using the mails incident to an essential part of the scheme to defraud Simon.  More specifically and without limitation:

(a) Ms. Lauria used her company credit card to authorize payment to the Lauria Companies and the Image Companies for fraudulent invoices and/or Service Agreements;

(b) Herman, Deming and Takio, at the direction of Ms. Lauria, used Ms. Lauria's company credit card to authorize payment to the Image Companies for fraudulent invoices and/or Service Agreements;

(c) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio used merchant accounts to receive payment for fraudulent invoices and/or Service Agreements which caused financial institutions to electronically deposit funds into their respective bank accounts;

Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio used merchant accounts to receive payment for fraudulent invoices

and/or Service Agreements which caused financial institutions to electronically deposit funds into their respective bank accounts;

(d) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio accessed the Internet to create fraudulent invoices on computers which were emailed to Simon to receive payment for marketing and advertising services allegedly performed by the Lauria Companies and the Image Companies;

(e) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio composed and transmitted email communications to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements;

(f) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio composed and transmitted facsimile communications to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements representing marketing and advertising work allegedly performed;

(g) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio placed telephone calls to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements representing marketing and advertising work allegedly performed;

(h) Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio composed and transmitted text messages to each other, the Lauria

Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements representing marketing and advertising work allegedly performed;

201.    In violating 18 U.S.C. § 1341 and 18 U.S.C. § 1343, Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio used a scheme to defraud and deprive Simon of property consisting of money by trick, deceit, chicane or overreaching.   The scheme to defraud involved misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence, such as co-workers and subordinates of Ms. Lauria that had no knowledge that invoices and/or Service Agreements Ms. Lauria authorized on behalf of the Lauria Companies and the Image Companies were fraudulent.

202.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio made numerous material misstatements of fact with reckless disregard for their truth when they created and/or authorized fraudulent invoices and/or Service Agreements for marketing and advertising work allegedly provided by the Lauria Companies and the Image Companies on behalf of Simon.

203.     Ms. Lauria's nondisclosure of material information concerning her or her family members' interest in the Lauria Companies further constitutes a violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 because Simon's Policies and Procedures placed an affirmative duty on Ms. Lauria to disclose this interest to Simon or avoid self-dealing.

204.    The underlying predicate acts of mail fraud and wire fraud had the same or similar purposes based upon Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio's desire to defraud Simon out of money which they ultimately achieved.  Additionally, the

predicate acts had the same results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics which were not isolated events.

205. The underlying predicate acts were related and occurred over the course of at least four years, a substantial period of time. Moreover, the nature and frequency of the predicate acts reflected the enterprise's regular way of doing business. Additionally, but for Simon receiving the email from the former employee of Image, and subsequent termination of Ms. Lauria, then the fraudulent actions and representations by Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio would have continued.

206. Simon was a target of the fraudulent schemes by virtue of Ms. Lauria's position, and Simon relied to its detriment upon Ms. Lauria when she caused the Lauria Companies' and Image Companies' fraudulent invoices and/or Service Agreements to be approved for payment or when she paid the invoices using her company credit card.

207. Pursuant to 18 U.S.C. § 1964(c), Simon is entitled to threefold the damages sustained and the cost of this action, including reasonable attorneys' fees by reason of the Defendants' violation of 18 U.S.C. § 1962(c).

**WHEREFORE,** Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, TIM HERMAN, RYAN DEMING and DALE TAKIO for damages, interest, costs, and such further relief as the Court deems just and proper.

**COUNT VIII**
**18 U.S.C. §1964(c) / 18 U.S.C. §1962(d)**
**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT**
**(Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria,**
**Herman, Deming and Takio)**

208.    Simon reincorporates by reference Paragraphs 1 through 159, Paragraphs 175 to 177 and Paragraphs 192 to 207 above, as if fully stated within this Count.

209.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio conspired to violate 18 U.S.C. § 1962(c).

210.    The period of the conspiracy began in June 2007 when Simon promoted Ms. Lauria to Vice-President, Mall Marketing for the Florida and Puerto Rico Regions and lasted until July 2011 when Simon terminated Ms. Lauria.

211.    The object of the conspiracy was exact a fraudulent scheme to deceive and defraud Simon of its property when the Lauria Companies and the Image Companies submitted fraudulent invoices and/or Service Agreements to Simon for payment.

212.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio had an agreement to commit the predicate acts of mail and wire fraud.

213.    Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio had knowledge that the predicate acts were part of a pattern of racketeering activity, designed to divert Simon's property to the Lauria Companies, the Image Companies and ultimately Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio.

214.    Simon was injured in its business or property by reason of the Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio's violation of 18 U.S.C. § 1962(d) described herein as a direct and proximate result of Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio's actions complained of herein.

215.    Pursuant to 18 U.S.C. § 1964(c), Simon is entitled to threefold the damages sustained and the cost of this action, including reasonable attorneys' fees, by reason of the Defendants' violation of 18 U.S.C. § 1962(d).

**WHEREFORE,** Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, TIM HERMAN, RYAN DEMING and DALE TAKIO for damages, interest, costs, and such further relief as the Court deems just and proper.

### COUNT IX
### § 668.703, FLORIDA STATUTES
### <u>FLORIDA ANTIPHISHING ACT</u>
### (Herman)

216.    Simon reincorporates by reference Paragraphs 1 through 159 and Paragraphs 169 to 173, above as if fully stated within this Count.

217.    After the former employee of Image Marketing notified Simon of the fraudulent schemes set forth herein, he received an email from "Charles Cauthen – CPA SPI Audit Services," ("Cauthen") purportedly an individual employed by Simon.

218.    Cauthen's email address was identified as ccauthen@simonpropertyinc.com.  The actual email domain name for Simon, however, is @simon.com.

219.    Cauthen directed the former employee not to communication with any Simon employees concerning the fraudulent schemes except himself and to transmit all documents to supporting his allegations concerning the Lauria Companies and the Image Companies to him via facsimile or email.

220.    Cauthen also stated that another purported Simon employee, "Cali Caldwell," ("Caldwell") might communicate with the former employee as part of the investigation into his claims.

221.    In the interim while communicating with Cauthen and Caldwell, the former employee received an email from Simon's Corporate Security Director.

222.   The Corporate Security Director advised the former employee that he was following up with his allegations concerning the Lauria Companies and the Image Companies. The former employee, however, initially refused to communicate with the Corporate Security Director based upon Cauthen's instruction.

223.   Cauthen and Caldwell are non-existent personas created by Ms. Lauria and/or Herman in an effort to divert the former employee's allegations away from Simon.  Records from GoDaddy.com, LLC show that, Herman bought the email domain name @simonpropertyinc.com from GoDaddy.com in June 2011 solely as a means to communicate with the former employee to give the appearance that he was a Simon employee.

224.   Ms. Lauria aided Herman in communicating with the former employee in an attempt to divert the former employee's efforts to bring the fraudulent schemes as described herein to the attention of legitimate personnel for Simon.

225.   Ms. Lauria and Herman acted with intent to engage in conduct involving the fraudulent use or possession of identifying information when they sent or caused to be sent an email to the former employee, a Florida resident, which was falsely represented as being sent from Simon without the authority or approval of Simon.

226.   The email message Ms. Lauria and Herman sent or caused to be sent directly or indirectly induced, requested or solicited the former employee to provide identifying information to Herman.

**WHEREFORE,** Plaintiff, SIMON PROPERTY GROUP, INC., demands judgment against Defendant, TIMOTHY HERMAN for damages, interest, costs, and such further relief as the Court deems just and proper.

Dated: March 14th 2012.                     **BAKER & HOSTETLER LLP**


                                            By:  s/ Coleman W. Watson
                                                 Brian C. Blair, Esq.
                                                 Florida Bar No. 0973084
                                                 bblair@bakerlaw.com
                                                 Brandon T. Crossland, Esq.
                                                 Florida Bar No. 0021542
                                                 bcrossland@bakerlaw.com
                                                 Coleman W. Watson, Esq.
                                                 Florida Bar No. 0087288
                                                 cwatson@bakerlaw.com

                                                 SunTrust Center, Suite 2300
                                                 200 South Orange Avenue
                                                 Post Office Box 112
                                                 Orlando, Florida  32802-0112
                                                 Telephone: 407.649.4000
                                                 Facsimile:  407.841.0168

                                                 Attorneys for Plaintiff


### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been filed electronically using this Court's ECF system, which will send an electronic copy to Kristopher M. Cruzada, Esquire, Nejame, Lafay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A., 189 S. Orange Avenue, Suite 1800, Orlando, FL 32801, this 14th day of March, 2012.


                                                 s/ Coleman W. Watson
                                                 Coleman W. Watson


089191, 000130, 601075621