**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**SIMON PROPERTY GROUP, INC.,**

               **Plaintiff,**

**-vs-**                                                                        **Case No. 6:11-cv-01598-Orl-31KRS**

**LYNNETTE LAURIA, et al.,**

               **Defendants.**
_____/

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration without oral argument on the following motion filed herein:

> **MOTION:** **MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AGAINST DEFENDANTS LYNNETTE LAURIA, RJL SERVICES, LLC, ARNELL, INC., AND SNOUTHOUND ENTERPRISES, LLC (Doc. No. 231)**
>
> **FILED:** **October 26, 2012**

This case comes before the Court on the motion for sanctions filed by Plaintiff Simon Property Group, Inc. ("Simon"), which motion is based on alleged spoliation of evidence by Defendant Lynnette Lauria ("Lauria") and the companies associated with her – Defendants RJL Services, LLC ("RJL"), Arnell, Inc. ("Arnell"), and Snouthound Enterprises, LLC ("Snouthound") (collectively referred to as the "Lauria Companies"). Neither Lauria nor the Lauria Companies had filed a response to the motion as of the writing of this Report and Recommendation, and the time

for responding has passed.[1]  Therefore, the facts on which the motion is based are not controverted and the relief requested is unopposed.

This case has all the elements of a made-for-TV movie: A company vice president surreptitiously awards lucrative business deals to a series of entities that she and her immediate family members control.  To cover up the egregious self-dealing, she fabricates multiple fictitious personas and then uses those fictitious personas to "communicate" with her employer on behalf of the entities she controls.  She also cut-and-pastes her supervisor's signature onto service agreements in an attempt to make it seem as if her activities have been approved.  After several years, a whistleblower exposes the scheme to the company.  The company then tells the vice president that she is being investigated and warns her not to destroy any documents or evidence.  Sensing that her scheme is about to collapse around her and wanting to cover her tracks, the vice president then travels to the East Coast of Florida and throws her laptop computer containing information about these activities into a river.

As improbable as they may be, these are the admitted and undisputed facts underlying the motion for sanctions.  Simon asks that the Court find that Lauria and the Lauria Companies intentionally and in bad faith spoliated evidence crucial to this lawsuit and enter a default against Lauria on Counts I and III-VIII of the Second Amended Complaint and against RJL, Arnell, and Snouthound on Counts II-V of the Second Amended Complaint.  Doc. No. 231 at 25.  In the alternative, Simon asks that the Court give an adverse inference instruction against Lauria and the

---

[1] Counsel for Lauria and the Lauria Companies received notice of Plaintiff's motion for sanctions and, thereafter, filed a document in the case joining in co-defendants' opposition to another motion filed by Plaintiff (Doc. No. 237).  Under these circumstances, the failure to respond to the present motion does not appear to have been the result of any excusable neglect.

Lauria Companies to the effect that all the allegations in the Second Amended Complaint are deemed admitted and strike Lauria and the Lauria Companies' affirmative defenses. *Id.* In addition, Simon requests an award of reasonable attorneys' fees and costs incurred as a result of the sanctionable conduct. *Id.*

Simon filed its motion on October 26, 2012. In support of its motion, it filed:

- Excerpts from Lynnette Lauria's deposition (at which she testified on her own behalf and as the corporate representative of the Lauria Companies) (Doc. No. 231-1);

- Simon's Requests for Admission to Lauria and her responses (Doc. No. 231-2);

- Correspondence related to Simon's investigation of Lauria (Doc. Nos. 231-3 through 231-5);

- Simon's First Request for Production of Documents to Lauria (Doc. No. 231-6);

- Excerpts from the deposition of Rachael Lauria (one of Lauria's daughters) (Doc. No. 231-7);

- Lauria's First Amended Answer to Simon's Interrogatories (Doc. No. 231-8);

- Excerpts from the deposition of Robert Lauria (Lauria's husband) (Doc. No. 231-9); and

- Excerpts from the deposition of Sarah Lagi (another of Lauria's daughters) (Doc. No. 231-10).

**I.     BACKGROUND.**[2]

Simon owns and operates shopping malls throughout the United States.  Lauria is a former employee of Simon.  Doc. No. 63 ¶ 27; Doc. No. 127 ¶ 27.[3]  Beginning in 2000, Lauria worked as the Marketing Director for the Florida Mall in Orlando.  *Id.*  In 2005, Simon promoted Lauria to the position of Regional Director of Marketing for Florida.  *Id.*  In 2007, Simon again promoted Lauria to the position of Vice President of Mall Marketing for the Florida and Puerto Rico Regions.  *Id.*  As relevant to the instant lawsuit, in this position, Lauria was responsible for locating outside marketing and advertising companies to provide general marketing services, brochure rack distribution, concierge services to hotels, and other marketing and advertising services.  Doc. No. 63 ¶ 28; Doc. No. 127 ¶ 28.  She was also responsible for negotiating service agreements with these companies.  *Id.*

At some point, Lauria began awarding some of Simon's marketing and advertising work to a series of companies, including RJL, Arnell, Snouthound, and a variety of fictitious business entities, including Marketing Resource Network, XLM Marketing, Excell Services, XLM Excell, and PR Works. Doc. No. 63 ¶¶ 45, 47, 53, 63, 67, 73, 77, 82, 85, 93, 103, 105, 112, 115; Doc. No. 127 ¶¶ 45, 47, 53, 67, 73, 77, 82, 85, 93, 103, 105, 112, 115; Doc. No. 231-1: Deposition of

---

[2] Except where indicated, all statements in this section have been admitted by Lauria.

[3] Simon filed an Amended Complaint on March 14, 2012.  Doc. No. 63.  Defendants Lynnette Lauria, Robert Lauria, Sarah Lagi, Rachael Lauria, RJL, Arnell, and Snouthound (collectively referred to as the "Lauria Defendants") filed their respective answers to the Amended Complaint on May 1 and 2, 2012.  Doc. Nos. 127-133.  Simon subsequently filed a Second Amended Complaint on June 5, 2012, to add the names of some of the other defendants into the *ad damnum* clauses of Counts III, IV, and V.  Doc. No. 147.  The Second Amended Complaint was otherwise substantively identical to the Amended Complaint. The Lauria Defendants did not file answers to the Second Amended Complaint, apparently because the changes to the Second Amended Complaint did not involve allegations against them.  Accordingly, this Report and Recommendation cites to the Amended Complaint, Doc. No. 63, and the Lauria Defendants' answers to the original Amended Complaint, Doc. Nos. 127-133, as appropriate.

Lynnette Lauria ("Lauria Dep.") at 184-85.[4]  All of these companies were owned by or associated with Lauria, her husband (Robert Lauria), and/or her daughter (Rachael Lauria).  *Id.*; Doc. No. 231-8 ¶¶ 2-3.  Lauria did not disclose to Simon that she was awarding work to companies that were associated with her or her family members, and she did not require the Lauria Companies to go through Simon's competitive bidding process before awarding them work.  Doc. No. 231-8 ¶ 5; Doc. No. 231-2 at 6, 12 (Request for Admission 57 and response thereto).  She also did not obtain approval from anyone at Simon to award work to the Lauria Companies.  Doc. No. 231-8 ¶ 5.  After awarding the work to the Lauria Companies, Lauria also – in her capacity as a Simon employee – approved invoices for work purportedly performed by the Lauria Companies for Simon.  Doc. No. 63 ¶¶ 49, 55, 68, 77, 85, 97, 106, 117; Doc. No. 127 ¶¶ 49, 55, 68, 77, 85, 97, 106, 117.  In many cases, Lauria herself had created the invoices that she subsequently approved. Lauria Dep. at 34.

Lauria knew that she was not supposed to be doing business with herself without Simon's knowledge.  Lauria Dep. at 106.  To cover up the fact that she was self-dealing, Lauria fabricated several fictitious people – including "Susan Thomas" and "Deborah Batchelor" – to "communicate" with Simon on behalf of the Lauria Companies.  Doc. No. 231-2 at 4-5, 10-11 (Requests for Admission 29-37, 39-41 and responses thereto); Lauria Dep. at 105-06.  Lauria created email accounts for "Susan Thomas" and "Deborah Batchelor" and then sent emails from those accounts to her Simon email address, including emails that contained invoices for payment to the Lauria Companies.  *Id.*  In other words, Lauria sent emails to herself from the "Susan Thomas"

---

[4] For ease of reference, citations to all depositions are to the original deposition transcript page numbers.

Case 6:11-cv-01598-GAP-KRS Document 256 Filed 12/13/12 Page 6 of 19 PageID 2720

and "Deborah Batchelor" personas to give Simon the impression that she was communicating with third parties. Lauria Dep. at 105-06. When asked at her deposition why she did this, Lauria testified, "Because I was not supposed to be doing business with myself without the company knowing." *Id.* Lauria also created service agreements to give her business dealings the appearance of legitimacy. She signed the name of the fictitious person "Susan Thomas" to at least one of these agreements so that she could "hide the identity that [she] was involved with it." Lauria Dep. at 141-42.

In addition to her dealings with the Lauria Companies, Lauria also – in her capacity as a Simon employee – awarded marketing work to a series of companies associated with Defendants Timothy Herman, Dale Takio, and Ryan Deming, including Image Marketing of FLA, Inc., Image Marketing of Florida, LLC, Image Marketing Group, Inc., Event Planners USA, Inc., DT Printing Solutions, LLC, Hat Marketing, LLC, Pointe Distribution, LLC, Takitik, Inc., Deming Kids Eat Free, Takio Kids Eat Free, EDL Management, Florida Tourism Distribution Services, Target Distribution, and TJI (collectively referred to as the "Image Companies"). Lauria fabricated service agreements with some of the Image Companies by cutting-and-pasting the signature of her superior at Simon onto the agreements to give the false impression that they had been approved. Lauria Dep. at 188, 248-61.

Simon alleges that, in 2011, it received an email from a former employee of one of the Image Companies, describing a number of improper and fraudulent activities by Lauria, the Lauria Companies, and the Image Companies. Doc. No. 63 ¶¶153-54. For example, Simon alleges that the whistleblower claimed that Image Marketing was charging Simon up to ten times as much for its services as it charged other clients for comparable services and that Lauria received kickbacks

from the Image Companies in exchange for giving them this business. *Id.* Simon subsequently launched an investigation, during which, it alleges, it discovered Lauria's interest in the Lauria Companies and a number of forged and fraudulent invoices from the Lauria Companies and the Image Companies. *Id.* ¶¶ 155-56.

At some point after the investigation commenced, Lauria and Defendant Timothy Herman purchased the domain name "simonpropertyinc.com." They then emailed the whistleblower from a "simonpropertyinc.com" address, pretending to be a Simon auditor and asking the whistleblower to send them all the information he had provided to Simon. Lauria Dep. at 158-61; Doc. No. 231-2 at 6, 12 (Request for Admission 59 and response thereto). In further response to the investigation, Lauria also placed a false address for one of the Lauria Companies onto a service agreement so that the company would not appear to be associated with her. Lauria Dep. at 141-42. When asked why she did this, she testified:

> A: That was after the audit started and I was trying to defer.
>
> Q: Defer what?
>
> A: Defer any – maybe defer is not the right word. The audit had started and I was just trying to cover.
>
> Q: Okay. Your tracks?
>
> A: Yes.

*Id.* at 142.

On August 1, 2011, Simon met with Lauria to inform her that she was being suspended.[5] At that meeting, Simon hand-delivered preservation demand letters to Lauria for the Lauria Companies and the fictitious business entities operated by Lauria (Marketing Resource Network, XLM Marketing, Excell Services, XLM Excell, and PR Works). Doc. No. 231 at 2. Those preservation demand letters notified Lauria and the Lauria Companies that Simon was launching an audit because it believed that it had paid for services that were not performed and/or were billed in violation of contract terms. Doc. No. 231-3 at 1-7. The letters also notified Lauria and the Lauria Companies that the Lauria Companies were "<u>not to destroy, conceal, or alter</u> any paper or electronic files and other data generated by and/or stored on [their] computers and storage media . . . , or any other electronic data." *Id.* They stated, "Failure to comply with this notice and the terms of the contract may result in an action for breach of contract and potential liability for spoliation of evidence." *Id.* Simon also sent the letters to the Lauria Companies and the fictitious entities' addresses of record via overnight mail. *Id.*; Doc. No. 231 at 4 n.3.

On August 5, 2011, Simon received a letter from an attorney purporting to represent Lauria with regard to Simon's audit. Doc. No. 231-4. On August 8, 2011, Simon terminated Lauria's employment for the activities at issue in this lawsuit. Doc. No. 231-5.

The next day[6], Lauria admittedly took her personal laptop computer – which contained business records for the Lauria Companies  –  to East Florida and threw it in the river near Satellite

---

[5] The facts in this paragraph have been alleged by Simon and supported by documentary evidence. Neither Lauria nor the Lauria Companies offered evidence to counter these allegations. Accordingly, I take them as true for purposes of this Report and Recommendation.

[6] Lauria testified at her deposition that she threw the laptop in the river "[t]he day after [she] was let go." Lauria Dep. at 33.

Beach. Lauria Dep. at 31-34, 106-07, 203, 229-30. When asked why she threw the laptop away, Lauria testified as follows:

> Q: Okay. Why did you throw the laptop away?
>
> A: Because I knew that something was coming down and I just didn't want all the stuff around.
>
> Q: So you were trying to get rid of documentation and e-mails and things?
>
> A: Uh-huh, yes.
>
> Q: That directly related to the lawsuit?
>
> A: Yes. Now, they do, yes.

Lauria Dep. at 32. Although Lauria threw the laptop into the river before Simon filed the instant lawsuit, she admitted that she knew that Simon was investigating her activities at the time that she destroyed the laptop. The record evidence further establishes that Simon had warned her not to destroy any documents or evidence. *Id.*; Doc. No. 231-3 at 1-7.

After Lauria destroyed the laptop, Simon filed suit against her, the Lauria Companies, and a number of other individuals and entities. In the lawsuit, Simon alleges that Lauria was involved in a massive fraud scheme in which she used the Lauria Companies (and other associated entities) to charge Simon exorbitant fees (payments totaling in excess of $1,125,000) for little or no services and direct those fees to herself and her family members. Doc. No. 63 ¶ 44; Doc. No. 231 at 4. It also alleges that Lauria and/or the Lauria Companies received kickbacks in exchange for awarding business to the Image Companies at exorbitant rates (payments totaling in excess of $2 million) for little or no services. Doc. No. 63 ¶¶ 120-132.

Based on these allegations, Simon asserts claims for fraud, civil conspiracy, and conversion against Lauria and the Lauria Companies. It also asserts claims for breach of fiduciary duty, civil theft, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Lauria individually, as well as a claim for aiding and abetting breach of fiduciary duty against the Lauria Companies. Doc. No. 147.

## II. ANALYSIS.

### A. *Spoliation.*

Simon contends that Lauria (individually and as an agent of the Lauria Companies) intentionally and with bad faith spoliated data relevant to this lawsuit. "'Spoliation' is the 'intentional destruction, mutilation, alteration, or concealment of evidence.'" *Optowave Co. v. Nikitin*, No. 6:05-cv-1083-Orl-22DAB, 2006 WL 3231422, at *7 (M.D. Fla. Nov. 7, 2006)(quoting Black's Law Dictionary 1437 (8th ed. 2004)). Federal law governs the imposition of spoliation sanctions in this case, but state law may be consulted to guide the Court in its analysis. *See Martinez v. Brink's, Inc.*, 171 F. App'x 263, 268 n. 7 (11th Cir. 2006); *Optowave*, 2006 WL 3231422, at * 8 (citing *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)).

Generally, spoliation is established when the party seeking sanctions proves that: (1) the missing evidence existed at one time; (2) the alleged spoliator had a duty to preserve the evidence; and (3) the evidence was crucial to the movant being able to prove its *prima facie* case or defense. *See Optowave*, 2006 WL 3231422, at *8; *Golden Yachts, Inc. v. Hall*, 920 So.2d 777, 781 (Fla. 4th Dist. Ct. App. 2006).

I recommend that the Court find that Simon has shown that spoliation occurred, as discussed in detail below.

-10-

1.     Whether the Evidence Existed.

With respect to the first element, the evidence submitted by Simon establishes that evidence relevant to this lawsuit was stored on the laptop that Lauria destroyed. Indeed, Lauria admitted as much. During her deposition, Lauria testified (as a corporate representative for RJL) that RJL utilized only one computer to do all of its business – the personal laptop that she threw in the river. She further testified that her laptop contained an Excel spreadsheet that recorded RJL's business activities, including receipts and business expenditures. Lauria Dep. at 31-34, 106-07. Lauria admitted that neither she nor RJL has a copy of that spreadsheet. *Id.* at 106.[7] Likewise, Lauria testified (as a corporate representative for Arnell) that any business records Arnell might have had were stored on the laptop that she threw into the river. *Id.* at 203. Thus, by Lauria's admission, the laptop contained records that would have shown the alleged business activities of RJL and Arnell.

With respect to Snouthound, Lauria testified (as the corporate representative of Snouthound) that it did not have its own computer that it used for billing. *Id.* at 227, 229-30. Lauria's daughter, Rachael (who, on paper at least, was the owner of Snouthound), testified that, although she regularly deposited checks from Simon to Snouthound, she never created any

---

[7] Although Lauria did not explicitly so admit, her deposition testimony also strongly indicates that the laptop contained copies of lists (in spreadsheet form) and mailing labels that would show the hotels to which RJL allegedly distributed promotional materials on behalf of Simon. It also strongly suggests that the laptop contained copies of promotional materials that RJL allegedly distributed to hotels. Lauria Dep. at 94-96, 101. Lauria testified that the paper copies of distribution lists and mailing labels she produced in discovery were not complete or current and that the hotels included on the lists were "by no way all of them." *Id.* at 94-95, 101. Instead, she testified that she had produced what she "could find." *Id.* at 95. Likewise, Lauria testified that she created the promotional materials allegedly distributed by RJL. *Id.* at 95-97. Given that Lauria also testified that all RJL business was conducted on her laptop and absent any contrary evidence from Lauria or RJL, Lauria's deposition testimony is sufficient to establish that the distribution lists, mailing labels, and promotional materials were also contained on the laptop that she threw in the river.

invoices to send to Simon requesting payment. Doc. No. 231-7 at 69. Instead, she assumed that "[her] mother was taking care of that." *Id.* Lauria testified that she did PR work that she billed through PR Works, which was a d/b/a of Snouthound. Doc. No. 231-1 at 227-28, 230. Lauria also admitted that she set up an email address for Snouthound. *Id.* at 230. This evidence is sufficient to establish that Lauria's laptop also contained billing and other records of Snouthound's business activities.

        2.      <u>Duty to Preserve</u>.

Lauria and the Lauria Companies do not dispute that they had a duty to preserve the laptop at the time Lauria threw it in the river in Satellite Beach. Indeed, they cannot do so as a matter of law.

A party has an obligation to retain relevant documents when litigation is reasonably anticipated. *Se. Mech. Servs., Inc. v. Brody*, No. 8:08-CV-1151-T-30EAJ, 2009 WL 2242395, at *2 (M.D. Fla. July 24, 2009); *Optowave*, 2006 WL 3231422, at *7-8 (citing *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126 (S.D. Fla. 1987)). In this case, on August 1, 2011, Simon informed both Lauria and the Lauria Companies that it was initiating a full audit of their marketing and promotional service agreements and that litigation might result. It also directed Lauria and the Lauria Companies not to destroy any evidence. These letters put Lauria and the Lauria Companies on notice that litigation was reasonably anticipated and triggered the duty to preserve. *Optowave*, 2006 WL 3231422, at *10.[8]

---

[8] Simon also submitted evidence strongly suggesting that – regardless of the preservation letters – Lauria, in fact, reasonably anticipated litigation after the August 1, 2011 meeting. Indeed, by August 5, 2011 (four days before the destruction of the laptop), she had hired counsel to represent her. Doc. No. 231-4.

### 3. Whether the Information was Crucial.

Lauria and the Lauria Companies do not dispute that the laptop contained information that was crucial to Simon's ability to prove its *prima facie* case against Lauria and the Lauria Companies. At the heart of all of Simon's claims against Lauria and the Lauria Companies is the contention that the Lauria Companies and the fictitious entities created by Lauria were not performing all (or, perhaps, any) of the services for which Simon was paying and that, even if any of these entities were performing services, they were charging exorbitant rates. Thus, to establish its claims, Simon must be able to show what the Lauria Companies were *actually* doing so that it can compare those activities to the services for which the Lauria Companies and the fictitious entities billed Simon. By Lauria's admission, any records of these business activities that existed were stored in the laptop that she destroyed.

Compounding matters further, Lauria produced in discovery hard copies of documents (in spreadsheet form) purporting to list the hotels to which some of the Lauria Companies distributed promotional materials. She also produced hard copies of some of the promotional materials that were allegedly distributed to the hotels. Doc. No. 231 at 15; Lauria Dep. at 94-97. Simon contends that Lauria and the Lauria Companies did not distribute promotional materials to all (or any) of the hotels on the list. It also contends that Lauria fabricated the promotional materials and the distribution lists after-the-fact, in an attempt to make it seem as if the Lauria Companies provided services to Simon that they did not, in fact, provide. Doc. No. 231 at 15-16. The electronically stored information, including metadata, on the laptop would provide evidence of when these documents were created or that these documents were fabricated at a later date. Similarly, without the information stored on the laptop, Simon does not have evidence necessary to

impeach any testimony Lauria or others might give about the work that the Lauria Companies performed. Therefore, Simon has established that electronically stored information on the laptop is crucial to proving its claims against Lauria and the Lauria Companies.

    *B.*    *Sanctions*.

        1.    <u>Bad Faith</u>.

Simon requests sanctions for the spoliation of the laptop. In this circuit, sanctions for spoliation of evidence are appropriate "only when the absence of that evidence is predicated on bad faith. . . . 'Mere negligence' in losing or destroying the records is not enough for an adverse inference, as 'it does not sustain an inference of consciousness of a weak case.'" *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (quoting *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).

Lauria and the Lauria Companies have not objected to Simon's characterization of the spoliation as being committed in bad faith or offered an alternative explanation for the destruction of the laptop. Indeed, this case appears to present a paradigmatic case of bad faith. After being notified of Simon's investigation into her conduct and the conduct of the Lauria Companies and the duty to preserve evidence, Lauria knowingly and intentionally took the laptop to Satellite Beach and threw it into the river. As evidenced by her deposition testimony, she knew that the laptop contained the only records of the Lauria Companies' business activities and, thus, the primary evidence by which Simon could objectively determine what work (if any) the Lauria Companies performed. There was no negligence or mistake, and there is no innocent explanation for her actions. On the contrary, this is the relatively rare case in which the spoliator admitted that she destroyed evidence because she knew "something was coming down," she "didn't want all that

stuff around," and she was trying to get rid of documentation and emails that were directly relevant to the litigation. Lauria Dep. at 32. Lauria has essentially admitted that she purposely destroyed the laptop to prevent Simon from investigating her activities and the business activities of the Lauria Companies.

The effect of Lauria's actions was to eliminate permanently the main source of objective information about the Lauria Companies' activities, thereby severely prejudicing Simon's ability to prosecute this case and putting it in the position of having to rely on the testimony of an individual who has admitted to fabricating documents and even personas to "cover her tracks" in order to make out its claims. Lauria's act of destroying the laptop (taken on her own behalf and on behalf of the Lauria Companies as their agent) is as flagrant, if not more so, than the actions taken by spoliators in other cases in which federal courts in Florida have found bad faith.

Likewise, the prejudice to Simon is as serious, if not more so, than the prejudice existing in cases in which those courts found bad faith. *See Britton v. Wal-Mart Stores East, L.P.*, No. 4:11cv32-RH/WCS, 2011 WL 3236189, at *13 (N.D. Fla. June 8, 2011) (finding bad faith where spoliator consciously chose to permit video evidence of alleged shoplifting to be destroyed over time by failing to download it, knowing that legal claims relevant to video were forthcoming); *Se. Mech. Servs.,* 657 F. Supp. 2d at 1300 (finding bad faith where spoliators had motive and opportunity to "wipe" data from their Blackberries); *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1281 (M.D. Fla. 2009) (finding bad faith where spoliators failed to direct employees to preserve evidence and, in at least one case, were directly responsible for spoliation by failing to sequester weapons used in incident and instead sending them back to manufacturer for disassembly). Bad

faith such as that present here sustains "an inference of consciousness of a weak case." *Bashir*, 119 F.3d at 931 (quoting *Vick*, 514 F.2d at 737).

Accordingly, I recommend that the Court find that Simon has established that Lauria and the Lauria Companies' acted in bad faith by destroying the laptop and that sanctions are warranted.

### 2. Appropriate Sanctions.

The Court has broad discretion to impose sanctions derived from its inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases. *Flury*, 427 F.3d at 944 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)).[9] The determination of an appropriate sanction should be made on a case-by-case basis. *Optowave*, 2006 WL 3231422, at *12 (citing *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2003)). Sanctions that may be imposed against a defendant for spoliation include, but are not limited to, the following: default judgment, adverse inference or rebuttable presumption instructions to the jury, striking pleadings, and an award of fees and costs incurred by the injured party as a result of the spoliation. *See Flury*, 427 F.3d at 944-45.

Although federal law controls, the Court's opinion on the appropriate sanction may be informed by state law, as long as it is consistent with federal law. *Id*. at 944. Under Florida law, the remedy for a party failing to produce crucial but unfavorable evidence that it destroyed is an adverse inference or discovery sanctions up to and including entry of a default judgment. *See Martino v. Wal-Mart Stores, Inc.*, 908 So.2d 342, 346 (Fla. 2005) (citing *Public Health Trust of*

---

[9] Federal Rule of Civil Procedure 37 also provides a wide range of possible sanctions for abuses of the discovery process. The analysis under Rule 37 and the Court's inherent authority to impose sanctions are essentially the same, and the conclusion in this case would be the same. *See Optowave*, 2006 WL 3231422, at * 12 n. 15.

*Dade Cty. v. Valcin*, 507 So.2d 596, 599 (Fla. 1987) and Fla. R. Civ. P. 1.380 (b)(2)). When determining the severity of the sanctions to impose, the Court considers the following factors: "(1) the willfulness or bad faith of the party responsible for the loss or destruction of the evidence; (2) the degree of prejudice sustained by the opposing party; and (3) what is required to cure the prejudice." *St. Cyr v. Flying J Inc.*, No. 3:06-cv-13-33TEM, 2007 WL 1716365, at *4 (M.D. Fla. June 12, 2007) (citing *Fleury v. Biomet, Inc.*, 865 So.2d 537, 539 (Fla. 2d Dist. Ct. App. 2003); *Sponco Mfg., Inc. v. Alcover*, 656 So.2d 629, 630 (Fla. 3d Dist. Ct. App. 1995)). In the Eleventh Circuit, the most severe sanctions (such as dismissal or default) should be exercised only when there is a showing of bad faith and lesser sanctions will not suffice. *See Flury*, 427 F.3d at 944-45. *See also Telectron*, 116 F.R.D. at 129 (quoting *Wilson v. Volkswagen*, 561 F.2d 494, 503 (4th Cir. 1977)) (default judgment should be imposed only if less drastic sanctions cannot properly redress the wrongdoing).

In this case, Simon seeks an entry of default against Lauria and the Lauria Companies as to the claims asserted against them. Neither Lauria nor the Lauria Companies have objected to Simon's requested sanction. Entering a default is a less severe sanction that entry of a default judgment. Lauria and the Lauria Companies will still maintain the ability to defend on the issue of damages.

Moreover, entering defaults against Lauria and the Lauria Companies is commensurate with the severity of their bad faith and the degree of prejudice to Simon. As explained above, Lauria's conduct represents the essence of bad faith, and the prejudice to Simon is severe. In addition, there is no apparent way to cure the prejudice, as Lauria's actions have – by her own admission – put the records of the Lauria Companies beyond the reach of Simon.

Finally, no lesser sanction will suffice. Indeed, Lauria's actions are at least as flagrant as those of the plaintiff in *Flury v. Daimler Chrysler*, in which the Eleventh Circuit imposed the ultimate sanction of dismissal. In that case, the plaintiff knew that the defendant wished to examine the vehicle that later became the subject of a products liability action. Despite this, the plaintiff allowed the vehicle to be sold for salvage without notification to the defendant. *Flury*, 427 F.3d at 945. In the instant case, Lauria (acting as the agent for the Lauria Companies) knew that Simon wanted to examine all business records of the Lauria Companies as part of its audit. She knew that litigation might be imminent (as evidenced by her receipt of Simon's preservation letters). She knew that she did not want "all that stuff" on her laptop around as Simon began its investigation. Knowing all these things, Lauria, individually and as a representative of the Lauria Companies, deliberately destroyed the information stored in the laptop by driving to another location and throwing the laptop into a river thereby preventing Simon from being able to discover information that would allow it to prove its *prima facie* case. Following the rationale of *Flury*, I recommend that the Court find that the entry of default is an appropriate sanction.

Simon also seeks an award of attorneys' fees and costs as a sanction for the spoliation of electronically stored information contained on the laptop. As mentioned above, an award of attorneys' fees and costs can be an appropriate sanction for spoliation. The record reflects that Simon has expended significant time and incurred costs to develop evidence of Lauria's misconduct on behalf of herself and the Lauria Companies. Therefore, I recommend that the Court award Simon its reasonable attorneys' fees and costs incurred as a result of the spoliation of electronically stored information contained on the laptop.

**III.     RECOMMENDATION.**

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the Court **GRANT** Simon's Motion for Sanctions for Spoliation of Evidence Against Defendants Lynnette Lauria, RJL Services, LLC, Arnell, Inc., and Snouthound Enterprises, LLC.  Doc. No. 231.  I further **RECOMMEND** that the Court **DIRECT** the Clerk of Court to enter a default against Lynnette Lauria as to Counts I and III-VIII of the Second Amended Complaint and to enter defaults against RJL Services, LLC, Arnell, Inc., and Snouthound Enterprises, LLC as to Counts II-V of the Second Amended Complaint.  Additionally, I **RECOMMEND** the Court **ORDER** Lauria and the Lauria Companies to pay Simon the reasonable attorneys' fees and costs it incurred relating to the spoliation motion in an amount either agreed to by the parties or as ordered by the Court.  Finally, I **RECOMMEND** that the Court require Simon to confer with counsel for Lauria and the Lauria Companies in a good faith effort to resolve the amount of attorneys' fees and costs to be paid and, if agreement is not reached, allow Simon to file a motion for assessment of attorneys' fees and costs on those issues within the time established by the Court in its Order on this Report and Recommendation

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on December 13th, 2012.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge and Courtroom Deputy Clerk
Counsel of Record
Unrepresented Party