UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SIMON PROPERTY GROUP, INC., a
Delaware corporation,

      Plaintiff

v.                                                                      Case No. 6:11-cv-1598-ORL-31KRS

LYNNETTE LAURIA, individually and
d/b/a Marketing Resource Network, XLM
Marketing, Excell Services, XLM Excell
and PR Works; ROBERT JAMES LAURIA,
individually d/b/a Marketing Resource
Network, XLM Marketing, Excell Services,
XLM Excell and & PR Works; SARAH LAGI,
individually and d/b/a XLM Marketing;
RACHAEL LAURIA, individually and d/b/a
PR Works; TIMOTHY HERMAN, individually
and d/b/a EDL Management, Florida Tourism
Distribution Services, Target Distribution, TJI;
RYAN DEMING, Individually and d/b/a Florida
Tourism Distribution Services, Kids Eat Free Card,
Target Distribution and TJI; DALE TAKIO,
Individually and d/b/a Kids Eat Free Cards;
RJL SERVICES, LLC, an inactive Florida limited
liability company; ARNELL, INC., an inactive
Nevada corporation, and d/b/a XLM Marketing;
SNOUTHOUND ENTERPRISES, LLC,
a Florida limited liability company; IMAGE
MARKETING OF FLA, INC., a Florida
corporation; IMAGE MARKETING OF FLORIDA,
LLC, an inactive limited liability company;
IMAGE MARKETING GROUP, INC., an inactive
Florida corporation; EVENT PLANNERS USA, INC.,
An inactive Florida corporation; DT PRINTING
SOLUTIONS, LLC, an inactive Florida limited
Liability company; HAT MARKETING, LLC, a
Florida limited liability company; POINTE
DISTRIBUTION, LLC, an inactive Florida limited
Liability company; and TAKITIK, INC., an inactive
Florida corporation,

      Defendants.
_____/

1

**DEFENDANTS RYAN DEMING AND DALE TAKIO'S JOINT MOTION FOR
SUMMARY JUDGMENT AS TO EACH CLAIM ALLEGED BY PLAINTIFF AGAINST
THEM IN THE SECOND AMENDED COMPLAINT [DOC. 147] AND MEMORANDUM
OF LAW IN SUPPORT**

Pursuant to Fed. R. Civ. P. 56, Defendants **RYAN DEMING** ("Deming") and **DALE TAKIO** (Takio")(together "Movants") jointly[1] move for entry of a Summary Judgment in their favor on each claim in the Second Amended Complaint[2] [Doc. 147] alleged by Plaintiff, SIMON PROPERTY GROUP, INC. ("Simon"), against them; Count II-Aiding and Abetting Breach of Fiduciary Duty; Count III-Fraud; Count IV-Civil Conspiracy; and Count V-Conversion; Count VII-R.I.CO.-Mail Fraud; and Count VIII-R.I.CO.-Wire Fraud.  As grounds therefore, Movants will demonstrate unto this Court that upon conclusion of discovery in this matter, there is an absence of evidence on a dispositive issue of each of the claims against Movants for which the Plaintiff bears the burden of proof at trial; therefore Movants are **entitled** to Summary Judgment on each of the counts filed against them in the Second Amended Complaint as a matter of law.

## SECTION I-BACKGROUND

**The following facts alleged in the Second Amended Complaint [Doc. 147] are not in dispute for the purpose of this motion**[3]:

Plaintiff Simon Property Group, Inc. ("Simon") is a publicly traded real estate company which owns and operates malls and retail centers throughout the United States. Defendant, LYNNETTE LAURIA ("Lauria") began her employment with Simon as a marketing director at

---

[1] While certain facts relate specifically to Deming and certain facts relate specifically to Takio, the general allegations contained in the six counts against them as well as the elements of each of the six counts are identical; therefore, for the purpose of conserving judicial resources, the two Defendants are filing a joint motion.  When applicable, specific facts relating to each separate Defendant will be discussed and argued.
[2] Plaintiff's Second Amended Complaint consists of nine (9) separate counts alleged against eighteen separate Defendants.
[3] Much of the language utilized here is quoted from the Magistrate Judge's Order [Doc. 143] on Motions to Dismiss the Amended Complaint filed by Defendants, Deming, Takio, Hat, Takitik, Inc., DT Printing Solutions, LLC, Pointe Distribution, LLC, Image Marketing Group, Inc., Image Marketing of Florida, LLC, and Event Planners USA, Inc.

a mall in New Hampshire.  In 2000 she was transferred to the Florida Mall in Orlando, Florida, where she continued to serve as marketing director. By June 2007, she was promoted to the position of "Vice-President for Mall Marketing for the Florida and Puerto Rico Regions"–a position she held until July 2011.  [Doc. 147 at 7.]  Relevant to the instant case, Lauria's job entailed negotiating service agreements and overseeing the efforts of outside marketing and advertising companies in the region.

Simon's internal policies required that Lauria avoid a "variety of conflicts of interest" in performing her duties, including that she refrain from transacting business with related persons. To enforce these policies Simon required compliance with "certain processes" set forth in Simon's Code of Business Conduct and Ethics; Simon's Competitive Bidding for Field Purchases; Simon's Service Agreement Policy; and Simon's Field Purchasing Card Procedures

For transactions up to $5,000, Lauria was required to "document and support all decisions made, including why vendors and suppliers were chosen." [Doc. 143 at 2.]  For transactions in excess of $5,000, Simon's processes required Lauria to follow additional procedures.

On June 27, 2012, Simon received an email[4] from Thomas Brignolo, using the name "Tommy Versace", making a variety of allegations of wrongdoing naming Lynnette Lauria, Timothy Herman, Image Marketing and Dale Takio as being involved.

As a result, Simon opened an investigation utilizing Dave Donaway, Simon's Director of Corporate Security, as the principal investigator and interviewer, and Karen Davis, Simon's Vice President of Audit Services, to review the financial records of Simon.

---

[4] August 30, 2011, Florida Marketing Investigation Report Preliminary, P 57-58 of 157.

Simon reported a claim to Great American Insurance Company, which had issued Simon a Crime Protection Policy effective January 1, 2011, to January 1, 2012, which included $5,000,000 (after a $250,000 deductible) for Employee Dishonesty Coverage.

On or about August 30, 2011, Dave Donaway, Simon's Director of Corporate Security, and Karen Davis, Simon's Vice President of Audit Services, issued a three volume report, including Florida Marketing Investigation Report Preliminary (157 pages), Florida Marketing Investigation Report Addenda (400 pages), and Marketing Review 2011 Exhibits 1-23 (204 pages).

On September 30, 2011, Simon filed its original Complaint against Lynnette Lauria, Robert J. Lauria, Sarah (Lauria) Lagi, Rachael Lauria and RJL Services, LLC, Arnell, Inc., and Snouthound Enterprises, Inc. ("Lauria Companies")(all said Defendants referred to as the "Lauria Defendants").  Doc. 1.

On November 16, 2011, Simon issued Subpoenas Duces Tecum for records of Hat Marketing, LLC, Takitik, Inc., DT Printing Solutions, LLC, Pointe Distribution, LLC, Image Marketing Group, LLC, and Event Planners USA, Inc., Kids Eat Free Card c/o Dale D. Takio, Owner, DRT Development LLC.

On December 9, 2011, Attorney Jason Herman, who had orally advised Simon's counsel that he represented Timothy Herman December 5, 2011[5], filed a Motion for Enlargement of Time to Respond to Subpoenas Duces Tecum for these entities, thereby entering his appearance on their behalf. [Doc. 41.]

---

[5] See attachment 3 to Doc. 43.

On January 9, 2012, Simon took the deposition of Thomas Brignolo.  At that time the Amended complaint had not been filed; therefore, the only attorneys present at the deposition were counsel for Plaintiff and counsel for the Lauria Defendants.

On March 6, 2012, Karen Davis, Simon's Vice President of Audit Services, executed a Proof of Claim – Fidelity" under oath making a claim for $4,029,605.84 by Simon against Great American Insurance Company's Crime Protection Policy No. SAA 585-86-12-07.

On March 14, 2012, Simon filed its Amended Complaint [Doc. 63] increasing the number of Defendants from seven (7) to eighteen (18), including the following RYAN DEMING, Individually and d/b/a Florida Tourism Distribution Services, Kids Eat Free Card, Target Distribution and TJI and DALE TAKIO, Individually and d/b/a Kids Eat Free Cards (Movants); Takitik, Inc., Pointe Distribution, LLC, DT Printing Solutions, LLC, Hat Marketing, LLC, Image Marketing Group, Inc., Image Marketing of Florida, LLC, and Event Planners USA, Inc.

## SECTION II-THE ALLEGATIONS OF PLAINTIFF'S SECOND AMENDED COMPLAINT, WHICH FORM THE BASIS OF PLAINTIFF'S CLAIMS AGAINST DEMING AND TAKIO

Plaintiff's Second Amended Complaint (hereinafter "Doc. 147") **alleges the following** against Deming and Takio:

1.      Deming conducts business in his individual capacity under the names Florida Tourism, Kids Eat Free Card, Target Distribution and TJI.  Doc. 147, *4, ¶9.

2.      Takio conducts business in his individual capacity under the name Kids Eat Free Cards.  Doc. 147, *4, ¶10.

3.      Plaintiff aggregated Defendants, Image Marketing, DT Printing, EDL, Event Planners, Florida Tourism, Hat Marketing, Deming Kids Eat Free, Takio Kids Eat Free, Pointe Distribution, Takitik, Target Distribution, and TJI as the "Image Companies" Doc. 147, *6, FN2.

4.      [Lynnette] Lauria engaged Herman, Deming and Takio on the basis that the Image Companies would provide marketing and advertising services on behalf of Simon, including brochure rack distribution, concierge events, printing services, website advertising and representation at trade shows. The marketing and advertising work was duplicative of services already provided by other vendors or allegedly provided by the Lauria Companies.  Doc. 147, *25, ¶120.

5.      Herman and Deming intended Event Planners [USA, Inc.] to be a company that provided theme park tickets and services for guests. Event Planners, however, had no phone number associated with it, no printed materials, such as business cards, and had no employees. Doc. 147, *25, ¶122-123.

6.      Herman, Deming and/or Takio individually, or by and through the Image Companies, paid Ms. Lauria and/or the Lauria Companies significant "kickbacks" in exchange for the marketing and advertising work that Ms. Lauria awarded to the Image Companies.  Doc. 147, *27, ¶131.

7.      For each and every business encompassed by the Image Companies in which Herman, Deming and/or Takio served as a Director/Officer, Herman, Deming and/or Takio dominated and controlled each business to such an extent that its independent existence was in fact non-existent. Herman, Deming and/or Takio engaged in improper conduct by commingling their personal finances with the corporate finances of certain entities encompassed by the Image Companies, or improperly diverted funds to themselves which were paid to the Image

6

Companies by Simon for little to no services. Herman, Deming and/or Takio also used the corporate form of the Image Companies for their own personal benefit to receive an improper financial gain to mislead or perpetrate fraud upon Simon, thus rendering the Image Companies a mere instrumentality of Herman, Deming and/or Takio.  Doc. 147, *28, ¶133.

8.      Deming, through Image Marketing of Florida, LLC, established Deming Kids Eat Free in February 2008 and Takio, through Takitik, established Takio Kids Eat Free in October 2009 as a service whereby restaurants were targeted as locations where children could eat free when an adult paid for a meal at each respective restaurant listed on a card issued by Deming Kids Eat Free or Takio Kids Eat Free.  Doc. 147, *28, ¶134.

9.      Despite that Simon operates no restaurants, Image Marketing and/or Takitik invoiced Simon exorbitant fees for Deming Kids Eat Free and/or Takio Kids Eat Free on a quarterly basis until Ms. Lauria's termination, such that Ms. Lauria, Mr. Lauria, Deming and Takio received an improper financial gain, causing injury to Simon.  Doc. 147, *28-29, ¶136.

10.      At all times, [Lynnette] Lauria, [Robert J.] Lauria, Deming and Takio were aware that Deming Kids Eat Free and Takio Kids Eat Free provided no services to Simon for the payments they received from Simon.  Doc. 147, *29, ¶138.

11.      During her tenure with Simon in her positions as the Regional Director of Marketing for Florida and Vice-President, Mall Marketing for the Florida and Puerto Rico Regions, [Lynnette] Lauria engaged in a pattern and practice of fraudulent activities designed to misappropriate and steal funds from Simon in direct violation of her fiduciary duties to Simon and Simon's Policies and Procedures. [Lynnette]   Lauria also conspired with the other Defendants to commit these unlawful acts.  Doc. 147, *29, ¶140.

12.      The Defendants all participated in the fraudulent schemes to improperly divert funds from Simon. The fraudulent schemes were accomplished by and through using the Lauria Companies and the Image Companies. In July 2008, [Lynnette] Lauria announced her "Tourism" program, which was mandatory for all of Simon's Malls that she managed. The Tourism program included services allegedly to be provided by the Lauria Companies and the Image Companies.  Doc. 147, *29, ¶141.

13.      At all times, [Lynnette] Lauria was aware that the Lauria Companies and Image Companies did not own any racks and did not have proprietary rights to distribute any brochures to the racks located at rest areas along Interstate highways and in hotels located in tourist areas in Florida because she had awarded legitimate Service Agreements for these same services to non-parties to this action.  Doc. 147, *30-31, ¶145.

14.      [Lynnette] Lauria directed Herman, Deming and/or Takio to establish new business entities or utilize the existing Image Companies as shell entities to receive payments from Simon for marketing and advertising work alleged performed. The shell entities ultimately paid kickbacks to the Lauria Companies.  Doc. 147, *31, ¶146.

15.      [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio created fraudulent invoices on computers, and submitted same to Simon, via U.S. Mail and email, for payment for marketing and advertising services awarded by [Lynnette] Lauria. Each time the Lauria Companies or the Image Companies submitted invoices for payment, [Lynnette] Lauria would use her company credit card to make payment or authorize a company check to pay for such services in violation of Simon's Policies and Procedures.  Doc. 147, *31-32, ¶150.

8

16.    At all times, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming, Takio, RJL, Arnell and Snouthound had knowledge that Ms. Lauria breached the fiduciary duty she owed to Simon[6].  Doc. 147, *34, ¶166.

17.    [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming, Takio, RJL, Arnell and Snouthound provided substantial assistance or encouragement to Ms. Lauria by acting with severe recklessness or conscious intent to aid [Lynnette] Lauria in her efforts to breach the fiduciary duty she owed to Simon. More specifically, the Defendants created fraudulent invoices for marketing and advertising services alleged provided by them on behalf of Simon and/or received payment for marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies while having knowledge that the Lauria Companies or the Image Companies did not provide any services to Simon or provided little to no services in exchange for exorbitant fees.  Doc. 147, *35, ¶167.

18.    To perpetrate the fraud on Simon, the Defendants made numerous false statements concerning a specific material fact. The Defendants established shell companies incorporated or organized under Florida law and established registered and unregistered fictitious business entities under Florida law solely as a vehicle by which to receive payments from Simon for marketing and advertising services allegedly provided that were either not performed, non-existent, or were performed for exorbitant fees for little to no services. The Defendants also created numerous false invoices and/or Service Agreements, including a forged signature by Ms. Lauria's superior, to receive payment for marketing and advertising services allegedly provided to Simon, such as distribution of brochures to racks along interstate highways and in hotels throughout Florida to advertise Simon's Malls, representation of Simon at concierge hotel

---

[6] A description of Lynnette Lauria's breach of fiduciary duty appears in Doc. 147, *34, ¶163.

events, public relations services, printing services and representation at trade shows globally. Additionally, the Defendants invented fictional personas in an effort to give the appearance that the Lauria Companies were not associated with [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi and Rachael Lauria. Doc. 147, *35-36, ¶169.

19.     The Defendants made all false statements concerning a specific material fact with the knowledge that each representation was false. At all times, the Defendants were aware that they did not perform the marketing or advertising services allegedly provided by Simon, that they charged Simon exorbitant fees for little to no services or that they sought duplicative payments from Simon for marketing and advertising services allegedly provided. Doc. 147, *36, ¶170.

20.     The Defendants intended that Simon rely on each false representation concerning a specific material fact. More specifically, the Defendants intended and expected that Simon make payment for the fraudulent invoices and Service Agreements which they knew represented marketing or advertising services allegedly provided by Simon or represented fees for little to no services to Simon. Doc. 147, *36, ¶171.

21.     The fraud perpetrated by the Defendants improved their respective personal financial conditions. The funds obtained from the fraudulent schemes were deposited into bank accounts held by the Lauria Companies or the Image Companies, which [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming or Takio then withdrew or transferred to their own personal bank accounts. Doc. 147, *37, ¶173.

22.     The Defendants by and through their actions as stated herein are parties to a civil conspiracy and agreed and conspired to do unlawful acts by unlawful means by defrauding and

10

improperly diverting funds from Simon through the purported performance of marketing and advertising services for Simon.  Doc. 147, *37, ¶175.

23.     The Defendants intended to and did take overt acts in furtherance of the conspiracy, including but not limited to when:

(a) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio created fraudulent invoices on computers to request and receive payment from Simon for marketing and advertising services purportedly performed, with the knowledge that such services had never been performed or were charged to Simon for exorbitant fees for little to no services;

(b) [Lynnette] Lauria forged, submitted and approved Service Agreements on behalf of the Lauria Companies and the Image Companies;

(c) The Lauria Companies and the Image Companies sought duplicative payments for marketing and advertising services purportedly performed or were charged to Simon for exorbitant fees for little to no services;

(d) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi and/or Rachael Lauria created false personas, including "Susan Thomas," "Roberto Jiminez," "S. Elizabeth Laggoon," and "Andrea Rodriguez," and created false websites for Arnell, Snouthound and PR Works in an effort to defraud Simon by making it appear as though [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi and Rachael Lauria have no interest in the Lauria Companies;

(e) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi and/or Rachael Lauria established a merchant account for the sole purpose of receiving money from Simon through the fraudulent acts set forth herein;

(f) The Lauria Companies and the Image Companies received payment from Simon which [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio then diverted to their own personal bank accounts.

Doc. 147, *37-38, ¶176.

24.     Simon has been deprived of money rightfully belonging to it by the unauthorized fraudulent actions of the Defendants as set forth herein.  Doc. 147, *39, ¶179.

25.     The Defendants wrongfully converted and exercised ownership over money belonging to Simon that was wrongfully paid by Simon for marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies. Simon paid money to the Lauria Companies and the Image Companies for each fraudulent invoice or fraudulent Service Agreement authorized by [Lynnette] Lauria at one time, by one act and in one mass. Simon paid money to the Lauria Companies and the Image Companies that is specific and identifiable based upon the transaction records of [Lynnette] Lauria's company credit card, the company checks she authorized on behalf of the Lauria Companies and the Image Companies and the bank accounts owned or maintained by the Defendants.  Doc. 147, *39-40, ¶180.

26.     The Defendants took Simon's money with no intention of providing the promised consideration or with the intention that the Lauria Companies or the Image Companies would charge exorbitant fees for little to no services.  Doc. 147, *40, ¶181.

27.     Simon has a definite and immediate right to possess the money which the Defendants wrongfully received for marketing and advertising services allegedly provided by the Lauria Companies and the Image Companies.  Doc. 147, *40, ¶182.

28.     Simon demanded that the Defendants return the money it wrongfully paid for marketing and advertising services allegedly provided, or such demand would be futile.  Doc. 147, *40, ¶183.

29.     Simon was injured in its business or property by reason of [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio's violation of 18 U.S.C. § 1962(c) as described herein.  Doc. 147, *40, ¶192.

30.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio were employed by or associated with an enterprise in a continuing business unit for the common purpose of profiting from fraudulent actions perpetrated upon Simon.  Doc. 147, *42, ¶194.

31.     The enterprise was an association-in-fact within the meaning of 18 U.S.C. §1961(4), consisting of [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio, the Lauria Companies, the Image Companies and Takio Kids Eat Free.  Doc. 147, *42, ¶195.

32.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio directly or indirectly participated in the operation or the management of the enterprise's affairs through a pattern of racketeering activity, consisting of at least two predicate acts occurring within 10 years of each other.  Doc. 147, *42, ¶197.

33.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio violated 18 U.S.C. § 1341 and 18 U.S.C. § 1343 to implement numerous predicate acts. Each violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343 represents a separate and distinct violation of 18 U.S.C. § 1962(c).  Doc. 147, *42-43, ¶198.

34.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio violated 18 U.S.C. § 1341 and deceived Simon by knowingly and intentionally using the mails for the purpose of executing a fraudulent scheme or artifice to defraud Simon or by knowingly and intentionally using the mails incident to an essential part of the scheme to defraud Simon. More specifically and without limitation:

> (a) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio mailed fraudulent invoices and/or Service Agreements to Simon, the Lauria Companies, the Image Companies and/or other non-parties to this action, such as J &S Multimedia;

> (b) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio mailed information to the Florida Secretary of State to incorporate and organize shell companies under Florida law that existed solely to achieve the fraudulent schemes causing injury to Simon.

Doc. 147, *43, ¶199.

35.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio violated 18 U.S.C. § 1343 and deceived Simon by knowingly and intentionally using interstate wires for the purpose of executing a fraudulent scheme or artifice to defraud Simon or by using the mails incident to an essential part of the scheme to defraud Simon. More specifically and without limitation:

> (a) Ms. Lauria used her company credit card to authorize payment to the Lauria Companies and the Image Companies for fraudulent invoices and/or Service Agreements;

14

(b) Herman, Deming and Takio, at the direction of Ms. Lauria, used Ms. Lauria's company credit card to authorize payment to the Image Companies for fraudulent invoices and/or Service Agreements;

(c) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio used merchant accounts to receive payment for fraudulent invoices and/or Service Agreements which caused financial institutions to electronically deposit funds into their respective bank accounts;  [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio used merchant accounts to receive payment for fraudulent invoices and/or Service Agreements which caused financial institutions to electronically deposit funds into their respective bank accounts;

(d) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio accessed the Internet to create fraudulent invoices on computers which were emailed to Simon to receive payment for marketing and advertising services allegedly performed by the Lauria Companies and the Image Companies;

(e) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio composed and transmitted email communications to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements;

(f) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio composed and transmitted facsimile communications to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements representing marketing and advertising work allegedly performed;

(g) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio placed telephone calls to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements representing marketing and advertising work allegedly performed;

(h) [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio composed and transmitted text messages to each other, the Lauria Companies, the Image Companies and/or Simon concerning payment for fraudulent invoices and/or Service Agreements representing marketing and advertising work allegedly performed;

Doc. 147, *43-44, ¶200.

36.     In violating 18 U.S.C. § 1341 and 18 U.S.C. § 1343, [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio used a scheme to defraud and deprive Simon of property consisting of money by trick, deceit, chicane or overreaching. The scheme to defraud involved misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence, such as co-workers and subordinates of [Lynnette] Lauria that had no knowledge that invoices and/or Service Agreements [Lynnette] Lauria authorized on behalf of the Lauria Companies and the Image Companies were fraudulent.  Doc. 147, *44, ¶201.

37.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio made numerous material misstatements of fact with reckless disregard for their truth when they created and/or authorized fraudulent invoices and/or Service Agreements for marketing and advertising work allegedly provided by the Lauria Companies and the Image Companies on behalf of Simon.  Doc. 147, *45-46, ¶202.

38.     The underlying predicate acts of mail fraud and wire fraud had the same or similar purposes based upon [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio's desire to defraud Simon out of money which they ultimately achieved. Additionally, the predicate acts had the same results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics which were not isolated events.  Doc. 147, *46, ¶204.

39.     The underlying predicate acts were related and occurred over the course of at least four years, a substantial period of time. Moreover, the nature and frequency of the predicate acts reflected the enterprise's regular way of doing business. Additionally, but for Simon receiving the email from the former employee of Image, and subsequent termination of [Lynnette] Lauria, then the fraudulent actions and representations by [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio would have continued. Doc. 147, *46, ¶205.

40.     Simon was a target of the fraudulent schemes by virtue of [Lynnette] Lauria's position, and Simon relied to its detriment upon [Lynnette] Lauria when she caused the Lauria Companies' and Image Companies' fraudulent invoices and/or Service Agreements to be approved for payment or when she paid the invoices using her company credit card. Doc. 147, *46, ¶206.

41.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio conspired to violate 18 U.S.C. § 1962(c).  Doc. 147, *47, ¶209.

42.     The object of the conspiracy was to exact a fraudulent scheme to deceive and defraud Simon of its property when the Lauria Companies and the Image Companies submitted fraudulent invoices and/or Service Agreements to Simon for payment.  Doc. 147, *47, ¶211.

43.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio had an agreement to commit the predicate acts of mail and wire fraud.  Doc. 147, *47, ¶212.

43.     [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio had knowledge that the predicate acts were part of a pattern of racketeering activity, designed to divert Simon's property to the Lauria Companies, the Image Companies and ultimately [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio.  Doc. 147, *48, ¶213.

44.     Simon was injured in its business or property by reason of the [Lynnette] Lauria, [Robert J.] Lauria, [Sarah] Lagi, Rachael Lauria, Herman, Deming and Takio's violation of 18 U.S.C. § 1962(d) described herein as a direct and proximate result of Ms. Lauria, Mr. Lauria, Ms. Lagi, Rachael Lauria, Herman, Deming and Takio's actions complained of herein.   Doc. 147, *48, ¶214.

<u>SECTION III-DOCUMENTS OF RECORD IN SUPPORT OF
DEFENDANTS RYAN DEMING AND DALE TAKIO'S
JOINT MOTION FOR SUMMARY JUDGMENT</u>

The following documents are being filed as Exhibits of Record ("Ex.") ancillary to the filing of this motion:

Ex. 1.  Affidavit of RYAN DEMING in support of this Motion for Summary Judgment. [This will be referred to as "Deming Aff." followed by the page and paragraph number.]

Ex, 2.  Affidavit of DALE TAKIO in support of this Motion for Summary Judgment. [This will be referred to as "Takio Aff." followed by the page and paragraph number.]

Ex. 3.  November 27, 2012, Deposition of DAVE DONAWAY, Director of Corporate Security for Plaintiff.  [This will be referred to as "DD 11/27/12 Depo." followed by the deposition page and line number.]

Ex. 4.  December 18, 2012, Deposition of DAVE DONAWAY, Director of Corporate Security for Plaintiff.  [This will be referred to as "DD 12/18/12 Depo." followed by the deposition page and line number.]

Ex. 5.  August 30, 2011, Florida Marketing Investigation Report Preliminary (157 pages), Florida Marketing Investigation Report Addenda (400 pages), and Marketing Review 2011 Exhibits 1-23 (204 pages), jointly prepared by DAVE DONAWAY, Director of Corporate Security for Plaintiff, and KAREN DAVIS, Vice President of Audit Services for Plaintiff. [These three (3) volumes (to be filed in subparts within the ECF megabyte limit for the documents, which should approximate five (5) to six (6) subparts for the three (3) volumes) will be referred to in the aggregate as "Simon's August 30, 2011, Investigation Report."]

Ex. 6.  March 6, 2012, three (3) pages "Proof of Loss – Fidelity" issued by Plaintiff, Simon Property Group, Inc., to Great American Insurance Company, executed under oath by KAREN DAVIS, Vice President of Audit Services for Plaintiff on March 6, 2012.  [This will be referred to as "Simon's March 6, 2012, Proof of Loss".] [It is also referred to as Composite Exhibit "C" to Karen Davis's December 17, 2012, deposition.]

Ex. 7.  March 8, 2012, two (2) pages spreadsheet, referring to "Simon Property Group, Inc." "Proof of Loss" "Great American Ins. Co. Policy No.: SAA 585-86-12-07.[7]  [This will be

---

[7] First produced to Movant's counsel December 15, 2012, two (2) days prior to the December 17, 2012, deposition of Karen Davis, Simon's Vice President of Audit Services, appearing in response to a Rule 30(b)(6) Notice of Taking Deposition issued to Simon by the undersigned counsel.

referred to as "Simon's March 8, 2012, Spreadsheet."][It is also referred to as Composite Exhibit "1" to Exhibit "D" to Karen Davis's December 17, 2012, deposition.]

Ex. 8.  Six (6) pages Supplemental Report No. 1 of April 11, 2012, observations prepared by DAVE DONAWAY, Director of Corporate Security for Plaintiff.  [This will be referred to as "DD 4/11/12 Supp. Rpt."]

Ex. 9.  Three (3) pages Supplemental Report No. 2 of September 25, 2012, observations prepared by DAVE DONAWAY, Director of Corporate Security for Plaintiff.  [This will be referred to as "DD 9/25/12 Supp. Rpt."]

Ex. 10. November 28, 2012, Deposition of KAREN DAVIS, Vice President of Audit Services for Plaintiff.  [This will be referred to as "KD 11/28/12 Depo." followed by the deposition page and line number.]

Ex. 11. December 17, 2012, Deposition of KAREN DAVIS, Vice President of Audit Services for Plaintiff.  [This will be referred to as "KD 12/17/12 Depo." followed by the deposition page and line number.]

Ex. 12. Affidavit of Defendant, LYNNETTE LAURIA.[8,9]  [This will be referred to as "Lauria Aff." followed by the paragraph number.]

## SECTION IV-APPLICABLE STANDARD OF REVIEW

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c); accord

---

[8] The Magistrate Judge, noting that this case has all of the elements of a made-for-TV movie noted in her December 13, 2012, Report and Recommendation [Doc.256, *2] that  the facts were "admitted and undisputed" by Defendant, Lynnette Lauria.  Movants suggest that her Affidavit, filed in support of this motion, be considered in the light that said Defendant has been truthful in her sworn September 25, 2012, deposition testimony.
[9] Applicable paragraphs of Ms. Lauria's Affidavit will be referenced (not recited verbatim) in Section VI below.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202  (1986);
*Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is
"material" if, under the applicable substantive law, it might affect the outcome of the case.
*Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole
could lead a rational trier of fact to find for the nonmoving party. *Id*. at 1260. A court must
decide "whether the evidence presents a sufficient disagreement to require submission to a jury
or whether it is so one-sided that one party must prevail as a matter of law." *Id*.; *Anderson*, 477
U.S. at 251-52, 106 S.Ct. at 2512.

The party moving for summary judgment has the burden of proving that: (1) there is no
genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). In
determining whether the moving party has satisfied its burden, the court considers all inferences
drawn from the underlying facts in the light most favorable to the party opposing the motion and
resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct.
2513. The court may not weigh conflicting evidence or weigh the credibility of the parties.
*Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact
finder could draw more than one inference from the facts and that inference creates an issue of
material fact, a court must not grant summary judgment. *Id*.

On the other hand, summary judgment must be granted after adequate time for
discovery[10] "against a party who fails to make a showing sufficient to establish the existence of
an element essential to that party's case, and on which the party will bear the burden of proof at
trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273. To avoid summary

---

[10] The discovery period closes herein on January 2, 2013.

judgment, the opposing party must come forward with specific facts in dispute that are material and of a substantial nature. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Conclusory allegations, evidence that is not significantly probative, and personal opinions will not suffice to defeat a motion for summary judgment. *Johnson v. Fleet Fin., Inc.*, 4 F.3d 946, 949 (11th Cir. 1993). In addition, when a claimant fails to produce "anything more than a repetition of his conclusory allegations", summary judgment for the movant is "not only proper but required." *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir. 1981).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25, 106 S.Ct. at 2553. Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. 477 U.S. at 322, 324-25, 106 S.Ct. at 2552, 2553; *Watson v. Adecco Employment Servs., Inc.*, 252 F.Supp.2d 1347, 1352 (M.D. Fla. 2003). The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

"The law is clear, however, that suspicion, perception, opinion, and belief **cannot** be used to defeat a motion for summary judgment." *LaRoche v. Denny's, Inc.*, 62 F.Supp.2d 1366, 1371 (S.D. Fla. 1999).


## SECTION V-DEPOSITION TESIMONY OF SIMON'S PRINCIPAL WITNESSES DEMONSTRATING THAT PLAINTIFF'S ALLEGATIONS AGAINST DEMING AND TAKIO ARE BASED ON SUSPICION, PERCEPTION, OPINION, BELIEF AND UNSUPPORTED HEARSAY

**The following facts, developed during the depositions of DAVE DONAWAY, Director of Corporate Security for Plaintiff, and KAREN DAVIS, Vice President of Audit Services for Plaintiff, demonstrate the failure of Simon to make a showing sufficient to establish the existence of an element essential to Counts II, III, IV, V, VII and VIII of Plaintiff's claims against Movants, and upon which Plaintiff will bear the burden of proof at trial.** [The abbreviation "P" will be used for "page" and the abbreviation "L" will be used for "line".][**THIS SECTION SHOULD BE READ IN CONJUNCTION WITH SECTION VI BELOW.**]

### MR. DONAWAY'S TESTIMONY:

Dave Donaway is the Director of Corporate Security for Simon.  DD 11/27/12 Depo., P 11, L 22-24.

**Dave Donaway, Director of Corporate Security for Simon, was in charge of the entire investigation as it relates to this case**.  DD 11/27/12 Depo., P13, L P 23, L 9-12.

Dave Donaway put together a portion of Simon's investigative reports.  DD 11/27/12 Depo., P 23, L6-9.

Karen Davis has been the Vice President of Audit Services for Simon since 2007.  KD 11/28/12 Depo., P 66, L 5-6.

**Karen Davis did all the audits on all the invoices and the payments and matched up the work on that.**  DD 11/27/12 Depo., P 23, L25-P24 L 2.

**Mr. Donaway has no idea or personal knowledge if Deming forged any service agreements.** DD 11/27/12 Depo.,  P 19 L 22-24 and P 20, L18-22; P 58, L 3-3.

**Mr. Donaway has no idea or personal knowledge if Takio forged any service agreements.** DD 11/27/12 Depo.,  P 20, L 23-P 21, L 2; P 58, L 14-15.

**Mr. Donaway has no knowledge of any duplicate billing of Simon done by Deming**. DD 11/27/12 Depo.,  P 21 L 5-14.

**Mr. Donaway has no knowledge of any duplicate billing of Simon done by Takio**. DD 11/27/12 Depo.,  P 21, L 15-17.

**When Mr. Donaway was asked what services Deming billed Simon for that he did not perform, Mr. Donaway stated that he did not know and counsel should ask Karen Davis**.  DD 11/27/12 Depo., P 23, L 13-15 and P 244, L 3-7.

**When Mr. Donaway was asked what services Takio billed Simon for that he did not perform, Mr. Donaway stated that he did not know and counsel should ask Karen Davis.** DD 11/27/12 Depo., P 24, L 8-19.

**Mr. Donaway has no knowledge of Deming or Takio drafting any fictitious invoices from Defendant, EVENT PLANNERS USA, INC.**  DD 11/27/12 Depo., P 48, L 11-17.

**Mr. Donaway has no knowledge that Mr. Deming or Mr. Takio in any way created fictitious documents or forged documents.**  DD 11/27/12 Depo., P 59, L 5-9.

**Mr. Donaway discovered no information that Deming or Takio has any knowledge of Simon's policies and procedures for billing, invoicing or payments.** DD 11/27/12 Depo., P 48, L 7-21.

Mr. Donaway has no personal knowledge of any wrongdoing by Hat Marketing, LLC. DD 11/27/12 Depo., P 50, L 1-13.

Mr. Donaway stated that Simon's vendors including counsel's clients would not be bound by Simon's policies and procedures. DD 11/27/12 Depo., P 60, L 21-P 61, L 9.

**The only item which Mr. Donaway investigated that he thought was billed "very, very expensively" amount was the vehicle wrap**[11]. DD 11/27/12 Depo., P 64, L 13-22. Any other question as to exorbitant amounts of bills should be addressed to audit services. DD 11/27/12 Depo., P 64, L 3-10.

The following colloquy between Movant's counsel and Mr. Donaway in his November 27, 2012, deposition sums up Mr. Donaway's involvement in the investigation which led to the pleadings filed in this case:

_____

Page 71 [Q=Question by Movants' Attorney, Craig A. Brand, Esq.]:

```
7 Q. Paragraph 141, makes a really, really general
8 allegation and, then does not follow up on it, and so
9 let me see if you can provide me any insight into this.
10 It states -- and I'm going to quote from paragraph 141.
11 The defendants all -- so my clients are also lumped
12 into this -- participated in the fraudulent schemes to
13 improperly divert funds from Simon. The fraudulent
14 schemes were accomplished by and through using the
15 Lauria companies and the Image companies. In
```

_____

[11] The vehicle wrap billing related only to Defendants, Image Marketing Group, LLC, and Takitik, Inc. In Karen Davis's December 17, 2012, deposition, she states that the vehicle wrap invoices are no longer an issue. See KD 12/17/12 Depo., P 62, L 1-4 and P 102, L 2-9, *infra*.

16 July 2008, Ms. Lauria announced her tourism program,
17 which was mandatory for all the Simon malls that she
18 managed. Kind of sounds sinister in its writing, and
19 I'm not sure if it is talking or meant to focus on
20 Ms. Lauria, Tim Herman, or my clients. So I'm going to
21 ask you; in the course of your investigation, did you
22 find evidence -- and if you did, what would that
23 evidence be that my clients participated in some kind
24 of fraudulent scheme to improperly divert funds from
25 Simon?

Page 72 [A=Answer by Mr. Donaway]:

1 **A. Well, again, it goes back to the audit**
2 **review. That has to be what that is based on. And to**
3 **get into the specifics of that, you would really -- you**
4 **are going to have to sit down and talk to those who**
5 **were involved in that.**
6 Q. And that is not you?
7 **A. No.**
8 Q. That is Karen Davis?
9 **A. Yes.**
10 Q. In the course of your investigation, did you
11 investigate any kind of fraudulent scheme -- and that
12 is a broad term, but I'm using the words that Simon's
13 lawyers use -- did you investigate any kind of
14 fraudulent scheme that just my clients -- I'm speaking
15 only to my clients -- had engaged in against Simon?
16 **A. My investigation of what I did was the**
17 **initial review of all the companies that each one of**
18 **these individual defendants had been involved in,**
19 **either been officers on the corporation or, you know,**
20 **had been doing business with Simon, pulling up some of**
21 **the initial invoices and contracts and all of that**
22 **stuff. But, again, to make that conclusion -- it**
23 **certainly had the appearance of that, to make that**
24 **conclusion, obviously, that had to go through our audit**
25 **service department; that is why the expert Mr. Homme's[12]**

---

[12]   Karen Davis testified in her December 17, 2012, deposition that Mr. Homme (Stoneturn Group LLP) was not brought in until after the March 6, 2012, Proof of Claim had been executed and submitted to Great American Insurance Company.  See KD 12/17/12 Depo., P 95, L 21-P 96, L 1, *infra*.

Page 73:

1 **was brought in to -- even though you disagree with your**
2 **[sic] report -- was brought in to do that. So, again,**
3 **they are the ones that pulled all that together. I had**
4 **very limited -- not access, but I mean, you know, when**
5 **you look at -- and Ms. Davis will be able to explain**
6 **this better during her deposition, you know, the**
7 **process of how all of that works with the invoices and**
8 **the payments and all of that. That is their**
9 **responsibility to do that for me, when they are trying**
10 **to make some type of a claim that I could go in there**
11 **and look at that and put it all together would be -- be**
12 **foolish to try and do that.**
13 **So, again, my involvement putting all of**
14 **these initial reviews of the companies, doing some**
15 **interviews of employees, interviewing Ms. Lauria, and**
16 **interviewing some of the other people that were from**
17 **Simon that were involved, certainly would lead the**
18 **company to believe that there was something going on**
19 **there, so it deserved a closer look by the audit**
20 **service department.**
21 Q. So you were the cogging on the wheel, one
22 source of information?
23 **A. I was one source of information.**
24 Q. And then on to the next?
25 **A. Right.**

Page 74:

1 Q. So in your participating piece, is it fair to
2 say that you, yourself, then would not arrive at any
3 conclusions; you would just forward the information
4 forward?
5 **A. I would, yes. I did not arrive at any**
6 **conclusions to, you know, the entire case.**
7 Q. Did you arrive at any conclusions that my
8 clients improperly diverted monies away from Simon?
9 **A. Me individually? No.**
10 Q. Did you arrive at any conclusion that my
11 clients had engaged in any kind of falsification of
12 documents which were adverse to Simon Properties?
13 **A. Again, that is going to be an answer for --**

```
14 that is going to be a question for Karen Davis.
15 Q. But I'm asking for you; did you arrive at any
16 conclusions?
17 A. I did not arrive at any conclusions, no.
18 Again, I just gathered the information that I had
19 access to and made sure that our audit services
20 department had the information to work off of.
```

_____

**Mr. Donaway did not investigate the payment of kickbacks by shell companies to Lynnette Lauria. That would be a question for Karen Davis**. DD 11/27/12 Depo., P86, L 17-P 87, L 11.

Mr. Donaway testified that there were two emails (of all those he reviewed from Lynnette Lauria's Simon office computer[13]) which purportedly contradicted Takio's deposition testimony that Herman, not Takio, made the billing decisions [DD 11/27/12 Depo., P 37, L 2-P 38, L14]:

(1) An April 1, 2009, email from Tim Herman to Lynnette Lauria, which includes the question: "Also not that we haven't ran enough this morning but Dale was just making sure there will not be a DPS check this month? And when would you like us to run the Florida amount?" and Lynnette Lauria's April 1, 2009, reply which states: "No DTPS right now.  We will see if we can later." [referred to as Exhibit 4 at page 48 of 157 in the Florida Marketing Investigation Report Preliminary portion of Simon's August 30, 2011, Investigation Report]; and

(2) A June 22, 2010, email from Lynnette Lauria (using her lynnettelauria@hotmail.com account) to Takio (using his dtakio@comcast.net account) [Page 72 of 157 in the Florida Marketing Investigation Report Preliminary portion of Simon's August 30, 2011, Investigation Report], which

---

[13] This is not referring to the laptop which Ms. Lauria threw into a river.

Mr. Donaway later admits that this email is **not** evidence that Takio did anything improperly [DD 11/27/12 Depo., P 133, L 13-P 134, L 1].

The sole evidence which Mr. Donaway stated demonstrated that Deming had knowledge of Lynnette Lauria improperly utilizing Simon's Credit Card was an undated hand-written note from Lynnette Lauria [DD 11/27/12 Depo., P 96, L 7-22 and P 134, L 20-P 135, L11.] [referred to as Exhibit 8a at page 78 of 157 in the Florida Marketing Investigation Report Preliminary portion of Simon's August 30, 2011, Investigation Report], which reads:

_____

"Ryan,

I re-did this list & put the approximate day each invoice is processed.   I highlighted the charges.

We can only run a $2000 charge thru the credit card each day to any 1 company.

Lynnette."

_____

Mr. Donaway inserted summaries from his notes in the DD 4/11/12 Supp. Rpt. and the DD 9/25/12 Supp. Rpt., and also inserted summaries of his interviews of Simon's Mall Managers and Marketing Directors of the properties that were under investigation into the Florida Marketing Report Addenda portion of Simon's August 30, 2011, Investigation Report; **however, Mr. Donaway destroyed all notes of the interviews**.  DD 11/27/12 Depo., P 99, L6-P  105, L25; DD 12/18/12 Depo., P 9, L 22-P11, L 6.

All the interviews with the Mall Managers were by telephone.  **There was no testimony from the Mall Managers about Deming or Takio**.  DD 12/18/12 Depo., P 13, L 11-12 and P 14, L 7-18 and P 15, L 5-7.

**Mr. Donaway only checked rack brochure sites at tourist destinations provided by Lynnette and Robert Lauria relating to the Lauria Companies.**  DD 12/18/12 Depo., P 20, L 8-P 21, L 10.

**None of the witnesses interviewed by Mr. Donaway stated that either Takio or Deming knew that Lynnette Lauria tried to steal money from Simon and/or intentionally worked with Lynnette Lauria to try to steal money from Simon**.  DD 12/18/12 Depo., P 25, L 8-14.

**Mr. Donaway states that his reports do not contain any mention that Dale or Ryan personally created fraudulent invoices**.  DD 12/18/12 Depo., 5-10.

**There are no other written reports of Simon's investigation relating to the issues in this case, except Simon's August 30, 2011, Investigation Report, DD 4/11/12 Supp. Rpt., and DD 4/11/12 Supp. Rpt.**  DD 12/18/12 Depo., P 29, L 4-10.

Mr. Donaway and Karen Davis primarily wrote Simon's August 30, 2011, Investigation Report; there may have been some input from other people.  DD 12/18/12 Depo., P 16,  L 12-14.

**<u>Mr. Donaway testified that he had no independent recollection; however, if he had any evidence of the following acts by Deming and/or Takio, it would be in Simon's August 30, 2011, Investigation Report, DD 4/11/12 Supp. Rpt., and DD 4/11/12 Supp. Rpt.</u>:**

A.    Established new business entities or utilized existing Image Companies as shell entities to receive improper payments from Simon for work performed or for kickbacks to the Lauria companies [DD 12/18/12 Depo., P 29, L 22-P 30, L 17];

B.     Had personal knowledge that Tim Herman requested Lynnette Lauria to forge service agreements [DD 12/18/12 Depo., P 31, L 14-22];

C.     Created fraudulent invoices on computers and submitted the same to Simon via U.S. mail or email for payment for marketing and advertising services ordered by Ms. Lauria [DD 12/18/12 Depo., P 31, L 24-P 32, L 17];

D.     Had any knowledge prior to July 2011 that Lynnette Lauria breached her fiduciary duty to Simon [DD 12/18/12 Depo., P 32, L 12-18 and P 33, L 11-14];

E.     Had knowledge that the Image Companies did not provide any services to Simon or provided little or no services in exchange for what's been deemed exorbitant fees [DD 12/18/12 Depo., P 33, L 24-P 34, L5];

F.     Established shell companies incorporated in Florida and established registered or unregistered fictitious business entities as a vehicle by which to receive payments from Simon for marketing and advertising services that were either not performed, not existent, or performed for exorbitant fees for little to no services [DD 12/18/12 Depo., P 34, L 6-14];

G.     Individually or on behalf of any of the other Defendants created numerous false invoices and/or service agreements, including a forged signature by Lynnette Lauria's superior, to receive payment for marketing and advertising services allegedly provided to Simon, such as distribution of brochures to racks along interstate highways and in hotels throughout Florida to advertise Simon malls for concierge services [DD 12/18/12 Depo., P 34, L 17-P 35, L 3];

H.     Individually or on behalf of the corporate defendants that they're part of invented fictitious personas to assist in the perpetration of a fraud on Simon [DD 12/18/12 Depo., P 35, L 5-16];

I.     Had knowledge prior to July 2011 that any of the Defendants did not perform the marketing or advertising services provided to Simon and that Simon was charged money for those services Simon [DD 12/18/12 Depo., P 35, L 18-24];

J.     Individually or on behalf of other Defendants caused any monetary damage to Simon  [DD 12/18/12 Depo., P 35, L 25-P 36, L 3];

K.     Took Simon's money with no intention of providing the promised consideration or with the intention that the Lauria Companies or the Image Companies would charge exorbitant fees for little to no services [DD 12/18/12 Depo., P 36, L 4-10];

L.     Participated in racketeering violations [DD 12/18/12 Depo., P 36, L 11-14];

M.     Would knowingly and intentionally have participated in an enterprise that would cause harm or continuing harm to Simon [DD 12/18/12 Depo., P 36, L 15-P 37, L 1].

### KAREN DAVIS'S TESTIMONY:

**Karen Davis has been Simon's Vice President of Audit Services since 2007.**  KD 11/28/12 Depo., P 66, L 5-6.  She reports to Simon's General Counsel. KD 11/28/12 Depo., P 66, L 8-11.

**She determined the final numbers listed as damages on Simon's March 6, 2012, Proof of Loss.**  KD 11/28/12 Depo., P 8, L 6-17.

She executed Simon's March 6, 2012, Proof of Loss under oath.  KD 11/28/12 Depo., P 16, L 8-13.

StoneTurn Group LLP, Simon's expert witness, did not Assist in formulating the amounts included in Simon's March 6, 2012, Proof of Loss.  KD 12/17/12 Depo., P 95, L 21-P 96, L 1.

**She has no evidence that Takio forged any documents** [KD 11/28/12 Depo., P 21, L 18-21] **or created fictitious persona documents** [KD 11/28/12 Depo., P 21, L 22-P 22, L 4].

**She has no evidence that Deming intentionally signed a document knowing that he was not going to provide services.** KD 11/28/12 Depo., P 33, L 16.

**She doesn't have knowledge of Deming specifically creating false invoices.** KD 11/28/12 Depo., P 37, L 9-10.

She has no knowledge of the business practices of Takio, Takio's companies, Deming and Deming's companies. KD 11/28/12 Depo., P 42, L 2-11.

**She has no corporate records documenting that Ryan Deming, individually or on behalf of any of the other Defendants, caused any monetary damage to Simon Property Group, Inc.** KD 11/28/12 Depo., P 44, L 2-15.

**She's not aware of any Simon vendor policies and procedures violated by Attorney Brand's clients.** KD 11/28/12 Depo., P 54, L 8-13.

**What she provided was "here is what we paid to vendors, here is the description of their services, here is what we paid these based on the description of their services. And then it was for others to determine. Again, we were just providing financial data from our records. We were not drawing any conclusions. That was for someone else."** KD 11/28/12 Depo., P 55, L 6-14.  Consistent: KD 12/17/12 Depo., P 7, L 4-18.

She worked with internal counsel and corporate security (Dave Donaway) on this investigation.  KD 11/28/12 Depo., P 84, L 5-12.

The actual dollars and cents and how things got paid and who got paid came from her department.  KD 11/28/12 Depo., P 84, L 13-23.

She has no documentation or evidence that Mr. Brand's clients knew that Lynnette Lauria was in violation of Simon's policies and procedures. KD 11/28/12 Depo., P 87, L 14-19.

She did not have a list of Image Marketing's rack locations. KD 11/28/12 Depo., P 95, L 21-P 96, L 19.

Exhibits 1-23 included in Marketing Review 2011 Exhibits 1-23 (204 pages) (contained in Simon's August 30, 2011 Investigation Report) were prepared by her. KD 11/28/12 Depo., P 122, L 3-9 and P 122, L 21-25. Consistent: KD 12/17/12 Depo., P 10, L 8-13.

She has nothing showing that Mr. Brand's clients did not perform the services they billed for. She only shows what Simon paid. KD 11/28/12 Depo., P 154, L22-24.

She has no documentation showing that Deming or Takio received any payments directly from Simon. KD 11/28/12 Depo., P 157, L 6-16.

She cannot state anything specific as to "what involvement Ryan Deming personally had in regards to any of the wrongdoing that is being alleged". [Emphasis added.] KD 11/28/12 Depo., P 157, L 17-21.

Simon never wrote a check to Takio or Deming personally and no record of Lynnette Lauria utilizing her credit card to pay Takio or Deming personally. KD 11/28/12 Depo., P 157, L 20-P 158, L 9.

She only checked rack locations relating to Lynnette Lauria's list. She did not check Mr. Brand's clients' rack locations. KD 12/17/12 Depo., P 10, L 18-P 13, L4.

Amounts up to $5,000 could be paid by check or Simon's Procurement Card[14]. KD 12/17/12 Depo., P 14, L 25-P 15, L 7.

In 2009 Ms. Davis's department audited the expenses charged to Lynnette Lauria's Procurement Card and did not find any suspicious activity. KD 12/17/12 Depo., P 18, L 16-23.

**She is not aware of any invoices submitted for Image Marketing Group that were not authorized by Simon's Mall Managers.** KD 12/17/12 Depo., P 20, L 1-5.

**Lynnette Lauria was authorized to use her procurement card to pay vendors a long as the amount fell within the $5,000 limit.** KD 12/17/12 Depo., P 21, L 8-21.

**Lynnette Lauria's expenditures were all approved by her supervisor, Regional Vice President, Lydia Gilmore.** KD 12/17/12 Depo., P 39, L 8-24.

Each of Simon's Malls has a Procurement Card for use by the Mall Manager. KD 12/17/12 Depo., P 40, L 15-25.

**The duty and responsibility of making sure the work on invoices was actually completed was the responsibility of the Simon Mall Manager. There was a procedure in place to follow. There is no written report that Mr. Brand's clients' work was ever not performed.** KD 12/17/12 Depo., P 41, L 16-P 43, L 14.

Simon is no longer challenging the invoicing and payments for the van wraps.[15] KD 12/17/12 Depo., P 62, L 1-4 and P 102, L 2-9.

**Page 60, Line 2, through Page 89, Line 5 of Karen Davis's December 17, 2012, Deposition discuss Simon's March 8, 2012, Spreadsheet as it relates to the determination of damages listed in Simon's March 6, 2012, Proof of Loss. It is readily apparent from the**

---

[14] Also referred to in depositions as "P Card" or "PC".
[15] In paragraph 121 of the Second Amended Complaint, Simon alleges that the Image Companies (without defining which actual Defendant was being accused) improperly billed Simon for two vehicle wraps.

answers of Simon's Vice President of Audit Services that the amount of damages claimed merely listed each and every payment listed on Simon's Audit Department's computer printout which resulted from a query of each and every payment made by Simon to the named entity, without any attempt whatsoever to verify whether the payments were for work properly billed and completed.  Instead, Ms. Davis testified that the March 8, 2012, spreadsheet figures entitled "Amount Estimated to be Fraudulent" formed the basis of what numbers were inserted in Simon's March 6, 2012, Proof of Loss; that is, the Total Paid to Vendor (by Simon) less (for only some of the listed vendors) an **arbitrary** credit figure which she either estimated based on hearsay or received from Simon's legal department as a figure to which she was directed to input.[16]

### SECTION VI-ARGUMENT IN SUPPORT OF GRANTING MOVANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON COUNTS II, III, IV, V, VII AND VIII OF THE SECOND AMENDED COMPAINT

### ARGUMENT AS TO COUNT II-AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

In order to prevail on an action for a claim of aiding and abetting a breach of fiduciary duty, Plaintiff must prove by a preponderance of the evidence: (1) a fiduciary duty on the part of the primary wrongdoer; (2) a breach of this duty; (3) knowledge of the breach by the alleged aider and abetter; and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing. *Sensormatic Electronics Corp. v. TAG Co. US, LLC*, 632 F.Supp.2d 1147, 1192 (S.D. Fla. 2008); *S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Florida, Inc.*, 365 F.

---

[16] Event Planners USA, Inc., Takitik, Inc., Hat Marketing LTD (notice that Hat Marketing, LLC, is not even mentioned in either Simon's March 6, 2012, Proof of Claim or Simon's March 8, 2012, Spreadsheet), and Pointe Distribution, LLC received no credit whatsoever.

App'x 202 (11th Cir. 2010); *Arwood v. Dunn* (*In re Caribbean K Line, Ltd.*), 288 B.R. 908, 919 (S.D.Fla.2002).

"A mere suggestion to another to take action that may be done negligently or non-negligently does not amount to a 'concert of action' between the suggestor and the actor even if that theory of liability is viable in Florida." *Kilgus v. Kilgus*, 495 So. 2d 1230, 1231 (Fla. 5th DCA 1986), rev. denied, 504 So. 2d 767 (Fla. 1987).

To satisfy the substantial assistance element, the plaintiff must prove (1) recklessness and a duty to disclose and/or (2) conscious intent. *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985).

At no time did Lynnette Lauria notify Deming of any of the written policies and procedures of Simon, including, but not limited to, Simon's Code of Business Conduct and Ethics, Simon's Competitive Bidding for Field Purchases Procedures and Simon's Field Purchasing Card Procedures. **Deming Aff., P 4, ¶7.  L. Lauria Aff., P 3, ¶7.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this. They merely have suspicion, perception, opinion, and belief.

At no time did Lynnette Lauria notify Deming that her failure to obtain competitive bids on the services provided by the "Image Companies" and her structuring payments for invoices in order to have any invoices submitted by the "Image Companies" charged to her Simon credit card were in violation of the written policies and procedures of Simon. **Deming Aff., P 4, ¶9. L. Lauria Aff., P 4, ¶9.** Dave Donaway and Karen Davis's deposition testimony states that the only evidence they have to contradict this is <u>an undated hand-written note</u>[17] appearing to be from

---

[17] See Exhibit 8a at page 78 of 157 in the Florida Marketing Investigation Report Preliminary portion of Simon's August 30, 2011, Investigation Report (discussed *supra*)..

Lynnette Lauria to Ryan Deming stating: "Ryan, I re-did this list & put the approximate day each invoice is processed.  I highlighted the charges.  We can only run a $2,000 charge thru the credit card each day to any 1 company.  Lynnette."    Dave Donaway and Karen Davis's deposition testimony demonstrates that the purported inferences Simon attempts to stack as a result of the undated hand-written note are nothing more than suspicion, perception, opinion, and belief and cannot come within any exception to the Hearsay Rule (Fed. R. Evid. Article VIII HEARSAY).

At no time did Deming assist Lynnette Lauria and/or any of the Lauria Companies in violating any of Simon's policies and procedures.    **Deming Aff., P 4, ¶10.  L. Lauria Aff., P 4, ¶10.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Takio has specifically denied that Lynnette Lauria ever informed him of Simon's written policies and procedures.  **Takio Aff., P 3, ¶**7. **L. Lauria Aff., P 3, ¶7.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Takio has specifically denied that Lynnette Lauria ever informed him of Simon's requirement of obtaining competitive bids.  **Takio Aff., P 4, ¶9. L. Lauria Aff., P 4, ¶9.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Takio states that he never knew that Lynnette Lauria was intentionally structuring payments in violation of Simon's policies and procedures.  **Takio Aff., P 4, ¶9, 10; P 6, ¶16.  L. Lauria Aff., P 4, ¶9.**    Dave Donaway and Karen Davis's deposition testimony demonstrates that the purported inferences Simon attempts to stack as a result of a June 22, 2010, email

(attached as Exhibit "1" to Takio's Affidavit) are merely suspicion, perception, opinion, and belief and cannot come within any exception to the hearsay rule (Fed. R. Evid. Article VIII).

At no time did Takio knowingly or negligently assist Defendant, LYNNETTE LAURIA and/or any of the Lauria Companies in violating any of Simon's policies and procedures. **Takio Aff., P 4, ¶11. L. Lauria Aff., P 4, ¶11.** Takio had no knowledge of any billings for allegedly duplicate services provided by any of the Takio Related Companies (or any of the other Defendants in this case). **Takio Aff., P 6, ¶16.  See L. Lauria Aff., P 5-6, ¶15.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this. They merely have suspicion, perception, opinion, and belief.

Movants have provided sufficient facts to controvert Plaintiff's Count II claim and to require Plaintiff to come forward with specific facts of a material and of a substantial nature to demonstrate the elements necessary to prove Deming and Takio have aided and abetted Lynnette Lauria in violating her fiduciary duty to the Plaintiff.   Failing same, the Court must enter summary judgment against the Plaintiff and in favor of each of the Movants on Count II of the Second Amended Complaint.

Wherefore, Defendants, RYAN DEMING and DALE TAKIO, pray that this Court will grant their joint motion for summary judgment on Count II of the Second Amended Complaint.

### ARGUMENT AS TO COUNT III-FRAUD

**Succinctly put, Plaintiff has improperly named these Defendants as parties in this lawsuit**.

In order to prevail on an action for fraud, Plaintiff must establish: (1) Defendant made a false statement regarding a material fact; (2) Defendant knew or should have known the

representation was false; (3) Defendant intended that the representation induce Plaintiff to act on it; and (4) Plaintiff suffered damages in justifiable reliance on the representation. *Webb v. Kirkland*, 899 So. 2d 344, 346 (Fla. 2d DCA 2005); *Essex Ins. Co., Inc. v. Universal Entertainment & Skating Center, Inc.*, 665 So. 2d 360 (Fla. 5th DCA 1995.

The sum and substance of Plaintiff's claim is that Movants knowingly and intentionally created shell entities and  false invoices to Simon in order to collect money from Simon for services they did not perform or they knowingly and intentionally invoiced and collected from Simon an amount of money which exorbitantly exceeded the value of the services actually provided.  Doc. 147, *36, ¶¶169, 170.

Deming had no knowledge of any billings for allegedly duplicate services provided by any of the Deming Related Companies and never knowingly attempted to collect any monies whatsoever from Simon for services not actually provided to Simon (the "duplicate payments"). **Deming Aff., P 5, ¶16. L. Lauria Aff., P 5-6, ¶17.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

At no time did Deming provide individual services or direct bill Simon in his name, nor did Simon make any direct payments to Deming.  **Deming Aff., P 6, ¶18.  L. Lauria Aff., P 6, ¶19.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They do not even have a suspicion, perception, opinion, and/or belief.

At no time did Deming ever pay any kickback to anyone for any purpose whatsoever, including, but not limited to, the purpose of receiving a preference in obtaining work from Simon and/or to obtain approval of any business relationship with Simon, and/or to obtain approval of any billings to or payments from Simon.  **Deming Aff., P 6, ¶19.  L. Lauria Aff., P 6-7, ¶21.**

Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Deming never used any of the Image Companies to obtain an improper financial gain from Simon and he had no knowledge whatsoever that there was any improper financial gain by any Defendants in this lawsuit at the expense of Simon.  **Deming Aff., P 6, ¶20.  L. Lauria Aff., P 7, ¶22.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this. They merely have suspicion, perception, opinion, and belief. [This proves the corporate veil of the corporate Defendants and limited liability company Defendants in this case <u>cannot</u> be pierced to hold Deming individually liable for acts performed in the name of the companies.  ]

The allegation in paragraph 145 of the Second Amended Complaint that the Image Companies did not own any racks and did not have proprietary rights to distribute any brochures advertising Simon and/or any of Simon's Malls is absolutely false.   Deming has personal knowledge and has personally placed marketing materials for Simon and its mall locations in Florida in numerous racks owned by the Image Companies and located in various hotels, motels, and other tourist destinations. **Deming Aff., P 7, ¶22. See also L. Lauria Aff., P 7, ¶24.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They only checked on the existence of the rack locations which Lynnette Lauria and Robert Lauria provided for the Lauria Companies.  They merely have suspicion, perception, opinion, and belief.

At no time did Deming use a computer or any other device to create any fraudulent invoices to submit by mail, electronic mail, in person or otherwise to any officer, director, employee, and/or agent of Simon and/or the Lauria Companies in order to obtain improper

41

payments from Simon.  **Deming Aff., P 7, ¶23.  L. Lauria Aff., P 7-8, ¶25.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Takio had no knowledge of any billings for allegedly duplicate services provided by any of the Takio Related Companies (or any of the other Defendants in this case) or structuring of any payments charged to any Simon credit used by or approved by Lynnette Lauria.  To the knowledge of Takio, all services which Takio performed on behalf of Takitik and/or its subsidiaries were properly and lawfully billed.  **Takio Aff., P 6, ¶16.  See also, L. Lauria Aff., P 5-6, ¶17.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Takio never attempted to collect any monies whatsoever from Simon for services not actually provided to Simon (the "duplicate payments"), and Takio was not aware that any checks were written by the Takio Related Companies for services which were not performed.  **Takio Aff., P 6, ¶17. See also, L. Lauria Aff., P 5-6, ¶17.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

At no time did Takio provide individual services or direct bill Simon in Takio's name, nor did Simon make any direct payments to Takio.  **Takio Aff., P 7, ¶19.  L. Lauria Aff., P 6, ¶19.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They do not even have a suspicion, perception, opinion, and/or belief.

At no time did Takio ever pay any kickback to anyone for any purpose whatsoever, including, but not limited to, the purpose of receiving a preference in obtaining work from Simon and/or to obtain approval of any business relationship with Simon, and/or to obtain approval of

any billings to or payments from Simon.  **Takio Aff., P 7, ¶20. L. Lauria Aff., P 6-7, ¶21.** Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Takio never used any of the Image Companies to obtain an improper financial gain from Simon.  Takio had no knowledge whatsoever that there was any improper financial gain by any Defendants in this lawsuit at the expense of Simon.  **Takio Aff., P 7, ¶21. See also, L. Lauria Aff., P 7, ¶22.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.  [This proves the corporate veil of the corporate Defendants and limited liability company Defendants in this case <u>cannot</u> be pierced to hold Takio individually liable for acts performed in the name of the companies.]

Contrary to Simon's allegation that Simon never received a benefit from the use of the "Kids Eat Free Card", Simon received preferred, prominent and exclusive mall placement of its Orlando's Florida Mall location in the advertising materials furnished to customers receiving the cards and the cards drew tremendous foot traffic to the restaurants located within Simon's Florida Mall, thereby fulfilling its intended purpose. This was for the benefit of the Florida Mall and Simon.  Simon absolutely benefited from participating in and paying to participate in the Kids Eat Free Card program.  Takio has no knowledge whatsoever that any kickbacks were paid to Lynnette Lauria, and/or the Lauria Companies in exchange for Simon participating in the Kids Eat Free Card program.  **Takio Aff., P 7, ¶22.  L. Lauria Aff., P 7, ¶23.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

The allegation in paragraph 145 of the Amended Complaint that the Image Companies did not own any racks and did not have proprietary rights to distribute any brochures advertising Simon and/or any of Simon's Malls is absolutely false.  Takio has personal knowledge that the Image Companies placed marketing materials for Simon and its mall locations in Florida in numerous racks owned by the Image Companies and located in various hotels, motels, and other tourist destinations.  These racks were prominently photographed and displayed on the Image website.  Furthermore, the Plaintiff's star whistle blower, Tommy Brignolo, whose testimony is the entire basis of Simon's case, is prominently photographed in the Image website next to the very racks and Simon brochures which he testified didn't exist and were never delivered.  **Takio Aff., P 7-8, ¶23.  See also, L. Lauria Aff., P 7, ¶24.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

At no time has Takio used a computer or any other device to create any fraudulent invoices to submit by mail, electronic mail, in person or otherwise to any officer, director, employee, and/or agent of Simon and/or the Lauria Companies in order to obtain improper payments from Simon.  Takio was never paid directly by Simon and has no knowledge of any Defendant in this lawsuit receiving improper payments from Simon.  **Takio Aff., P 8, ¶24.  See also, L. Lauria Aff., P 7, ¶25.**  Dave Donaway and Karen Davis's deposition testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

At all times Takio was engaged in providing the creative work involved in the services provided to Simon and/or its malls located in Florida on behalf of the Image Companies.  **Takio Aff., P 8, ¶25.  L. Lauria Aff., P 8, ¶26.**  Dave Donaway and Karen Davis's deposition

testimony states that they have no evidence to contradict this.  They merely have suspicion, perception, opinion, and belief.

Movants have provided sufficient facts to controvert Plaintiff's Count III claim and to require Plaintiff to come forward with specific facts of a material and of a substantial nature to demonstrate the elements necessary to prove either Deming and/or Takio made a false statement to Simon regarding a material fact, which was known or should have known to be false and made with the intention that Simon rely upon and act upon to the detriment of the Plaintiff.  Failing same, the Court must enter summary judgment against the Plaintiff and in favor of each of the Movants on Count III of the Second Amended Complaint.

Wherefore, Defendants, RYAN DEMING and DALE TAKIO, pray that this Court will grant their joint motion for Summary Judgment on Count III of the Second Amended Complaint.

## ARGUMENT AS TO COUNT IV-CIVIL CONSPIRACY

"A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Hogan v. Provident Life & Accident Ins. Co.*, 665 F. Supp. 2d 1273, 1285 (M.D. Fla. 2009) (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008) (citing *Raimi v. Furlong*,702 So.2d 1273, 1284 (Fla. 3d DCA 1997).

"Conspiracy is not a separate or independent tort but is a vehicle for imputing the tortious actions of one co-conspirator to another to establish joint and several liability." *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 460 (Fla. 5th DCA 1999) (citing *Ford v. Rowland*, 562 So. 2d 731 (Fla. 5th DCA 1990).  "To be held liable for the acts of all co-conspirators, each co-

conspirator need only know of the scheme and assist in it in some way." *Principal Life Ins. Co. v. Mosberg*, No. 09-22341-CIV, 2010 WL 473042, at *6 (S.D. Fla. Feb. 5, 2010) (quoting *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987).  "The existence of a conspiracy and an individual's participation in it may be inferred from circumstantial evidence." *Donofrio*, 503 So.2d at 1281

Plaintiff alleges that Movants agreed and conspired with Defendants to do unlawful acts by unlawful means by defrauding and improperly diverting funds from Simon through the purported performance of marketing and advertising services for Simon  [Doc. 147, *37, ¶175, 176(a), 176(c) and 176(f)].

In opposition to Plaintiff's conspiracy count, in order to avoid repeating verbatim the paragraphs sworn to in their respective Affidavits and the paragraphs sworn to in the Affidavit of LYNNETTE LAURIA and to conserve judicial resources, Deming and Takio incorporate by reference each and every paragraph of their respective Affidavits filed as "Ex. 1" and "Ex. 2" and the Affidavit of LYNNETTE LAURIA filed as "Ex. 12" in support of this Joint Motion for Summary Judgment.  The depositions of Dave Donaway, Simon's Director of Corporate Security, and Karen Davis, Simon's Vice President of Audit Services, provide no evidence, direct or circumstantial, in support of Simon's claim that Deming and Takio participated in the alleged conspiracy.  They merely have suspicion, perception, opinion, and belief.

Movants have provided sufficient facts to controvert Plaintiff's Count IV claim and to require Plaintiff to come forward with specific facts of a material and of a substantial nature to demonstrate the elements necessary to prove either Deming and/or Takio participated in the alleged conspiracy.  Failing same, the Court must enter Summary Judgment against the Plaintiff and in favor of each of the Movants on Count IV of the Second Amended Complaint.

Wherefore, Defendants, RYAN DEMING and DALE TAKIO, pray that this Court will grant their joint motion for Summary Judgment on Count IV of the Second Amended Complaint.

## ARGUMENT AS TO COUNT V-CONVERSION

A conversion claim requires an unauthorized act which deprives another of his property permanently or for an indefinite time. *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984).  As previously pointed out by the Magistrate Judge: "There is nothing in the nature of money as personal property which makes it an improper subject of conversion so long as it consists of specific money capable of identification. To be a proper subject of conversion each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specific money in question, so that such money can be identified. Money is capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or where the wrongful possession of such property is obtained. *Florida Desk, Inc. v. Mitchell Int'l, Inc.*, 817 So. 2d 1059, 1061 (Fla. 5th DCA 2002) (quoting *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)); see also *Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x 263, 272 (11th Cir. 2009); *Navid v. Uiterwyk Corp.*, 130 B.R. 594, 595 (M.D. Fla. 1991)."  [Doc. 143 at 10.]

In opposition to Plaintiff's conversion count, in order to avoid repeating verbatim the paragraphs sworn to in their respective Affidavits and the paragraphs sworn to in the Affidavit of LYNNETTE LAURIA and to conserve judicial resources, Deming and Takio incorporate by reference each and every paragraph of their respective Affidavits filed as "Ex. 1" and "Ex. 2" and the Affidavit of LYNNETTE LAURIA filed as "Ex. 12" in support of this Joint Motion for Summary Judgment.   The depositions of Dave Donaway, Simon's Director of Corporate

Security, and Karen Davis, Simon's Vice President of Audit Services, provide no evidence, direct or circumstantial, in support of Simon's claim that Deming and Takio participated in the conversion of Simon's funds.  They merely have suspicion, perception, opinion, and belief.

Movants have provided sufficient facts to controvert Plaintiff's Count V claim and to require Plaintiff to come forward with specific facts of a material and of a substantial nature to demonstrate the elements necessary to prove either Deming and/or Takio converted Plaintiff's funds.  Failing same, the Court must enter summary judgment against the Plaintiff and in favor of each of the Movants on Count IV of the Second Amended Complaint.

Wherefore, Defendants, RYAN DEMING and DALE TAKIO, pray that this Court will grant their joint motion for Summary Judgment on Count V of the Second Amended Complaint.

## ARGUMENT AS TO COUNTS VII and VIII-R.I.C.O. MAIL AND WIRE FRAUD

To establish a prima facie civil RICO claim, Plaintiff "must satisfy four elements of proof: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285 (1985)). These requirements apply whether the RICO claim is civil or criminal in nature.  See also, *Williams v. Mohawk Indus. Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006).

"An act of racketeering is commonly referred to as a 'predicate act.' A 'pattern' of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts." *Maiz v. Virani*, 253 F.3d 641, 671 (11th Cir. 2001) (quotation marks, citations, and brackets omitted). "If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which they arose." *Cox v.*

48

*Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1397 (11th Cir. 1994), modified on other grounds by 30 F.3d 1347 (11th Cir. 1994)).

With regard to elements (1) and (2) of the four-part test under § 1962(c), the plaintiffs must establish "conduct of an enterprise" and that the enterprise had a common goal. See *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528-29 (1981) ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct.").

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).  As stated in *United States v. Goldin Industries, Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000), "the existence of an enterprise is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (internal quotation marks and citation omitted). Furthermore, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *Id*.

As discussed in *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994):

> A "pattern of racketeering activity," for purposes of the RICO Act, "requires at least two acts of racketeering activity," 18 U.S.C.A. § 1961 (5) (1984 & Supp.1993), and the Supreme Court has observed that "two isolated acts of racketeering activity do not constitute a pattern." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n. 14, 105 S. Ct. 3275, 3285 n. 14, 87 L. Ed. 2d 346 (1985). Instead, "'it is the factor of continuity plus relationship which combines to produce a pattern.'" *Id*. (quoting S.Rep. No. 91-617, 91st Cong., 1st Sess. 158 (1969)).  More recently, the Court has expanded on the definition of "continuity" and "relationship." Borrowing from Title X of the Organized Crime Control Act

of 1970, the Court has explained that predicate acts are "related" if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S. Ct. 2893, 2901, 106 L. Ed. 2d 195 (1989) (quoting 18 U.S.C. § 3575(e)). As for "continuity," the Court explained:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. See Barticheck v. Fidelity Union Bank/First National State, 832 F.2d 36, 39 (CA3 1987). It is, in either case, centrally a temporal concept--and particularly so in the RICO context, where what must be continuous, RICO's predicate acts or offenses, and the relationship these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.... 492 at 241-42, 109 S. Ct. at 2902.

To prove a conspiracy to violate § 1962(c), a plaintiff must demonstrate that a defendant "objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise" through a pattern of racketeering activity. *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) (citation omitted). An agreement to participate in a RICO conspiracy may be shown either by proving "an agreement on the overall objective of the conspiracy" or by showing that the defendant agreed to commit two predicate acts. *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007) (citation omitted). The existence of an agreement, as well as its objective, may be inferred from circumstantial evidence demonstrating "that each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Id*. (citation omitted). But this does not require proof that "each conspirator agreed with every other conspirator . . . [or] was aware of all the details of the conspiracy." *Starrett*, 55 F.3d at 1544.

Indeed, participation in a conspiracy may be inferred merely from acts which furthered its object. *United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir. 1982) (citation omitted).

The substantive elements of mail and wire fraud are identical. *Beck v. Prupis*, 162 F.3d 1090, 1095 (11th Cir. 1998) (explaining that civil RICO fraud claims require that plaintiffs "prove that a reasonable person would have relied on the misrepresentations").

In opposition to Plaintiff's R.I.C.O. counts, in order to avoid repeating verbatim the paragraphs sworn to in their respective Affidavits and the paragraphs sworn to in the Affidavit of LYNNETTE LAURIA and to conserve judicial resources, Deming and Takio incorporate by reference each and every paragraph of their respective Affidavits filed as "Ex. 1" and "Ex. 2" and the Affidavit of LYNNETTE LAURIA filed as "Ex. 12" in support of this Joint Motion for Summary Judgment, **with the exception of paragraph 25 Deming's Affidavit, paragraph 26 of Takio's Affidavit and paragraph 27 of LYNNETTE LAURIA's Affidavit**, which are set **forth verbatim**:

**Deming Aff., P 7-8, ¶25:** "Contrary to what Simon alleges in Counts VII and VIII of the Second Amended Complaint, I [RYAN DEMING] never conspired with or participated with Defendants, DALE TAKIO, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, and/or TIMOTHY HERMAN, for the purpose of profiting from fraudulent actions perpetrated upon Simon, nor did I participate in sending any fraudulent invoices, correspondence, documents or any other tangible or intangible item through the United States of America's postal service, any postal service of a foreign country, any third-party delivery service and/or via facsimile, telecommunication device and/or other electronic mode of transmission to Simon in order to fraudulently obtain any benefit whatsoever from Simon."

**Takio Aff. P 8, ¶26:**   "Contrary to what Simon alleges in Counts VII and VIII of the Second Amended Complaint, I [Dale Takio] never conspired with or participated with Defendants, RYAN DEMING, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, and/or TIMOTHY HERMAN, for the purpose of profiting from fraudulent actions perpetrated upon Simon, nor did I participate in sending any fraudulent invoices, correspondence, documents or any other tangible or intangible item through the United States of America's postal service, any postal service of a foreign country, any third-party delivery service and/or via facsimile, telecommunication device and/or other electronic mode of transmission to Simon in order to fraudulently obtain any benefit whatsoever from Simon."

**L. Lauria Aff., P 8, ¶27:**   "Contrary to what Simon alleges in Counts VII and VIII of the Second Amended Complaint, neither Defendant, RYAN DEMING, nor Defendant, DALE TAKIO, ever conspired with or participated with Defendants, LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RACHAEL LAURIA, and/or TIMOTHY HERMAN, for the purpose of profiting from fraudulent actions perpetrated upon Simon, nor did Defendant, RYAN DEMING, and Defendant, DALE TAKIO, participate in any predicate acts which would constitute mail fraud or wire fraud committed against Simon.

Plaintiff cannot prove by direct or circumstantial evidence that either Deming or Takio, individually or as a result of being an officer, director, manager, agent, shareholder, and/or member of any corporate or limited liability company, were aware of, participated in and/or had knowledge or any predicate acts and/or agreed to participate in any enterprise in furtherance of the R.I.C.O. Act violations alleged in Counts VII and VIII.

The depositions of Dave Donaway, Simon's Director of Corporate Security, and Karen Davis, Simon's Vice President of Audit Services, provide no evidence, direct or circumstantial,

in support of Simon's claim that Deming and Takio participated in the alleged conspiracy.  They merely have suspicion, perception, opinion, and belief.

Movants have provided sufficient facts to controvert Plaintiff's Count VII and Count VIII R.I.C.O. claims and to require Plaintiff to come forward with specific facts of a material and of a substantial nature to demonstrate the elements necessary to prove either Deming and/or Takio participated in the alleged R.I.C.O. actions.   Failing same, the Court must enter summary judgment against the Plaintiff and in favor of each of the Movants on Counts VII and VIII of the Second Amended Complaint.

Wherefore, Defendants, RYAN DEMING and DALE TAKIO, pray that this Court will grant their Joint Motion for Summary Judgment on Counts VII and VIII of the Second Amended Complaint.

## SECTION VII-CONCLUSION

Defendant, RYAN DEMING, and Defendant, DALE TAKIO, have demonstrated that Plaintiff, SIMON PROPERTY GROUP, INC., has failed to provide admissible direct or circumstantial evidence, taken in the light most favorable to Plaintiff, of all of the elements necessary to prove that either of these Defendants: A. have aided and abetted LYNNETTE LAURIA in violating her fiduciary duty to the Plaintiff, as alleged in Count II; B. have committed fraud against Simon proximately causing damages to Simon, as alleged in Count III; C.  have conspired with any Defendant in this action to commit fraud or other wrongdoing against Simon, as alleged in Count IV; have converted any money of Simon, as alleged in Count V; or have committed mail or wire fraud as part of a R.I.C.O. conspiracy, as alleged in Counts VII and VIII.

Defendant, RYAN DEMING, and Defendant, DALE TAKIO, respectfully move the Court for entry of a summary judgment against the Plaintiff and in their favor on Counts II, III, IV, V, VII and VIII of the Second Amended Complaint.

## ECF CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF System which will send a notice of electronic filing to the following:

Carlos E. Mustelier, Jr. Esq., Winget, Spadafora, Schwartzberg LLP, mustelier.c@wssllp.com.

Thomas A. Sadaka, Esq.
tom@nejamelaw.com, tsadaka@cfl.rr.com, carol@nejamelaw.com

and on this same date furnished a copy of the foregoing Timothy Herman, by electronic mail at tim@exileorlando.com and mailed furnished a copy of the foregoing to him by First Class U.S. Mail to P. O. Box 14152, Orlando, FL 32814.

/S/ *Craig A. Brand, Esq.*
_____

**Craig A. Brand, Esq.**
FBN: 896111
THE BRAND LAW FIRM, P.A.
Attorneys for Defendants, Ryan Deming,
individually and d/b/a Florida Tourism
Distribution Services, Kids Eat Free Card,
Target Distribution and TJI; Event
Planners USA, Inc.; Image Marketing of
Florida, LLC; Image Marketing Group, Inc.;
Dale Takio, Individually and d/b/a Kids Eat
Free Cards; DT Printing Solutions, LLC;
Hat Marketing, LLC; Pointe Distribution,
LLC; and Takitik, Inc.
Grove Forest Plaza
2937 S.W. 27th Avenue, Suite 101
Miami, Florida 33133
Main Office and Fax Line. 877-407-2726
(VOIP Dual Line)
Tel. (407) 447-1447
Tel. (305) 878-1477
Email: Craig@TheBrandLawFirm.com