UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SIMON PROPERTY GROUP, INC.,

                Plaintiff,

                                      Case No. 6:11-cv-1598-Orl-31KRS

      -against-

LYNNETTE LAURIA, et al.

                Defendants.

_____/

**Plaintiff Simon Property Group. Inc.'s**
**Response to the Motion for Summary Judgment**
**Filed by Defendants Dale Takio and Ryan Deming**

The Joint Motion for Summary Judgment ("Motion") filed by Defendants Dale Takio ("Takio") and Ryan Deming ("Deming") (collectively, "Defendants") should be denied in all respects. Defendants have failed to establish that no genuine issue of material fact remains with respect to Plaintiff Simon Property Group, Inc.'s ("Simon") claims against them. The Joint Motion boils down to the self-serving and facile assertions by Takio and Deming that if: (1) Defendants deny wrongdoing; (2) their co-conspirator supports their denials; and (3) Simon was not actually present to personally witness certain aspects of Defendants' fraud, then there must be no genuine issue of material fact and the case must be dismissed.  This is not enough.

Defendants' argument cannot withstand scrutiny, principally, because of the following: (1) circumstantial evidence is sufficient to prove fraud; (2) Simon does have testimony from witnesses with personal knowledge of Defendants' fraud; (3) Simon has volumes of documentary evidence raising inferences of fraud against all of Defendants;

and (4) the only defense witness that Defendants rely upon, besides themselves, Lynnette Lauria ("Lauria"), has absolutely no credibility and even her affidavit contradicts her previous statements. Simon has more than enough evidence to establish that there is, at least, a genuine issue of material fact with respect to each and every claim asserted against Defendants. In fact, a case could be made that summary judgment should be granted against Defendants.

## **FACTS**

**I.     Overview of Defendants' Fraud and Wrongdoing**

Defendants owned, jointly with co-defendant Timothy Herman ("Herman")[1], several companies that submitted false invoices to Simon on a monthly or bi-monthly basis over a period of at least eight years, in concert with a Vice President of Simon, Lauria, and her family. Deming and Herman owned the following companies jointly: (1) Image Marketing Group, Inc.; (2) Event Planners USA, Inc.; and (3) Florida Tourism Distribution Services (collectively, "Image Companies"). *See*, Ex. N.  Takio and Herman owned the following companies jointly: (1) Takitik, Inc.; (2) DTPS/DT Printing Solutions; and (3) Pointe Distribution, LLC (collectively, "Takitik Companies"). *See*, Ex. O.

The Image and Takitik Companies billed Simon, ostensibly, for various marketing activities, such as "Monday Mixers"; the purchase of brochure racks at hotels, rest stops, malls, and other locations to distribute flyers for Simon-owned properties; and printing brochures. *See*, Exs. A-M. The record thus far supports Simon's conclusion that

---

[1] Timothy Herman is not part of the instant Motion because, after failing to answer or cooperate with Court orders, the Clerk for the U.S. District Court, Middle District of Florida was directed to, and did, enter a default against Herman. [Docket Entry Nos. 212, 216.] By Order of Magistrate Judge Spaulding, Plaintiff will move for entry of a default judgment against Herman following resolution of the remaining claims against the remaining defendants. [Docket Entry No. 279.]

little, if anything, was actually done on behalf of Simon by the Image and Takitik Companies. *See*, Ex. P (Expert Report of Rex Homme ("Expert Report"), ¶¶133-242).

The "Monday Mixers" were events for which the Image and Takitik Companies were paid entrance fees by the attendees to cover the cost of the event and were not designed to offer any publicity to Simon, in particular. *See*, Ex. R (Deposition of Thomas Brignolo ["Brignolo Dep."], 57:14-58:10). Yet, despite the events being paid for by the attendees and having nothing to do with Simon, the Image Companies submitted exorbitant invoices to Simon on a regular basis.

The Image and Takitik Companies have been unable to substantiate the rental or purchase of any distribution rack for Simon brochures. Defendants' reference to a photo of a former employee standing in front of some racks is not proof of ownership of the pictured racks, does not indicate where the supposed racks were, does not explain the absence of contracts related to any racks and certainly does not prove that multiple racks were owned by the Image and Takitik Companies. *See*, Defendants' Motion, p. 44. The Image Companies also conspired with EDL Management, a trucking company, to use its name to submit fraudulent invoices for brochure distribution, as admitted by EDL Management's sole owner, Edgar Lozada, for which the Image Companies were then "reimbursed" by Simon. *See*, Ex. S (Deposition of Edgar Lozada ["Lozada Dep."], 13:23-16:25, 17:1-4; 20:24-24:23).

When the Image and Takitik Companies finally produced documents through Herman, the only documentation that allegedly memorialized the marketing work Defendants claim was done over a period of eight years, at a total cost of more than $2.3 million to Simon, and using at least twelve different businesses as a front for such

charges, are photocopies of no more than three different coupons Herman apparently printed off of the internet site of the Orland Tourist Information Bureau ("OTIB") and what appear to be four brochures for Simon-owned malls. These photocopies do not evidence that the Image or Takitik Companies had anything to do with the design of these items, the distribution of these items (which, at least concerning the online printouts, appears to have been done by the OTIB) or any other service that was billed to Simon. *See*, Ex. BB (Representative samples of Herman's meager production).

Finally, the "consulting fees" that the Image and Takitik Companies paid to Lauria and her family-owned companies, which are also defendants herein, were nothing more than outright kickbacks. *See*, Exs. Q, R (Affidavit of Rex Homme ["Homme Aff."], ¶¶35-40; Brignolo Dep., 41:12-44:4). No evidence supports Defendants' assertion that the payments were for any type of "professional consulting" by Lauria for Herman, such as their oft-repeated claim that she helped Herman learn how to conduct himself in a corporate atmosphere and how to use proper grammar. *See*, Exs. T, V (Deposition of Dale Takio ["Takio Dep."], 83:2-14; Deposition of Ryan Deming ["Deming Dep."], 91:17-92:23). Rather, Lauria's requests for payments refer to them as her portion of the Simon invoices. For instance, in one email, Lauria sent Takio invoices to be submitted to Simon on behalf of certain of the Takitik Companies, asking whether she could "get at least half of mine by next Monday." *See*, Ex. CC (EMA_66-67). Defendants also cannot explain why these payments continued for seven to eight years and were made by several of the different Image and Takitik Companies, given that Defendants have described the consulting as for the single purpose of educating Herman on how to act in a corporate environment, rather than for any purposes specific to each company.

Simon paid the invoices submitted by both the Image and Takitik Companies over the course of approximately eight years. *See*, Exs. A-M. The Image and Takitik Companies submitted those false invoices by mail, facsimile, and email. Additionally, the Image and Takitik Companies used a credit card machine owned by Lauria to charge her Simon-issued corporate credit card for the false invoices, thereby committing wire fraud. *See*, Ex. R (Brignolo Dep., 41:12-44:4).

## II.     Defendants Takio and Deming Were Personally Involved in the Fraud

Defendants argue, first, that they had nothing to do with the services provided to Simon by the Image and Takitik Companies, instead blaming Herman (who has already had a default entered against him by the Clerk).  Second, Defendants argue that, in any event, all of the services charged by the Image and Takitik Companies to Simon were actually performed.  However, neither argument is credible. Further, Takio has already admitted discussing Takitik's Simon business with Herman.  *See*, Ex. T (Takio Dep., 59:22-60:2).

As the above subsection makes clear, Simon has established a genuine issue of material fact that it was charged for services either never rendered or grossly over-billed by the Image and Takitik Companies.  Lauria's affidavit submitted in support of the Motion cannot eviscerate the testimony of Thomas Brignolo and Edgar Lozada, the independent, uninterested witnesses who both testified as to their personal knowledge of aspects of the fraud.  Nor can Lauria's affidavit overcome the lack of evidence that the charged services were performed for Simon, let alone in any manner justifying the amounts charged.  At worst, the dueling testimony creates an issue of credibility among the several witnesses.  In this context, Lauria's affidavit, which swears that all of the

services charged by the Image and Takitik Companies were performed, even contradicts previous admissions by Lauria, when she met with Simon's representatives early in the course of Simon's investigation, that certain charges by Image Marketing were over-billed to Simon.  *See*, Ex. DD (LYNLAURIA00511).  Lauria's revision of her previous admissions to fit whatever she believes will best suit the circumstances is unsurprising.  As previously noted by Magistrate Judge Spaulding, Lauria has a well-documented penchant for lying and fraud, which included the creation of fictitious persons and contracts in order to stave off Simon's ability to identify Defendants' fraud through a regular audit. *See*, Docket Entry No. 256 (Magistrate Judge Spaulding's Report and Recommendation).

With respect to the claims that Defendants were not actively involved in the provision of services to Simon, Simon has elicited more than enough evidence to support a contrary inference, as discussed immediately below.

## A. Dale Takio's Knowledge and Involvement in the Fraudulent Scheme

Takio was clearly aware that Lauria was engaged in self-dealing and fraud against Simon. Takio knew that Lauria was a Vice President of Simon, because Takio sometimes sent emails to Lauria's Simon account. *See*, Ex. CC (EMA_57-58). Takio also knew that Lauria was involved with RJL. *See*, Ex. T (Takio Dep., 43:2-8). Takio also produced emails in which Lauria sent invoices to the Takitik Companies by contacting Takio and the names of the attachments reference RJL. *See*, Exs. CC (EMA_32-33;   EMA_41;   EMA_66-67;   EMA_68;   EMA_71;   EMA_167-168). Conspicuously, whenever Lauria sent these emails, she used her hotmail account, rather than her Simon account. *Id.* However, despite the regular and exorbitant sums

6

the Takitik Companies paid to RJL and Lauria, Robert Lauria, Lauria's husband and partner in RJL, testified that he had never heard of Takitik, Inc. *See*, Ex. W (Deposition of Robert Lauria ["R. Lauria Dep."], 69:12-25).

The correspondence between Lauria and Takio provide a valid basis on which the Court could conclude that Takio was a knowing participant in the fraudulent scheme led by Lauria against Simon.  For example, in a February 2009 email, Takio received a batch of invoices from Lauria, who told Takio in that email that the invoices were from February, but only "two of them can be run today."  *See*, Ex. CC (EMA_41).  On another occasion, Lauria sent Takio invoices for March 2009, again telling Takio that only some could be "run today," and Lauria asked whether she could "get at least half of mine by next Monday." *See*, Ex. CC (EMA_66-67).  If the business was legitimate and the invoices concerned work actually done in a certain month, there is no reason why the invoices could not have been run contemporaneously. Takio's failure to question this order/request by Lauria raises a reasonable inference that he understood exactly why the invoices needed to be charged on a rolling basis – Takio knew that Lauria needed to evade Simon's internal controls that might flag charges over a certain amount. Additionally, Lauria's request for 'half of hers' indicates that she was being paid on some agreed split of funds Simon paid to Takio's companies, rather than any indication that the payments had anything to do with a consulting arrangement with Herman.

Further, although none of the attachments to the emails were produced, the emails also raise the inference that Lauria was actually creating the entirety of the invoices for Takio and the Takitik Companies and then sent them to Takio to be submitted to Simon by the Takitik Companies. With the Takitik Companies submitting

the invoices, Simon would be deceived into believing that the invoices were from a legitimate outside source. The inference that Lauria was actually creating the invoices for the Takitik Companies is also supported by the fact that, despite sending these invoices for March 2009, none of the defendants produced any invoices from RJL or any other Lauria-related company to any Takitik Company for that month. This phenomenon is not confined purely to March 2009, but is seen in the context of Takitik Company invoices from many other months, as well.

Then, in April 2009, Lauria sent Takio more invoices, stating: "Here are the April invoices. Not as many as usual, but somethings [sic] are going on." *See*, Ex. CC (EMA_68). Takio responded, in part, "No DTPS?" *Id.* Takio's question as to why there were no invoices relating to one of his own companies is also strong evidence that Lauria was creating invoices for the Takitik Companies, despite the fact that Lauria was not an employee of any of the Takitik Companies and should not have been creating invoices on their behalf. The fact that Lauria was creating Takitik's invoices is not only damning evidence that the work was not actually done, but also that Lauria was just making up numbers out of thin air – only restricted in amounts and frequency by Lauria's knowledge as to what might raise red flags at Simon. Takio knew that Lauria was breaching her fiduciary duties and, as long as that Takitik Companies got their half, Takio would make sure the Takitik Companies kept aiding and abetting Lauria. Lauria's warning to Takio that there were fewer invoices in April than usual because "somethings [sic] are going on" also evidences Takio's knowledge that Lauria was breaching her fiduciary duties to Simon and wanted the conspiracy to be more inconspicuous until the time at which whatever "things" were "going on" had subsided.

In May 2009, Lauria instructed Takio exactly how much could be submitted for several of the Takitik Companies and told him that she would be "submitting invoices for $6,000 for DTPS" (DTPS was routinely submitting invoices to Simon for $3,000 each month at that time). *See*, Ex. CC (EMA_71). This is further evidence that it was Lauria determining the amount of the invoices and that Takio was well aware of it.

Takio and Lauria did not handle their fraudulent business only via email, mail and facsimile, however. The two would meet in person at times, which illustrates the complete fabrication of their current party line that they barely knew each other and did business through Herman. Certain emails indicate that at these meets, Takio would deliver Lauria's fraudulent profits and bring fraudulent receipts for Lauria to sign before submission to Simon for reimbursement. *See*, Ex. CC (EMA_84). Takio, after agreeing to mail additional shares of fraudulent profits and receipts to Lauria, told her "Miss you tons. We must get together when you return." *See*, Ex. CC (EMA_86).

Finally, in September 2010, in one more explicit email, Lauria told Takio that she would "go ahead and charge your card as usual" and that Takio could run an invoice on her Simon credit card. Takio responded, "Re: invoice…usual $2250.00 to Takitik??" *See*, Ex. CC (EMA_167-168). This email provides further proof of Takio's central involvement in Lauria's fraudulent scheme and the illusory nature of the supposed "hotel rack distributions" for which Takitik was billing Simon. If Takitik was really providing services, surely Takio would know that and would be the one telling Lauria how much it would cost, not the other way around.

**B. Ryan Deming's Knowledge and Involvement in the Fraudulent Scheme**

Although Deming appears to have been somewhat craftier than Takio with respect to explicitly discussing the fraud by e-mail, his involvement and knowledge thereof is nevertheless established by reference to other evidence. The Image Companies were owned only by Deming and Herman, yet Deming pleads with the Court to believe that he had no idea that the Image Companies were engaged in a massive fraudulent scheme against their biggest client, Simon, the termination of which led to the *de facto* or *de jure* dissolution of the Image Companies. This creates an issue of credibility for the trier-of-fact, which may not be resolved on a motion for summary judgment. Furthermore, Simon fully expects that any credibility issues with respect to Deming will be resolved in its favor.

Most damningly, just as the Takitik Companies paid a high percentage of their profits from Simon's business in kickbacks to Lauria and RJL, so did the Image Companies.[2]  From 2006 to 2011, Image Marketing paid a total of $271,542.50 to RJL and Lauria.  *See*, Ex. Q (Homme Aff., ¶37).  In 2006 alone, Image Marketing paid $92,025 to RJL and $800 to Lauria, while paying only $54,500 to Deming and $46,000 to Herman.  *See*, Exs. EE, FF, GG.  In 2006, Event Planners paid a total of $20,300 to RJL, and $1,000 directly to Lauria.  *See*, Ex. HH (ST_EPUSA00101, 103, 113, 127, 128, 142, 150).  Conversely, Event Planners paid only $6,500 to Deming in 2006 and $8,300 to Herman.  *See*, Ex. HH (ST_EPUSA00115-118, 141, 152).  In 2007, Event Planners also paid $1,400 to a business owned by Lauria's son-in-law Eric Lagi.  *See*, Ex. HH (ST_EPUSA00183).  As those amounts illustrate, Lauria and RJL were paid as

---

[2] Florida Tourism Distribution Services did not have its own bank account, but rather its payments went directly into the Image Marketing bank accounts, so an analysis as to its payments to RJL and Lauria is inseparable from an analysis of the payments made by Image Marketing.

though they were controlling partners in these businesses, receiving a larger draw than either Deming or Herman from the Image Companies. In the case of Event Planners, Lauria and RJL even received more than Deming and Herman combined in 2006.

Surely, if he was not aware of the fraud, Deming would have insisted that the payments stop or, at least, wondered why payments had to be made by all of the Companies for the same alleged consulting service, since his draws from the Image Companies were substantially reduced by these payments. Lauria's husband and partner in RJL, Robert Lauria, even testified that he had no idea why RJL was paid by Image Marketing. *See*, Ex. W (R. Lauria Dep., 69:3-16).   When deposed, Deming claimed that he believed the payments were for Lauria's consulting with Herman to teach him marketing techniques (despite the fact that Simon was paying the Image Companies for their supposed expertise in marketing), but that he also does not know exactly what Lauria was supposedly doing for Herman. *See*, Ex. V (Deming Dep., 92:1-17). It strains credulity that Deming would have simply accepted the very high percentages of profits that his companies were paying to Lauria without knowing exactly what benefit was being gained and never questioned whether the payments were proper given Lauria's position as Vice President with Simon.  The payments to Lauria would have effectively come straight out of Deming's pocket, for a benefit to Herman personally (even if the consulting had actually occurred), under highly suspicious circumstances.   If the Image Companies were legitimately performing services for Simon and truly earning the payments received from Simon, it is very reasonable to expect that Deming would not have so easily handed over the great majority of that money to Lauria.

Furthermore, Defendants cannot provide any innocent explanation as to why RJL/Lauria was paid by every single one of the Image and Takitik Companies to provide the exact same "consulting" services to Herman. Defendants have not described the purported consulting services in any manner that indicates that the services were specific to each Company; describing them only as general marketing education for Herman. *See*, Exs. T, V (Takio Dep., 83:2-14; Deming Dep., 91:17-92:23).  Nor is it reasonable to infer that the consulting services could have been specific to each Company, given that each Company was effectively in the same business and only charged Simon separately to avoid "red flags" according to Herman. *See*, Ex. X (Deposition of Timothy Herman Dep. ["Herman Dep."], 48:13-49:1). The most reasonable inference is that Lauria was being paid solely on the basis of whether those Companies had received payments from Simon that had been facilitated by Lauria's inside knowledge of Simon's auditing processes.

Additionally, Simon has established Deming's involvement with certain services that former Image Companies' employee Thomas Brignolo has testified were fraudulent. For example, Deming was paid by Event Planners, which Brignolo testified was never even operational. *See*, e.g., Exs. R (Brignolo Dep. 89:6-20), HH. Deming also attended the Monday Mixers, which Brignolo testified had nothing to do with Simon in particular and were actually paid for by the attendees to those events. *See*, Ex. V (Deming Dep., 174:2-9). Deming has also admitted that he has no idea who an "S. Henry" is that appears on a bill from Event Planners to Simon and there is no evidence that such a person has ever existed or worked with any of the Image Companies. *See*, Ex. V (Deming Dep., 111:3-13). Despite Deming's claims that he would not have known what

was on the invoices to Simon, Deming was a central figure with respect to the Image Companies' billing to Simon (not to mention that Simon was the Image Companies' largest client and Deming, as co-owner, would have little if anything to do when he went to work if he did not work on Simon business).  For instance, when inconsistencies in invoices received from Deming and the Image Companies once nearly led to an audit of all of their business with Simon in August 2009, Deming was the person Simon contacted regarding the inconsistencies. *See*, Ex. II (IE1834-1835). Of course, this audit was avoided when Lauria got involved, for little did Simon know at that point that this was an inside job. *Id.*

Finally, Deming's receipt of tens of thousands of dollars fraudulently obtained by the Image Companies from Simon also serves as evidence that he had knowledge of the fraud. *See United States v. Salas*, 2012 U.S. App. LEXIS 14119, *8 (11th Cir. July 11, 2012) ("[e]vidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud.") (*quoting United States v. Naranjo*, 634 F.3d 1198, 1207 (11th Cir. 2011)).  Lauria's affidavit is garbled and equivocates so thoroughly that it is difficult to understand, but she does seem to acknowledge that the Image Companies did financially benefit from a fraud upon Simon. Lauria softens this admission by claiming that only Herman and not Deming would have benefited from that fraud, but that is nonsense, given Deming's status as half-owner and the multitude of checks made out to him by those Companies.  *See*, Defendants' Exhibit 12 (L. Lauria Aff., ¶¶17, 26, 27).  Lauria has also previously confirmed that the Image Companies did benefit from a fraud upon Simon (*see*, Ex. DD [LYNLAURIA00510-511]), notwithstanding her ongoing attempts to obfuscate the full extent of the fraud, including

destruction of evidence, falsification of documents, creation of fictitious personas and, now, submitting an affidavit full of half-truths and bald-faced lies in an attempt to slough the entire fraud off on the one partner in the Image and Takitik Companies who has already defaulted anyway.

### III.    Defendants Are Personally Liable for the Fraud of the Image and Takitik Companies

Simon has also elicited sufficient evidence to create a material question of fact as to whether the corporate veil should be pierced in this case since the Image and Takitik Companies were created as means to perpetrate a fraud and were also mere alter egos of Takio, Deming and Herman.  *See*, Ex. P (Expert Report, ¶¶14, 150-1, 175-178, 186-7, 197-200, 206-8, 221-226, 232-234, 241).  Accordingly, even if Defendants had been able to establish that they were unaware of or uninvolved with the Image and Takitik Companies' wrongdoing, they would still be liable for that malfeasance because the corporate form may be disregarded.

As noted above, Herman admitted that many of the Image and Takitik Companies that billed Simon were created specifically to help Lauria avoid any "red flags."  *See*, Ex. X (Herman Dep., 48:13-49:1).  In other words, the companies were created to serve as mere instrumentalities of fraud.  Herman also admitted that he discussed the creation of these separate companies for separate payments with Defendants and that it was actually Defendants who made the decision to follow Lauria's advice.  *See*, Ex. X (Herman Dep. 120:8-19).  While Defendants both claimed that Simon was only one company serviced by the Image and Takitik Companies, their testimony is belied by the fact that many of these companies were not in existence for

long, if at all, before they began submitting bills to Simon and nearly all were dissolved very shortly after Simon stopped working with them.  *See*, Exs. N, O, JJ.

The separation of invoicing to Simon among the various Image and Takitik Companies was purely arbitrary and those Companies were simply alter egos of Defendants, as well as Herman.   The Image and Takitik Companies were small businesses, each owned only by some combination of Deming, Takio and Herman, yet each charged for the same or extremely similar services.   Considering the common ownership of these companies, there is no legitimate explanation for this separation more plausible than an inference that numerous entities were used in order to create the appearance of wholly separate entities in order to evade detection by Simon's internal controls.   In Herman's own words, Lauria had told him that several company names needed to be used because "[s]he did not want to red flag [sic] because she said if she is giving too much money to one business, that she would get into trouble."  *See*, Ex. X (Herman Dep, 48:13-49:1).

The propriety of piercing the corporate veil is also supported by the lack of usual indicia of a legitimate corporation. Deming admitted that Event Planners and Image Marketing held no board meetings, either quarterly or annually, and kept no minutes of board meetings. *See*, Ex. V (Deming Dep., 79:20-25, 149:24-150:4). Similarly, Takio admitted that Takitik and DT Printing Solutions also did not hold board meetings or keep any board minutes. *See*, Ex. T, U (Takio Dep., 61:12-23, 213:20-214:1). Event Planners also transferred money, which it called "short-term loans," to Image Marketing. *See*, e.g., Ex. P (Expert Report, ¶200). However, there is no evidence that any of the so-

called "short-term loans" were ever repaid or that any contracts existed stating the terms of any those asset transfers. *Id.*

## ARGUMENT

### I.     Standard on a Motion for Summary Judgment

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law." Fed. R. Civ. P. 56(c).  As Defendants correctly point out, an issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case and an issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *See*, *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Defendants also correctly note that the burden is upon Defendants to establish that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *See, Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party, i.e., Simon, and the Court must resolve all reasonable doubts against the movants, i.e., Defendants.  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2513.  As such, the court may not weigh conflicting evidence or weigh the credibility of the parties. *See, Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a

reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court may not grant summary judgment. *Id.*

Defendants are also correct that conclusory allegations do not provide adequate support for the denial of a motion for summary judgment. However, the case cited repeatedly by Defendants for the proposition that a motion for summary judgment may not be denied purely on the basis of "suspicion, perception, opinion, and belief" is misconstrued by Defendants, who cite it in a manner far broader than its actual holding (not to mention being far out of line with cases that are controlling precedent, rather than merely persuasive, such as this single Southern District of Florida case). That case, *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999), involved 'suspicions, perceptions, opinions and beliefs' that were not supported by any reasonable inference based upon the evidence available. The plaintiff had drawn the conclusion that he had been the victim of racial discrimination simply from a false statement by the restaurant staff that the stove was broken, but the restaurant had been serving other guests of the same race at the time when plaintiff was falsely informed of the broken stove. Based on those facts, the Court had no choice but to grant summary judgment.

Defendants' relation of this case to *LaRoche* is wide of the mark. The 'suspicions, perceptions, opinions, beliefs' or other types of conclusions that Simon draws herein are based upon reference to specific, concrete facts, many of which are contained in Defendants' own memorandum and exhibits. These facts are the basis upon which Simon argues that inferences adverse to Defendants are reasonably reached. In this case, that a fraud occurred is not in dispute. Lauria may challenge Simon's valuation of

the full extent of the fraud, but she has at least admitted that Simon was overcharged on some invoices. *See*, Ex. DD (LYNLAURIA00510-511); Defendants' Exhibit 12 (Lauria Aff., ¶¶4, 12, 17, 26). The question on this motion for summary judgment is only whether Simon has enough evidence to implicate Defendants in that fraud.

Even based solely upon the testimony of Thomas Brignolo and Edgar Lozada, Simon submits that this threshold has been reached.  To the extent Defendants ask the Court to weigh the credibility of Lauria, an admitted fraudster, forger and liar who has once again contradicted her own testimony, and the self-serving affidavits submitted by Defendants against the credibility of Messrs. Brignolo and Lozada, who are uninterested parties, not only is that an improper query in the context of a motion for summary judgment, it is a query that Simon believes could only be resolved in its favor.

## II.  Even if Deming and Takio Could Show a Lack of Personal Involvement, the Court Could Validly Pierce the Corporate Veil

In order to pierce the corporate veil, Florida requires a showing that a company was used to perpetrate a fraud or other wrongdoing. *See*, *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114 (Fla. 1984). In this case, as demonstrated above, there is sufficient evidence to create an issue of material fact as to whether the Companies such as DT Printing Solutions, Florida Tourism Distribution, Event Planners and Pointe Distribution, if not Image Marketing and Takitik, Inc., as well, were formed solely for the purpose of effectuating the fraud alleged in Simon's Complaint.  Herman admitted that billing to Simon from those Companies was purely to avoid what Lauria told him were "red flags."  Given that the Companies did not exist at all or until just before they began billing Simon and that it appears they did not conduct any non-Simon business, which is substantiated by the immediate dissolution of these companies or halt to operations

18

after Simon sent litigation hold letters to them, there is strong evidence that those companies were created solely as a fraud upon Simon. *See, McCormack v. Ribbeck*, 702 So. 2d 271, 272 (Fla. Dist. Ct. App. 1st Dist. 1997) (post-fraud actions, such as immediate dissolution of company following completion of fraud, may be probative of conduct justifying piercing corporate veil.). Therefore, Defendants, as co-owners of each of the Image and Takitik Companies with Herman, may be found vicariously liable for the damage caused by those Companies.

## III.   Count II – Aiding and Abetting Breach of Fiduciary Duty

In order to prove that a defendant has aided and abetted a breach of fiduciary duty, a plaintiff must show that (1) there was a breach of fiduciary duty; (2) that the aider and abettor knew of that breach; (3) that the aider and abettor substantially assisted that breach; and (4) that the plaintiff suffered damages as a result of that breach. *See, Amerifirst Bank v. Bomar*, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991); *Lawrence v. Bank of Am., N.A.*, 455 Fed. Appx. 904, 906 (11th Cir. Fla. 2012).

Defendants argue that "substantial assistance" requires "conscious intent." However, this merely appears to be a restating of the requirement of knowledge of the breach of fiduciary duty rather than a consideration of whether they substantially assisted Lauria's breaches of fiduciary duty, which Defendants certainly did by using the Takitik and Image Companies to pass bills from RJL onto Simon. Nevertheless, "conscious intent" is proven here, as well.

### A.  The Court Could Validly Find that Lauria Owed and Breached a Fiduciary Duty to Simon as Its Officer and Employee

The primary breach of fiduciary duty that Defendants aided and abetted is easily shown. Lauria was Regional Vice President of Marketing, Florida for Simon at all

19

relevant times. *See*, Ex. Y (Deposition of Lynnette Lauria, 7:18-19). There is no question that an officer owes a fiduciary duty to her corporate employer, which includes a proscription against self-dealing without full disclosure to the Company. *Avila South Condo. Assn., Inc. v. Kappa Corp.*, 347 So. 2d 599, 606-607 (Fla. 1977) (citing to 19 Am. Jur. 2d Corporations § 1281 (1965)); *Orlando Orange Groves Co. v. Hale*, 107 Fla. 304, 314 (Fla. 1932) ("Officers of corporations, because of their fiduciary character, are required to act with the utmost good faith, and they are forbidden to deal in or handle the funds or property of the corporation to their own advantage.").

Lauria breached her fiduciary duties to Simon in numerous ways. The most relevant of these breaches to the instant Motion include her receipt of kickbacks from the Image and Takitik Companies out of amounts they had received from billing Simon, as well as her assistance to the Image and Takitik Companies in billing Simon fraudulently, which included advice on how to avoid red flags and dictation of the invoices' amounts.

**B. The Court Could Validly Find that Takio and Deming Had Knowledge of and Substantially Assisted Lauria's Breaches of Fiduciary Duty**

1. *Knowledge of the Breaches of Fiduciary Duty*

Deming's and Takio's knowledge of Lauria's breaches of fiduciary duty is sufficiently established to pass muster on a motion for summary judgment. As discussed above, Simon has documented that both Defendants knew that Lauria was involved with both Simon and RJL. Both Defendants were also aware that Lauria and RJL were being paid by the Image and Takitik Companies. Thus, it is established that Defendants knew of Lauria's self-dealing each time she received a kickback from the Image and Takitik Companies.

Defendants argue that they did not know that Lauria failed to disclose that she was being paid by the Image and Takitik Companies to Simon. Such a denial is an issue of credibility for the fact finder to decide at trial, not an issue that can be resolved on a motion to dismiss. At any rate, the credibility of this claim is highly dubious given the evidence that Defendants were aware that the Image and Takitik Companies were billing for services never rendered to Simon. With respect to Takio, in particular, the emails cited above indicate that Lauria was actually creating the invoices for Takio to submit to Simon on behalf of the Takitik Companies, which certainly creates a very strong presumption that he was both aware that Lauria was assisting the Takitik Companies to bill Simon for services that were not rendered and that she did so in order to receive kickbacks from Defendants.

Further, it is very difficult to believe that Defendants did not know that Lauria was breaching her fiduciary duties to Simon given the very high percentage of Simon's payments to the Image and Takitik Companies that Lauria was receiving in kickbacks from the Defendants. As far as Defendants' other claims that Defendants were unaware that Lauria was falsifying contracts, this is just a red herring.  Whether and when they knew of the falsified contracts is a matter of credibility for the Court to decide, but, even if Defendants did not know, their knowledge of the self-dealing involved with the kickbacks is sufficient to establish this claim. As the Eleventh Circuit has held, it is not necessary for a defendant to know all the details of a fraudulent scheme in order to be found liable for said defendants' role in the conspiracy. *United States v. Mateos*, 623 F.3d 1350, 1363 (11th Cir. Fla. 2010).

2.    _Substantial Assistance in the Breaches of Fiduciary Duty_

The substantial assistance of Lauria's breaches of fiduciary duty by Defendants is also easily established.  Naturally, if Defendants did not use the Image and Takitik Companies to submit the fraudulent invoices, Simon would never have paid those fraudulent invoices.  It was as a result of those payments that the Image and Takitik Companies were then able to pay kickbacks to Lauria. The Image and Takitik Companies never identified consulting fees to RJL on any invoice submitted to Simon, thus establishing Defendants also assisted with the concealment of Lauria's self-dealing from Simon.

**C. The Court Could Validly Find that Simon Suffered Damages Due to Lauria's Breaches of Fiduciary Duty**

There is no question that Lauria personally benefited at Simon's expense from her breach of fiduciary duty when she received kickbacks from Defendants. Simon was clearly injured for every dollar it paid to Defendants, through the Image and Takitik Companies, for services that were either not performed or were grossly overbilled. These payments would never have happened without Lauria's breaches of fiduciary duty to Simon and Defendants' corresponding efforts to ensure that the Image and Takitik Companies' billing appeared legitimate on its face.

**IV.   Count III – Fraud**

To state a prima facie case for fraud under Florida law, a plaintiff must show: (1) a defendant made a false statement regarding a material fact; (2) defendant knew or should have known the statement was false; (3) defendant made the false statement with an intention that the plaintiff rely and act on it; (4) an injury resulted to the plaintiff who acted in justifiable reliance on the false statement. _See_, _Collins v. Countrywide_

*Home Loans, Inc.*, 680 F. Supp. 2d 1287, 1292-93 (M.D. Fla. 2010) (citing *Simon v. Celebration Co.*, 883 So.2d 826, 832 (Fla. 5th DCA 2004)).

### A. The Court Could Validly Find that Dale Takio and Ryan Deming Intentionally Made Materially False Statements to Simon

The false statements, with respect to Defendants, are obviously the invoices that charged Simon for services that were either not performed or grossly overcharged. The evidentiary support for Defendants' intent is several.

First, as Simon has already noted, the receipt of proceeds from a fraud, such as the draws Defendants took from the Image and Takitik Companies following Simon's payments to those Companies, is recognized as circumstantial evidence that an individual had the requisite fraudulent intent.

Second, the payment of kickbacks, as Defendants did, through the Image and Takitik Companies, to Lauria and RJL, is also evidence of their knowledge and participation in the fraudulent scheme. *See*, *United States v. Mateos*, 623 F.3d 1350, 1363 (11th Cir. Fla. 2010) (Evidence of kickbacks and payments without legitimate reason are evidence of fraudulent intent); *United States v. Clarkson Auto Elec., Inc.*, 2012 U.S. Dist. LEXIS 12747 (W.D.N.Y. Feb. 1, 2012) ("Stacer further testified that Gerald Fretto delivered kickbacks to the Xerox mechanics at his home. Reasonable inferences of LaVilla's and Gerald Fretto's knowledge and participation in the alleged mail fraud scheme may be drawn from this evidence.").

Finally, the involvement of Defendants in the Image and Takitik Companies' operations, or lack thereof, combined with their receipt of funds from billing to Simon, is also proof that Defendants had the requisite fraudulent intent. *See*, *United States v.*

*Mateos*, 623 F.3d 1350, 1363 (11th Cir. Fla. 2010) (Involvement in activities of company alleged to be fraudulent provides evidence of fraudulent intent).

**B. The Court Could Validly Find that Simon Detrimentally Relied Upon the Fraudulent Invoices and Thereby Suffered Damages**

Simon's reasonable reliance and resulting damage is easily shown. Simon reasonably relied upon the presumption that its Vice President of twenty years, Lauria, was acting as a gatekeeper and exercising oversight over would-be fraudsters. Simon did not know and could not have reasonably been expected to know that this longstanding fiduciary relationship was being abused and that Lauria, rather than simply not doing her job, was actually orchestrating and counseling Defendants in an effort to make sure that the fraud was successful and undetected.  As a result, Simon paid every invoice submitted by the Image and Takitik Companies and have been damaged in the full amount of those invoices, because Simon never would have done business with those Companies had it known the truth of the matter.  Even if Defendants were able to show that some of the payments were for services actually performed, there still remains the amount in damages that Simon paid for services that were not performed or were grossly overcharged.

**V.    Count IV – Civil Conspiracy**

Under Florida law, a claim for civil conspiracy is properly set forth when a plaintiff alleges that two or more persons agreed to commit an unlawful act. *See*, e.g., *American United Life Ins. Co. v. Martinez*, 480 F. 3d 1043, 1067 (11th Cir. 2007).  "The gist of a civil conspiracy is not the conspiracy itself but the civil wrong which is done through the conspiracy which results in injury to the Simon." *Id.*  No express agreement between the parties is necessary provided that an "inference sought to be created by…circumstantial

evidence outweighs all reasonable inferences to the contrary." *Borden v. Saxon Mortg. Services, Inc.*, No. 08-61851-CIV, 2010 WL 3834590, *13 (S.D. Fla. Sept. 28, 2010).

Defendants' knowledge and intent to engage in the fraud upon Simon, in coordination with defendants Lauria and Herman, in particular, has already been discussed in great detail in the above sections. The only point Simon can add that would be also relevant to this discussion is to note that Defendants did, in fact, submit the fraudulent invoices to Simon. The conduct of Defendants in doing so clearly evidences their intent to further the fraudulent conspiracy. Again, the damages suffered by Simon is the amount it paid in reliance upon the fraudulent invoices submitted by all of the defendants who partook in this conspiracy, including the moving Defendants.

## VI.   Count V – Conversion

"'Conversion' occurs when a person who has a right to possession of property demands its return and the demand is not or cannot be met." *Pain Care First of Orlando, LLC v. Edwards*, 84 So. 3d 351, 354 (Fla. Dist. Ct. App. 2012) (*quoting Pearson v. Ford Motor Co.*, 694 So. 2d 61 (Fla. Dist. Ct. App. 1997)). Embezzlement occurs "whereby [a] defendant lawfully obtains possession of the plaintiff's funds and thereafter converts said funds to his own use." *Escudero v. Hasbun*, 689 So. 2d 1144, 1147 (Fla. Dist. Ct. App. 1997) (citations and quotations omitted).

Conversion of money requires proof that funds are "specific and identifiable . . . delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit, or *where the wrongful possession of such property is obtained.*" *Tambourine Comercio Internacional SA v. Solowsky*, 312 F. App'x. 263, 272 (11th Cir. 2009) (emphasis added). "Neither an

obligation to pay money nor a breach of contract generally gives rise to a claim of conversion in tort." *1021018 Alberta Ltd. v. Netpaying, Inc.*, No. 8:10-CV-568, 2011 WL 1103635, *4 (M.D. Fla. Mar. 24, 2011) (citations omitted).

It has not been uncommon for Florida courts to find money specifically identifiable such that conversion may be established. *See*, e.g., *Rosenthal Toyota, Inc. v. Thorpe*, 824 F. 2d 897, 902 (11th Cir. 1987) (finding conversion when defendant took plaintiff's money with no intention of delivering cars); *Mandel v. Howard*, No. 11-23620-CIV, 2012 WL 1069182, *4 (S.D. Fla. Mar. 29, 2012) (finding money specific and identifiable where funds misappropriated from investors in Ponzi scheme and the transactions, amount of money, and recipients of funds were alleged in complaint); *Galstaldi v. Sunvest Communities USA, LLC*, 637 F. Supp. 2d 1045, 1060 (S.D. Fla. 2009) (finding conversion of money where defendants took money with no intention of delivering consideration in exchange for the funds); *Masvidal v. Ochoa*, 505 So. 2d 555 (Fla. 5th DCA 1987) (finding conversion where defendant took funds from plaintiff's escrow account); *Allen v. Gordon*, 429 So. 2d 369, 371 (Fla. 1st DCA 1983) (finding money specific and identifiable where defendant wrongfully withdrew balance in bank accounts for his own use).

As was discussed and decided in Simon's favor with respect to Motions to Dismiss that were filed by Defendants against the conversion claim (and which were denied on the same grounds), this is not a case where Simon is seeking to enforce a contractual debt because Defendants have no contractual relationship with Simon that may be enforced; therefore, the claim for conversion is not barred by contract. *Cf. 1021018 Alberta Ltd.*, 2011 WL 1103635 at *4. While the money Defendants received

from Simon may not be specifically identifiable in the traditional sense, it is specifically identifiable nonetheless because all money Defendants received from the Simon came into their bank accounts through fraudulent means, and Defendants exercised control over the money by not returning it to Simon. As a result, Defendants achieved a wrongful possession of Simon's property, which is sufficient to establish a claim for conversion. *See*, *Tambourine Comercio Internacional SA*, 312 F. Appx. at 272. Additionally, many of the Image and Takitik Companies were organized for no other reason than to defraud Simon by issuing false invoices and had no clients other than Simon. Thus, anything in their bank accounts is specific and identifiable.

## VII.   Count VII – RICO 18 U.S.C. § 1964(c)/18 U.S.C. § 1962(c)

Under this RICO Count, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Therefore, "to state a RICO claim, a plaintiff must plead (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *McCulloch v. PNC Bank*, 298 F.3d 1217, 1225 (11th Cir. 2002).

### A. The Court Could Validly Find that Dale Takio and Ryan Deming Engaged In Fraudulent Acts on Several Occasions over the Course of Several Years

"A pattern of racketeering activity consists of the commission of at least two distinct but related predicate acts." *Ironworkers Local Union 68 v. AstraZeneca Pharms.*, 634 F.3d 1352, 1358 n.13 (11th Cir. 2011). As discussed above, Defendants'

submission of fraudulent invoices was not an isolated incident. Defendants submitted fraudulent invoices over a period of eight years on far more than two occasions. Thus, Simon has established a prima facie showing of a "pattern" of racketeering activity, as well as the direct or indirect involvement of Defendants in the racketeering activity.

### B. The Court Could Validly Find that Dale Takio and Ryan Deming Committed Mail and Wire Fraud

The fraudulent invoices must have been submitted through the mails, facsimile or e-mail, since they did not magically appear in Simon's offices. *See*, 18 U.S.C. § 1341 (mail fraud statute); 18 U.S.C. § 1343 (wire fraud statute); *United States v. Roemmele*, 2011 U.S. Dist. LEXIS 113812, 16-17 (S.D. Fla. Oct. 3, 2011) (frauds committed over the internet via email and over telephone lines by facsimile are considered wire fraud). Simon has documented admissions from Takio that he used the mail to send portions of ill-gotten gains to Lauria. *See*, Ex. CC (EMA_78-79). Simon also has evidence that Deming discussed and submitted the Image Companies' bills by using e-mail. *See*, Ex. II (IE1834-1835).

Furthermore, Takio's production contained admissions that he fraudulently charged Lauria's Simon-issued credit card to pay the fabricated invoices submitted by Pointe Distribution and Takitik. *See*, Ex. CC (EMA_86; EMA_94; EMA_95); *United States v. Roemmele*, 2011 U.S. Dist. LEXIS 113812, 16-17 (S.D. Fla. Oct. 3, 2011) (frauds involving the use of credit cards qualifies as wire fraud). Simon's files also contained receipts attached to invoices received from the Takitik and Image Companies that showed that the fraudulent invoices had often been already paid through charges to Lauria's Simon-issued credit card.

**D. The Court Could Validly Find that Dale Takio and Ryan Deming Orchestrated Their Fraud as an "Enterprise," Within the Meaning of RICO**

"[A]n enterprise includes any union or group of individuals associated in fact and that RICO reaches a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 944 (2009). Such an enterprise, "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Boyle*, 556 U.S. 938, 944-945 (2009).

"From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in *Turkette*, an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle*, 556 U.S. 938, 946 (2009) (*quoting United States v. Turkette*, 452 U.S., at 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)).

The racketeering enterprise in this case could be any one of several different enterprises. Of course, the overarching enterprise was the association in fact comprised of Lauria, Takio, Deming, Herman, Lauria's family, and the companies owned by those several defendants. Then, there is the subset of that enterprise involving the whole of the Image Companies, Takitik Companies, Deming, Takio and Herman that operated in lockstep to submit fraudulent charges to Simon by spreading the charges among the several Companies, such that it might avoid Simon's internal auditing controls. Finally, each of the Image and Takitik Companies themselves comprises a separate enterprise, with Deming, Takio and Herman all involved with each of these companies, each

29

organized for the purpose of effectuating the fraud and racketeering enterprise. Defendants' interest in each of the racketeering enterprises is fairly obvious, given their active involvement in the enterprises' racketeering activities, their status as 50% owners of the Image and Takitik Companies and as profiteers from the racketeering activities.

### E. The Court Could Validly Find that the Activities of Dale Takio and Ryan Deming Affected Interstate Commerce

Since any fraudulent invoice would have been delivered to Simon via use of the interstate U.S. Postal Service or a similar interstate provider such as Federal Express or UPS, Simon has established the requisite element that the mail fraud affects interstate commerce. 18 U.S.C. §1341.

Furthermore, since the use of e-mail or facsimile to submit fraudulent invoices would have used an interstate service provider, Simon has also established the requisite element that the wire fraud affects interstate commerce. 18 U.S.C. §1343. Additionally, the fraudulent charges to Lauria's Simon-issued credit card were transmitted through Visa, an interstate and international credit conglomerate, which also establishes the effect on interstate commerce by the wire fraud.

### VIII.   Count VIII – RICO 18 U.S.C. § 1964(c)/18 U.S.C. § 1962(d)

A plaintiff can establish a RICO conspiracy claim either by: (1) showing that the defendant agreed to the overall objective of the conspiracy; or (2) showing that the defendant agreed to commit two predicate acts. A plaintiff need not offer direct evidence of a RICO agreement; the existence of conspiracy may be inferred from the conduct of the participants. 18 U.S.C. § 1964(c); 18 U.S.C. § 1962(d); *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1992) (citations omitted).

Defendants have clearly agreed to the overall objective of the RICO conspiracy to defraud Simon and agreed to commit far more than two predicate acts. As has already been discussed in detail above, Simon has sufficient evidence to show that both were directly engaged in paying kickbacks to Lauria, that both knew that the services being charged to Simon had never been performed, that both agreed to the creation of companies for the sole purpose of furtherance of the fraud, and that both received the fraudulent profits of the RICO conspiracy.

## **CONCLUSION**

WHEREFORE, for all the foregoing, Simon Property Group, Inc. respectfully requests this Honorable Court deny the Motion for Summary Judgment filed by Defendants Dale Takio and Ryan Deming in all respects; award attorneys' fees and costs against Defendants Dale Takio and Ryan Deming in favor of Simon; as well as order any other relief this Court may deem just and proper.

Dated:	February 7, 2013

> WINGET, SPADAFORA &
> SCHWARTZBERG, LLP
>
>
> By: */s/ Carlos E. Mustelier*
>
> Carlos E. Mustelier Jr.
> Florida Bar No. 58033
> Mustelier.c@wssllp.com
> 14 NE 1st Avenue, Suite 600
> Miami, Florida 33130
> Tel: (305) 830-0600
> Fax: (305) 830-0601
>
> *Attorney for Plaintiff*
> *Simon Property Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing has been filed electronically using this Court's ECF system, which will serve an electronic copy to Thomas Sadaka, Esq., Nejame, Lafay, Jancha, Ahmed, Barker, Joshi & Moreno, P.A., 189 S. Orange Avenue, Suite 1800, Orlando, FL 32801, Craig A. Brand, The Brand Law Firm, P.A., Grove Forest Plaza, 2937 S.W. 27th Avenue, Suite 101, Miami, FL 33133, and Timothy Herman, an unrepresented party, P.O. Box 141452, Orlando, Florida 32814, on this 7th day of February, 2013. Furthermore, a copy of the foregoing has been sent by regular mail and email to pro se Defendant Timothy Herman at the foregoing address and the email address provided by Mr. Herman for the purpose of service in this action, tim@exileorlando.com.

*/s/Carlos E. Mustelier*

Carlos E. Mustelier, Jr.