**EXHIBIT R**

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SIMON PROPERTY GROUP, INC.,
          Plaintiff,
-vs-                              Civil Action No.
                                  6:11-cv-1598-GAP-KRS

LYNNETTE LAURIA, ROBERT JAMES
LAURIA, SARAH LAGI, RACHAEL
LAURIA, RJL SERVICES, LLC, ARNELL,
INC., and SNOUTHOUND ENTERPRISES,
LLC,

          Defendants.
_____/

THE DEPOSITION OF:

THOMAS BRIGNOLO

Taken by the Plaintiff

DATE:        JANUARY 9, 2012

TIME:        10:21 am to 2:15 pm

LOCATION:    Baker & Hostetler
             200 South Orange Avenue
             Orlando, Florida

REPORTER:    Elizabeth A. Speer, CRR

---

**Page 3**

1                    I N D E X
2
    TESTIMONY OF:  THOMAS BRIGNOLO
3
       Direct Examination by Mr. Blair       4
4      Cross Examination by Mr. Cruzada       112
       Redirect Examination by Mr. Blair      169
5      Recross Examination by Mr. Cruzada     182
6
7   CERTIFICATE OF OATH                       185
8   ERRATA SHEET                         186
9   CERTIFICATE OF REPORTER                   187
10                 * * * * *
11
12
                    E X H I B I T S
13
14  Plaintiff's Exhibit No. 1
       Deposition subpoena                 6
15
    Plaintiff's Exhibit No. 2
16     Composite of documents faxed to Simon   7
17  Plaintiff's Exhibit No. 3
       Composite of documents emailed documents
18     to Simon                    74
19
                 * * * * *
20
21
22
23
24
25

---

**Page 2**

1  A P P E A R A N C E S :
2
3      BRIAN C. BLAIR, ESQ., OF:
       Baker & Hostetler
4      200 South Orange Avenue
       Suite 2300
5      Orlando, Florida 32801
       (407) 649-4050
6      bblair@bakerlaw.com
       on behalf of the Plaintiff
7
8
       KRISTOPHER CRUZADA, ESQ., OF:
9      Nejame LaFay Jancha Ahmed Barker
       Joshi & Moreno, PA
10     189 South Orange Avenue
       Suite 1800
11     Orlando, Florida 32801
       (407) 245-1232
12     Kristopher@nejamelaw.com
       on behalf of the Defendants
13
14
    ALSO PRESENT:  Dave Donoway
15
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1              P R O C E E D I N G S
2   WHEREUPON:
3            THOMAS BRIGNOLO
4   having been first duly sworn to tell the truth, the
5   whole truth and nothing but the truth, testified as
6   follows:
7            THE WITNESS:  Yes.
8               * * * * *
9            DIRECT EXAMINATION
10  BY MR. BLAIR:
11     Q.  Would you state your name for the record,
12  please.
13     A.  Thomas Brignolo.
14     Q.  Mr. Brignolo, my name is Brian Blair.  And I
15  represent the Plaintiff, Simon Property Group, in this
16  matter.  And I'm going to be asking you some questions
17  today under oath.  And it's just as a fact-finding
18  mission.
19         Have you ever had your deposition before?
20     A.  No.
21     Q.  Just some simple instructions.  I'm going to
22  ask you questions.  There may or may not be objections
23  from opposing counsel.  If you'd just maybe pause before
24  you answer, that way the attorney could have time to
25  state the objection.

**Ambassador**

Page 5

1    If you need to take a break, let me know.
2  It's not an endurance contest. And if you don't
3  understand the question, please just ask me to rephrase
4  it and I will. Otherwise I'll assume that you've
5  understood the question that I've asked you.
6    Good ground rules?
7    A.  Yeah.
8    Q.  Could you list your home address, please.
9    A.  Sure. It's 4436 Cranston Place, Orlando,
10  Florida 32812.
11    Q.  And how long have you lived there?
12    A.  Two years.
13    Q.  Do you have a work address?
14    A.  It's the same.
15    Q.  Are you currently employed?
16    A.  Self-employed.
17    Q.  In what type of business are you
18  self-employed?
19    A.  Restaurant consulting and events.
20    Q.  Can you elaborate on that for me a little bit?
21  Do you consult as far as like --
22    A.  Sure. Opening procedures, grand openings,
23  events like that, and then from there, general marketing
24  ideas.
25    Q.  And are you receiving anything for your

Page 6

1  testimony today?
2    A.  No.
3    Q.  And have you appeared in response to a
4  subpoena served by my office?
5    A.  Today, yes.
6    Q.  And if I could just show you a copy of the
7  subpoena and ask you if you recognize it.
8    A.  That's it.
9    MR. BLAIR:  I'd like to mark that as
10  Exhibit 1.
11    (Marked for identification
12    as Plaintiff's Exhibit No. 1)
13    Q.  Has anyone contacted you about your testimony
14  prior to today?
15    A.  No.
16    Q.  Is there anything that might affect your
17  ability to testify today, such as medication, alcohol,
18  drugs, anything of that nature?
19    A.  No.
20    Q.  Are you under a doctor's care?
21    A.  No.
22    Q.  And in response to the subpoena or the notice
23  of taking deposition I've marked as Exhibit 1, did you
24  produce any documents?
25    A.  Yes.

Page 7

1    Q.  And I'm going to show you a pack that we've
2  all copied today and ask you if that is in response to
3  what you brought to the subpoena?
4    A.  That's it.
5    MR. BLAIR:  I'm going to mark that as
6  Plaintiff's Exhibit 2.
7    (Plaintiff's Exhibit No. 2
8    Marked for Identification)
9    Q.  Are there any other documents you have in your
10  possession that you did not bring today?
11    A.  No.
12    Q.  Does your business -- what is the name of your
13  business?
14    A.  Nolo Marketing.
15    Q.  Nolo?
16    A.  Yeah, N-O-L-O.
17    Q.  Does it operate an email account?
18    A.  Yes.
19    Q.  What is the email address?
20    A.  My email is tommy@nolomarketing.com.
21    Q.  And do you have a service provider?  Bright
22  House, AOL?
23    A.  It's called circletree.com. So I'm able to
24  use my @nolomarketing for anything.
25    Q.  And can you give me your educational

Page 8

1  background starting after high school?
2    A.  After high school I did a year of college in
3  Spain and just completed one year.
4    Q.  And what was your course study?
5    A.  Spanish.
6    Q.  And prior to Nolo Marketing where did you
7  work?
8    A.  I worked for Image Marketing Group.
9    Q.  And how long did you work at Image Marketing
10  Group?
11    A.  I believe I started in December of 2003 until
12  about July of 2011.
13    Q.  And why did you leave Image Marketing Group?
14    A.  Several reasons. No one was ever there. The
15  owners were always upset about everything. And then I
16  came to light of this situation why we're here today.
17  And I thought something was going on wrong, and I didn't
18  want this to affect my reputation in the hospitality
19  market.
20    Q.  Did you resign or were you fired?
21    A.  I quit, myself.
22    Q.  And you said that no one was ever there. How
23  many employees did Image Marketing Group have, to your
24  knowledge?
25    A.  There was two owners, Ryan Deming, Tim Herman.

**Ambassador**

Page 9

1   And Dale Takio operated out of our office. He ran a
2   different company, called Kids Eat Free Card. But he
3   was a partner within Image Marketing.
4       Q.  And other than those three individuals --
5       A.  Nobody else.
6       Q.  And what was your position at Image Marketing
7   Group?
8       A.  Originally just distribution, visiting the
9   locations for them. And then within the past two years
10  it was accounting and operations, running the whole
11  office.
12      Q.  Can you describe for me the type of work or
13  services Image Marketing Group provided its clients?
14      A.  Sure. They do hotel distribution in the
15  Orlando area and referral programs for the concierge and
16  bellmen.
17      Q.  Since I'm not in the business. I'm a lawyer.
18      A.  Sure.
19      Q.  Can you tell me what the hotel distribution
20  and hotel referral --
21      A.  They provide the concierge with offers for the
22  restaurants, like a two-for-one card or a discount card.
23  The concierge writes their name on that. The guests
24  redeem those. So there is a trackable number at the end
25  of the month, so they provide a kickback to the

Page 10

1   concierge.
2       Q.  And is that -- when you say hotel distribution
3   and hotel referral -- is that the services you just
4   described for me? Or is there something different
5   between hotel distribution --
6       A.  No. That's all they distribute. It's not
7   brochure racks or anything like that.
8       Q.  So basically, if I can paraphrase -- and again
9   tell me if I'm saying this incorrectly -- but a business
10  will come up with some type of coupon or discount or
11  advertisement or something of that nature which Image
12  Marketing Group would provide to a hotel concierge.
13      A.  Right. It's just the discount cards and
14  coupons.
15      Q.  And then that concierge would in return steer
16  people to those areas.
17      A.  Yes. Concierge recommends their guests to go
18  to those restaurants with those coupons. And when
19  they're redeemed the restaurants hold on to them. Image
20  Marketing collects them at the end of the month, tracks
21  them, sorts them, and provides a kickback to those
22  concierge.
23      Q.  And when we say kickback, some form of
24  compensation --
25      A.  Compensation. Gift certificates, some

Page 11

1   concierge -- some do cash.
2       Q.  And how does Image Marketing track those
3   coupons or discount cards?
4       A.  They pick them up from restaurants as well as
5   any reservations. They put them on an Excel sheet. And
6   they give them back to the restaurant, letting them know
7   how much money or funds they need to give to the
8   concierge.
9       Q.  Obviously if it's on an Excel spreadsheet,
10  it's on a computer; correct?
11      A.  Uh-huh (affirmative).
12      Q.  Can you describe to me what Image Marketing
13  Group's website is like?
14      A.  They have a website, and it's
15  image-marketing.com. And they list -- when a concierge
16  signs up, they go into that program. And when they do
17  referrals to the clients, when you're tracking them, it
18  goes into that system, and then you export it from there
19  to Excel.
20      Q.  So I don't know if I followed you. Do
21  concierge sign up at the Image Marketing --
22      A.  Yeah, they sign up -- or they could sign up
23  with anyone at Image Marketing and Image Marketing puts
24  them in their database. So when you're doing the
25  accounting at the end of the month for each client, you

Page 12

1   find their name on the website, and then the client.
2   And then that tracks it all on the website. So it's
3   visible to the concierge what they've done. But also
4   when you export it, you can do a report for each client,
5   and the concierge names would be there for how many
6   referrals they've done.
7       Q.  And is Image Marketing Group's data maintained
8   on or about a server or a stand-alone?
9       A.  It's a server. I think it's somewhere out of
10  New Jersey for some reason.
11      Q.  Do they back it up regularly?
12      A.  I don't -- I don't know.
13      Q.  Do you know if Image Marketing Group has a
14  document retention policy?
15      A.  I don't believe so.
16      Q.  During your tenure there did you ever destroy
17  documents or delete documents off the computer?
18      A.  No.
19      Q.  Did Mr. Herman, Mr. Deming, or Mr. Takio ever
20  ask you to do that?
21      A.  No.
22      Q.  Did they have -- when I say they, Image
23  Marketing Group or Ryan Deming, Tim Herman or Dale
24  Takio -- did they use either iPads or any other type of
25  hand-held devices, such as Blackberries?

3  (Pages 9 to 12)

**Ambassador**

Page 13

1    A.  Yes.
2    Q.  Were they through the business, or were they
3  personal devices?
4    A.  Through the business I'm sure.
5    Q.  And did you all routinely text each other?
6    A.  Yes.
7    Q.  Did you have a Blackberry or --
8    A.  I had a iPhone through the company at that
9  time.
10    Q.  And when you resigned did you turn that in?
11    A.  I kept the phone.
12    Q.  Okay.
13    A.  And I switched the number, and AT&T was able
14  just to give me a new account using that same phone.
15    Q.  And when you were at Image Marketing Group
16  your phone was through AT&T?
17    A.  Correct.
18    Q.  What was the phone number?
19    A.  (321) 274-2365.
20    Q.  And did you have an email at your work?
21    A.  Yes, tommy@image-marketing.com.
22    Q.  Do you have any other -- well, excuse me.
23       Back then did you have any other email
24  addresses?
25    A.  Personal, but none from work.

Page 14

1    Q.  What were your personal?
2    A.  T-O-M-M-Y-V-E-R-S-A-C-E @aol.com.  And then as
3  well I had tommybrignolo@gmail.com.
4    Q.  Did you save any of your -- strike that.
5       Do you have a current email address?  I know
6  you gave me the one for your Nolo Marketing.  But do you
7  have a new current personal email address or it would
8  be --
9    A.  Those are the same.
10    Q.  Okay.  Did you save any of the texts or emails
11  that Mr. Herman, Mr. Deming, or Mr. Takio may have sent
12  you on your iPhone?
13    A.  Yeah, I took snapshots of those.
14    Q.  And where are those snapshots?
15    A.  There's one right here in this --
16    Q.  You're pointing to Exhibit 2?
17    A.  Yes.
18    Q.  The first page?
19    A.  Correct.
20    Q.  And there is a snapshot from your iPhone?
21    A.  Yes.
22    Q.  Were there any other texts or messages, email
23  messages, that you saved from Image Marketing?
24    A.  Yes, but none that pertained to this matter.
25    Q.  When you say this matter, what is your

Page 15

1  understanding --
2    A.  Nothing to do with Simon Property Group,
3  Florida Mall, me leaving, or anything like that.
4    Q.  So you were at Image Marketing Group
5  approximately seven and a half years?
6    A.  That's correct.
7    Q.  And I know you said that Mr. Deming,
8  Mr. Herman, and Mr. Takio were the only employees.  Was
9  that true throughout your entire tenure?
10    A.  Not through the whole tenure.
11    Q.  Okay.
12    A.  Going back there was an intern for a while.
13  Her name was Michelle Levy.  That was probably just for
14  a year, maybe '06.  And there was an accountant from day
15  one when I was there by the name of Babette Picanol.
16    Q.  Can you spell that?
17    A.  B-A-B-E-T-T-E.  Last name, Picanol,
18  P-I-C-A-N-O-L.  And she was there until probably I want
19  to say 2008, and that's when -- she was our office
20  manager and accountant -- that's when I started assuming
21  some responsibilities for accounting.
22    Q.  Do you know why Miss Picanol left?
23    A.  She was accused of stealing.
24    Q.  What was she accused of stealing?
25    A.  Money, and I -- that's all I can think of.

Page 16

1  Nothing ever became of it.
2    Q.  Has Mr. Herman, or Mr. Deming, or Mr. Takio
3  accused you of taking anything when you left Image
4  Marketing Group?
5    A.  Yes.
6    Q.  What did they accuse you of taking?
7    A.  They accused me of taking documents.  None
8  were listed.  They sent me a certified letter not
9  listing anything specific, just saying that I've taken
10  stuff and to return it, which was not true.
11    Q.  Did they accuse you of deleting information
12  off the computer system?
13    A.  No.
14    Q.  Was that included in your certified letter?
15    A.  No.
16    Q.  You say you worked for Image Marketing Group.
17  Did Image Marketing Group -- is that the name of the
18  company, or does it have other companies within that
19  group?
20    A.  There are other companies, the Kids Eat Free
21  Card.  When I worked there I was only aware of Image
22  Marketing Group.  Now, later that I've quit, I've
23  realized that there's a lot more companies under their
24  umbrella that I didn't know about.
25    Q.  How did you find out that there were more

**Ambassador**

Page 17

1    companies under the umbrella?
2        A.   Well, looking at the subpoena there was a
3    couple listed.  And then doing Google searches and
4    sunbiz.org there is a lot more.
5        Q.   And I just want to ask you, I'm going to go
6    through some names and ask you if you've heard of the
7    company before.  If you could just tell me yes or no,
8    and then on the ones you've heard of before, we'll talk
9    about those.
10       A.   Okay.
11       Q.   Image Marketing Group, Inc.
12       A.   Yeah.
13       Q.   Image Marketing Group.
14       A.   Yes.
15       Q.   Is it Takitik, Inc.?
16       A.   Yes.
17       Q.   Point Distribution LLC.
18       A.   Not until after the subpoena.
19       Q.   Is it fair to say the subpoena made you aware
20   of that company?
21       A.   Correct.
22       Q.   DT Printing Solutions.
23       A.   Never.
24       Q.   Hat Marketing LLC.
25       A.   Yes.

Page 18

1        Q.   Inview Marketing of Central Florida, Inc.
2        A.   Never.
3        Q.   Millennia Communications Group, Inc.
4        A.   No.
5        Q.   Florida Tourism Distribution Services.
6        A.   No.
7        Q.   Kids Eat Free Card.
8        A.   Yes.
9        Q.   Target Distribution.
10       A.   No.
11       Q.   Image Marketing of Florida, LLC.
12       A.   Yes.
13       Q.   Event Planner USA, Inc.
14       A.   Yes.
15       Q.   DRT Development, LLC.
16       A.   No.
17       Q.   Mobile Higher Communications, Inc.
18       A.   No.
19       Q.   Master Map, Inc.
20       A.   No.
21       Q.   Radio One, Inc.
22       A.   No.
23       Q.   Marketing Assistance, Inc., d/b/a Rep
24   International.
25       A.   No.

Page 19

1        Q.   VS Publishing Company.
2        A.   Yes.
3        Q.   Start with VS Publishing Company, what is that
4    business or what is your knowledge of that business?
5        A.   VS Publishing creates different brochures,
6    magazines in the tourism area, in-room directories,
7    brochures in Spanish and English, tourism guides, coupon
8    booklets, things like that.
9        Q.   Have you ever witnessed any of the products of
10   this company?  Have you seen them?
11       A.   Yes.  They're everywhere.
12       Q.   And to your knowledge, did VS Publishing
13   Company do any business with Simon Property Group?
14       A.   No.
15       Q.   Were you privy to the client list of VS
16   Publishing Company such that you would know this
17   information?
18       A.   Yeah.  Well, I mean, if you pick up their
19   publication, whoever is in there, people they work with.
20       Q.   Well, are you aware of any billings from VS
21   Publishing Company to Simon Property Group?
22       A.   No.
23       Q.   And in your scope of work at Image Marketing
24   Group would you have privy to invoices?
25       A.   Yes.

Page 20

1        Q.   How about accounts receivables?
2        A.   Yes.
3        Q.   Accounts payables?
4        A.   Yeah.
5        Q.   How about any type of financial records that
6    may be on the computer?
7        A.   No.  Those weren't on any of the office
8    computers.
9        Q.   Where were those kept?
10       A.   With Mr. Herman.
11       Q.   And what type of system?  Does he have his own
12   computer?
13       A.   Yeah, he has a personal laptop.
14       Q.   Who has access to that personal laptop?
15       A.   Just him.
16       Q.   To your knowledge, was it password protected?
17       A.   Actually I think it was password and finger
18   scan.
19       Q.   If I wanted to subpoena the laptop, could you
20   describe it for me?
21       A.   If I remember correctly, it was gray.  I'm
22   assuming a Dell.  They kind of all look the same.
23       Q.   Is it small --
24       A.   Larger than this one, so maybe 15 inches.  And
25   when you open it up there is a little finger scan that

**Ambassador**

Page 21

1  you have to swipe.
2      Q.   And to your knowledge, that is only programmed
3  for Mr. Herman?
4      A.   That he did -- well, I'm not sure that's him
5  that does the accounting either.  He probably had
6  someone help him.
7      Q.   Who has access to that computer?
8      A.   Just him.
9      Q.   Okay.  Does Image Marketing Group employ a
10  certified public accountant or an accountant?
11      A.   I don't believe so.
12      Q.   Other than Mr. Herman, are you aware of anyone
13  that has access to Image Marketing Group's financial
14  records?
15      A.   Yeah.  When asking where my paycheck was, they
16  said that Sarah Lagi took over the books.  That was
17  probably within the last two years, maybe two or
18  three years of me being at Image Marketing.
19      Q.   So Sarah Lagi had some involvement in the
20  bookkeeping at Image Marketing Group?
21      A.   Yes.
22      Q.   Was she paid for those services?
23      A.   Yes.
24      Q.   Did you have access to her payment
25  information?

Page 22

1      A.   Not to her program.  She would send invoices
2  to my email, already created, for me to then give those
3  to the clients.
4      Q.   She would send invoices for her services?
5      A.   No.  Invoices from Image Marketing, she did
6  the work.  Created those invoices for Image Marketing.
7  And then sometimes would send them directly to the
8  clients for billing.  Or certain ones that I had to hand
9  deliver, she would send to me.
10      Q.   I want to back up because I'm a little
11  confused.  I thought you said Sarah Lagi took over the
12  books and records, so to speak, for Image Marketing.
13      A.   Correct.
14      Q.   So she was like an accountant?
15      A.   Yes.  I guess an accountant, but not a full
16  accountant, if that makes sense.
17      Q.   So she was in charge of creating invoices for
18  Image Marketing Group.
19      A.   Creating the monthly invoices for the
20  services.
21      Q.   Okay.  And then emailing them to whoever --
22      A.   Correct.
23      Q.   -- the services were performed; is that
24  correct?
25      A.   Yes.

Page 23

1      Q.   Do you know how much Miss Lagi was paid for
2  these services?
3      A.   No.
4      Q.   Did you have access to the Image Marketing
5  Group client list?
6      A.   Yeah, that's public.
7      Q.   Well, if I had to say how many clients do you
8  believe Image Marketing group had, approximately could
9  you tell me?
10      A.   In the beginning, in like 2003, they probably
11  had around 30 clients.  Towards the end they were
12  looking about like 5 or 6.
13      Q.   And what percentage of the work generated out
14  of Image Marketing Group was from Simon Property Group
15  as opposed to the other clients?
16      A.   Like physical work?
17      Q.   Like in other words, did Simon account for
18  50 percent of the work?  80 percent of the work?
19      A.   Oh, no.  They were a normal client.
20      Q.   What would that be?
21      A.   So I guess if you had ten clients, 10 percent.
22      Q.   Ten percent.
23      A.   Yeah.
24      Q.   Now, when Miss Lagi was generating these
25  invoices for Image Marketing Group, did she work out of

Page 24

1  the Image Marketing Group offices?
2      A.   No.
3      Q.   Where did she work out of?
4      A.   Probably from home.
5      Q.   Was that just your assumption?
6      A.   That's just my guess.  Everything was done
7  through email.
8      Q.   Do you know what email address she used?
9      A.   I believe it was image-marketing@gmail.  So it
10  looked similar, but it was a Gmail account.
11      Q.   So image-marketing@gmail --
12      A.   Correct.
13      Q.   -- dot-com?  Or is it just at Gmail?
14      A.   At Gmail.com.  However, it could have been
15  from her personal one a couple of the times.
16      Q.   Do you know what that personal email account
17  was?
18      A.   I don't remember.
19      Q.   Do you know who Sarah Lagi is?
20      A.   Yes.
21      Q.   Who do you believe her to be?  I mean --
22      A.   She is Lynnette Lauria's daughter, and she
23  works for Westgate Resorts.
24      Q.   If I could go back to just real quick to Image
25  Marketing Group.  We talked about this concierge

**Ambassador**

1  referral -- or hotel distribution and hotel referral
2  system. Did it ever include what I would call rack
3  distribution?
4      A.  No.
5      Q.  And what is your understanding of rack
6  distribution?
7      A.  Rack distribution is rack cards, brochures,
8  larger materials that go into racks, literally racks, in
9  the hotels.
10     Q.  So for me, I'm not in the marketing business,
11 if I go into a hotel --
12     A.  Yeah.
13     Q.  -- I see these little fliers for Sea World,
14 Disney World, there's usually 60 or 70 of them in this
15 rack. Is that it?
16     A.  Yeah, those are the racks. Usually an
17 information area, as soon as you walk in the hotel, an
18 information spot, tons of brochures in one area, that's
19 what I would call rack.
20     Q.  And is one able to just place, to your
21 knowledge, is a company able to just place their
22 information in the rack?
23     A.  No. Those -- every single rack is owned by a
24 company. There's two large ones. Actually, they're
25 throughout all of Florida. FPIS and Kenney

1  Communications. You have to pay them to be in those
2  racks. And they distribute the materials.
3      Q.  So you just rent a space in the rack?
4      A.  Yeah, you rent a space in the rack, and you
5  pay to have them serviced and keep them filled.
6      Q.  So to your knowledge, Image Marketing Group
7  did not provide any rack services; is that correct?
8      A.  No.
9      Q.  And other than Sarah Lagi working for Image
10 Marketing Group, did any of the Lauria family, to your
11 knowledge, work for any of the companies owned or
12 operated by Tim Herman?
13     A.  No.
14     Q.  And just so we know, the Lauria family, are
15 you familiar with the name Lynnette Lauria?
16     A.  Yes.
17     Q.  Robert Lauria?
18     A.  Yes.
19     Q.  And Rachael Lauria?
20     A.  Yes.
21     Q.  And Sarah Lagi; of course?
22     A.  Yes.
23     Q.  How about Eric Lagi?
24     A.  I met him once.
25     Q.  And do you know who he is?

1      A.  Right.
2      Q.  That's Sarah's husband?
3      A.  Sarah's husband.
4      Q.  Okay, back to the companies I asked you about,
5  you had knowledge of them, I want to just ask you now as
6  to the ones that you said yes what your understanding of
7  the services they provide. Is that okay?
8      A.  Sure.
9      Q.  Hat Marketing, LLC, what type of services does
10 that service provide?
11     A.  Hat Marketing. The person I knew there was
12 Kevin Brett. And he provides marketing promotions to
13 clients in the UK. So his client base is here in
14 Orlando. And so he meets with them and takes their
15 materials to the various travel agencies and group
16 bookers in the UK.
17     Q.  So he would take an advertisement, for
18 example, in this case from Simon Property Group and take
19 it to the UK and distribute it?
20     A.  Yes.
21     Q.  What type of advertising or literature does he
22 take?
23     A.  Brochures, sales kits, media kits.
24     Q.  Did Hat Marketing, LLC ever perform any
25 services for Simon Property Group?

1      A.  I wouldn't know.
2      Q.  Have you seen any marketing materials from Hat
3  Marketing, LLC regarding Simon Property Group?
4      A.  No.
5      Q.  Have you ever witnessed Kevin Brett providing
6  any services or marketing materials to anybody?
7      A.  Once I did a trip with him in the UK. I don't
8  believe Simon was a client at the time. This was
9  probably 2004, 2005. But with Boggy Creek Air Boats.
10 And I just kind of tagged along to see what he did.
11     Q.  Can you describe for me what he did?
12     A.  Sure. He just had a couple of meetings. One
13 was like with Thomas Cook, Virgin Holidays, to meet with
14 their sales team and just do a quick presentation of his
15 clients.
16     Q.  And who prepared the materials that he was
17 presenting? Did he prepare those himself?
18     A.  No. The clients did.
19     Q.  Are you aware of any materials that anyone at
20 Simon Property Group ever prepared for Hat Marketing,
21 LLC?
22     A.  No.
23     Q.  And Takitik, Inc., could you tell me what type
24 of marketing or services that company provides?
25     A.  I'm not sure they provide any services. It's

**Ambassador**

Page 29

1   just one of Dale Takio's companies that he just has.
2       Q.   Have you ever seen any employees for Takitik?
3       A.   No.
4       Q.   Have you ever seen any materials --
5       A.   None.
6       Q.   -- for Takitik?
7       A.   No.
8       Q.   Have you ever seen any invoices from Takitik?
9       A.   Never.
10      Q.   Have you ever seen any accounting records or
11  anything of that nature from Takitik?
12      A.   No.  He -- Dale Takio owns Kids Eat Free Card.
13      Q.   Okay.
14      A.   I would do monthly hotel visits from him.  And
15  my paychecks for Kids Eat Free came from Takitik.
16      Q.   Takitik, is that how you say it?
17      A.   I think so.
18      Q.   Since you're familiar with -- well, let me
19  back up.
20           Have you ever seen any services from Takitik
21  provided to Simon Property Group?
22      A.   No.
23      Q.   Were all the books and records for these
24  companies that you're familiar with, were they kept at
25  the Image Marketing Group offices?

Page 30

1       A.   Probably on their computers or in their
2   office.
3       Q.   And before I leave the computer part, we have
4   kind of a main frame.  You said it was up in New Jersey
5   you thought.
6       A.   Right.
7       Q.   And then Mr. Herman's personal laptop.
8       A.   Right.
9       Q.   Were there any other computer systems at Image
10  Marketing Group?
11      A.   Yeah.  There's computer systems there.
12      Q.   Okay.
13      A.   I don't know about invoices or any documents
14  that are saved on them.
15      Q.   Is there more than one computer terminal?
16      A.   Yes.
17      Q.   How many computer terminals are there?
18      A.   Probably three.
19      Q.   Are they hooked through a main frame or
20  linked?
21      A.   Yeah.  However, I think they've closed their
22  offices in the past couple of months.
23      Q.   Do you know why they closed their offices?
24      A.   I couldn't say for sure.  Probably because
25  they're down clients.  I don't know the correct answer.

Page 31

1       Q.   But the computers were not individual
2   stand-alone terminals.  They were hooked together
3   through a network or something of that nature?
4       A.   Yeah.  There was a system.
5       Q.   And did you ever perform yourself any back-ups
6   of the system at night or anything of that nature?
7       A.   I didn't.
8       Q.   Did you ever see it being done?
9       A.   No.
10      Q.   Did you ever get any emails or anything of
11  that nature saying we'll be backing up the system that
12  night?
13      A.   Yeah, there were times when the system was
14  down for backups.
15      Q.   Do you know approximately how long or the
16  intervals it was backed up?
17      A.   No.
18      Q.   Did Image Marketing Group have an IT person?
19      A.   It was that company in New Jersey.
20      Q.   Do you know the name of the company?
21      A.   I don't.
22      Q.   So if a computer crashed --
23      A.   Well, it -- I'm not for sure -- it could be
24  something called Sequence.
25      Q.   Sequence?

Page 32

1       A.   Yeah.  When there was a problem there was a
2   1-800 number to call.  They would fix the system.
3       Q.   Okay.  Did anyone local ever come in, like a
4   warm body, come in and work on your computer systems?
5       A.   No.
6       Q.   Back to the Kids Eat Free Card.  What type of
7   business or service was that?
8       A.   Kids Eat Free Card, they sell this card for
9   $20.  When an adult pays for a meal, the child eats free
10  for the restaurants listed on the card.
11      Q.   Was that in any way associated with any
12  marketing with Simon Property Group?
13      A.   I don't believe so.
14      Q.   And that's run by Mr. Takio?
15      A.   Ran by Dale Takio, but owned by Tim Herman and
16  Dale I believe.
17      Q.   Did you ever see any invoices for services
18  from Kids Eat Free going to Simon Property Group?
19      A.   No.
20      Q.   How about Event Planners USA, Inc., what type
21  of services did that provide?
22      A.   That was going to be an event company.  Never
23  took off the ground with Image Marketing.  They were
24  going to try to sell park tickets and provide services
25  for guests.

8  (Pages 29 to 32)

**Ambassador**

Page 33

1  Q.  And to your knowledge, did Event Planners USA
2  ever perform any services for Simon Property Group?
3  A.  No.
4  Q.  To best of your knowledge, did Event Planners
5  USA, Inc. ever bill Simon Property for any services?
6  A.  I don't know.
7  Q.  And now you said you had knowledge of three
8  companies called Image Marketing Group, one just being
9  Image Marketing Group, one being Image Marketing Group,
10  Inc., and one being Image Marketing Group of Florida
11  LLC.  Are you considering those kind of one company?
12  A.  All the same.
13  Q.  Can you tell me what type of -- well, other
14  than the hotel referral and the hotel distribution
15  services that you described earlier, to your knowledge,
16  did any of those companies provide any other services?
17  A.  No.
18  Q.  And as far as the -- I guess the discount
19  cards or coupons, whatever is given to the concierge,
20  who makes those or prints those?
21  A.  The client is responsible for paying for it.
22  Image Marketing sometimes would create them.  Or if each
23  client had their own graphics person, they were able to
24  do that themselves.
25  Q.  So Image Marketing would not do any, like,

Page 34

1  event, like go to events or anything of that nature.
2  A.  They would host concierge events --
3  Q.  Okay.
4  A.  -- every once in a while.
5  Q.  Can you describe for me what that would be?
6  A.  Sure.  That would be at the client, most
7  likely, so the concierge would be educated on that place
8  and be able to refer their guests better.  They used
9  to -- Image Marketing held something called The Summer
10  Bash for two years only while I was employed there.  And
11  that was a big trade show style event, event kind of and
12  party as well.  And that was probably '04, '05.
13  Q.  But other than, I guess, having an acclimation
14  for the concierge, and then taking these discount
15  coupons to the concierge and possibly producing the
16  coupon, did Image Marketing provide any other services
17  to any other client?
18  A.  No.
19  Q.  Did it go to any trade shows?
20  A.  They would host a trade show, but not go on
21  behalf of any of the clients.
22  Q.  So when you say host a trade show, can you
23  describe for me what that would be?
24  A.  Yeah.  They would have a trade show at a hotel
25  and invite all of their clients to go and have a table

Page 35

1  top.
2  Q.  So they could interact?
3  A.  So they could market to those concierge.
4  Q.  It was all, again, back to the concierge;
5  correct?
6  A.  Correct.
7  Q.  So would they host a trade show where Simon
8  Property Group would be present, or represented by Image
9  Marketing Group?
10  A.  Yes.
11  Q.  In what context?
12  A.  They would just -- well, Image Marketing
13  wouldn't go on behalf of Simon.  They would invite Simon
14  and Simon would provide a representative.
15  Q.  At the trade show being hosted by Image
16  Marketing Group?
17  A.  Correct.
18  Q.  Would Image Marketing Group typically bill
19  Simon Property Group for showing up at that trade show?
20  A.  Yes.
21  Q.  How much would they bill?
22  A.  Usually table tops are three to $400.
23  Q.  As far as the hotel distribution and hotel
24  referral business, i.e., concierges, who would do the
25  physical distribution for those discount cards?

Page 36

1  A.  When I was employed it was me.
2  Q.  And did you have a list of hotels that you
3  went to?
4  A.  Yes.
5  Q.  And where was that list kept?
6  A.  On Image Marketing database.
7  Q.  Did anyone else, to your knowledge, do that
8  distribution?
9  A.  No.
10  Q.  And can you kind of give me a rough idea where
11  you did the distribution?
12  A.  Sure.  International Drive in Orlando, Lake
13  Buena Vista hotel area and Kissimmee, 192.
14  Q.  Did you ever go out of town, like the I-4
15  corridor?
16  A.  No.
17  Q.  Did you ever go to South Florida, Miami?
18  A.  Towards the end, I want to say maybe 2009,
19  they picked up the South Florida -- or South Florida
20  Simon properties, a couple there.  And I did it maybe
21  twice.
22  Q.  When you say they picked up, Image
23  Marketing --
24  A.  Image Marketing picked up.
25  Q.  Did Tim Herman ever perform any distribution?

9  (Pages 33 to 36)

**Ambassador**

Page 37

1      A.  No.
2      Q.  Did Brian Deming ever perform any
3  distribution?
4      A.  No.
5      Q.  Did Dale Takio ever perform any distribution?
6      A.  No.
7      Q.  To your knowledge, did Lynnette Lauria perform
8  any distribution?
9      A.  No.
10     Q.  Did Sarah Lagi perform any distribution?
11     A.  No.
12     Q.  Did Robert Lauria ever perform any?
13     A.  No.
14     Q.  How about Rachael Lauria?
15     A.  No.
16     Q.  Eric Lagi?
17     A.  No.
18     Q.  Do you know why Mr. Herman and Mr. Deming
19  owned so many companies under this Image Marketing
20  Group?  Was that ever discussed?
21     A.  No.  Their books and everything were not ever
22  discussed with me.
23     Q.  To your knowledge, the companies that we
24  discussed that you had knowledge about, did they keep
25  their own separate books and records?  Like if I went to

Page 38

1  Takitik, or however it's pronounced, would that have its
2  own set of book and records?  Or were they all kind of
3  all milled in together with Image Marketing Group?
4      A.  Takitik probably had his own books, because
5  that was partially owned by Dale Takio.  But all the
6  Image ones there were just through Tim.
7      Q.  Did you ever see any division between the
8  marketing -- I mean, excuse me -- the books and records
9  for the various Image Marketing companies I told you
10  about today?  In other words, did Image Marketing Group
11  have a set of books?  Did Image Marketing Group, Inc.
12  have a set of books?
13     A.  No.  The three Image listed there, I don't
14  know why there's three or what happened.  They were
15  always the same company.
16     Q.  Were you ever privy to any of the Image
17  Marketing Group's corporate records, such as meetings
18  and articles of incorporation?
19     A.  No.
20     Q.  Did you ever witness any quarterly or yearly
21  meetings with the companies?
22     A.  No.
23     Q.  Did Image Marketing Group ever hold any
24  meetings, like sales meetings or anything of that
25  nature?

Page 39

1      A.  You mean sales meetings to get new business?
2      Q.  Like in other words, just three or four people
3  working at the company, I just didn't know if you were
4  just given tasks, or did they have meetings where things
5  were discussed?
6      A.  No.  It was a lot of calling.  Can you do this
7  today, that today, over the telephone.
8      Q.  Did you go into the office to work a lot?  Or
9  did you work from home?
10     A.  I went into the office every morning.  And
11  then I went out to the hotel area.
12     Q.  And when you distributed these discount cards
13  and the like, where did you get them from?
14     A.  Their office.
15     Q.  And to your knowledge, were they
16  distributed -- or excuse me -- printed or made up from
17  Image Marketing or the clients?
18     A.  From the clients.
19     Q.  Did you ever witness Image Marketing preparing
20  any discount cards?
21     A.  No.
22     Q.  Or preparing any literature that you
23  distributed through this program?
24     A.  The clients provided the discount cards.
25  Image Marketing would create fliers every once in a

Page 40

1  while or a newsletter or contest information just on
2  regular 8 by 11 paper.
3      Q.  So is it fair to say that you had direct
4  knowledge about the marketing material that was being
5  distributed by Image Marketing Group?
6      A.  Yes.
7      Q.  Did you ever witness any marketing materials
8  being distributed on behalf of Simon Property Group or
9  any of its malls?
10     A.  Yes.
11     Q.  And do you know where those marketing
12  materials came from?  In other words, did the client
13  provide them or did Tim Herman make them up?
14     A.  I know that the Simon mall, whatever they
15  wanted distributed came directly from them.  Usually
16  with corporate accounts, everything has to be approved
17  by them.
18     Q.  What was the business address for the Image
19  Marketing Group companies?
20     A.  7021 Grand National Drive, Orlando, Florida
21  32819.
22     Q.  Was there a suite number?
23     A.  105.  They had moved within that office
24  complex a couple of times throughout the years.
25     Q.  Have you ever met Lynnette Lauria?

10  (Pages 37 to 40)

**Ambassador**

Page 41

1    A.  Yes.
2    Q.  On how many occasions?
3    A.  Maybe ten.
4    Q.  Do you know a woman named Lydia Gilmore?
5    A.  No.
6    Q.  Do you know a gentleman named Brian Peters?
7    A.  Yes.
8    Q.  Who is Brian Peters?
9    A.  Brian Peters is the GM of Florida Mall.
10   Q.  Do you know a woman named Becky Morantz?
11   A.  No.
12   Q.  I'm going to ask you another list of companies
13   and ask you if you're familiar with any of these
14   companies.  Are you familiar with RJL Services?
15   A.  Not until about a month before I left.  Image
16   Marketing --
17   Q.  And then how did you become aware of RJL
18   Services?
19   A.  Mr. Herman had asked me to run credit cards
20   and put the slips in a certain file.  And those -- there
21   was invoices from RJL Services in that file.
22   Q.  And what was the purpose of running the credit
23   card slips for RJL Services; do you know?
24   A.  It wasn't for RJL Services.  It was for Image
25   Marketing.  But he wanted them in that same file.

Page 42

1    Q.  So Image Marketing was being paid by somebody?
2    A.  Correct.
3    Q.  And then when you ran the credit cards to get
4    paid you put the receipts in a file; is that correct?
5    A.  Yes.
6    Q.  And in that file were invoices from RJL
7    Services?
8    A.  Correct.
9    Q.  And do you happen to recall what client was
10   paying those credit card invoices when you were running
11   them?
12   A.  Simon Malls.
13   Q.  And do you know why it was going into the RJL
14   Services file folder?
15   A.  No.
16   Q.  Did you ask?
17   A.  No.
18   Q.  Did you ask Mr. Herman or anyone at Image
19   Marketing Group who RJL Services was?
20   A.  No.
21   Q.  Other than seeing the invoices in the file, do
22   you have any knowledge as to who RJL Services is?
23   A.  No.
24   Q.  Do you know who owns RJL Services?
25   A.  At the time, no.  Now I know.

Page 43

1    Q.  Who do you believe owns RJL Services?
2    A.  Either Lynnette, or Bob Lauria, or Robert.
3    Q.  Her husband?
4    A.  Her husband.
5    Q.  And how did you find that out?
6    A.  Google.
7    Q.  Did you ever witness RJL Services providing
8    any services to Image Marketing Group?
9    A.  No.
10   Q.  Did you ever witness RJL Services providing
11   any services to Simon Property Group?
12   A.  No.
13   Q.  And just so I'm thorough, did you ever witness
14   RJL Services preparing any marketing materials for Image
15   Marketing Group?
16   A.  No.
17   Q.  On behalf of Simon Property Group.
18   A.  No.
19   Q.  Did you ever see RJL Services preparing any
20   marketing material on behalf of Simon Property Group?
21   A.  No.
22   Q.  Did you yourself ever receive at Image
23   Marketing Group invoices from RJL Services?
24   A.  No.
25   Q.  Was that the only time that you described this

Page 44

1    one time to run the credit card for Image Marketing
2    Group, that's the only time you've ever seen the RJL
3    Services invoices?
4    A.  Correct.
5    Q.  Are you familiar with a company called Arnell,
6    Inc.?
7    A.  No.
8    Q.  Do you know who owns Arnell, Inc.?
9    A.  Never heard of it.
10   Q.  So is it fair to say you've never seen any
11   services or materials provided by Arnell, Inc. to either
12   Simon Property Group or Image Marketing Group?
13   A.  No.
14   Q.  Are you familiar with the business called XLM
15   Marketing?
16   A.  No.
17   Q.  And do you know who owns or is affiliated with
18   XLM Marketing?
19   A.  No.
20   Q.  Is it fair to say you've never seen any
21   marketing material or services being provided by XLM
22   Marketing to either Image Marketing Group or Simon
23   Property Group?
24   A.  Never.
25   Q.  How about XL Marketing?

11 (Pages 41 to 44)

**Ambassador**

Page 45

1    A.  No.
2    Q.  You don't know who owns it or is affiliated
3  with it?
4    A.  No.
5    Q.  Is it fair to say that you've never seen any
6  marketing services or advertising materials provided by XL
7  Marketing to either Simon Property Group or Image
8  Marketing Group?
9    A.  Never.
10    Q.  Are you aware of a company called PR Works?
11    A.  No.
12    Q.  And you do not know who owns or was affiliated
13  with PR Works?
14    A.  No.
15    Q.  So you do not have any knowledge or have never
16  seen any marketing material or services being provided
17  by PR Works to either Image Marketing Group or Simon
18  Property Group?
19    A.  Never.
20    Q.  To speed things up I'm just going to ask you
21  if you've heard of these companies; then I'll ask one
22  big question.  How's that?
23    A.  Good.
24    Q.  Have you heard of Marketing Resource Network,
25  LLC?

Page 46

1    A.  Yes.
2    Q.  Have you heard of Excell, E-X-C-E-L-L,
3  Services?
4    A.  No.
5    Q.  SEI?
6    A.  No.
7    Q.  Orange Thorpe Investments, LLC?
8    A.  Yes.
9    Q.  Westgate Resorts?
10    A.  Yes.
11    Q.  OnCall Services, Inc.?
12    A.  No.
13    Q.  M. Lauria & Associates, Inc.?
14    A.  No.
15    Q.  Okay.  For the ones that you have not -- don't
16  have any knowledge, which is Excell Services, SEI,
17  OnCall Services, Inc., or M. Lauria & Associates, Inc.,
18  is it fair to say that you've never seen any marketing
19  material or witnessed any services being provided by any
20  of these companies to either Image Marketing Group or
21  Simon Property Group?
22    A.  Never.
23    Q.  As far as any of the companies that we have
24  talked about so far, did you see any books and records
25  in the Image Marketing Group office associated with

Page 47

1  these companies?
2    A.  Just the one you listed, Oglethorpe.
3    Q.  Okay.
4    A.  And RJL.  And I think there was a third one.
5    Q.  Westgate.
6    A.  No, not Westgate.  The other two were all in
7  that same file that we talked about a couple questions
8  ago.
9    Q.  Was there a label to this file?
10    A.  Florida Mall.
11    Q.  Florida Mall.  As far as the Westgate Resorts,
12  what is your familiarity with that company?
13    A.  Westgate Resorts is the largest timeshare
14  company in Orlando.
15    Q.  I mean, so you just know it by reputation?
16    A.  Reputation, yeah.
17    Q.  Did you work on any files or any projects with
18  Image Marketing Group associated with Westgate Resorts?
19    A.  No.
20    Q.  Did you or were you privy to any marketing
21  material or services being exchanged between either
22  Westgate Resorts and Simon Property Group or Image
23  Marketing Group?
24    A.  None with Simon.  Image Marketing Group had a
25  client, the Orlando Magic, and Westgate sold their

Page 48

1  tickets.  So we would visit those desks and locations
2  with schedules and seating arrangements and everything.
3    Q.  What is your familiarity with Orange Thorpe
4  Investments?
5    A.  That was in the same file, that Florida Mall
6  file.
7    Q.  Did you see any -- like could you tell what
8  the invoices were about?
9    A.  Just said for services.  But I've never met a
10  person from there.  Never worked with them.  Never had
11  any contact with them ever.
12    Q.  So from what you could tell, it appeared as
13  though Orange Thorpe Investments had been paid for
14  services rendered?
15    A.  Correct.
16    Q.  Do you know who paid them?  Could you tell who
17  had paid them?
18    A.  I don't know if they were -- could I look at
19  these?
20    Q.  Sure.
21    A.  They were billing Image Marketing or Image
22  Marketing was paying them.
23    Q.  But it was between Orange Thorpe Investments
24  and Image Marketing; correct?
25    A.  Correct.

**Ambassador**

Page 49

1    Q.  It wasn't Orange Thorpe Investments and Simon
2   Property Group.
3    A.  I don't believe so.
4    Q.  So your best -- the best of your recollection
5   was that Orange Thorpe Investments was either being paid
6   by Image Marketing Group --
7    A.  Correct.
8    Q.  Did you ever witness any services or materials
9   being provided by Orange Thorpe Investments to either
10  Image Marketing Group or Simon Property Group?
11   A.  No.
12   Q.  And you said you never met anyone from Orange
13  Thorpe Investments?
14   A.  No.
15   Q.  Do you know who owns Orange Thorpe
16  Investments?
17   A.  I do now.
18   Q.  And how do you know who owns it now?
19   A.  Google.
20   Q.  And who do you think owns Orange Thorpe
21  Investments?
22   A.  The Laurias.
23   Q.  And that would be Lynnette Lauria and Robert
24  Lauria?
25   A.  Correct.

Page 50

1    Q.  You said you were also familiar with Marketing
2   Resource Network, LLC; is that correct?
3    A.  Correct.
4    Q.  What is your familiarity with them or that
5   company?
6    A.  They're in this Exhibit No. 2.
7    Q.  And what --
8    A.  They were in that Florida Mall file.
9    Q.  And that's the one where you found the RJL
10  Services invoice and the Orange Thorpe Investment
11  invoice?
12   A.  Correct.
13   Q.  And other than seeing the invoice in the file,
14  do you have any knowledge as to about the company?
15   A.  No.
16   Q.  Could you tell what the invoice was for?
17   A.  Could I look?
18   Q.  Sure.
19   A.  You're talking about Marketing Resource?
20  Yeah, distribution services.
21   Q.  And you're looking at just some of the
22  invoices in Exhibit No. 2?
23   A.  Correct.
24   Q.  And is Exhibit 2, is that a copy of this file,
25  of that file?

Page 51

1    A.  Yes.
2    Q.  To the best of your knowledge, what was the
3   content of that file?  In other words, you've given me a
4   lot of papers here under Exhibit 2.  Can you tell me
5   what was in the file versus maybe would you have
6   collected or printed off your phone?
7    A.  Sure.  In that file were the invoices from
8   Marketing Resources, RJL Services, receipts, and then
9   these Excel spreadsheets.  Let's see these the back.
10   Q.  I know there are some credit card receipts?
11   A.  Credit card receipts.
12   Q.  Those were in there as well?
13   A.  Correct.
14   Q.  So is it fair to say maybe other than the
15  photographs and the front page, most of this came -- and
16  the emails, the very beginning, most of these came from
17  that file?
18   A.  Correct.  Everything except for the emails.
19  The Simon Mall invoices were not in that file.  These
20  were sent from Sarah to my work email at Image.
21   Q.  Can you show me -- can you put your finger on
22  that line and show me?
23   A.  Sure.
24   Q.  So it's an invoice dated March 24th, 2011.
25  It's invoice number 123.  And it's from Image Marketing?

Page 52

1    A.  There's a couple.
2    Q.  Okay.
3    A.  But they all look like this format.
4    Q.  When you say this format, that would be the
5   ones from Sarah Lagi --
6    A.  Correct.
7    Q.  -- to you at Image Marketing Group?
8    A.  These were sent to Tim Herman.  Tim Herman
9   called me one day, said his printer wasn't working, and
10  emailed these to me.  I had no contact with any of the
11  Florida Mall or Simon Mall invoices until this.
12   Q.  Until these invoices on March 24th were sent
13  through?
14   A.  Correct.
15   Q.  And just so we have a clear record, we're
16  looking at Exhibit 2.  And about four, five pages in,
17  there is some Image Marketing invoices, and they start
18  with a date of 3/24/2011; correct?
19   A.  Correct.
20   Q.  And it's invoice number 124.  And then the
21  next one, which is an invoice dated March 24, 2011,
22  which is 127; correct?
23   A.  Yes.
24   Q.  And invoice dated March 24, 2011, invoice
25  number 126; correct?

**Ambassador**

Page 53

1     A.  Correct.
2     Q.  Invoice dated March 24, 2011, invoice number
3  123; direct?
4     A.  Correct.
5     Q.  And invoice dated March 24th, 2011, invoice
6  number 122?
7     A.  Correct.
8     Q.  And invoice dated 3/24/2011, invoice 121,
9  all -- correct?
10    A.  Correct.
11    Q.  And all those are from Image Marketing?
12    A.  Correct.
13    Q.  And all those, to the best of your knowledge,
14  were sent to you from Sarah Lagi?
15    A.  From Sarah to Tim.
16    Q.  Yes.
17    A.  And then Tim to me.
18    Q.  And in the email at the bottom, I notice it
19  says Image Marketing at Gmail.com?  Is that Sarah --
20    A.  That is most likely Sarah.
21    Q.  Do you know why Sarah Lagi would be sending
22  these?
23    A.  No.
24    Q.  And to the best of your knowledge, were these
25  invoices paid?

Page 54

1     A.  Yeah.
2     Q.  And who paid them?
3     A.  Simon Mall.
4     Q.  And do you know how these invoices were paid?
5     A.  Credit card machine.
6     Q.  And where -- who -- well, can you describe
7  the --
8     A.  Sure.  In the Image Marketing offices there
9  was a little credit card terminal.  They had Lynnette's
10  card on file.  And then the site of the Florida Mall
11  Orlando had a separate card, corporate card, on file.
12  So these were divvied up.  Certain ones were charged to
13  Lynnette.  Certain ones were charged to the Orlando
14  card.
15    Q.  How do you know which ones, how to divvy it
16  up?
17    A.  Tim would let us know which ones to do.  Or
18  Tim would do it.
19    Q.  Did he give you any indication of how they
20  were divvied up, or he'd just tell you?
21    A.  Yeah, he would just tell us.  I think -- tell
22  you the numbers.  Number 121.
23    Q.  And you're talking about invoice 121; correct?
24    A.  Correct.  This was probably to Lynnette's
25  card.  Number 122 would probably be Lynnette's card.

Page 55

1  Number 123 would be Lynnette's card.  Number 126 would
2  be Lynnette's card.  Number 127 would be Lynnette's
3  card.  And then 124 -- and it has a different name,
4  Andrea Bjornlie, that would go to the Orlando Florida
5  Mall card.
6     Q.  So all the invoices that were billed to
7  Lynnette Lauria would go on her card.
8     A.  Correct.
9     Q.  And all the invoices that were billed to
10  someone else at Florida Mall would go to the Florida
11  Mall card on file; correct?
12    A.  Correct.
13    Q.  To your knowledge -- let me back up.
14        So to understand the process, these invoices
15  that we've just talk -- that you just testified to would
16  be emailed to you by Sarah Lagi.  They would be emailed
17  from Sarah Lagi to you for payment; correct?  I'm just
18  trying to figure out -- can you describe the process?
19    A.  Sure.  Sarah Lagi would do the books for Image
20  Marketing.
21    Q.  Okay.
22    A.  For all other clients she would send them
23  directly to the client.
24    Q.  Okay.
25    A.  For Simon Mall I never saw any invoices in my

Page 56

1  seven years there until March of 2011, because Tim
2  Herman's printer wasn't working and he sent these to me.
3     Q.  All the other ones --
4     A.  All the other ones went directly to the
5  clients.
6     Q.  Did you see other clients' invoices?
7     A.  Yeah, when they would submit payments, I would
8  pick those up and there would be the invoice attached to
9  them usually.
10    Q.  But you didn't do that for Simon Property
11  Group?
12    A.  No.
13    Q.  Do you have knowledge as to whether any of the
14  services provided in these Image Marketing invoices were
15  actually provided?
16    A.  I can go through in order.
17    Q.  Sure.
18    A.  Number 124, this was the referral program for
19  the Orlando Florida Mall.  This one was provided.
20    Q.  Now, when you say the referral program, is
21  this the concierge?
22    A.  The concierge referral program with the hotel
23  distribution.
24    Q.  Okay.
25    A.  Vehicle sponsorship was I submitted a picture.

**Ambassador**

Page 57

1  Q.  That's invoice number 127?
2  A.  Number 127, yeah.  Page two in this exhibit --
3  Q.  Right.
4  A.  -- was pictures of the logo on the van.  This
5  was supposed to be on two.  It was only on one.
6  Q.  Whose van is that?
7  A.  Owned by Image Marketing.
8  Q.  And so basically Simon Property Group paid
9  $4,500 for the stickers that are on page 2 of Exhibit 2?
10  A.  Correct.
11  Q.  And it was one sticker instead of two?
12  A.  Correct.
13  Q.  Go ahead.
14  A.  The next one, number 126, Mixer Monday, the
15  event did occur.  Each month it was hosted at a
16  different restaurant.  The restaurant footed the bill.
17  And Image Marketing charged at the door.  And those
18  funds -- I worked the door quite often, and I would give
19  that cash to Tim Herman.
20  Q.  So what would be the Monday Mixer bill to
21  Simon Property Group for?
22  A.  I don't know.
23  Q.  Was there any services provided by Image
24  Marketing for that $4,500, to the best of your
25  knowledge?

Page 58

1  A.  No.
2  Q.  In other words, Image Marketing Group got paid
3  by the admission charge; correct?
4  A.  Got paid by the admission charge.  Prior to
5  the event Image Marketing would send out an E-blast to
6  its database just inviting people to come.
7  Q.  And were mixer participations part of the
8  scope of services that Image Marketing was supposed to
9  be providing to Simon Property Group?
10  A.  No.
11     This is for number 123.
12  Q.  Invoice number 123?
13  A.  Correct.  This would be the hotel distribution
14  for South Florida.  This occurred sometimes.
15  Q.  When you say sometimes, can you give me the
16  best of your --
17  A.  I did it maybe two times out of the
18  ten-year -- or seven years I was with Image Marketing.
19  I was in Orlando.  It wasn't my responsibility to do it.
20  Q.  And other than you, you said no one else was
21  doing it.  So if you didn't do it, did the distribution
22  get done, to the best of your knowledge?
23  A.  I don't believe so.
24  Q.  So as far as invoice 123, you're saying that
25  that service happened, to the best of your knowledge,

Page 59

1  once or twice, but you're not is sure whether it
2  happened on the 24th of -- March 24th of 2011?
3  A.  Yeah, that's correct.
4  Q.  What, to your knowledge, what is the charge
5  based upon?  Like for example, this one, you're
6  distributing in Miami, it's $1,400 on the invoice 123.
7  And then under, you know, the local referral program
8  under invoice 124, it's 3,500.  I mean, do you know the
9  correlation of the charges?
10  A.  No.  I wouldn't know why it's different, I
11  mean, why 123 invoice and invoice number 122 would be
12  any different amounts.  And actually invoice number 122
13  is charging something extra which invoice number 124
14  covers, the concierge service fee, guest service
15  referral program.  And number 122, the top spots hotel
16  distribution is the same thing.  They just named it
17  differently here.  But it's the same service.
18  Q.  So they're billing for the same service, just
19  calling it something different?
20  A.  Correct.
21  Q.  What about invoice number 121, dated March 24,
22  2011?
23  A.  Yeah.  That is also covered by number 124.
24  That's the same exact service.
25  Q.  Do you know why the amounts were different if

Page 60

1  it's the exact same service?
2  A.  No.
3  Q.  Did you have any knowledge to the pricing or
4  have any access to the pricing structure between Image
5  Marketing Group and Simon Property Group?
6  A.  Not until these documents came.
7  Q.  And then --
8  A.  I had knowledge of the -- what the other
9  typical clients were paying.
10  Q.  Could you tell what the other typical clients
11  were paying?
12  A.  Anywhere from 500 to a thousand dollars per
13  month.
14  Q.  To do the same thing?
15  A.  Do the same exact thing.
16  Q.  And then what were they charging Simon
17  Property Group for the same thing?
18  A.  I think, if you total all these up, it's
19  around 15 grand per month.
20  Q.  So it's anywhere from five -- to kind of
21  recap, you have 4 to 5 clients, basically, you say when
22  you were leaving.
23  A.  Sure.
24  Q.  Four of them were being charged 500 to a
25  thousand dollars a month for what Simon Property was

**Ambassador**

Page 61

1 being charged $15,000 a month.
2 A. Correct.
3 Q. Do you know why Simon Property Group was being
4 charged so much?
5 A. No.
6 Q. Do you know if Miss Lauria was receiving any
7 money in return for those exorbitant fees?
8 A. If you'd look at page one of Exhibit 2.
9 Q. Yes.
10 A. It leads me to believe that Lynnette was
11 receiving funds or kickbacks from Tim at Image
12 Marketing.
13 Q. And page 1 to Exhibit 2, it looks like it's a
14 maybe an instant message off your iPhone; correct?
15 A. Correct.
16 Q. And it says Tim at the top. Do you know who
17 that Tim is?
18 A. That's Tim Herman.
19 Q. And who was he addressing this message to?
20 A. To me.
21 Q. And could you read it into the record for me,
22 please?
23 A. Sure. Tried to run -- try to run before if
24 possible, because moneys still have not arrived for
25 money, 1,650, because we ran it so late and Lynnette has

Page 62

1 used already. Makes it rough. And please lose your
2 sarcasm immediately. I don't need it right now. I just
3 want to know exactly what happened.
4 And then another text from him: And you are
5 not to talk to our -- talk our company business to no
6 one, including especially any rep from VS Publishing.
7 Understand.
8 Q. And this was -- I see a time of 5:13 PM. Do
9 you recall when this was sent, like a date?
10 A. Probably beginning of June of 2011. I
11 couldn't give an exact date.
12 Q. So in May or June of 2011?
13 A. Correct.
14 Q. And can you explain to me, in the context of
15 what you understand this to be, like for example, just
16 break down the message. It says: Try to run if
17 possible. What is that?
18 A. Sure. I was on the road visiting the
19 concierge. He needed me to go back to the office to run
20 a credit card. That's what he means "to run."
21 Q. Try to run the credit card?
22 A. Run a credit card through the machine, because
23 the funding hasn't come through and Lynnette had already
24 taken her funds.
25 Q. Meaning her cut?

Page 63

1 A. Her cut.
2 Q. Okay. Did you ever witness any checks or
3 anything being distributed to Lynnette Lauria or for any
4 of her businesses?
5 A. No.
6 Q. And is this email based on your understanding
7 of what she got a cut on?
8 A. Yes.
9 Q. Do you know if anyone else from Simon Property
10 Group was taking a cut?
11 A. No.
12 Q. Do you know if Lydia Gilmore was?
13 A. No.
14 Q. Do you know if Brian Peters was?
15 A. No.
16 Q. Do you know if Becky Morantz was?
17 A. No.
18 Q. Do you know if any of those individuals were
19 involved in any of what we're talking about today?
20 A. No.
21 Q. Have you discussed the problems or the
22 concerns you had today with any of those individuals?
23 A. No.
24 Q. And do you know why Mr. Herman does not want
25 you to talk about company business, especially with any

Page 64

1 rep from VS Publishing?
2 A. Yes.
3 Q. Why is that?
4 A. There's another name on one of the invoices,
5 Andrea Bjornlie. She was new. And she was the
6 marketing representative for the Florida Mall in
7 Orlando.
8 Q. You're saying new for Simon Properties?
9 A. Or new in that position.
10 Q. Okay.
11 A. She asked me to come in to describe what Image
12 Marketing provides, what kind of services. So I went
13 in. Just gave her a brief overview of the concierge
14 referral program. She asked which guest service company
15 was the strongest.
16 And I let her know that Expedia Local Experts
17 was a new company. They're really strong. And they had
18 a booklet printed by VS Publishing, but it was not --
19 you didn't have to advertise with this booklet to be
20 referred off the Expedia desk. She asked me for the
21 contact because she wanted to advertise in that Expedia
22 booklet.
23 She -- from a phone conversation from Tim,
24 what I understand is Andrea liked it. She wanted to go
25 ahead and be in that booklet. Set up a meeting with VS

**Ambassador**

Page 65

```
 1   Publishing.  She asked Lynnette for the okay for the
 2   budget to go in that program.  And Lynnette called Tim.
 3          The whole sarcasm comment in this text message
 4   is because Tim was screaming at me.  I wish there was a
 5   record button on my phone.  Because he said, we don't
 6   want to go in VS Publishing.  That's more money out of
 7   Lynnette's budget that could be going to me.
 8       Q.  So in other words, he was upset that you were,
 9   in essence, steering the mall towards another -- what
10   would be a competitor?
11       A.  No.  VS Publishing, it was -- it's a magazine
12   that's on a lot of the concierge desks, activity
13   booklets.  The concierge writes, you know, activities
14   and recommendations for tickets in there.  So the Andrea
15   lady really liked it.  I just gave her the number for
16   it.
17       Q.  How would that be taking money from Image
18   Marketing Group then?  I don't understand.
19       A.  It was -- well, his words were:  More money
20   out of Lynnette's budget that could be going to Image
21   Marketing.
22       Q.  So she is spending money in two places instead
23   of all with them.
24       A.  Correct.
25       Q.  If we could talk about some of the things
```

Page 66

```
 1   maybe in Exhibit 2.
 2       A.  Sure.
 3       Q.  You could either use yours or the exhibit.  Do
 4   you have any knowledge what a -- what Simon Property
 5   Group was supposed to be paying for as far as the
 6   sticker or advertising on the van?
 7       A.  Sure.  On one of the sides of the van Sun
 8   Cruise Casino, when that was open, was on there.  I
 9   think it was around $75 a month.
10       Q.  And it was like a full side of the van?
11       A.  The full side of the van.
12       Q.  Do you know what a typical cost for such an
13   advertisement would be?
14       A.  For the production?  Or for --
15       Q.  For the whole thing.  What would a client say?
16   I want your van to be wrapped in my logo --
17       A.  Probably $500 a month for the whole thing.
18       Q.  That's production and the --
19       A.  The monthly fee.
20       Q.  And you said Sun Cruise Casino was paying
21   rough 75 for that?
22       A.  Correct.
23       Q.  Why would they pay 75 and someone else pay
24   500?  Just curious.
25       A.  Wasn't up to me to make the billing.
```

Page 67

```
 1       Q.  Okay.  Do you know how much Simon Property
 2   Group was paying for the monthly fee for their sticker
 3   on the back window?
 4       A.  Fifteen hundred.
 5       Q.  And do you know how long that went on?
 6       A.  Well, probably six years.
 7       Q.  Who hired Image -- I mean, in other words,
 8   Image Marketing Group, who from Simon Property Group
 9   hired Mr. Herman or Image Marketing Group?  Do you know?
10       A.  I couldn't say for sure.
11       Q.  Did you -- you or -- did you see anyone else
12   at Image Marketing interacting with anyone other than
13   Miss Lauria?
14       A.  From Simon?
15       Q.  Yes.
16       A.  Well, Brian Peters would come to our events
17   sometimes, or Image Marketing's events.  Once in a while
18   they would send a marketing representative as well to
19   the trade shows and such.
20       Q.  To your knowledge, what malls did Image
21   Marketing Group cover with these concierge services?  I
22   mean, how many malls were in its scope of services?
23       A.  In Orlando, just the Florida Mall.
24       Q.  Right.
25       A.  Then in South Florida they had Boca, Boca Town
```

Page 68

```
 1   Center, Miami International, the Dadeland Mall.  And
 2   then towards the end they picked up on the other coast
 3   the Naples mall, which is I say Coconut Point.
 4       Q.  Who hired them to do what -- this concierge
 5   distribution services?  Was it Lynnette or the mall
 6   manager?
 7       A.  Lynnette.
 8       Q.  So Lynnette -- but can you describe for me how
 9   the hiring process would be?  Would she call and say,
10   Tim, I would like for you to --
11       A.  I don't know how that occurred.  I just know
12   working at Image Marketing Tim would come and say, by
13   the way, we've picked up this mall or -- and this
14   additional mall.
15       Q.  But to your knowledge, it was Lynnette that
16   hired the --
17       A.  Yes.
18       Q.  -- Image Marketing Group?
19       A.  Yes.
20       Q.  What makes you think that?
21       A.  Tim or no one from Image Marketing had contact
22   with any of the people from any of the other malls.
23   Kind of far out of our realm of -- or their realm of,
24   you know, networking, being in a different town.
25       Q.  And that was going to be my next question.
```

17  (Pages 65 to 68)

**Ambassador**

Page 69

1  Did you ever meet the mall managers for any of the malls
2  you listed other than Brian Peters?
3      A.  I met the marketing manager, Diane Ivey, in
4  Coconut Point.  I was introduced to a couple of the
5  people in the South Florida market.  I couldn't remember
6  them.  If I saw them, maybe I'd recognize them, but I
7  couldn't tell you their names.
8      Q.  But you say introduced.  Was it a one time --
9      A.  One time deal --
10     Q.  Okay.
11     A.  -- at an event.
12     Q.  It wasn't like you would go distribute to
13  these malls and there was something -- or an area and
14  then meet with the people when you were there; correct?
15     A.  No.  There was never any presentation or, you
16  know, meetings with them to talk about their program or
17  anything like that.
18     Q.  And I think you testified earlier with respect
19  to the Boca, Miami and Dadeland areas, at best the
20  distribution may have occurred once or twice --
21     A.  Correct.
22     Q.  -- in the entire time you were there?
23     A.  Correct.
24     Q.  And were you there the entire time the Boca,
25  Miami and Dadeland Malls were a client?

Page 70

1      A.  Yes.
2      Q.  And do you know what the services -- or what
3  Image Marketing Group charged for the services for Boca,
4  Miami and Dadeland?
5      A.  I don't know.
6      Q.  But if they were to be charged do you know
7  what a reasonable charge would be?  Like in other words,
8  if I were going to say what would you charge me,
9  Mr. Brignolo, to go deliver this concierge distribution
10  to the Boca?
11     A.  It would be whatever the other clients were
12  paying.  So, 500 to a thousand dollars per month.
13     Q.  And for that 500 to a thousand dollars a
14  month, how many times, assuming you go, how many times
15  should you go to distribute?  Is it once a week?
16     A.  Once a week.
17     Q.  So if I had Coconut Point down in Naples for
18  $500 a Month, Image Marketing should go once a week to
19  Naples.
20     A.  Correct.
21     Q.  And was anyone else involved in distributing
22  the concierge material to the Coconut Point other than
23  yourself?
24     A.  No.
25     Q.  Do you know how many times you went to Coconut

Page 71

1  Point?
2      A.  Probably three.
3      Q.  Do you know how much Simon Property Group was
4  billed for that?
5      A.  No.
6      Q.  But would your testimony be that it would be
7  approximately, if you went down there three times, that
8  would be, what, a month and a quarter of service?
9      A.  I think I went once a month for three months.
10     Q.  So at best $1,500?
11     A.  Correct.
12     Q.  Do you know if Image Marketing Group provided
13  any services -- that I might not have a term -- where
14  they would get a brochure together and hand it to the
15  front desk and they would keep it behind the front desk?
16     A.  Did Image Marketing make those?
17     Q.  Make them or distribute them for Simon
18  Property Group.
19     A.  They would distribute brochures upon request.
20  So if a hotel called Simon Malls and said so and so at
21  this hotel requested brochures, could you pick some up
22  and bring them?  Rare.
23     Q.  And as far as your distribution service, we
24  were talking about concierge.  So I assume like, on I
25  Drive, like the Westin or the Peabody would be targets;

Page 72

1  correct?
2      A.  Correct.
3      Q.  What about a Days Inn or something, I mean,
4  that doesn't have a concierge, would you deliver --
5      A.  Yeah, they would go to the front desk people.
6      Q.  But what would go is this discount ticket?
7      A.  Yeah, the referral card.
8      Q.  To your knowledge, did any of the Simon
9  Property Group Mall properties ever complain about Image
10  Marketing's services?
11     A.  No.
12     Q.  Did anyone ever question whether the services
13  were being provided?
14     A.  No.  Well, not in Orlando.  The South Florida
15  people did call.
16     Q.  Who did they call?
17     A.  They called Tim.
18     Q.  Do you know what the sum and substance of the
19  calls were about?
20     A.  One of the managers in the South Florida
21  hotels got a call from I think the J W Marriott, saying
22  that he didn't have any information at the Simon Malls
23  at all.  Wanted to make sure that Image Marketing was
24  actually distributing them.
25     Q.  And what was Tim Herman's response?

**Ambassador**

Page 73

1    A.  You need to get down there and do some
2  distribution.
3    Q.  So we can -- we can say it's been done?
4    A.  Correct.
5    Q.  Did Mr. Herman know that these things weren't
6  being distributed?
7    A.  Yeah.
8    Q.  And what were you basing that on?
9    A.  He was the owner of the company and the
10  manager of the company.  He knew very well that I was in
11  Orlando.  For me to go to South Florida I had to get
12  permission, permission to use the van down there,
13  permission to get a hotel room.  These weren't decisions
14  I got to make.  It wasn't my company.  So he knew that
15  no one was going down there or doing it.
16    Q.  When you did these distributions, especially
17  for the east and the west coast, did you maintain like a
18  mileage log or anything?
19    A.  I used the Image Marketing corporate card.
20    Q.  And what kind of a card was that?
21    A.  It was an American Express card.
22    Q.  And was it in the name of Image Marketing
23  Group?
24    A.  Yes.
25    Q.  That you pay your hotel room for?

Page 74

1    A.  Use the hotel, gas, food.
2    Q.  So if I wanted to find out when you were down
3  there, I could basically --
4    A.  Right.
5    Q.  -- get the credit card records.
6    A.  The corporate card was only used in Orlando
7  for gas, maybe to go to some networking lunches.  And
8  then whenever it's out of town, that's probably exactly
9  when we were doing distribution for Simon Malls.
10    Q.  Did you have any knowledge as far as the time
11  frame when Miss Lauria may have started getting these
12  kickbacks, you know as we talked about?
13    A.  Not exactly.
14    MR. BLAIR:  Anyone need to take a break?
15    THE WITNESS:  I could use a restroom break.
16    MR. BLAIR:  Sure.
17    (Brief recess taken)
18    (Marked for Identification
19    as Plaintiff's Exhibit No. 3)
20    Q.  I'm going to show you an email with some
21  documents I will mark as Plaintiff's 3.  And ask you if
22  you have seen this before and if you're familiar with
23  it.  And take your time, if you want to page through it.
24    A.  Yeah, I recognize this.
25    Q.  Can you tell me what it is?

Page 75

1    A.  Sure.  It's an email I sent to someone at
2  Simon corporate in Indiana.
3    Q.  So the tommyversace@aol.com, that's you?
4    A.  Personal email.
5    Q.  And did you send it on June 27 at 2011 at
6  11:04 AM, as noted on the email?
7    A.  Correct.
8    Q.  And why did you send this email?
9    A.  After finding all this stuff in Exhibit No. 2,
10  things weren't adding up.  I could tell these services
11  weren't being provided.  I didn't want to be involved
12  with it at all.
13    That's a small company.  Image Marketing is a
14  small company.  If I wanted to proceed in the tourism or
15  hospitality industry, that would really hurt my
16  reputation.  So I thought I'd turn in to Simon to see
17  what they thought.
18    Q.  And did someone respond to you?
19    A.  Yes.
20    Q.  Who responded to you?
21    A.  I think his name is Charles Cauthen, the CPA
22  of audit services.
23    Q.  And just for clarity, is his response page 3
24  of Exhibit 2?
25    A.  Yes.

Page 76

1    Q.  I'd like to just kind of walk through the
2  email with you and maybe ask you some questions about
3  some of the statements in there.
4    First of all, on the first page it says:
5    I know the mall paid more than any other
6  company, and I thought it was normal because they were
7  such a huge corporation.  But I had no idea that they
8  paid Image Marketing about ten times as much as other
9  clients.
10    Do you see that?
11    A.  Yes.
12    Q.  Are you basing that off of the vehicle
13  wrap/sticker we talked about?
14    A.  Well, that and the regular service invoices
15  were much higher than the average client.
16    Q.  Did you review the invoices from Image
17  Marketing to Simon Property Group to see what they were
18  being charged?
19    A.  Well, it's in here, Exhibit 2, as well.
20    Q.  Okay.
21    A.  Those ones that we went over, the 120 invoice
22  numbers, those service agreements.
23    Q.  You said Image Marketing had about four other
24  clients.  Do you know who they were?
25    A.  Ripley's Believe It or Not, NASCAR Sports

**Ambassador**

Page 77

1  Grill, and CityWalk, the Orlando Magic, I think Vines
2  Restaurant on Sand Lake.
3      Q.  Do you know if any of those businesses are
4  still doing business with Image Marketing?
5      A.  They are.
6      Q.  Do you know, do they do the same types of
7  services that they -- well, excuse me.  Does Image
8  Marketing allegedly provide the same type of services to
9  these four businesses as they did Simon Property Group?
10     A.  Yes.
11     Q.  And the email goes on to say:
12         It's my opinion that Image Marketing
13  overcharges Simon Property Group and then provides
14  kickbacks to Lynnette Lauria, regional marketing
15  director.
16         Do you see that?
17     A.  Yes.
18     Q.  Is that based upon your review of Exhibit 2,
19  along with the text message that's on the face of
20  Exhibit 2?
21     A.  Correct.
22     Q.  Is there anything else that led you to believe
23  that Miss Lauria is getting kickbacks?
24     A.  Yes.
25     Q.  What was that?

Page 78

1      A.  Throughout the years at Image Marketing I
2  could never understand why I was able to do the books
3  for all of the other clients except for Simon Malls.
4  Whenever there was an event, Tim would stop everything
5  when Lynnette would come in.  Make sure she had a drink.
6  Make sure she was taken care of.  Very secretive about
7  them.  Whenever I asked questions about the Simon Mall,
8  it was, it's none of your business.  So, very short and
9  very secretive.
10     Q.  Did Lynnette and Mr. Herman have any more than
11  a professional relationship; to your knowledge?
12     A.  They were friends.
13     Q.  So other than friends, I mean, there was no
14  romantic --
15     A.  No, no, I don't think so.
16     Q.  And we're talking about kickbacks.  Are you
17  aware of the form or type of kickbacks you believe
18  Miss Lauria received?
19     A.  I know that Tim's car was leased in her name.
20  But other than that, it was probably cash.
21     Q.  Tim's car was leased in her name?
22     A.  Correct.
23     Q.  What kind of car did he drive?
24     A.  BMW.
25     Q.  So she leased a BMW for him?

Page 79

1      A.  Correct.
2      Q.  Do you know why?
3      A.  No.
4      Q.  Do you know if he is still driving it?
5      A.  This was his previous car.  He has another
6  BMW.  I don't know whose car that's in.
7      Q.  How did you know that his first -- or his
8  previous BMW was in her name?
9      A.  A friend borrowed his car, got a speeding
10  ticket.  Took the registration out saw the registration
11  was not in Tim's name; it was in Lynnette's name.
12     Q.  I may have asked you this.  Do you know why it
13  was in her name?
14     A.  No.
15     Q.  Did you ever witness Miss Lauria receiving
16  anything other than like -- like, would she get a free
17  trip or you, know, a car, anything of that nature from
18  Mr. Herman?
19     A.  No, I don't.
20     Q.  Again, and as far as Exhibit 3, I guess the
21  first full paragraph on the second page, it says:
22         The first set of invoices are what Simon pays
23  to Image each month.  Some are fake and others are for
24  things that should not be charged.
25         What is fake about the invoices, if you could

Page 80

1  tell me?
2      A.  Sure.
3      Q.  And just so we're clear, we're talking about
4  the invoices we talked about earlier?
5      A.  Correct.
6      Q.  Which were the ones from Image Marketing
7  dated -- I think they're all dated March 24th, 2011.
8      A.  Invoice number 124 is the only thing that
9  should be really charged for in Orlando.  Number 121 and
10  number 122 are what I mean in this email by fake.
11  Meaning there's no reason to be charging these separate
12  invoices when number 124, the concierge service fee,
13  covers these same services.
14     Q.  Like what we talked about earlier.
15     A.  Correct.
16     Q.  And just again, I apologize in advance, but we
17  covered a lot.  In 124 the referral program fee for
18  April 2011 is $3,500; correct?
19     A.  Correct.
20     Q.  Is that what other people would be typically
21  charged for that?
22     A.  No way.
23     Q.  What would they be paid?
24     A.  Five hundred to a thousand dollars a month.
25     Q.  Did you have any knowledge as to what the

**Ambassador**

Page 81

1  difference between the 500 and the thousand would be?
2      A.  Sure.  If a restaurant had two referral cards
3  out there, maybe a two-for-one for the bar and an
4  appetizer card for the restaurant, there was more
5  tracking for hours involved.  They would get charged
6  more.
7      Q.  So one discount card or promotion might be one
8  fee, two might be another?
9      A.  Correct.
10     Q.  Three could even be another?
11     A.  Correct.
12     Q.  And it was based upon the amount of tracking
13  they had to do?
14     A.  Yes.
15     Q.  And who did the tracking at Image Marketing?
16     A.  I did when I was there.
17     Q.  For the entire time?
18     A.  Yes.
19     Q.  Do you have any idea as far as the Simon
20  Property Group material how much came in?  Do you have
21  any knowledge?
22     A.  Sure.  The Orlando hotel -- or the Orlando
23  Florida Mall probably generated anywhere from 500 to 600
24  referrals per month.
25     Q.  And then in that same paragraph of Exhibit 3,

Page 82

1  it says:
2          The concierge event is something that Image is
3      supposed to provide in their services.
4          Is that also we talked about earlier, where
5      they get paid from charging at the door?
6      A.  Correct.
7      Q.  And they shouldn't be billing the client for
8  that?
9      A.  Correct.
10     Q.  Is that how other clients are handled?
11     A.  Correct.
12     Q.  It talks about a reprint of brochures.  Is
13  that on one of these bills?
14     A.  Yes.
15     Q.  Could you tell me which bill it's on?
16     A.  Number 130.  There was no reprint in April.  I
17  actually remember, when we talked about this text
18  message, how I was talking to Andrea when she was new at
19  the Florida Mall, we were actually discussing at that
20  time some ideas for a future card.  The Image Marketing
21  had plenty of stock for the Florida Mall at this time.
22     Q.  I'm looking for invoice 130.  Is it back in
23  the pack somewhere?
24     A.  It's in both.  It was in this one that you
25  just gave me with this email.

Page 83

1      Q.  Could I see your 130?
2      A.  Yeah.
3      Q.  It's an invoice dated March 24, 2011, invoice
4  number 130.  It says:  Service fee and brochure
5  reprinting April 2011 for $2,735; correct?
6      A.  Correct.
7      Q.  And that was billed to Lynnette Lauria?
8      A.  Yes.
9      Q.  So your understanding of that would be charged
10  to her Simon --
11     A.  Probably.
12     Q.  -- Property Group credit card?
13     A.  Yes, yes.
14     Q.  And to your knowledge, that was not necessary
15  and was not done?
16     A.  It was not necessary and was never -- never
17  happened.  If I could go back --
18     Q.  Sure.
19     A.  -- maybe re-answer something.
20     Q.  Sure.
21     A.  On the sentence, the concierge events is
22  something that Image is supposed to provide, that is in
23  addition to that Monday Mixer event.  Later on in this
24  packet there is these Excel spreadsheets.
25     Q.  And you say this packet, you're talking about

Page 84

1  Exhibit 2?
2      A.  Three.
3      Q.  Three.
4      A.  There is this one with the Spring Concierge,
5  Summer Bash, Fall Concierge, Summer Picnic, Magic
6  Concierge, CFCA Holiday, that sentence refers to this,
7  that these never happened.  And I don't know why Simon
8  Mall would be paying Image Marketing for an Orlando
9  Magic event, and it never happened.
10     Q.  We're looking at Exhibit 3, which is the email
11  we identified as your own.  Toward the end there is a
12  little spreadsheet that has Spring Concierge, Summer
13  Bash, Fall Concierge, Summer Picnic.  Is that the one
14  you're referring to?
15     A.  Correct.
16     Q.  Magic Concierge, CFCA Holiday.  And to your
17  knowledge, those were billed to Simon Property Group?
18     A.  Yes.
19     Q.  And what makes you believe these were billed
20  to Simon Property Group?
21     A.  Well, they were in the same packet of
22  information with all their invoices.
23     Q.  And there would be based upon your experience
24  with the company no reason whatsoever that Simon
25  Property Group should be paying for those?

**Ambassador**

Page 85

1  A.  None.
2  Q.  Any of them or just the Magic?
3  A.  None of them.
4  Q.  What is the CFCA Holiday?
5  A.  Central Florida Concierge Association.  If
6  Simon Mall sponsored that event or hosted that event,
7  they would have paid that directly to the concierge
8  association.
9  Q.  And what's the Magic Concierge?
10  A.  That's probably Orlando Magic, one of Image
11  Marketing's clients, an event that never happened.
12  Q.  What is the Summer Picnic?
13  A.  The Summer Picnic, Fall Concierge, Summer
14  Bash, Spring Concierge are events that never happened or
15  never were thought up or never --
16  Q.  To your knowledge they just don't exist?
17  A.  They don't exist.
18  Q.  Just so we're clear, because I was a little
19  confused earlier, the invoices that you talked about,
20  the invoice 130, that is included in Exhibit 3, your
21  email packet.
22  A.  Correct.
23  Q.  And I noticed that on Exhibit 3 there are some
24  additional -- it looks like different invoices -- strike
25  that.  Are the invoices that are in Exhibit 3 the same

Page 86

1  invoices that are in Exhibit 2?
2  A.  Correct.
3  Q.  If we go on in Exhibit 3, there are some other
4  invoices from Marketing Resource Network; correct?
5  A.  Correct.
6  Q.  And I'm just going to talk to you, for
7  example, the first one is invoice number 051102, dated
8  October 15, 2005.
9  A.  Uh-huh (affirmative).
10  Q.  And it's for I-4 distribution hours.  Do you
11  see that?
12  A.  Yes.
13  Q.  And it says at the bottom paid 11/14 IMG --
14  which I assume is Image Marketing Group check number --
15  1507; correct?
16  A.  Correct.
17  Q.  Do you know why another company would be
18  distributing Simon Property Group information for Image
19  Marketing Group?
20  A.  No.
21  Q.  And to your knowledge, were any other
22  companies that did?
23  A.  No.
24  Q.  And you were the only one that did that;
25  correct?

Page 87

1  A.  Correct.
2  Q.  So to simplify, any invoice from Marketing
3  Resources Network for distribution in your opinion
4  didn't occur?
5  A.  Didn't occur.
6  Q.  Because you would be the one that would be
7  distributing if anybody was?
8  A.  Yes.
9  Q.  Did you ever talk to anyone about the Laurias,
10  meaning Robert, Rachael, Sarah Lagi or Lynnette,
11  distributing any information for Simon Property Group?
12  A.  Ever talk about it?
13  Q.  Have you ever heard that?
14  A.  No.
15  Q.  To your knowledge, did any of those
16  individuals distribute any marketing material for Simon
17  Property Group?
18  A.  No.
19  Q.  You also attached to your email a handwritten
20  note that's in Exhibit 3.  Do you see that?
21  A.  Yes.
22  Q.  And it's stated to Ryan.  Do you see that?
23  A.  Yes.
24  Q.  And signed, says:  Thanks, Lynnette?
25  A.  Yes.

Page 88

1  Q.  Do you know who the Ryan is?
2  A.  Ryan Deming.
3  Q.  Have you ever met Mr. Deming?
4  A.  Yes.
5  Q.  And he was in the office with you?
6  A.  Yeah.  He didn't work for Image the past maybe
7  year, but I knew him for quite a time.
8  Q.  And I'm going to read it, the handwritten note
9  from Lynnette.  It says, I -- well, could you read it to
10  me?
11  A.  Sure.  I redid this list and put the
12  approximate day each invoice is processed.  I
13  highlighted the charges.  Can only run a 2,000 charge
14  there the credit card each day to any one company.
15  Thanks, Lynnette.
16  Q.  Do you have any idea what this note was
17  referring to?
18  A.  It was within all of these invoices.  So I
19  assume it was she can only run $2,000 per company or
20  something.  I'm not quite sure.
21  Q.  Okay.  Do you have any idea what the change is
22  or whatever she is referring to the top, the
23  highlighted, what that is referring to?
24  A.  No.
25  Q.  And then you've also attached the next page,

22  (Pages 85 to 88)

**Ambassador**

Page 89

1  Exhibit 3 is some I guess printout receipts of charges;
2  correct?
3      A.  Correct.
4      Q.  And are those having to do -- do you notice
5  the date, the name at the top?
6      A.  Event Planners USA.  And then it's signed by
7  Lynnette Lauria.
8      Q.  And is that the company you testified to
9  earlier that never really got off the ground?
10     A.  Correct.
11     Q.  So to your knowledge, even though Event
12  Planners is charging Simon Property Group, it never
13  operated.
14     A.  Correct.
15     Q.  Do you know what these services would be for
16  then?
17     A.  No.
18     Q.  And to the best of your knowledge, are these
19  legitimate charges?
20     A.  No.
21     Q.  Do you recognize the signature on the imprint
22  card for the transaction copy?
23     A.  Yes.
24     Q.  Whose?
25     A.  Lynnette Lauria.

Page 90

1      Q.  To your knowledge, was Miss Lauria aware of
2  the status of the Event Planners company?  I mean, did
3  she know it wasn't operating?
4      A.  Probably.
5      Q.  Do you have any knowledge of that or are
6  you --
7      A.  I'm just assuming she knew Tim and Ryan quite
8  well.  And she knew how Image Marketing operated, so she
9  would know that Event Planners isn't up and running.
10     Q.  Did you ever talk to Miss Lauria about any of
11  the services that Image Marketing Group was providing to
12  Simon Property Group?
13     A.  No.
14     Q.  You've met her though; correct?
15     A.  Correct.
16     Q.  Did you talk to her about any business
17  associated with Image Marketing Group for Simon Property
18  Group?
19     A.  Never.
20     Q.  So you just met her in a casual context?
21     A.  Yes.
22     Q.  How about any of her family members, meaning
23  Rachael, Sarah, Eric or Robert, have you ever talked to
24  any of those people about services or work?
25     A.  No.

Page 91

1      Q.  Have you met any or all of them?
2      A.  All of them.
3      Q.  Is it in just kind of a casual context?
4      A.  Correct.
5      Q.  Also in Exhibit 3 you have included some -- at
6  least three invoices from an RJL Services.  Do you see
7  that?
8      A.  Yes.
9      Q.  And I believe -- are you familiar with RJL
10  Services other than seeing these invoices?
11     A.  Just seeing these invoices.
12     Q.  And you would know that they all three of them
13  charge an amount for I-4 distribution; is that correct?
14     A.  Correct.
15     Q.  And based upon your knowledge of Image
16  Marketing's business, that would be the only
17  distribution service would be this concierge program we
18  talked about?
19     A.  Correct.
20     Q.  And the only person that would be doing that
21  is you; correct?
22     A.  Correct.
23     Q.  So to your knowledge, did RJL Services provide
24  any distribution services to Image Marketing?
25     A.  No.

Page 92

1      Q.  Did Image Marketing even have any hotels in
2  the I-4 corridor that they distribute to, to your
3  knowledge?
4      A.  No.
5      Q.  Did Image Marketing have any hotels in the
6  other than the Coconut Point and the Fort Myers, Naples,
7  Port Charlotte area they distribute to?
8      A.  No.
9      Q.  So based upon what you know after working at
10  the company for 6 or 7 years, any distribution to
11  companies basically down I-4, Sarasota, Fort Myers,
12  Naples, that area would be false, except for -- could
13  not have occurred except for a Coconut Point?
14     A.  Correct.
15     Q.  The next thing you've included is an email
16  from Dale Takio to -- excuse me -- from Lynnette Lauria
17  to Dale Takio, dated June 22nd, 2010.  Do you see that?
18     A.  Yes.
19     Q.  And that's included in your package Exhibit 3;
20  correct?
21     A.  Yes.
22     Q.  To your knowledge, did Dale Takio have any I
23  guess knowledge as to what was going on with these
24  services and billing for services that didn't take
25  place?

**Ambassador**

Page 93

1    A.  With which company?
2    Q.  Any of them.  I mean, did he -- if I just say
3  do you think Dale knew what was going on, would your
4  answer be yes?  And if so, why?
5    A.  Yes, because he was partners with -- business
6  partners with Tim Herman.
7    Q.  So did he derive income from Image Marketing
8  Group?
9    A.  Yes.
10    Q.  So if Simon Property Group paid Image
11  Marketing Group for services, who would directly benefit
12  from that?
13    A.  Tim Herman, and then next would probably be
14  Ryan and Dale.
15    Q.  So they all -- all three of them somehow
16  derived income from that Image Marketing Group company.
17    A.  Correct.
18    Q.  Do you have any idea what Lynnette was talking
19  to Mr. Takio about in this email?
20    A.  Sure.  It appears that she is saying -- well,
21  she is giving a credit card number and telling him
22  amounts to run on them from his companies that he owns,
23  Takitik and Point.
24    Q.  And to your knowledge, after being with the
25  company for the time you were, Point did not provide --

Page 94

1  and I assume that's Point Distribution, LLC?
2    A.  Correct.
3    Q.  To your knowledge, did not provide any
4  services to Simon Property Group; correct?
5    A.  None.
6    Q.  And you testified earlier that Takitik was
7  associated with the Kids Eat Free Card; correct?
8    A.  Correct.
9    Q.  Would Takitik be providing, to your knowledge,
10  any services to Simon Property Group?
11    A.  None.
12    Q.  Did you do any distribution or any work with
13  Takitik, Inc.?
14    A.  Just monthly visits to count how many Kids Eat
15  Free Cards were sold at a couple of his vendor
16  locations.
17    Q.  Other than that, what I'm trying to figure out
18  is who would be doing the work for Takitik other than
19  you?
20    A.  Daily Takio and Tim Barber.
21    Q.  Who is Tim Barber?
22    A.  He's an employee of Takitik.
23    Q.  Does he still work there?
24    A.  Probably.
25    Q.  Do you know where Tim lives by any chance?

Page 95

1    A.  In Orlando.
2    Q.  Like Windermere?
3    A.  I think Ocoee.
4    Q.  Ocoee?
5    A.  Uh-huh (affirmative).
6    Q.  Do you know why -- obviously they have some
7  amounts on this email they're talking about, 3,750 for
8  Takitik and 4,100 for Point.  Do you see that?
9    A.  Yes.
10    Q.  Do you know how they derived those amounts?
11    A.  No.
12    Q.  Do you see the next paragraph, says let's run
13  the same on July 10th; correct?
14    A.  Correct.
15    Q.  Do you have any idea what that means?
16    A.  Probably means run the same exact amounts
17  again on July 10th.
18    Q.  And to your knowledge, these services never
19  took place?
20    A.  None.
21    Q.  And there would be no reason for Simon
22  Property Group and the Kids Eat Free Card to be
23  associated with one another?
24    A.  Correct.
25    Q.  And then the next item in the email packet is

Page 96

1  that page with the spreadsheet about the Spring
2  Concierge, Summer Bash that never took place?
3    A.  Correct.
4    Q.  Okay.  And then the next thing you attached to
5  your email is another spreadsheet, and it says monthly
6  referral service.  And then it has route service, route
7  service west I-4 exit 52 through I-295 Sarasota.  Do you
8  see that?
9    A.  Yes.
10    Q.  Do you have any knowledge as to what this is
11  talking about?
12    A.  These are what I believe to be made-up
13  services in their tracking for their accounting system.
14    Q.  And it looks like the items are being paid
15  to -- or that the company being paid for these services
16  are Image?
17    A.  Correct.
18    Q.  And that would be Image Marketing, to the best
19  of your knowledge?
20    A.  Yes.
21    Q.  And Event Planners?
22    A.  Image and Event Planners.
23    Q.  What is the FTDS?
24    A.  I have no idea.
25    Q.  What about the MRN?

**Ambassador**

Page 97

1    A.  Probably Marketing Resource Network.
2    Q.  And I just want to go back to the Event
3   Planners because you said that never got off the ground.
4   Did they ever have any, like, business cards printed?
5    A.  No.
6    Q.  Ever have a phone number associated with it?
7    A.  No.
8    Q.  Ever print up any material for it?
9    A.  No.
10    Q.  Ever hire any employees?
11    A.  No.
12    Q.  And you said you believe these are services
13   that were made up.  Can you tell me what you're basing
14   that on?
15    A.  Sure.  The second line, route service west I-4
16   exit 52 to Sarasota, that makes no sense to distribute
17   any materials there.  There's no malls or there's no
18   hotels or anything in between there.  I don't know who
19   Optimedia is.  Concierge tracking, I don't know why that
20   would be charged separately.
21    Q.  What is that?  Do you know what that is?
22    A.  I'm assuming they're saying that's a separate
23   fee to track the referrals that came in through the
24   Florida Mall.
25    Q.  But that's supposed to be billed in the

Page 98

1   monthly fee; correct?
2    A.  Correct.  Printing west route, that doesn't
3   make any sense.  There was not anything to print.
4   Concierge newsletter, that's made up.  Image Marketing
5   used to create a monthly newsletter, but it wasn't --
6   there was no charges.  That was part of their marketing
7   program.
8    Q.  But you've never seen one produced by Event
9   Planners; correct?
10    A.  No, never by Event Planners.
11    Q.  And how long ago did the newsletter stop or
12   cease?
13    A.  Gees, it was probably the first year I worked
14   there they did it every month, and that was about it.
15    Q.  So it hadn't been since like '03?
16    A.  Correct.  Top spots, top spots is covered by
17   the whole -- that other invoice we talked about.  Route
18   Daytona service, that never happened.  Concierge
19   referral printing, that may have happened.  Generally
20   clients needed to print about every six months.
21    Q.  And can you explain to me what the concierge
22   referral printing would be?
23    A.  The printing of those referral cards.  Most of
24   the time the clients paid for that themselves.
25    Q.  So just to sort of be clear, these discount

Page 99

1   cards and things we talked about that are distributed to
2   the concierge, the clients would typically print up a
3   new batch and deliver them to Image Marketing?
4    A.  Correct.
5    Q.  But had you ever seen Image Marketing print
6   them for somebody and bill somebody?
7    A.  No.
8    Q:  But you believe that's what this charge would
9   be for from Event Planners?
10    A.  Correct.  Printing east route, again, that
11   doesn't make any sense.  Concierge rewards, that one
12   doesn't make sense.  For every 25 referrals a concierge
13   did to the Florida Mall, they got a $25 Visa card or a
14   Florida Mall gift certificate.  But that was purchased
15   separately.  So there's -- it wouldn't be on here.
16    Q.  It wouldn't be billed to a client?
17    A.  It wouldn't be billed to Event Planners.  It
18   wouldn't be -- it would be billed separately.  And they
19   bought those with their card at Image Marketing.
20    Q.  But you wouldn't bill a client for that;
21   correct?
22    A.  Correct.
23    Q.  That's part of the -- in other words, the fee
24   that you're paying for the services is that for $500 or
25   a thousand dollars a month we deliver all the stuff and

Page 100

1   basically take care of the concierge so they will --
2    A.  No.  The client is responsible for that
3   amount.
4    Q.  Okay.  So every 25 referrals they get a -- how
5   much a gift card?
6    A.  Twenty-five for 25.
7    Q.  So a dollar every referral?
8    A.  Correct.
9    Q.  And then that's billed to the client?
10    A.  Yes.
11    Q.  So if I had -- it's pretty easy to figure out
12   how many gift cards I should be charged is how many
13   referrals I have in the Image Marketing database.
14    A.  Yes.
15    Q.  I think we skipped over the van logo
16   sponsorship.
17    A.  Right.
18    Q.  What is that?  Or to your knowledge, what is
19   it?
20    A.  I'm assuming they're talking about the van
21   logos.  But the amount is off there as well.
22    Q.  So that might be an additional charge other
23   than the invoice?
24    A.  Right.
25    Q.  And have you seen any or witnessed any

**Ambassador**

Page 101

1 services that have been billed on this piece of paper?
2 If I had to say, hey, have you seen any marketing or
3 services being provided to Optimedia?
4     A.  Yeah, nothing.
5     Q.  How about any of these -- I mean, could you
6 tell me if you've seen anything to justify the charges
7 on this page?
8     A.  Well, no.  I mean, the monthly referral
9 service, the top spots and the concierge rewards all
10 fall under that other invoice.  But so separately, no.
11    Q.  When you say other invoice, the --
12    A.  That number 130.
13    Q.  That was charged?
14    A.  Correct.
15    Q.  So those would all be billed in that invoice.
16    A.  Right.
17    Q.  And then the next page in Exhibit 3 is just
18 another kind of spreadsheet.  That seems to be almost
19 the same thing.  Is that --
20    A.  Right.
21    Q.  Not the same charges, but the same alleged
22 services.
23    A.  Yes.
24    Q.  And then finally you attach color photos,
25 which are pictures of a sticker that's on the back of a

Page 102

1 caravan; correct?
2     A.  Correct.
3     Q.  And do you recognize the license number?
4     A.  Yes.
5     Q.  As 131-NQL Florida tag?
6     A.  Yes.
7     Q.  Who is the owner of that vehicle?
8     A.  Image Marketing.
9     Q.  And to your knowledge, have you ever seen any
10 advertising on this vehicle other than this sticker?
11    A.  No.
12    Q.  Has there ever been what I would term a car
13 wrap?
14    A.  Not a whole wrap.
15    Q.  A partial wrap?
16    A.  Just these -- this sign.  It was probably put
17 on six years ago.  And it's still in the same condition.
18 Never been replaced.
19    Q.  And there's another van photo.  It's got Magic
20 tag, K537W.  Do you see that?
21    A.  Yes.
22    Q.  Who owns that car?
23    A.  Image Marketing.
24    Q.  And has there ever been any Simon Property
25 Group advertising on that?

Page 103

1     A.  No.
2     Q.  I'd like to kind of walk through your email
3 here, if you don't mind.  We might have covered it.  So
4 you can just say that's what we already talked about.
5 You say that:
6         I found old invoices paid from Image Marketing
7 to Marketing Resources and to RJL.  These companies were
8 being paid from Image for distribution and consulting.
9 This is what Image Marketing does.
10        Do you see that?
11    A.  Yes.
12    Q.  Okay.  And is that based upon what we talked
13 about earlier in your deposition?  Or is there anything
14 else that might have led you to that conclusion?
15    A.  Well, I mean, they're paying them for
16 marketing and distribution, and that's what Image
17 Marketing provided.
18    Q.  Okay.  And it says in this email, which was
19 back in June, you said:  These companies are owned by
20 Lynnette Lauria and her husband.  How did you know that?
21    A.  I Googled it.
22    Q.  And then the next paragraph down in Exhibit 3
23 says:
24        The attachment titled Dale Takio is an email
25 that was left by Images's credit card machine.  There

Page 104

1 was no reason for Simon to be giving money to Dale
2 Takio.
3         Is that because, based on what we talked about
4 earlier, the companies aren't even providing --
5     A.  Right.
6     Q.  -- services --
7     A.  They don't --
8     Q.  -- you would probably be using.
9     A.  Correct.
10    Q.  Obviously the next one is the logo we just
11 talked about in the car.
12    A.  Correct.
13    Q.  It says:  Below is a text that Tim had sent me
14 that basically proves everything.  Is that the text that
15 is on the front page of Exhibit 2?
16    A.  Correct.
17    Q.  Did you have any other text from Tim that kind
18 of talked about what was going on?
19    A.  No.
20    Q.  Are you aware if Tim Herman has filed a police
21 report against you?  Are you aware of that?
22    A.  No.
23    Q.  Has he accused you, other than this -- you
24 talked about a letter earlier that he had -- you had
25 taken stuff from his company?

26 (Pages 101 to 104)

**Ambassador**

Page 105

1      A.   No.
2      Q.   Who was the letter from?
3      A.   One was from an attorney, certified.  And then
4  a second one came maybe a month later from a separate
5  attorney, not certified.
6      Q.   And the attorney's last name is Herman as
7  well?
8      A.   No.
9      Q.   Do you remember the name of the attorney?
10     A.   No.
11     Q.   And then we'll see, 1, 2, 3, 4, 5, the 6th
12  full paragraph -- and it says page four of this email,
13  but I think it's actually page two.
14     A.   Uh-huh (affirmative).
15     Q.   It says:  I have a folder of copied invoices
16  dating from 2005 to 2008.  Is that what you produced
17  today as Exhibit 2?
18     A.   Yes.
19     Q.   And says:  I'm guessing that they have taken
20  over 250,000.  Can you tell me who you believe they to
21  be?
22     A.   Image Marketing and Lynnette Lauria.
23     Q.   And do you have an idea of where your -- how
24  did you derive the $250,000 figure?
25     A.   Sure.  I just kind of tallied up some of these

Page 106

1  invoices, and then multiplied it by the number of years.
2      Q.   Do you know how long Simon Property Group has
3  been a client of Image Marketing?
4      A.   Ever since I was employed there in 2003.  So
5  it could have been prior to that as well.
6      Q.   Was Image Marketing and Simon Property Group,
7  were they an existing client?  I mean, did they have a
8  relationship when you came in 2003?
9      A.   Yes.
10     Q.   And was Lynnette Lauria already at the Florida
11  Mall or in this region when you began work there?
12     A.   Yeah.  I believe she was the marketing manager
13  of just the Orlando mall, and then was put up in the
14  higher position.
15     Q.   And, to your knowledge, she's the one that
16  hired Tim Herman and Image Marketing Group?
17     A.   Correct.
18     Q.   Did Brian Peters ever have any say in the
19  hiring of Image Marketing Group?
20     A.   No.
21     Q.   To your knowledge, was Brian Peters involved
22  in the approval of any of these invoices we talked about
23  today?
24     A.   No.
25     Q.   And other than stopping by and talking to him

Page 107

1  as an occasional occurrence, I mean, have you talked to
2  Mr. Peters about this case or any of the things in
3  there?
4      A.   No.
5      Q.   And then the bottom, it says:  See attached
6  files.  And you attached, you know, about 10 or
7  15 pieces -- or these files, are those the files you
8  produced today?
9      A.   Yes.
10     Q.   And we talked about the other clients at Image
11  Marketing Group.  I assume I know the answer to this,
12  but I just check.  Event Planners, to your knowledge,
13  they have no other clients?
14     A.   None.
15     Q.   Hat Marketing, do you know what clients, what
16  kind of client base it has?
17     A.   He has a couple of clients here in Orlando.
18  If you probably pull up his website they probably list
19  it.
20     Q.   How about VS Publishing, do they have a lot of
21  clients?
22     A.   Hundreds of clients.
23     Q.   And is that associated with Tim Herman at all?
24     A.   No.
25     Q.   The Takitik, do you know what type of client

Page 108

1  base it has?
2      A.   Well, it's a discount card.  So the
3  restaurants that advertise on that card, it's free for
4  them.  So, really, I mean, no one pays to be on that
5  card.  He sells that card to people.
6      Q.   So he makes money -- when I say he, Dale Takio
7  and Tim Herman -- they make money by -- they bundle
8  basically deals?  Is that the way to say it?  Like
9  discounts and deals?
10     A.   Right.  It's all the same offer.  For when a
11  child -- when they have that card, the child eats for
12  free when the adult pays for a meal.  So what they do is
13  they sell that card to people coming into Orlando.  And
14  then they also sell it to people like Virgin Holidays
15  add tour group agencies who have a lot of people coming
16  through their doors.
17     Q.   To your knowledge, did Kevin Brett of Hat
18  Marketing have any knowledge of what's going on -- I
19  mean, what we talked about today?
20     A.   I wouldn't know.  I wouldn't know.
21     Q.   Have you ever seen any contracts between Image
22  Marketing and Simon Property Group?
23     A.   No.
24     Q.   Do you know Tim Herman's cell phone number?
25     A.   Yes.

27 (Pages 105 to 108)

**Ambassador**

Page 109

1    Q.   Can you tell me what that is?
2    A.   (321) 229-0192.
3    Q.   Do you know his cell phone carrier?  Is it
4  AT&T as well?
5    A.   AT&T.
6    Q.   Do you know what email addresses he may have
7  used?
8    A.   Sure.  Tim@image-marketing.com.  And then I
9  think timmoisnumberone@Yahoo.  That might be off by a
10 character.
11   Q.   Tim O?
12   A.   Tim O.
13   Q.   Like Timmo, hey, Timmo?
14   A.   Yeah.
15   Q.   At?
16   A.   At Yahoo.
17   Q.   And your iPhone you said is in your current
18 possession; is that correct?
19   A.   I have a newer phone now.
20   Q.   But the iPhone you had at Image Marketing, do
21 you have that in your possession?
22   A.   Sure.
23   Q.   If I were going to subpoena it, would I just
24 have someone forensically look at it?  Would I just
25 subpoena the iPhone from Image Marketing?  Or do you

Page 110

1  have it with you or --
2    A.   I don't have it with me.  However, when I
3  updated to my new iPhone, I don't know that the content
4  on the old iPhone is there any more.
5    Q.   I'd ask if you could keep that and preserve it
6  for me just in case.
7    A.   Sure.
8    Q.   Do you ever recall being contacted by
9  Mr. Donoway, who sits to my right?
10   A.   No.
11   Q.   Do you recall having an email exchange with
12 him about meeting after you sent the email which is
13 Exhibit 3?
14   A.   No.
15   Q.   Do you know a gentleman named Andre Sabati?
16   A.   No.
17      MR. BLAIR:  We have about two minutes and we
18   might be done.
19      (Brief recess taken)
20   Q.   In Exhibit 3 you testified that some of those
21 events did not occur at all.
22   A.   Correct.
23   Q.   I mean, was there a calendar or event planner
24 or something that I could ask Image Marketing to produce
25 to me that would show what events transpired?  I mean,

Page 111

1  was that kept somewhere?
2    A.   No.
3    Q.   Did they even -- I'm a little confused.  Did
4  they even do events for clients like that?  Because what
5  I heard you testify earlier is that you would either
6  have a concierge kind of party, so to speak, or Simon
7  Property Group would be invited to sit at a table where
8  they could kind of exchange or cross-market with other
9  either concierges -- or is that correct?
10   A.   No, that's it.
11   Q.   Okay.  So other than that type of event, there
12 were no events; correct?
13   A.   Correct.
14   Q.   And I'm just trying to refresh your memory,
15 Mr. Donoway to my right, he had set up a meeting with
16 you at the Elephant Bar in Maitland.  Does that ring a
17 bell with you?
18   A.   No.
19   Q.   You sent that email to, Exhibit 3, to Simon
20 Property Group, and I believe it was like an accountant
21 that replied to you; is that correct?
22   A.   Correct.
23   Q.   And I believe in the email he said something
24 like don't talk to anyone.
25   A.   Right.

Page 112

1    Q.   Have you talked to anybody?
2    A.   No.
3    Q.   Is the reason you didn't talk to anybody
4  because he told you not to talk to anybody?
5    A.   Correct.
6    Q.   Has anyone from Mrs. Lauria's family or her
7  attorneys reached out to you to talk to you?
8    A.   No.
9    Q.   Has Mr. Herman reached out to talk to you?
10   A.   No.
11   Q.   Mr. Deming?
12   A.   No.
13   Q.   Mr. Takio?
14   A.   No.
15   Q.   Has anyone reached out to you, other than
16 myself or the subpoena, to ask you to talk to them about
17 this case?
18   A.   Just you.
19      MR. BLAIR:  That's all I have.
20         *  *  *  *  *
21         CROSS EXAMINATION
22 BY MR. CRUZADA:
23   Q.   I'm not sure if you know who I am.  But I
24 represent Lynnette Lauria and Sarah Lagi and Robert
25 Lauria, Rachael Lauria, and a few of the other entities,

**Ambassador**

Page 113

1   RJL Services, one of them that you mentioned in here.
2       Nolo Marketing, tell me about Nolo Marketing.
3       A.  It's a company I created since I left to do
4   consulting, events for restaurants or anyone who tours
5   the area primarily and -- well, downtown Orlando.
6       Q.  Do you have any employees in Nolo Marketing?
7       A.  No.
8       Q.  Just you?
9       A.  Just me.
10      Q.  Any partners in the company?
11      A.  No.
12      Q.  Okay.  Have you ever been arrested before?
13      A.  Yeah.
14      Q.  And what were you arrested for?
15      A.  I'm assuming you're asking because you know
16  the answer already?
17      Q.  No, I don't.  I need to have it on the record.
18      A.  I had a DUI.  And I was arrested for battery
19  but not charged.  It was filed but dropped.
20      Q.  Who was the battery against?
21      A.  A taxi driver.
22      Q.  Was that here in Orlando?
23      A.  In Orlando.
24      Q.  When did these occur, approximately?
25      A.  The DUI, three years ago.  And the battery

Page 114

1   probably four years ago.
2       Q.  Any other arrests?
3       A.  No.
4       Q.  No other charges other than the DUI.
5       A.  No.
6       Q.  Any arrests in Spain when you were there?
7       A.  No.
8       Q.  Any cases or matters opened up with the
9   St. Louis University Madrid campus?
10      A.  No.
11      Q.  In regards to maybe cheating or --
12      A.  No.
13      Q.  -- lying --
14      A.  No.
15      Q.  -- on an exam?
16      A.  No.
17      Q.  How did you meet Tim Herman?
18      A.  I was a server at a restaurant downtown.  And
19  another server there was a manager of a restaurant on
20  International Drive called Thai Thani.  And they had
21  worked together previously on something that tours the
22  Marriott.
23      Q.  And how did you come into working for Image
24  Marketing?
25      A.  He was letting somebody go and asked me if I

Page 115

1   was interested in doing the distribution for him.
2       Q.  Okay.  Any relationship between you and Tim
3   other than just an employer/employee relationship?
4       A.  We're friends.
5       Q.  Anything romantically involved?
6       A.  No.
7       Q.  Now when you say friends, friends back then?
8       A.  Right.
9       Q.  Are you no longer friends?
10      A.  No, we don't talk.
11      Q.  Why is that?
12      A.  Well, I left the company.  We just don't talk.
13      Q.  Would you say that you left on bad terms?
14      A.  No.  I left on good terms.
15      Q.  Why, again, in your opinion, why don't you
16  converse with him?
17      A.  I have created a company similar to his.  And
18  I am quite sure he blames me for all of this.
19      Q.  And what is this?
20      A.  The reason why we're here today for this case,
21  Simon and Lynnette.
22      Q.  So when you worked for him, it's apparent that
23  you came across some documents --
24      A.  Sure.
25      Q.  -- that you presented here as an Exhibit 2 and

Page 116

1   Exhibit 3 that you gave to Plaintiff's counsel here.
2   How were you able to come into these documents?
3       A.  Tim had asked me to do the credit card
4   charges, file things, and they were just right there in
5   the Image Marketing office.
6       Q.  Did that entail you taking documents?
7       A.  He never said I couldn't.
8       Q.  Does he know that you took these documents?
9       A.  I didn't take those documents.  Those are
10  photocopies.
11      Q.  How did you obtain these documents?
12      A.  I photocopied those documents.
13      Q.  Okay.  Does he know that you photocopied these
14  documents?
15      A.  I wouldn't know.
16      Q.  And when you left did he ask you to return any
17  documents that you may have taken or photocopied?
18      A.  He sent me a certified letter that we talked
19  about earlier.  Nothing specific.  Just return anything.
20      Q.  And you don't think this is anything?
21      A.  Well, that could be something.  But he had
22  those copies at his --
23      Q.  So it is something that could have been
24  returned.
25      A.  There are -- I never --

**Ambassador**

Page 117

1    Q.  It's a yes or no question.
2    A.  Could you say the question again?
3    Q.  Is it something that can be returned that is
4  not yours?
5    A.  No.
6    Q.  It cannot be returned?
7    A.  He has those copies.
8    Q.  But is it something that is not yours?  I'll
9  move on.
10       I've got an email here from
11  ccauthen@simonpropertygroup to tommyversace@aol.com.  Is
12  Tommy Versace you?
13    A.  Yes.
14    Q.  Give me a little background on the name
15  Versace for you?
16    A.  That's an email I've had since I was about
17  13 years old.
18    Q.  Is there a reason why for the Versace?
19    A.  No.
20    Q.  It's not an alias?
21    A.  No.
22    Q.  And is this the only email that you have
23  received from Simon Property Group in regards to this?
24    A.  Probably just that one and one that said he
25  was in receipt of these documents.

Page 118

1    Q.  Okay.  Did you ever talk to Cali Caldwell?
2    A.  She was copied on them, but she never
3  responded.  It was just Charles Cauthen.
4    Q.  Just Charles Cauthen?
5    A.  Yes.
6    Q.  And what's Charles Cauthen's position with
7  Simon Property Group?
8    A.  He is in audit services.
9    Q.  He was a CPA that contacted you back that
10  Mr. Blair referred you to?
11    A.  Correct.
12    Q.  So he would have been also the person that
13  responded to this email that's the beginning of
14  Exhibit 3; correct?
15    A.  Correct.
16    Q.  Is there a reason why this chain of email
17  doesn't contain the chain of email to you between the
18  two exhibits, Exhibit 3 and Exhibit 2 email?  Do you see
19  the date they were sent and the time they were sent?
20  There's a gap.
21    A.  So -- and what's your question?
22    Q.  Is there a reason why, in your opinion or if
23  you have any knowledge, that there is a gap in the chain
24  email with the Exhibit 2 email versus the Exhibit 3
25  email?

Page 119

1    A.  Well, one was probably sent, and he needed to
2  think about it or -- someone sending an email, it's not
3  instantaneous.  I don't -- I don't -- I still don't
4  understand your question.
5    Q.  Okay.
6    A.  Why is there a gap?  Like one is the next day?
7    Q.  Yeah, if you notice that -- I guess you sent
8  it on the 27th at 11:04 AM?
9    A.  Uh-huh (affirmative).
10    Q.  And there is then a June 27 12:24 PM.  But I
11  don't see something coming back as far as a cc or --
12  then it goes to the next email on the 29th, where there
13  is a chain email going back and forth.  Do you see how
14  the -- that -- what I'm referring to?
15    A.  Uh-huh (affirmative).  Well, these are just
16  emails that we went back and forth on, and there's not
17  anything else.
18    Q.  So you don't know.
19    A.  I don't know.
20    Q.  I'm going back to Exhibit 2, so I won't get
21  them confused as much.  Going to Exhibit 2 in the
22  invoices, did you ever see the service agreement between
23  Image Marketing and Simon Property Group?
24    A.  No.
25    Q.  Did you ever see a fee structure for services?

Page 120

1    A.  No.
2    Q.  As a part of -- so you couldn't tell whether
3  or not that this was a contractually based fee or not;
4  is that correct?
5    A.  Correct.
6    Q.  So in any of these invoices, you had not seen
7  any, again, service agreements between Florida Mall and
8  Image Marketing?
9    A.  Correct.
10    Q.  Simon Property Group.
11    A.  Correct.
12    Q.  How about any service agreements between RJL
13  Services and Image Marketing?
14    A.  No.
15    Q.  Never saw a service agreement.
16    A.  No.
17    Q.  Never saw a fee structure.
18    A.  No.
19    Q.  Did, to the best of your knowledge, did Image
20  Marketing ever outsource anything?
21    A.  No.
22    Q.  Nothing.
23    A.  Nothing.
24    Q.  Over the past eight years.
25    A.  Just design, when they needed referral cards

**Ambassador**

Page 121

1  or if they made a poster or something.
2      Q.  Who was in charge of paying bills that came
3  due from RJL?
4      A.  I wouldn't know.
5      Q.  Did you say that you were sometimes doing the
6  books towards the end of your--
7      A.  Towards the end?  There was never any --
8      Q.  You never --
9      A.  Nothing from RJL Services.
10     Q.  No.  Did you ever pay any bills on behalf
11 of --
12     A.  No.
13     Q.  Do you know who would pay the bills on behalf
14 of Image Marketing?
15     A.  Probably Tim Herman.
16     Q.  You never talked to RJL Services or Robert J.
17 Lauria in regards to any of these invoices that were
18 presented --
19     A.  Never.
20     Q.  -- to see if the work was done?
21     A.  No.
22     Q.  So you can't independently verify if these
23 were done or not; correct?
24     A.  No.
25     Q.  And these were invoices you copied?

Page 122

1      A.  Correct.
2      Q.  When did you copy the invoices?
3      A.  Probably end of May of 2011.
4      Q.  Had something occurred in April or May of last
5  year that made you decide to copy these invoices?
6      A.  Yes.
7      Q.  And what was that?
8      A.  The email from Tim Herman, which is -- well,
9  it's in both of these exhibits.  The emails from Image
10 Marketing to Simon, numbers, let's see, 124, 127, 126,
11 123, 122.
12     Q.  So that would be March -- when those March
13 invoices that were sent to you --
14     A.  Right.
15     Q.  -- you started copying invoices to --
16     A.  This was the red flag.
17     Q.  -- create a case against them, in your
18 opinion.
19     A.  I'm not in the position to make a case against
20 anybody.
21     Q.  Well, what did you think you were doing when
22 you presented to Simon Property Group?
23     A.  It didn't make sense.  Things weren't adding
24 up.  It didn't seem right.  I didn't want to be involved
25 in it.

Page 123

1      Q.  You never addressed Tim Herman about this; did
2  you?
3      A.  No.
4      Q.  Yet you were good friends with him.  I don't
5  understand.
6      A.  Oh, I wouldn't say good friends.  I worked for
7  him.
8      Q.  You left on an amicable situation; is that
9  right?
10     A.  Right.
11     Q.  Did you copy this after hours or during
12 business hours?
13     A.  Well, there was no hours.  I was a salaried
14 employee.
15     Q.  Okay.  Referring to the spreadsheet, one of
16 the first spreadsheets in Exhibit 2, do you know who
17 created the spreadsheet?
18     A.  I don't.
19     Q.  You don't know who created the spreadsheet?
20     A.  No.
21     Q.  But yet you copied it; correct?
22     A.  Correct.
23     Q.  And where did you copy it from?
24     A.  It was in the same files as all these other
25 invoices.

Page 124

1      Q.  Was it the Image Marketing file for RJL or
2  Marketing Resources Network?
3      A.  They were all just filed together.
4      Q.  There's one big file.
5      A.  Yes.
6      Q.  Do you know who created this spreadsheet other
7  than somebody at Image Marketing?
8      A.  No.
9      Q.  Do you even know if actually these amounts
10 even were billed?
11     A.  I'm quite sure they were, because there's
12 personal notes and credit cards and everything written
13 on them, and then there are credit card slips.
14     Q.  These are not a trail back to the invoices, in
15 your opinion?
16     A.  I wouldn't know.
17     Q.  Do you know when this was created?
18     A.  No.
19     Q.  So you're saying to me that if I were to pull
20 the invoices that were previous to this spreadsheet,
21 that they should match up?
22     A.  I wouldn't know.
23     Q.  So there's no -- okay.  How about the next
24 spreadsheet?  Back to the first spreadsheet.  Do you
25 know whose handwriting this is in the far right-hand

**Ambassador**

Page 125

1  corner?
2      A.  I don't know.
3      Q.  Do you know who created this spreadsheet?
4      A.  No.
5      Q.  Recognize the handwriting on it?
6      A.  No.
7      Q.  Do you know when possibly these dates could
8  have possibly occurred?
9      A.  No.
10     Q.  Do you know the customer or client for Image
11 Marketing this would have pertained to?
12     A.  Well, I would assume it's Simon Mall, when
13 it's with the same file as the other things, labeled
14 Simon Mall.
15     Q.  So you're making an assumption that it's
16 related to Simon Property Group; correct?
17     A.  Correct.
18     Q.  You didn't create these; did you?
19     A.  No.
20     Q.  Next spreadsheet.  Do you know when this was
21 created?
22     A.  No.
23     Q.  And do you know who created this one?
24     A.  No.
25     Q.  In the top left-hand corner it says January

Page 126

1  2006.
2      A.  Yeah.
3      Q.  Next spreadsheet has August 2006.  There's
4  handwriting on it.  Do you recognize that handwriting?
5      A.  Yes.
6      Q.  Whose handwriting is that?
7      A.  Ryan Deming.
8      Q.  Do you know if Ryan had any possibility of
9  creating this spreadsheet?
10     A.  Probably.
11     Q.  Next spreadsheet has FTDS.  You have no idea
12 what FTDS stands for?
13     A.  No.
14     Q.  The next spreadsheet has handwriting on the
15 top right-hand corner.
16     A.  Uh-huh (affirmative).
17     Q.  Can you read that?
18     A.  Probably abbreviation for December.
19     Q.  Okay.  Do you know who created this
20 spreadsheet?
21     A.  No.
22     Q.  Do you know whose handwriting that is?
23     A.  It looks like Lynnette Lauria's handwriting
24 with -- if you look at the other documents.
25     Q.  And again, this is a spreadsheet that was

Page 127

1  found in Image Marketing's files?
2      A.  Same.
3      Q.  And you took --
4      A.  Copied.
5      Q.  Was that with or without permission?
6      A.  Without.
7      Q.  Next spreadsheet is a March 2006.  There is
8  handwriting in the -- below the grid there, I guess.  Do
9  you know whose handwriting that is?
10     A.  Looks like Ryan Deming.
11     Q.  Next spreadsheet, May of 2006.  Again it
12 says -- scratch out of '06 and says '07.
13     A.  Uh-huh (affirmative).
14     Q.  Not sure if you can make it out as legible.
15 Do you know whose handwriting that could be?
16     A.  No.
17     Q.  Next spreadsheet has -- seems to be a February
18 2006, but scratched out below is January 2006.
19     A.  Uh-huh (affirmative).
20     Q.  Do you know whose handwriting that is?
21     A.  Looks like Lynnette's again.
22     Q.  How about says website?
23     A.  Same.
24     Q.  Again, you don't know who created the
25 spreadsheet or when it was created; is that correct?

Page 128

1      A.  Correct.
2      Q.  Do you know whether or not this could have
3  been a misplaced invoice in this file?
4      A.  If there was a misplace --
5      Q.  Misplaced invoice.
6      A.  I don't know.
7      Q.  You couldn't determine whether or not it was
8  or it was not.
9      A.  Correct.
10     Q.  Next spreadsheet, and it looks up here, there
11 is handwriting on it.
12     A.  Uh-huh (affirmative).
13     Q.  Do you know whose handwriting that is?
14     A.  Ryan Deming.
15     Q.  And again, you don't know who created this
16 spreadsheet either?
17     A.  No.
18     Q.  No titling on the top of it, no date, and what
19 the purpose was for; correct?
20     A.  Correct.
21     Q.  How about the next spreadsheet.  Got cut off
22 November 2000 -- could be a five on it; is that correct?
23     A.  Correct.
24     Q.  Is that Ryan Deming's handwriting again?
25     A.  Yes.

32 (Pages 125 to 128)

**Ambassador**

Page 129

1    Q.   Seems to be Torres and consulting Latin
2    America?
3    A.   Uh-huh (affirmative).
4    Q.   In November of 2005 did you remember him going
5    down to Latin America?
6    A.   No.
7    Q.   Next spreadsheet is due to MRN from.  What do
8    you think this signifies?
9    A.   Due to marketing leads.  So it's network from
10   Event Planners, Image Marketing and FTDS.
11   Q.   Did you have any idea what this could relate
12   to?
13   A.   Funding needing to go to Marketing Resource
14   Network.
15   Q.   Okay.  And Marketing Resource was run out of
16   the same building as Image Marketing?
17   A.   No.
18   Q.   Do you know who owns Market Resource Network?
19   A.   I believe it's Lynnette Lauria.
20   Q.   You believe it is, but you don't know without
21   certainty.
22   A.   Without certainty.  But I think that's what
23   Google would tell you.
24   Q.   Next spreadsheet, again FTDS at the very top.
25   There is some handwriting on there.

Page 130

1    A.   Uh-huh (affirmative).
2    Q.   Do you know whose handwriting that could be?
3    A.   Lynnette Lauria.
4    Q.   No dates, no author that was creating this
5    document.  And were these spreadsheets that were also
6    possibly maintained on the server at Image Marketing?
7    A.   Probably.
8    Q.   Next spreadsheet says Image Marketing.  Again,
9    no author and no date; is that correct?
10   A.   Correct.
11   Q.   Same thing with the next spreadsheet.  Here it
12   says -- it has XMG.  Do you know what that stands for?
13   A.   No.
14   Q.   Next spreadsheet, there is a month and a year
15   that was associated with this.  It's June 2006.  Were
16   you working for Image Marketing at that time?
17   A.   Yes.
18   Q.   Anything that stands out on here that you
19   think is suspicious?
20   A.   Concierge newsletter, printing and tracking,
21   concierge rewards.  Then on the bottom the route
22   services, concierge newsletter again.  Well, their
23   referral service and top spot.
24   Q.   And why do these stand out to you?
25   A.   Those are events or items that weren't

Page 131

1    serviced or ever created.
2    Q.   And how would you know this?
3    A.   Because I worked at Image Marketing, and those
4    were responsibilities I would have had to take care of.
5    Q.   But you don't know if Tim Herman may have
6    outsourced this to someone else; is that correct?
7    A.   Outsourcing a newsletter wouldn't make any
8    sense, because it is the company's newsletter.  And
9    outsourcing distribution wouldn't make any sense,
10   because that was part of what Image Marketing does.
11   Q.   But you couldn't say for certain that it was
12   outsourced to someone else.
13   A.   I mean, I can say in my opinion I'm certain it
14   wasn't.  However, I don't think it was.
15   Q.   Again, it's just your opinion though; right?
16   A.   Correct.
17   Q.   The next series of documents is a series of
18   receipts.
19   A.   Uh-huh (affirmative).
20   Q.   And that seems to be Lynnette Lauria's
21   signature on there --
22   A.   Yeah.
23   Q.   -- correct?  And this was being run by Event
24   Planners; is that correct?
25   A.   Yes.

Page 132

1    Q.   The second page of the receipts, can barely
2    make out the top.  Can you read that?
3    A.   Florida Tourism District -- or distribution.
4    Q.   Okay.  And these weren't credit cards that
5    were run by you; is that correct?
6    A.   Correct.
7    Q.   All right.  The next invoice is Image
8    Marketing to Florida Mall.  They seem to be all to
9    Florida Mall.  It will be a January -- January 3rd is
10   the due date.  I'm going to go from whenever it was
11   activity, November 2008, October 2008, concierge
12   incentive programs, billing to Florida Mall.  Is Florida
13   Mall meant to be SPG in this?  Or is it Trade Tech
14   Florida Mall being billed?
15   A.   They said just bill right to Florida Mall.
16   Q.   Okay.  And you explained the concierge
17   incentive program as getting some type of kickback to
18   the concierge; is that right?
19   MR. BLAIR:  Object.
20   A.   Right.
21   Q.   And on the second invoice, it's invoice 2861,
22   is that Ryan Deming's signature -- I mean handwriting on
23   there?
24   A.   Yes.
25   Q.   And then invoices go all the way to December

**Ambassador**

Page 133

1  2008. And then actually their statement of invoice 2863
2  is twice. I'm not sure if it's the same in yours.
3       Then you've got receipts for Florida Tourism
4  Distribution. And then the last spreadsheet, this looks
5  like to be Ryan Deming's; isn't that right?
6       A. Yes.
7       Q. Did you make out some of the handwriting on
8  there?
9       A. Yes. Simon Property Group, CFHLA table
10  sponsorship, route distribution, van advertising,
11  website, top spot placement.
12      Q. And your recollection I guess around in '06,
13  was there ever a table sponsorship?
14      A. I don't believe so, no.
15      Q. There's a website in there too. Is that what
16  it looks like there?
17      A. Uh-huh (affirmative).
18      Q. These were all spreadsheets that, in your
19  opinion, belonged with Image Marketing and SPG?
20      A. Well, they belonged to Image Marketing.
21          (Brief recess taken)
22      Q. I'm going to refer to Exhibit 3, the email
23  that was sent from you to scasac@simon.com.
24      A. Uh-huh (affirmative).
25      Q. Do you know who that would have been?

Page 134

1       A. They gave me -- I called Simon corporate and
2  they gave me a general email.
3       Q. Okay.
4       A. They just told me that. I don't know the
5  person's name.
6       Q. Okay. And then all the documents that were
7  attached to this email --
8       A. Uh-huh (affirmative).
9       Q. -- would have been in Exhibit 2?
10      A. Yes.
11      Q. Or just Exhibit 3?
12      A. No. They were in Exhibit 2.
13      Q. So the image of the text message, that would
14  have been part of this email.
15      A. Correct.
16      Q. What would have been named on page 4 with all
17  the title documents?
18      A. What would be named?
19      Q. Yes.
20      A. What do you mean?
21      Q. It says at the very bottom of page 4, it says,
22  see attached files.
23      A. Right.
24      Q. So, I'm looking at this document that has your
25  text message. If it was an image copy of something, it

Page 135

1  would be either a JPEG or PDF, right --
2       A. Right.
3       Q. -- or an IMG; is that right?
4       A. Right.
5       Q. Do you remember what you called it, what you
6  attached it as?
7       A. It could have been just a picture copied
8  within the email. I'm looking here. Everything is
9  named except for this one.
10      Q. If it would have been, it would have been in
11  the text, though, of the email though; right?
12      A. Right. See attached file note, JPEG.
13      Q. File note?
14      A. Yeah.
15      Q. Okay, so that would be the next message;
16  correct?
17      A. Correct.
18      Q. Then obviously the images of the van, that's
19  image 1, 2, and 3; is that right?
20      A. Yeah.
21      Q. Is there a fourth image? Or is it one that's
22  just superimposed or at least blown up?
23      A. There is --
24      Q. And looking at the second page of Exhibit 2, I
25  see four pictures, but I see three in here.

Page 136

1       A. Right. This original email, not all the
2  documents were sent. These were just samples.
3       Q. Okay, so there was a separate email that was
4  sent to you -- or sent from you to SPG?
5       A. Right. This first one was an initial email
6  sent to scasac@simon.
7       Q. Okay.
8       A. And then they -- I was contacted by
9  Mr. Cauthen, and he asked me to send everything. So
10  that's why this one is a lot bigger than this one.
11      Q. So there are two separate emails.
12      A. Correct.
13      Q. Okay. So this is containing everything, and
14  the original email contained less.
15      A. No. This was the original email.
16      Q. Okay. So there is a second email of possible
17  more information that was sent.
18      A. Right. This was the original email sent to
19  this general person I don't know. And then Mr. Cauthen
20  contacted me and said send everything. So this would be
21  the second email, and these were the documents he had
22  requested.
23      Q. Okay. So Exhibit 3 was the initial email and
24  Exhibit 2 was more later; correct?
25      A. Right. And these were actually not sent via

**Ambassador**

Page 137

1  email.  These were sent by fax.
2      Q.  There was a fax?  This was sent by fax?
3      A.  Both.
4      Q.  I'm sorry.  I'm a little con -- which were
5  sent by email and which were sent by fax again?
6      A.  Exhibit 3 --
7      Q.  Uh-huh (affirmative).
8      A.  -- was, with all of these attachments, were
9  sent via email.
10     Q.  Okay.
11     A.  Cauthen -- or Charles Cauthen contacted me.
12  And rather than scan all these in, he said I could fax
13  them.  I just faxed them.
14     Q.  Okay.  And did you get confirmation of what
15  you faxed?
16     A.  The machine may have spit one out.  I didn't
17  take it.
18     Q.  And what machine did you fax it from?
19     A.  One -- a client of mine.
20     Q.  Okay.  Who are your clients, by the way?
21     A.  Matteo's Restaurant, Ragland Road, Wild
22  Florida Air Boats, MacroBaby, America's Golf Outlet,
23  Melting Pot, and that's it.
24     Q.  Were any of your -- any of your current
25  clients clients of -- previous clients of Image

Page 138

1  Marketing?
2      A.  Yeah.
3      Q.  Which ones were those?
4      A.  Ragland Road and Matteo's.
5      Q.  And how long have they been a client of yours?
6      A.  For probably six months now.
7      Q.  Did you take them -- did you take their client
8  files as you left?
9      A.  No.
10     Q.  Did you initially make contact with Matteo's
11  and Rockland Road through Image Marketing?
12     A.  No.
13     Q.  How did you --
14     A.  Well, I -- I knew who those people were
15  through my time at Image Marketing.
16     Q.  Okay.  So you knew of these clients, Matteo's
17  and Rockland Road, as you were working at Image
18  Marketing; correct?
19     A.  Correct.
20     Q.  And you took their phone numbers with you?
21     A.  No.
22     Q.  You had their phone numbers already?
23     A.  No.
24     Q.  No?  How did you initiate the conversation
25  between Matteo's and Rockland Road to do business with

Page 139

1  them?
2      A.  Went to those locations afterwards and
3  contacted them.
4      Q.  Uh-huh (affirmative).  Who in particular did
5  you talk to at Matteo's Restaurant?
6      A.  At Matteo's Restaurant?
7      Q.  Uh-huh (affirmative).
8      A.  Her name is Laura Bonnerati.
9      Q.  All right.  At Rockland Road?
10     A.  Lorraine Gorham.
11     Q.  And you knew of these two people prior to
12  going to --
13     A.  Uh-huh (affirmative).
14     Q.  And how did you come to know them?
15     A.  Through marketing events.  Or --
16     Q.  And you were representing Image Marketing at
17  the time when you --
18     A.  Correct.
19     Q.  -- when you initially first ran into Lorraine
20  Gorham and Laura Demmarati?
21     A.  Bonnerati.
22     Q.  Bonnerati?
23     A.  Correct.
24     Q.  You mentioned an air boat business.  Is that a
25  business that was previously affiliated with --

Page 140

1      A.  No, never.
2      Q.  Did Tim Herman know that you had taken some of
3  his business?
4      A.  I didn't take any of his business.
5      Q.  Does Tim Herman know that you are now -- or
6  that Rockland Road and -- is a client of yours?
7      A.  Yes.
8      Q.  And Matteo's is a client of yours?
9      A.  Yes.
10     Q.  How do you know this?
11     A.  They had to let him know, so they just let me
12  know that they would no longer be working with Image
13  Marketing.
14     Q.  So Matteo's told -- Matteo's Restaurant and
15  Rockland Road told Tim Herman that you are now their
16  marketing person?
17     A.  Uh-huh (affirmative).
18     Q.  Do you have a phone number for Matteo's?
19     A.  Not off the top of my head.
20     Q.  How about Rockland Road?
21     A.  No.
22     Q.  How about Lorraine Gorham?
23     A.  No.
24     Q.  Laura Bonnerati?
25     A.  No.

**Ambassador**

Page 141

1    Q.   Would that be on your current phone?
2    A.   Yeah.
3    Q.   And when you switched over your phone service,
4  did you delete any of the contacts that you had
5  established with Image Marketing?
6    A.   No.
7    Q.   So you kept all the contacts.
8    A.   Well, I didn't have these people's personal
9  numbers.  If I was re-contacting them on behalf of Image
10  Marketing, it would have been calling the restaurants or
11  calling any general number.
12    Q.   Did you try to solicit any other clients that
13  were Tim Herman's at Image Marketing?
14    A.   No.
15    Q.   Back to emails in Exhibit 3.  There was a
16  separate fax, obviously now we've established, that sent
17  Exhibit 2; correct?
18    A.   Correct.
19    Q.   The invoices in the Exhibit 3 are the same as
20  the invoices in Exhibit 2; is that correct?
21    A.   Correct.
22    Q.   I'll read through them:  121, 122, 123, 124,
23  126, 127, 129, and 130.  That's just for Simon Property
24  Group from Image Marketing; correct?
25    A.   Correct.

Page 142

1    Q.   And Florida Mall.  I'm just checking to make
2  sure I didn't -- there's a 129 that's missing, but
3  that's all right.  It's in one, not the other.  And 130
4  was also missing.
5    The next invoice is our marketing resource
6  network.  I don't think these were initially -- oh, they
7  are.  1021, 1022, up to -- only 1021 and 1023 are in
8  Exhibit 3.  So there is a whole bunch of others that are
9  not in there.
10    Let me ask you something.  Again, these
11  documents that have been provided in these exhibits,
12  this is everything that was copied from Image Marketing;
13  is that correct?
14    A.   Correct.
15    Q.   There is nothing else that is in your
16  possession that has not been disclosed to either SPG or
17  here at this deposition.
18    A.   Correct.
19    Q.   No other emails, interoffice emails.
20    A.   No.
21    Q.   Again, you don't know whether or not any
22  services were performed or not; is that correct?
23    A.   Correct.
24    Q.   Email from Lynnette Lauria to Dale Takio.  Was
25  this in the file?

Page 143

1    A.   No.
2    Q.   How did you obtain this email?
3    A.   This was sitting on the boardroom -- or the
4  counter in the boardroom.
5    Q.   So there actually -- this is not associated
6  with any file then; is it?
7    A.   Correct.
8    Q.   And you recall when you picked this up?
9    A.   Must have been the week of June 22nd or around
10  the time of the date of the email.
11    Q.   And when you picked it up, did you just put it
12  in your -- a book bag or a briefcase?
13    A.   No.  Just made a copy.
14    Q.   Did you return the email to the boardroom
15  countertop?
16    A.   Yes.
17    Q.   And what did you do with the copy when you
18  were done -- when you made -- when you finished making
19  the copy?
20    A.   The original went back where I found it, and
21  then the other one I put with this Exhibit 2
22  information.
23    Q.   I mean, did you carry it out of the building?
24    A.   The copy.
25    Q.   Yes.

Page 144

1    A.   Yes.
2    Q.   And then the spreadsheet after that, was this
3  attached to it?
4    A.   No, this was not.
5    Q.   And where did this come from?
6    A.   That was in the file which we talked about
7  earlier labeled Florida Mall.
8    Q.   Is there a reason why this email is a part of
9  a group of documents that before and after are said to
10  be a part of a file and this one is separate?
11    A.   Well, this just didn't make sense to me
12  either.
13    Q.   Okay.  Do you know why it was not separated
14  from all the other documents that would say that it was
15  part of a file in Image Marketing versus this being on
16  the countertop?
17    A.   There's no difference.  It's just something
18  that didn't make sense to me.
19    Q.   Okay.  How about the next spreadsheet, was
20  this found in the file or found --
21    A.   Yeah.
22    Q.   -- copied from the file or copied -- just a
23  document laying around?
24    A.   From the file.
25    Q.   How about the next spreadsheet?

**Ambassador**

Page 145

1    A.   Same, in the file.
2    Q.   Copied from the file.  And then these were
3  pictures that you originally took?
4    A.   Yes.
5    Q.   Taken with your iPhone?
6    A.   Yeah.
7    Q.   Are the pictures still contained on your
8  iPhone?
9    A.   No.  This is a different -- an old iPhone.
10   Q.   Did you download these pictures to your
11 computer?
12   A.   Uh-huh (affirmative).
13   Q.   Okay.  What kind of computer do you have?
14   A.   Just a desktop.
15   Q.   What type of desktop?
16   A.   A Dell.
17   Q.   Uh-huh (affirmative).  Do you keep it at your
18 residence?
19   A.   Yes.
20   Q.   Did you happen, by any chance, to maybe
21 download any of these documents onto your --
22   A.   No.
23   Q.   -- Dell?  No?  Just the photos.
24   A.   Just the photos.
25   Q.   Would there be any communications between you

Page 146

1  and Tim Herman in maybe some work that you had done on
2  your computer?
3    A.   No.
4    Q.   None.
5    A.   No.
6    Q.   You never used your computer for --
7    A.   No.
8    Q.   Would you mind if we took an examination of
9  it?
10   A.   Sure.
11   Q.   You would allow us to do that?
12   A.   Yeah.
13   Q.   Going back to some of the questions that Brian
14 asked you.  You said that there was a Keith Dixon that
15 worked at Image?
16   A.   I didn't say that.
17   Q.   Okay.  Do you know who Keith Dixon is?
18   A.   I do know who he is.
19   Q.   Who is Keith Dixon?
20   A.   He does design work, graphic design.
21   Q.   And how did you come to know him at Image?
22   A.   He was on board before I got there.  He
23 never -- he didn't work out of the office.  He would
24 design some of the referral cards that the clients used.
25   Q.   It was your opinion that he did work; correct?

Page 147

1    A.   Yes.
2    Q.   But you didn't see him; is that correct?
3    A.   Correct.
4    Q.   Did you ever see a paycheck go to him?
5    A.   No.
6    Q.   Any other employees other than you and Keith
7  Dixon?
8    A.   In the past there was an intern, like I said,
9  but Beth Picanol was the office manager.  There was a
10 lady named Deanna Mashburn who was there for maybe a
11 year and a Denise Tucker who was there maybe a year or
12 two.
13   Q.   Did you know what they did?
14   A.   Denise and Deanna did distribution.
15   Q.   Okay.  Did they do distribution for Image
16 Marketing and SPG?
17   A.   For Image Marketing.
18   Q.   Do you know if they did any distribution for
19 SPG?
20   A.   No.
21   Q.   You don't know --
22   A.   Well, Simon was a Image client.  So assuming
23 that they're doing distribution for Image Marketing,
24 they were doing it for all of their clients.
25   Q.   Do you have an idea of what their work

Page 148

1  schedule was or a work calendar they had?
2    A.   In my time there I was on as well, and I
3  was -- made their schedule, so 9 to 5 five days a week.
4    Q.   Is it possible for any of those interns or any
5  of those previous employees that you had named that
6  could have been going down to South Florida or over to
7  Coconut Grove?
8    A.   No.
9    Q.   Why is that?
10   A.   I made their schedule.
11   Q.   Okay.  So you were their supervisor?
12   A.   Correct.
13   Q.   And what were some of your other duties, other
14 than supervising staff?
15   A.   Do the actual hotel visits.  Be present if
16 there was a concierge event.  Towards the end, help out
17 with the tracking and sorting of the referrals.  Running
18 to the bank for them.  Just general operations.
19   Q.   And what was your title there?
20   A.   Distribution manager, and then later just
21 manager.
22   Q.   You had said that you have met Lynnette
23 Lauria; is that correct?
24   A.   Yes.
25   Q.   How did you first meet her?

37 (Pages 145 to 148)

**Ambassador**

1    A.   Probably at a marketing event or a networking
2  event, Visit Orlando, which is the convention center,
3  something like that.
4    Q.   Do you ever recall when this would have
5  occurred?
6    A.   No.
7    Q.   Did you converse with her at all at any of
8  these events?
9    A.   You know, nothing in-depth, just hi, how are
10 you, nice to meet you, things like that.
11   Q.   Did you talk about business?
12   A.   Never.
13   Q.   Do you have her phone number?
14   A.   No.
15   Q.   How about Sarah Lagi?
16   A.   Same, just at events.  She worked for Westgate
17 Resorts, so at times hospitality functions, she was
18 there.
19   Q.   Do you know her phone number?
20   A.   No.
21   Q.   Just her personal email?
22   A.   I don't know her personal email.  Just these
23 ones on here.
24   Q.   Robert Lauria, have you ever met him before?
25   A.   Yeah.

1    Q.   And where did you meet him?
2    A.   Same thing, at an event.
3    Q.   At an event.
4    A.   Uh-huh (affirmative).
5    Q.   How about Rachael Lauria?
6    A.   Same thing, at an event.
7    Q.   Event.  How many events did you go to on a
8  weekly basis for Image?
9    A.   Never on a weekly basis.  Around the holidays
10 there is always a lot, Central Florida Hospitality
11 Association, Central Florida Concierge Association.
12 They always have their holiday galas, so I always see
13 them there.  Sometimes she would go to that Monday
14 Mixer, so would her daughters and her husband.  I mean
15 probably I would go to a networking meeting a month.
16   Q.   Just one a month --
17   A.   Yeah.
18   Q.   -- average?  Did they ever call the office or
19 speak to you while you were at Image?
20   A.   Not really, no.
21   Q.   No.  Now, when you found these invoices in
22 March of 2011, you never went to Ryan or to --
23   A.   Ryan was, under my understanding, being bought
24 out by Tim, so he was never in the office for the past
25 probably two or three years.

1    Q.   Okay.  How well did you know Ryan?
2    A.   At the time, well.
3    Q.   How would you describe your relationship with
4  Ryan?
5    A.   Just fine.  I went to him for a lot of
6  questions and things like that.  Ryan was more in the
7  office as opposed to Tim.
8    Q.   Would you characterize your relationship as
9  friendly?
10   A.   Yeah.
11   Q.   Similar to your relationship with Tim.
12   A.   Correct.
13   Q.   Are you amicable to this day?
14   A.   Yeah.  I haven't had any contact with him in
15 probably the past year.  Like I said, he was not in the
16 office any more, so I rarely saw him or talked to him.
17   Q.   Any of the clients that you have, have they
18 ever requested any referrals or -- excuse me -- any
19 references?
20   A.   Of my clients?
21   Q.   Yeah.  Any clients that you currently have,
22 have they ever requested any references, you know, work
23 references?
24   A.   No.
25   Q.   Would you consider, if they did, would you

1  consider referring them to Tim Herman or to Ryan Deming?
2    A.   No.
3    Q.   Why is that?
4    A.   If you ever filled out a job application, you
5  don't usually put your previous past employer.
6    Q.   Have you filled out any job applications
7  lately?
8    A.   No.
9    Q.   So in your opinion, you don't think it's
10 important to disclose who your previous employer is when
11 you're applying for a job?
12   A.   It's important, in my sort of business if I
13 list them, that would be a conflict, listing another
14 marketing company.  Similar to if -- never mind.
15   Q.   So it's okay to not list them as a previous
16 employee.
17   A.   No.
18   Q.   Employer.  It's okay not to list them as a
19 previous employee, but it's okay to take their business,
20 like Rockland Road and Matteo.
21   A.   I haven't taken any of their business.  When I
22 approach a new client I tell them where -- my
23 previous employment history.
24   Q.   Are you changing your answer now?
25   A.   No.  You asked previously if it was

**Ambassador**

Page 153

1  important -- can you reask the question?
2      Q.  Sure.  Is it -- with Matteo's and Rockland
3  Road, did you disclose to them that you had worked
4  with --
5      A.  Oh, absolutely.
6      Q.  The references, references, did you request a
7  reference from them?  Or did they request a reference
8  from you?  Excuse me.
9      A.  I didn't need to.  They knew who I was.
10     Q.  Okay.  And then my next question was:  So was
11 it customary for you to not disclose who your previous
12 employers are, but then to take clients away from your
13 previous employer?
14     A.  Any new business I go after, I absolutely tell
15 them where I came from in my history.
16     Q.  Okay.
17     A.  If they want to call them for reference,
18 they're more than welcome to.
19     Q.  Other than reporting these invoices to SPG,
20 did you go to any other -- any other vendors --
21     A.  No.
22     Q.  -- or customers of Image Marketing?
23     A.  No.
24     Q.  Bear with me as I go through my notes.
25     A.  Sure.

Page 154

1      Q.  Who is Alan Harris?
2      A.  My partner.
3      Q.  Business partner?
4      A.  No.  Domesticated partner.
5      Q.  Okay.  How long have you been in a
6  relationship with him?
7      A.  Two years.
8      Q.  Would he have any knowledge of your workings
9  at Image Marketing?
10     A.  He knew I worked there.
11     Q.  Did you ever disclose to him some of the stuff
12 that you had found going on at Image Marketing?
13     A.  Not specifics.
14     Q.  Did he help you in preparing any of the emails
15 or documentation?
16     A.  No.
17     Q.  What does Alan Harris do?
18     A.  He's the emergency manager for Seminole
19 County.
20     Q.  Do you have a phone number for him?
21     A.  Sure.  (407) 416-3287.
22     Q.  How did you meet Alan?
23     A.  That's not important.
24     Q.  No?  How did you meet him?
25     A.  An iPhone app.

Page 155

1      Q.  Okay.  Did you have a partner before Alan
2  Harris?
3      A.  No.
4      Q.  No partners before Alan Harris?
5      A.  No.
6      Q.  Does he own the residence at 4436 Cranston?
7      A.  Yes.
8      Q.  Do you lease from him at all?
9      A.  Yes.  I pay rent.
10     Q.  I'm sorry.  Say again?
11     A.  Pay rent.
12     Q.  Pay rent.  Describe for me a day within the
13 last 30 days of your employment when you were working at
14 Image Marketing.
15     A.  A typical day:  Go to the office.  Check any
16 emails.  Grab some of the referral cards.  And then
17 servicing locations in the hotels.  Talk to the
18 concierge.  You know, provide them with all that
19 information.  Stop for lunch.  Go back again.
20         Sometimes I would go right home afterwards, or
21 sometimes I'd stop back in at the Image Marketing office
22 and just look at emails or do anything that needs to be
23 done there.
24     Q.  Was your iPhone at the time synced to your
25 email service through the company?

Page 156

1      A.  Yes.  There was always issues with it, but for
2  the most part, yeah.
3      Q.  When you transferred over your iPhone did they
4  get rid of any of the emails that were on there?
5      A.  Yes.
6      Q.  All of them --
7      A.  I didn't -- I didn't take any of those.
8      Q.  Did you forward any emails from your company
9  to your personal?
10     A.  Afterwards, or before, or while I was working
11 there?
12     Q.  While and --
13     A.  Oh, while I was working there, yeah, every
14 once in a while.
15     Q.  And those are not disclosed here; is that
16 correct?
17     A.  Things like these pictures, I just did that so
18 it would make it easier to print out.  And then that's
19 probably about it.
20     Q.  Was there any other matters that would have
21 been discussed between you and Image Marketing that you
22 felt that was important to forward to your personal
23 email?
24     A.  No.
25     Q.  Nothing else.

**Ambassador**

Page 157

1    A.  No.
2    Q.  You never worked directly under Dale Takio?
3    A.  Like I said before, the Kids Eat Free Card,
4   once a month I would go to his vendor location and count
5   their cards and see how many they have left.
6    Q.  Now, did any pay come to you from Dale Takio's
7   company?
8    A.  Yeah.
9    Q.  So you were an employee of --
10   A.  Uh-huh (affirmative).
11   Q.  -- of the -- is that the Kids Eat Free
12  Program?
13   A.  Kids Eat Free Card.
14   Q.  Is that the company name, Kids Eat Free Card?
15   A.  Yeah, that's the name of the company.  But my
16  paycheck came from the Takitik, Inc. or Takitik company.
17   Q.  So Takitik was the company that paid you.  So
18  you were actually getting paid from Image and from
19  Takitik --
20   A.  Correct.
21   Q.  -- is that correct?  Any other company that
22  you received pay from during this time period with your
23  employment from December of 2003 to July of 2011?
24   A.  No.
25   Q.  No other pay?

Page 158

1    A.  No.
2    Q.  Prior to December 2003 you had said you were
3   working at Thai Thani; is that correct?
4    A.  No.  Gargi's Lakeside.
5    Q.  Gargi's Lakeside.  Besides Thai Thani and
6   Gargi's Lakeside, any other places you --
7    A.  I never worked for Thai Thani.
8    Q.  Well, how did that come into our --
9    A.  One of the other servers at Gargi's worked for
10  Thai Thani.  And that's where she and Tim Herman met.
11   Q.  Prior to Gargi's Lakeside where did you work?
12   A.  Probably back in Connecticut.  That was
13  previous to moving here.
14   Q.  Okay.  And where in Connecticut?
15   A.  I worked for a restaurant that's no longer in
16  business called Casa Mia and another restaurant that's
17  no longer in business called Bohemian Pizza.
18   Q.  And what cities would they have been in?
19   A.  Torrington, Connecticut.
20   Q.  Torrington?
21   A.  T-O-R-R-I-N-G-T-O-N.
22   Q.  Is that where you also resided in Connecticut?
23   A.  Uh-huh (affirmative).
24   Q.  Torrington, Connecticut?
25   A.  Yes.

Page 159

1    Q.  Anywhere else in Connecticut that you resided?
2    A.  Litchfield.
3    Q.  And how long did you reside in Connecticut
4   before coming down to Orlando?
5    A.  That's where I'm from, born.  So --
6    Q.  And when did you come down to Orlando then?
7    A.  2002.
8    Q.  Summer?
9    A.  Summer.
10   Q.  June, July, August?
11   A.  I think August.
12   Q.  Did you become employed right away in Orlando
13  in 2002?
14   A.  No.  That was right before those three
15  hurricanes, so I had quite a bit of time off for a
16  while.
17   Q.  Okay.  And where did you reside between August
18  2002 to before I guess residing with Mr. Harris in 2009?
19   A.  In Apopka.
20   Q.  Is there an address up there?
21   A.  Lenore Lane.  I couldn't remember the house
22  number.
23   Q.  Did you have a roommate or --
24   A.  Yeah.
25   Q.  Who was your roommate?

Page 160

1    A.  James Polisano.
2    Q.  Was he a significant other or --
3    A.  Friend.
4    Q.  Friend, okay.  And you lived in Apopka from
5   2002, approximately, all the way to 2000 --
6    A.  No.  It was only for about a year.
7    Q.  Okay.  Where did you live after that?
8    A.  Ferncreek Ave.
9    Q.  That's downtown Orlando?
10   A.  Yes.
11   Q.  What's that address?
12   A.  I want to say 1419 North Ferncreek.
13   Q.  Did you live there by yourself?
14   A.  No.  With a roommate.
15   Q.  Who was your roommate?
16   A.  Liz Murphy.
17   Q.  And that was between what months again?
18   A.  Probably from November of that year until --
19   Q.  November 2002 or November 2003?
20   A.  Two.
21   Q.  Until about October of 2003, about a year
22  lease?
23   A.  Yeah, I'd say about that.
24   Q.  And then from October of '03 onwards, where
25  did you live?

**Ambassador**

Page 161

1    A.  Jefferson Street.
2    Q.  Is that Orlando also?
3    A.  Yes.
4    Q.  Did you have a roommate?
5    A.  Yeah.
6    Q.  Who was your roommate?
7    A.  Laura Bonnerati.
8    Q.  And she is the owner of Rockland Road?
9    A.  No.  She was a marketing rep at Matteo's.
10   Q.  Matteo's, okay.  And then spent a year there;
11   is that correct?
12   A.  Right.
13   Q.  Then after I guess 2000 -- October of 2004,
14   the new lease I presume.
15   A.  That was probably two years I lived there.
16   Q.  So 2005.
17   A.  I lived by myself on Amelia.
18   Q.  From I guess October?
19   A.  About two years.  And then after that into my
20   current address.
21   Q.  Between -- hold on.  You said you've been
22   living with Alan Harris for two years.
23   A.  Yes.
24   Q.  There is a gap between 2007 and 2009.
25   A.  Well, from Amelia I was with Alan Harris.  So

Page 162

1    maybe the stay at Laura Bonnerati was probably a little
2    longer, and so was the one with the Ferncreek address.
3    Q.  Okay.  So you went back to live at 1415 and
4    having a roommate Liz Murphy also.
5    A.  Uh-huh (affirmative).
6    Q.  And with Laura Bonnerati after the 2005, 2007.
7    A.  No.  Those are in chronological order.
8    Q.  Okay.
9    A.  I'm just saying the lengths of time may have
10   been a little longer.
11   Q.  So instead of a year it could have been two
12   years.
13   A.  Correct.
14   Q.  Okay.  Do you still communicate with Babette
15   Picanol?
16   A.  No.
17   Q.  Do you know where her current whereabouts are?
18   A.  No.
19   Q.  Do you know whether or not any of the Kids Eat
20   Free Cards established a relationship with
21   restauranteurs that were tenants of SPG?
22   A.  I wouldn't know.
23   Q.  Do you know if they could have been?
24   A.  It was open to any restaurant in Orlando, so
25   it's a possibility.

Page 163

1    Q.  You had mentioned that Sarah Lagi was doing
2    accounting work for Image Marketing; is that correct?
3    A.  Correct.
4    Q.  And what was your estimation of that time
5    period?
6    A.  Probably starting in 2009?  I mean, that's
7    just a guesstimate.
8    Q.  Did she do any other types of services, other
9    than accounting work for Image Marketing?
10   A.  No.
11   Q.  That you're aware of.
12   A.  None.
13   Q.  And it was your answer that you didn't know
14   whether or not Sarah Lagi was paid or not; is that
15   correct?
16   A.  No.  She was paid.
17   Q.  Okay.  She was paid?
18   A.  Uh-huh (affirmative).
19   Q.  And how do you know that?
20   A.  We all got handwritten checks.  There was a
21   time when Tim asked me to deposit her check for her.
22   Q.  Did you receive your paycheck by handwritten
23   check too?
24   A.  Yes.
25   Q.  How often were you paid by Image Marketing?

Page 164

1    A.  Every other week.
2    Q.  So it's biweekly?
3    A.  Yes.
4    Q.  These were done handwritten; correct?
5    A.  Correct.
6    Q.  By Tim himself; correct?
7    A.  Yes.
8    Q.  You had mentioned Kevin Brett with Hat
9    Marketing.  He provided services in the UK; is that
10   correct?
11   A.  Yes.
12   Q.  Is that specifically for Image Marketing or
13   were there other vendors that Mr. Brett serviced?
14   A.  No.  He serviced a lot of different clients
15   throughout Central Florida.
16   Q.  You don't have access to those records; do
17   you?
18   A.  No.
19   Q.  Did you ever work for him directly?
20   A.  No.
21   Q.  Are you still in good terms with him?
22   A.  I have no contact with him.  He lives in the
23   UK.
24   Q.  Do you have an email for him by any chance?
25   A.  No.

41  (Pages 161 to 164)

**Ambassador**

Page 165

1    Q.   Who did the records for Takitik -- or Takitik?
2    A.   Probably Dale.
3    Q.   Dale.  Other than Charles Kaufner -- I guess
4  Cauthen and possibly Dave Donoway, has anyone else from
5  SPG communicated with you?
6    A.   There was another lady who sent me an email.
7  I don't know if I copied it in here.  He had asked me
8  not to communicate with anybody else, so I never
9  responded.  I don't think I included it in here.  Saying
10  she was a local person, wanting to meet about this.
11       MR. CRUZADA:  Take a break real quick.
12       (Brief recess taken)
13    Q.   Just a couple more questions, Tom.  As a
14  manager for Image Marketing -- presuming it's Image
15  Marketing Group; correct?
16    A.   Uh-huh (affirmative).
17    Q.   -- Image Marketing Group, LLC, and Image
18  Marketing of Florida, LLC, did you happen to see any
19  financial statements of Image Marketing?
20    A.   No.
21    Q.   Any tax returns for Image Marketing?
22    A.   Not of the company.
23    Q.   Okay.  Any accounts payables?
24    A.   No.
25    Q.   Any accounts receivables statements?

Page 166

1    A.   No.
2    Q.   Any time sheets for any of the employees that
3  you supervised?
4    A.   No.
5    Q.   Were they hourly employees or were they
6  salaried employees that you supervised?
7    A.   I think they were independent contractors like
8  I was.
9    Q.   You were an independent contractor for Image
10  Marketing?
11    A.   Well, looking back at my taxes one year, I was
12  able to claim things -- I didn't understand, I was real
13  young -- about claiming things and not claiming things.
14  So I thought I was paid hourly, but it turns out I was
15  paid per contract.  But there was no existing contract,
16  so that's why I didn't understand.
17    Q.   This throws a wrench in everything in my
18  impression of how you're being employed.  Did you have
19  an independent contractor's agreement with --
20    A.   No.
21    Q.   No.  Did you have the authority to sign on
22  behalf of Image Marketing at all?
23    A.   I was not listed as, you know, an officer of
24  the company.  She and I never signed anything.
25    Q.   When you would go to some of the properties of

Page 167

1  SPG, like Miami-Dade, Dadeland Mall, or Coconut Point,
2  would you tell them that you're an independent
3  contractor or you're an employee?
4    A.   No.  I'm with Image Marketing.  I would say
5  something like that.
6    Q.   Did you ever see any checks signed by Tim
7  Herman go to Lynnette Lauria?
8    A.   No.
9    Q.   None?
10    A.   None.
11    Q.   RJL Services?
12    A.   No.
13    Q.   Any checks from Image Marketing to Lynnette
14  Lauria?
15    A.   No.
16    Q.   RJL Services?
17    A.   No.
18    Q.   Arnell?
19    A.   No.
20    Q.   Snouthound Enterprises?
21    A.   No.
22    Q.   Sarah Lagi?
23    A.   No.  Well, yes, sorry.  I did see checks go to
24  Sarah Lagi.
25    Q.   Those were payroll checks?

Page 168

1    A.   They were the handwritten checks from Image,
2  yeah.
3    Q.   Okay.  How about Rachael?
4    A.   No.
5    Q.   Rachael Lauria, okay.
6       Now, if you were an independent contractor,
7  was it you and solely you?  Or is it a company that you
8  created to be an independent contractor?
9    A.   No.  I didn't have a company.
10    Q.   Have you figured out I guess in the years that
11  you've worked there when you were considered an employee
12  and when you were considered an independent contractor?
13    A.   There was no difference in any of the time
14  that I worked there.
15    Q.   Okay.  And working for Dale Takio, was it kind
16  of the same thing as an independent contractor?
17    A.   Yeah.
18    Q.   The reference to Takitik, which is Dale
19  Takio's company, you were an independent contractor?
20    A.   Uh-huh (affirmative).
21    Q.   And at Image Marketing you were an independent
22  contractor?
23    A.   Yes.
24    Q.   How about Event Planners?
25    A.   No.

**Ambassador**

Page 169

1  Q.  No.  Target Distribution?
2  A.  No.
3  Q.  Point Distribution?
4  A.  No.
5      MR. CRUZADA:  No further questions.
6          * * * * *
7      REDIRECT EXAMINATION
8  BY MR. BLAIR:
9  Q.  The unfortunate thing of this process is I'm
10 going to have a few follow-up questions based upon --
11 A.  That's all right.
12 Q.  -- based upon questions that counsel asked
13 you.  He was talking about your employment status.  When
14 you got a paycheck, what name was on the top of it?
15 A.  Image Marketing.
16 Q.  Was it Group, Inc.?  LLC?  Do you recall?
17 A.  No.
18 Q.  You said before you, Deanna Mashburn and
19 Denise Tucker did distribution.
20 A.  Uh-huh (affirmative).
21 Q.  Would that be the same distribution you did?
22 A.  Correct.
23 Q.  Do you know if they kept time sheets about
24 where they went?
25 A.  No.

Page 170

1  Q.  Did anybody at Image Marketing keep record of
2  where they went and when they went?
3  A.  No.
4  Q.  So the only way to be able to find that out
5  would be to look at the charge card receipts?
6  A.  Yeah.  If it was on out of town, one, yeah.
7  Q.  Were Miss Mashburn and Miss Tucker provided
8  with an Image Marketing charge card as well?
9  A.  I don't believe so.
10 Q.  Did they do any out-of-town distribution?
11 A.  No.
12 Q.  One time you said that Mr. Herman asked you to
13 deposit Sarah Lagi's paycheck?
14 A.  Correct.
15 Q.  Do you recall what bank you deposited it in?
16 A.  Either SunTrust or Chase.
17 Q.  Okay.  Do you recall the amount of the
18 paycheck?
19 A.  Around 400.
20 Q.  And for how long -- was that a biweekly?
21 A.  Probably, yes.
22 Q.  And at the end of the year when tax season
23 comes around, from Image Marketing did you receive a
24 W-2?
25 A.  Yes.

Page 171

1  Q.  So they did withholding for you, things of
2  that nature?
3  A.  They didn't.
4  Q.  They didn't.
5  A.  I was responsible for paying at the end of the
6  year.
7  Q.  So you paid your own, like, quarterly taxes
8  or --
9  A.  Annual.
10 Q.  Annual, okay.  Do you know what bank Image
11 Marketing used?
12 A.  SunTrust.
13 Q.  You had also talked about Monday Mixers and
14 these events that you may have attended; is that
15 correct?
16 A.  Yes.
17 Q.  And you said that you had met Robert Lauria
18 and possibly other members of the Lauria family at these
19 mixers; correct?
20 A.  Yes.
21 Q.  Do you know why they were in there?
22 A.  Why they were there?
23 Q.  Yeah.
24 A.  No.
25 Q.  To your knowledge, does Robert Lauria have any

Page 172

1  type of marketing degree or background?
2  A.  No.
3  Q.  Do you know what he does for a living?
4  A.  No.
5  Q.  Do you know what Sarah Lagi does for a living?
6  A.  Yeah.
7  Q.  What does she do?
8  A.  She works for Westgate Resorts in the
9  corporate office.  I'm not exactly sure what her
10 position is.  I just know it's Westgate Resorts.
11 Q.  Do you know if she has a marketing background
12 or education?
13 A.  I have no idea.
14 Q.  Same with Rachael Lauria, do you know why she
15 would have been there?
16 A.  No.
17 Q.  Do you know what she does for a living?
18 A.  No.
19 Q.  Do you know if she has any marketing or
20 background or education?
21 A.  No.
22 Q.  Did you ever see Lydia Gilmore and her family
23 at these events?
24 A.  Don't know who she is.
25 Q.  Do you know the address for Deanna Mashburn or

**Ambassador**

Page 173

1  Denise Tucker?
2      A.  Deanna Mashburn I want to say lives back up
3  north.  I want to say possibly Indiana.  Denise Tucker
4  lives here in Orlando.
5      Q.  Do you know in what area of Orlando?
6      A.  No.
7      Q.  Do you know who does Image Marketing's tax
8  returns?
9      A.  Mike Molika & Associates.
10     Q.  Mike Molika?
11     A.  Yeah.
12     Q.  M-O-
13     A.  Probably M-O-L-I-K-A.  I think Casselberry --
14  Casselberry.  He might have an associate.  I just
15  remember his name.  He did our taxes every year.
16     Q.  Who?  Mike Molika?
17     A.  Uh-huh (affirmative).
18     Q.  Were you involved in any of the tax
19  preparation?
20     A.  No.
21     Q.  And I believe counsel asked you if you had
22  ever seen any tax returns.  And your answer was not of
23  the company.  Did you see anybody else's tax returns?
24     A.  No.
25     Q.  You had also gotten in a discussion about your

Page 174

1  iPhone and the replacement of the data.  What I'm trying
2  to figure out is, when you were at Image Marketing you
3  had an iPhone; correct?
4      A.  Correct.
5      Q.  Since then have you had just one other iPhone?
6      A.  Yeah.  I just upgraded to the new one when it
7  came out.
8      Q.  Okay.  And they transferred your contacts and
9  data from the old one to the new one.  Is that what they
10  did?
11     A.  Just the contacts.
12     Q.  Okay.
13     A.  Everything else unfortunately I had to do by
14  myself.
15     Q.  And we also had talked about -- I want to go
16  back to the hotel distribution and hotel referral plan,
17  the concierge we talked about.
18     A.  Uh-huh (affirmative).
19     Q.  How far out does the distribution go and who
20  decided that?  For example, if I'm at the Florida Mall,
21  it doesn't make sense for me to distribute, I don't
22  think, concierge pamphlets in Tallahassee; is that
23  correct?
24     A.  Correct.
25     Q.  Who determined the scope or area of the

Page 175

1  distribution?
2      A.  Image Marketing goes only to International
3  Drive, Lake Buena Vista, 192, downtown Orlando, and
4  airport area.
5      Q.  But, for example, then Dadeland Mall I believe
6  is one of the ones on your list.  Where would you go
7  distribute for that?
8      A.  There is a small hotel close -- hotel area
9  with a group of -- cluster of hotels.
10     Q.  Is there a list of where you distribute?
11     A.  Yeah, they had a hotel list.
12     Q.  And who is they?
13     A.  Image Marketing.
14     Q.  And if -- I mean, do you recall any of the
15  hotels that you went to for some of these places?
16     A.  Not really.  Like I said, I only did it two or
17  three times.  I did it once with Ryan Deming.  I'm not
18  that familiar with South Florida, so I would have gotten
19  lost.
20     Q.  Are you familiar with the Plaza Carolina?
21     A.  No.
22     Q.  Have you ever done any distribution services
23  for the mall -- a mall in Puerto Rico?
24     A.  No.
25     Q.  And based upon what I hear you testifying to

Page 176

1  today, that would require someone to physically fly to
2  Puerto Rico; correct?
3      A.  Yes.
4      Q.  And hand out pamphlets to the local hotels?
5      A.  Correct.
6      Q.  And you never did that; correct?
7      A.  No.
8      Q.  Did you ever see Mr. Herman do that?
9      A.  No.
10     Q.  Did you ever see Mr. Deming do that?
11     A.  No.
12     Q.  Mr. Takio do that?
13     A.  No.
14     Q.  Anybody at Image Marketing?
15     A.  No.
16     Q.  To your knowledge, did anyone ever fly
17  anywhere to distribute any type of marketing information
18  for Image Marketing?
19     A.  No.
20     Q.  As far as the Florida Mall, like you went
21  through where you would go to distribute for the Florida
22  mall --
23     A.  Uh-huh (affirmative).
24     Q.  -- who made that decision?  Was that Lynnette,
25  Tim, Herman?

44 (Pages 173 to 176)

**Ambassador**

Page 177

1     A.   Well, those are the only areas they go to.  So
2  it would just make sense to go to all of them.  Each
3  client wanted distribution in that area.  That's the
4  tourism area.
5     Q.   Would there be any reason for someone to
6  distribute these discount cards, like, in Tampa?
7     A.   No.
8     Q.   And why would that be?
9     A.   There's no referring agents in Tampa.  And
10  also the Florida Mall is quite a bit far away from
11  Tampa.
12     Q.   So if someone might go to the mall, it would
13  be like the Town Center or something like that; correct?
14     A.   Right.
15     Q.   So in order for that to be useful, what I'm
16  understanding is that someone would have to basically
17  hand out a pamphlet in Tampa.  The person would have to
18  cross three or four malls -- or go by three or four
19  malls to come to the Florida Mall?
20     A.   Exactly.
21     Q.   To your knowledge, when you were at Image
22  Marketing Group did you ever distribute for, say, the
23  Florida Mall in other cities?  Like would you take a
24  Florida Mall referral?
25     A.   No.  Only in Orlando.

Page 178

1     Q.   Same way for Coconut Point.  Did you ever take
2  Coconut Point material and distribute it in any other
3  city?
4     A.   No.
5     Q.   When you were in Naples did you ever -- what
6  hotel did you distribute to?
7     A.   I think the hotels are on Tamiami Trail.  You
8  know, I don't recall the exact names of the hotels.
9  Probably 30 locations.
10     Q.   Okay.  We've looked at a lot of invoices today
11  from Image Marketing and things of that in exhibits I
12  think 2 and 3.  There is not a lot of detail on the
13  invoices.  It would say something like distribution,
14  December 2008, for example.  Was that a typical invoice
15  that you saw going out of Image Marketing?  Or did other
16  clients have different styled invoices?
17     A.   No.  There are more details.  They would say,
18  you know, the exact date, the monthly -- the month that
19  they were charging the service fee for.  And then there
20  would be a second invoice for the amount of the kickback
21  going to the concierge.  That would be a couple of weeks
22  after.
23     Q.   So if let's say I think Ripley's was one.
24     A.   Right.
25     Q.   Can you describe to me what the Ripley's bill

Page 179

1  would look like for Orlando?
2     A.   Sure.  They'd get a bill in December.  It
3  would say December, you know, monthly service fee to
4  Image Marketing, $500.  Once those referrals were
5  calculated, another one would go out to Ripley's saying
6  the date and everything for the month of December's
7  referrals, this many referrals times $2 per person,
8  let's say, totaling this amount.
9     Q.   Did the invoices actually state the date that
10  the distribution occurred?
11     A.   Well, it's the date that the referrals
12  occurred.
13     Q.   Okay.  But as far as where they distributed
14  the material, did they give any information about that?
15     A.   No.
16     Q.   Who paid like the invoices at Image Marketing?
17  So for example, if you had a printer invoice, printing
18  services, would you be involved in that?
19     A.   No.
20     Q.   Who would pay those?
21     A.   Tim.
22     Q.   Are you aware of any of the incoming invoices
23  that Image Marketing may have had?  Like were you privy
24  to any of that?
25     A.   No.

Page 180

1     Q.   Are you aware of -- have you ever heard of a
2  company called the Snouthound?
3     A.   No.
4     Q.   I had asked you about some companies earlier
5  today, if you had any knowledge about one.  Do you have
6  knowledge about a company called Mobile Hire
7  Communications, Inc.?
8     A.   That was another company Image tried to
9  launch, basically rental cell phones.  That never took
10  off as well.
11     Q.   To your knowledge, it never did business?
12     A.   Never.
13     Q.   Do you know who owned that company?
14     A.   I can't say for sure.
15     Q.   But it was associated with Image Marketing?
16     A.   Yes.
17     Q.   And then on some of the exhibits today we saw
18  spreadsheets with -- looks like FTDS.
19     A.   Uh-huh (affirmative).
20     Q.   Did that stand for Florida Tourism
21  Distribution Services?
22     A.   Yes.
23     Q.   Are you familiar with that company?
24     A.   Not until after the subpoena.
25     Q.   And then you researched it?

45 (Pages 177 to 180)

**Ambassador**

Page 181

1    A.  Correct.
2    Q.  And are you aware of who the owner is?
3    A.  No, I don't remember.
4    Q.  Did any, to your knowledge, did any such
5  business operate out of the Image Marketing Group
6  location?
7    A.  No.
8    Q.  To your knowledge, did Florida Tourism
9  Distribution Services ever perform any work or services
10 for Simon Property Group?
11   A.  No.
12   Q.  Do you know where Tim Herman lives?
13   A.  I don't.
14   Q.  Do you know if Tim Herman operated any
15 businesses out of his home?
16   A.  No, I don't believe so.
17   Q.  Did you ever supervise or have occasion to
18 supervise Sarah Lagi in her duties?
19   A.  No.
20   Q.  And do you know why she was retained as an
21 accounting or bookkeeper for Image Marketing?
22   A.  No.
23   Q.  Do you know if she has any skill or expertise
24 in that area?
25   A.  Don't know.

Page 182

1    Q.  And this may have been asked throughout the
2  day, but who was the bookkeeper before that?
3    A.  Ryan Deming, and previous to that was the
4  Babette Picanol lady.
5    Q.  Are you aware of whether any of the companies
6  today I talked to you about -- I gave you a big list,
7  Takitik and Point Distribution -- if any of those have
8  gone out of business since -- in the last six months?
9    A.  No.
10   MR. BLAIR:  I think that's all I have.
11        *  *  *  *  *
12        RECROSS EXAMINATION
13 BY MR. CRUZADA:
14   Q.  You said you were W-2'd for any of the pay you
15 received.  Are you sure it wasn't a 1099?
16   A.  It may have been 1099.  I'm going to have to
17 double-check.  I really can't remember.
18   Q.  That's fine.  And how much did you earn
19 annually at Image Marketing?
20   A.  Probably just under $30,000 a year.
21   Q.  Is that consistently through 2003 to 2011?
22   A.  Pretty much.
23   MR. CRUZADA:  No further questions.
24   MR. BLAIR:  That's all I have.  You have the
25 ability to either read the deposition to make any

Page 183

1  changes you deem appropriate.  You can make any
2  type of change, but I would just tell you you're
3  subject to be redeposed on any substantive change.
4    THE WITNESS:  Okay.
5    MR. BLAIR:  Or you have the right to what they
6  call waive, which means you believe that everything
7  you said today was correct, and you can just waive
8  that right.  And since neither of us are your
9  attorney we really can't advise you on what to do,
10 but you have those two options.
11   And you have to tell madam court reporter
12 which one, because she will mail you a copy if you
13 want to read it.
14   THE WITNESS:  I'd like to read it.  And then
15 if there's something wrong, I just put an email?
16   MR. BLAIR:  I think he sends something back to
17 you; doesn't he?  He calls you?
18   (Discussion off the record)
19   MR. BLAIR:  And if there's something, you can
20 make a change there.  And then she mails us a copy
21 of what they call an errata sheet, which has your
22 changes.  And we have the right to look at it.
23   THE WITNESS:  Okay.
24   MR. BLAIR:  And then if we see something, we
25 may want to talk to you about it.

Page 184

1    THE WITNESS:  Okay.
2    MR. BLAIR:  Thank you for your time.
3    THE WITNESS:  No problem.
4    THE REPORTER:  Do you want this transcribed?
5    MR. BLAIR:  Yes, please.
6    THE REPORTER:  Do you want a copy?
7    MR. CRUZADA:  Yeah, I'll get a copy.  Ask my
8  client.
9    THE REPORTER:  Do you want me to send it or do
10 you want me to call you?
11   MR. CRUZADA:  Yes, call me.
12   (Deposition concluded at 2:15 PM)
13
14
15
16
17
18
19
20
21
22
23
24
25

**Ambassador**

Page 185

```
1        E R R A T A   S H E E T
2    DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
3
     IN RE:   Simon v. Lauria
4        Deposition of THOMAS BRIGNOLO taken 1/9/12
5    Page    Line    Correction        Reason
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21   Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct subject to
22   any changes in form or substance entered here.
23
24       DATE            THOMAS BRIGNOLO
     (NOTE: This document no longer needs to be notarized)
25   EAS
```

Page 186

```
1        CERTIFICATE OF OATH
2
3    STATE OF FLORIDA   )
4    COUNTY OF ORANGE    )
5
6        I, the undersigned authority, certify that THOMAS
7    BRIGNOLO personally appeared before me and was duly
8    sworn and at the time of the deposition requested review
9    of his/her transcript.
10
11       WITNESS my hand and official seal this 9th day of
12   January, 2012.
13
14
15       _____
16       ELIZABETH A. SPEER, CRR
17       Notary Public, State of Florida
18       EE 143748
19       My commission expires 11/28/15
20
21
22       *   *   *   *   *
23
24
25
```

Page 187

```
1        CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA   )
4    COUNTY OF ORANGE    )
5
6        I, ELIZABETH A. SPEER, Certified Realtime Reporter,
7    certify that I was authorized to and did
8    stenographically report the foregoing deposition and
9    that the transcript is a true record of the testimony
10   given by the witness.
11       I further certify that I am not a relative,
12   employee, attorney, or counsel of any of the parties,
13   nor am I a relative or employee of any of the attorneys
14   or counsel connected with the action, nor am I
15   financially interested in the action.
16
17       Dated this 19th day of January, 2012.
18
19
20       _____
21       ELIZABETH A. SPEER, CRR
22
23
24
25
```

**Ambassador**