# EXHIBIT T

Dale Takio - 9/20/2012

Page 1

                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                     ORLANDO DIVISION

            CASE NO.:  6:11-cv-1598-GAP-KRS


    SIMON PROPERTY GROUP, INC.,

            Plaintiff,

    vs.                                    VOLUME I
                                       (Pages 1-200)

    LYNNETTE LAURIA, et al.,

            Defendants.


    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

    VIDEO RECORDED
    DEPOSITION OF:      CORPORATE REPRESENTATIVE
                        OF TAKITIK, INC.
                        CORPORATE REPRESENTATIVE
                        OF POINTE DISTRIBUTION, LLC.
                        CORPORATE REPRESENTATIVE
                        OF DT PRINTING SOLUTIONS, LLC
                        DALE TAKIO

    DATE TAKEN:         SEPTEMBER 20, 2012

    TIME:               9:57 A.M. – 4:43 P.M

    PLACE:              200 SOUTH ORANGE AVENUE
                        SUITE 2300
                        ORLANDO, FLORIDA  32801

    TAKEN BEFORE:       BETSY J. SHATTO, FPR
                        AND NOTARY PUBLIC


    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                         Page 2
  1
             APPEARANCES:
  2
             BRIAN C. BLAIR, ESQUIRE
  3          COLEMAN W. WATSON, ESQUIRE
                  Baker & Hostetler, LLP
  4               200 South Orange Avenue, Suite 2300
                  Orlando, Florida  32801
  5
                          APPEARING ON BEHALF OF THE PLAINTIFF
  6

  7          THOMAS A. SADAKA, ESQUIRE
                  Nejame, Lafay, Jancha, Ahmed,
  8               Barker, Joshi & Moreno, P.A.
                  189 South Orange Avenue, Suite 1800
  9               Orlando, Florida  32801

 10                       APPEARING ON BEHALF OF LYNNETTE LAURIA,
                          ROBERT LAURIA, SARAH LAGI, ET AL.
 11

 12          CRAIG A. BRAND, ESQUIRE
                  The Brand Law Firm, P.A.
 13               2937 S.W. 27th Avenue, Suite 101
                  Miami, Florida  33133
 14
                          APPEARING ON BEHALF OF TAKITIK, INC.,
 15                       POINTE DISTRIBUTION, LLC, DT PRINTING
                          SOLUTIONS, LLC, DALE TAKIO, AND RYAN
 16                       DEMING

 17

 18          ALSO PRESENT:

 19          RICKY DYER - CAMERA OPERATOR

 20

 21

 22

 23

 24

 25
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 3

1                        C O N T E N T S

2

3       VIDEO RECORDED TESTIMONY OF DALE TAKIO

4           Direct Examination by Mr. Blair                 5

5       EXHIBITS                                    Attached

6
                        E X H I B I T S
7                                                      PAGE

8       PLAINTIFF'S EXHIBIT A - Notice for Corporate        54
        Representative of Takitik, Inc.
9
        PLAINTIFF'S EXHIBIT B - Notice for Corporate        56
10      Representative of Pointe Distribution, LLC

11      PLAINTIFF'S EXHIBIT C - Notice for Corporate        57
        Representative of DT Printing Solutions, LLC
12
        PLAINTIFF'S EXHIBIT D - Service Agreement Design   135
13      Professional for Takitik

14      PLAINTIFF'S EXHIBIT E - Copy of Takitik, Inc.      137
        Check Number 1092
15
        PLAINTIFF'S EXHIBIT F - Copy of Takitik, Inc.      137
16      Check Number 1097

17      PLAINTIFF'S EXHIBIT G - Copy of Takitik, Inc.      137
        Check Number 1328
18
        PLAINTIFF'S COMPOSITE EXHIBIT H - Takitik, Inc.    151
19      Invoices

20                        - - - - -

21

22

23

24

25

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 4

1                       P R O C E E D I N G S

2            CAMERA OPERATOR:  Okay.  We're on the record.

3       Today's date is September 20, 2012.  The time now is

4       9:57.  We're here to take the deposition of Dale

5       Takio taken by the plaintiff at the office of Baker

6       & Hostetler, LLP, Orlando, Florida 32801, in the

7       matter of Simon Property Group, Inc., plaintiff

8       versus Lynnette Lauria, et al., defendants.  The

9       United States District Court, Middle District of

10      Florida, Orlando Division.  Case number

11      6:11-cv-1598-GAP-KRS.

12            My name is Ricky Dyer.  I'm a certified legal

13      video specialist for Baker & Hostetler.  The court

14      reporter is Betsy Shatto, 333 North Ferncreek

15      Avenue, Orlando, Florida 32803.  Will Counsel please

16      introduce themself.

17            MR. BLAIR:  Brian Blair on behalf of the

18      plaintiff, Simon Property Group.

19            MR. BRAND:  Craig Brand on behalf of the

20      defendant, Dale Takio.  And he's going to be here as

21      well in corporate capacities for Takitik, Pointe,

22      and DT Printing Solutions, which I represent them

23      all.

24            MR. WATSON:  And Coleman Watson for Baker &

25      Hostetler on behalf of the plaintiff.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 5

1          CAMERA OPERATOR:  Will the court reporter

2          please swear in the witness.

3     WHEREUPON,

4                         DALE TAKIO,

5         having been first duly sworn to tell the truth, was

6          examined and testified upon his oath as follows:

7                    THE WITNESS:  I do.

8                    DIRECT EXAMINATION

9     BY MR. BLAIR:

10         Q.   Good morning, Mr. Takio.  My name is Brian

11    Blair, and as I said, I represent the plaintiff and I'm

12    going to be asking you some questions today.  As a matter

13    of housekeeping, there is a video camera pointed on me.

14    I've checked and noticed it's not videoing me; is that

15    correct?

16         **A.   It's going to be in this general direction.**

17         Q.   Okay.  Is it videoing --

18         **A.   I set it up to be videoing.**

19         Q.   Okay.

20         **A.   I set it up on this chair, so if we'd like to**

21    **go over, we can check it again.**

22         Q.   Can you check it, Craig?  I trust you.  I just

23    don't want to be videoed.  It's not my deposition.  Thank

24    you.

25         **A.   I understand.  But it should be on this chair.**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 6

1              MR. BRAND:  It's on this chair.

2              THE WITNESS:  Cool.

3              MR. BRAND:  Raise it just a little bit.  There

4          you are, Dale.

5      BY MR. BLAIR:

6          Q.   Thank you.  Have you ever had your deposition

7      taken before?

8          **A.   I have not.**

9          Q.   Okay.  Just some ground rules.  It's not an

10     endurance test.  So if you need a break, just let me

11     know.  I'll be happy to use the rest room, get a drink,

12     what not.  If you do not understand a question, just let

13     me know and I'll rephrase it.  Throughout the deposition,

14     Mr. Brand might object.  If you would allow him to finish

15     his objection instead of speaking over him or the lawyers

16     speaking over each other, make everything go a lot

17     better.  And also, even though we're videotaping, madam

18     court reporter needs your voice, so if you could say yes

19     or no as opposed to uh-huh or un-hun or head nods.

20         **A.   Correct.  Okay.**

21             MR. BRAND:  I'm sorry.  I hit something by

22         accident.

23             MR. BLAIR:  Sure.

24             MR. BRAND:  It made a noise.  It's flashing.

25             MR. BLAIR:  Craig, can you just make sure

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 7

1          that's not on me?

2                    MR. BRAND:  Hum?

3                    MR. BLAIR:  Can you just make sure that's not

4          pointed on me, please?

5                    MR. BRAND:  Yeah.  It's literally right on him.

6                    CAMERA OPERATOR:  You want to go off the

7          record?

8                    MR. BLAIR:  Yes.

9                    CAMERA OPERATOR:  Okay.  We're off the record.

10         Time now is 10:00.

11                   (Off-the-record discussion.)

12                   CAMERA OPERATOR:  Okay.  We're back on record.

13         The time is 10:01.

14    BY MR. BLAIR:

15         Q.   Okay.  Could you please state your full name?

16         A.   Dale Douglas Takio.

17         Q.   Mr. Takio, where is your personal residence

18    address?

19         A.   11222 Oak Shore Lane, Clermont, Florida 34711.

20         Q.   And how long have you lived at that address?

21         A.   I have lived at that address approximately

22    eight months.

23         Q.   And where did you live prior to that?

24         A.   Prior to that, I lived at 3224 Dante Drive,

25    Unite 201, Orlando, Florida.  I think the Zip code was

Page 8

1    32835.

2        Q.   Approximately, how long did you live at that

3    residence?

4        **A.   Approximately, four years.  Four to five years.**

5        Q.   And do you recall where you lived prior to

6    that, by any chance?

7        **A.   I was at 3190 Dante Drive, Unit 203, I believe**

8    **was the unit number, Orlando, Florida 32835.**

9        Q.   Is that an apartment complex?

10       **A.   It's a condominium complex.**

11       Q.   Okay.  And do you have a business address?

12       **A.   I do have a business address.**

13       Q.   What is that address?

14       **A.   My business address is 11222 Oak Shore Lane,**

15   **Clermont, Florida 34711.**

16       Q.   Okay.  And what businesses are based at that

17   address?

18       **A.   Currently?**

19       Q.   Yes.

20       **A.   Currently, the only business based at that**

21   **address is Takitik Enterprises, Incorporated, and Hat**

22   **Marketing, LLC.**

23       Q.   You had said "currently."  How long has Takitik

24   Enterprises been based out of that address?

25       **A.   Takitik Enterprises has been based out of that**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 9

1      address since I moved into that address.  It's a home

2      based office.

3              Q.   So about eight months?

4              A.   About eight months, correct.

5              Q.   And were there any previous businesses based

6      out of the 11222 Oak Shore Lane address?

7              A.   No, there were not.

8              Q.   And prior -- for the last eight months, where

9      were your businesses located before?

10             A.   Prior to that, they were at my previous home

11     based residence would have been the corporate address.

12             Q.   Okay.

13             A.   And they held offices as well at 7021 Grand

14     National Drive, Suite 101, I believe is the full address,

15     Orlando, Florida 32819.

16             Q.   And what businesses were operated out of your

17     residence at that time as well as the Grand National

18     address?

19             A.   Is that one question?  Or can we --

20             Q.   Sure.  How about your home address --

21             A.   -- stay on one address if --

22             Q.   Your previous home address, what businesses

23     were run out of that?

24             A.   My previous home address, the corporate address

25     that was a corporate address for Takitik Incorporated,

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 10
  1        the subsidiaries that I had ownership in, Pointe

  2        Distribution, and DT Printing Solutions and Hat

  3        Marketing, LLC.

  4             Q.   Any other businesses run out of your home

  5        address at that time?

  6             A.   No.

  7             Q.   Okay.  And what businesses were run out of the

  8        7021 Grand National address?

  9             A.   There was -- businesses that I owned?

 10             Q.   Yes.

 11             A.   The businesses that I had ownership in would

 12        have been Takitik, Incorporated and it's subsidiaries

 13        that I had ownership in, Pointe Distribution, DT Printing

 14        Solutions, and Hat Marketing.

 15             Q.   And you said that those are the businesses that

 16        you owned.  Were there other businesses run out of that

 17        address at the time?

 18             A.   There were.

 19             Q.   What businesses were those?

 20             A.   At which time?

 21             Q.   Well, during the time you were at -- well,

 22        strike that.

 23                  How long were your businesses run out of 7021

 24        Grand National Drive, the Takitik, Inc. and it's

 25        subsidiaries?
```

64020ea4-12e2-480e-8d56-0be97680450a

Page 11

1        A.    From, approximately, January of 2010 until the
2     dissolution of the companies sometime in mid to late
3     2011.  I don't know those dates.
4        Q.    So during that period of time, the January 2010
5     until the dissolution, what other businesses were run out
6     of 7021 Grand National address?
7        A.    Image Marketing.  Image Marketing -- I don't
8     know how their corporate structure was, but I know that
9     they had other subsidiaries as well.  Event Planners.
10    There were several subleased individuals that used the
11    office spaces on a temporary basis.  GMF Consulting.  I
12    believe Action Car Rental held office spaces there for a
13    short period of time.  That's all I can recall right now.
14    There may have been others, but I would have to look back
15    at the records to verify that.
16       Q.    Did you own an interest in any of the
17    businesses you just went through?  The Image Marketing,
18    Event Planners.
19       A.    No, I did not own any interest in them.
20       Q.    Did you work for any of those companies?
21       A.    No, I did not.
22       Q.    Other than the Takitik Enterprises, Inc.,
23    Takitik Inc. and their subsidiaries, DT Printing
24    Solutions, Pointe Distribution, have you owned any other
25    interest in a business entity?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 12

```
1          A.    When?

2          Q.    Ever.

3          A.    Yes.

4          Q.    Okay.  When?

5          A.    Between the years -- I absolutely can't say

6     definitively, late '90s, early turn of the millenia.

7          Q.    Let's start from 2004 forward.

8          A.    No, I have not.

9          Q.    Okay.  Have you worked for any other business

10    entities other than Takitik, Inc., Takitik Enterprises,

11    Inc., DT Printing Solutions, or Pointe Distribution since

12    2004?

13         A.    Yes, I have.

14         Q.    What entities have you worked for?

15         A.    I have worked for Open Table, Incorporated.  I

16    have worked for Groupon.  I believe, falling in that time

17    frame, would have been Xirius Technologies.

18         Q.    Xirius?

19         A.    Xirius.

20         Q.    Can you spell that?

21         A.    X-I-R-I-U-S.

22         Q.    Okay.

23         A.    The Filta Group.

24         Q.    Sorry?

25         A.    The Filta Group.
```

Page 13

1           Q.    F-I-L-T-A?

2           **A.    Uh-huh.  Correct.**

3           Q.    Any other ones?

4           **A.    Underneath Filta Group, one of their divisions,**

5     **Xenerga, with an "X."**

6           Q.    Okay.

7           **A.    And I think I have everything covered.**

8           Q.    And I know what Open Table does, but what did

9     you do for Open Table?

10          **A.    What didn't I do?  I was brought into the**

11    **company, I believe, in 2005 to open the Northern Central**

12    **Florida markets.  Part of my responsibilities would have**

13    **included expanding their network of restaurants,**

14    **training, working with concierges to use some of their**

15    **products, OT Concierge, working in market as a**

16    **representative of the company.  I guess, any of the**

17    **day-to-day duties, that would encompass it.**

18          Q.    You had mention an OT Concierge, what is that?

19          **A.    OT Concierge is a product of Open Table.**

20          Q.    Can you tell me what that is?

21          **A.    It's -- OTConcierge.com is a parallel website.**

22    **If you're familiar with Opentable.com, from a consumer**

23    **standpoint, it is Opentable.com for consumers have a lot**

24    **of restrictions where a consumer can only book one**

25    **reservation for a two hour time slot across an entire**

64020ea4-12e2-480e-8d56-0be97680450a

Page 14

1      global network.  So it prohibits no shows at a

2      restaurant.  It helps restrict abuse of using the system.

3              However, through the OTConcierge.com platform,

4      concierges, admins, guest service reps, essentially any

5      individual deemed responsible for booking other

6      reservations on behalf of another individual.  It could

7      be a secretary defined as a concierge.  It was a very

8      loose interpretation of the word.  They would have that

9      separate portal where restrictions would be removed from

10     there.  They would be able to book multiple reservations

11     at multiple restaurants for multiple individuals at a

12     given time.

13         Q.   Okay.  And I obviously know what Groupon does

14     as well, but what did you do for Groupon?

15         A.   Groupon, very similar in nature to my

16     experiences both pre-IPO and post-IPO with Open Table, I

17     applied a lot of those things to the products and

18     services that Groupon had to offer.  I had multiple

19     capacities with Groupon, one of which was

20     responsibilities to what Groupon defined as Orlando

21     market, which would be, essentially, Greater Orlando, I

22     don't know the exact territorial definitions, but a

23     fairly broad base.

24              I was responsible for educating merchants on

25     our products and services, working with them, consulting

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 15

1    with them on their businesses to align an offer for the

2    consumers for Groupon.  I was also -- I was also, at the

3    request of the Open Table executive team, brought on to a

4    founding team of a separate vertical for Groupon called

5    Groupon Get Aways in partnership with Expedia in which we

6    specialized in just travel-related offers, packages

7    hotels stays, hotel -- or I'm sorry, travel experiences

8    for -- for consumers.  And for that, my responsibilities

9    encompassed primarily the Southeast United States and the

10   Caribbean.

11        Q.   And as far as your employment with Open Table

12   and Groupon, was it through an employment contract with

13   those companies?

14        A.   There was -- I was an at will employee for both

15   companies.

16        Q.   Did you work -- so you did a subcontract for

17   your businesses, it was Dale Takio individually working

18   for --

19        A.   I was an individual W2.

20        Q.   Okay.  And what did you do for Xirius Tech?

21        A.   Xirius Technologies?

22        Q.   Yes, sir.

23        A.   Xirius Technologies was a reseller of point of

24   sale software for restaurants.  Two of the brands

25   underneath their company would have been Aloha Point of

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                         Page 16
  1        Sale Systems and Dinerware.  My job was --

  2             Q.   And --

  3             A.   I'm sorry.  Go ahead.

  4             Q.   Can you explain to me what those point of sales

  5        systems are to me, as a layperson, who doesn't work in

  6        that business?

  7             A.   A point of sale is, essentially, a computer for

  8        a business.  I specialized in restaurants that does

  9        everything from -- takes -- where a server will enter an

 10        order.  That order will then be communicated to a

 11        kitchen.  Reporting on a point of sale system will be

 12        generated for various uses of an individual operator or a

 13        group of operators.

 14             Q.   And before I get too far down the track, how

 15        long did you work for Open Table?

 16             A.   I worked for Open Table from approximately

 17        April of 2005 until, I believe, January of 2007.

 18             Q.   Why did you leave?

 19             A.   I saw an opportunity with Filta Group.  Filta

 20        Group made me a job offer that I felt aligned with my

 21        personal and professional aspirations.

 22             Q.   Were you asked to leave Open Table?

 23             A.   No.

 24             Q.   And when did you work for Groupon?

 25             A.   I worked for Groupon from, approximately,
```

Dale Takio - 9/20/2012

Page 17

1          January of 2011 until, approximately, April of this year.

2               Q.   And why did you leave Groupon?

3               A.   Many reasons.  I did not -- I no longer agreed

4          with the vision and alignment of the executive execution

5          of the business model.  I did not agree with the way

6          things were rapidly changing, and in my opinion, hastily

7          changing.  I did not agree with their now initial public

8          -- now that they've initially publicly offered, did not

9          feel comfortable with declining valuation of 70 to 80

10         percent of their market share.

11              Q.   And at Open Table, were you paid via check,

12         cash, direct deposit?

13              A.   I don't recall.  I'd have to go back to my bank

14         statements.  I believe it would have been direct deposit.

15              Q.   As far as Groupon, were you paid cash, check,

16         direct deposit?

17              A.   Groupon would have been a direct deposit.

18              Q.   How long were you a -- I'm sorry, I can't --

19         Xirius Technologies?

20              A.   Xirius Technologies, I'm absolutely guessing

21         here, I would say from five to eight months.

22              Q.   Okay.

23              A.   But I honestly do not know definitively.

24              Q.   And why did you leave Xirius Technologies?

25              A.   I left Xirius Technologies because I was

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 18
```

1          recruited and offered a position with Open Table.

2               Q.   And you were not asked to leave Xirius

3     Technologies?

4               A.   I was not asked to leave Xirius Technologies.

5               Q.   What does the Filta Group do?

6               A.   Filta Group has multiple businesses under their

7     company.  At the time, Filta Group specialized in

8     servicing restaurant cooking oil, cleaning it.

9               Q.   Is that recycled cooking oil or grease?

10              A.   No.  Servicing restaurant cooking oil.  They

11    did not recycle.  They did filter it, hence the name

12    Filta Group.  They would filter it through, put it back

13    in.  My understanding of recycling, it's not recycling.

14              Q.   And what did you do for the Filta Group?

15              A.   For the Filta Group, I had two roles.  Or two

16    main projects, I should say, that I was focused on.  The

17    one was business development needs of one of their

18    companies called Xenerga.  Xenerga was a biodiesel

19    technology that Xenerga built into a business model.

20    Part of which then would have been taking then the

21    recycled cooking oil.

22              So Xenerga would have been -- part of what

23    their business model would have been doing would have

24    been recycling or reusing cooking oil, among other

25    sources of organic oils, into the production of biodiesel

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                Page 19

 1        for use in fleet machinery, fleet vehicles, consumer

 2        vehicles.

 3             Q.   Okay.

 4             A.   The other parallel project that I was working

 5        on with them was what I believe is now rebranded Filta

 6        Cool.  Filta Cool was a product that was designed for

 7        restaurants in which they used a mineral called sorbite

 8        to -- as a filtration agent for refrigeration units to

 9        absorb and filter water content and humidity.

10             Q.   And how long were you at the Filta Group?

11             A.   I was at the Filta Group until, approximately,

12        April, maybe May of 2007.

13             Q.   That's when you left Filta Group, 2007, or

14        started there?

15             A.   I both started and left.

16             Q.   In the same month?

17             A.   No.  I started Filta Group in January of 2007.

18             Q.   Okay.

19             A.   And left approximately four or five months

20        later.

21             Q.   And why'd you leave?

22             A.   I realized that the grass was not greener on

23        the other side, so I left voluntarily.

24             Q.   Did you have a supervisor at Open Table?

25             A.   I did have a supervisor.
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                        Page 20
    1            Q.   Who was that?

    2            A.   At which point in time?

    3            Q.   Well, throughout the course you were employed

    4       there.

    5            A.   I had different supervisors.

    6            Q.   Can you give me their names?

    7            A.   At which point in time?

    8            Q.   Well, how many did you have?

    9            A.   I had two direct supervisors.

   10            Q.   Can you give me their names?

   11            A.   John Martin and Joy Taggert.

   12            Q.   Joy Taggert?

   13            A.   Yes.

   14            Q.   Are they local?

   15            A.   Joy Taggert, I believe -- I believe she resides

   16       in Denver, Colorado or somewhere near Denver, Colorado.

   17       John Martin, I believe he's in Marin County, California.

   18            Q.   Did you have any local supervisors?

   19            A.   No, I did not.

   20            Q.   How about at Groupon, did you have any

   21       supervisors?

   22            A.   I did have multiple supervisors.

   23            Q.   Can you give me their names?

   24            A.   I had -- my first supervisor would have been

   25       Bob Lopez, would have been my first direct supervisor for
```

64020ea4-12e2-480e-8d56-0be97680450a

```
                                               Page 21
     1        my responsibilities of Orlando.  I was assigned to Matt

     2        Constandyne [phonetic] for my responsibilities of travel.

     3        For local, after Bob Lopez, would have been Jeremy Unger

     4        or Luke Masry [phonetic].  And on travel, then would have

     5        been Jason Bushman.

     6             Q.   Are any of them local?

     7             A.   They all are in Groupon's corporate

     8        headquarters.

     9             Q.   Where is that located?

    10             A.   Chicago, Illinois.

    11             Q.   And did you have any -- who was your supervisor

    12        at the Xirius Technologies?

    13             A.   My supervisor would have been Vincent

    14        Schneider.

    15             Q.   And is he local?

    16             A.   He lives where the offices were, outside of

    17        Atlanta.  Atlanta, Georgia.

    18             Q.   Any other supervisors at Xirius Technologies?

    19             A.   Any direct supervisors, no.  Ultimately, the

    20        owners, I guess, I believe been considered supervisors,

    21        but no other direct supervisors.

    22             Q.   And how about the Filta Group, who was your

    23        supervisor there?

    24             A.   At Filta Group, I reported to Victor Clews

    25        [phonetic] and to Jason Sayers.
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 22

```
 1              Q.   Are they local?

 2              A.   They are local.

 3              Q.   And I apologize if I've asked you this, but I

 4       lost track.  At the Xirius Group, were you paid by check,

 5       cash, or direct deposit?

 6              A.   I believe it would have been by check, but

 7       again, I would have to go back and check my records.

 8       That was quite some time ago.

 9              Q.   And how about the Filta Group, same question?

10              A.   At Filta Group, I believe it was by direct

11       deposit.  But again, I'd have to verify.

12              Q.   Okay.  So other than working for Takitik, Inc.,

13       Takitik Enterprises Inc., DT Printing Solutions, Pointe

14       Distribution, Open Table, Groupon, Xirius Technologies,

15       and the Filta Group, have you had any other employment

16       since 2004?

17              A.   Can you repeat those again?

18              Q.   Sure.

19              A.   I want to make sure you covered everything.

20              Q.   Other than Takitik, Inc., DT Printing

21       Solutions, Pointe Distribution, Takitik Enterprises,

22       Inc., Open Table, Groupon, Xirius Technologies, and the

23       Filta Group, have you had any other employment since

24       2004?

25              A.   Well, Xenerga was --
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 23

1        Q.   I thought it was part of Filta Group?

2        **A.   It was part of Filta Group, but they were two**

3    **separate companies.**

4        Q.   Okay.

5        **A.   So they were during the time period, so.**

6        Q.   And other than adding the Xenerga --

7        **A.   I believe we have everything covered.  To the**

8    **best of my knowledge, we have everything covered.**

9        Q.   Okay.  And I believe you had also given a

10   previous -- well, strike that.

11            Have your businesses operated out of any --

12   when I say the businesses, let's just say Takitik Inc.,

13   Takitik Enterprises, DT Printing Solutions, and Pointe

14   Distribution have they operated out of any other

15   addresses other than your home address or the 7021 Grand

16   National address?

17       **A.   No, they have not.**

18       Q.   Okay.

19       **A.   Oh, strike that.  Strike that.  For Takitik,**

20   **Inc., DT Printing Solutions, and Pointe Distribution,**

21   **yes.**

22       Q.   Okay.

23       **A.   Within the same complex at Grand National from**

24   **inception, creation of the companies, until we moved to**

25   **the previous address I mentioned, the 7021 Unit Number**

64020ea4-12e2-480e-8d56-0be97680450a

Page 24

1        101, we were next door.  I do not recall the unit.  I

2        believe it was 7081, Unit 201, I believe.

3             Q.   Same complex?

4             A.   Same complex.  Just better lease second time

5        around.

6             Q.   Usually is.  Can you give me a brief synopsis

7        of your education past high school?

8             A.   Past high school?

9             Q.   Yes, sir.

10            A.   I have some college.  And I have lots of

11       various formal training within different organizations I

12       don't work for.

13            Q.   You said "some college."  Do you have a college

14       degree?

15            A.   I do not have a college degree.

16            Q.   Did you attend college at some facility?

17            A.   I did attend college at some facility.

18            Q.   Where was that?

19            A.   That was in New Jersey.

20            Q.   The name?

21            A.   The County College of Morris was the campus

22       that I attended classes at.

23            Q.   And what type of classes did you take?

24            A.   I took primarily business classes, prerequisite

25       classes that would have aligned with working towards a

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                    Page 25
   1        degree in Business Administration.

   2             Q.   Do you hold any licenses or certifications

   3        other than a driver's license?

   4             A.   Can you further clarify that?  Formal,

   5        informal.

   6             Q.   A formal --

   7             A.   I'm not a lawyer, so I don't have a --

   8             Q.   I just want to know if you have a real estate

   9        license?  Do you have a securities license?  Do you have

  10        a --

  11             A.   I do not have a real estate license.  I do not

  12        have a securities license.

  13             Q.   Okay.  Since there's many licenses out there,

  14        I'm saying, do you hold any type of licenses?

  15             A.   I do not hold any type of licenses.

  16             Q.   Do you hold any type of certifications, like an

  17        AIA or an --

  18             A.   I don't know what an AIA is.

  19             Q.   -- architect or appraisal, or are you --

  20             A.   No.  Any certifications I would have, would be

  21        from companies that I worked for, whether they were

  22        internal certifications or external, I don't know.  But

  23        when I would attend courses with them, I would receive

  24        certificates for completion of the respective training

  25        and courses.  But I do not have any other licenses
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 26

1      **through a government agency.**

2            Q.    And other than completing course work, do you

3      have any certifications from like marketing or business

4      entities, like ICSC or something like that?

5            A.    **Again, I don't know what ICSC --**

6            Q.    International Conference of Shopping Centers or

7      there's marketing, marketing groups or -- do you have

8      anything of that nature?  Like I'm a certified marketing

9      technician or something.  I don't know if there's such a

10     thing, but --

11           A.    **No.  I do not, no.**

12           Q.    Okay.  Do you have any experience in like web

13     design?

14           A.    **No, I do not.**

15           Q.    Okay.  Do you have any experience in like

16     financial training or anything of that sort?

17           A.    **Please clarify it.**

18           Q.    Well, other than running a business and

19     possibly doing your own finances, are you like a

20     certified financial planner?

21           A.    **I am not a certified financial planner.**

22           Q.    Do you give any type of training or seminars

23     relating to financial aspects of running a business?

24           A.    **I -- if you have a specific question, I think I**

25     **can answer that better.  Financial is a broad range.**

64020ea4-12e2-480e-8d56-0be97680450a

Page 27

1      **Every business, the definition of a business, will be a**

2      **monetary transaction that takes place will -- will**

3      **numbers and money be discussed?  Yes.  So again, finance**

4      **is a very broad term.  I can't answer a question that**

5      **broad.**

6           Q.   Well, we'll break it way down for you then.

7           A.   **Please.**

8           Q.   If I said, Mr. Takio, I'd like to hire you to

9      come to my business and provide me with a seminar on any

10     financial aspects of the business, would you --

11          A.   **What is -- my question to you would be:  What**

12     **is any financial aspect?**

13          Q.   Accounts payable, accounts receivable,

14     bookkeeping, marketing.  Would you feel comfortable --

15          A.   **All --**

16          Q.   Let me finish, please.

17          A.   **Okay.**

18          Q.   Would you feel comfortable coming to my

19     business and giving me a seminar?

20          A.   **No.**

21          Q.   Have you ever given any businesses a seminar?

22          A.   **Describe --**

23          Q.   Any type of seminar.

24          A.   **What kind of seminar?**

25          Q.   Any type of seminar, sir.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 28

1          A.   Well, can I please have your definition of a

2      seminar?

3          Q.   Have you gone to a business and presented some

4      type of educational process so that another business can

5      learn from you?

6          A.   Yes, I have presented educational processes.

7          Q.   And what were those?

8          A.   At what point in time?

9          Q.   Any time.

10         A.   I can't name them all.  Can you narrow that

11     down?  It's very broad.

12         Q.   How about the types of seminars you've given?

13         A.   The types of seminars I would give would be,

14     for example, with Open Table, how to use the Open Table

15     systems, the systems that I would have been responsible

16     for.  I have trained many organizations, many individuals

17     on how to use Opentable.com, Opentableconcierge.com.

18     Those would be examples.

19         Q.   Do you do any consulting out of your

20     businesses?  When I say "businesses," so we're clear,

21     Takitik, Inc., Takitik Enterprises, Inc., DT Printing

22     Solutions, Pointe Distribution, or Hat Marketing?

23         A.   Yes.

24         Q.   What type of consulting do you do?

25         A.   For which business?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 29

1          Q.   Well, which ones do you do it for?

2          A.   I have performed consulting services through

3     Takitik, Incorporated.

4          Q.   Any other ones?

5          A.   I have not performed consulting services

6     through any of the other three that you named.

7          Q.   And what type of consulting services did you

8     perform through Takitik, Incorporated?

9          A.   I have provided various consulting.  I have

10    done reviews of advertising trends.  I have done

11    documentation of various advertising campaigns for

12    specific businesses.  I have -- after Open Table, I had

13    advised companies on ways to more efficiently use the

14    Open Table systems and drilled down deeper into the value

15    and the use of Open Table for their business.

16         Q.   Any other type of consulting that you've done

17    through Takitik, Inc.?

18         A.    I've done marketing consulting, not related to

19    financial advice as a professional.

20              (Whereupon, Mr. Sadaka entered the conference

21         room at 10:29 a.m.)

22    BY MR. BLAIR:

23         Q.   What do you consider "financial advice as a

24    professional"?

25         A.   A licensed individual, as you indicated

64020ea4-12e2-480e-8d56-0be97680450a

Page 30

1      earlier.

2           Q.   Any other consulting through Takitik, Inc.?

3           A.   No, not that I can recall.  But again, as I did

4      mention earlier, I have done a lot of projects, I would

5      have to go back and look.

6           Q.   And when you enter into a consulting

7      relationship --

8           A.   Actually, just so we're clear -- never mind.

9      Okay.

10          Q.   And when you enter into a consulting

11     relationship with a business or entity, is it usually

12     done -- memorialized with some type of contract or a

13     letter?

14          A.   Memorialized?

15          Q.   Like do you have a contract with them?  Do you

16     know what a contract is?

17          A.   Yeah, I know what a contract is.

18          Q.   Okay.

19          A.   I mean, there would always be some sort of

20     agreement.  We would come to terms and we would have an

21     agreement.  We would have agreements in various --

22          Q.   You can have verbal agreements or --

23          A.   I'm sorry?

24          Q.   You can have verbal agreements or written

25     agreements that memorialize a verbal agreement.  Do you

Dale Takio - 9/20/2012

Page 31

1       understand that?

2            A.   Okay.  So that would -- I think of memorialize,

3       I think of honoring the debt.

4            Q.   Okay.

5            A.   To something -- is the question:  Have I had

6       verbal or written agreements?

7            Q.   In your consulting, yes, sir.

8            A.   Yes, I have had both.

9            Q.   And do you maintain the written agreements?

10           A.   Yes, I have maintained written agreements.

11           Q.   If I were to ask for Takitik's consulting

12      agreements from 2004 to 2011, would you be able to

13      produce consulting agreements, sir?

14           A.   Takitik, Incorporated was not in business in

15      2004.  It started in 2007.  So previous to 2007, no.

16           Q.   Okay.

17           A.   And yes, I do have agreements on file.

18           Q.   Okay.  And do you recall any of the companies

19      that you've performed consulting for?

20           A.   That I personally did in a personal capacity?

21           Q.   Yes, sir.

22           A.   Under Takitik, Takitik would have performed

23      consulting services for companies such as eBrands.

24           Q.   eBrands?

25           A.   eBrands.

64020ea4-12e2-480e-8d56-0be97680450a

Page 32

1          Q.   Okay.  eBrands.

2          **A.   Takitik, Incorporated provided consulting**

3     **services for Image Marketing of Florida.  Takitik, Inc.**

4     **provided consulting services for RE Management.  Takitik,**

5     **Inc. -- that's all I can recall at this time.  I'd have**

6     **to look at records to see others.**

7          Q.   Did it perform any consulting for RJL Services?

8          **A.   No, it did not.**

9          Q.   Did it perform any consulting for Arnell, Inc.?

10          **A.   It did not.**

11          Q.   Did it perform any consulting services for

12     Snouthound?

13          **A.   I'm sorry?**

14          Q.   Snouthound Enterprises, I believe.

15          **A.   I don't know what that is.  And no, it did not.**

16          Q.   Do you know what RJL Services is?

17          **A.   I do.**

18          Q.   What is your understanding of what RJL Services

19     is?

20          **A.   My understanding of RJL Services, they provided**

21     **professional consultation and general business**

22     **consultation to individuals and businesses.**

23          Q.   Okay.  Do you know what Arnell, Inc. is or

24     does?

25          **A.   I do not.**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                        Page 33

1           Q.   Have you ever heard of it?

2           A.   At what point in time?

3           Q.   Any time.

4           A.   I have heard of it since I see it on a lot of

5      documents that go around is the first time I've seen or

6      heard of that name.

7           Q.   So prior to the lawsuit, have you heard of

8      Arnell, Inc.?

9           A.   No, I have not.

10          Q.   And prior to the lawsuit, have you heard of

11     Snouthound Enterprises?

12          A.   I have not.

13          Q.   And you had said -- made some clarification

14     about consulting through Takitik.  Does Dale Takio

15     individually do consulting work?

16          A.   Dale Takio individually does not do consulting

17     work.

18          Q.   So if any consulting work is done, then it's

19     done through Takitik, Inc.?

20          A.   Correct.

21          Q.   Do you have any formal education or training in

22     marketing?

23          A.   I would have taken marketing classes as part of

24     my collegiate studies.

25          Q.   And when --
```

64020ea4-12e2-480e-8d56-0be97680450a

Page 34

1          A.   And then I, again, as I mentioned earlier, I
2     have formal training through companies I've worked for.
3          Q.   And when were you at the New Jersey College of
4     Morris, is that what it's called?
5          A.   No, it was County College of Morris.
6          Q.   I'm sorry.  The County College of Morris.
7     Where were you there?
8          A.   That would have been after graduating from high
9     school, approximately 1995, 1996.  I believe I actually
10    did go back and take subsequent classes.  I don't recall
11    the time frames on when I took additional classes.  I
12    don't know if they were summer classes, fall classes, or
13    winter classes.
14         Q.   Are you from New Jersey?
15         A.   I am from New Jersey.
16         Q.   And when did you move to Florida?
17         A.   I moved to Florida in, I believe it was April
18    of 2005 when I started with Open Table.
19         Q.   And back in the consulting that you did through
20    Takitik, you said you review advertising trends.  Can you
21    explain to me what that is?
22         A.   It varied by the scope of the discussion with
23    each client.  I mean, if you want to pick one of the
24    companies, I can give you an example.  It's a broad range
25    of discussions that would take place.

Page 35

1          Q.   So what would be review of advertising trends

2     for eBrands?

3          A.   So for eBrands, again, I worked specifically

4     on a project which encompassed how traffic -- how

5     consumer traffic flowed from places that they were

6     advertising to ultimately into the Open Table system.  So

7     looking at -- looking at ways to then use the Open Table

8     system and the software portion of what a -- what the

9     restaurant had, to offer ideas of how to identify their

10    customers more uniquely.

11              To drill down and further clarify, on the

12    identifying customers, the Open Table system has the

13    ability to create custom codes and tag that code to a

14    consumer.  eBrands may be interested in -- eBrands may

15    have told me, we are interested in people that drink red

16    wine.  They may want to look at, building within their

17    business, presenting wine dinners.

18              In order to leverage the power of the Open

19    Table systems, they would be able to, through server

20    process and through the business process that's taking

21    place, a server may be able to say, okay, this consumer

22    just ordered this red wine, this red wine we're going to

23    classify them internally as a red wine drinker.

24              eBrands would then be able to filter by those

25    codes and filter through all of their customer database

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 36

1      to identify just those that they've deemed are red wine

2      drinkers to then communicate with them possibly for a red

3      wine dinner event.  That would be a way to help create

4      greater efficiencies on any of the communications that

5      they would like to have with their customers.  That would

6      be an example of some of the consultation.

7          Q.   And can you give me an example of what you

8      would do for Image Marketing and reviewing advertising

9      trends for that company?

10         A.   I did not necessarily review advertising

11     trends.  That was not part of the specific scope.

12         Q.   Okay.  Well, what was your scope of services

13     that Takitik did for Image Marketing?

14         A.   The general scope of my duties were to provide

15     my general industry experiences and knowledge that I had

16     obtained through both my previous and present career at

17     any given point in time, share those ideas with Image

18     Marketing, collaborate on ways to help expand their

19     business.  Some of the services that Takitik would

20     provide to Image Marketing would include assistance in

21     building new client base.  That would be the general.

22         Q.   Okay.  Did you document various advertising

23     campaigns for Image Marketing?

24         A.   I'm sorry?

25         Q.   You said that your consulting -- part of your

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 37

1          scope of services that you said you would document, I

2          believe you said various advertising campaigns?

3               A.    I did not say that.

4               Q.   Okay.  Then what --

5               A.   For --

6               Q.   You said you --

7               A.    Not for Image Marketing.

8               Q.   No, you said -- I understand that.  That's why

9          I asked you if you did that for them.  In other words,

10         let me back up.

11              A.    Okay.

12              Q.   I asked you what kind of consulting you did and

13         you gave me four areas.  You said you reviewed

14         advertising trends for clients, you documented various

15         advertising campaigns for clients, you'd advise companies

16         on ways to use the Open Table system, and marketing

17         consulting not related to financial aspects.

18              A.    Yes.

19              Q.   So all I'm trying to -- of those four areas you

20         gave me, I'm trying to figure out if you did any of them

21         for Image Marketing?

22              A.    I would not have documented any of their

23         advertising campaigns, they would have documented and

24         possibly shared that information with me.

25              Q.   And would you advise Image Marketing on ways to

64020ea4-12e2-480e-8d56-0be97680450a

Page 38

1     use Open Table systems?

2          A.   I have advised Image Marketing on ways to use

3     Open Table.  I also have advised Image Marketing clients

4     on ways to use Open Table systems.

5          Q.   That would come under the guise of consulting

6     -- do you consider that consulting with those Image

7     Marketing clients?

8          A.   If it was an Image Marketing client, no, I

9     would not.  It would be part of the capacity of me -- of

10    Takitik as a consultant to Image Marketing, but not to

11    their clients.

12         Q.   Okay.  Do you have any experience or education

13    in graphic design?

14         A.   I do not.  I have -- well.

15         Q.   You have experience in what?

16         A.   I have working knowledge of graphic design.  I

17    don't have any formal education or training in creating

18    graphic design.

19         Q.   Put it this way, if I were to ask, Mr. Takio, I

20    would like you to do some graphic design for me, would

21    you feel comfortable undertaking that task?

22         A.   Me personally, no.

23         Q.   Do you have any experience in editing or

24    journalism?

25         A.   No, I do not.

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                Page  39
   1           Q.    Do you ever attend trade shows on behalf of
   2      Takitik?
   3           A.    Yes.
   4           Q.    Okay.  Where do you attend trade shows?
   5           A.    When?
   6           Q.    Put it this way, have you ever attended any
   7      outside the continental United States?
   8           A.    I personally have not attended any trade shows
   9      for Takitik outside the continental United States.
  10           Q.    Have you personally attended any trade shows
  11      outside the continental United States for anybody?
  12           A.    No.
  13           Q.    Okay.  And let's talk about Takitik.  How many
  14      employees does -- well, did Takitik, Inc. have?
  15           A.    I'm sorry?
  16           Q.    How many employees did Takitik, Inc. have from
  17      2007 to 2011?
  18           A.    Can we narrow that down?
  19           Q.    Okay.
  20           A.    There was ebbs and flows.
  21           Q.    Okay.  At any time during the existence of
  22      Takitik, Inc., did it ever have over ten employees?
  23           A.    No, it did not.
  24           Q.    Did it have over five employees?
  25           A.    At any one time?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                            Page 40
   1          Q.   Yes, sir.

   2          A.   I believe the maximum number of W2 employees

   3     that it had at any one time would have been four, but I'm

   4     not sure if there was overlap there.  I'd have to refer

   5     back to --

   6          Q.   I just want to get a feel of how many people

   7     worked there.  I'm not trying to --

   8          A.   No.  No.  No.  Again, like I said, different

   9     points in time it had different numbers of employees.

  10          Q.   And can you recall the names or give me your

  11     best recollection of the names of the employees of

  12     Takitik, Inc.?

  13          A.   I would have been an employee of Takitik, Inc.

  14     Timothy Herman would have been an employee of Takitik,

  15     Inc.  Tommy Brignolo would have been an employee of

  16     Takitik, Inc.  Babette Picanol would have been an

  17     employee of Takitik, Inc.  Katalin Nagy-Takio would have

  18     been an employee of Takitik, Inc.

  19          Q.   I'm sorry, Kathleen -- oh, I'm sorry, that's

  20     your wife?

  21          A.   That's my wife.

  22          Q.   I'm sorry.  I apologize.  Anyone else?

  23          A.   I believe those would encompass all of the W2'd

  24     employees.

  25          Q.   Were there other employees that weren't W2?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 41

1        A.   Yes, we did have independent contractors that

2     worked for us.

3        Q.   Do you recall the names of any of those people?

4        A.   Tim Barber would have been an independent

5     contractor for a period of time.  I believe Deanna

6     Mashburn would have been an independent contractor.

7     That's all I can recall right now.

8        Q.   Did Sarah Lagi -- do you know who she is?

9        A.   I know of her.

10       Q.   Did she ever work for Takitik, Inc.?

11       A.   No she did not.

12       Q.   To your knowledge, did Sarah Lagi ever work for

13    any of your companies?  And when I say "your companies,"

14    I'm referring to Takitik, Inc., Takitik Enterprises, DT

15    Printing, Pointe Distribution, or Hat Marketing.

16       A.   She has not worked for any of those entities.

17       Q.   And so we can just -- when I say "your

18    companies" for the next couple questions, can we have all

19    those that we just --

20       A.   As long as its relevant.

21       Q.   All I want to know is has Rachel Lauria worked

22    for any of your companies?

23       A.   Any of the companies that you just named, no.

24       Q.   Yes, sir.  And just -- has Sarah Lagi worked

25    for any companies that I haven't named that you were

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                   Page 42

 1      affiliated with?

 2           A.    That I was affiliated with?

 3           Q.    Yes, sir.

 4           A.    I believe so.

 5           Q.    Which one?

 6           A.    I believe she worked for Westgate.

 7           Q.    Okay.

 8           A.    Westgate Resorts.

 9           Q.    Other than that?

10           A.    I believe, after my departure, I believe that

11      she worked for Image Marketing.

12           Q.    Okay.  Other than that?

13           A.    I don't know anything else about her work

14      history.

15           Q.    Okay.  Did Rachel Lauria ever work for any of

16      your companies?  I may have asked you that.

17           A.    She did not.

18           Q.    How about any of the companies that you were

19      affiliated with?

20           A.    I am not aware of her working for any of the

21      other companies that I have ever been affiliated with.

22           Q.    How about Lynnette Lauria?  Do you know who

23      Lynnette Lauria is?

24           A.    I do know Lynnette Lauria.

25           Q.    Has she ever worked for any of your companies?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 43

1        **A.    She has never worked for any of my companies.**

2        Q.    Has Lynnette Lauria, to your knowledge, worked

3    for any of the companies that you've been affiliated

4    with?

5        **A.    Yes.**

6        Q.    Which ones?

7        **A.    She worked for Simon Property Group and she**

8    **worked for RJL Services.**

9        Q.    Okay.

10       **A.    Currently known as XLM Marketing.**

11       Q.    And I'm -- by no way do I want this to be a

12   limitation, I'm just trying to jog memories.  Has she

13   ever worked for Image Marketing or any of the Image

14   companies?

15       **A.    To my knowledge, she has never worked for Image**

16   **Marketing, I'll be specific to that.  I don't know what**

17   **any of the other companies you're referring to.**

18       Q.    How about Image Marketing Group, Inc., to your

19   knowledge?

20       **A.    To my knowledge, I am not aware of her working**

21   **for.**

22       Q.    To your knowledge has -- and I'll just --

23   Lynnette Lauria, Sarah Lagi, or Rachel Lauria ever worked

24   for Image Marketing of Florida, LLC?

25       **A.    I believe we already addressed the question for**

64020ea4-12e2-480e-8d56-0be97680450a

Page 44

1      Rachel and for Sarah.

2          Q.   Well, I'm adding Image entities because I asked

3      for your companies, but --

4          A.   Okay.  I told you all the companies I know

5      they're affiliated with.

6          Q.   Okay.

7          A.   I am not -- I am not familiar with or have

8      knowledge of them being affiliated with any other

9      companies --

10         Q.   That makes it easier.

11         A.   -- that I've been affiliated.

12         Q.   How about Robert Lauria, same question, your

13     companies or any companies you're affiliated with, has he

14     ever worked for any of those?

15         A.   Robert Lauria worked for XLM Marketing formerly

16     known as RJL Services.

17         Q.   And other than that, to your knowledge, has he

18     worked for any company that you --

19         A.   That I've been affiliated with, not to my

20     knowledge.

21         Q.   How about -- want to take a break?

22         A.   I figure we'll keep it on even numbers, if

23     that's all right.  Maybe another ten minutes?

24         Q.   Perfect.  How about Susan Ortega, do you know

25     who she is?

Page 45

1    **A.    I do know Susan Ortega.**

2        Q.    Has she worked for any of your companies or

3    companies you've been affiliated with?

4        **A.    She has never worked for any of my companies,**

5    **however, she has worked for companies that I've been**

6    **affiliated with.**

7        Q.    And which company is that?

8        **A.    Travel Host, JS Media.**

9        Q.    Any other ones?

10       **A.    Not that I know of.**

11       Q.    Okay.  As far as of the employees of Takitik,

12   Inc. from 2007 to 2011, can you kind of run through, for

13   example, what your general day-to-day responsibilities

14   were?

15       **A.    As an entrepreneur, my day-to-day**

16   **responsibilities encompassed every -- everything from**

17   **corresponding daily with the clients that were ultimately**

18   **my responsibility as an individual.  My primary -- my**

19   **primary function within the organization was overseeing**

20   **products that we maintained distribution for, concept**

21   **cards that we maintained distribution for, and overseeing**

22   **the employees and/or independent contractors associated**

23   **with those products and clients that were under my**

24   **jurisdiction.**

25       Q.    Is it fair to say that you were -- did you run

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 46

1     the company?  I mean, your wife's CEO, so I'm trying to

2     figure out who kind of ran the company.

3          A.   I -- Takitik, Incorporated and it's

4     subsidiaries would have been co-run by myself and Timothy

5     Herman.

6          Q.   Okay.  Did your wife, which is Katalin

7     Nagy-Takio, does she have any day-to-day involvement in

8     the businesses?

9          A.   She had very little day-to-day involvement.

10    Essentially, the only role that she ever assisted with

11    would have been consumer requested hotel deliveries.  So

12    individual consumer requesting delivery of our products

13    to their hotel.  And other than that, my wife had no

14    day-to-day involvement in the organization.

15         Q.   How about the Ms. Picanol, what was her

16    involvement?

17         A.   Babette Picanol, she assisted with various

18    miscellaneous tasks, errands, post office.  I guess we

19    could classify her as administrative functions.

20         Q.   Was she the bookkeeper?

21         A.   No, she was not the bookkeeper.

22         Q.   Who was the bookkeeper?

23         A.   We did not have an official bookkeeper.

24         Q.   And who would do the invoicing for the company?

25         A.   The individual responsible for their respective

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                              Page  47
   1        clients would handle the invoicing for the clients that

   2        they managed.

   3             Q.    What was Thomas Brignolo's role?

   4             A.    Thomas Brignolo assisted us with in market

   5        distribution of products and services on behalf of our

   6        clients.  He also assisted with other general duties

   7        encompassed with the company, which would have required

   8        attending events, attending company sanctions.

   9             Q.    And what did Tim Herman do?

  10             A.    Tim Herman's responsibility was to essentially

  11        oversee all aspects of in market representation,

  12        distribution, education of concierges, communication with

  13        concierges on behalf of our clients that needed those

  14        services -- that those services were being provided to.

  15             Q.    What did the independent contractors do?  I

  16        believe it was Tim Barton, is that what it was?

  17             A.    Barber.

  18             Q.    Barber.  And Deanna Mashburn.

  19             A.    Deanna Mashburn.  Deanna Mashburn would have

  20        had, again, general undefined duties, would be things

  21        such as running errands, making deliveries, assisting

  22        with -- essentially, assisting Tommy with any surplus --

  23        I don't know if "surplus" is the right word -- any work

  24        flows at a given time where it was too much for just him

  25        to handle.
```

64020ea4-12e2-480e-8d56-0be97680450a

Page 48

1          Q.   Okay.

2          **A.   So she would have been kind of a backup.**

3          Q.   And what did Tim Barber do?

4          **A.   Tim Barber, his responsibilities were managing**

5     **relationships with clients associated with the concept**

6     **cards that Takitik maintained distribution for.**

7          Q.   And you said the billing was done by the

8     individual whose client it was?

9          **A.   Correct.**

10         Q.   Okay.  So who managed the clients?  Like if I

11    had to say, who would be the -- of the people you've

12    listed, who would be doing the billing, who would that

13    be?

14         **A.   I think I've answered that.**

15         Q.   Well, I don't know who managed the clients, so

16    I'm trying -- would it be Tim Herman doing billing?

17    Tommy Brignolo billing for their respective clients?

18         **A.   Correct.**

19         Q.   Did all these individuals you listed have

20    clients?

21         **A.   Tommy would not have had that function where a**

22    **client would have been assigned to him.**

23         Q.   Okay.

24         **A.   So no, Tommy --**

25         Q.   So I'm just trying to figure out, out of all

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 49

1    the people you've listed, who are the client handlers and

2    who would be doing the billing for their respective

3    clients?  Does Tim Barber have clients?

4         A.   **Tim Barber manages clients, correct.**

5         Q.   So he would bill his own clients?

6         A.   **Correct.**

7         Q.   Did Deanna Mashburn have clients?

8         A.   **No, she did not.**

9         Q.   So she would not be doing any billing?

10        A.   **Correct.**

11        Q.   Did Dale Takio have any clients?

12        A.   **Yes, I did.**

13        Q.   So Dale Takio would do billing?

14        A.   **Correct.**

15        Q.   Just your clients though; correct?

16        A.   **Generally -- generally speaking.  There were**

17   **times that -- with Tim Barber -- Tim Barber reported**

18   **directly to me.**

19        Q.   Okay.

20        A.   **So obviously, as his supervisor, so to speak, I**

21   **would have functions that involved his components.**

22        Q.   Did Tim Herman have clients?

23        A.   **Yes, he did.**

24        Q.   So Mr. Herman would bill his clients?

25        A.   **Correct.**

64020ea4-12e2-480e-8d56-0be97680450a

Page 50

1        Q.   And I think I've asked, Mr. Brignolo did not

2    have clients?

3        **A.   No, he did not.**

4        Q.   So he would not do billing?

5        **A.   No.**

6        Q.   Ms. Picanol, would she do any billing?

7        **A.   I don't -- I don't believe she did.  She never**

8    **did billing for any of the clients that I managed.  She**

9    **may have done billing assisting Tim Herman.  She**

10   **primarily would have reported to Tim Herman, so I --**

11       Q.   Did Mrs. --

12       **A.   -- I don't know.**

13       Q.   Did Mrs. Takio do any billing?

14       **A.   No.**

15       Q.   And as far as who billed for what respective

16   client, was there a list?  Mr. Herman, this is your

17   client you bill.  Mr. Takio, this is your client you

18   bill.

19       **A.   A list?  Each of us maintained our own**

20   **respective lists and understanding of who our clients**

21   **were, yes.  Yes.**

22       Q.   And do you currently have those lists?

23       **A.   Yes.**

24       Q.   And if I were to ask for those, would that be

25   the respective list -- it would be the Dale Takio client

Dale Takio - 9/20/2012

Page 51

1      list for Takitik, Inc. from January 2007 through --

2           A.   That's not how we kept records.

3           Q.   Okay.

4           A.   We're in the process of production for you, so

5      you'll have a list of all our clients.

6           Q.   Does the list of all the clients show who is

7      responsible for that client?

8           A.   I just said, no.  That's not how we maintained

9      our list.

10          Q.   So it's just a big list?

11          A.   We -- again, we each individually would have

12     had our lists.

13          Q.   Okay.

14          A.   For the purposes of your order of production,

15     we have compiled those into a reasonable working order.

16          Q.   Okay.  And I'm just -- I haven't seen the

17     documents, so if I were to look at the list, will it show

18     me whose client is whose or is it just a large list?

19          A.   No, it will not.

20          Q.   Okay.

21          A.   It'll show you a list of Takitik clients.

22          Q.   Okay.  And those would include Tim Herman's

23     and --

24          A.   That would include all clients of Takitik --

25          Q.   Okay.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 52

1        A.   -- and/or its respective subsidiaries.

2        Q.   Okay.  Is Hat Marketing a subsidiary of

3    Takitik, Inc.?

4        A.   Yes, it is.  Takitik has ownership in Hat

5    Marketing.

6        Q.   And did any of the, what I call Lauria family

7    members, I talked about to you earlier, Sarah Lagi,

8    Rachel Lauria, Robert Lauria, Lynnette Lauria, did they

9    ever work for Hat Marketing?

10       A.   I believe I answered that before, but I'll

11   answer it again.  No, they did not.

12            MR. BLAIR:  Want to take a break?  We're close

13       enough.

14            THE WITNESS:  A break will be good.

15            CAMERA OPERATOR:  Okay.  We're off record.  The

16       time now is 10:59.

17            (Whereupon, a recess was taken at 10:59 a.m.

18       and proceedings resumed at 11:18 a.m.)

19            CAMERA OPERATOR:  Okay.  We're back on the

20       record.  The time now is 11:18.

21   BY MR. BLAIR:

22       Q.   Mr. Takio, early on, your lawyer had indicated

23   that you were appearing today in several capacities.  Do

24   you recall that?

25       A.   Yes.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 53

1        Q.   You're obviously appearing on behalf of

2   yourself; correct?

3        **A.   Correct.**

4        Q.   And are you also the authorized representative

5   to speak at this deposition regarding Takitik, Inc.?

6        **A.   I am.**

7        Q.   Are you also the authorized representative to

8   speak at this deposition of Pointe Distribution, LLC?

9        **A.   I am.**

10       Q.   And are you also the authorized representative

11  to speak at this deposition on behalf of DT Printing

12  Solutions, LLC?

13       **A.   I am.**

14       Q.   And then rather than taking four depositions, I

15  think we have an understanding that when we're answering

16  the questions, you're answering on behalf of the

17  companies as well --

18       **A.   Okay.**

19       Q.   -- is that fair --

20       **A.   So we're not going to follow the schedule that**

21  **was assigned to separate them out?**

22       Q.   I wrote Mr. Brand and we're going to -- we can

23  do four separate ones --

24       **A.   No.  No.  No.  My understanding was we were**

25  **going to have separate time sessions today.**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 54

```
 1           Q.   I'd like to do them all at once.
 2           A.   That's fine by me.
 3           Q.   I just want to make sure that when you're
 4    answering, that you are -- get your agreement that you're
 5    answering --
 6           A.   No.  No.  No.  Absolutely.
 7           Q.   Okay.
 8           A.   Absolutely.  I just ask that you ask the
 9    questions with respect to each company so I know which
10    capacity I'm answering in.
11                (Whereupon, a document was marked as
12           Plaintiff's Exhibit A for Identification.)
13    BY MR. BLAIR:
14           Q.   And I'm going to show you what I've marked as
15    Exhibit A, which is a deposition notice for Takitik, Inc.
16    and ask if you've seen that before?
17           A.   Yes, I have seen this before.
18           Q.   And what did you do today to prepare for your
19    deposition on behalf of Takitik, Inc.?
20           A.   What did I do today?
21           Q.   Yes, sir.
22           A.   I woke up today.  It was pretty early.
23           Q.   Did you review any books and records?
24           A.   Today, no.
25           Q.   At any time in preparation for your deposition?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 55

1          A.    Oh, absolutely.

2          Q.    What did you review?

3          A.    Documents.  Thousands of documents, emails.

4          Q.    Okay.  Anything else besides documents?  Did

5     you meet with anybody?

6               MR. BRAND:  Don't --

7               MR. BLAIR:  Other than your attorney.

8               MR. BRAND:  Any conversations that we may have

9          had or anything that we have done, it's privileged.

10          You don't talk about at that.

11               THE WITNESS:  Okay.  Did I -- I'm not sure --

12     BY MR. BLAIR:

13          Q.    For example, did you meet with Mr. Deming in

14     preparation for your deposition today?

15          A.    I have met with Mr. Deming with regard to

16     anything that would have involved any of the entities

17     that we did business with.

18          Q.    Okay.  Have you met with anyone else in

19     preparation for your deposition today, other than Mr.

20     Brand?

21          A.    I'm not sure of the timelines, because I

22     believe we had several sets of things that have been

23     transpiring over roughly the past year.  Previously, I

24     would have met with Tim Herman, but I don't believe -- I

25     don't know what the date of this document is in reference

Dale Takio - 9/20/2012

```
                                                    Page 56
   1        to this document.  So since then, no.  September 7, 2012,

   2        no, I have not.

   3            Q.   Have you spoken to any of Lauria family

   4        members?

   5            A.   I have not.

   6                 (Whereupon, a document was marked as

   7            Plaintiff's Exhibit B for Identification.)

   8        BY MR. BLAIR:

   9            Q.   I'll show you what's been marked as Exhibit B,

  10        which is a corporate representative notice for Pointe

  11        Distribution, LLC and ask you if you've seen that before?

  12            A.   And actually, if I can reclarify the previous

  13        one, for your Exhibit A for Takitik, Inc., I would have

  14        not met with, I would have communicated with Kevin Brett.

  15            Q.   And who is Kevin Brett?

  16            A.   Kevin Brett is an owner in Hat Marketing, LLC.

  17            Q.   And in preparing for your deposition today on

  18        behalf of Pointe Distribution, what did you undertake, if

  19        anything?

  20            A.   Similar activities as to -- with Takitik.  I

  21        would have gone through emails for -- basically, would

  22        have gone through anything that would have corresponded

  23        with the requests for productions.

  24            Q.   Did you review the complaint?

  25            A.   Yes, I've reviewed the complaint.
```

Dale Takio - 9/20/2012

Page 57

1          Q.   Did you review the answers filed on behalf of

2     these entities?

3          **A.   Which answers?**

4          Q.   Do you know what an answer in affirmative

5     defenses are?

6          **A.   I don't know what the legal definition of what**

7     **you're talking about is.**

8          Q.   Have you reviewed the pleadings or legal

9     papers?

10         **A.   I've reviewed many legal papers.  I don't know**

11    **specifically.  I don't know what that means.**

12              **(Whereupon, a document was marked as**

13         **Plaintiff's Exhibit C for Identification.)**

14    BY MR. BLAIR:

15         Q.   And I'd like to show you what's been marked as

16    Exhibit C and ask you if you've seen that before, which

17    is a corporate representative deposition notice for DT

18    Printing Solutions, LLC?

19         **A.   I have.**

20         Q.   And I assume you did similar activities, such

21    as reviewing business records, in preparation for your

22    deposition?

23         **A.   Correct.**

24         Q.   And did you meet with anybody, other than Mr.

25    Brand, in preparing for your deposition for DT Printing

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                        Page 58
   1        Solutions or Pointe Distribution, LLC?

   2             A.    Since the date of this document?

   3             Q.    Yes, sir.

   4             A.    No.

   5             Q.    Other than Mr. Brand, have you met with anybody

   6        regarding this lawsuit since it was filed against you and

   7        your companies?

   8             A.    I'm sorry.  Can you repeat the question?

   9             Q.    Other than Mr. Brand, have you met with anybody

  10        regarding this lawsuit since it was filed?

  11             A.    Yes.

  12             Q.    Who?

  13             A.    Previous Counsel.

  14             Q.    Other than that?

  15             A.    I have met with Tim Herman, and I have met with

  16        Ryan Deming, I have met with or communicated with Kevin

  17        Brett.

  18             Q.    Do you know if Mr. Herman's in town?

  19             A.    I don't know.

  20             Q.    Have you seen him?  I'm just -- have you seen

  21        him around at all?

  22             A.    When?

  23             Q.    Any functions.  The last month?

  24             A.    No.

  25             Q.    Back to Takitik, as the corporate
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 59

1     representative, do you know who had the authority to sign

2     checks that were issued by Takitik, Inc.?

3          A.   Yes.

4          Q.   Who?

5          A.   Myself and Timothy Herman.

6          Q.   Anybody else?

7          A.   No.

8          Q.   Whose client was Simon Property Group

9     considered at Takitik?

10         A.   Timothy Herman.

11         Q.   Did you have any involvement with Simon

12    Property Group?

13         A.   I would have had limited involvement.

14         Q.   Were you Tim Herman's supervisor?

15         A.   No.

16         Q.   Did anyone supervise Tim Herman?

17         A.   No.

18         Q.   Did you ever have any like weekly or monthly

19    meetings to discuss business?

20         A.   We regularly had meetings by phone, in person,

21    we did not have scheduled meetings.

22         Q.   Was Simon Property Group ever discussed at

23    these meetings?

24         A.   Yes.

25         Q.   And the types of services that were being

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 60

 1        provided to them?

 2             A.    Correct.

 3             Q.    Who had the authority on behalf of Takitik to

 4        enter into contracts with whether it be vendors or

 5        clients?

 6             A.    Myself, Timothy Herman, to a limited extent

 7        Timothy Barber.

 8             Q.    Okay.  Was there any type of approval process

 9        that these contracts may have to go through at Takitik?

10             A.    For myself or Timothy Herman, no.

11             Q.    Okay.  And you all had some approval over Mr.

12        Barber's?

13             A.    Loose approval, yes.  Generally speaking, he

14        would outline anything he would enter into.

15             Q.    Do you know who at Takitik billed Simon

16        Property Group for the services?

17             A.    Timothy Herman.

18             Q.    Did you ever review those bills?

19             A.    I've seen the bills.  I mean, I've not seen

20        every one of them, but yes, I've seen bills for Simon.

21             Q.    Just to get a reference, during the time the

22        services were allegedly being provided, were you aware of

23        the bills and the services that were allegedly being

24        provided?

25             A.    I'm sorry?
```

Dale Takio - 9/20/2012

```
                                                    Page 61
 1              Q.   I mean, were you aware during the time these
 2      services were allegedly being provided that Simon was
 3      being billed for them?
 4              A.   For the services that we provided?
 5              Q.   Yes.
 6              A.   For the work that we did?
 7              Q.   Yes.
 8              A.   Yes, I was aware that there were bills.
 9              Q.   Okay.
10              A.   I don't think there was anything alleged about
11      it though.
12              Q.   Does Takitik have -- keep meeting minutes of
13      it's corporate records or meetings?
14              A.   No.
15              Q.   Does it have any type of annual meeting?
16              A.   No.
17              Q.   Did it in -- did it during it's existence?
18              A.   As far -- can we define "annual meeting"?  Are
19      we talking where -- board meetings?
20              Q.   Yes, sir.
21              A.   No.
22              Q.   Did it keep any type of corporate minutes?
23              A.   No.
24              Q.   Did it maintain a bank account?
25              A.   Yes.
```

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                    Page 62

    1           Q.   Where at?

    2           A.   Takitik maintained two bank accounts.  One with

    3      SunTrust and one with Affinity Federal Credit Union.

    4           Q.   Did it have any other type of financial

    5      account, brokerage, merchant account, anything of that

    6      nature, savings account?

    7           A.   Yes.

    8           Q.   What other accounts did it have?

    9           A.   It maintained a merchant account, and it

   10      maintained -- I don't know if this falls in that realm,

   11      but it held a corporate credit card with American

   12      Express.

   13           Q.   Where was the merchant account held at?

   14           A.   Merchant account would have been held through

   15      Visa/Mastercard systems through First Payment Systems,

   16      and for American Express with American Express

   17      Establishment Services.

   18           Q.   And who had access to corporate credit cards?

   19           A.   A corporate credit card would have been -- at

   20      what point in time?

   21           Q.   Well, I mean, is there a --

   22           A.   Just overall.

   23           Q.   Like throughout the existence of Takitik, which

   24      is only several -- 2007, 8, 9 --

   25           A.   A corporate -- would it be easier if I just
```

```
                                                    Page 63
 1        identified all of the --

 2             Q.   Sure.

 3             A.   A corporate credit card would have been issued

 4        to myself.  A corporate credit card would have been

 5        issued to Tim Herman.  A corporate credit card would have

 6        been issued to Tim Barber.  A corporate credit card --

 7        there was a general corporate credit card for office --

 8        general office use.  And there -- I believe that there

 9        was, at one point in time, an American Express credit

10        card issued on that account to my wife.

11             Q.   And can you explain to me how the billing

12        process at Takitik would work?  For example, say if

13        service "X" was provided, was a bill generated monthly,

14        mailed to the client, is that how it works?

15             A.   It really varied by client.

16             Q.   Okay.  Can you give me what types it would have

17        for the varying clients?  I mean, it's your business.

18        I'm just trying to understand how your billing process

19        worked.

20             A.   What I can speak about are the billing

21        practices that I executed.

22             Q.   Okay.

23             A.   So invoicing that I executed and that I oversaw

24        for Tim Barber.

25             Q.   Okay.
```

Page 64

1      A.   I have a general knowledge of how Tim

2      maintained his invoicing practices.

3            Q.   Okay.

4      A.   For me, again, depending on the request of the

5      merchant, I might have a merchant that uses internal

6      proprietary systems for invoicing, where they are

7      submitted electronically through, again, I guess their

8      proprietary systems.

9            Q.   Okay.

10     A.   We have clients where it was a little less

11     formal, where it might just simply be an execution of an

12     order form.  We have individuals where an invoice would

13     be printed and/or emailed directly to the client.  And

14     Timothy Barber would apply, essentially, those same

15     principles that I would oversee.

16           Q.   What is an "order form," just like a purchase

17     order or something?

18     A.   I guess you can call it a purchase order.  It

19     would basically be a document with a definition of what

20     was to be provided, what the monetary value of the

21     services to be provided, and it would have essentially

22     terms, general terms and conditions of the relationship

23     of that transaction.

24           Q.   And how was that transmitted to the client?

25     A.   Again, that would have been either emailed or

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                    Page 65
 1        -- actually, it would have been emailed, delivered in

 2        person, it may have been mailed, again, it depended on

 3        the circumstances of each scenario.

 4             Q.   Do you all still use facsimile?

 5             A.   Not really.  I don't know if people really do.

 6             Q.   How about --

 7             A.   I mean, I have used fax.  And I'm sure I

 8        probably have faxed as well.

 9             Q.   I'm just talking have you ever faxed, I guess,

10        order forms?

11             A.   Yes, I've faxed invoices that I was responsible

12        for.

13             Q.   How about just the paper invoice, you said that

14        might sometimes be generated, was that transmitted via

15        mail, email, fax, or hand delivery?

16             A.   Yes.

17             Q.   Okay.  All of above?

18             A.   All of the above possibly.  Definitely.

19        Definitely.

20             Q.   And you said you had some knowledge as to Tim

21        Herman's billing practices; correct?

22             A.   Correct.

23             Q.   Do you know how Mr. Herman would generate his

24        bills?

25             A.   Tim Herman would generate his bills using
```

Page 66

1    **Microsoft based products.  And he would either hand**

2    **deliver, fax, mail, or email.**

3         Q.   Okay.  But he did all of the above?  I mean,

4    like he hand delivered every one of them or he mailed

5    every one of them?

6         **A.   I can't speak that he definitively hand**

7    **delivered.  I can assume that he hand delivered if it**

8    **wasn't any of the other above.**

9         Q.   No, but I mean, you don't know for a fact that

10   he like hand delivered every invoice.  I mean, he

11   might --

12        **A.   Oh, no.  No.  No.  No.  I mean, there was --**

13   **again, there was never any --**

14        Q.   Set --

15        **A.   -- set procedure behind.  I guess it would be**

16   **what was most convenient for any given scenario.**

17        Q.   As far as the bills or the order forms, was

18   that on a computer system?  You said a Microsoft product.

19        **A.   I believe that -- for which one?**

20        Q.   Well, I'm just trying to get a handle on

21   Takitik sends out a bill.  Whether it's you or Mr.

22   Herman, is there a billing program?

23        **A.   Again, there's several systems maintained**

24   **depending on the client.**

25        Q.   Okay.

64020ea4-12e2-480e-8d56-0be97680450a

Page 67

1          **A.    For the ones that I did off of Microsoft based**

2     **products, yes, that would be done on a computer.**

3     **Microsoft is a computer software.**

4          Q.    Okay.  And I assume that Takitik has a computer

5     system; correct?

6          **A.    Yes.**

7          Q.    Is it a network based system?

8          **A.    No.**

9          Q.    Do each of the individuals have a desktop at

10    their own desk, is that how it works?

11         **A.    At certain periods of time, there were -- every**

12    **individual would have a desktop, and then I'm not sure at**

13    **what point in time laptops would have been issued as**

14    **well.**

15         Q.    And I realize people have laptops, iPads, what

16    not, I'm just trying to get -- they were not linked

17    together by --

18         **A.    No, sir.**

19         Q.    So if Tim Herman wanted to issue a bill, would

20    he just go into this Microsoft product and generate a

21    bill and deliver however he delivers it?

22         **A.    I can only assume.**

23         Q.    Was there any type of -- strike that.

24               How about as far as -- is that how it did with

25    you, you would say I did "X" services for client "Y" and

Dale Takio - 9/20/2012

Page 68

1     you would go on your computer and draft a bill, or did

2     someone do that for you?

3          A.   Again, it would depend on the circumstances.

4     If I were issuing an order form, an order form would be

5     executed before that transaction took place --

6          Q.   Okay.

7          A.   -- with whatever terms.  So whether it was cash

8     on delivery, whether it was net 30, et cetera, those

9     terms would be defined in there.  If it was through one

10    of the proprietary systems, we have clients that actually

11    they manage all of the invoicing.  So for example, Viator

12    would be one of my clients.  Viator will send us feeds

13    based on individual transactions that take place during a

14    period of time.  Those individual transactions are

15    essentially notifications to let us know that that

16    transaction took place with a consumer, one of their

17    consumers.

18         They would then reconcile and they would issue

19    a statement of what they were paying for.  We never

20    actually had to issue, it was a very automated type

21    process.  So essentially, there was a checks and balances

22    against what they were telling us was sold versus what

23    was being paid out.

24         We had systems where we were then required.  We

25    would get those transactions, whether it be on a daily

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                        Page 69
   1        basis or as per transaction basis, where we would then

   2        reconcile those and then submit those to a proprietary

   3        system.  So there were various ways that invoicing took

   4        place.

   5            Q.   But what I'm trying to understand is did

   6        someone do it for you and Mr. Herman?  Like you would

   7        just tell Ms. Pinnacle [sic], or whatever her name is, to

   8        go say  --

   9            A.   I have never told Ms. Picanol to invoice

  10        anything on my behalf or any of my clients.  I may have

  11        asked Tim Barber.  Tim Barber would have been the only

  12        person that I have ever asked to generate and issue an

  13        invoice on behalf of a client that I managed.

  14            Q.   And to your knowledge, as the corporate rep of

  15        Takitik, how did Tim Herman generate his bills?  Did he

  16        do it personally?

  17            A.   I can't say.  I know Tim had support members.

  18        But definitively, I don't know if they assisted him with

  19        those efforts or if he did them on his own.

  20            Q.   Did he have support members, other than the

  21        individuals we talked about today?  Ms. Picanol, your

  22        wife, Mr. Brignolo --

  23            A.   My wife never had any business interaction with

  24        Tim.  Ms. Picanol was also an employee of Image Marketing

  25        for a period of time.  Part of her duties, I believe, did
```

Dale Takio - 9/20/2012

Page 70

1        involve creating and generating invoices, but I don't

2        know all of the operational business practices and

3        procedures --

4             Q.   I'm just trying to --

5             A.   -- of them.

6             Q.   I'm sorry.  If Mr. Herman had any assistants

7        that might have helped him with billing, other than

8        possibly --

9             A.   To my knowledge, yes, he did.

10            Q.   Do you know who they were?

11            A.   I believe Denise Tucker would have assisted Tim

12       for a period of time.  Babette Picanol.  Tommy Brignolo

13       would have assisted Tim with aspects of fulfilling his

14       role.  I believe his partner, Ryan Deming, likely would

15       have assisted him in some capacity.  I'm trying to think

16       in time.  I believe Tim may have had interns that he

17       utilized in different capacities, but I don't know

18       specifically what they would have been tasked with.

19            Q.   Who's Denise Tucker?

20            A.   Denise Tucker, she was an employee of Image

21       Marketing.  She was a distribution agent.

22            Q.   But she wasn't an employee of Takitik?

23            A.   No, she was not.

24            Q.   Okay.  Were the computer systems at Takitik

25       backed up to any type of server?

64020ea4-12e2-480e-8d56-0be97680450a

Page 71

1          A.    I don't know what that means.

2          Q.    In other words, in the event your laptop or

3     desktop crashed, was there a backup?

4          A.    No.

5          Q.    Was any data deleted from any of the Takitik

6     computers since say November of last year, to your

7     knowledge?

8          A.    To my knowledge, no.

9          Q.    Okay.  Have you made any efforts --

10         A.    Strike that.  I regularly delete my spam

11    folders.  However, other than that, I don't know of any

12    deletions and I don't know of anybody else deleting

13    anything.

14         Q.    Do you know if any efforts were made to

15    preserve any electronic data regarding the Simon Property

16    Group client?

17         A.    Yes.

18         Q.    What efforts were made?

19         A.    Upon an initial subpoena of production, I

20    believe about a year ago, we began to compile all of the

21    data requested from, first -- actually, I believe before

22    subpoena, from Simon directly.  We began to prepare those

23    documents and communications and the requests that they

24    had, we began to prepare them onto both the hard drives

25    of the computer and we also backed some up through

Page 72

1      **printed copy as well as through flash drive.**

2          Q.   And so to the best of your knowledge, that data

3      has been preserved?

4          A.   Yes.

5          Q.   And the flash drive, is that the one that's in

6      possession of Jason Herman, to your knowledge?

7          A.   Yes.

8          Q.   In other words, I'm trying to figure out with

9      all that data you gathered, can you tell me what you did

10     with it?  Did you give it to Jason Herman or do you have

11     it in your possession?

12         **A.   Actually, we gave it to Larry Smith of Southern**

13     **Trial Counsel.**

14         Q.   And that's where Jason Herman used to work?

15         A.   Yes.

16         Q.   And to your knowledge, have you been able to

17     recreate that data?

18         A.   Yes.

19         Q.   Do you know for a fact that you have been able

20     to produce document for document?

21         **A.   Document for document, I can say with level of**

22     **comfort, after having an opportunity to review what was**

23     **in Jason Herman's possession, that with the sole**

24     **exception of original pieces of collateral relating to**

25     **Simon, with Simon -- any of Simon's brands on them, that**

64020ea4-12e2-480e-8d56-0be97680450a

Page 73

1    I can recreate 100 percent of it -- that I have recreated

2    100 percent of it.

3         Q.   Are you aware if any of the originals sitting

4    in Mr. Herman's possession have notes or things like that

5    that you cannot recreate?

6         A.   Which Mr. Herman?

7         Q.   I'm sorry.  Jason Herman.

8         A.   Okay.  Anything that I saw during that review

9    that had notes would have been photo copies.  There was

10   multiple photo copies made for each of the respective

11   parties that were requested.

12        Q.   So to the best of your knowledge, it's your

13   assessment that you have been able to recreate 100

14   percent the data that is in Mr. Jason Herman's

15   possession?

16        A.   Correct.

17        Q.   Okay.  Did -- were the computers at Takitik

18   locked, like password protected?

19        A.   Mine was not.  I don't know what the personal

20   settings were set for Tim Barber's.  I know that Tim

21   Herman had a pretty fancy system with a biometric entry

22   on it.  The desktop computers, mine was not.  I believe

23   Tim Barber's was.  We also maintained essentially an all

24   purpose computer at a reception area and that was not

25   locked.

64020ea4-12e2-480e-8d56-0be97680450a

Page 74

1      Q.   And I thought of something about the data in

2  Jason Herman's possession.  Were you able to recreate all

3  the what I would call electronic information?  Like say

4  for instance, say for example, you copied a letter to a

5  flash drive.

6      **A.   Anything that was -- that I copied to that**

7  **flash drive, I had also made a subsequent copy of that --**

8  **of the contents of that flash drive as well that I**

9  **created.**

10     Q.   To your knowledge, did Tim Herman's computer

11 get copied and was that given to Mr. Smith?

12     **A.   His computer get copied?**

13     Q.   In other words, my understanding was that Tim

14 Herman had a laptop that was not networked to your

15 computer.  In other words --

16     **A.   Correct.  Yes.**

17     Q.   To your knowledge, did Mr. Herman, in response

18 to the subpoena, provide information to Jason Herman that

19 was off of his laptop?

20     **A.   To my knowledge, Tim Herman did not produce any**

21 **electronically formatted information documents, any**

22 **files, electronic files.  Reasonably, I think, that any**

23 **documents that would have originally been created would**

24 **have been from his computer ultimately.**

25     Q.   And I guess what I'm trying to figure out is

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 75

1    who produced electronic data in response to the subpoena,

2    did yourself, copies?

3         A.   Yes, I did.

4         Q.   Did Mr. Barber?

5         A.   Mr. Barber did not -- at the time, did not have

6    anything that was pertinent to the scope of the subpoena.

7    Tim Barber did not ever have involvement with Simon as a

8    client.

9         Q.   Did Deanna Mashburn?

10        A.   No.  Deanna Mashburn -- I don't know where she

11   is now.  I don't have any access.  I don't know where she

12   is.

13        Q.   Did Mr. Brignolo have a computer?

14        A.   Mr. Brignolo did have a computer.

15        Q.   Was his computer searched?

16        A.   His computer went missing, which we made your

17   office and Simon notified of -- along with many stolen

18   documents out of our office.

19        Q.   Mr. Brignolo took a computer?

20        A.   Yes, Mr. Brignolo took a computer.  We believe

21   he took a computer.

22        Q.   Was there a police report filed?

23        A.   I believe there was a police report filed.

24        Q.   So in other words, you were unable to search

25   his computer, is that a fair statement?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 76
    1        A.   That's correct.  There was a desktop that was

    2   left behind.  That desktop, there was deleted files.  We

    3   made attempts to have it restored and recreated, we were

    4   unsuccessful.

    5        Q.   Who did you have attempt to recreate and

    6   restore that?

    7        A.   A gentleman by the name of Steve Tune.

    8        Q.   Does he work at any company?

    9        A.   He did work for a company, but he was also a

   10   freelance -- he was an IT director at a company, retail

   11   company.  I don't know the name of it.  However, he did

   12   do freelance technology work.

   13        Q.   Was Mr. Herman's -- did he have a laptop and a

   14   desktop or just a laptop?

   15        A.   He had a laptop and he also would have had

   16   access to general desktops.

   17        Q.   Okay.  Do you know where the information

   18   regarding Simon Property Group was stored, on which

   19   computer?

   20        A.   Which information?

   21        Q.   Bills, contracts, communications.

   22        A.   I have had communications that involved

   23   dealings with Simon which would have been produced on

   24   those flash drives.  But any of the -- anything --

   25   besides anything I created, should be on either Tim
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 77

1       Herman's computer or on general office computers.

2           Q.   Did you make any effort to secure Tim Herman's

3       laptop computer?

4           A.   Did I make any efforts to secure it?

5           Q.   Yeah.

6           A.   We requested it.  We -- when we produced, we

7       requested that he do the diligent searches to find the

8       relevant information --

9           Q.   Okay.

10          A.   -- requested by first Simon's security and then

11      subsequently by your firm.

12          Q.   Okay.

13          A.   I personally did not go through any of his

14      computers.  But yes, we did make attempts to have Tim

15      Herman produce anything that would have been in his

16      access.

17          Q.   And did that include electronically stored

18      information?  Was that transferred to a disk drive or

19      anything?

20          A.   Again, I didn't -- I didn't transfer anything

21      from -- I never had access to Tim Herman's laptop.

22      Whether he did it or not, I don't know.

23          Q.   Was it a company laptop or his personal laptop?

24          A.   I don't know.  I don't know.

25          Q.   Was his -- did you transfer any electronically

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 78

1       stored data off of his desktop?

2            A.   Again, he would have, as I mentioned earlier,

3       he would have used a general office desktop.

4            Q.   And was that general office desktop --

5            A.   I don't believe on the searches there that we

6       found anything that related to Simon.

7            Q.   Okay.  You just said he used a general office

8       desktop for some of that.  So I'm trying to figure --

9            A.   No, I said I would assume he would have.  I

10      don't know for a fact.

11           Q.   And so --

12           A.   When we searched that desktop, we did not find

13      anything relating to Simon.

14           Q.   And who was in charge of conducting the

15      diligent search, was it you?

16           A.   In charge of conducting --

17           Q.   Well, you said "we conducted a search of these

18      computers."  Who was that?

19           A.   Everybody respectively searched the devices

20      that were in their control.

21           Q.   Okay.  Did you follow up with any of them to

22      determine if they had, in fact, copied everything that

23      needed to be copied?

24           A.   Yes.

25           Q.   Okay.  And then who delivered it to Mr. Smith?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 79

1          A.    Respectively, we each delivered what we had in

2     our -- in our findings in our individual access.  So what

3     I found, I produced.  And at that time, the initial

4     production would have been at the offices of Southern

5     Trial.  Ryan and I attended.  I believe that Tim Herman

6     may have subsequently produced documents.  I never saw

7     them.  I never saw him produce them, so I can't speak as

8     to whether --

9          Q.   Do you know whether Mr. Herman, Tim Herman,

10    produced to Jason Herman and/or Mr. Smith?

11         A.   I'm sorry?

12         Q.   Do you personally know what Mr. Herman, Tim

13    Herman, produced to either Jason Herman or --

14         A.   No, I do not --

15         Q.   -- Mr. Smith?

16         A.   -- I personally know.

17         Q.   And it could include information from your

18    personal business, Takitik; correct?

19         A.   It can, yes.  I mean, anything's possible.

20         Q.   And all I'm trying to figure out if you've

21    never seen what he's produced, then how are you able to

22    know --

23         A.   What I've seen --

24         Q.   Let me finish.  Then how are you able to know

25    what you've created, he's produced if you don't know what

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 80

1      he produced?

2           A.   I know what was in possession of Jason Herman

3      as of, I believe, two days ago.  I believe -- I know that

4      every document that I saw pertaining to Takitik or any of

5      it's subsidiaries, we took a log of what was going on and

6      I had an opportunity to reconcile to make sure that I had

7      each of those items that were there.  So which -- if

8      those documents included anything on behalf of Takitik or

9      any of it's subsidiaries that was produced by Tim, I have

10     copies of those pieces.  I don't know that it was

11     necessarily Tim that produced them.  I can't say

12     definitive.  I can only assume that Tim would have been

13     the one that produced them.

14          Q.   Okay.  I'm a little confused, because according

15     to you, Tim is the only one that has access to his laptop

16     because he's got a biometric lock; correct?

17          A.   Correct.

18          Q.   You did not search that computer yourself;

19     correct?

20          A.   Correct.

21          Q.   He delivered it to the lawyer himself; correct?

22          A.   Correct.

23          Q.   So --

24          A.   Again, I assume.

25          Q.   Okay.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 81

```
 1        A.    I assume.  I was not present.  He may have had

 2   a courier service.  He may have had --

 3        Q.    Well, what I'm trying to figure out, not

 4   looking at it, having access to it, or knowing when it

 5   was delivered, how do you now know that you can recreate

 6   that information from your system if you don't even have

 7   access to it?

 8        A.    Because there may have been duplicative pieces.

 9   I saw emails in there where I was cc'd on those which

10   corresponded with my receipt of what would have been sent

11   from him.

12        Q.    I understand you saw what you had on your

13   system.  I'm just trying to figure out how do you know

14   what's on Tim's system if you don't have access to it?

15        A.    That's not where we were.  The question was:

16   In Jason Herman's office, I made a log of every document

17   that I saw.  I went back to all of the documents that we

18   have been working on diligently producing, under your

19   request.  I went through every single line item and I was

20   able to identify that I have every one of those documents

21   that were in possession of Jason Herman currently.

22        Q.    How many documents were in possession of Jason

23   Herman?

24        A.    I did not count them.

25        Q.    Approximately.
```

First Choice Reporting & Video Services
www.firstchoicereporting.com                    Worldwide Scheduling                    800.939.0093

64020ea4-12e2-480e-8d56-0be97680450a

Page 82

1      **A.    I don't know.**

2          Q.   How many boxes?

3      **A.    There were two boxes.**

4          Q.   And you categorized two boxes of single spaced

5      pages and went back and checked them by hand in two days?

6          **A.    I don't know that they were all single spaced.**

7          Q.   No, I mean, single pages.  So I think there's

8      about 3,000 pages in a box, you went back and categorized

9      6,000 pages in two days and verified them?

10             MR. BRAND:  Objection.  Argumentative.  I also

11             think there's a difference in what you guys are

12             talking about.  I think you're not defining -- I

13             think you each are defining "categorization"

14             differently.

15     BY MR. BLAIR:

16         Q.   Did Takitik ever have a server that it backed

17     up its computers to -- what's it called?

18             MR. WATSON:  Sequent.

19     BY MR. BLAIR:

20         Q.   -- sequent?  Did Takitik ever back up any files

21     to a server or a --

22         **A.    I've already answered that.  No.**

23         Q.   Okay.  Earlier, we talked about Takitik

24     providing consulting services to members of the Lauria

25     family; correct?  Do you remember that?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 83

1          A.    Uh-huh.

2          Q.    Did the Lauria family members ever provide

3     consulting services to Takitik?

4          A.    Companies owned by the Lauria companies

5     provided services to Takitik.

6          Q.    And what were those services?

7          A.    They were -- XLM Marketing, formally known as

8     RJL Services, provided consultation to Tim Herman in

9     general business expertise, general aspects of how to

10    conduct business.  They worked with him on projects, such

11    as the Orlando Magic.  They worked on projects for

12    clients that he maintained and assisted him with

13    developing strategies and further cultivating clients

14    that he managed relationships.

15         Q.    And were there any contracts that documented

16    that relationship?

17         A.    I don't know if Tim Herman -- I don't know how

18    those were memorialized, as you said earlier.

19         Q.    He worked for Takitik though; right?

20         A.    I'm sorry?

21         Q.    He worked for Takitik; right?

22         A.    Correct.

23         Q.    And you are the corporate representative of

24    Takitik; right?

25         A.    Correct.

64020ea4-12e2-480e-8d56-0be97680450a

Page 84

1           Q.   And you don't even know how the business was

2      conducted in your own office?

3           A.   There was -- Tim Herman had -- it was something

4      that we had inherited, Tim's service -- Tim Herman had

5      those consulting services prior to me ever having any

6      involvement with Tim Herman in any capacity.  So I don't

7      know how they were -- that would have been something that

8      Tim Herman had on his file.  What we would have on --

9      what I know would be any payables on behalf of those

10     services that were rendered by XLM to Tim Herman or --

11     I'm sorry, XLM formerly known as RJL.

12          Q.   When the bills were generated by Takitik, no

13     matter who generated them, did they all go into one bank

14     account?

15          A.   For Takitik specifically?

16          Q.   I assume Takitik issues a bill, it gets paid.

17     Where's it go?

18          A.   Okay.  Takitik would have had, again,

19     maintained the two bank accounts.

20          Q.   Okay.

21          A.   Affinity Federal Credit Union and then

22     SunTrust, so it would have gone into one of those two

23     accounts.

24          Q.   Okay.  And who had access to those two

25     accounts?

Page 85

1        A.    To the SunTrust, I was a signer and Tim Herman

2    was a signer.   To Affinity was the original creation,

3    prior to Tim Herman having ownership in Takitik, that I

4    would have been the signer on.

5        Q.    So nobody had access to the Affinity bank

6    account but you; correct?

7        A.    Correct.

8        Q.    And when you had all these merchant accounts, I

9    assume that's where they swipe a Visa or Mastercard; is

10   that correct, and pay a bill?

11       A.    Correct.

12       Q.    Where does that money go to?

13       A.    They would have gone into one of those two

14   respective accounts.

15       Q.    And was there a methodology as to which account

16   money went into?

17       A.    Because Affinity preceded any growth of the

18   company or any evolutions of the company, those initial

19   -- that initial bank account was assigned to a merchant

20   service terminal which directed funds into there.   When

21   Tim Herman joined the company and we then established,

22   essentially fresh bank accounts, a fresh merchant service

23   with a separate credit card processer owned by Takitik,

24   separately owned by Takitik, was used.

25       Q.    But there wasn't like Tim Herman's clients went

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 86

1     to one bank account and your clients went to another bank

2     account?

3          A.   No.

4          Q.   They all went to the same -- one of the two

5     accounts?

6          A.   Correct.

7          Q.   What does -- if you had to tell me what Takitik

8     did, what does it do?  What services does it provide

9     clients?

10         A.   **Takitik provided a long range of services.**

11    **Representation, distribution, referral tracking.  What --**

12    **the components that I oversaw would have been, again, the**

13    **concept cards, the growth of the concept cards, anything**

14    **having to do with those concept cards, which would be**

15    **securing clients, overseeing the development of that**

16    **product, the production of that product -- that**

17    **respective product.**

18         Q.   You say "representation," can you tell me what

19    that entails?

20         A.   **Again, it would be defined by the scope of a**

21    **conversation to the respective clients.**

22         Q.   And was it Takitik's business practice to

23    document that representation in some type of paper,

24    whether it be an order form or a contract?

25         A.   **I think I've already answered this.  Anything**

64020ea4-12e2-480e-8d56-0be97680450a

Page 87

1    that I would have had would have been documented in the

2    ways that we discussed.

3        Q.   Okay.

4        A.   When -- there were times where things could

5    have been done verbally and then -- that I oversaw,

6    things that would have been done verbally, and then

7    either solidified or memorialized by an order form or a

8    more extensive contract, again, depending on the

9    circumstances and the relationship with that client.

10            I -- depending on the size of the client, if it

11   was a larger client, and requested, I may put together

12   presentations, portfolio -- preservations in general

13   scope of my understanding of what we collected -- of what

14   myself, on behalf of Takitik, and the client had scoped

15   out as to the nature of what the relationship was

16   supposed to be.  In those instances, I would have done

17   that through power points, presented power points, bound

18   booklets.

19       Q.   You're here on behalf of Takitik as a

20   corporate --

21       A.   Correct.

22       Q.   -- representative.  And you're telling me what

23   you're doing.  Can you tell me what the four people that

24   worked for you were doing?  Can you tell me what Mr.

25   Herman did as far as documenting his contracts?  I mean,

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 88

1      you ran the company, didn't you?

2          A.   Again, we had -- we were equal owners in the

3      company.  He had his respective roles and his respective

4      styles of doing things.  I don't know the processes of

5      how he did it.  Tim would have been responsible for -- if

6      he -- if he entered into an agreement, he would have been

7      responsible for following the procedures of that

8      agreement in the same fashion that I would have been.  So

9      if a client requested a proposal from him, then he would

10     have created a proposal for that client.

11              If a client requested an order form, he would

12     have created that order form.  If a client requested a

13     contract, either they would have created it or he would

14     have created it.  So he would have reasonably followed

15     the same types of practices.  How he executed those, I

16     can't say definitively.

17         Q.   But Takitik did not have any procedure that

18     said, it's our business practice to put everything in

19     writing, therefore, there's no misunderstandings or

20     anything of that nature?

21              MR. BRAND:  Objection.  Asked and answered.

22     BY MR. BLAIR:

23         Q.   You just let him do what he wanted?

24              MR. BRAND:  Objection.  Argumentative.

25              MR. BLAIR:  Speaking objections aren't allowed

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                        Page 89
 1              anymore, Craig.  So you can object to form, but we

 2              can't keep coaching the witness, please.

 3                   MR. BRAND:  I'm not coaching anybody.

 4                   THE WITNESS:  The -- no, we did not.  We had

 5              very loose relationships with each of our clients,

 6              and it would have been based on the comfort levels

 7              between each of our clients.  If I had a client that

 8              simply requested an order form and that adhered to

 9              their practices, we were flexible with the terms of

10              those policies.

11                   If a client requested a formal contract, then

12              we would request -- or I'm sorry, we would follow

13              that request.  If they would ask us to produce for

14              them to review for final execution, we would could

15              that.  If there was a client that used their own

16              standard agreements for our review and final

17              approval or mutual approval, then we would follow

18              those practices.

19                   So again, it depends on the nature of the

20              relationship with the client.  And our informal

21              procedures would have been to follow the comfort

22              level and the relationship that we were maintaining

23              with that respective client.

24         BY MR. BLAIR:

25              Q.   And so whatever Tim did, he had carte blanche
```

64020ea4-12e2-480e-8d56-0be97680450a

Page 90

1       to do whatever he wanted; is that what you're saying?

2           **A.   I don't know what you mean by "carte blanche."**

3           Q.   Did you oversee anything that he did?

4           **A.   Yeah, I saw many things that he did.**

5           Q.   Oversee.   Supervise.

6           **A.   No, I was not his supervisor.**

7           Q.   So he could negotiate any contract that he

8       wanted?

9           **A.   Absolutely.**

10          Q.   And where did that money go?  It went to your

11      company's bank account; correct?

12          **A.   Correct.**

13          Q.   And you got to use that money; correct?

14          **A.   Me?**

15          Q.   You get paid; right?

16          **A.   Absolutely.**

17          Q.   Okay.   How much did you -- how much did you

18      make last year off of Takitik?

19          **A.   Off of Takitik, how much did I make?**

20          Q.   Yeah.

21          **A.   Zero.**

22          Q.   How much in 2010?

23          **A.   In 2010, I -- I'd have to refer to my tax**

24      **returns.   I believe I was paid somewhere in the**

25      **neighborhood, by salary, about $40,000.**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 91

1          Q.   How about 2009?

2          A.   I -- I believe somewhere in the neighborhood of

3     maybe about $15,000 by salary.

4          Q.   Okay.  2008?

5          A.   I don't -- I honestly can't answer that far

6     back.  I'd have to look at my tax returns.

7          Q.   Who owns Takitik, is it you and your wife or is

8     it you and Mr. Herman?

9          A.   Takitik doesn't exist.  It's --

10         Q.   Well, who owned it?

11         A.   -- been dissolved.

12         Q.   Who owned it at the time?

13         A.   At what time?

14         Q.   2007 to 2011.

15         A.   From beginning of 2007 to middle of --

16    approximately, middle of 2007, I solely owned Takitik.

17    From the middle of 2007 until December of 2010, Tim

18    Herman and I were the officers of the company.  I stepped

19    down as an officer of the company in December of 2010.

20         Q.   Okay.

21         A.   And my wife was appointed as a figurehead to

22    maintain the family's interest in the ownership of the

23    company.

24         Q.   And why did you step down as an officer?

25         A.   I felt that there might be a conflict to my

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 92

```
 1        responsibilities upon accepting an at will employee

 2        relationship with Groupon.

 3             Q.   And why was Takitik, Inc. dissolved?

 4             A.   I'm sorry?

 5             Q.   Why was Takitik, Inc. dissolved?

 6             A.   Takitik, Inc. was dissolved ultimately -- Tim

 7        Herman and I decided that it didn't make sense for there

 8        to be affiliations between us and business, so we had to

 9        figure out a way to go our separate ways, so we

10        dissolved.

11             Q.   And that had nothing to do with the current

12        lawsuit?

13             A.   It actually happened before we ever knew that

14        we were named in the lawsuit, so no.

15             Q.   And was there any money in the bank accounts

16        when Takitik dissolved?

17             A.   I believe there were, yeah.

18             Q.   And where did that money go?

19             A.   The final distribution of funds that were

20        remaining in Takitik were issued by check from the bank

21        -- actually, from the SunTrust account, from SunTrust the

22        check was issued.  Check was never cashed, I still have

23        possession of that check.  I haven't been able to

24        determine how the assets were allocated.

25             Q.   And how much was that check?
```

64020ea4-12e2-480e-8d56-0be97680450a

Page 93

1        **A.    I don't know.**

2        Q.   Is it 55,000?

3        **A.    No.**

4             CAMERA OPERATOR:  Excuse me, Counsel.  Five

5        minutes left on tape.

6             MR. BLAIR:  You want to just take lunch?  It's

7        12:00.  Let's just do that.

8             CAMERA OPERATOR:  We're off the record.  The

9        time is 12:06.

10            (Whereupon, a recess was taken at 12:06 p.m.

11       and proceedings resumed at 1:07 p.m.)

12            CAMERA OPERATOR:  Okay.  We're back on the

13       record.  The time now is 1:07.

14   BY MR. BLAIR:

15       Q.   Okay.  Back after lunch.  I have a few

16   follow-up questions.  I checked my notes at lunch.  So as

17   far as we went with the bank accounts for Takitik, where

18   do you have your personal banking at?

19       **A.    My personal banking is at Affinity.**

20       Q.   Is that where you maintain all of your

21   accounts, at Affinity?

22       **A.    No.**

23       Q.   Do you have any brokerage accounts?

24       **A.    I have brokerage accounts as well, yeah.**

25       Q.   Where are those located at?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 94

1        A.   I have a brokerage account at Merrill Lynch.   I

2    believe there were accounts established when I was at

3    both Open Table and Groupon for --

4        Q.   Retirement?

5        A.   -- stock options, retirement, that are now

6    housed in --

7        Q.   Other than those accounts and the account at

8    Affinity Bank, do you have any other personal bank

9    accounts?

10        A.   I do not.

11        Q.   And who has access to the Affinity bank

12    account, is it just you?

13        A.   Which?  My personal account?

14        Q.   Yes.

15        A.   My personal account is a custodial joint

16    account with my father.  However, he doesn't access it.

17    He has access to it, but he doesn't access it.

18        Q.   And had said you had gone over to Jason

19    Herman's law office and made a list to reconcile what you

20    had versus what he had; is that a fair statement?

21        A.   Yes.

22        Q.   Did you keep a copy of that list?

23        A.   I believe so.

24        Q.   If I were to ask for a copy of that list, what

25    would I ask for?  What would you want me to call it so

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 95

1        you would know what I was asking for a copy of?

2            A.   I guess we'd call it a log of documents

3        reviewed at Jason Herman's office on whatever the date.

4            Q.   Okay.  And it was this week; correct, that you

5        reviewed them?

6            A.   Correct.

7            Q.   And approximately, how many customers did

8        Takitik, Inc, have during it's existence, was it over

9        ten?

10           A.   Over 200.

11           Q.   Over 200.  And is there a client list or a list

12       you're producing of the clients in your --

13           A.   I already answered that, yes.

14           Q.   Okay.  And did Takitik maintain any post office

15       boxes?

16           A.   No.

17           Q.   Do you personally maintain any post office

18       boxes?

19           A.   No.

20           Q.   Did Takitik have what's commonly known as a

21       accounts payable or accounts receivable department?

22           A.   I'm sorry?

23           Q.   Like when a payment came in, who posted it to

24       the account at Takitik?  When a payment comes in, is it

25       posted to any type of ledger?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 96
    1          A.   We didn't have formal departments in our

    2     organization.  Again, I think I answered this before.

    3     Rule of thumb was, the individual maintaining that --

    4     that would issue -- or I'm sorry that would manage any

    5     account would issue.  However, it was ultimately a

    6     collective role on receivables, whatever was most

    7     convenient at that time, whoever was available to

    8     exercise.

    9          Q.   And did Takitik keep a list of the receivables

   10     that were outstanding?

   11          A.   They would have been associated with files of

   12     the records of any invoices.

   13          Q.   So say at the end of the month, was there any

   14     way for you to say, these are the outstanding bills for

   15     the month of September 2012?

   16          A.   Bills as in payables or receivables?

   17          Q.   Receivables.

   18          A.   On receivables, again, that's where we would

   19     reference back, and you know, keep notes and

   20     communication, whether it be maybe calendar reminders.

   21     Essentially, there would have been a working file that we

   22     maintained.

   23          Q.   So would you have to go to each individual

   24     client's file to determine if they'd paid a bill?

   25          A.   No.  There would be a general working file
```

64020ea4-12e2-480e-8d56-0be97680450a

Page 97

1    **until the receivables were closed out, then it would go**

2    **into a client file.**

3        Q.   Maybe I'm confused.  I'm just trying to figure

4    out, how would you figure out who hadn't paid their bill

5    at the end of the month?  How would that --

6        **A.   Yeah.  We would have a working file.**

7        Q.   Yeah.

8        **A.   So if I have ten people -- ten clients that**

9    **owed -- that I -- clients that I managed that owed money**

10   **to Takitik, when payment was received, I would then be**

11   **able to take the documentation of that and put it in that**

12   **client's file.**

13       Q.   But with over 200 files, I guess, I assume with

14   200 clients, would you then, every month, have to go

15   through every file to see who had paid and who had not

16   paid?

17       **A.   I did not have clients that owed me all the**

18   **time in 200.  I didn't have all 200 clients always owing**

19   **me or Takitik money at --**

20       Q.   But it was --

21       **A.   -- those times.**

22       Q.   -- the account manager's responsibility to

23   collect the money as well as deposit it?

24       **A.   To make a best effort, yes.**

25       Q.   So when a check is mailed into the office, did

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 98

1    someone make a bank run or do you each deposit your own

2    client's account?

3         A.   No.  Generally, it would be a centralized bank

4    run.  We tried to do things in the most efficient manner

5    possible with the resources that we had.

6         Q.   Was the Takitik bank account ever used for,

7    what I would say, personal businesses or purchases by

8    you?

9         A.   For personal?

10        Q.   Yes.

11        A.   No.  It would be associated to business related

12   matters.

13        Q.   And did, to your knowledge, Tim Herman or

14   anyone else use the Takitik business account for personal

15   use?

16        A.   No.

17        Q.   As far as the operation of Takitik, was there

18   any type of formal agreement between you and Mr. Herman

19   how the business was run?

20        A.   No.

21        Q.   As far as -- how about as far as sharing

22   profits or losses?  I mean, did you all have an

23   agreement, you get 50/50?

24        A.   That would have been determined at the end of

25   the year by the tax preparer, and it would have been

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 99

1      50/50.

2           Q.   And you all -- so I assume you each owned 50

3      percent of the stock, is that how it worked?

4           A.   There was never stock issued.

5           Q.   So it was just an agreement that you split

6      everything 50/50?

7           A.   Yes.

8           Q.   Okay.  And I know earlier you said, I think,

9      RJL Services provided some consulting services for

10     Takitik; is that correct?

11          A.   RJL Services provided services to Tim on --

12     with Tim as a representative of Takitik.

13          Q.   So --

14          A.   So he's continuing -- any investment into Tim's

15     continuing education and continued learning, continuing

16     understanding, would have been for the benefit of any

17     efforts that he conducted in business.

18          Q.   But I mean, the consulting by RJL is being

19     provided to an employee of Takitik; correct?

20          A.   To an officer of Takitik, correct.

21          Q.   And I'm using the word "consulting," so I want

22     to make it clear.  Other than RJL Consulting Services,

23     did any of the Lauria family members provide any other

24     types of services to Takitik?

25          A.   Formally, not that I'm aware of.  I believe

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 100

1       that ideas might have been bounced off as a result maybe

2       on a project if we were struggling at a point.  I have no

3       doubt that, at some point, that would have taken place.

4            Q.   And would Takitik have paid --

5            A.   It would have been RJL or XLM -- XLM Marketing

6       once they did their merger, but never a Lauria family

7       member.

8            Q.   Meaning an individual?

9            A.   An individual.

10           Q.   Did Snouthound -- I know you said you --

11           A.   I don't even know who it is.

12           Q.   Then obviously, they did not provide any --

13      that company did not provide any services to Takitik?

14           A.   That's correct.

15           Q.   How about Arnell, Inc.?

16           A.   Again, I have no knowledge of Arnell.

17           Q.   Do you know a woman named Susan Thomas?

18           A.   No.

19           Q.   And we had talked about a computer that you

20      indicated you thought Mr. Brignolo had possibly taken.

21      Is that a fair statement?

22           A.   I know of a computer that there was a police

23      report filed naming Tommy as --

24           Q.   All I'm trying to figure out, are there any

25      computers missing from Takitik, irrespective of who took

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 101

1    them?

2         A.   Are they missing?

3         Q.   Yeah.  Gone.  Stolen.

4         A.   Ultimately, upon the dissolution, part of the

5    dissolution agreement, those all -- Tim would have

6    received all the remaining assets, such as computers.

7    But I don't know that they're missing, other than the one

8    in question with Tommy Brignolo.

9         Q.   Let me clarify.  Other than -- upon the

10   dissolution of Takitik, to your knowledge, was any

11   computer misplaced, taken, or stolen --

12        A.   No.

13        Q.   -- from Takitik?

14        A.   No.

15        Q.   And how did you come to learn that Mr.

16   Brignolo may have taken this computer?

17        A.   We went into the office and Tommy quit without

18   notice and the computer was gone.

19        Q.   Okay.

20        A.   And he was the last person that we knew was in

21   the office.

22        Q.   And was it a laptop?

23        A.   It was a laptop.

24        Q.   And was it password protected?

25        A.   I don't know.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 102

```
 1            Q.   Who -- do you know whose laptop it was?

 2            A.   That -- should have been -- might have been an

 3      Image Marketing computer.  It might have been a Takitik

 4      computer, I don't know.

 5            Q.   Did Image Marketing and Takitik use the same

 6      computers?

 7            A.   With -- did they use the same computers?

 8            Q.   Yes.  In other words, if there was a -- I'm

 9      sorry.  Go ahead.

10            Q.   Tim Herman and his personal computer, the one

11      that he used for his laptop, the one that he used

12      personally, would have been used for both companies that

13      he had interest in as well as companies that I had

14      interest in, including Takitik, so yes.

15            Q.   Okay.  And approximately, how many desktop

16      computers did Takitik have?

17            A.   Takitik had -- Takitik had two desktop

18      computers.

19            Q.   And were those given to Tim Herman upon

20      dissolution?

21            A.   Correct.

22            Q.   And how many laptop computers did Takitik have?

23            A.   Takitik had -- would have had Tim Barber's

24      computer, and then my personal computer that I used for

25      Takitik.
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 103

```
 1            Q.   And what happened to those computers upon

 2      dissolution?

 3            A.   I still have --

 4            Q.   Both of them?

 5            A.   I believe so.  I believe Tim Barber still has

 6      that computer.

 7            Q.   Okay.  Tim Barber has it?

 8            A.   I believe so.

 9            Q.   Is it his computer or is it Takitik's computer?

10            A.   It would have been owned by Takitik.

11            Q.   Okay.  Did Takitik ever make any personal loans

12      to either you or Mr. Herman?

13            A.   Did Takitik make any personal loans?

14            Q.   Yes.  Or loans to you or Mr. Herman?

15            A.   No, Takitik, I don't believe, ever made loans

16      to us.

17            Q.   Did you or Mr. Herman make loans to Takitik?

18            A.   I've made capital investments in the company.

19            Q.   Do you know how much?

20            A.   I do not.

21            Q.   Do you know when they were made?

22            A.   I -- there would have been various times since

23      inception start-up.

24            Q.   Were these documented on any type of promissory

25      note or anything of that nature?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 104

1         A.    No.

2         Q.    Did Takitik use any what I would call outside

3    vendors for any -- in, I guess, providing of any of its

4    services, such as like a printer?

5         A.    Yes.

6         Q.    Can you tell me what outside vendors Takitik

7    used during the course of its business?

8         A.    Yes.  For printing, we used -- we started out

9    using International Minute Press.  Then we did the bulk

10   of our printing through Digital Propaganda.

11   Occasionally, we used online printers, such as Vista

12   Print, PS Print.  I don't know the exact ones, but those

13   types of printers.

14        Q.    And other than printers, did you use any other

15   type of outside vendors?

16        A.    Yeah.  We used a graphic design firm.

17        Q.    Who was that?

18        A.    That was Evolution Graphics.

19        Q.    Did you use any like web companies to design

20   web pages or anything of that nature?

21        A.    Yes.  We used Quest Solutions.  We used Sequent

22   Technologies.  And we used B to B Solutions.  The

23   aforementioned, Steve Tune, did some web development.

24        Q.    And if my notes are correct, you said that

25   Takitik did a product distribution; is that -- you said

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 105

1       we -- some product distributed -- you all distributed

2       some type of products?

3           A.    Correct.

4           Q.    What do you distribute?

5           A.    We distribute what we refer to as concept

6       cards.  Concept cards consist of a product called the

7       Kids Eat Free card.  The Dine For Less card.  We do

8       distribution of a Play for Less card.  We did

9       distribution of the Go Golf card.

10          Q.    And you also said -- and please feel free to

11      correct me if I'm wrong -- but you all did -- okay.  I

12      had you distributed your product and then I had concept

13      card.  So is that the only product you distributed is the

14      concept cards or did you distribute anything else?

15          A.    No.  No.  We also did collateral distribution

16      for clients.

17          Q.    What is "collateral distribution"?

18          A.    "Collateral" would be marketing pieces.

19          Q.    And I'm not -- what is a "marketing piece,"

20      like a brochure?

21          A.    That would be an example.

22          Q.    Or any advertisement the client wanted

23      distributed, is that what you would distribute?  Or do

24      you design --

25          A.    I think that would be fair to say.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 106

1          Q.    Okay.  Is it products that you all design and

2     print for the client or is the client giving you

3     something to distribute?

4          **A.    There were occasions where a product would be**

5     **designed on behalf of a client, and other times where**

6     **they would provide us with -- again, that's going to vary**

7     **client by client depending on their brand standards.**

8          Q.    And if you had to give an estimate, was most of

9     it -- was it 50/50 or was it we primarily delivered stuff

10    the client gave us, or can you give me any type of feel

11    for that?

12         **A.    I honestly can't.  I did not oversee that**

13    **piece.  The distribution of collateral services would**

14    **have been ultimately under Tim Herman.  And what I do**

15    **know is he was extremely good at his job, and I know that**

16    **there was a lot of collateral being distributed.**

17         Q.    All right.  Other than marketing pieces, is

18    there anything else that you all would consider

19    collateral distribution?

20         **A.    I mean, if you have something specific, I could**

21    **identify.**

22         Q.    I'm asking you about your business.  I don't

23    know what to ask you.

24         **A.    Again, it's a very broad scope.  If you have a**

25    **specific -- if you have a specific piece of collateral, I**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 107

1      can identify whether or not --

2            Q.   Do you have any knowledge, as the corporate

3      representative of Takitik, as to what you all -- what

4      marketing material you all collaterally distributed?

5            A.   Yes.

6            Q.   Could you give me ten examples of what you

7      distributed?

8            A.   Ten?

9            Q.   Yeah.  I mean, is it coffee mugs?  It is

10     baseballs?  What is it?

11           A.   We would -- we would distribute rack cards.  We

12     would distribute brochures.  We would distribute fliers.

13     We would distribute electronic communication messages.

14     We would distribute -- we would distribute gift bags.  We

15     would distribute pens, such as this one that we have

16     here.  We would distribute -- I don't know.  How many are

17     we at?  I mean, is that --

18                MR. SADAKA:  Six.

19     BY MR. BLAIR:

20           Q.   Anything else?

21           A.   I'm sure there was.

22           Q.   And was there any agreements between Takitik

23     and the clients as to what was distributed?  Where it was

24     distributed?

25           A.   Absolutely.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 108

1              MR. BRAND:  Wait a minute.  Repeat that.

2              MR. BLAIR:  I just asked if there was any

3        agreements between Takitik and any of these clients

4        as to what was distributed and where it was

5        distributed.

6              THE WITNESS:  Yeah.  Absolutely.

7   BY MR. BLAIR:

8        Q.   And you've seen signed contracts?

9        **A.   I've seen lots of signed contracts.**

10   **Absolutely.**

11        Q.   Is there what you would call a going rate for

12   distribution?  How is that priced?

13        **A.   Distribution is really, again, back to the core**

14   **of what we do, is we try to customize our products and**

15   **services based on the relationship with an individual.**

16   **And that can vary.  We might have -- if we're talking**

17   **specifically about distribution, we might have a client**

18   **that only needs distribution in a general area, maybe two**

19   **to five miles from an audience that they're looking to**

20   **speak to.  We would have larger clients, such a Simon,**

21   **where we had have a very broad reach, where they're**

22   **looking for a much greater critical mass and not as**

23   **finite as a singular general or specific area.**

24        Q.   How does that -- how does Takitik price, is it

25   done by stop, by mile, by item?

Page 109

1        A.    No, it's done through conversations, as I

2     mentioned earlier.  It's going to be done through the

3     conversations of the needs and assessments.  It's then

4     going to be our scope and our understanding of the

5     project.  We would make calculated estimates of what our

6     cost of doing business would be and figure out what is a

7     fair markup for that service that's being provided.  That

8     would be presented to a client, a client would either

9     accept or negotiate.

10        Q.    And does Takitik do collateral distribution for

11     other clients other than Simon?

12        A.    No.  Strike that.  Yes.

13        Q.    Who does it do collateral distribution for

14     other than Simon?

15        A.    We have relationships with our concept cards

16     where we will actually distribute on behalf of our

17     clients.

18        Q.    Are there agreements for collateral

19     distribution between Takitik and those clients?

20        A.    Yes.  Again, those would be scoped out in each

21     of those pieces.

22        Q.    Were you involved in any of the contracts, if

23     any, between Takitik and Simon Property Group for

24     collateral distribution?

25        A.    I'm sorry?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                            Page 110
 1           Q.   Were you involved in any of the contract

 2      formation between Takitik and Simon Property Group for

 3      collateral distribution?

 4           A.   On the contract formation?

 5           Q.   Yeah.

 6           A.   No.

 7           Q.   Do you know if there are any contracts in

 8      place?

 9           A.   My understanding was that Simon would issue

10      contracts, that signer would have been Tim for any

11      contracts for services.

12           Q.   You also said that Takitik did consumer hotel

13      delivery.  Can you tell me what that is?

14           A.   Yeah.  If we received an order from a consumer

15      direct, either over -- through our web site or over the

16      phone, they would have an option for a hotel delivery.

17           Q.   What would they be ordering?

18           A.   A concept card.

19           Q.   So somebody goes on the web or calls you and

20      says, I need a Dine For Less card, you'd take it to the

21      hotel?

22           A.   If that was the delivery option that they

23      chose.

24           Q.   Okay.  Do you know what Takitik charged for

25      that service?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                        Page 111

    1          A.   It varied.  Fluctuated based on correlated to

    2    United States Post Office services.  I believe, the most

    3    recent rate was $7.50 per.

    4          Q.   Would you just mail it?  I mean, when you say

    5    -- where are you getting the rate from?  What the post --

    6          A.   Well, we would look at other options that we

    7    had.  So there's US -- there would be a priority mail,

    8    there would be a standard mail delivery, there would be

    9    an option to pick up at one of our redemption centers.

   10          Q.   If you took it the hotel, what would Takitik

   11    charge?

   12          A.   I just said, 7.50.

   13          Q.   Anywhere in Orange County?

   14          A.   I'm sorry?

   15          Q.   Anywhere in Orange County or is that anywhere

   16    in the State of Florida?

   17          A.   It would cover Orange County.  It would cover

   18    -- I believe we had it listed on the web site any hotel

   19    in Orlando or Kissimmee I think is how we had it,

   20    Orlando, Kissimmee, or Lake Buena Vista, I think is how

   21    we have it listed on the web site.  However, if there was

   22    a customer a little bit outside of that realm, we would

   23    then make the assessment based on what was the best

   24    customer service response.

   25          Q.   Do you have any idea as to what was delivered
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 112

1          in the collateral distribution for Simon Property Group,

2          what was delivered on Simon's behalf?

3              A.   By whom?

4              Q.   Your company, Takitik.

5              A.   Oh, yeah.  Absolutely.

6              Q.   What did you all deliver on behalf of --

7              A.   We delivered fliers, brochures.  We delivered

8          bags, rack cards.  We delivered pretty much everything I

9          mentioned earlier to help you clarify what I meant by

10         collateral.

11             Q.   Let's talk about rack cards.  What's a rack

12         card?

13             A.   A rack card is a printed piece of collateral

14         that has some sort of consumer message on it.  And that

15         rack card would be given to different areas, where there

16         would be heavy populations of consumers.

17             Q.   Is it like when you go in the hotel and you see

18         all these little pamphlets in these little slots, is

19         that --

20             A.   That would be -- I'm not really the expert on

21         this.  I would classify that more as a brochure.

22             Q.   So --

23             A.   On what you're describing, there's different

24         types of --

25             Q.   Well, you tell me what your company did, how

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 113

1       about that?

2               A.   I just told you what --

3               Q.   Well, where did it go?

4               A.   It went to a list of upwards of 4 or 500

5       hotels, guest service desks, ticket booths,

6       restaurants --

7               Q.   Did --

8               A.   -- timeshare companies, resorts.

9               Q.   Did Takitik own those -- those racks that they

10      distributed the fliers in?

11              A.   They weren't always just in racks.  No.  We

12      utilized racks that were owned by Image Marketing.

13      Collateral was ultimately then given to individuals,

14      which was a large part of the representation, so there

15      would a concierge at XYZ hotel, a concierge that was

16      there, and we would make sure that they were informed of

17      all of the respectively current collateral being

18      distributed at that time.

19              Q.   So is it your testimony that every pamphlet

20      that was delivered to a rack in a hotel, the rack was

21      owned by Image?

22              A.   Not necessarily.

23              Q.   Okay.  And what I'm trying to figure out is if

24      it wasn't owned my Image, don't you have to have a lease

25      to put a pamphlet in that rack?

64020ea4-12e2-480e-8d56-0be97680450a

Page 114

1          A.    Not necessarily.

2          Q.    Did you keep a list of the racks that you owned

3    or that Image owned that you delivered to?

4          A.    Yes, I did have -- I was privy to the racks

5    that Image owned.

6          Q.    And do you have a list of that?

7          A.    I do have our master list with everything

8    including racks, and then also things that would have

9    been delivered to the individual desks.

10          Q.    And so is there a list that says something like

11    master rack distribution list?  How would I identify that

12    in your documents?

13          A.    I don't know.  I'd have to look at the

14    documents.  I don't know if it's coded specifically.

15    Again, these are aspects that would have been overseen by

16    Tim Herman.  I didn't babysit what he did.  I know what

17    he did was fantastic.  I know he did it well.  I know he

18    had a stellar reputation, and I imagine, no differently

19    than that.

20          Q.    But you just don't know what he did, I guess?

21          A.    I did not say that.

22          Q.    Well, then --

23          A.    I did not say that.  No differently than -- Mr.

24    Blair, no differently than your partners.  You don't -- I

25    imagine you don't babysit your partners and don't know

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                        Page 115

    1        every activity and how they conduct business.

    2             Q.   I want to know --

    3             A.   Is it fair to say -- is it fair to say --

    4             Q.   Sir --

    5             A.   Can I finish?  You asked me a question.

    6             Q.   You're asking me a question.  It's not my --

    7             A.   I'm not.  I'm saying -- I use that as an

    8        example.  Is it fair to say that I don't know everything,

    9        every second of every day of what my, you know, friend

   10        and business partner did in his role.  I know the general

   11        overview of what he was supposed to do.  I personally

   12        have jumped in and assisted and been on routes when we

   13        hit those ebbs and flows and we needed additional human

   14        resource support to deliver collateral.

   15             Q.   Do you know what hotels the collateral was

   16        delivered to?

   17             A.   Yes, I have that list.

   18             Q.   And how do I tell from that list in which

   19        hotels Image Marketing owned the racks?

   20             A.   I think you would have to default to Image

   21        Marketing to find out which ones they owned.

   22             Q.   Let's go back to the Kids Eat Free concept

   23        card.  How's that work?  Like what is it?

   24             A.   It's a card in which when a -- from a consumer

   25        perspective, when a consumer presents the card to a
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 116

  1        network of participating restaurants, and accompanied by

  2        a paying adult, that child eats for free.  They eat a

  3        child meal for free.

  4             Q.   Okay.  And how is it -- how does Takitik make

  5        money off of that?  How --

  6             A.   We have multiple models in which we distribute

  7        that card.  We have some clients that will pre-buy in

  8        bulk.  They will then, in turn, take those cards and

  9        possibly given them as gifts to their guests as a value

 10        ad.  We have clients that may use it as a value ad to

 11        specific products.  They might say, if you buy a Disney

 12        ticket, or you buy a Universal ticket, if you buy a Sea

 13        World ticket, if you make it a multi day, maybe we'll

 14        give you a Kids Eat Free card.

 15                  We have, through our distribution network, we

 16        have companies that will sell the card directly to the

 17        consumer as a reseller of the product in which we then

 18        fulfill on their behalf.  We have customers that may buy

 19        -- pre-buy and then re-sell.  So there's multiple,

 20        multiple ways that the card is used.

 21             Q.   Did Takitik sell or otherwise, I guess, provide

 22        Simon with any Kids Eat Free cards?

 23             A.   Did they provide Simon with Kids Eat Free

 24        cards?

 25             Q.   Was Simon and Takitik involved in that?
```

Dale Takio - 9/20/2012

Page 117

1          A.    Yes, Simon, absolutely.  Simon was a sponsor of

2     the Kids Eat Free card.

3          Q.    How did -- how did the -- you said there was

4     multiple models.  What model did Takitik and Simon

5     Property Group do for their Kids Eat Free cards?

6          A.    Simon wanted access to the consumers that we

7     were reaching.  They wanted to, ultimately for the

8     benefit of their tenant restaurants that were also

9     participating in our program, they wanted essentially

10    title listings to signify -- and actually, it was

11    specific to Florida Mall.

12              Where Florida Mall had a heading listing, then

13    a listing next to each respective restaurant for the

14    purposes of driving more business to Florida Mall versus

15    the other 100 plus restaurants that were participating

16    with the idea that they come to the mall, we have more,

17    and then hopefully foot traffic will turn into shopping

18    and spending more money.  So --

19         Q.    Correct me if I'm wrong, so basically, Simon

20    had their own kind of personalized Kids Eat Free card?

21         A.    No.

22         Q.    Okay.

23         A.    I just told you exactly.

24         Q.    Well, why don't you repeat it for me then

25    because I don't understand.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page  118

 1          A.    They had a listing on our card.  Each card was

 2      accompanied with a listing of the participating

 3      restaurants.

 4          Q.    Okay.

 5          A.    Simon had a defined listing, which then

 6      identified above and beyond a restaurant -- any other

 7      restaurant, virtually any other restaurant -- to signify

 8      that those restaurants were affiliated with Florida Mall.

 9      Rather than having this is the Florida Mall address, they

10      would say, this is at Florida Mall in the Florida Mall

11      area.

12          Q.    So I have never seen one of these, so bear with

13      me.  So basically, it's a card where all the other

14      restaurants are listed on there, but Florida Mall would

15      have their restaurants specifically identified as located

16      at the Florida Mall?

17          A.    Mr. Blair, it's my understanding that you guys

18      have over 40,000 documents.  I imagine you do your job

19      well.  I imagine that a simple Google search of the word

20      Kids Eats Free cards would populate hundreds, if not

21      thousands of pages of what the card is.  To obtain that

22      card with what you're spending, to accuse me, my friends,

23      my companies of things, I can't imagine that it would

24      have been a big deal for you to spend $20 to buy a Kids

25      Eat Free card to know exactly what it is.  I've defined
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 119

1     **and explained to you what that card is, so I've answered**

2     **your question.**

3          Q.   I appreciate your commentary and I'm going to

4     ask you again.  How is that -- what is the model? I don't

5     understand how that's the model for Simon.  So they would

6     just get a special listing on the card?  Is that

7     different from anybody else?

8          A.   **Yes.**

9          Q.   Okay.  So all I'm saying is that the

10    restaurants on their card would be identified as being

11    located --

12         A.   **No, it's on every one of my cards.**

13         Q.   Every one of your cards.  So what their special

14    deal was their restaurants were identified as located at

15    their mall?

16         A.   **Yes.**

17         Q.   Okay.

18         A.   **They would be able to have visual in front of**

19    **every single customer that they did not have access**

20    **through other traditional channels.  Their name would be**

21    **identified.**

22         Q.   Okay.  Now, how did the compensation structure

23    work for that?

24         A.   **Those were essentially negotiated based on the**

25    **value of service that they were receiving, and I believe**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 120

1    they were paid out quarterly.  I think they were.

2         Q.   You're telling me something about the value of

3    the services, but I just want to ask you:  What did they

4    pay to get those cards?  That's all I'm asking you.

5         A.   They didn't get the cards.  They paid for a

6    listing on my card.

7         Q.   Well, what did they pay?

8         A.   I don't know the exact numbers.  We can go --

9    you should have this.  Simon paid it.  You should have

10   all the exact numbers.

11        Q.   Sir, you're sitting here as the corporate

12   representative of Takitik --

13        A.   And you're asking me from over 200 clients and

14   thousands of transactions that have taken place to

15   identify an exact number to an exact transaction that

16   took place.  I cannot do that.  You have 40,000 documents

17   in your possession.  Simon paid for those transactions.

18   If you show me a document, which we've been asking for

19   since day one.  We've offered them to you.  We've made

20   appointments with you and your client to come to our

21   offices to inspect our documents, to inspect our

22   computers, to look at all of these things for over 13

23   months.  You and your clients have never taken us up on

24   that offer.

25             What I do know is those transactions that took

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 121

1          place, the work was definitively fulfilled.  And do a

2          simple Kids Eat Free card search and it will show you

3          where they were associated and how they were associated.

4          That's the best I can answer your question, because I

5          don't know what you're trying to ask.

6               Q.   So you don't know what my client paid for that

7          service?  That's yes or no.

8               A.   I don't know what the collective payment.

9               Q.   Were you involved in -- on one hand you keep

10         telling me you're not involved, it was Tim Herman's

11         client, he billed it.  Can you give me a level of

12         involvement you had with Simon Property Group?  I mean,

13         were you actively involved, [inaudible] involved, never

14         involved?

15              A.   No.  I absolutely would have been involved.

16         There would have been, again, times where, you know, we

17         needed additional, you know, we're in an industry, we're

18         in a tourism industry where there's ebbs and flows.  When

19         we have a lot of people in and collateral burns through

20         at fast rates, we need to replenish that collateral at

21         faster rates.  Rather than hiring people to come on just

22         for small periods of time, I absolutely would chip in.

23              Q.   Okay.  Is the Dine For Less card similar to the

24         Kids Eat Free, just doesn't apply to kids or something?

25              A.   It's an adult dining concept card.  It's a

Dale Takio - 9/20/2012

Page 122

1        percentage off of --

2               Q.   And did Simon participate --

3               A.    -- in that program.

4               Q.   How about the Play For Less card, what is that?

5               A.   Play For Less card is essentially a combination

6        of discounts to attractions, to spa services, to retail.

7        And yes, Simon did participate in that.

8               Q.   And do you know what they paid for that

9        service?

10              A.   They paid zero dollars.

11              Q.    Okay.

12              A.    We did not charge actual entities for

13       participating, for giving us an offer on the program.

14              Q.   Can you explain to me how that program worked,

15       the Pay For Less -- or Play For Less, excuse me?

16              A.   Play For Less.  Play For Less card is -- it's

17       used in multiple ways.  Internally, if a consumer comes

18       directly to -- to and purchases directly from Takitik, a

19       Play For Less card would be given for free as a value ad

20       to the Kids Eat Free card and/or the Dine For Less card

21       purchase.  We have, essentially, customers with the Play

22       For Less card that will distribute in similar ways.  It's

23       a value ad product.

24                   It's not designed -- we don't charge even -- it

25       was an investment that we made to enhance the value of

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 123

1      our portfolio to the ultimate consumer.  But we do not

2      charge consumers or businesses for the distribution of

3      that card.

4           Q.   Okay.

5           A.   And we also have an electronic version, so if

6      you want to go to playforless.com, you can download an

7      electronic version of the card.

8           Q.   What about the Go Golf card, did Simon partake

9      in that?

10          A.   No, they did not.

11          Q.   As far as getting into all the pricing and all

12     that, does Takitik have any type of pricing structure,

13     like a sheet for any of its services, whether it be

14     collateral distribution, concept card, or consumer hotel

15     delivery, like is there a pricing sheet?

16          A.   For the products?

17          Q.   Yes.

18          A.   Yes.  We've had evolving pricing sheets, yeah,

19     depending upon whether it be the volume that you buy if

20     you're pre-purchasing or a commitment if you're not going

21     to pre-purchase, if it was an annual commitment.  Again,

22     those would all be negotiated, then negotiated one on one

23     and finalized for any of the services that we were

24     providing on behalf of our clients.  We were not a one

25     size fits all.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 124

1            We were a, you know, we customized our business

2       to our clients.  So that would have first initially taken

3       place with what services do you think that we have that

4       are a value to you, what would you like us to do, let's

5       look at and expand on that scope or retract on that.

6       Then ultimately finalized by either a verbal or a formal

7       presentation.

8            Q.   Okay.  So again, I'm not trying to trick you.

9       So there is a general starting place pricing sheet and

10      then you work up or down from that depending on the

11      client, is that how it works?  Or is it all just

12      negotiated?

13           A.   Again, everything is ultimately negotiated.  We

14      did have pieces.  If I was soliciting a client for a Kids

15      Eat Free card, I might have general parameters of what a

16      Kids Eat Free card might cost that entity.  But again, it

17      depended on how they utilized that product.  If it were a

18      company that was willing to tie our product to a Disney

19      ticket, you buy an adult/child combo multi day Disney

20      ticket, well, I was able to say, well, that's a little

21      more valuable of a relationship than somebody who's just

22      going to put it up online, like Expedia, and sell it.  So

23      it really depended then -- it was a two-way street

24      depending on the efforts they were going to contribute

25      back.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 125

1           We had clients that would build in advertising

2      as well.  So they might have maintained a publication,

3      where they would then get further exposure for -- for the

4      benefit of everybody that was involved.

5           Q.   And then the client of Takitik that do the Kids

6      Eat Free card, is that typically a contractual

7      relationship, is there a signed contract like whatever

8      model you're using, is it all set forth in the contract?

9           A.   We do maintain some that are a handshake and

10     tell us what you sold and there's a level of trust there.

11     Again, it depends client by client where the comfort is

12     on both sides on whether it's maintaining a verbal

13     arrangement and/or a formalized.  There are certain

14     companies that we'll say, well, to do business with us,

15     it's our agreement, it's our terms, you sign off and

16     agree to those or we don't buy or sell your product, so.

17          Q.   And you gave me several models.  Are you able

18     to track if the customer sells or uses this card in any

19     way?

20          A.   If the customer sells?

21          Q.   I'm just trying to figure out --

22          A.   Define "customer."

23          Q.   Well, say Simon buys 100 Kids Eat Free cards.

24          A.   (Simultaneous speaking.)

25          Q.   Pay for a listing of 100 Kids Eat Free cards,

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 126

1       is there a way to determine if those -- how many Kids Eat

2       Free cards are utilized at the Florida Mall?

3               A.   Definitively.   Absolutely.

4               Q.   How?

5               A.   Each one of their restaurants would have

6       tracked that, because they would have had to have honored

7       that discount.   And to my knowledge, every single one of

8       the restaurants at Florida Mall that participated in the

9       Kids Eat Free card program since it's -- whenever,

10      maintained a point of sale system, which I explained to

11      you what a point of sale system was earlier for that

12      restaurant.

13              Q.   Does the customer give the card to the

14      restaurant?

15              A.   They would present it to the restaurant.

16              Q.   Okay.

17              A.   They don't give it to them.

18              Q.   Okay.   And then they --

19              A.   Because they want to use it again and that's

20      where the value is to the consumer.

21              Q.   Okay.

22              A.   So if they want to use it 100 times, they can

23      use it 100 times.

24              Q.   And there's a tracking number or something on

25      the card?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                  Page 127

  1          A.   At the beginning, there was not a unique

  2      identifier.  We did evolve and every card is serial

  3      numbered.

  4          Q.   And did --

  5          A.   Whether or not the restaurant tracks that

  6      serial number, that's up to their policies and

  7      procedures.  I don't know.

  8          Q.   So who -- the tracking is up to the restaurant;

  9      correct, or not -- I'm sorry, not Takitik?

 10          A.   It's insignificant to me.

 11          Q.   Okay.

 12          A.   What I want to hear from the restaurants is:

 13      you sent us a lot of traffic.  Awesome.  We're going to

 14      stay a part of this program.  But that's what would make

 15      the determination on how they calculate the value of a

 16      program.  We cool with another ten minutes?

 17              MR. BLAIR:  Sure.

 18              MR. BRAND:  Actually, I got --

 19              THE WITNESS:  Like the iced tea went through

 20          me.

 21              CAMERA OPERATOR:  We're off the record.  The

 22          time is 1:49.

 23              (Whereupon, a recess was taken at 1:49 p.m. and

 24          proceedings resumed at 1:59 p.m.)

 25              CAMERA OPERATOR:  Okay.  We're back on the
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 128

1          record.  The time now is 1:59.

2     BY MR. BLAIR:

3          Q.   Okay.  As far as the concept cards, especially

4     Simon -- as far as Simon Property Group goes, did -- did

5     -- were any cards ever -- I understand they were on the

6     listing, but did Simon ever purchase any cards that were

7     delivered to them?

8          A.   That were delivered to them, no.  However,

9     there were instances where cards were being given out to

10     charities, to organizations on their behalf.

11          Q.   So if I see a bill from Takitik for a Kids Eat

12     Free card, it would be for the listing that we talked

13     about?

14          A.   It would be for the listing.

15          Q.   Okay.

16          A.   However, that, I believe, in some instances,

17     would have included a block of physical cards to be not

18     distributed to Simon, to be distributed at will to expand

19     the name exposure of the Florida Mall.

20          Q.   And would it be distributed -- given to Simon

21     for them to distribute, or you all would distribute for

22     them?

23          A.   I just answered that.  It would not be given to

24     Simon, it would be distributed at our discretion to

25     expand -- to consumers, to charities, to organizations

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 129

1    for the effort of further penetrating that exposure of

2    the Florida Mall name.

3         Q.   And who made the determination of where that

4    distribution went?

5         A.   That would have been me.

6         Q.   Okay.  Can you give me some examples of where

7    you distributed those bulk purchases?

8         A.   They would have been relatively nominal,

9    generally in blocks of 1,000, though some of those would

10   have been given to organizations, such as Give Kids The

11   World, Back to School/Back to Health, which is an Orange

12   County based initiative for underprivileged children.  To

13   -- I believe we gave some to one for an eagle scout

14   project, if not mistaken, for a young gentleman that was

15   working on getting his eagle scout award, so those types.

16        Q.   And as far as the collateral distribution of

17   the marketing pieces, who delivered that to the

18   locations?

19        A.   That would have been a collective effort.

20        Q.   Okay.

21        A.   That would have been Tim Herman, Tommy

22   Brignolo, at times, I helped out.  Any other employees or

23   contractors of Image Marketing would also chip in.

24        Q.   Did --

25        A.   Deanna Mashburn.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 130

1         Q.    Would Deanna Mashburn deliver?

2         A.    She did.

3         Q.    How about Tim Barber?

4         A.    No, he would not have.  He only was related to

5    dealings of the concept cards.

6         Q.    How about Ms. Picanol?

7         A.    Ms. Picanol, yeah, there would have been times

8    that she would have.  Definitely.  Both her and Tommy

9    were bilingual and often we saw that as being useful.

10        Q.    Did your wife distribute any?

11        A.    Any collateral, no.

12        Q.    Did Denise Tucker?

13        A.    Denise Tucker would have.

14        Q.    And was there any set route for any of these

15   people to take to deliver?

16        A.    The routes would have been determined, again,

17   through the ebbs and flows of the business.  One of Tommy

18   Brignolo's primary functions was managing those routes,

19   putting together what logistically made the best sense or

20   the most efficient way to drive through those routes and

21   assign certain areas, certain specific hotels, certain

22   general areas, he would essentially assign those out.

23            However, we would, you know, continually

24   assist.  We had -- we utilized data that was collected by

25   Image Marketing on how things were returning in, because

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 131

1        collateral pieces often would have been associated with

2        an offer where individuals, concierges, guest service

3        reps, front line hospitality, valet, bellmen would give

4        that offer to their guest.  Those would then go back to

5        the respective client, those clients would then give

6        those for purposes of tracking, and there was essentially

7        a referral fee paid to the individual that brought that

8        consumer to that business.

9            Q.   And who was able to track the return of that

10       marketing piece, is it Takitik or the clients?

11           A.   Well, ultimately, I think it came back to the

12       client.  The client would have the ability to track.

13       Whether or not they made record of it or not, I can't

14       speak to that.  Then reconciling that would then go into

15       technologies owned by Image Marketing but utilized by

16       Takitik and all of its subsidiaries as well.

17           Q.   And how many marketing pieces had this ability

18       to track, I guess, the return of the marketing piece?

19           A.   I would collectively say millions.

20           Q.   Okay.  I mean, the offers that are out there,

21       there's millions of different types of offers?

22           A.   No.  There's millions of campaigns.  There

23       would be a campaign that would go out --

24           Q.   Okay.

25           A.   -- so for Simon, a campaign would go out with

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 132

1      an offer to receive a Simon gift booklet for $500 worth

2      of savings at the Florida Mall.  That individual would

3      bring that piece of collateral to the guest service desk

4      at the Simon property, they will then issue them the

5      book.

6          Q.   So Simon could track it by the book?

7          A.   Simon could absolutely track it.

8          Q.   And what I'm trying to figure out does Takitik

9      have any ability to track any of those types of things or

10     is it just the client?

11         A.   Well, no.  Because then, as I mentioned, Simon

12     would then take all those pieces of collateral, present

13     them back to the respective company --

14         Q.   Right.

15         A.   -- to figure out who's -- what individual is

16     owed.

17         Q.   The referral fee?

18         A.   The referral fee, correct.

19         Q.   Okay.  Who was in charge?  Was Mr. Brignolo

20     also in charge of making sure the deliveries, I guess, to

21     these respective hotels were done, the collateral

22     marketing pieces?

23         A.   On a day-to-day basis, yes.  And then Tim would

24     supervise him to make sure, you know, check in, whether

25     it was several periods throughout a day, whether, you

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 133

1    know, it was, you know, what'd you do this week, give me

2    a list of what you've done this week, what you've

3    accomplished, where we see a need to maybe shift.  Maybe

4    there's too much collateral in this area and we need to

5    put more focus and concentration on this area.  But

6    ultimately, that would have been a collective effort to

7    try and understand and make the best -- again, the best

8    efficient decision.

9        Q.   Did you have knowledge of what routes were

10   taken to deliver the collateral marketing pieces for

11   Simon?

12       A.   Yeah.

13       Q.   Can you give me an idea of what the routes

14   were?

15       A.   From a general point of view, we had -- the way

16   that we actually conducted, we would have South Florida

17   distribution, so we wouldn't go down just for South

18   Florida and come back to Orlando.  So we would

19   concentrate efforts based on the best analysis that we

20   could make to make it as efficient of a trip down to

21   South Florida.

22       Q.   I don't mean to interrupt you, but was there

23   somebody that was like specifically in charge of that

24   area as a general rule?

25       A.   No.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 134

```
 1            Q.   So in any given day --

 2            A.   Depending on the resources and what was

 3      available.

 4            Q.   Okay.  And then what were some of the other

 5      routes?  You said generally that was one.

 6            A.   We would have -- sometimes we would have a

 7      concentration in Lake Buena Vista.  Sometimes we would

 8      have a concentration in just the I-drive area if we knew

 9      that there was a big convention coming in.  We look at

10      other environmental factors that were taking place with

11      the information that we had on hand.

12            Q.   Did you deliver any to North Florida?

13            A.   To North Florida?

14            Q.   Like Tallahassee.

15            A.   No.

16            Q.   Pensacola?

17            A.   No.

18            Q.   Jacksonville?

19            A.   Jacksonville, I believe that there was

20      sometimes Jacksonville was included.  It was not a

21      primary tourism traffic driver, so collateral seemed --

22      typically, it would last longer.

23            Q.   How about the Tampa area, was that on a route?

24            A.   Tampa, absolutely.

25            Q.   About Southwest Florida, Naples, Ft. Myers?
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 135

1          A.    Naples, we would have -- we internally would

2     have classified that as essentially West Florida or

3     Tampa.  We would have lumped that in because it's

4     geographically --

5          Q.    And was that one of the routes?

6          A.    That would have been in routes.

7               (Whereupon, a document was marked as

8          Plaintiff's Exhibit D for Identification.)

9     BY MR. BLAIR:

10          Q.    We already talked about some contracts with

11     Takitik and I just want to show you -- there's two of

12     them.  Two contracts, one marked Exhibit D and one marked

13     Exhibit H, and ask you if you've ever seen either one of

14     those documents?  Oh, excuse me.  We're going to delete

15     Exhibit H, it was the same contract twice.  And ask you

16     if you've ever seen Exhibit D before?

17          A.    I have seen this when it was produced in some

18     of the legal correspondences.  And at that point, when I

19     saw it for the first time, I had identified this as a

20     forged signature.  It is not my signature.

21          Q.    That's my next question, it's not your

22     signature.  Did you have any -- although you haven't

23     signed it, I need to ask you:  Did you have -- prior to

24     production, have you ever seen this contract before?

25          A.    I don't -- there's a lot of words in there.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 136

1      I've seen similar type formats to that, but no, I've

2      never seen that document with that signature on it,

3      absolutely not.

4          Q.   Did you ever sign any contracts between Takitik

5      and --

6          A.   I did not personally put my signature on

7      contracts between Takitik and Simon.

8          Q.   Do you know whose signature or who you believe

9      forged your signature?

10         A.   I -- I imagine it could be anywhere from your

11     CMO to you, Mr. Blair.  I have no idea.  I know it's not

12     me.

13         Q.   Did you see any of these -- a copy of this

14     contract in the documents that you're going to be

15     producing in response to the request to produce?

16         A.   No, I did not.

17         Q.   As far as Takitik, other than RJL Services, it

18     was your testimony that none of the Lauria members did

19     any type of work for Takitik; correct?

20         A.   The Laurias as individuals?

21         Q.   Yes.

22         A.   Correct.  No.

23         Q.   Would there be any reason to pay then any of

24     the Laurias?  Like would Takitik be issuing any payments

25     to the Laurias?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 137

1          A.     Absolutely not.

2          Q.    Let me show you --

3          A.     Strike that.  We did buy a vehicle off of --

4     off of the Laurias.  That was the only transaction that

5     went to an individual.

6               (Wherepon, documents were marked as

7          Plaintiff's Exhibit E and Plaintiff's Exhibit F for

8          Identification.)

9     BY MR. BLAIR:

10         Q.    And would checks E and F, is that what those

11    are for?

12         A.    Yes.  Correct.  To purchase the van from them.

13         Q.    And is that your signature on the check?

14         A.    That is my signature on the checks.  As you can

15    see, quite different from the other signature.

16               (Wherepon, a document was marked as

17         Plaintiff's Exhibit G for Identification.)

18    BY MR. BLAIR:

19         Q.    As far as -- I also saw a check that I'm going

20    to show you as Exhibit G.  It's from Takitik, Inc. to

21    Takitik, Inc. for 55,000.

22         A.    Correct.

23         Q.    Is that your signature?

24         A.    Yes, it is.

25         Q.    What is that check for?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 138

1          A.    That was essentially settled distribution

2     during the initial proceedings of our dissolution

3     agreement with -- or my dissolution agreement with Tim

4     Herman.

5          Q.    You earlier testified you got the money,

6     basically, and he got the computers and the equipment, is

7     that how it went?  What was the terms of your dissolution

8     agreement?

9          A.    Well, there were many terms in the dissolution,

10    but basically, in a nutshell, I'm going to go do what I

11    specialize in and what I'm great at, which is all these

12    concept cards and building these networks and these

13    pieces that I built up over my career, and Tim was going

14    to go and do what he was best at, which was distribution

15    and representation and those types of services.  But

16    ultimately, it was determined between the two of us, that

17    Tim was ahead of me in the game, because it was mid-year

18    and we hadn't closed out any books at that point.

19         Q.    So did Mr. Herman get a check as well from the

20    dissolution?

21         A.    He would have gotten a series of checks

22    equivalent to that amount.

23         Q.    Okay.  It was before lunch, so I can't remember

24    if I asked you this:  Is the dissolution agreement in

25    writing?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 139

1          A.   Yes.  And also, part of those assets would have

2     been the van would have gone to him as well.

3          Q.   Okay.  What type of -- other than the

4     collateral distribution of marketing pieces and the Kids

5     Eat Free concept card, what other services did Takitik

6     provide to Simon Property Group?

7          A.   I'm sorry?

8          Q.   What other services besides the Kids Eat Free

9     card and the collateral distribution of marketing pieces

10    did Takitik provide to Simon Property Group?

11         A.   Takitik would have attended trade shows,

12    events, social mixers, organizational representation on

13    their behalf or with their -- in conjunction with them

14    and their team members as well.  So sometimes it was just

15    no Simon employees at the events or trade shows or et

16    cetera, sometimes their teams were there as well.

17         Q.   And who attended the trade shows on behalf of

18    Simon from Takitik?

19         A.   I've personally attended probably about, I

20    think, three or four trade shows.  I've attended, I mean,

21    dozens upon dozens of mixers, organizational events,

22    galas on behalf of Takitik for Simon.  One of the trade

23    show routes having to do with client bases, that

24    typically would have been Tim Herman.  I typically would

25    have attended trade shows specific then for any other

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 140

1        trade shows would have been specific to our participation

2        under the concept cards.

3            Q.   Do you recall where the trade shows were that

4        you attended?

5            A.   Yeah.

6            Q.   Where?

7            A.   I attended Florida Huddle, I believe, twice.  I

8        believe one was in Orlando.  The other location,

9        Clearwater or St. Pete, I'm not -- in that general area.

10       I don't remember exactly --

11           Q.   Florida?

12           A.   -- where it was.  Yes, in Florida.

13           Q.   Okay.

14           A.   I attended sales calls on behalf of Simon on

15       two occasions in the UK.

16           Q.   Okay.  On two occasions?

17           A.   Yeah, I've been to UK twice, I believe.

18           Q.   Did you ever go to like the Caribbean or

19       Central or South America for Simon?

20           A.   No.  That would have been Tim.  Tim and Tommy.

21       Tommy, again, fluent in Spanish, he would have been an

22       asset.

23           Q.   Okay.

24           A.   Just worked out.

25           Q.   And other than the Florida Huddle, those two

Dale Takio - 9/20/2012

Page 141

1    shows, did you call it sales call in the UK, are there

2    any other trade shows that you attended?

3         A.   I attended trade show -- yes.  I've attended

4    trade shows at Crowne Plaza, at Regal Sun Hotel.  Those

5    would have been hospitality trade shows.

6         Q.   Are those local?

7         A.   Yes, those are local.  Local in Orlando.

8    Generally, when it came to trade shows on behalf of Simon

9    with my participation, it would have been local with the

10   exception of the two times that I represented the

11   corporation for -- in the UK.

12        Q.   Do you attend similar type trade shows for

13   other clients, other than Simon?

14        A.   Yes.  I have in that capacity, through some of

15   the Takitik responsibilities to Image Marketing on behalf

16   of their clients.  I've attended many trade shows for

17   companies such a Boggy Creek Air Boats, Florida Dolphin

18   Tours, the Orlando Magic.

19        Q.   Like, for example, sales call in the UK, have

20   you been to that trade show for anyone other than Simon?

21        A.   Well, sales calls would not have been trade

22   shows --

23        Q.   Okay.

24        A.   -- that I attended.

25        Q.   Well, what's a sales call?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 142

```
 1            A.   A sales call would essentially be going over,

 2       you know, in this instance -- or these two instances when

 3       I went to UK, would be going over to -- well, the first

 4       time was a lot more expanded.  It was going doing client

 5       visits.  So with companies such as Thomas Cook, which is

 6       an international tour operator that sends a lot of

 7       traffic to Florida.  There would have been companies such

 8       as Attraction World.

 9            There would have been -- I don't know the whole

10       listed itinerary of where we went.  At that point, part

11       of the responsibilities that I had on behalf of Simon

12       would be to speak to the programs that they have in

13       place.  Ultimately try and establish a relationship so

14       they could distribute their collateral as well.

15            Q.   Have you done similar type sales calls for

16       other clients in the UK?

17            A.   Oh, yes.  Yes.  Yes.

18            Q.   Do you recall who they were?

19            A.   The first one, actually, Boggy Creek, was in

20       attendance as well, so I acted in a dual role.  So part

21       of a discussion with a vendor would be, okay, let's talk

22       about this client, and then she, as a representative, I

23       would then be there to support her initiatives.  I

24       believe Orlando Balloon Rides was another one that was in

25       attendance on that trip.  The second trip was more of a
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 143

1          strategy sales call, and that was individually with Hat

2          Marketing, LTD.

3                Q.   Do any of the client representatives ever go

4          with you on these trips or do you go by yourself?

5                A.   I'm sorry?

6                Q.   Like I -- you go over there to the UK to

7          basically talk to the tour operators about your clients

8          back in the US?

9                A.   Yeah.  Uh-huh.

10               Q.   Do you take anyone from, for example, Simon

11         with you or do you take anyone from Boggy Creek Air Boats

12         with you?

13               A.   Yeah.  As I said, I actually flew over with

14         Margie Long from Boggy Creek to that event.  I don't know

15         that I would say that I took her along.

16               Q.   Well, I'm -- did anyone go with you?

17               A.   Yes.  Margie Long, in that instance.  Jason

18         Shulkey [phonetic] of Orlando Balloon Rides, I believe he

19         had other initiatives where he was already in UK and then

20         joined up with us because their founder is based in the

21         UK.

22               Q.   When you went for Simon, did anybody go with

23         you or attend with you from Simon Property Group?

24               A.   No.

25               Q.   As far as like a -- the Florida Huddles, what

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 144

1      are those?

2           A.    Florida Huddle is a trade show in which the

3      format is set as such, there are what are considered

4      suppliers and -- suppliers, and I'm not sure if they

5      refer to them as distributors or buyers.  So a buyer may

6      be somebody like Thomas Cook, a tour operator in the UK.

7      A supplier would be somebody like Simon.  We have

8      something that you want for your customers.

9                At those formats, at Florida Huddle, the

10     Florida -- the people that organize Florida Huddle allow

11     the ability for suppliers to be matched up with buyers.

12     I mean, there's literally thousands of vendors at these.

13     So there's a matter of over a two, three day period,

14     however long it is, trying to match up meetings.  The

15     prior -- I'm sorry, the buyers have first right of

16     refusal to accept or deny that meeting.

17                A supplier, which would be anything that we did

18     on behalf of any client or the actual client, would then

19     have to try and win that meeting with Thomas Cook.   So

20     if Thomas Cook can only take 36 meetings, but there's

21     thousands of possible people, products to buy or

22     distribute, the idea is to get that meeting with them, to

23     then -- relatively short meetings, I believe they're

24     about 15 minutes per client, on that format, I could be

25     off by a few minutes, maybe it's 20 minutes, within

64020ea4-12e2-480e-8d56-0be97680450a

Page 145

1        there.

2                It's a matter of giving the high end level

3        elevator idea, elevator pitch so to speak, of why would

4        we want to do business together.  To then set it up where

5        those relationships can then be solidified between those

6        two parties.

7            Q.   What about a mixer, what would you typically do

8        at a mixer for Simon Property Group, what kind of

9        services?

10           A.   Well, I mean, Image Marketing held a monthly

11       mixer on behalf of Simon Property Group where they

12       sponsored it for primarily industry professionals to

13       bring industry -- synergistic industry professionals

14       together for the purposes of conducting business in a

15       social environment.  Essentially, after hours, let's do

16       business together.

17           Q.   Hobnob?

18           A.   Hobnob.  I think that's a fair assessment.

19           Q.   I've got one right today.

20           A.   What's that?

21           Q.   I've got one right today.

22           A.   There you go.  Even a broken clock is right

23       twice a day, so you got one more.

24           Q.   You said something about the Crowne Plaza and

25       the Regal Sun at the hotels, what were those functions?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 146

1          A.   Those would have been trade shows in a little

2     different format.  Hospitality trade shows.  So

3     hospitality trade show would be for front line

4     hospitality.  That's a loose term that we use for, again,

5     concierges, guest service, reps, bellmen, people that had

6     direct one-on-one interaction with a consumer and can

7     influence, either from their respective location on

8     property, influence the dollars spent and where they

9     went.

10          So specific to Florida Mall, well, we want

11     every one of thousands of concierges that we worked with

12     or front line hospitality reps to say, go to the Florida

13     Mall, don't go to Mall of Millenia.  Keep us top of mind.

14     At that -- let me -- I guess the question was the trade

15     show itself.  At that trade show, what we would do is the

16     idea was to get the individuals to then visit every

17     single exhibitor at the trade show.  So now, again,

18     reinforcing that -- that top of mind learning experience.

19          These are things -- new things that are going

20     on at the Simon properties, so here's an opportunity for

21     us to have a face-to-face, where the clients would have

22     an opportunity to also have that direct interaction.

23          Q.   It was explained to me that essentially Simon

24     and other, I guess, vendors would have tables or booths

25     there and the concierges would basically go around and

64020ea4-12e2-480e-8d56-0be97680450a

Page 147

1        visit with them, is that basically it?

2            A.    Yeah.  Yeah.

3            Q.    Okay.

4            A.    I mean, that's a very simplified version of it,

5        but yeah.

6            Q.    As far as the mixers, the trade shows, and this

7        the -- you just described at the hotels, is there a what

8        I would call a standard rate that you would charge

9        clients for those types of things?

10           A.    It depended on their level of involvement.

11       Yeah.  If somebody was just having, you know, if somebody

12       just had a booth there, yeah, and didn't have any other

13       exposure or sponsorship, ultimately, the idea was to -- I

14       mean, because there were other associated costs with just

15       that space.  There was the communication, the

16       invitations, there was getting the people there, actually

17       marketing the event.  As far as those cost tables, I

18       honestly don't know how those worked.  I never -- I never

19       held a trade show.  You know, I participated in those

20       trade shows, so I don't know how the pricing scale would

21       have worked on that.

22           Q.    Well, how about like the sales calls, I mean,

23       do you bill hourly for those to fly over there or do you

24       bill a standard rack rate to every client that wants to

25       go over there?  How does that work?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 148

1          A.   Again, with everything it would be, you know,

2     what is the ultimate objective of why I'm going anywhere?

3     It wasn't an hourly.  I mean, I would love for it to be

4     an hourly rate, that'd be great.  Put me on a plane and

5     pay me to -- that's what lawyers get to do.  I don't get

6     to do that.

7          Q.   What I'm trying to figure out, how do you

8     determine what to charge Boggy Creek or Orlando Balloon

9     or Simon for going over there?  I mean, how is that

10    determined?  I'm not trying to -- do you just pick

11    something out of air?  Do you say, I'm going to spend

12    eight hours for you and only four for you?

13         A.   Again, it goes to the scope of what the

14    expectations are.  You know, I mean, that's going to

15    bounce back and forth.  Obviously, I want -- you know, I

16    want to do as much work as I possibly can.  You know, I

17    want to fill as much time as I possibly can.  However,

18    they might say, well, wait a minute, you know, maybe

19    let's dumb down some of the services that we need on your

20    behalf.  I don't need you to negotiate everything that

21    we're doing, that's why I'm here.  You know, I think I

22    can speak to my company in this setting, in this

23    situation on behalf.  So again, it would have depended on

24    how and why.

25         Q.   And are your scopes of services for going over

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 149

1     there in writing with these people, the clients you went

2     over there for, Boggy Creek, Orlando Balloon, and Simon?

3          A.   I'm sorry?

4          Q.   Are those scopes of services that you

5     negotiated with these clients, are those in writing?

6          A.   That, I don't know.  With Boggy Creek and

7     Orlando Balloon Rides, they were clients --  I'm sorry,

8     they were clients of Image Marketing.  Well, part of

9     Takitik's responsibilities under the consulting agreement

10    to Image Marketing was assisting them with some of these

11    efforts.  So I would have had -- Takitik would have had a

12    fiduciary responsibility to Image, not necessarily to

13    that client.  They would have negotiated that directly

14    with Image Marketing.

15         Q.   And you would have just billed Image Marketing

16    for your time and Image would have billed the client for

17    the deal they cut?

18         A.   I don't know that we necessarily would have

19    itemized it that finite.  Again, we were a bunch of

20    friends doing business together.  I mean, ultimately, my

21    scope and responsibilities under Takitik were covered

22    under a contractual retainer fee.  So sometimes, you

23    know, there wasn't a lot of need for me and I'd only have

24    to dedicate 20 hours a week to Image Marketing efforts.

25    Other times, it was 80 hours a week that I was defined

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 150

1        under that contract that Takitik maintained with Image.

2            Q.   So there's a contract between Takitik and

3        Image?

4            A.   Correct.

5            Q.   Did Takitik, on behalf of Simon, ever place any

6        ads in magazines?

7            A.   To my knowledge, no.

8            Q.   Did Takitik ever provide any sales training to

9        Simon Property Group?

10           A.   Sales training to them?

11           Q.   Yeah.

12           A.   I don't understand what sales --

13           Q.   I just saw it on a bill.

14           A.   Like who?

15           Q.   I don't know what it is, I just saw it on a

16       bill.

17           A.   Do you have the document so I can understand

18       the relevance of -- or the significance of what you're

19       saying or the definition of what you're saying?

20           Q.   And --

21           A.   Is there some way he can get me coffee?  Is

22       that okay?

23                MR. BRAND:  Sure.

24                MR. BLAIR:  Let's go off for a second.

25                CAMERA OPERATOR:  We're off record.  The time

64020ea4-12e2-480e-8d56-0be97680450a

```
                                                        Page 151

  1            now is 2:30.

  2                  (Whereupon, a recess was taken at 2:30 p.m.

  3            and proceedings resumed at 2:40 p.m.)

  4                  CAMERA OPERATOR:  Okay.  Back on the record.

  5            The time now is 2:40.

  6                  (Whereupon, documents were marked as

  7            Plaintiff's Composite Exhibit H for Identification.)

  8      BY MR. BLAIR:

  9            Q.   Mr. Takio, I showed you what's been marked as

 10      Exhibit H and it's a series of Takitik, Inc. invoices.

 11      And just so we have a clear record, I'm going to read

 12      them in, a Bates number on the lower right-hand corner to

 13      make sure we're looking at the same document.  It's

 14      SPG01428, SPG01450, SPG01451, SPG01462, and Takitik00008,

 15      Takitik00015, and SPG01460.  Do you see those?

 16            A.   I do.

 17            Q.   Okay.  Have you seen these invoices before or

 18      do you recognize them?

 19            A.   This looks like a form of invoicing that Tim

 20      Herman would have used for invoicing.

 21            Q.   And did all the invoices for Takitik look the

 22      time?  I mean, in other words, does this look familiar to

 23      you?

 24            A.   Well, again, I think we already addressed that.

 25      We had different formats for different clients.  This
```

Page 152

1      looks consistent with --

2          Q.   Simon Property Group?

3          A.   Well, no, on Tim Herman and how he issued

4      invoices to clients.

5          Q.   At the top, it says, salesperson D. Tako.  Is

6      there any D. Tako?

7          A.   No.  I don't know what that's in reference to.

8          Q.   And it's a bill for -- SPG01428, which is an

9      invoice number 105, dated May 16, 2008.  It is for

10     Powerpoint presentations for the following, it's billed

11     from Takitik to Simon Property Group for sales training.

12     Are you aware of any sales training that Takitik does for

13     Simon Property Group?

14         A.   Absolutely.

15         Q.   Okay.  What do they do?

16         A.   That would be educating concierges.

17     Concierges, for example, Expedia Local Experts, a

18     division of Expedia, they're a guest service company.

19     Expedia Local Experts, we would regularly conduct new

20     hire training and that sales training, I would imagine,

21     refers to teaching them, here are the benefits of that

22     program.

23         Q.   Do you know if that's what you did on this

24     invoice?

25         A.   I did not do those services, no.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 153

1         Q.   So I know you're giving me an example of

2    something you might do.  Do you know if that was done on

3    behalf of Simon Property Group?

4         **A.   I have no reason to believe that any work for**

5    **Simon was not completed.**

6         Q.   But do you have knowledge, personal

7    knowledge --

8         **A.   To my knowledge, every bit of work that was**

9    **assigned to Takitik was completed.**

10        Q.   But my question is:  Do you have personal --

11   this is a Powerpoint presentation.  Do you see that?

12        **A.   Yes, I see the Powerpoint presentation.**

13        Q.   Have you ever seen that Powerpoint

14   presentation?

15        **A.   I have not seen that Powerpoint presentation in**

16   **reference.**

17        Q.   Is it in the production you're going to give to

18   me?

19        **A.   No.  It would not be something that would have**

20   **been in my possession.**

21        Q.   So you have not seen this Powerpoint

22   presentation and do you know definitively that it was

23   presented?

24        **A.   I don't know what that Powerpoint presentation**

25   **is.  I mean, I've seen lots of Powerpoint presentations,**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 154

1       so I don't know which one specifically that's referring

2       to.

3               Q.   Do you recall attending a Powerpoint

4       presentation on behalf of Simon Property Group?

5               A.   I did not.

6               Q.   It also mentions financial training.  Do you

7       see that?

8               A.   Yeah.

9               Q.   We earlier talked about financial training and

10      you told me, what type of financial training, so here it

11      is.

12              A.   Well --

13              Q.   So what'd you --

14              A.   -- now in context, I would imagine that that

15      has to do with, you know, itemizing out some of the

16      scope.  We have to talk about how referral fees take

17      place, because there is a financial transaction that

18      takes place ultimately when a guest service rep refers

19      business on behalf of Simon.

20              Q.   You said you "imagine."  Do you know that

21      that's what that financial training was?

22              A.   In this context, that's the only --

23              MR. BRAND:  Let me object.  You're asking him

24              about an invoice he says he didn't go to and doesn't

25              know, so.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 155

1           MR. BLAIR:  That's why I want to know how he

2       knows all about it.  I don't know.  That's what I'm

3       saying.  I don't know.  How's he know?

4           MR. BRAND:  He's already answered the question

5       now like the sixth time.

6   BY MR. BLAIR:

7       Q.   Well, I know, but I don't know if you're

8   guessing or you know this was done.  Because as Mr. Brand

9   just said --

10      **A.   Those are two different questions though.  So**

11  **you know, ultimately, the question:  Do I -- I have no**

12  **reason to believe that any person in my company would not**

13  **have completed the work that they said they completed.**

14      Q.   I understand you have no reason to believe.

15  But I'm asking you, do you have proof --

16      **A.   I do not remember this --**

17      Q.   Do you have proof that it was done?

18      **A.   Do I have personally have proof?**

19      Q.   Yes.

20      **A.   No, I do not.**

21      Q.   Okay.  PR training, do you know what that

22  stands for?

23      **A.   Public relations.**

24      Q.   Okay.  Do you know what type of training that

25  was?  I don't want you to guess.  I'm saying, do you

64020ea4-12e2-480e-8d56-0be97680450a

Page 156

1       know?

2            A.   To -- specific to this?

3            Q.   Yes.

4            A.   PR training that we would have conducted or PR

5       education would have been, again, public relations.  If

6       Florida Mall is having a concert at their property, if

7       they're having a fashion show at their concert, the

8       public relations events that are taking place or

9       activities that are taking place, would refer, in the

10      context of our company, to those -- to public relations.

11           Q.   And do you know who put on this seminar?

12           A.   I'm sorry?

13           Q.   Do you know who put this seminar on?

14           A.   That should have been Tim Herman or Tommy

15      Brignolo.  It would have fallen on their

16      responsibilities.  Which one attended --

17           Q.   You don't know?

18           A.   -- that presentation, I don't know.

19           Q.   Do you have any skill or experience in pricing

20      Powerpoint presentations for Takitik?  There's a unit

21      price here.

22           A.   Do I have experience in it?

23           Q.   Yes.

24           A.   I've created Powerpoint presentations and done

25      presentations before.  Again, that varies.  I've had

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 157

1    clients where part of what was maybe negotiated at the

2    end was, okay, well, we want a Powerpoint presentation

3    summarizing the cumulative efforts of that exercise.  So

4    yes, I have experience in it.

5         Q.   I mean, if I wanted to figure out what Takitik

6    charged other clients for Powerpoint presentations, would

7    there be a way I could do that?

8         A.   You would have to ask me about a specific

9    client and a specific instance.

10        Q.   Do you recall any Powerpoint presentations that

11   you have done for specific clients?

12        A.   Absolutely.

13        Q.   Can you give me the names of some of them,

14   please?

15        A.   I presented a Powerpoint presentation to

16   eBrands.

17        Q.   To eBrands?

18        A.   I presented Powerpoint presentations to our

19   guest service companies.  I presented them to Expedia.  I

20   presented them to Marriott.  I presented to -- I

21   presented many Powerpoint presentations.

22        Q.   And do you recall if any of them were $250 per

23   unit?

24        A.   I do not -- again, I don't recall specifics.

25        Q.   The next invoice is SPG01450 dated April 1,

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 158

1     2010.  It reads invoice 3101.  Do you see that?

2          A.  I do.

3          Q.  Before I go any further, how is the invoice

4     numbering system done at Takitik?

5          A.  Again, I mean, I imagine that Tim had either a

6     sequential or a methodology associating to --

7          Q.  Do you know what it is?

8          A.  No, I don't know what his --

9          Q.  Do you have a numbering or methodology of how

10    you number your bills?

11         A.  Some instances, an order form would not be

12    numbered, however, an invoice would be numbered.  That

13    would vary by client.  Some clients like it in a format

14    where that invoice number corresponds with the date of

15    the transaction taking place or the billing taking place.

16         Q.  Okay.  This invoice says, Dale Takio.  Do you

17    see that?

18         A.  I do.

19         Q.  Did you -- were you the salesperson for --

20         A.  I was not the salesperson.

21         Q.  Do you know why it's on there?

22         A.  I do not.

23         Q.  Do you know who put it on there?

24         A.  I can only imagine that Tim Herman put that on

25    there, because he's the only other person that would have

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 159

1       created an invoice (inaudible) to sign it.

2            Q.   It says, hotel rack distribution May 2010.  Do

3       you see that?

4            A.   I do.

5            Q.   Is that for what we talked about earlier, you

6       would put in some type of media piece, some type of a

7       rack at a hotel?

8            A.   At a rack or sometimes we would internally, if

9       it wasn't a physical rack.  Some companies did not allow

10      a physical rack to be placed.

11           Q.   Okay.

12           A.   So a Ritz Carlton is not going to allow a rack,

13      so that rack would be considered, you know, their filing

14      -- the representative's filing system.

15           Q.   Do you know how the rack distribution or the

16      racks work in hotels?

17           A.   Yeah.

18           Q.   Okay.  If Image Marketing did not own the rack,

19      how would you be able to put a pamphlet in there for

20      Simon Property Group?

21           A.   Well, again, I mean, it depends on -- there's

22      many racks owned by many different companies even in the

23      same hotel.

24           Q.   Okay.

25           A.   You might go to a resort, there might be five

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 160

1        different companies that own racks in there.

2              Q.    Okay.  How would you get into any of those five

3        racks?  Could you just place your pamphlet in there?

4              A.    No.

5              Q.    What do you need to get in that rack?

6              A.    You basically need their permission to get into

7        that rack.

8              Q.    And don't they lease those little spaces?

9              A.    Not always.

10             Q.    They're free?

11             A.    Sometimes.  Sometimes they are.  Again, I know

12       that, you know, again, through relationships, we're a

13       community of friends all trying to customize our

14       businesses for each other.  There's a lot of times mutual

15       benefit to each other.  I know that -- what I know first

16       hand was I know that Kenney communications, who owns

17       racks, often allowed, you know, if they had an empty

18       space that wasn't being used, well, okay, they would

19       allow anyone of the entities, many of their partners to

20       utilize that space.

21             With regard to racks that you don't need --

22       that -- where it's not a third party company owned, that

23       would be, things like that hotel, owns that desk, or that

24       guest service company owns that desk, and their filing

25       system would be considered a rack as well.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 161

1          Q.   So to get --

2          **A.   It's a relatively broad term.**

3          Q.   So how do you know what hotels you can put your

4     stuff in or deliver Simon's stuff to and which ones you

5     don't?  Is there -- do you have a list?

6          **A.   Yeah, we have a list.  I mean, that's what we**

7     **did.**

8          Q.   And this one right here, it says -- you're

9     familiar with the Florida Mall; right?

10         **A.   I am.**

11         Q.   It's here in Orlando; right?

12         **A.   Correct.**

13         Q.   And do you see that this bill includes -- if

14    you look at the bottom, it's $1,000 for, I assume,

15    delivering some type of advertisement that we incurred

16    for somebody to go the Miami International Mall.  Do you

17    see that?

18         **A.   The way I read that and the way we conducted**

19    **business --**

20         Q.   Well, it's your invoice.  What's that mean?

21         **A.   There's no need to be condescending.**

22         Q.   I'm just asking what that means.

23         **A.   Okay.  Let me answer the question.**

24         Q.   Sure.

25         **A.   I mean, I'm going on zero hours sleep.  You've**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 162

1      had me up for 30 days reviewing documents.  I've asked

2      you for this at least a dozen times, so --

3           Q.   Just explain --

4           A.   -- allow me to.

5           Q.   All right.

6           A.   Miami International would have been the

7      collateral being represented.  So it would have been a

8      piece of collateral identifying Miami International.

9           Q.   Okay.

10          A.   It would have been a piece of collateral

11     identifying Town Center at Boca.  It would have been a

12     piece of collateral identifying Dadeland Mall.  We would

13     not have been delivering to those malls.

14          Q.   I understand that.  We're speaking different

15     languages, so I just want to make sure we're on the same

16     page.  So you would be placing some type of advertisement

17     that identifies one of these three malls --

18          A.   Yes.

19          Q.   -- in a hotel somewhere?

20          A.   Correct.  Not necessarily -- in a location.

21          Q.   Can you explain to me why, with the Florida

22     Mall here in Orlando, you would be placing advertisements

23     for other malls owned by the same company in Orlando?

24     Does that make sense to you?

25          A.   Absolutely.

Dale Takio - 9/20/2012

Page 163

1        Q.   Why would you do that?

2        A.   We have 55 million visitors that come into

3    Orlando that don't stay in Orlando, they expand their

4    trip.

5        Q.   Okay.

6        A.   They drive down to other areas.  They drive

7    down to Miami very often.

8        Q.   Okay.

9        A.   And those demographics of 55 million of

10   anything, there's a lot of people that do that.

11       Q.   So there's some marketing sense to advertising

12   a Tampa mall -- I mean, a Miami mall in Tampa?  They're

13   going to drive through Orlando, pass that mall, through

14   Boca Town Center, miss that mall, and go to Miami?

15            MR. BRAND:  Well --

16   BY MR. BLAIR:

17       Q.   And that's a marketing theory is that they're

18   going to bypass all the malls on the way and go to the

19   Miami International Mall?

20       A.   Again, the idea is to be top of mind.  Yes,

21   they're going to pass it.  If they're in any route coming

22   from Orlando, coming from Tampa, coming from Miami to any

23   one of those points, or any other point in Florida for

24   that matter, or anywhere else that Simon is represented.

25   The marketing is ultimately fundamentally the idea of

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 164

1          being in front of that person and having the highest

2          chance of being in front of that person.

3                   If I took out a super bowl ad and spent $4

4          million for 30 seconds, there's going to be a lot of

5          people that I'm communicating to that will never use my

6          product, never could use my product, but the idea is to

7          try and spread that communication spread that reach as

8          far and wide as possible.

9               Q.    Who made the determination what locations to

10         put what collateral for what mall that was clear?

11                   MR. BRAND:  We're not talking about this

12              invoice now, we're just talking about in general?

13                   MR. BLAIR:  Just general.

14         BY MR. BLAIR:

15              Q.    Like you said, let's put a Miami International

16         Mall piece of collateral in a Tampa or Ft. Myers mall,

17         who made that decision?

18              A.    Ultimately, our efforts would be assumed that

19         we would want to put collateral in every point of

20         distribution regardless.  But ultimately, those

21         directions would be made my Simon, Simon marketing

22         managers, Simon general managers, every one of them were

23         involved in communications on what -- why their

24         individual strategies were.

25                   Because beyond Simon Property Group having

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 165

1        whatever, I guess, their global initiative is, I don't

2        know how their internal operations work, you're going to

3        have a marketing manager at the Florida Mall that has

4        other goals that have been assigned to them.  So it's a

5        matter of, hey, you know, these are things that I need

6        for my goals.  If we were going to now a sub area, if

7        we're going to Orlando, we would take collateral and put

8        it in every single location that needed additional

9        collateral.

10               If there was a location where maybe there was

11       slower traffic and they still had remaining collateral

12       from last month, then there would obviously be no need to

13       waste money on the printed collateral.  We would then

14       make sure and then the next property may not have any

15       collateral or it might be little collateral.

16               So those determinations would be essentially

17       the best -- whoever was physically putting that stuff in

18       place, you know, making a relatively logical

19       determination, I believe that we need to put 500

20       brochures in this location because I put 500 last month

21       and now there's only five left.

22          Q.   We're talking about two different things.

23       You're talking about replenishing and so what I'm trying

24       to figure out --

25          A.   That's part of distribution.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 166

1          Q.   I understand that.  But what I'm trying to say

2     is who told Takitik to say, put Miami International

3     Mall --

4          A.   That would have been at the direction of Simon.

5          Q.   Would it be a marketing person for that mall or

6     would it have been Ms. Lauria, would it have been

7     somebody else?

8          A.   It would have been multiple people.  There were

9     times -- again, I don't know the full corporate hierarchy

10    of how decisions are made within Simon.  I know that

11    there were certain initiatives if Simon determined that

12    this was a benefit to multiple properties, then Simon

13    would essentially initiate that instruction and that

14    activity.  If Simon determined that, okay, this is only a

15    Florida Mall -- this is only relevant to Florida Mall,

16    then that's a Florida Mall.

17         Q.   My question's much simpler.  Did Simon tell you

18    where to distribute this collateral material?

19         A.   Simon would have been involved in that decision

20    on what properties and what collateral would have had to

21    have gone where.

22         Q.   And did you personally talk to anyone at Simon

23    about that decision?

24         A.   I -- again, it was not part of the scope of

25    what I did.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 167

```
 1          Q.    Okay.  Who did?

 2          A.    Tim Herman and Tommy Brignolo would have been

 3    the direct points of contact on making those

 4    determinations on how to -- on receiving the

 5    instructions, and then confirming the compliance of those

 6    instructions and the execution of the work.

 7          Q.    And on something like this, this hotel rack

 8    distribution, do you know what was distributed, like what

 9    piece of collateral?

10          A.    Well, again, for Miami International, it would

11    have been whatever current pieces we had for --

12          Q.    That's what I'm trying to figure out.  Do you

13    know what those pieces were?

14          A.    Yeah.  Those pieces change.  I mean, open up a

15    magazine this month, Florida Mall is going to have a

16    different piece of collateral the next month.  It was

17    whatever.

18          Q.    Is it a card?  Is it a two-sided pamphlet?  Is

19    it a magazine?

20          A.    Again, we addressed this earlier.  There's

21    multiple pieces of collateral that would have gone out.

22    Whatever would have been given to our organization to

23    distribute, which would have been everything from a -- I

24    don't know the exact dimensions, I'm sorry, I'm not a

25    printer, but a trifold brochure that would look something
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 168

1    like that, I would imagine that's about the approximate

2    size.  We would have single sided, almost the equivalent

3    of a business card size.  We would have bifold pieces, if

4    opened up, twice the size of a business card.  We would

5    have -- there were times where 8 and a half by 11

6    collateral was given to us.

7         Q.   Did Takitik or any of its subsidiaries or any

8    of your businesses print up the collateral for Simon or

9    did they always give it to you?

10        A.   I believe there were occasions where we did

11   print, if it were a relatively small batch runs that --

12   or we had commercial printers, but they weren't

13   industrial printers.  So if it were something like this

14   size piece of paper, we need something relatively niche

15   distributed, we need 500 or 1,000 copies of this

16   distributed to whatever points of distribution, something

17   like that, often --

18        Q.   Is that an occasional thing, not the norm?  I

19   mean, you typically delivered what --

20        A.   Again, we -- we -- we served at the pleasure of

21   Simon.

22        Q.   Did you bill Simon for any time you -- Takitik

23   printed those types of materials, would you bill them for

24   that?

25        A.   I'm sure there were times that we did, but

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 169

1          there were probably more times that we didn't actually

2          charge them for the services.

3               Q.   Are you familiar with the rates that are being

4          charged on SPG01450?  It says $1,000, I guess, for each

5          mall.

6               A.   I'm sorry?

7               Q.   Are you familiar with those rates?  Is that

8          normal?  Do you not know?

9               A.   Yes, that seems absolutely normal.

10              Q.   So if I were to ask for whatever hotel client

11         you did rack distribution, would I see $1,000 charge?

12              A.   I think quite often you'll see some for way

13         more than $1,000.

14              Q.   And what goes into figuring out the cost to

15         distribute that collateral?

16              A.   I think we've addressed this like three times

17         already.  Again, that would --

18              Q.   I have a specific amount, so can you tell me

19         based upon -- okay.  This is obviously three pieces of

20         collateral going to three areas in the State.

21              A.   For these specific amounts, I was not involved

22         in that discussion to determine where Simon determined

23         what a fair value was for that service being provided.

24              Q.   And that would be Mr. Herman?

25              A.   That would be Mr. Herman.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 170

1      Q.   Was Mr. Brignolo involved in any of that?

2      **A.   He may have been present.  He often, just to**

3   **make sure he understood the scope of what needed to be**

4   **done, he was often present at meetings with Tim Herman.**

5      Q.   And if you wouldn't mind, skip maybe to

6   SPG001462, which is an invoice dated December 22, 2010,

7   number 6018.

8      **A.   Okay.**

9      Q.   And it says, salesperson D. Takio?

10     **A.   Correct.**

11     Q.   Am I saying your name right, is it Takio?

12     **A.   Takio.**

13     Q.   Is -- do you have any knowledge of this

14   invoice?

15     **A.   I was not --**

16     Q.   Your name has been put on there?

17     **A.   Yes.**

18     Q.   Are you aware of what any of these services are

19   that are listed in the description?

20     **A.   They should have been negotiated agreements to**

21   **have one of the Simon properties or any of the Simon**

22   **properties listed on those respective web sites.  The**

23   **first one that -- I mean, the first one that jumps out is**

24   **one of the most -- well, the first two, visit Orlando is**

25   **the Orlando CDV, so any listings that would have been.**

Dale Takio - 9/20/2012

Page 171

1          Q.   And is -- are you familiar with the pricing

2     structure of these types of web listings?

3          A.   I am not.  I don't know how it was calculated.

4     Again, I think that would be determined by -- when I

5     would look as these types of things for projects I worked

6     on, I would look at the amount of traffic that was going

7     to a web site.  So if there was a web site that was a

8     very popular web site, then they would obviously be at a

9     higher rate.  If it was a web site that had a couple

10    hundred hits a month, yeah, those would be factors in

11    determining what the ultimate aggregate value is.

12         Q.   So if you were doing this for your clients, for

13    example, you might bill different amounts for different

14    web sites depending on the volume, a high volume more?

15         A.   Again, I wouldn't have itemized it.

16         Q.   Okay.

17         A.   I would have said, okay, this is where we came

18    up with it, because also, part of me facilitating that

19    work to get this done would have been the value of my

20    time that goes into it.  But that would be, again, a

21    factor.  It would obviously be a very major factor in

22    deciding why is this pair of shoes $50 versus this pair

23    of shoes that's $500.

24         Q.   I understand you have told me you have no

25    reason to believe it was not done, but just to kind of

Dale Takio - 9/20/2012

Page 172

1      cut to the chase, are you aware of --

2          A.   I am aware of web listings that took place.  I

3      don't know the specific web sites that were done.  I am

4      absolutely aware of web listings that were facilitated --

5          Q.   For Simon Property --

6          A.   -- for Simon Property Group.

7          Q.   But as far as this invoice number SPG01462, you

8      don't have any confirmation with --

9          A.   Specific to the itemized pieces on that, I

10     can't confirm or --

11         Q.   And the next invoice is Takitik00008, I

12     believe?

13         A.   Correct.

14         Q.   Invoice number 123, dated July 9, 2008.  And

15     again, salesperson Dale Tako, which is obviously spelled

16     wrong.  But that is not you, sir?

17         A.   That is not me.  I was not the salesperson on

18     that point.  However, this portion was executed primarily

19     by me.  This is where a sponsorship level would go to the

20     listing on the Kids Eat Free card directories.  We had

21     campaigns that were going similar to what -- this is

22     actually what stimulated the idea behind us developing

23     our Play For Less card -- with the Play For Less card,

24     while there was a value ad to go with the pieces.  So a

25     consumer now has more value at a proposition, more

Dale Takio - 9/20/2012

Page 173

```
 1        exposure for the individual.  So with that, we were

 2        issuing the mall directories directly to the consumers.

 3        So this was another opportunity for consumers to get the

 4        mall directories in their hands rather than solely

 5        waiting to the definitive moment when we know they're at

 6        a guest service desk.

 7             Q.   So the sponsorship gold levels that we talked

 8        about earlier, where Simon's name -- like the name Simon

 9        Property Group and the restaurants are listed actually at

10        the Florida Mall?

11             A.   Correct.

12             Q.   That's the sponsorship gold level, third

13        quarter?

14             A.   Right.

15             Q.   And is the Kids Eat Free Miami, Orlando, and

16        San Juan, is that anything different or is that the same?

17             A.   No, that would have been for the benefit of

18        those individuals.

19             Q.   And when it says Miami, Orlando, San Juan, so

20        that is for the benefit of a mall in San Juan?

21             A.   No.  No.  No.  Ultimately, where the primary

22        demographic would have been focused on.  I had clients

23        coming from all over the world.  So within the

24        definitions of Miami, Orlando, or San Juan, yes,

25        ultimately, for the benefit of those respective
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 174

1      properties, but not a Simon property in Vegas.

2          Q.   So again, I'm not trying to -- I'm just

3      confused.  So would the cards be shipped over to San Juan

4      to be passed out at different places?  No?

5          A.   No.

6          Q.   Okay.  Bear with me here.

7          A.   Okay.  There would have been mall directories

8      that we would have supplemented.  There would have been

9      supplemental value ad to say, here's more from,

10     ultimately -- other than just the listing.

11         Q.   A mall directory, can you explain to me what

12     that -- I mean, is it a listing of the stores for that

13     mall?  Like you would go in the mall and say, here's all

14     the stores in the Florida Mall?

15         A.   With then offers within there.

16         Q.   Okay.

17         A.   So it's probably the largest call to action

18     initiative that Simon Property Group has.

19         Q.   So you would do a back cover listing with

20     additional distribution of mall directories.  So you said

21     before they'd come in and get the card and they would get

22     the coupon book?

23         A.   Yes.

24         Q.   This, they would just get ahead of time?

25         A.   Yes.  So it would be then in correlation to

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 175

1       malls in Orlando, Miami.  We didn't need to give a Vegas

2       directory too, so.

3           Q.   So what you're handing out covers Miami and --

4           A.   That's how we execute it.

5           Q.   -- those properties?

6           A.   Correct.

7           Q.   Okay.  And this is when you might get

8       frustrated with me, but when it's handed out, I mean,

9       who's handing it out and where's it getting handed out

10      at?  By concierges and places like that?

11          A.   No.  Again, this is where we're -- when we're

12      facilitating directly with a consumer.  So if somebody

13      orders a card directly from us, then in that instance,

14      during that period of time when we were running this

15      campaign, here, now you get a bonus.  You get this $500

16      savings booklet along with that card.  So it would have

17      then trickled into various points of our other

18      distribution, places at our redemption centers.  So our

19      redemption centers, that would have then -- where people

20      would come in to pick up their Kids Eat Free card and be

21      able to get the value ad of also the Simon Mall

22      respective property booklet.

23          Q.   And do you have personal knowledge about this

24      invoice since it deals with --

25          A.   Yes, I did give Tim my input and consultation

Dale Takio - 9/20/2012

```
                                                    Page 176

 1        on it.  Ultimately, my recollection of -- yeah, I'm

 2        trying to determine value, was taking the Kids Eat Free

 3        card and then also looking for other revenue streams

 4        associated with it.  My Holy grail vision was to say,

 5        okay, well, I'd love for somebody that -- like Coca-Cola

 6        -- that wants to do business and support every restaurant

 7        on my network and win that away from Pepsi, here you go.

 8        Let's do brand recognition collectively together.

 9              When we did that, I remember doing homework to

10        try and understand, based upon values of impressions.

11        How many impressions were going out to figure out how do

12        we come up -- if we're saying that there's 10,000

13        impressions that we're going to have, then what does that

14        equate to into dollars and cents, how much is that worth.

15              So I did give a lot of input and guidance on,

16        yeah, the direction of where that should go.  And my

17        opinion, based on the volumes that we move and the number

18        of people that are seated, I felt that that was

19        ridiculously too cheap.

20        Q.   And so is it fair to say that Mr. Herman then

21        established that pricing point?

22        A.   My guess, and Simon then really said, we do a

23        lot of work with you so we want a better price on that.

24        Q.   But you --

25        A.   My annualized value that I had come up with
```

Dale Takio - 9/20/2012

Page 177

1        that I wanted from one client to have, you know, even

2        beyond those levels of service, I wanted to

3        conservatively put it in the neighborhood of six figures.

4        And I felt that that was still a very fair value based on

5        similar type things, like the super bowl where just

6        because they got better brand recognition, when you break

7        it down to the number of people that view it.

8            Q.    So these were, I guess, Tim Herman's clients

9        that he managed, he had the authority to negotiate

10       whatever pricing schedule he wanted?

11           A.    Absolutely.

12           Q.    The next bill, Takitik00015, which is invoice

13       1069 of December 3rd of 2008, is that the same thing we

14       just discussed?

15           A.    Same type of thing, correct.

16           Q.    Is there anything different about the

17       sponsorship includes logo inclusion and all collateral?

18           A.    I mean, there was clearly defining what a

19       minimal threshold of cards that -- cards and impressions

20       that we were going to put out to the marketplace.  I

21       think I mentioned this earlier, I remember being

22       authorized to give out 1,0000 cards at will.  I recall

23       that very clearly.

24           Q.    This one actually says 1,000 Kids Eat Free

25       cards to distribute at will.  Did you -- are you able to

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 178

1    tell how many cards were distributed for these prices, in

2    other words?  I assume their name got sponsored on the

3    cards, but was it perpetual?  Was it for three months?

4    Was it for five months?  How long did they get their name

5    on these Kids Eat Free cards for these prices?

6          **A.   As long as they kept on paying for sponsorship.**

7          Q.   That's what I was saying, was this for a

8    monthly sponsorship with these bills?  Would --

9          **A.   That should have run for a quarterly, I**

10   **believe.**

11         Q.   So 6,000 is basically a quarterly sponsorship?

12         **A.   I believe so.**

13         Q.   And every card you all print?

14         **A.   Yeah.  Yeah.  Precisely.**

15         Q.   And then the last invoice is SPG01460.  Invoice

16   number 5203, December 17, 2010.  What is this for?  Is it

17   -- it says, Holiday distribution of all concierge hotel

18   racks, including cost of thank you for your business

19   cards.

20         **A.   I remember --**

21         Q.   What's that?

22         **A.   I remember going -- I remember going through**

23   **and looking at productivity based on individuals to try**

24   **and figure out who was, essentially, the highest**

25   **referring producer on behalf of Simon to determine who**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                   Page 179
 1        would get those gift cards.  Simon, I believe it was a

 2        $25 increment -- or I'm sorry, I think it was an American

 3        Express gift card that was issued, essentially as a

 4        reward and bonus to keep them from -- sending business to

 5        them and not their competitors.

 6             Q.   So this is --

 7             A.   (Simultaneous speaking.)

 8             Q.   -- a gift card that went to the concierges?

 9             A.   Yes.  Yes.

10             Q.   And when we're talking concierge, are we

11        talking like doormen like in New York?  Are we talking

12        front desk clerk?  All the above?

13             A.   Again, we use the term "concierge" very

14        loosely.  Reality of it is there's not that many

15        concierges in Orlando.  Well, it's reality.  Sometimes

16        they may be off property consultants for a timeshare

17        company that also happens to provide guest services.  I

18        think, you know, maybe for the remainder of this

19        deposition we can call front line hospitality reps, which

20        would include doormen, bellmen, front desk agents, guest

21        service representatives, actual concierges.

22                  Anybody that would have direct interaction with

23        a consumer, whether to be that local expert for them that

24        is coming for, where do I want to go for dinner, where do

25        I want to go shopping, help me out.  There's a lot of
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 180

1         choices out there, help me narrow it down.  And

2         ultimately, our job was to make sure, whenever possible,

3         our clients were the only option.  you don't need to go

4         to Mall at Millenia for any purpose because there's

5         nothing good there.

6                   MR. BRAND:  That's where I go.

7                   THE WITNESS:  Because you make money.  We cool

8              taking a bathroom break?

9                   MR. BLAIR:  We're cool taking them whenever you

10             want.

11                  CAMERA OPERATOR:  Okay.  We're off the record

12             at 3:14.

13                  (Whereupon, a recess was taken at 3:14 p.m. and

14             proceedings resumed at 3:31 p.m.)

15                  CAMERA OPERATOR:  All right.  We're back on the

16             record.  The time now is 3:31.

17        BY MR. BLAIR:

18             Q.   We had earlier talked about your -- Takitik

19        delivering marketing pieces.  Do you have any -- did you

20        save any of -- or samples of whatever you deliver?

21             A.   We did save a lot of samples.  However, I'm not

22        sure of the exact time period, Brian, I believe it was

23        Brian Peters, general manager from Florida Mall, came and

24        took all collateral.  We did have some that were kind of

25        left over, but took all the boxes.  They were all

Dale Takio - 9/20/2012

Page 181

1      separated into boxes by campaign.

2           Q.   Was it in the last year?

3           A.   Well, it's been gone for a while.  I believe --

4      if I had to guess the time frame, I would say sometime

5      around August of last year.

6           Q.   Okay.  2011?

7           A.   2011, yes.

8           Q.   And also you had mentioned that you all, on

9      occasion, used to do some printing of Simon of some small

10     scale, like 100,000 or 5,000 pieces?

11          A.   No.  No.  No.  I mean, if we're printing off --

12     in-house, off our own printers, it would typically be

13     units of about 500 to 1,000.

14          Q.   Do you save any of those from Simon Property

15     Group?

16          A.   I believe -- I'd have to go back and look

17     through all the documents, but I believe I actually have

18     a copy of one.

19          Q.   Perfect.  And when Takitik was providing

20     services to Simon, can you tell me who at Simon Property

21     Group you had interaction with during this time period?

22          A.   That I had interaction with?

23          Q.   Yes.

24          A.   I had met with, obviously, Lynnette Lauria,

25     Lydia Gilmore, I forget her last name, I believe it was

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 182

1       Venetia, she was at one of the South Florida properties.

2       I had -- we had many Simon representatives that were

3       regularly attending our events.  Jamie Roy.  Thearon

4       Scurlock.  There was a gentleman by the name of, I think

5       it was Ozzie.

6            Q.   Dominguez?

7            A.   That sounds familiar.  That sounds familiar.

8       So the answer is, yes.  Yes.

9            Q.   And if I had to say, out of these people, was

10      there a primary contact you had at Simon Property Group?

11           A.   If I said the primary contact at Simon Property

12      Group, it would be Lynnette Lauria.  However, there were

13      instances where there were primary contacts for certain

14      projects.  So I mean, Venetia, I actually made the trip

15      down to her property in South Florida to discuss the

16      scope of what we were going to be doing.

17           Q.   What was Venetia's last name?

18           A.   I don't remember Venetia's last name.

19           Q.   Was she a mall manager?  A marketing manager?

20           A.   She was -- I believe her title was director of

21      marketing.  I recall, she was -- she had just transferred

22      from a property to I think it was Sawgrass.  I remember

23      being in the food court with her.  That was at Sawgrass.

24      I don't remember which property she transferred from, but

25      part of the discussions were, okay, what do you have

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 183

1      going on at the property.

2          Q.   Now, when you were discussing or talking to

3      these people, were you just -- well, are you just

4      casually interacting or were you actually cutting the

5      deals and doing the business with Simon or was it --

6          A.   No, I was not.  Typically, when I would

7      interact with these individuals, whether it was at a

8      mixer, depending on the position and depending on the

9      role, somebody like Brian Peters, we would be -- we would

10     talk about general ideas and general initiatives that

11     were taking place and trying to identify new

12     opportunities and new synergies for the benefit of

13     whether it be just the industry or specific matters.

14          Jamie -- Jamie was really always kind of quiet

15     to begin with.  I actually attended the Florida Huddle

16     with Jamie Roy.  She always kind of kept to herself.  She

17     never interacted at the events that took place after the

18     show.  So there was -- limited to the scope of, okay,

19     this is what we're going to do today at the show.  This

20     is -- do me a favor, you get this information from these

21     clients and I'll get the information from these clients

22     and then we'll share that information in between breaks

23     at the shows.

24          Q.   Okay.  And earlier we talked about RJL Services

25     providing some type of consulting, and you said to Tim

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 184

1    Herman.

2         A.   Correct.

3         Q.   And I know we talked generally it was about

4    assistance.  I mean, can you kind of elaborate what kind

5    of consulting, to your knowledge, they provided to Tim?

6         A.   It was something that ultimately I -- preceded

7    even me knowing Tim Herman.  It was a relationship that

8    was there.  But it was a mentor type relationship.  It

9    was -- Tim did not have formal education.  And Tim saw a

10   lot of benefit from understanding how to conduct business

11   within more formal environments, with organizations.

12            You know somebody like the Orlando Magic would

13   be a much different conversation than an independent

14   owner of a small business, let's just have a casual

15   conversation and figure out how to do our business.  And

16   it was more about improving his ability to interact more

17   into a corporate -- a more corporate environment.

18            You just made me recall something, and if we

19   can kind of go way back.  When you asked about my

20   certification, I don't know if this would apply because

21   it didn't really fall in the scope, I was formally

22   certified as a food service -- a food service trainer.

23        Q.   Okay.

24        A.   And that was at -- I believe it was at the

25   Morris County School of Technology, so.  And then -- and

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 185

1    then also I forgot that I had taken several courses

2    online at University of Phoenix, so just didn't want you

3    guys to think I was leaving anything out.

4         Q.   It's been a long day.

5         A.   You just triggered that.

6         Q.   It's been a long day, so I apologize if I've

7    asked you this, but was there a formal, to your

8    knowledge, a formal consulting agreement between RJL

9    Services and Takitik -- or Takitik, I'm sorry?

10        A.   I've never seen a paper.  My understanding was

11   always a verbal -- you know, a verbal arrangement.

12        Q.   And do you know what that verbal arrangement

13   was?

14        A.   That it was -- that was based on billable

15   hours, so the time that was spent on any of the services

16   provided by RJL would have been billed out at $100 an

17   hour.

18        Q.   And do you have any, I guess, basic experience

19   or knowledge as to whether that would be a reasonable

20   hourly rate?

21        A.   From my experience, I would say it's an

22   extremely reasonable rate.  I know, you know, most

23   recently, my brother just told me about very similar

24   program that he had with his company and they charged his

25   company $15,000 for two weeks worth of coaching, which

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 186

1     was maybe about two hours a day.  So from my layperson's

2     understanding of how that type of consultant would bill,

3     I see my lawyer's bills, I assume it's a extremely

4     reasonable rate, so.

5          Q.   I mean, just so I put stuff in simple terms

6     too, I mean, was Ms. Lauria essentially teaching Tim how

7     to do formal marketing with, I guess, larger clients?

8          A.   Yeah.  Yeah.

9          Q.   Okay.  And you were aware of that arrangement?

10         A.   Yes.

11         Q.   And did you approve that arrangement?

12         A.   Yes.

13         Q.   And you didn't think it was strange marketing

14    company is having somebody teach them how to,

15    essentially, market?

16         A.   Again, I think it's, you know, the scope.  Tim

17    -- Tim is probably the most amazing gift of gab people.

18    He's -- he -- again, he doesn't have the formal

19    education, formal processes that some companies demand.

20    Some companies, you know -- so ultimately, a lot of

21    perception of how you interact.  Simple things like, you

22    know, today, I would have loved to have come in shorts,

23    but it's not appropriate.

24              I know that the setting that I'm in, because of

25    formal education and formal things that I have taken

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 187

1       place, that I should be in a suit.  Right on up into, you

2       know, how do you go -- how would you go through a

3       process.  I know when I first did business with Tim, Tim

4       was very shoot off the cuff, okay, yeah, we'll help you

5       out and we'll just -- we'll just figure it out later,

6       let's just get to work.  Well, no, Tim, let's have a

7       conversation first to figure out what they need to then

8       start defining.  And then, again, setting expectations,

9       you know.

10              And within any business, I think it's very

11      important to set expectations between two parties that

12      are about to bind so they can ultimately be measured over

13      time.

14          Q.   You mentioned Brian Peters earlier.  Is he a

15      Simon mall manager?

16          A.   I believe -- I think I heard rumors that he was

17      terminated.

18          Q.   Okay.

19          A.   I don't know definitively if he still works

20      there.

21          Q.   But I mean, when you were dealing with him --

22          A.   Oh, absolutely, yeah.

23          Q.   Okay.  And other than seeing him at functions

24      or talking to him, I mean, did you and Mr. Peters conduct

25      any like formal business, like contracts?

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 188

1        A.   No, we never had scheduled meetings.  Again,

2   that was outside of the scope of my responsibilities

3   there.

4        Q.   And we had earlier said -- you mentioned Susan

5   Ortega, and you said she was -- I'm sorry --

6        A.   She owns JS Media, Travel Host Magazine --

7        Q.   Okay.

8        A.   -- with Jackie Siegel.

9        Q.   And does Ms. Ortega do any business with your

10  companies, which I would say are Takitik, Inc., DT

11  Printing, Pointe Distribution, or Takitik Enterprises?

12       A.   No.  We never had formal arrangements.  We

13  absolutely did have, you know, informal relationships.

14  You have to be friends with your peers even though

15  they're competitors sometimes, and sometimes they're not.

16       Q.   I mean, I understand relationships.  But did

17  you do -- in other words, transact business together, pay

18  her to do something?

19       A.   No.  I never -- Takitik never paid Travel Host

20  and Travel Hose never paid Takitik.

21       Q.   Okay.

22       A.   But we did collaborate on a lot of initiatives.

23  Simon Property Group.  Multiple organizations came

24  together to do an event at the Florida Mall.  So we would

25  have been involved in those collective efforts.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 189

1        Q.   And just so we can shut some doors, you said

2   Takitik never paid Susan Ortega or her business and vice

3   versa?

4        **A.   Correct.**

5        Q.   How about any of your other businesses, being

6   the DT Printing, Pointe Distribution --

7        **A.   No.**

8        Q.   Okay.  Do you know someone named Michael Moran?

9        **A.   Yes, I know Michael.**

10       Q.   Who's Michael Moran?

11       **A.   Michael Moran, he's actually a friend of all of**

12   **ours.  He's owned several different companies over the**

13   **years.  I was first introduced to Michael Moran --**

14   **actually, you just jogged my memory again.  We had an**

15   **organization that Brian, myself, and Tim Herman had**

16   **created for the purposes of doing architectural rendering**

17   **presentations.  Michael Moran had a 3D background in**

18   **architectural rendering and graphic design under one of**

19   **his companies called Victoria Studios.**

20            **We collaborated on efforts.  Unfortunately, the**

21   **timing of that business was not great.  It was -- we can**

22   **thank 2008 for shutting that down.  Our first and only**

23   **client was Turner Construction.  What we did, we built 3D**

24   **animated presentations for them to then present.**

25       Q.   Did Mr. Moran or any of his businesses do work

Dale Takio - 9/20/2012

Page 190

```
1        for Simon Property Group?
2             A.   No, not to my knowledge.
3             Q.   Did they do business with, other than what
4        you've just described for Turner, did they do business
5        with any of your companies?
6             A.   I'm sorry?
7             Q.   Did Mr. Moran or his companies do business with
8        Takitik or any of your companies, other than the Turner
9        project you just described?
10            A.   Michael Moran was, I -- he would not have
11       transacted business directly with Takitik or any of our
12       entities.  They never would have had a reason to pay him
13       for anything.  It would have been DRT Development that
14       had a relationship with Victoria Studios.
15            Q.   What is DRT Development?
16            A.   That was the architectural rendering.
17            Q.   Oh, okay.  It's out of business now though?
18            A.   Yeah.
19            Q.   Okay.
20            A.   Turner was an awesome client.
21            Q.   How about Edgar Lozada, Junior, do you know who
22       that is?
23            A.   I think I met him once at the Vue.  I think he
24       was one of Tim Herman's neighbors and friends.  Other
25       than that, I don't know anything about him.
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 191

1          Q.   Have you ever heard of his company, EDL

2     Management?

3          **A.   Not until I saw it in the documents.**

4          Q.   Do you know or any knowledge why Mr. Herman

5     would have reason to pay Mr. Lozada for anything?

6          **A.   Again, I don't know anything about EDL.  I**

7     **don't know what they do, so I --**

8          Q.   Okay.  Gregory Livingston?

9          **A.   I don't know that name.**

10         Q.   Do you know Eric Lagi?

11         **A.   Eric is Sarah's husband.**

12         Q.   And other than that, have you met him?

13         **A.   Yeah, I have met him.  Yeah, socially I've met**

14    **Eric before, but I've never conducted business with Eric.**

15    **I think I gave -- he has a band, that I'm aware of, and I**

16    **think at one point I was asked for -- if I knew any**

17    **contacts that produce stickers and bumper stickers for**

18    **his band and I passed along the industry contact, but I**

19    **never conducted business.**

20         Q.   And then Sarah Lagi, we talked about her

21    earlier.  You haven't conducted any business with her?

22         **A.   Well, the first time I ever knew Sarah by Sarah**

23    **Lagi, was we received, through the Kids Eat Free card web**

24    **site, an inquiry on behalf of Westgate.  Apparently, Ms.**

25    **Lagi, her vice-president of marketing, Karen Waltrip, and**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 192

1    I'm not sure the exact title of Mark Mryzinski

2    [phonetic], were on a flight back from Vegas on Allegient

3    Airlines, saw our advertisement in their pocket

4    directory, and she reached out to see about having the

5    Westgate Resorts restaurants participate in our program.

6              I subsequently -- we didn't allow timeshare

7    resort restaurants to solely be on there, unless they

8    were conducting business with us, and I subsequently took

9    a meeting with -- with all of them to see how we could

10   fit within the other sides of their business, the

11   timeshare, the resort, the room rental side.

12             And then after that meeting and after the dots

13   were kind of connected, oh, because Tim was with me in

14   that meeting, this is, you know, Lynnette's daughter, she

15   actually -- we needed -- we needed some more girls for a

16   kickball team, so she joined our kickball team for a

17   portion of the season.

18        Q.   Okay.  And have you or any of your companies

19   ever done business with Ms. Lagi?

20        A.   I'm sorry?

21        Q.   Have you or any of your companies ever done

22   business with Ms. Lagi?

23        A.   Outside of that one isolated incidence with

24   Westgate, which we never actually consummated that

25   business, no, we have not.

64020ea4-12e2-480e-8d56-0be97680450a

Page 193

1        Q.   Do you know Robert Lauria?

2        **A.   Yes, I know Robert.**

3        Q.   Socially or have you --

4        **A.   I've met Robert socially and Robert also, under**

5   **RJL, would also share his professional expertise on**

6   **behalf of RJL to Tim Herman.**

7        Q.   Do you know what Robert Lauria does for a

8   living?

9        **A.   I don't know exactly what the scope of his work**

10  **is.   I know it's something to do with Sylvania, but no, I**

11  **don't.**

12       Q.   Do you know if it's in the marketing field?

13       **A.   I don't know.   I know he's a business**

14  **professional of some sort.**

15       Q.   Other through RJL Services, you've had no

16  business with Mr. Lauria?

17       **A.   No.   No.**

18       Q.   And how about Rachel Lauria?

19       **A.   I've met Rachel Lauria before.   I have never**

20  **conducted business with Rachel.   My understanding is that**

21  **she, if I recall, she had something to do with some sort**

22  **of trainer of some sort.**

23       Q.   Just so I don't keep asking, if I say you never

24  conducted business, can we make assumptions you or your

25  company, so I don't have to --

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 194

1      A.    Fair enough.

2      Q.    Okay.  And Lynnette, obviously, just to kind of

3   speed things along, my understanding is Tim Herman was

4   the primary contact with Simon and her; is that fair to

5   say?

6      A.    Yeah, Tim had a long, long relationship, again,

7   before I even lived in the State of Florida, both

8   professionally and personally, and --

9      Q.    So if I want to talk about --

10      A.    -- a client relationship.

11      Q.    -- pricing and decisions and all that between

12   Simon and Takitik, would that be Tim Herman?

13      A.    Yes.

14      Q.    How about Elizabeth Laggoon?

15      A.    Could --

16      Q.    Elizabeth S. L-A-G-G-O-O-N?

17      A.    No.

18      Q.    Okay.  And Tim Herman, obviously you know Tim?

19      A.    Yeah.

20      Q.    And how did you first meet Tim?

21      A.    I actually met Tim through Ryan Deming.  I met

22   Ryan Deming at a mixer where we decided -- you know, the

23   mixers --

24      Q.    And you're still friends with him?

25      A.    Absolutely.  Ryan and I -- this was when I was

64020ea4-12e2-480e-8d56-0be97680450a

Page 195

1        at Open Table in the capacity of the tool sets that I had

2        at OT Concierge, they were absolute synergies to what

3        Ryan and Tim were doing with concierge.  I had the

4        ability to bring really neat tools --

5            Q.    Okay.

6            A.    -- to what they were doing to help kind of set

7        them aside from their competitors much more.  And the

8        industrial revolution, yeah.  We all became friends and

9        then eventually we all became, yeah, associated in

10       business.

11           Q.    Did you or Tim have any employment contracts

12       with either Takitik or any of your companies?

13           A.    Employment contracts?

14           Q.    Yeah.

15           A.    No.

16           Q.    How about Cindy Harding, does that name sound

17       familiar?

18           A.    No.

19           Q.    Lydia Gilmore, you said --

20           A.    I know Lydia Gilmore.

21           Q.    And other than meeting her at some mixers, did

22       you conduct any business with Lydia?

23           A.    Actually, no.  Lydia was usually quite tipsy.

24       You'll remember that.

25           Q.    Before I forget, have you paid any of the

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 196

1    Laurias -- when I say you, meaning you or any of your

2    businesses, paid any of the Lauria family members any

3    type of referral fees?

4         **A.   No.**

5         Q.   What about might be loosely termed kickbacks?

6         **A.   No.**

7         Q.   Have you paid any Simon employees any type of

8    referral fees or kickbacks?  And that would be like Mr.

9    Peters, Ms. Gilmore, and any of that type of thing.

10        **A.   In the scope of what you're saying, I think we**

11   **can just cover it all, our company has never paid**

12   **kickbacks or referral fees, as you're referring to, of**

13   **any kind.**

14        Q.   Okay.  How about George Fakhaory?

15        **A.   Yeah, George Fakhaory.**

16        Q.   Who is George Fakhaory?

17        **A.   George Fakhaory owns now GMF Consulting.  I**

18   **first met George Fakhaory while he was working at Dollar**

19   **Car Rental.  He was an executive at Dollar Car Rental.**

20   **Again, just another industry affiliate, I guess we could**

21   **call him, under Dollar, because there was a lot of events**

22   **and multiple places that we would see each other.  George**

23   **Fakhaory then left Dollar and started up his own**

24   **consulting firm.  George Fakhaory, he assisted with a lot**

25   **of hospitality events and trade shows.**

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                    Page 197
   1            He conceptualized a lot of them, where there
   2    were a lot of collaborative efforts from multiple
   3    marketing agencies, companies within the industry being
   4    involved in those.  After -- after my departure from the
   5    organization and day-to-day activities and when I went to
   6    Groupon, it was my understanding there was more of a
   7    formal relationship established with Image Marketing and
   8    GMF.
   9            I don't know the terms.  I don't know if it was
  10    a merger or if it was just a loosely affiliated
  11    association.  But George Fakhaory, at that point, I
  12    believe, did have -- hold an office at the same location,
  13    at the 7021 Grand National Drive.
  14        Q.  And so I don't get lost on words and semantics,
  15    let me go back.  Have you or your firm or your companies
  16    ever paid any type of consideration, whether it be cash
  17    or gifts, to any of the Lauria family members, other than
  18    the RJL?
  19        A.  No.
  20        Q.  Have you and your firm ever paid any
  21    consideration, and again, whether it be cash or gifts, to
  22    any employee of Simon Property Group?
  23        A.  Never.
  24        Q.  Ozzie Dominguez --
  25        A.  Yes.
```

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 198

1      Q.   -- mall manager for Simon Property Group; is
2      that correct?
3          A.   That's correct.
4          Q.   And other than --
5          A.   Other than him working.  Again, I don't know
6      what his exact title was.
7          Q.   But other than maybe seeing him at mixers or
8      functions, did you conduct any business with him through
9      Simon Property?
10         A.   Oh, I have actually never met him in person.
11     Never met him in person.  I've seen his name through
12     communications going back and forth.
13         Q.   And obviously, you know Mr. Deming, who's
14     sitting here today?
15         A.   Correct.
16         Q.   And do you and Mr. Deming have any business
17     enterprises together currently?
18         A.   Currently, no.
19         Q.   Did you in the past?
20         A.   Yes.
21         Q.   And what were those?
22         A.   DRT Development, we were involved together.
23     Obviously, I represented his -- we already covered that
24     Takitik represented Image Marketing, you know, in a
25     consulting capacity and advisory capacity.

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

Page 199

1          Q.   How about Deborah Batchelor?

2          A.   I don't know that name.

3          Q.   Patricia Barbarino?

4          A.   I don't know that name.

5          Q.   James Barbarino?

6          A.   I don't know that name.

7          Q.   Joseph Aintabi?

8          A.   Yes, I know Joseph.

9          Q.   Who is Joseph?

10         A.   Joseph is Tim Herman's boyfriend.

11         Q.   Okay.

12         A.   And I believe -- I don't know for certain, but

13    I believe he's also a business partner in a restaurant

14    concept that they have together.

15         Q.   He shows up at some capacity being affiliated

16    with Target Distribution.  Does that sound familiar to

17    you?

18         A.   Until these documents came through, I'm not

19    aware of Target Distribution.

20         Q.   Okay.  Andrea Rodriguez, does that sound

21    familiar?

22         A.   No.

23         Q.   She's listed as the owner of PR Works.  Does

24    that sound familiar?

25         A.   I know PR Works from the documents, but I don't

64020ea4-12e2-480e-8d56-0be97680450a

Dale Takio - 9/20/2012

```
                                                          Page 200
   1      know --

   2            Q.    Anything about --

   3            A.    -- PR Works.

   4            Q.    A T. Ruiz, who was listed as a salesperson on

   5      some XLM Marketing invoices, does that sound familiar?

   6            A.    I don't know a T. Ruiz, no.

   7            Q.    Thearon Scurlock?

   8            A.    I know Thearon Scurlock.

   9            Q.    Who is he?

  10            A.    Thearon Scurlock was a director of marketing at

  11      the Florida Mall.

  12            Q.    And did you have any interactions with him in

  13      conducting business with Simon?

  14            A.    Again, not initiating business.  Thearon sat on

  15      a lot of the same committees and organizations that I

  16      did, and yes, business would have been discussed, but

  17      there were never initiated formal meetings between myself

  18      and Thearon.  However, being the -- yeah, a very

  19      significant -- holding a very significant role with the

  20      Florida Mall at a flagship property for Simon, Tim Herman

  21      regularly would have had to report in to Thearon Scurlock

  22      on anything that would have fell under Thearon's

  23      jurisdiction.

  24                  (Proceedings continued in Volume II.)

  25                        *   *   *   *   *
```

64020ea4-12e2-480e-8d56-0be97680450a