# EXHIBIT V

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:  6:11-cv-1598-GAP-KRS


SIMON PROPERTY GROUP, INC.,

          Plaintiff,

vs.


LYNNETTE LAURIA, et al.,

          Defendants.


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

VIDEO RECORDED
DEPOSITION OF:      CORPORATE REPRESENTATIVE
                    OF IMAGE MARKETING GROUP, INC.
                    CORPORATE REPRESENTATIVE
                    OF IMAGE MARKETING OF FLORIDA, LLC.
                    CORPORATE REPRESENTATIVE
                    OF EVENT PLANNERS USA, INC.
                    RYAN DEMING

DATE TAKEN:         SEPTEMBER 21, 2012

TIME:               9:52 A.M. - 4:05 P.M

PLACE:              200 SOUTH ORANGE AVENUE
                    SUITE 2300
                    ORLANDO, FLORIDA  32801

TAKEN BEFORE:       BETSY J. SHATTO, FPR
                    AND NOTARY PUBLIC


*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 2

```
 1      APPEARANCES:

 2      BRIAN C. BLAIR, ESQUIRE
        COLEMAN W. WATSON, ESQUIRE
 3          Baker & Hostetler, LLP
            200 South Orange Avenue, Suite 2300
 4          Orlando, Florida  32801

 5              APPEARING ON BEHALF OF THE PLAINTIFF

 6

 7      THOMAS A. SADAKA, ESQUIRE
            Nejame, Lafay, Jancha, Ahmed,
            Barker, Joshi & Moreno, P.A.
 8          189 South Orange Avenue, Suite 1800
            Orlando, Florida  32801
 9
                APPEARING ON BEHALF OF LYNNETTE LAURIA,
10              ROBERT LAURIA, SARAH LAGI, ET AL.

11

12      CRAIG A. BRAND, ESQUIRE
            The Brand Law Firm, P.A.
            2937 S.W. 27th Avenue, Suite 101
13          Miami, Florida  33133

14              APPEARING ON BEHALF OF TAKITIK, INC.,
                POINTE DISTRIBUTION, LLC, DT PRINTING
15              SOLUTIONS, LLC, DALE TAKIO, AND RYAN
                DEMING
16

17

18      ALSO PRESENT:

19      RICKY DYER - CAMERA OPERATOR

20

21

22

23

24

25
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 3

1                       C O N T E N T S

2       VIDEO RECORDED TESTIMONY OF RYAN DEMING

3           Direct Examination by Mr. Blair                    6

4       CERTIFICATE OF REPORTER                              201

5       CERTIFICATE OF OATH                                  202

6       ERRATA PAGE                                          203

7       NOTIFICATION LETTER                                  204

8       EXHIBITS                                        Attached

9                       E X H I B I T S

10         (Plaintiff's Exhibits A through N were marked in the
         deposition of Dale Takio, taken on September 20, 2012.)
11
                                                            PAGE
12
         PLAINTIFF'S EXHIBIT O - Notice of Corporate          7
13       Representative of Image Marketing Group, Inc.

14       PLAINTIFF'S EXHIBIT P - Notice of Corporate          8
         Representative of Image Marketing of Florida, LLC
15
         PLAINTIFF'S EXHIBIT Q - Notice of Corporate          8
16       Representative of Event Planners USA, Inc.

17       PLAINTIFF'S COMPOSITE EXHIBIT R - Event Planners    96
         USA, Inc., Various Checks
18
         PLAINTIFF'S COMPOSITE EXHIBIT S - EP USA, Various   111
19       Invoices

20       PLAINTIFF'S EXHIBIT T - Tim Herman Emails (From     125
         LL Sent Folder)
21
         PLAINTIFF'S EXHIBIT U - Handwritten Note From       127
22       Lynnette to Ryan

23       PLAINTIFF'S EXHIBIT V - Pictures of Van Wrap        156

24       PLAINTIFF'S EXHIBIT W - Service Agreement Standard, 157
         Image Marketing Group, LLC
25

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 4

```
 1                         EXHIBITS
                          (Continued)
 2
                                                      PAGE
 3
         PLAINTIFF'S COMPOSITE EXHIBIT X - Image Marketing    181
 4       Group, Inc., Various Checks Payable to Ryan Deming

 5       PLAINTIFF'S COMPOSITE EXHIBIT Y - Image Marketing    183
         Group, Inc., Various Checks
 6
         PLAINTIFF'S COMPOSITE EXHIBIT Z - Florida Tourism     192
 7       Distribution Services, Inc., Various Invoices

 8                            - - - - -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 5

1                   P R O C E E D I N G S

2          CAMERA OPERATOR:  We're on the record.  Today's

3     date is September 21, 2012.  The time now is 9:52

4     a.m.  We're here to take the deposition of Brian

5     Deming taken by the plaintiff at the offices of

6     Baker & Hostetler, LLP, Orlando, Florida 32801 in

7     the matter of Simon Property Group, Inc., plaintiff,

8     versus Lynnette Lauria, et al., defendants, in the

9     United State District Court, Middle District of

10    Florida, Orlando Division.  Case number

11    6:11-ca-1598-GAP-KRS.

12         My name is Ricky Dyer.  I'm a certified legal

13    video specialist for Baker & Hostetler.  The court

14    reporter is Betsy Shatto of First Choice Reporting,

15    333 North Ferncreek Avenue, Orlando, Florida 32803.

16    Will Counsel please introduce themselves.

17         MR. BLAIR:  Brian Blair on behalf of plaintiff,

18    Simon Property Group.

19         MR. WATSON:  Coleman Watson on behalf of

20    plaintiff, Simon Property Group.

21         MR. SADAKA:  Tom Sadaka, Lynnette Lauria,

22    Robert Lauria, Sarah Lagi, et al.

23         MR. BRAND:  Craig Brand on behalf of defendants

24    Dale Takio, Ryan Deming, Takitik, Pointe, DT

25    Printing, Inc., and the Image companies and Event

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                  Page 6
   1          Planners, et al.

   2               CAMERA OPERATOR:  And will the court reporter

   3          please swear in the witness.

   4     WHEREUPON,

   5                         RYAN DEMING,

   6        having been first duly sworn to tell the truth, was

   7          examined and testified upon his oath as follows:

   8                    THE WITNESS:  Yes.

   9                    DIRECT EXAMINATION

  10     BY MR. BLAIR:

  11          Q.   Good morning.  My name is Brian Blair.  I'm

  12     going to ask you some questions today.  Could you please

  13     state your name for the record?

  14          A.   Ryan Allen Deming.

  15          Q.   And Mr. Deming, what is your address, please?

  16          A.   My current address is 13560 Turtle Marsh Loop,

  17     Number 324, Orlando, Florida.

  18          Q.   Is that a home or a business address?

  19          A.   It's a condo.

  20          Q.   And do you have a work address?

  21          A.   I work from home.

  22          Q.   And obviously you were present for the

  23     deposition yesterday, but just as a reminder, if you

  24     don't understand a question, please let me know.  If you

  25     need a break, let me know.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 7

1          A.    Okay.

2          Q.    Let's try not to talk over each other.  I know

3     I got out of whack with that yesterday.  And also, if you

4     would audibly respond for the court reporter as opposed

5     to a nod or an uh-huh or un-hun.

6          A.    Okay.

7          Q.    You are appearing today in your individual

8     behalf as -- correct?

9          A.    Correct.

10          Q.    And are you also appearing on behalf of several

11     corporations?

12          A.    Correct.

13              (Whereupon, a document was marked as

14          Plaintiff's Exhibit O for Identification.)

15     BY MR. BLAIR:

16          Q.    And I will show you three notices of taking

17     deposition.  The first one marked Plaintiff's Exhibit O,

18     which is the Corporate Representative Notice Of Taking

19     Deposition for the Corporate of Image Marketing Group,

20     Inc. and ask if you've seen that before?

21          A.    I have.

22          Q.    And have you been designated as the appropriate

23     individual to testify as to the matters set forth

24     therein?

25          A.    About under Image Marketing Group, correct.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 8

1           **(Whereupon, a document was marked as**

2           **Plaintiff's Exhibit P for Identification.)**

3    BY MR. BLAIR:

4           Q.   Okay.  I also want to show you another exhibit,

5    which is Plaintiff's Exhibit P, which is the Notice of

6    Taking Videotaped Deposition of the Corporate

7    Representative of Image Marketing of Florida, LLC, and

8    ask you if you've seen that before?

9           A.   Correct.

10          Q.   And have you been the person designated with

11   the most knowledge to testify as to the areas set forth

12   therein?

13          A.   **I'm your second best man that's present to**

14   **represent the companies, yes.**

15          Q.   You said "second best."  Who would be the first

16   best?

17          A.   **That would be Tim Herman.**

18          **(Whereupon, a document was marked as**

19          **Plaintiff's Exhibit C for Identification.)**

20   BY MR. BLAIR:

21          Q.   I'm going also to also show you what's been

22   marked at Plaintiff's Exhibit Q, which is a Notice of

23   Taking Videotaped Deposition of the Corporate

24   Representative of Event Planners USA, Inc., and ask you

25   if you've seen that before?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 9

1      A.   I have.

2      Q.   And have you been designated as the individual

3   with the most knowledge to testify as to areas set forth

4   therein?

5      A.   Again, I'm the second best man to represent

6   this company.

7      Q.   And who would be the first best man?

8      A.   That would be Tim Herman.

9      Q.   Have you attempted to talk to Mr. Herman about

10   appearing for these depositions?

11      A.   We have made several attempts to contact Mr.

12   Herman and to cooperate with this matter from day one

13   when security in your office had contacted us to comply.

14   Since we have -- I have -- we've made attempts at the

15   very beginning to cooperate and we have not -- I have

16   not, since the suit, had any contact with Timothy Herman,

17   and have done my best and that's why I'm here today to

18   represent myself, because I'm holding to allegations that

19   are falsely accused of me and my work.  I'm here today to

20   represent everything that I've been called to be here to

21   talk about.

22      Q.   Are you an officer or director of the companies

23   set forth in Exhibit O, P, and Q?

24      A.   Correct.

25      Q.   And what efforts have you made to contact Mr.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 10

1      Herman?

2          A.    From what time period?

3          Q.    Since the -- since you were served with the

4      lawsuit.

5          A.    We -- when the lawsuit was served, that was

6      originally through prior representation, complied on

7      providing documents to Southern Trial Counsel that I had

8      provided.  Tim Herman was not present -- let me correct

9      -- was present at Southern Trial Counsel at that time.

10     The Counsel, Jason Herman --

11             MR. BRAND:  Don't speak about anything that

12         Jason Herman may have been speaking to you guys

13         about.

14             THE WITNESS:  Correct.  So I produced the

15         documents and complied with the requests that were

16         made.

17     BY MR. BLAIR:

18         Q.    Are you talking about the subpoena that was

19     originally served or the lawsuit?

20         A.    The lawsuit.

21         Q.    Have you tried to telephone Mr. Herman since

22     you became aware of the lawsuit?

23         A.    No, I have not.

24         Q.    Do you know where Mr. Herman resides?

25         A.    The last residence that I am aware of that he

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                              Page 11
 1        resides is, I believe, Flame Avenue in Maitland.

 2           Q.   Do you know if he still resides there?

 3           A.   I have no idea.

 4           Q.   Did you try to go over and knock on his door

 5        and see if he was home?

 6           A.   Yes.

 7           Q.   And did anyone answer?

 8           A.   No answer.

 9           Q.   How many occasions did you try that?

10           A.   There was two times.

11           Q.   Do you know Mr. Herman's telephone -- strike

12        that.

13                Does he have a cell phone?

14           A.   Yes.

15           Q.   Do you know his cell phone number?

16           A.   (321) 229-0192.

17           Q.   And does he have a home number?

18           A.   That's the only number I have at this time.

19           Q.   And you had earlier given your address as 13560

20        Turtle Marsh Loop?

21           A.   Correct.

22           Q.   How long have you lived at that address?

23           A.   Since 2000.

24           Q.   And you said you work at home.  What's your

25        current employment?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 12
 1          A.   I'm currently employed by Red Carpet Promotions
 2     and Max Media Outdoor.
 3          Q.   And how long have you been employed by Red
 4     Carpet Promotions and Max Media Outdoor?
 5          A.   Red Carpet, since 2010.
 6          Q.   Okay.
 7          A.   Max Media Outdoor, since 2011.
 8          Q.   And prior to those two businesses, where were
 9     you employed?
10          A.   Image Marketing.
11          Q.   And there are several Image Marketings.  And I
12     don't know if there is a distinction.  Which one employed
13     you?
14          A.   Image Marketing of Florida, LLC.
15          Q.   And how long were you employed by Image
16     Marketing of Florida, LLC?
17          A.   Since it's corporate structure of 2007.
18          Q.   And did your -- has your employment with them
19     ceased?
20          A.   Yes, it has.
21          Q.   When did it cease?
22          A.   It officially ceased in late 2009.  I did -- it
23     administratively dissolved.  I did officially leave
24     October 2010.  If I could have left a lot sooner, I would
25     have left sooner, but officially with resignation and
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                 9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 13

1      letters sent out, it was October of 2010.

2           Q.   And why did you resign?

3           A.   I resigned because, honestly, from the first

4      six months that I became -- Tim Herman became a business

5      partner of Image Marketing, it was a fire and ice

6      relationship.  That's the only knowledge that I had of

7      building a company in the tourism industry.  I did

8      everything to the best of my abilities.  I finally had a

9      breaking point and had an opportunity to do something

10     that I enjoy doing and separate myself to support myself

11     and that's when I went ahead and took on a role with Red

12     Carpet Promotions in 2010.

13          Q.   And where was Image Marketing of Florida, LLC

14     located?

15          A.   Image Marketing of Florida, LLC was located at

16     7081 Grand National Plaza.  We had moved offices within

17     the same plaza three times.  I cannot recall the other

18     two addresses.

19          Q.   And prior to your employment by Image Marketing

20     of Florida, LLC, where were you employed?

21          A.   From what time period?

22          Q.   Just -- well, did you have any other employment

23     during 2007 to 2010 time frame?

24          A.   I did not.

25          Q.   So prior to 2007, when you became employed by

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                         9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 14

```
 1          Image Marketing of Florida, LLC, what did you do?

 2          A.   Prior to 2007?

 3          Q.   Yes, sir.

 4          A.   I was employed, after college, at Universal

 5     Studios.

 6          Q.   What'd you do at Universal Studios?

 7          A.   I was a vacation planner.

 8          Q.   And how long did you work at Universal Studios?

 9          A.   I worked there for approximately two years.

10          Q.   Would that be 2005 to 2007, approximately?

11          A.   Let me clarify.  I did Image Marketing Group,

12     Inc. was the corporate structure was adjusted to an LLC

13     at the advice of a CPA.

14          Q.   Okay.

15          A.   Image Marketing Group, Inc. was originally

16     established in 2002.  And in 2007, that had dissolved and

17     the company was structured under an LLC, which is known

18     as Image Marketing of Florida, LLC.

19          Q.   Okay.  So to try to simplify, it wasn't a

20     different company, it just changed structure?

21          A.   Correct.

22          Q.   And did you work at Image Marketing Group, Inc.

23     at any time?

24          A.   Correct.

25          Q.   And when did you work at Image Marketing Group,
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                              Page 15
 1     Inc.?
 2          A.   From the beginning of 2002.
 3          Q.   To 2007?
 4          A.   Correct.
 5          Q.   And what did you do before the 2002 time frame
 6     for Universal Studios?
 7          A.   I had a company called In View Marketing of
 8     Central Florida.
 9          Q.   How long did you work at In View Marketing?
10          A.   1998 through 2002.
11          Q.   And then was the Universal Studios prior to
12     that?
13          A.   Correct.
14          Q.   And did you own In View Marketing of Central
15     Florida?
16          A.   Correct.
17          Q.   Did it have any other employees besides
18     yourself?
19          A.   It had a partner.
20          Q.   Who's the partner?
21          A.   Gregory Livingston.
22          Q.   And what did In View Marketing of Central
23     Florida do?
24          A.   They provided marketing concierge
25     representation and referral card distribution.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 16

1        Q.   Can you explain to me what that is?

2        **A.   We provided representation for various clients**

3    **in the tourism industry primarily in Central Florida**

4    **providing graphic design, providing printing, providing**

5    **representation to the front line hospitality employees,**

6    **which were concierge, guest services, anyone that would**

7    **be in a front line position -- would work at hotels,**

8    **timeshare resorts, (inaudible).**

9        Q.   Can you elaborate, one of the things you said

10   was you represented, I believe, various clients in the

11   tourism industry.  What does that mean?

12       **A.   We represented leisure services, restaurants,**

13   **attractions.**

14       Q.   And can you tell me what you did for these

15   various industries?  Like did you create advertising?

16   Did you --

17       **A.   We created referral programs.**

18       Q.   And can you explain what that is, please?

19       **A.   Referral program is a piece -- collateral piece**

20   **that was created with a discount offer that was**

21   **distributed to front line hospitality employees in those**

22   **positions that I had discussed earlier, and distributed**

23   **to the hotels, tracked, and then the results were**

24   **measured for each individual client represented.**

25       Q.   So is it fair to say that you would deliver

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 17

1    some type of advertising or promotional material to

2    somebody that worked at a hotel or restaurant?

3         A.   Correct.

4         Q.   Or leisure services?

5         A.   We'd provide, on behalf of the restaurant,

6    service, attraction.

7         Q.   Okay.  So did you all create those discount

8    programs or did you deliver them?

9         A.   We created and delivered.

10        Q.   And why did In View Marketing of Central

11   Florida go out of business?

12        A.   In View Marketing dissolved because the current

13   business partner at the time, Gregory Livingston, had

14   moved and taken a different career path.

15        Q.   Was it an amicable parting?

16        A.   Yes, it was.

17        Q.   And then you went to work at Image Marketing

18   Group, Inc.; is that correct?

19        A.   Correct.

20        Q.   Did you form that corporation?

21        A.   Correct.

22        Q.   Did you form it by yourself?

23        A.   Correct.

24        Q.   And when you formed it, how many employees did

25   you have?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                      Page 18
 1            A.    Myself.

 2            Q.    And at any time did Image Marketing Group, Inc.

 3       from 2002 to 2007 hire any other employees?

 4            A.    There was one employee when I was solely

 5       responsible for the company.  His name was Joe Ryan.

 6            Q.    And when did Mr. Ryan begin working there?

 7            A.    He was there for approximately six months, 2000

 8       -- during the year 2002, I believe.

 9            Q.    And then you said when you were "solely

10       responsible for the company," did you take on a business

11       partner, I guess?  Someone buy into the company?

12            A.    No, I had -- Tim Herman became a business

13       partner.

14            Q.    When you say "business partner," did he acquire

15       stock in the company?

16            A.    He did not acquire stock in the company.  I

17       gave him an ultimatum to -- at the time we were friends.

18       I gave him an opportunity to bring clients aboard that

19       would support the company, from which he did, and when he

20       met that goal, he became a partner.

21            Q.    And did you or Mr. Herman have any type of

22       employment agreements with Image Marketing Group?

23            A.    He did not.

24            Q.    Did you?

25            A.    I did not.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 19

1      Q.   Did you all have any type of agreement as to --

2      operating agreement as to how the company would be run?

3      **A.   I did not.**

4      Q.   Was there an understanding as to how the

5      profits and/or losses would be shared?

6      **A.   There was no -- it was trust, friendship**

7      **relationship that we had, and you know, it was a trusting**

8      **relationship, there was nothing in writing.**

9      Q.   But I mean, if a hypothetical $1,000 came in,

10     would you get 500 and he get 500?

11     **A.   It was a 50/50 relationship, so everything was**

12     **50/50.**

13     Q.   And did -- once Mr. Herman came on board, did

14     Image Marketing Group, Inc. hire additional employees?

15     **A.   At a later period, yes, we did.**

16     Q.   And at its prime, how many employees did Image

17     Marketing Group, Inc. have?

18     **A.   Including myself and Tim or additional?**

19     Q.   Including yourself.

20     **A.   Four.**

21     Q.   Four?

22     **A.   Five.  I apologize.  My mind is mush right now.**

23     **And the documents you guys produced --**

24     Q.   Okay.

25     **A.   To my best recollection, yes.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 20

1      Q.   Okay.  So there was four to five employees

2      including yourself and Mr. Herman?

3      **A.   Correct.**

4      Q.   And so could you tell me who the two to three

5      other employees were?

6      **A.   Denise Tucker, Babette Picanol, Deanna**

7      **Mashburn, Thomas Brignolo.  There was a gentleman by the**

8      **name of Juan, I cannot recall his last name.  And there**

9      **was a gentleman by the name of Jessie, I cannot recall**

10     **his last name as well.  And Michelle Levy was our**

11     **attorney at the time.**

12     Q.   I'm sorry, Michelle --

13     **A.   It was Michelle Levy.**

14     Q.   Were all these people employed at the same time

15     or were these various periods of time?

16     **A.   There were some overlap but not all at the same**

17     **time.**

18     Q.   Do you recall who was employed in,

19     approximately, 2006 to 2011?

20     **A.   Thomas Brignolo, Babette Picanol, Deanna**

21     **Mashburn, Denise Tucker.**

22     Q.   Is that it?

23     **A.   To my best recollection, yes.**

24     Q.   Does Denise Tucker still work with any of your

25     companies?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 21

1       A.    No.

2       Q.    Did she -- do you know when she -- when did she

3   quit working for you?

4       A.    I have no recollection, because before -- after

5   2010, I was --

6       Q.    Okay.  Do you know where she lives?

7       A.    I do not.

8       Q.    These are some of the same employees that Mr.

9   Takio identified for me yesterday.  Did Image Marketing

10  Group, Inc. and Takitik share employees?

11      A.    We all worked in the same office.  We all had

12  different responsibilities.  So yes.

13      Q.    And if I said who issued a W2 to Denise Tucker,

14  Babette Picanol, Deanna Mashburn, or any of those

15  individuals, who would have issued the W2?

16      A.    It would have been issued by the CPA.

17      Q.    No, I mean, was it Image Marketing?  Did her

18  paycheck come from Image Marketing Group, Takitik?

19      A.    I can't speak on behalf of any other company

20  except Image Marketing, so Image Marketing.

21      Q.    And to your knowledge, Image Marketing Group,

22  Inc. issued W2 to those employees?

23      A.    They -- 1099's were issued except for the

24  partners -- partnerships.

25      Q.    So were these individuals independent

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 22
    1      contractors?

    2           A.   Yes.

    3           Q.   And then just so I cover all my bases, were

    4      there any other individuals you would deem independent

    5      contractors employed by Image Marketing Group, Inc.?

    6           A.   No.

    7           Q.   What did Denise Tucker do?

    8           A.   Denise assisted with office kind of management,

    9      kind of organizing.  She also assisted with distribution.

   10           Q.   What did Babette Picanol do?

   11           A.   She assisted with office management.  She

   12      worked closely with Tim (inaudible).

   13                COURT REPORTER:  I'm sorry?

   14                THE WITNESS:  She also worked closely with Tim,

   15           handled some invoicing.  She also assisted with some

   16           distribution.

   17      BY MR. BLAIR:

   18           Q.   What about Deanna Mashburn, what did she do?

   19           A.   Deanna Mashburn assisted with distribution.

   20           Q.   What did Thomas Brignolo do?

   21           A.   Thomas assisted in all aspects of the company

   22      from distribution to some office management.

   23           Q.   What did Juan do?

   24           A.   Distribution.

   25           Q.   What did Jessie do?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 23

1        A.    Distribution.

2        Q.    What did Michelle Levy do?

3        A.    Distribution.

4        Q.    And can you just give me an overview of what

5   Image Marketing Group, Inc. did?

6        A.    Image Marketing was a well recognized marketing

7   firm in the tourism industry that represented multiple

8   clients.

9        Q.    Can you --

10       A.    We provided representation on behalf of a

11  variety of restaurants, leisure services, attractions,

12  malls, sport -- professional sports teams.

13       Q.    And again, I'm not in the marketing industry,

14  so when you say "representation of" and then you list --

15  can you tell me what your representation consisted of?

16       A.    It consisted of the implementation of the

17  concierge guest service referral program, distribution,

18  brochures, rack cards, pamphlets, newsletters, email

19  blasts, technology build regarding real tracking systems,

20  and management.

21       Q.    You said "technology build"?

22       A.    Yes.  Consulting.

23       Q.    Anything else?

24       A.    That would pretty much be the scope of the

25  business.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 24

1          Q.    And why did you decide to go into business with

2    Mr. Herman?

3          A.    Again, as previously discussed, Tim Herman had

4    an interest in seeing what the concept that I built with

5    Image Marketing.  I gave Mr. Herman an opportunity to

6    prove himself and to acquire clients that would come over

7    to Image Marketing to sustain himself and his position

8    with the company, at which at that point he did.  That is

9    when I brought him on as a partner to assist me in

10   building a company.

11         Q.    Do you know what his marketing experience was

12   before you hired him?

13         A.    He was employed by Gator Tours.

14         Q.    Gator Tours?

15         A.    Yes.

16         Q.    Is that airboat?

17         A.    No, it was a tour operator.  He oversaw the

18   marketing of that company.

19         Q.    Okay.  Can you explain to me what the concierge

20   guest referral program -- is that what you called it?

21         A.    Correct.

22         Q.    Can you explain to me what that is?

23         A.    Concierge guest referral program, as discussed

24   earlier, was a program that was designed, created by

25   Image Marketing that encompassed the graphic design of

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 25

1    the card, the printing of the card, the communication of

2    the program to the various front line hospitality

3    employees referenced earlier in the hospitality tourism

4    industry throughout the State of Florida.

5         Q.   So is this, essentially, you would provide a

6    concierge or front line employee at a hotel with a card

7    that would encourage him or her to refer that guest to a

8    specific venue, and in return, they would be paid a

9    commission in doing so?

10        A.   Correct.  A rack card, a pamphlet, depending

11   on what the client preferred.

12        Q.   And for example, you have a restaurant, there's

13   lots of restaurants in Orlando.  How would it work when

14   you have 20 restaurant clients and you go to a hotel and

15   there's a referral card, does he have the option to pick

16   one of the twenty, or whoever pays the most gets the

17   first referral?  How's that work?

18        A.   It's based on the front line hospitality rep's

19   recommendation of who they prefer and it really comes

20   down to the communication between that guest and the

21   concierge.

22        Q.   And you also said Image Marketing Group, Inc.

23   did distribution of brochures, racks, and pamphlets, and

24   that type of thing?

25        A.   Correct.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                     Page 26
    1           Q.   Where did they distribute them to?

    2           A.   Hundreds, if not close to 1,000 locations

    3      throughout the State of Florida.

    4           Q.   Does Image Marketing Group, Inc. have a list of

    5      those distribution points?

    6           A.   Yes, we do.

    7           Q.   And since I have not seen the list, can you

    8      give me an idea, is it hotels, restaurants, malls, bars?

    9           A.   Hotels, timeshares, resorts, rest stops, front

   10      desk.  I mean, it encompassed anywhere that a traveler

   11      would come to.  Any of the destinations in the State of

   12      Florida, we were most likely there.

   13           Q.   And at the time, Mr. Herman -- or prior to Mr.

   14      Herman joining Image Marketing Group, Inc., how many

   15      clients did Image Marketing Group, Inc. do distribution

   16      for?

   17           A.   To the best of my recollection, six to seven.

   18           Q.   Do you know who they were?  Can you recall who

   19      they were?

   20           A.   Yes.  Universal City Walk, NASCAR Cafe, House

   21      Of Blues, Sun Cruise Casino, Latin Quarter.

   22           Q.   So Latin Quarter at City Walk?

   23           A.   Correct.  And City Walk as well, which

   24      encompasses several different entities under that

   25      program.  There may have been a couple more I cannot
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 27

1    recall.

2         Q.   And when you were -- prior to Tim Herman when

3    you were distributing to these entities that you just

4    listed, how was the route determined as far as the

5    distribution of their promotional material?

6         A.   It was determined, you know, by the client.  We

7    had several areas that we covered and our job was to

8    provide the best exposure for that client.

9         Q.   And I'm just trying to get a feel.  I assume

10   you had routes established and you would tell the client,

11   these are my routes, tell me what you want?

12        A.   There were no established route.  There was --

13   each -- there was established hotels, there was several

14   companies that we worked with within the industry and

15   guest service companies that changed, hotels opened, we

16   provided the distribution to all hotels.

17        Q.   So if NASCAR, for example, said, I want my

18   promotional materials distributed, would you just take

19   your list and distribute to that?

20        A.   Correct.

21        Q.   And then likewise, the House of Blues, while

22   you were there, you would distribute their material at

23   the same location?

24        A.   Correct.

25        Q.   It wasn't like -- and I'm just trying to figure

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 28

1        out, if you just distribute it off a list or if there was

2        some type of ala carte menu that these people could

3        select from is what I'm trying to figure out?

4             **A.   It was off the list.**

5             Q.   And do you recall how many -- approximately,

6        how many hotels were on the list at that time?

7             **A.   I can't recall an exact number.**

8             Q.   Over 100?

9             **A.   I would say at that time, well over 100.**

10            Q.   Over 200?

11            **A.   Correct.  I would say probably 500, 400.**

12       **Between 3 and 500.**

13            Q.   And after Mr. Herman joined Image Marketing

14       Group, Inc., did you continue to distribute to these

15       companies, meaning Universal, NASCAR, House of Blues, Sun

16       Coast [sic] Casino, and Latin Quarter?

17            **A.   At that time, House of Blues and Sun Cruise**

18       **Casino.  I cannot recall if there was overlap and I don't**

19       **believe Universal was a client at that time when Tim came**

20       **aboard.**

21            Q.   How about in -- if I wanted to get a 2007 time

22       frame, do you recall, of these entities that we just

23       talked about, who were you distributing to in 2007?

24            **A.   We had brought on more clients.  If you're**

25       **referring back to the clients previously discussed that**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                      9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 29

```
 1        were represented at that time, it would be Sun Cruise

 2        Casino.

 3             Q.   Only?

 4             A.   Again, my mind is -- I'm trying to do my best

 5        to remember.

 6             Q.   Okay.  How about in 2008, do you recall of

 7        those one, two, three, four, five entities we've been

 8        discussing, which ones you were distributing to in 2008?

 9             A.   In 2008?

10             Q.   Yes, sir.

11             A.   Again, we had -- I believe in 2008 we had 36

12        clients.  I can't specifically point out what we had

13        prior to that.

14             Q.   Is there a list -- does Image Marketing Group,

15        Inc. maintain a list or did it maintain a list of its

16        clients?

17             A.   It did.

18             Q.   Were they maintained by year?

19             A.   They were maintained by year.  Sometimes they

20        were listed in our newsletters that went out.

21             Q.   Okay.  We talked about after Tim Herman came on

22        board, you said at that time maybe had 30 plus clients;

23        is that correct?

24             A.   After -- at what time period?

25             Q.   I said after Mr. Herman came aboard.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 30

1          A.    At any time period?

2          Q.    Yes.

3          A.    Yes.

4          Q.    Give or take, you had about 30 clients?

5          A.    An average of 20, but yes, at one time we had

6     like 36 plus clients.

7          Q.    So to somewhere between 20 and 36?

8          A.    Yes.

9          Q.    And of those 20 to 36 clients, which ones of

10    them did you do distribution for?

11         A.    All of them.  I mean, I was involved with all

12    of them.

13         Q.    And as far as the pricing goes for these 36

14    clients that you did distribution for, how was that

15    established?

16         A.    It was all established by the scope of the

17    services that the client wanted.

18         Q.    Didn't you just tell me that they all were just

19    distributed off the list?

20         A.    They were all distributed off the list, but

21    each client wanted -- there were different services that,

22    you know, provided.  If they wanted printing, if they

23    wanted graphic design, if they wanted distribution.  So

24    each client it really differed in each capacity.

25         Q.    If the client wanted solely distribution, what

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 31

1         would you charge them?  For these 36 clients.

2              A.    It was based on -- like again, we had different

3         areas that were distributed upon.

4              Q.    Well, can you tell me, based upon the areas,

5         what you would charge them?

6              A.    Based on -- I can't recall and recollect each

7         one.  It was all negotiable on the salesperson.  So you

8         know, I'm going to provide as much service as I can to

9         that client and exposure.  There was events.  There was

10        racks.  There was referral cards.  There was additional

11        time taking for tracking.  So each client was all -- it

12        was a different price.  I just can't recall the price.

13             Q.    I'm just asking.  I don't care about mixers and

14        things.  If I just ask you what you charge any of these

15        36 clients to distribute literature to these hotels that

16        we discussed off of your list, could you tell me what you

17        charged?

18             A.    I could come up with an approximate average.

19        1,000 to 3,000 to $4,000.

20             Q.    What would make the difference between 1,000

21        and $4,000 to deliver to the same hotel?

22             A.    The amount of work done that it would take to

23        manage that program.

24             Q.    And aren't you just giving them some type of

25        pamphlet?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                            Page  32
    1          A.    There's a lot of services that are involved in
    2     the concierge referral program based on each client
    3     beyond just distribution.
    4          Q.    I'm not talking about concierge referral
    5     program, I'm talking about distribution to these hotels.
    6     I assume it's rack distribution?
    7          A.    Correct.
    8          Q.    And then what, concierge cards?
    9          A.    Correct.
   10          Q.    Okay.  So let's just take NASCAR and House of
   11     Blues.
   12          A.    Okay.
   13          Q.    Say you go to Hotel X for both of them.  Why
   14     would they be a different price?
   15          A.    Because House of Blues had monthly calendars
   16     and they had a referral program and they had newsletters
   17     that were pushed out.
   18          Q.    So you would charge them because they had three
   19     pieces of paper --
   20          A.    Absolutely.
   21          Q.    -- you would charge them more than one piece of
   22     paper?
   23          A.    Correct.
   24          Q.    And how much difference was it per piece of
   25     paper?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                      Page 33

  1          A.   I can't recall, again, exact amounts at this

  2      time.

  3          Q.   Did you enter into contracts for your

  4      distribution for all 36 clients?

  5          A.   We went into contracts, but there was also a

  6      lot of verbal contracts.

  7          Q.   And I'm just trying to figure out, if I go to

  8      subpoena the Latin Quarter, will there be a contract

  9      there between Image Marketing, Inc. and the Latin

 10      Quarter?

 11          A.   There should be a contract there for that one,

 12      yes.  Universal produced the contract for us.

 13          Q.   How about Sun Coast [sic] Casino, will there be

 14      a contract there?

 15          A.   Sun Cruise Casino, yes.

 16          Q.   What about House of Blues?

 17          A.   Yes.

 18          Q.   How about NASCAR?

 19          A.   I cannot recall.

 20          Q.   How about Universal?

 21          A.   They provided a contract, yes.

 22          Q.   And of your clients, who had the -- I guess you

 23      said there's different types of services or extents of

 24      service.  Who had the most extensive requirements for

 25      service?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                                      Page  34
  1              A.    In regards to clients?

  2              Q.    Yes.

  3              A.    Florida Mall.

  4              Q.    Okay.

  5              A.    Simon Mall.  Multiple malls that were

  6      represented.

  7              Q.    Who had the second -- like who would you -- if

  8      you had to say who were your highest requirement clients,

  9      could you give me the top five?  Florida Mall being one.

 10              A.    There's -- well, again, to rephrase, if you're

 11      referring to clients, clients were individually -- I

 12      mean, Simon Mall, Florida Mall was one of Tim's clients.

 13      Okay.  So it wasn't -- we had different responsibilities.

 14      So I had certain responsibilities when dealing with a

 15      client and then Tim had his clients that he had.  And

 16      regards to that scope, I can't answer that question.

 17              Q.    Wasn't Simon Property Group a client of your

 18      company?

 19              A.    It was a client of Image Marketing Group

 20      brought in --

 21              Q.    And you were an officer of Image Marketing

 22      Group?

 23              A.    I was an officer of Image Marketing Group.

 24              Q.    So let's just cut to the chase, who did you

 25      bill the most services to?  Simon Property Group would be
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                       Page 35

  1       obviously one.  Who would be your next highest grossing

  2       client?

  3               MR. BRAND:  Let me object to the question.  I

  4           also don't understand it.  Are you saying who did

  5           you -- those are your words.  Are you saying --

  6               MR. BLAIR:  I understand you don't understand

  7           it, Craig, but he didn't say he didn't understand

  8           it.  So can you let him try to answer and tell me if

  9           he didn't understand?

 10               MR. BRAND:  No.  No.  Not when you're taking a

 11           deposition and you're trying to merge four different

 12           entities into a single deposition.  So the answer

 13           is, no.  So please tell my client which hat you

 14           would like him to wear when answering your question.

 15               MR. BLAIR:  Well, let's do four depositions

 16           today.  I'm going to start with you individually.

 17           Let's do it that way.

 18               MR. BRAND:  I don't care.  Ask the question any

 19           way you want, as long as it makes sense.

 20       BY MR. BLAIR:

 21           Q.  Start with your education.  Can you give me

 22       your education, please?

 23           A.  My education, I went to high school.

 24           Q.  Do you have any college education?

 25           A.  Yes, I do.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                        Page  36
    1           Q.   From where?

    2           A.   I went to Lee University.

    3           Q.   The University?

    4           A.   Lee.

    5           Q.   Lee University.  Where is that located?

    6           A.   (Inaudible.)

    7                COURT REPORTER:  I'm sorry?

    8                THE WITNESS:  Cleveland, Tennessee.

    9      BY MR. BLAIR:

   10           Q.   And do you have a degree?

   11           A.   I do not.

   12           Q.   How many years of college did you complete?

   13           A.   Three years.

   14           Q.   And approximately, what durations were you at

   15      Lee University?

   16           A.   '94 to '97.  And I'm sorry, I recall to end of

   17      '96.

   18           Q.   And do you have any licenses or certifications

   19      other than a driver's license?

   20           A.   No.

   21           Q.   Have you taken any courses in marketing or

   22      anything of that nature?

   23           A.   No.

   24           Q.   Even beyond college, did you attend any type of

   25      seminars or what I would call continuing education
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                              Page 37
1      programs in marketing?
2           A.   No.
3           Q.   Did you --
4           A.   Strike that earlier question.  I did go to
5      school for communications, so there were classes that
6      encompassed marketing.
7           Q.   And you said communications.  Where'd you go to
8      school?
9           A.   Lee University.
10          Q.   Other than Lee University, have you -- since
11     then have you attended any type of, again, seminars or
12     continuing education on advertising?
13          A.   There was multiple seminars that were
14     established through different industry associations that
15     had keynote speakers that went over different marketing
16     topics that I educated myself on that I attended.
17          Q.   And could you give me the name of those or who,
18     I guess, provided the seminar?
19          A.   There was Visit Orlando.  There was Central
20     Florida Hotel and Lodging Association.  There's Orlando
21     Business Journal.  There may be more, I just can't
22     recall.
23          Q.   Are these like lunch type functions or are you
24     there all day for courses?
25          A.   There were some days that there was a lunch
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 38

1          included, but individual courses throughout the day.

2               Q.    And approximately, how many of those have you

3          attended?

4               A.    Since what time frame?

5               Q.    Since you graduated college -- or since you

6          left college, excuse me.

7               A.    Probably -- wow, a lot.

8               Q.    Over ten?

9               A.    Yes.

10              Q.    Over twenty?

11              A.    Yes.

12              Q.    Over thirty?

13              A.    I would say maximum fifty.

14              Q.    Did any of these seminars have to do with

15         distribution type marketing that your company deals with?

16              A.    It encompassed several aspects of tourism

17         marketing and included distribution. I'd also like to add

18         Florida Attractions Association to that as well.

19              Q.    Do you have any training in what I call

20         finances?

21              A.    No.

22              Q.    Do you have any skills, expertise, or training

23         in web design?

24              A.    Yes.

25              Q.    Can you describe that for me?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a4773 9a

Ryan Deming - 9/21/2012

Page 39

```
 1              A.    Simple fact HTML through WordPress.

 2              Q.    WordPress?

 3              A.    Yes.

 4              Q.    What's WordPress?

 5              A.    WordPress is a platform, open source platform.

 6       Also, just through HTML email, newsletters.

 7              Q.    If I came to you and said, Mr. Deming, I'd like

 8       to hire you to design my web page, do you feel qualified

 9       to do that?

10              A.    It depends on what would be included in that

11       web page.

12              Q.    And what would you feel qualified to do and not

13       feel qualified to do in designing a web page?

14              A.    It -- a basic white page, if you want your logo

15       and address on there and some pictures.  Again, it wasn't

16       my expertise.  I -- we consulted with companies that had

17       the expertise and that knowledge.

18              Q.    Have you --

19              A.    As far as basic.

20              Q.    Have you ever attended any trade shows on

21       behalf of your clients?

22              A.    Yes.  Several.

23              Q.    First, for which company that you worked for

24       did you (inaudible)?

25              A.    Image Marketing Group, Inc.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 40

1      Q.   Did you attend any for -- any trade shows while

2      you were working at Image Marketing Group of Florida,

3      LLC?

4          A.   Yes.

5          Q.   And did you attend any trade shows -- put it

6      this way, were you ever employed by Event Planners USA,

7      Inc.?

8          A.   I was an officer of that company.

9          Q.   Did you ever attend any trade shows while you

10     were an officer of Event Planners USA, Inc.?

11         A.   Yes.

12         Q.   And where did you attend trade shows?

13         A.   There were several trade shows.  I cannot

14     recall each one.  I can give you to my best recollection

15     of the ones that I attended.  There's other officers and

16     employees of the company that attended as well.  Central

17     Florida Concierge Association.

18         Q.   Okay.

19         A.   Central Florida Hotel and Lodging Association.

20     Florida Attractions Association.  Florida Huddle.

21     Florida Statewide Concierge Conference.  Orlando

22     (inaudible) Partners.

23             COURT REPORTER:  Orlando what?

24             THE WITNESS:  Fun partners.  Southwest Florida

25     Concierge Association.  If there's more, I will let

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a4773a

Ryan Deming - 9/21/2012

Page 41

1          you know, but at this time, there were so many --

2          off the top of my head, I cannot remember any

3          additional.

4     BY MR. BLAIR:

5          Q.   The list that you just gave me were all in

6     Florida; correct?

7          A.   **In regards to what?**

8          Q.   The trade shows that you just listed that you

9     attended.

10         A.   **Those were all located in the State of Florida.**

11         Q.   Have you ever attended a trade shows outside

12    the State of Florida?

13         A.   **No.**

14         Q.   Of the trade shows that you gave me you had

15    attended, did anyone attend with you?

16         A.   **At times there was -- Thomas Brignolo would**

17    **have attended with me at times.  At times, Tim Herman**

18    **would have attended with me.**

19         Q.   Anybody else?

20         A.   **There would be mall managers that would attend.**

21         Q.   Which mall managers attended with you?

22         A.   **Jamie Roy.**

23         Q.   Who was she a mall manager for?

24         A.   **Florida Mall.  She had two additional**

25    **representatives, I cannot recall their names.  Thearon**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 42

1      **Scurlock.**

2          Q.   Is it Scurlock?

3          A.   **Scurlock, of Florida Mall. Diane Ivey, Coconut**

4      **Point. Venetia, I believe Tiberias, Sawgrass Mall.**

5      **Deborah Ray, Florida Mall. There was others, I just**

6      **cannot recall their names at this time.**

7          Q.   Did you attend any of these trade shows on

8      behalf of any other clients other than Simon Property

9      Group?

10         A.   **Yes.**

11         Q.   Who did you attend on others behalf? If that

12     makes sense.

13              Who did you attend for besides Simon Property

14     Group?

15         A.   **It depends. Referring to what conference?**

16     **They were all different conferences in different areas.**

17         Q.   Okay. Well, at this point, I don't really care

18     which conference, since it's probably one of the ones

19     that you gave me.

20         A.   **Yes.**

21         Q.   Can you just give me the names that you recall

22     of the clients that you attended a trade show for,

23     regardless of which one it is, other than Simon Property

24     Group?

25         A.   **Boggy Creek Airboats, Florida Dolphin Tours,**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 43

1      **Ripley's Believe It or Not, (inaudible).**

2              COURT REPORTER:  I'm sorry?

3              THE WITNESS:  Titanic exhibition.  Orlando

4       Balloon Rides, Sun Cruise Casino, Brian's Grill and

5       Wine Bar, Papa John's Pizza, Sammy Duvall's

6       Watersports.

7    BY MR. BLAIR:

8        Q.    Is that the ski place?

9        **A.    Correct.  Raglan Road Irish Pub and Restaurant,**

10      **Forever Florida.  A lot of clients.**

11       Q.    Okay.

12       **A.    Again, my mind is --**

13       Q.    And we can go through these individually, but

14      are these all the same type of trade show, did you do the

15      same thing at all of them generally, or is each one --

16       **A.    Each one is a different platform.**

17       Q.    Well, let's go through the Central Florida

18      Concierge trade show.  What did you do at that one?

19       **A.    We would --**

20       Q.    What would your function be as a representative

21      of a company there?

22       **A.    We would represent our clients in front of**

23      **concierges that were members of the Concierge**

24      **Association.**

25       Q.    And is this what we talked about earlier where

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a4773a

Ryan Deming - 9/21/2012

Page 44

1        your client would have a booth or a table there?

2             A.   Correct.

3             Q.   And then they would familiarize the concierge

4        with the services?

5             A.   **They would have an annual trade show, but they**

6        **would also have monthly meetings that we would attend on**

7        **behalf of our clients.**

8             Q.   I'm just trying to get a feel for what goes on.

9        I'm not trying to trick you.  Tell me if I'm wrong --

10            A.   **I'm just -- you're all over the board and I'm**

11       **really confused right now.**

12            Q.   I'm just trying to figure out what you do at

13       the Central Florida Concierge show.

14            A.   **That's what we do.**

15            Q.   But in layman's terms, there are booths that

16       your client would set up; correct?

17            A.   **At the annual trade show.**

18            Q.   Okay.  And then they would pass out literature

19       to concierges; correct?

20            A.   **Correct.**

21            Q.   To try to familiarize them with your clients

22       goods and services?

23            A.   **Correct.**

24            Q.   And encourage the concierges to refer people to

25       their businesses?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                        Page 45
     1          A.    Correct.
     2          Q.    Now, of the trade shows that you've described
     3     for me, which ones did that occur at, that type of
     4     service that we just described, about the booth and
     5     introducing the concierges to --
     6          A.    Again, are you -- on behalf of Image Marketing,
     7     there was several representatives and I didn't attend
     8     every single one of them.
     9          Q.    Okay.
    10          A.    So each platform was different, so I can't
    11     specifically -- and they had monthly and annual trade
    12     shows and meetings on that at different locations.  I
    13     can't answer.  They were different.
    14          Q.    How about this:  At the Central Florida
    15     Concierge Conference, did you go and have clients there
    16     setting up a booth and passing out literature to
    17     concierges?
    18          A.    Yes, sir.
    19          Q.    At the Central Florida Hotel and Lodging
    20     Association trade show, did you go there and have clients
    21     that set up a booth that were passing out literature to
    22     concierges?
    23          A.    There was -- each association had different
    24     attendees.
    25          Q.    Okay.  I just want to know if you were there?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                     Page 46

 1          A.    There was -- the years I was there, recalling

 2     which year, I cannot answer that question.

 3          Q.    Do you recall if the Florida Attractions

 4     Association if you were there passing out literature --

 5          A.    Yes.

 6          Q.    -- with clients?  And the Florida Huddle, were

 7     you there doing that same process?

 8          A.    Yes.

 9          Q.    And the --

10          A.    Again, I've said this before, each conference

11     and each meeting had a different platform, so to

12     generalize passing out brochures or concierge referrals,

13     they were all unique and all different.

14          Q.    We're going to go ahead and talk about it.  So

15     what did you do at the Central Florida Hotel and Lodging

16     Association that was unique and different from that?

17          A.    They would host monthly meetings.  They would

18     host annual galas.  They would host golf tournaments.

19     They would host their annual trade show.  They would host

20     seminars to better educate.

21          Q.    So you would go to a golf outing on behalf of a

22     client?

23          A.    Correct.

24          Q.    And bill them for that?

25          A.    Absolutely.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 47

1          Q.    And how much did you bill your clients for

2     that?

3          **A.    Depending on what the fee or sponsorship fee**

4     **was for that specific tournament and for our time to be**

5     **there.**

6          Q.    But if NASCAR wanted to have you go to a golf

7     tournament, let's just say, and House of Blues wanted you

8     to go to a golf tournament, would you charge them

9     differently?

10         **A.    No.**

11         Q.    And generally, for attending these trade shows,

12    did you bill your clients the same fees at Image

13    Marketing Group, Inc.?

14         **A.    Again, each individual had different clients,**

15    **so I can't be -- I can't talk on behalf of every invoice**

16    **and every client that Image Marketing had.  I know that**

17    **the clients that I invoice for, yes.**

18         Q.    Okay.  So the clients that you invoice for, you

19    would basically charge them the same to attend the same

20    trade show?  Seems fair to me.

21         **A.    To my best recollection, if they all had**

22    **multiple -- there was -- each individual client was**

23    **different in each different capacity that wanted**

24    **different services that were provided.**

25         Q.    So other than deposing someone from the Orlando

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a4773 9a

Ryan Deming - 9/21/2012

Page 48

1        Magic or NASCAR, how would I find out what services that

2        you or your companies provided to them?

3            **A.    In regards to NASCAR?**

4            Q.   Sure.  Any of your clients.  How would I find

5        that out?

6            **A.   At that time, NASCAR was considered my client**

7        **that I brought into the company.**

8            Q.   Okay.

9            **A.   So you can -- NASCAR was a client until, I want**

10       **to say, 2000 -- I can't recall that far what we did for**

11       **them.**

12           Q.   No, I'm saying -- I'm not asking you to recall.

13       I'm asking you, if I wanted to find out what you did for

14       them, is there a piece of paper that I could look at that

15       would tell me that or do I have to depose them?

16           **A.   At my departure of Image Marketing in 2010, had**

17       **no responsibility to take any information out of the**

18       **office with me.  I moved on with my career.  If it was**

19       **there, it would be in the possession of Tim Herman.**

20       **Again, all records regarding to the company were there.**

21       **You would -- I would assume that you would have to talk**

22       **to Tim Herman or to NASCAR.**

23           Q.   Okay.  All right.  With respect to any of the

24       clients you had at Image Marketing Group, Inc. or Image

25       Marketing Group, LLC, are any of them your current

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

                                                          Page 49

 1        clients at Red Carpet Promotions or Max Media?

 2            A.   No.

 3            Q.   And if I'm going to talk to you today in your

 4        corporate capacity as a corporate representative for

 5        Image Marketing Group, Inc. or Image Marketing Group of

 6        Florida, LLC, is there a distinction I would need to

 7        make?  Because you just told me you basically changed the

 8        formalities.

 9            A.   No distinction.

10            Q.   Okay.  So if I ask you a question about Image

11        Marketing Group, is it fair to say it applies to both?

12            A.   Correct.

13            Q.   Thank you.

14            A.   Could I take a break?

15            Q.   Yes, sir.

16            CAMERA OPERATOR:  All right.  We're off the

17        record.  The time now is 10:50.

18            (Whereupon, a recess was taken at 10:50 a.m.

19        and proceedings resumed at 11:18 a.m.)

20            CAMERA OPERATOR:  Okay.  We're back on the

21        record.  The time now is 11:18.

22        BY MR. BLAIR:

23            Q.   Mr. Deming, I just want to close some loops on

24        the Image Marketing Group, Inc. entity.  Other than you

25        and Mr. Herman, have there ever been any owners of that

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                      9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 50

1       company?

2            A.    Yes.

3            Q.    Who?

4            A.    Thomas Brignolo.

5            Q.    And what was Mr. Brignolo's share of the

6       ownership?

7            A.    I did not retain the corporate certificate,

8       that was in the possession of Tim Herman.  I want to say,

9       from documents that I have seen in the past,

10      approximately three and a half percent.

11           Q.    And at the time of your, I guess, resignation,

12      was Mr. Brignolo still an owner?

13           A.    Yes.  Correct.  To my understanding.

14           Q.    And then we were talking about some of the, I

15      guess, services that Image Marketing Group, Inc.

16      performed and we went through the representation, the

17      implementation of concierge guest referral program, the

18      distribution, and you had an email blast.  What is an

19      email blast?

20           A.    An email blast was catered, customized toward

21      each individual client if they requested that service.

22      It was advertising an event, familiarization of that

23      event, or it was communicated out through the monthly

24      newsletter.

25           Q.    Was it like an advertisement that goes out via

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 51

1       email, essentially?

2           A.   Correct.

3           Q.   And I assume, since it's a blast, indicates it

4       goes to a large number of --

5           **A.   We had over 8,000 contacts in the database.**

6           Q.   And did Image Marketing Group, Inc. have any

7       type of rate structure they would charge it's clients for

8       an email blast?

9           **A.   There was no specific rate structure for that.**

10      **Each one was specific to -- there was several email**

11      **blasts that were sent out specific to different**

12      **communications.**

13          Q.   And who designed the content of the email

14      blast, was it the client or Image?

15          **A.   The client would provide us the message and/or**

16      **image.   There was times that we would create the image or**

17      **message.   And there was times that we would translate the**

18      **communications or the content and create it in a**

19      **presentable format to be sent out to the database.**

20          Q.   And was the fee, or whatever it was, based upon

21      the amount of recipients or the content of the email or a

22      combination of things?

23          **A.   There was -- each client was different.   Each**

24      **communication was different.   There was no set fee.   They**

25      **all were customized to the client.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                      Page 52
    1          Q.    And as far as the, I guess, just the general
    2     fee, can you give me a range?  Were most clients charged
    3     under $100 for an email blast?  Between 100 and 200?  I
    4     mean --
    5          A.    It was encompassed in different formats of the
    6     relationship that we had.  Based on the scope of work
    7     that that specific client would request us on an
    8     individual basis or just included, there was a lot of
    9     times at our good will that we would represent the client
   10     to our best interest, multiple clients were on one
   11     specific email blast.  So I can't answer a specific fee
   12     pertaining, because each client had different scope of
   13     representation work.
   14          Q.    And typically, if Image Marketing Group, Inc.
   15     entered into a contractual relationship with a client,
   16     would the various fees for these services be set forth in
   17     the contract?
   18          A.    Are you referring to a specific client or --
   19          Q.    Any client that has a contract, would you break
   20     down the fees this much for distribution, this much for
   21     email blast, or do you just bill them a lump?
   22          A.    Each client that we represented had different
   23     formats of the way they received or billed or requested
   24     financial matter.  Again, each individual person and
   25     capacity would have their own accounts, so depending on
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 53

1      what account, you would have to talk to the person that

2      handled that account on how those were structured.

3            Q.   How about for your fees and your contracts for

4      your clients, did you ever have contracts with any of

5      your clients where these fees were broken down?

6            A.   Contracts for my specific clients -- is there a

7      specific client that you're referring to?

8            Q.   Let's just take, for example, Orlando NASCAR.

9            A.   NASCAR.

10           Q.   If you did email blasts for NASCAR and you also

11     did distribution for NASCAR, would their contract say, we

12     are going to bill you "X" for these services or would the

13     contract say, we're going to bill you "X" for email

14     blasts and "Y" for distribution?

15           A.   I can't recall what the exact contract and

16     service scope defines regarding that in regards to

17     invoices.  For that specific client, the invoice, I can't

18     recall exactly.  There was different line items, yes, for

19     different scopes of work.  Specific to the subject in

20     line for each invoice, I cannot recall.

21           Q.   In preparation for your deposition today, what

22     tasks did you undertake?

23           A.   The various task of going through the thousands

24     of documents requests that you have subpoenaed me

25     individually and the companies associated with -- that my

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 54

1    name was listed on.  In complying to my best ability to

2    those, hours, days, nights, so every document that you

3    produced to me was in preparation to today's deposition.

4        Q.   Okay.  My client hasn't produced any documents

5    yet.  They're available for review.  But did you review

6    Image Marketing Group, Inc.'s corporate documents prior

7    to your deposition today?

8        A.   Yes.

9        Q.   Did you review Image Marketing of Florida,

10   LLC's documents prior to your deposition today?

11       A.   Prior, as an indefinite prior?

12       Q.   Like prior to coming here, did you refresh your

13   memory and look at any of the Image Marketing of Florida,

14   LLC's documents?

15       A.   At the time of going through the production of

16   documents and information since originally sent to my

17   attention, at what time point I cannot recall, but yes, I

18   did have a chance to review documents relating to the

19   company.

20       Q.   Did you go over to Jason Herman's office this

21   week and review any documents?

22       A.   I did.

23       Q.   Did you review any documents from Event

24   Planners USA, Inc.?

25       A.   Yes.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a4773 9a

Ryan Deming - 9/21/2012

Page 55

```
 1          Q.   And did you review those at Jason Herman's

 2     office?

 3          A.   At Jason Herman's office.

 4          Q.   And likewise, the two Image companies, were

 5     those documents located at Jason Herman's office?

 6          A.   Yes.

 7          Q.   And then other than the documents at Jason

 8     Herman's office, have you reviewed any documents that

 9     were either at your counsel's office or somebody else's

10     possession relating to Image Marketing Group, Inc., or

11     Image Marketing of Florida, LLC?

12          A.   I'm confused by the question.

13          Q.   In other words, the only documents that you

14     reviewed in preparation for your deposition, were they

15     the ones at Jason Herman's office?

16          A.   No.

17          Q.   What other documents did you review?

18          A.   The other documents that I reviewed are

19     anything that, basically, through Sunbiz, through

20     documents in request for production that I was able to

21     obtain.

22          Q.   And where did you obtain those documents from?

23          A.   I obtained the documents through an email

24     account that was used at my time at Image Marketing.

25          Q.   And what email account was that?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 56

1          A.    Rdeming@image-marketing.com.

2          Q.    What did you go to the -- is it still in the

3    email account?

4          A.    They were still in the email account.

5          Q.    Is that email account still active?

6          A.    Yes.  Well, no, it's not active, but I was able

7    to access it.

8          Q.    Is it -- like did you just go to your computer

9    and dial in or did you have to go to a backup server

10   somewhere?

11         A.    Backup server.

12         Q.    Where is the backup server?

13         A.    It was Go Daddy.  I believe it was Go Daddy.

14         Q.    You also said Image Marketing Group, Inc. did

15   technology building, tracking or something like that?

16         A.    Oh, let me define that.  We had a proprietary

17   referral tracking system that we invested a lot of money

18   and time into developing.  There's no other -- that would

19   manage the tracking of our referrals through.

20         Q.    Without disclosing any trade secrets, can you

21   tell me, in layman's terms, what it does?

22         A.    It tracks referrals specific to each client --

23              MR. BLAIR:  We might want to wait for the train

24   to go.

25              (Interruption by outside noise.)

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 57

1    BY MR. BLAIR:

2         Q.   I'm sorry.  Go ahead.  You were explaining

3    what the technology does.

4         A.   **It managed multiple clients referral tracking**

5    **related to redemptions.**

6         Q.   So when someone turns in one of these marketing

7    pieces, there's a way to track, I guess, who gave it out

8    and -- is that how it works?

9         A.   **Correct.**

10        Q.   And is it only related to the concierge

11   referral program?

12        A.   **Correct.**

13        Q.   And so what it does, I guess, the concierge

14   have this marketing material that they hand out to

15   potential patrons; correct?

16        A.   **Correct.**

17        Q.   And then that patron will go to the mall, the

18   restaurant, the movie, whatever it might be and turn it

19   in for some discount?

20        A.   **Correct.**

21        Q.   And then it is tracked back so that concierge

22   will get a commission?

23        A.   **Correct.**

24        Q.   And who pays the commission?

25        A.   **Image Marketing would pay the commission**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 58

1      directly to the referring representative on behalf of the

2      client.

3          Q.    And then is the client, in turn, billed for the

4      commission?

5          A.    Correct.

6          Q.    What is the commission?

7          A.    It varies.  It was -- it was -- it varied from

8      client to client.

9          Q.    Does Image Marketing Group, Inc. have any

10     commission structure of any type?

11         A.    Again, each client is -- has different

12     commission structures regarding the concierge referral

13     program.

14         Q.    And then Image Marketing Group, Inc. also did,

15     you said, consulting.  Can you tell me what kind of

16     consulting it did?

17         A.    Consulting, we would lay out the program,

18     explain the program to the client.  We would organize

19     familiarization trips.  We would, at times, would bring

20     the representative of the client out with us, we would

21     call those ride-alongs.  We would manage, you know, the

22     tracking system for them.  We would -- at times, we would

23     advise them on additional advertising solutions through

24     our expertise in the industry on where to advertise in

25     multiple different media outlets in the industry.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 59

1          Q.   Are you saying based upon your expertise in the

2     industry, what would you describe Image Marketing Group,

3     Inc.'s expertise in the industry to be?  What would it

4     have been?

5          A.   It was a very high -- it was a very highly

6     recognized marketing firm in the tourism industry

7     statewide.

8          Q.   Right.  But my understanding is there's

9     different types of marketing; correct?

10         A.   Correct.

11         Q.   So if I had to say, Mr. Deming, what is your

12    company -- what is your expertise at the time you were at

13    Image Marketing Group, Inc., what would your answer to me

14    have been, other than we're a great --

15         A.   We're a full service marketing firm.  I wore

16    many hats.  I did the best to my ability to everything

17    that I did.  And if I didn't know about it, I would learn

18    it and I would communicate that to the best of my

19    knowledge to better serve our client.  So in regards to a

20    specific, I'm sure there's several attorneys here that

21    specialize in different areas, you have different

22    clients, so you're considered a full service marketing

23    firm in the tourism industry in the State of Florida.

24         Q.   Well, I asked you what you did and you gave me

25    several things, which we went through, the technology

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 60

1     tracking system, the email blasts, brochure distribution,

2     concierge referral program, and consulting.  Is there

3     anything else that Image Marketing Group did?

4          A.    We did rack fulfillment.

5          Q.    Okay.

6          A.    We had a program called Top Spots, which was a

7     36 spot created rack that was distributed to over 250

8     locations.

9          Q.    I don't mean to interrupt you.  You said you

10    did a rack, isn't that -- I mean, isn't rack, and

11    basically, the distribution the same thing, whether it's

12    put into the rack or giving it to the person at the front

13    desk, you're delivering something?

14         A.    Two separate.  Again, each client had different

15    scopes of services.  There was brochure racks that we had

16    specific to a client that were placed in different

17    hotels, welcome centers, areas of front line hospitality

18    employees that we represented on behalf of our clients

19    to.

20         Q.    But that's taking a piece of paper and putting

21    it in a rack; right?

22         A.    Correct.

23         Q.    Now, other than taking another piece of paper

24    and giving it to the guy at the front desk, is there any

25    difference between rack distribution and this concierge

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                              Page 61
   1       program where you take the packet and give it to the
   2       concierge at the same hotel?
   3            A.   Again, there's -- based on the client's needs
   4       and the services that we provided, each hotel and each
   5       location was different.
   6            Q.   Okay.
   7            A.   Okay.  So yes, there was times that we would
   8       place collateral in a rack and we would also provide the
   9       collateral and/or brochure to the concierge as well.
  10            Q.   Okay.
  11            A.   There would be multiple locations within a
  12       hotel or resort and multiple representatives that we
  13       would distribute collateral to.
  14            Q.   Okay.  So let's take a hotel or mall that wants
  15       to do a -- put collateral on a rack or the concierge
  16       referral program.
  17            A.   Okay.
  18            Q.   Person from Image Marketing drives up to the
  19       hotel; correct?
  20            A.   Correct.
  21            Q.   Concierge cards in one hand, rack material in
  22       the other hand; right?
  23            A.   Correct.
  24            Q.   Person walks in, puts the rack material -- or
  25       the pamphlets in the rack and then gives the concierge
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 62

```
 1        cards to either the front line personnel or the

 2        concierge; correct?

 3            A.    Depending on each individual property, there

 4        was multiple things that we did specific to each

 5        property.  No one like property was the same.

 6            Q.   I understand, like there were more racks.  Like

 7        might put it in two racks or five racks.  But other than

 8        doing exactly what I described, was there anything else

 9        to that program?

10            A.    In regards to --

11            Q.    Delivery.

12            A.    -- delivery, there was, again, the brochure --

13        specific to each client, brochure distribution.  There

14        was referral card distribution.  There was rack

15        placement.  There was -- and in our Top Spot rack.  And

16        there was distribution of -- if a client wanted a

17        newsletter.  If there was an invitation to an upcoming

18        event.  If there was pens, bags, tchotchkes, doughnuts,

19        coffee, we would provide that to the hotel.

20            Q.   And I understand you're describing to me

21        different things you take there, but isn't the basic

22        program either taking a piece of paper, a tchotchke, or a

23        gift and putting it in some rack in the hotel, or racks,

24        and giving it to somebody at the hotel?  Is there

25        anything that's -- am I missing something?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 63

1        A.   You're -- I thought I've answered this several

2    times.  Each specific location was different.  There were

3    multiple scopes of representation and distribution that

4    we provided.  And I believe, to the best recollection of

5    my knowledge, I've explained to you every type of piece,

6    to my knowledge, that we distribute to a hotel or any of

7    our locations.  Each hotel has different policies.  Each

8    hotel has different locations within that specific

9    property.  Each hotel has requirements on where a rack

10   can go, where a rack cannot go.  So there's hundreds of

11   properties that we distribute to.

12       Q.   I understand --

13       A.   If you want to know the pieces, those are the

14   pieces that we distribute.

15       Q.   And I acknowledge you've told me you take --

16   can take one of multiple things to the hotel and you can

17   take -- and be placing them in multiple racks.  But other

18   than taking something to the hotel and delivering it, is

19   there anything other than that to the program, whether it

20   be one piece, fifty pieces, or putting it in one rack, I

21   understand that.  But other than delivering something to

22   the hotel, is there -- am I missing something?  Is there

23   anything else --

24       A.   Yes.

25            MR. BRAND:  Objection.  Asked and answered.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 64
  1              THE WITNESS:  We're a full service marketing
  2         firm.  We provided multiple scopes of business.  In
  3         regards to your distribution answer, I think I've
  4         answered that several times.
  5    BY MR. BLAIR:
  6         Q.   You've told me you deliver stuff to the hotel.
  7    What do you do in the delivery program other than
  8    delivering something to the hotel?  That's all I want to
  9    know.  It's either nothing or I deliver "X."  Or I do
 10    something else, I don't know.  But other than delivering
 11    a tchotchke or a piece of paper to a rack or a person at
 12    the hotel or numerous racks or numerous people at the
 13    hotel, is there anything else?  I don't want to talk
 14    about what you deliver, is there anything else?
 15         A.   Are you speaking on behalf of me personally or
 16    the company?
 17         Q.   Your businesses.
 18         A.   Okay.  Well, each business had different --
 19         Q.   Well, you told me earlier there was no
 20    difference between LLC and Inc. on Image Marketing.  Is
 21    there a difference now?
 22         A.   There's -- no.  We're a full service marketing
 23    firm.  And in regards to distributing and asking me what
 24    we did when we visited hotels, I just explained it to you
 25    several times.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 65

1          Q.   I just want to know, other than delivering

2     stuff to the hotels, is there anything else that little

3     program does?  That's all I want to know.  I mean, it's

4     yes, no.  And then if it's, yes, then I'm going to ask

5     you what you deliver other than what you deliver other

6     than the stuff to the hotel and then we can move on.

7               MR. BRAND:  Objection.  Asked and answered.

8               THE WITNESS:  You're sticking to the subject of

9          delivery to a hotel?

10     BY MR. BLAIR:

11          Q.   Yeah.  That's one of your things --

12          A.   Yes.

13          Q.   -- distribution programs.

14          A.   Okay.  Our company did a variety of other

15     services besides just distributing to a hotel, materials

16     distributed to the hotel, I just explained to you what

17     those materials are to the best of my knowledge.

18          Q.   And I'm not asking what the materials were.

19     I'm asking you for that delivery program, other than

20     delivering stuff to the hotel, is there anything else you

21     do for that program?

22          A.   Yes.

23          Q.   What?

24          A.   We provided familiarization events.  If a new

25     restaurant opened, we were, again, consulting capacity of

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 66

1          launching a program.  The client is ready to go, we would

2          host an event.  We would create invitations.  We would

3          distribute invitations to the hotel's front line

4          representatives, thousands of them.  We would invite them

5          to an event.  We would educate them on the program.  On

6          behalf of the client, we would provide that.

7               Q.   You said you're a full marketing -- full

8          service marketing firm.  Would you consider television

9          one of the mediums a full service marketing firm would

10         do?

11              A.   And specific to some marketing firms in

12         general, yes.

13              Q.   Did your firm do any television placement or

14         media placement?

15              A.   Our firm has worked with -- I don't understand

16         your question.

17              Q.   You said you're a full service marketing firm;

18         correct?

19              A.   Correct.

20              Q.   And that, to me, would be I do everything in

21         marketing; correct?

22              A.   Again, it's specific to each client's request

23         of their own scope of business.  It depends.  Are you

24         referring to a specific account?

25              Q.   I'm asking you.  You said you were a full

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                           9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 67
   1      marking -- full service marketing firm.
   2           A.   Yes.  If a client wanted placement on any type
   3      of screen, if a client wanted placement on a commercial,
   4      yes, we would be able to provide those types of services
   5      as a marketing firm.
   6           Q.   Did Image Marketing Group, Inc. provide that
   7      service to anybody?
   8           A.   The service was available.  Correct.
   9           Q.   Did you provide it to anybody?
  10           A.   It depends on what account.
  11           Q.   Did you put any of your clients --
  12           A.   We had 36 --
  13           Q.   Let me finish, sir.  Did you put a television
  14      advertisement on for any of your clients?
  15           A.   I personally did not put a television ad
  16      placement for any of my clients.
  17           Q.   Are you aware if anyone at Image Marketing
  18      Group, Inc. did?
  19           A.   Specific to what client?
  20           Q.   Any client.  Was anyone put on television?
  21           A.   Speaking on my behalf, any of the clients I
  22      represented, I did not place any advertising on any of --
  23      any type of media referring to what you're asking me.
  24           Q.   There's only four of you all in this business;
  25      right?  I mean, it's not like you're on multiple floors
```

Ryan Deming - 9/21/2012

```
                                                    Page 68
 1      so you don't know what's going on, is it?  How many

 2      people --

 3           A.   We all had different responsibilities and we

 4      all assisted each other in those responsibilities.

 5           Q.   Okay.

 6           A.   We all had our own -- each had our own accounts

 7      and if I needed help, I would -- we had a very friendly

 8      relationship.  I would help out.  It would be in the best

 9      interest of looking out for everyone.  But again, we had

10      separate accounts, so I can't answer on behalf of that

11      account representative, just like you couldn't answer on

12      another attorney to this law office.  So we all manage

13      different accounts, it doesn't matter how large we are.

14           Q.   Sir, you don't know what I can answer.  So I

15      just want to ask you, to the best of your knowledge, did

16      anyone at Image Marketing Group, Inc. put a client on a

17      television advertisement?  Just yes or no.  Do you know?

18      And if -- I'm going to ask you who, and if you don't

19      know, we'll move on.

20           A.   I am not aware of any.

21           Q.   How about radio?  Did you put any of your

22      clients on a radio spot?

23           A.   None of the clients I managed I placed on a

24      radio spot.

25           Q.   And to your knowledge, did anyone at Image
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 69

1      Marketing Group, Inc. put any of their clients on a radio

2      spot?

3             A.   I have no knowledge.

4             Q.   Did you design any web pages for any of your

5      clients at Image Marketing Group, Inc.?

6             A.   Yes.

7             Q.   Who?

8             A.   The Florida Mall.

9             Q.   Other than the Florida Mall, did you design any

10     web pages for anybody?

11            A.   I cannot recall.  We -- again, we had

12     technology companies that would refer that business to

13     based on the accounts needs.  I would like to say, yes,

14     I'm -- just let me refresh my memory and I could provide

15     you a specific example of that.  It's been a long time.

16            Q.   And I'm a little confused.  You've been telling

17     me that Florida Mall and Simon was Tim Herman's clients,

18     so why are you designing a web page for them?

19            A.   There was a placement that was directed to by

20     Tim Herman on a web side that we managed called

21     OrlandoPlanners.com.

22            Q.   Did you do any magazine advertisements for any

23     of your clients?

24            A.   We did.

25            Q.   Through who?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 70

1          A.   Specific magazines that I can recall, there was

2     some -- Vacation Village had an in-house publication.

3     There was other locations, hotels, occasions that we did

4     place on behalf of our clients.  I cannot recall the

5     specific magazine or publication.

6          Q.   Do you recall what client it was for?

7          A.   It was for -- some were for multiple, some were

8     for individual.  Again, I cannot recall exactly, so I'm

9     unable to answer that question.  If I remember, I'll let

10    you know.

11         Q.   Did you do any ads like that for Simon -- or

12    any magazine ads for Simon Property Group?

13         A.   Specify -- clarify "ad" and where that would be

14    placed.

15         Q.   Did you -- were you involved in any placement

16    of an ad in any magazine for Simon Property Group?

17         A.   I was not responsible for any ad placement

18    because that was not my account.  There was -- again,

19    there was multiple -- are you referring to a specific

20    mall or malls -- all Simon malls in general?

21         Q.   Any mall.

22         A.   There were so many different programs and

23    things that I would see in the office relating to that

24    account, ads, changes, some could have been magazine ads,

25    some could have been just fliers.  There was several

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 71
  1        malls that we had.  So yes, sir, there could have been --
  2        there could have been magazine placement ads, yes, we did
  3        that.
  4             Q.   Sir, I'm not asking you to speculate.  I'm
  5        asking you:  Do you know if one was placed or not for
  6        Simon Property Group?  And if you know, I'm going to ask
  7        you about it.  And if you don't know, we'll move on.
  8             A.   There was an ad placed, best of my knowledge,
  9        Vacation Villages, there was an ad placed in -- there was
 10        ads placed in newsletters that we sent out.  There was
 11        ads placed in some specific directories.  What specific
 12        directories they were, trade show association
 13        directories, there was --
 14             Q.   How about anything like Orlando Travel and --
 15        or Travel and Leisure, Orlando Magazine, Florida Trend,
 16        anything like that?
 17             A.   I'm familiar with those magazines.  The
 18        accounts that I represented, I did not place any ads in
 19        those specific magazines.
 20             Q.   How about any magazines similar to something
 21        like that?
 22             A.   There was -- there was a lot of publications.
 23             Q.   How about Travel Host Magazine?
 24             A.   No.  To my best recollection, on any of
 25        accounts that I had represented, I did not place any
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 72

1        advertisements within Travel Host Magazine.

2            Q.   And to the best of your knowledge, did anyone

3        at Image Group, Inc. place an ad in Travel Host Magazine

4        for Simon Property Group?

5            A.   I don't -- I don't know.

6            Q.   Okay.  Obviously, you owned an interest in

7        Image Group -- Image Marketing of Florida, LLC and Image

8        Marketing Group, Inc.; correct?

9            A.   Correct.

10            Q.   Did you own an interest in Event Planners USA,

11        Inc.?

12            A.   Correct.

13            Q.   Are there any other entities that you own or

14        have owned in the last ten years an interest in?

15            A.   I had set up a Deming Partnerships, which has

16        no clients, it was just set up.

17            Q.   Was it recently set up?

18            A.   No -- yeah, I would say two years ago.

19            Q.   Did it ever conduct business?

20            A.   No.

21            Q.   Okay.  And what was the purpose of setting it

22        up?

23            A.   I had set it up because moving forward after

24        parting with Tim, I wanted to possibly get into some, you

25        know, private consulting purposes.  Also, for -- instead

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 73

1      of going through a sole proprietorship, I would rather,

2      you know, have everything go through Deming Partnerships

3      for tax purposes.

4           Q.   And I think you mentioned In View Marketing of

5      Central Florida?

6           A.   Correct.

7           Q.   You worked there at one time?

8           A.   Yes.

9           Q.   Was that also your company?

10          A.   Yes.

11          Q.   Did anyone own interest in it besides yourself?

12          A.   Yes.  I answered this earlier.  Gregory

13     Livingston.

14          Q.   I'm sorry, you did.  And is that entity still

15     in existence?

16          A.   No.  It was dissolved in 2002.

17          Q.   Okay.  What about an entity called Mobile Hire

18     Communications?

19          A.   Mobile Hire Communications was a company that,

20     I believe it was 2006, that was created.  Me, myself,

21     being an entrepreneur coming up with new ideas, always

22     trying to diversify myself, I created a company to

23     provide rental phone services.  It never conducted one

24     dollar's worth of business and was shortly dissolved

25     upon.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 74

1          Q.   Okay.  Any other entities that you own or have

2     owned an interest in in the last ten years?

3          A.   Not that I can recall.  Actually, I do -- just

4     refreshed my memory.  DRT Development.

5          Q.   Yes, we talked about that yesterday.

6          A.   Yes.  Again, being an entrepreneur, I created

7     and saw an opportunity to diversify myself and do 3D

8     rendering.  Turner was the only client that we did work

9     for.  Shortly after that, there was no additional clients

10    and the company dissolved.

11         Q.   What about Millenia Communications Group, Inc.?

12         A.   Millenia Communications Group, Inc. was

13    basically the same as Mobile Hire and conducted no

14    business.

15         Q.   What about the Call For Golf, Inc.?

16         A.   Call For Golf, Inc. was a company that we were

17    going to set up.  I cannot recall the -- I know I had set

18    it up.  We were going to put golf programs together.

19    Never conducted one dollar's worth of business.  It was

20    shortly dissolved after.  I just made a habit of creating

21    companies and ideas, and the first thing I would do is

22    try to reserve the name.

23         Q.   Event Planners USA, Inc., did that ever conduct

24    any business?

25         A.   Yes.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 75

1        Q.   What type of business did it conduct?

2        **A.   Large scope of management -- event management.**

3        Q.   I'm not in the marketing business, so I have to

4   ask rudimentary questions.  What does that entail?

5        **A.   Event management would entail solicitation, the**

6   **marketing, the management of -- of providing a service to**

7   **corporate groups, providing a service to consumers,**

8   **providing a service to clients.**

9        Q.   And I'm going to ask you these questions as a

10  corporate representative of Event Planners USA, Inc.; is

11  that understood?

12       **A.   Yes.**

13       Q.   I heard what you said, but again, as a person

14  that's not in marketing, that doesn't mean a lot to me.

15  So can you tell me, like Brian, this is what we would do

16  for a typical company, kind of walk me through what you

17  might do under the Event Planners USA, Inc.?

18       **A.   Okay.  Event Planners USA, Inc., to the**

19  **capacity, we would have a -- we would attend trade shows.**

20  **We would host trade shows.  We would manage corporate**

21  **group outings.**

22       Q.   Like golf or whatever?

23       **A.   Golf, dinners, sightseeing tours, corporate**

24  **incentive outings.  We also had a web site called**

25  **Orlandoplanners.com that was a conduit for attraction**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 76

```
1        ticket sales, advertising, restaurant booking portal,

2        accommodation booking.

3             Q.   Anything else that that company would do?

4             A.   Not to my recollection.

5             Q.   And did Event Planners attend any trade shows

6        on behalf of any clients?

7             A.   Specific to what client?

8             Q.   That's what I'm saying, any.  Did Event

9        Planners attend any trade shows for any clients?

10            A.   Yes.

11            Q.   Who?

12            A.   The clients that were involved with those trade

13       shows, Timothy Herman would have attended, because the

14       two clients that were recommended -- that involved in the

15       scope of trade show representation, he would be the one

16       to speak with about that.

17            Q.   Do you know what clients those were?

18            A.   They were Simon Property Group and it's

19       associated malls.

20            Q.   Okay.

21            A.   Florida Dolphin Tours.  If there was any

22       additional ones that he represented under that umbrella,

23       I couldn't answer.  You'd have to ask him.

24            Q.   You are an officer in Event Planners USA, Inc.,

25       aren't you?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 77

1          A.    Correct.

2          Q.    And are you basically telling me you didn't

3     know what was happening?

4          A.    Sir, there's a lot of things that occurred to

5     my recollection that seemed to not be happening.  To be

6     honest with you, me and Tim had a very noncommunicative

7     relationship.  It was -- I did the work to the best of my

8     knowledge.  I was on the road.  I was fulfilling every

9     need that was instructed by him for his clients and the

10    clients that -- I'm sorry, rephrase that, accounts

11    represented under the Image Marketing/Event Planners

12    companies.  Other than that, want to go down the history

13    road, we can go there.  But --

14         Q.    What history road --

15         A.    -- as far as what Tim did on a day-to-day

16    basis, I was not next to him.  There was many times that

17    we were in separate cities, countries, areas, offices,

18    so.

19         Q.    Did you pay yourself out of Event Planners?

20         A.    I believe I paid myself.  I cannot answer that.

21         Q.    You don't know if you paid yourself?

22         A.    I did pay myself, I just don't know the exact

23    amount.

24         Q.    But you did receive money from Event Planners?

25         A.    Yes.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 78

1      Q.   Did Event Planners share offices with all these
2   Image companies --
3      A.   Correct.
4      Q.   -- with Takitik?
5      A.   Correct.
6      Q.   Did Event Planners share the computer systems
7   with all these same companies?
8      A.   Correct.
9      Q.   So did Event Planners USA have any of its own
10   computer network or own system?
11     A.   It was all shared through the same office.
12     Q.   Did Event Planners USA, Inc. have any
13   employees?
14     A.   Event Planners, there was no employees of Event
15   Planners.  There was cooperative between myself and Tim
16   that would encompass that.  There was also overlap if
17   there was -- it was -- they worked hand in hand.  I mean,
18   it was -- if you want an honest answer, Event Planners,
19   it was a company that, you know, set up, and again, you
20   know, entrepreneur trying to create new opportunities.
21     Q.   Okay.  And did Image Marketing of Florida, LLC
22   or Image Marketing Group, Inc. attend a trade show on
23   behalf of Simon Property Group?
24     A.   Sorry.  Can you repeat that?
25     Q.   I'm moving off of Event Planners.  I just

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 79

1        wanted to ask a quick question as far as the corporate

2        representatives of these companies, Image Marketing

3        Group, Inc. and Image Marketing of Florida LLC, excuse

4        me, did either of those Image companies attend a trade

5        show on behalf of Simon Property Group?

6             A.   Yes.

7             Q.   What would be the difference between that trade

8        show and the trade show that Event Planners USA, Inc.

9        might attend?

10            **A.   Again, as previously discussed, I did not**

11       **attend on behalf of Event Planners or any of the accounts**

12       **-- any trade shows.  The two accounts I was familiar with**

13       **that Tim Herman represented that had anything to do with**

14       **trade shows would be the Florida Dolphin Tours and Simon**

15       **Mall Property Group.**

16            Q.   I realize you didn't attend, but do you know

17       what Event Planners USA did, like what trade shows they

18       attended or what they did there?

19            **A.   I do not.**

20            Q.   Did Event Planners USA, Inc. maintain a

21       corporate minute book?

22            **A.   No.**

23            Q.   Did Event Planners USA, Inc. conduct regular

24       meetings, whether they be annual or quarterly?

25            **A.   No.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                          Page 80
   1              Q.   Did Event Planners USA, Inc. maintain a

   2       separate bank account?

   3              A.   Yes.

   4              Q.   Why was that?

   5              A.   Because it was two separate companies.

   6              Q.   And who had access to the Event Planners USA,

   7       Inc. bank account?

   8              A.   Myself and Tim Herman.

   9              Q.   And did you ever use the Event Planners USA,

  10       Inc. bank account for any personal use?

  11              A.   No.

  12              Q.   To your knowledge, did Mr. Herman use the Event

  13       Planners USA, Inc. bank account for any personal use?

  14              A.   Again, I can't answer that question, because I

  15       departed -- I'm sorry, I departed and I wasn't by Tim's

  16       side every day.  So as far as my recollection, I would

  17       honestly, as a partner, want to trust him, and say no.

  18              Q.   But you don't know for sure?

  19              A.   I don't.  I can't answer on behalf of Tim.

  20              Q.   Who received the -- I assume with a banking

  21       account you get statements; correct?

  22              A.   Correct.

  23              Q.   Who received the statements for Event Planners

  24       USA, Inc.?

  25              A.   They were mailed to the office of -- I'm sorry.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 81

1        They were mailed to the PO box.

2              Q.   And whose PO box was that?

3              A.   It was Image Marketing and Event Planners.

4              Q.   And they have a PO box somewhere?

5              A.   I can't -- we -- again, I can't answer that

6        question because we had moved offices three times.  We

7        had a PO box.  I can't recall what address that -- those

8        statements were mailed to.

9              Q.   Okay.  Do you ever recall receiving an Event

10       Planners bank statement, looking at one?

11             A.   Yes.

12             Q.   So you had access to them?  That's what I'm

13       trying to figure out.

14             A.   I had seen them, yes.

15             Q.   And as far as a PO box, I'm just -- again, not

16       a trick question, was it a PO box in your like business

17       condominium facility or was it like a Mailboxes Etc. or

18       something?

19             A.   It was at the post office.

20             Q.   And several companies used that PO box?

21             A.   Several -- the only companies that I am aware

22       that used that PO box, that I can personally, are Image

23       Marketing Group.  Back to my answer regarding Event

24       Planners, I cannot recall if that mail -- I did not pick

25       up the mail every day -- was mailed to one of the Grand

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 82

1    National Plaza offices or the PO box.

2         Q.   As far as the Event Planners USA entity, did

3    you and Tim have any assigned roles within the company,

4    such as you were in charge of obtaining new clients, he

5    was in charge of servicing existing clients, or anything

6    like that?

7         A.   He was in charge of the clients I described

8    earlier.  My role was to conduct business with the golf

9    program that we had, to conduct business with the

10   restaurant reservation portal and advertising placement

11   on the Orlandoplanners.com web site.

12        Q.   Okay.  Did you, in your employment of Event

13   Planners USA, Inc., ever host a trade show for any

14   clients?

15        A.   Again, I personally did not attend any trade

16   shows.  The only two clients that would have most likely

17   have requested trade show representation through Event

18   Planners would be those accounts of Tim Herman that were

19   discussed earlier.

20        Q.   Which are Simon Property Group --

21        A.   Simon Property Group and Florida Dolphin Tours.

22   There may have been others, but I don't know.

23        Q.   All I'm trying to find out is what you know.

24        A.   I'm trying to remember what I did yesterday.

25        Q.   You also said that Event Planners did corporate

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 83

1          outings, which included sightseeing, possibly golf,

2          dinners, that type of thing.  During your employment at

3          Event Planners, did you ever, I guess, host or attend any

4          corporate outings on behalf of your clients?

5               A.   I did.

6               Q.   And who would that be?

7               A.   They wouldn't be specific to -- I guess you

8          could refer them to a client.  I believe the name was --

9          oh, what was it?  Let me -- Vacation Villages.

10              Q.   And I'm not -- is that like a --

11              A.    It's a timeshare resort.  Vistana Resort, which

12         I think is also known as Sheraton Resorts.  There was

13         golf package outings that were marketed and advertised

14         within their activities department.

15              Q.   And other than that, did you attend or host any

16         corporate outings for any clients through Event Planners

17         USA?

18              A.   Not to my -- it was awhile ago.  I was -- I

19         can't recall at this point.

20              Q.   How about as far as Tim Herman, to the best of

21         your knowledge, did he host any corporate outings under

22         the Event Planners USA banner?

23              A.   Yes, he did.

24              Q.   Do you know for who?

25              A.   For Simon Property Group, Florida Dolphin

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 84

1      Tours, and if there's any additional clients or accounts

2      he represented, then I cannot recall, yes.

3           Q.   Do you know what type of event it was?

4           A.   Trade shows, industry trade shows,

5      international trade shows.  He was attending things left

6      and right, so I don't know which specific ones he would

7      have attended.

8           Q.   I talked about the trade shows.  I'm talking

9      about like a corporate outing, like golf.  You told me

10     there was like a golf, a sightseeing, or possibly a

11     dinner, kind of corporate rewards thing, and I just

12     didn't know if you were aware if Tim Herman either

13     hosted, produced, or attended any of those types of

14     outings for anybody?

15          A.   In regards to anyone?

16          Q.   Yes, sir.

17          A.   There was a quite a few with Boggy Creek

18     Airboat Rides.

19          Q.   Do you know how many clients Event Planners

20     had?

21          A.   I know the accounts that I currently can talk

22     on behalf of.  The accounts would be Open Table, it's on

23     the top of my tongue.  Attraction.  Official Ticket

24     Center, there it is.  Hampton Inn.  There were some

25     others on the web site, and unfortunately, I can't

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 85

1      reference back to the web site because it is no longer

2      live, so I can't refresh my memory on the additional

3      clients that were on there.

4          Q.   And like Hampton Inn, that would be like a

5      client that you would, I guess, loop through the web site

6      so people could do hotel accommodations?

7          A.   Correct.

8          Q.   And would Hampton Inn pay for that?

9          A.   Yes.

10         Q.   Was it a Hampton Inn franchisee or is it like

11     the corporate Hampton Inn?

12         A.   I don't remember.

13         Q.   Would any of your -- was it your practice for

14     your clients under Event Planners to enter into any type

15     of written contract for the services you would provide?

16         A.   It was specific to what each client, some may

17     have been invoices, some may have been contracts, I can't

18     recall.

19         Q.   Okay.  You don't recall if Hampton Inn had a

20     contract or not?

21         A.   I cannot recall that.

22         Q.   How about Official Ticket?

23         A.   I believe I had an affiliate agreement with

24     them.  I also had a affiliate agreement with Open Table.

25         Q.   Mr. Takio gave his deposition yesterday.  He, I

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 86

1    guess, worked at Open Table and was, for lack of my

2    characterization, helping market them.  So why would Open

3    Table need your services?

4        **A.   It came to my knowledge about the Open Table**

5    **online reservation system that was available and I saw it**

6    **as a viable tool to generate restaurant reservations**

7    **through the Orlandoplanners web site.**

8        Q.   Did Event Planners maintain a client list?

9        **A.   There was no specific published list that was**

10   **needed to advertise.**

11       Q.   If I were to ask you to like, for example,

12   search your computer for Event Planners, would that

13   generate at least what invoices were printed out to

14   various people?

15       **A.   Again, I don't have any invoices on my**

16   **computer.  Everything was done in the office.  And then**

17   **when I left in 2010, everything remained there.**

18           MR. BLAIR:  Okay.  You all want to take a

19           break?  It's lunch.

20           CAMERA OPERATOR:  Okay.  We're off record.  The

21           time now is 12:07.

22           (Whereupon, a recess was taken at 12:07 p.m.

23           and proceedings resumed at 1:10 p.m.)

24   BY MR. BLAIR:

25       Q.   Before the break we were talking about the

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                         9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 87

1      invoices for Event Planners, and again, I apologize if

2      I've covered this, but it's hard to remember everything

3      we've asked.  Can you describe to me how Event Planners

4      would generate its invoices to its clients?

5           **A.   It was generated at the office by -- depending**

6      **on which account, whoever handled that account, they**

7      **would generate an invoice.  And it was either emailed or**

8      **mailed.**

9           Q.   And did you ever fax invoices, to your

10     knowledge?

11          **A.   No.**

12          Q.   Okay.  Did you ever hand deliver invoices for

13     Event Planners?

14          **A.   No.**

15          Q.   And what I'm asking you, just so we're clear,

16     as the corporate representative of Event Planners, do you

17     know if anybody either faxed or hand delivered Event

18     Planners invoices?

19          **A.   I can't say.**

20          Q.   Okay.

21               MR. BRAND:  Remember to speak up because the

22               court reporter.  That doesn't mean you have to stand

23               up, just speak up.

24     BY MR. BLAIR:

25          Q.   So were you -- if I understand your testimony

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 88

1    correctly, you were in charge of, in essence, billing

2    your clients for your Event Planners work and Mr. Herman

3    was in charge of billing his clients for his Event

4    Planners work?

5        A.   Correct.

6        Q.   Did you have a laptop when you were at work

7    with either Image Marketing or Event Planners?

8        A.   Yes.

9        Q.   And when you left in, I believe 2010, what

10   happened to that laptop?

11       A.   It remained at the office.

12       Q.   Okay.  And when you were served with this

13   lawsuit, did you ever make inquiry of either Event

14   Planners or Image Marketing either Group or Image

15   Marketing, LLC to determine what were the status of the

16   computers that you left at the office?

17       A.   Yes.  We -- yes.

18       Q.   Who did you ask about those computers?

19       A.   Tim Herman.

20       Q.   And what did Mr. Herman tell you was the status

21   for either Image Marketing Group, Inc., Image Marketing

22   of Florida, LLC, or Event Planners USA, Inc.?

23       A.   He did not provide me the status of where

24   they --

25       Q.   What did you ask Mr. Herman about the computers

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)        9fe8d661-fa6f-48d2-a272-6b9e4a4773a

Ryan Deming - 9/21/2012

Page 89

1      then?

2          **A.    Specifically regarding the computers, it was**

3      **concerning everything.  When you guys first requested**

4      **information from Simon to cooperate, to bring everything,**

5      **so that would cover the computers.**

6          Q.    Okay.  And what did Mr. Herman say he would do?

7          **A.    He would bring everything that he had.**

8          Q.    And where was he to bring everything he had?

9      To the attorney's office?  To you?

10         **A.    To the attorney's office.**

11         Q.    Okay.  And that would be the Southern Trial

12     Counsel?

13         **A.    Correct.**

14         Q.    And to your knowledge, do you know if Mr.

15     Herman delivered that information?

16         **A.    I can't answer to that.**

17         Q.    Did you ever see what he delivered?

18         **A.    I -- he had brought information, but I can't**

19     **confirm that he has actually delivered it.**

20         Q.    Did Event Planners USA, Inc. file any tax

21     returns?

22         **A.    Yes, they did.**

23         Q.    And who filed the tax returns for Event

24     Planners?

25         **A.    Mike -- Mollica & Jenson, Mike Mollica, to my**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 90
   1        best recollection.

   2             Q.   And did you review the tax returns for Event

   3        Planners, Inc.?

   4             A.   When Mike Mollica -- he had also -- yes.  I

   5        can't recall.  There were so many different documents he

   6        was preparing.

   7             Q.   And other than -- I know we talked about a

   8        checking account that Event Planners had.  Does Event

   9        Planners have any other type of account at a financial

  10        institution?

  11             A.   No.

  12             Q.   Did Event Planners, Inc. have it's own credit

  13        card, corporate credit card?

  14             A.   It was a check card.

  15             Q.   So a debit card?

  16             A.   Correct.

  17             Q.   And would it debit out of that account that it

  18        had?

  19             A.   Correct.

  20             Q.   And I think there's what they call a merchant

  21        account.  Did it have a merchant account?

  22             A.   Correct.

  23             Q.   Since that was in yesterday's deposition, my

  24        understanding is that is a terminal where you can swipe a

  25        Visa or Mastercard or American Express?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 91

1        A.   Yes.

2        Q.   And then that money will transfer, I guess,

3   into the business account of Event Planners; is that

4   correct?

5        A.   Yes.

6        Q.   And who was at that -- who was that merchant

7   account with?

8        A.   First Payment Systems.

9        Q.   Did Event Planners hire any outside consultants

10  to assist it with its work?

11       A.   No.

12       Q.   Did Event Planners do any work with Lynnette

13  Lauria?

14       A.   At the capacity of -- I can't answer that

15  question.  I --

16       Q.   You don't know?

17       A.   Event Planners and Image Marketing kind of just

18  in the office, I believe she had consulted both companies

19  on behalf of direction of Tim Herman.

20       Q.   So Lynnette Lauria --

21       A.   Yes.

22       Q.   -- was consulting for Event Planners as well?

23       A.   Correct.

24       Q.   And what was her role as a consultant to Event

25  Planners?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 92

1        A.    That was between herself and Tim.  I was not at

2    those meetings.  He -- you know, he basically met with

3    her and she consulted him directly.

4        Q.   And you don't know what they consulted about?

5        A.    I can tell you that they spent a lot of time

6    together.  He's improved a lot of things.  They worked on

7    -- I mean, she was third party validation with the

8    knowledge that she had in the corporate environment.

9    Tim, when he came into the company, he basically could

10   get in anyone's face and have a great reputation.  She

11   worked with him on, you know, Magic accounts.

12            She worked with him, as far as I know, with

13   contracting, with opening doors, and with enhancing his

14   professional corporate representation.  So I can't answer

15   on behalf of Tim what she exactly did, but I trusted the

16   best to my knowledge that he took her advice and utilized

17   it with -- in respect to the companies.

18       Q.   Did you ever see any consulting agreement

19   between Ms. Lauria and her companies and Event Planners?

20       A.    No.

21       Q.   And you said you were never present at any

22   consulting meetings; is that correct?

23       A.    That's correct.

24       Q.   And just so I can dot my I's and cross my T's,

25   I understand you believe what she helped with, but do you

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a4773 9a

Ryan Deming - 9/21/2012

Page 93

1        know for a fact what she helped Mr. Herman with?

2            A.   I don't know as a fact.  I can't answer that.

3            Q.   Okay.  Did you ever see any payments going to

4        Ms. Lauria?

5            A.   I did.

6            Q.   Okay.  Did you agree with the amount she was

7        being paid?

8            A.   I didn't question the amount.  I agreed with the

9        amount because I was instructed by Tim to pay that

10       consulting fee, so I assumed that, yes, I would agree

11       with him.

12           Q.   Did you believe Mr. Herman needed some help in

13       his marketing capabilities when you hired him?

14           A.   Yes.

15           Q.   And was his relationship with Ms. Lauria and

16       their consulting in place at the time you hired him or

17       did it happen after --

18           A.   It happened after.

19           Q.   And did you ever discuss the terms or

20       conditions of his consulting treatment with Ms. Lauria?

21           A.   No.

22           Q.   And you don't think it's strange that a man

23       that's in marketing needs help, hiring someone to coach

24       him how to market?

25           A.   No.  I believe it was more of a professional

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 94

1      coaching, professional coaching to make him a better

2      person, to not only market but represent himself in front

3      of clients and new potential clients.

4           Q.   Do you know what Ms. Lauria's experience is in

5      personal coaching?

6           A.   I know that she's a very well respected person

7      in the industry and the corporate environment, and

8      respected everything that she may have given him advice

9      on, because myself or Tim has not worked in the corporate

10     environment.  And so, yes, I believe that she was

11     qualified to provide that service to him.

12          Q.   And I know you said she's respected.  I asked

13     you if you knew what her qualifications were?

14          A.   I'm not familiar with her qualifications.

15          Q.   Do you know what type of degree she holds?

16          A.   I do not.

17          Q.   Do you know what type of certifications she

18     holds?

19          A.   I do not.

20          Q.   Have you ever hired a personal coach before?

21     Like it sounds like he's a career coach for Mr. Herman,

22     is that what you would call her?

23          A.   I  don't know the definition of her exact

24     title.

25          Q.   But you don't know what services she performed

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 95

1      for Mr. Herman?

2          A.   I was under -- consulting services, she

3      provided to Tim Herman.

4          Q.   Did you agree with the amount she was being

5      paid?

6          A.   Yes, I did not question the amount.

7          Q.   Okay.  If you don't know what she was doing,

8      how do you know if the rate was reasonable?

9          A.   Because consultants, attorneys, people that

10     provide services -- I'm not a consultant so I can't

11     justify what the price would be.

12         Q.   What type of consultant would you consider Ms.

13     Lauria to Mr. Herman?

14         A.   A business consultant.

15         Q.   Do you know what the going rate in Orlando,

16     Florida is for a business consultant?

17         A.   I do not.

18         Q.   And then I would ask you again:  How do you

19     know if her rate was reasonable?

20              MR. BRAND:  Objection.

21              MR. BLAIR:  You can answer.

22              THE WITNESS:  I -- I cannot compare the rate

23         based upon any other rates for business consulting.

24     BY MR. BLAIR:

25         Q.   Did you do anything to verify if the rates Ms.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 96

1      Lauria were charging were reasonable?

2          **A.   I did not do anything to verify the rates.**

3              **(Whereupon, documents were marked as**

4          **Plaintiff's Composite Exhibit R for Identification.)**

5      BY MR. BLAIR:

6          Q.   I'm going to show you what's marked as Exhibit

7      R --

8              MR. BRAND:  I'm sorry?

9              MR. BLAIR:  It's what you have in front of you,

10         Craig.

11     BY MR. BLAIR:

12         Q.   -- which is a series of checks.  And I will

13     just read the number into the record, it's

14     ST-EPUUSA00101.  And then I'm just going to read 103,

15     105, 117, 125, 127, 132, 141, 149, 150, 155, 167, 173,

16     192, 193, 194, and 205.  Do you have all of those?

17         **A.   Yes.**

18         Q.   Okay.  And these are checks from Event Planners

19     bank account.  Do you see that?

20         **A.   That's correct.**

21         Q.   And on the first one, on the 101 document

22     number, do you recognize that signature?

23         **A.   Yes, I do.**

24         Q.   And whose signature is that?

25         **A.   It looks like mine, but I'm having some**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 97

1      difficulties comparing some signatures on this, so I

2      can't verify that all these are my signatures.

3          Q.   Well, let's go through this.  Is 101 your

4      signature?

5          A.   First page?

6          Q.   Yeah.  ST -- what I'm going to do is go

7      STEPUSA00101.  So when I refer to 101, without having to

8      regurgitate that entire number --

9          A.   Right.

10         Q.   So is document number 101 your signature, which

11     is check number 1153?

12         A.   To draw some comparison to my signature -- I

13     can't answer that question.

14         Q.   You don't know if that's your signature?

15         A.   No.

16         Q.   How about 103, is that your signature?

17         A.   That looks comparable to my signature, but I

18     can't answer if that's my signature.

19         Q.   And who has signature rights to this account?

20         A.   Myself, Tim and -- myself and Tim.

21         Q.   All right.  Number 105, is that your signature?

22         A.   That looks a little bit more like my signature.

23         Q.   Okay.  Is 117, check number 1184, your

24     signature?

25         A.   Which one are we on?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)            9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 98

1          Q.    117.

2          A.    Okay.

3          Q.    We did 103, 105, 117.

4          A.    Yes.  That looks like my signature.

5          Q.    Is 125 your signature?

6          A.    I can't make out the signature.  It looks

7     comparable to my signature, but I can't verify that's my

8     signature.

9          Q.    Is 127 your signature?

10         A.    Looks close to it, but it's distorted.  I can't

11    verify it's my signature, but it looks.

12         Q.    Is 132 your signature?

13         A.    It looks similar to my -- yes.  Yes.

14         Q.    And 141 does not appear to be your signature.

15    Do you know whose signature that is?

16         A.    That is not my signature, and I would assume it

17    would be Tim's signature, but I can't verify that.

18         Q.    How about 149, do you know whose signature that

19    is?

20         A.    That would -- looks to be the same signature as

21    on 141.  I would assume it would be Tim Herman's

22    signature.

23         Q.    Okay.  150?

24         A.    I would assume that would be Tim Herman's

25    signature, because it looks like the other two.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 99

1          Q.    And 155?

2          A.    There's clearly a difference between 150 and

3      155 and that signature, so I cannot verify that

4      signature.

5          Q.    167?

6          A.    167, I cannot verify that signature.

7          Q.    Does it look like yours at all?

8          A.    It's absolutely not mine.

9          Q.    192?

10         A.    That looks like my signature.

11         Q.    193?

12         A.    That, I can't make out.  I cannot verify that's

13     my signature.

14         Q.    194?

15         A.    That is not my signature.

16         Q.    And 205?

17         A.    That is not my signature.

18         Q.    Okay.  Did you or Mr. Herman have a corporate

19     car?

20         A.    I had -- my car was in my own name, so it was

21     not a corporate car.

22         Q.    Did Mr. Herman have a corporate car, to your

23     knowledge?

24         A.    I don't know if -- I believe he did have a

25     corporate car that he may have paid through the company.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 100

1        Q.   When you say "the company," which company?

2        A.   Corporate cars, is that referring to his

3   personal vehicle?

4        Q.   A corporate car would be a car that is owned by

5   the corporation.

6        A.   Okay.  I would -- yes.

7        Q.   And you said it was paid for by "the company,"

8   which company was that?

9        A.   I would assume it would be Image Marketing, but

10   I can't verify that.

11        Q.   Okay.  Did you or Mr. Herman take any personal

12   loans from either Event Planners, Image Marketing of

13   Florida, LLC, or Image Marketing Group, Inc.?

14        A.   I did not.

15        Q.   Did Mr. Herman, to your knowledge?

16        A.   I wouldn't be able to answer that.  But to my

17   knowledge, no.

18        Q.   As far as STEPUSA00101, the check for $5300,

19   check number 1153 to RJL Services, do you know what that

20   was for?

21        A.   That was for the consulting services Lynnette

22   provided to Tim.

23        Q.   And do you know what time period that covered?

24        A.   I'm assuming it would be January 19, 2006 by

25   the date of the check.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                    Page 101

    1          Q.   But is that the fee for one consult?

    2          A.   I don't have the invoices for that, so I can't

    3     compare it.

    4          Q.   Did Ms. Lauria or her companies invoice Mr.

    5     Herman or Event Planners for their services?

    6          A.   I believe she did.

    7          Q.   So I should find a corresponding invoice for

    8     $5300 to Event Planners?

    9          A.   In the documents he would have -- yes.

   10          Q.   And the next check, which is 103, for the

   11     amount of $4,000, check number 1156, do you know what

   12     that is for?

   13               MR. BRAND:  Let me object.  Grounds is he said

   14          that he cannot verify these are his signatures on

   15          these checks.

   16     BY MR. BLAIR:

   17          Q.   Sir, this is your company; correct?

   18          A.   It is my company.

   19          Q.   And do you know what was going on in your

   20     company?

   21          A.   Yes, but I was not the only authorized person

   22     to write checks for the company.

   23          Q.   No, what I'm asking you is:  Do you know what

   24     that check is for?  Which is number 1156 for $4,000.

   25               MR. BRAND:  Same objection.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 102

1            THE WITNESS:  To my best recollection, it's for

2       RJL Services for consulting services provided.

3  BY MR. BLAIR:

4       Q.   Okay.  Next check, which is 1178 for $2,168 and

5  it appears to be 72 cents.  Do you see that?

6       **A.   I'd like to correct, that's $2,168.72.**

7       Q.   I'm sorry.

8            MR. BRAND:  Same objection.

9            MR. BLAIR:  I haven't even asked the question.

10           MR. BRAND:  Anything you're referring -- let me

11      just do this so I don't interrupt you:  Standing

12      objection concerning these checks as to any check

13      that Mr. Deming was not able to verify his signature

14      to.

15  BY MR. BLAIR:

16      Q.   As far as number 105, is that your signature?

17      **A.   I can't 100 percent verify that's my signature.**

18      Q.   Do you know what -- this is obviously to

19  Windermere Country Club.  Did Event Planners, Inc. have a

20  corporate membership at Windermere Country Club?

21      **A.   No.  We provided, again, as previously**

22  **discussed, the golf packages with the resorts.  We had a**

23  **contract with them.**

24      Q.   Okay.  And do you know why Event Planners USA,

25  Inc. would be paying Windermere Country Club then?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                        9fe8d661-fa6f-48d2-a272-6b9e4a4773 9a

Ryan Deming - 9/21/2012

Page 103

```
 1              A.    For the amount of golfers that were -- that

 2       played --

 3              Q.    Okay.

 4              A.    -- in our golf packages per month.

 5              Q.    Okay.  The next check, which is number

 6       STEPUSA00117, check number 1184, for $3500, is that your

 7       signature?

 8              A.    That seems to appear to be my signature.

 9              Q.    And it's payable to yourself; correct?

10              A.    Correct.

11              Q.    And it was a draw; correct?

12              A.    Correct.

13              Q.    And what was your -- how was your pay

14       determined at Event Planners?

15              A.    It was never a set amount.  It was basically --

16       I would pay myself for, you know, for the work that was

17       performed.

18              Q.    Okay.  Would you take a draw weekly?

19              A.    I can't recall how often I did back in the

20       time, but it's 2006.

21              Q.    Did you and Mr. Herman have any agreement you

22       would take weekly draws, quarterly draws?

23              A.    There was no agreement.

24              Q.    The next check, which is check number 1190,

25       with the Bates number ending in 125, for $2,000.  Is that
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 104

1        your signature?

2              A.    That I cannot verify as my signature.

3              Q.    It says, temporary loan, and it's payable to

4        Image Marketing Group.  Do you see that?

5              A.    Yes, I do.

6              Q.    Do you know what that was for?

7              A.    There was times, since we did work very closely

8        together, that Event Planners would pay Image Marketing

9        if there was a need to cover bills.

10             Q.    Did you document that cross company loan?

11             A.    It would be documented in, most likely,

12       accounting systems.  I don't know how my accountant did

13       it.

14             Q.    And the accounting systems for these

15       businesses, who maintained those?

16             A.    The accounting systems were maintained by the

17       company.

18             Q.    So if I said I wanted to see the accounting

19       system for Event Planners USA, Inc., what would that get

20       me?

21             A.    QuickBooks.

22             Q.    QuickBooks?

23             A.    Yes, sir.

24             Q.    So there is a QuickBooks program in place for

25       each company?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 105

1        A.    Correct.

2        Q.    Do you know if Image Marketing Group repaid

3    these temporary loans?

4        A.    I cannot recall back in 2006, because money --

5    I can't recall that far back.

6        Q.    And was the consulting agreement with Ms.

7    Lauria?  RJL Services?  Arnell, Inc.?  I mean, do you

8    recall which one it was with?

9        A.    RJL Services.

10       Q.    If you look at the next check, it's number

11   1195, with Bates number ending 127.

12       A.    Okay.

13       Q.    It's payable to Lynnette Lauria for $1,000.

14       A.    Okay.

15       Q.    Do you know what that would be for?

16       A.    I would assume that would be for the consulting

17   services provided by Lynnette Lauria and RJL Services.

18       Q.    Well, I asked you who provided them and you

19   said RJL Services, so --

20       A.    Right.  I do recall writing this check.  Again,

21   there was times that Tim was out on the road doing

22   services.  He would ask me to white a check.  He asked me

23   to write a check to Lynnette Lauria and I assumed that

24   was for the consulting services.  I didn't question his

25   -- so I wrote a check.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 106

1          Q.    So he would just tell you to write checks and

2      you would just do it?

3          **A.    If he was out of the office, yes.**

4          Q.    And you didn't question any of it, why it was

5      being done?

6          **A.    No.  Every time I questioned Tim, it seemed**

7      **like there was an argument, so I trusted his best**

8      **knowledge.**

9          Q.    Was this an argument between you two?

10         **A.    Yes.**

11         Q.    Did you and Mr. Herman part on amicable terms?

12         **A.    It was amicable, but it was -- I separated**

13     **myself and moved on with life.**

14         Q.    And the next check, which is 1199, ending in

15     Bates number 132 for $2,000, again payable to Image

16     Marketing Group.  Is that one of these loans we talked

17     about earlier?

18         **A.    Seems to be, yes.**

19         Q.    And your belief is that those would be

20     documented in the QuickBooks system?

21         **A.    They -- again, I can't recall how they were**

22     **documented in the system.**

23         Q.    Next check is number 1208, ending in Bates

24     number 141, and payable to Tim Herman.  Do you see that

25     one?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                           9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                               Page 107

 1         A.    Yes, I do.

 2         Q.    And I know you said that was not your

 3    signature.  Do you have any idea what this was for?

 4         A.    I have no idea what that's for.

 5         Q.    Could this be a draw for Mr. Herman?

 6         A.    It could possibly be a draw.

 7         Q.    If it was a draw for Mr. Herman, would you have

 8    a corresponding draw for the same month in the same

 9    amount?

10         A.    I could not remember back as far as 2006 how

11    often checks were written in equal amounts of draws and

12    when they were taken.

13         Q.    Next check, number 1218, ending in Bates number

14    149, in the amount of $6,000.

15         A.    I see that.

16         Q.    And do you know what that's for?

17         A.    I have no idea what this is for.

18         Q.    And on the bottom it says, AX.  Does that ring

19    any bell?

20         A.    I have no idea what AX is.

21         Q.    And the next check, which is 1219, ending in

22    Bates number 150, again, that's not your signature?

23         A.    That is not my signature.

24         Q.    But do you know what that was for?

25         A.    I would assume that's for the consulting
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 108

1      services provided by RJL Services.

2           Q.   And you told me on these, you assume it's that,

3      and I don't like assumptions.  I just want to know, do

4      you know?

5           A.   Yes.  Definitely, yes.  The consulting services

6      were provided.

7           Q.   Okay.  And you definitely know that this check

8      was to pay for those consulting services?

9           A.   I did not write the check, so I can't speak on

10     behalf of the signer of the check.

11          Q.   Is that -- I know the signature looks like Tim

12     Herman's or appears to be.  Do you recognize the

13     handwriting on the check itself?

14          A.   I do not.

15          Q.   The next check, which is 1224, for $7,000,

16     ending in Bates number 1555, do you have any idea what

17     that's for?

18          A.   I have no idea what this is for.

19          Q.   Has an AX on the bottom again.

20          A.   I have no idea what AX is.

21          Q.   The next check, which is 1238, ending in Bates

22     number 167, it appears to be for $2,243.32 to Fields BMW.

23          A.   Yeah.

24          Q.   Do you know what that would be for?

25          A.   It's not my signature.  I'm assuming it was

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 109

1    made out to Fields BMW for Tim's car.  He did drive a

2    BMW.

3         Q.   Do you know who that BMW's name was registered

4    in?

5         A.   I believe it was referenced as Image

6    Marketing's.

7         Q.   To your knowledge, did Ms. Lauria ever purchase

8    a car from Mr. Herman?

9         A.   To my knowledge, no.

10        Q.   To your knowledge, did Mr. Herman ever drive a

11   car registered in Ms. Lauria's name?

12        A.   No.

13        Q.   Check number 1246, ending in Bates number 173.

14   Is that your signature?

15        A.   I can't confirm that is my signature.  It's

16   broken up.

17        Q.   And do you know is that a short-term loan we

18   talked about earlier, a similar type thing, to the best

19   of your knowledge?

20        A.   It's seems to appear that, but I can't confirm

21   that because that's not my handwriting.

22        Q.   The next check, 1267, ending in Bates number

23   192, in the amount of $3,000 paid to Image Marketing.  Is

24   that your signature?

25        A.   I can't verify that's my signature and that's

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 110

1       **not my writing on that check.**

2            Q.   And safe to assume you don't know what this is

3       for?

4            **A.   Correct.**

5            Q.   So we can go quicker, the next three checks,

6       which are 1268, 1269, 1282, ending in Bates numbers

7       respectively, 193, 194, and 205, are -- none of those are

8       your signature; correct?

9            **A.   Correct.**

10           Q.   And they're payable to Image Marketing, but do

11      you know what they're for?

12           **A.   I have no idea.**

13           Q.   And it does say "temporary loan" at the bottom

14      of two of them.  Does that jog your memory for anything?

15           **A.   No.**

16           Q.   And as well as the pay AX, does that jog --

17           **A.   AX does not.**

18           Q.   Do you know Event Planners -- and I'm asking as

19      a corporate representative -- do you know whether they

20      provided any services to Simon?  In other words, you said

21      that that was Tim's clients and they did it for Simon and

22      its malls.  Do you know which malls?

23           **A.   I can't confirm exactly which malls.**

24           Q.   Okay.  Would there be any reason for Event

25      Planners to be doing work for say a mall in Puerto Rico?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                      9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 111

1          A.    Again, that was my account, but Tim did travel

2     all over the place, so yes, I could see a reasoning for

3     that.

4          Q.    And as an officer in Event Planners, what do

5     you think a reason would be for an Orlando marketing firm

6     to be dealing with a Puerto Rico mall?  How's that work?

7          A.    It depends on what the client wants.

8          Q.    But as a marketer, full service marketing firm,

9     what would be your understanding of why that would be a

10    good synergy?

11         A.    Because it's -- all malls are considered

12    tourist destinations that we represented and tourists

13    come from all over the country and some of the guests may

14    visit more than one mall.

15              (Whereupon, documents were marked as

16         Plaintiff's Composite Exhibit S for Identification.)

17    BY MR. BLAIR:

18         Q.    I'm going to show you a composite exhibit of

19    some invoices from EP USA, and ask you if you recognize

20    --

21              MR. BRAND:  Is this Exhibit S?

22              MR. BLAIR:  Yes, Exhibit S.  I'm sorry.

23         Composite Exhibit S.

24    BY MR. BLAIR:

25         Q.    Ask if you recognize at least the format of

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 112

1      these?

2          A.   I do not recognize any format for any of these

3      invoices.

4          Q.   Okay.  And I'm going to ask you -- just go in

5      line here.  The first one, which is -- looks like 869 up

6      in the corner, invoice number, and Bates numbered

7      SPG01491 for approximately $4,678.  And it appears to

8      say, Plaza Carolina at the top.  Do you see that?

9          A.   I do.

10         Q.   Do you know what this was for?

11         A.   I have no idea what this was for.

12         Q.   And at the bottom, it has some descriptions.

13     Does that look like anything that Event Planners would do

14     for a client?  Tote bags.

15         A.   Specifically to Event Planners, yes.

16         Q.   Okay.  So what would Event Planners do with

17     looks like 1,000 tote bags?  What would they do for Plaza

18     Carolina?

19         A.   I can't speak on behalf of this invoice.  I've

20     never seen this before.

21         Q.   Have Event Planners or you ever done anything

22     with tote bags for somebody?

23         A.   Event Planners --

24         Q.   Yes, sir.

25         A.   -- Image Marketing, yes, I've -- yes, I've done

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 113

1        something with tote bags before.

2              Q.    Through Event Planners?

3              A.    I cannot recall the exact company that it was

4        done through, but yes, I've done something with tote

5        bags.  I can't answer the question.

6              Q.    It also says for logo set up costs.  Do you

7        know what those are or what that is?

8              A.    Logo set up costs, yes.

9              Q.    It's obviously a set up cost for the logo.  But

10       what is that -- what would Event Planners be doing?

11             A.    When --

12                   MR. BRAND:  Wait.  Hold on.  Point of

13             clarification.  We're not talking about this

14             invoice, you're just asking him a question as to

15             what a logo set up is; right?

16                   MR. BLAIR:  He says he has no knowledge on the

17             invoice, so I --

18                   MR. BRAND:  Right.

19                   MR. BLAIR:  -- I'm just asking him is this the

20             type of work that Event Planners does.

21       BY MR. BLAIR:

22             Q.    Like does Event Planners set up logos?

23             A.    Yes.

24             Q.    And do you know what a typical cost for that

25       is?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 114

1        A.    It varies depending on what type of product the

2     logo's being printed on.

3        Q.    And for a mall, what would be -- to my

4     understanding, Simon has it's own kind of logo and

5     branding.  Wouldn't you agree with that?

6        A.    I would agree with that.

7        Q.    Okay.  So what type of logo do you believe

8     Event Planners would be setting up for a client that

9     already had a logo?

10        A.    There's imprint charges for embroidery, for

11     printing on pens, each specialty product company charges

12     a set up charge.

13        Q.    And do you know -- so basically, these logo

14     costs, your understanding is there's some type of cost

15     associated with printing a logo?

16        A.    Correct.

17        Q.    But you don't know for sure?

18        A.    I know it's a fact, yeah.  I mean, logo imprint

19     charges vary depending on what you print the logo on.

20        Q.    And based upon your previous experience with

21     tote bags, does this invoice appear to be reasonable for

22     what's done on here?

23        A.    Yes, it does.

24        Q.    The next invoice, which is number 1432, ending

25     -- or Bates number SPG01492, it is a -- appears to be --

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 115

1       says, billed to Simon Property Group, Sunrise, Florida.

2            A.    That's what it appears to say.

3            Q.    And it says, sales rep, S. Henry.  Did Event

4       Planners have a sales rep --

5            A.    Where does it say that?  Oh, okay.  Right

6       there.  No.

7            Q.    So you're unfamiliar with anyone named S.

8       Henry?

9            A.    Correct.

10           Q.    And none of your companies you're involved with

11      ever employed anybody with the name of S. Henry?

12           A.    No.

13           Q.    And it appears to be for two people attending a

14      conference in San Antonio.  Do you see that?

15           A.    Yes.

16           Q.    Do you have any knowledge as to, A, that

17      conference, or B, if it ever took place?

18           A.    I'm not familiar with it, no.

19           Q.    And is it safe to say you were not one of the

20      attendees?

21           A.    Correct.

22           Q.    And you don't know who attended on behalf of

23      Simon Property Group?

24           A.    I cannot answer who would have attended on

25      behalf of Simon.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 116

1          Q.   The next is an Event Planners invoice, it looks

2     to be now invoice number 281-9, and it's Bates number

3     SPG02328.

4          **A.   Okay.**

5          Q.   And it says, sponsorship, and it's handwritten

6     "gold."  Do you know what that's for?

7          **A.   I do not.**

8          Q.   It also says, Gator Tours, Carter Ticket

9     Program.  Am I reading that right?

10         **A.   That seems to be what it says.**

11         Q.   Do you know what that's about?

12         **A.   I do not know what that's about.**

13         Q.   Is it fair to assume then you do not know what

14    the services were?

15         **A.   I do not know what the services were regarding**

16    **this invoice.**

17         Q.   And I notice the kind of logo for the Event

18    Planners or the invoice format changed.  Is that --

19         **A.   I did notice that.  I've never seen either one**

20    **of the logos.**

21         Q.   Okay.  The last invoice is number 280-3, Bates

22    number SPG02332, for $1500.  Do you see that one?

23         **A.   Yes.**

24         Q.   And it has a description of three things,

25    Orlando Top Spot Distribution, Kissimmee Top Spot

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 117

1        Distribution, and Multi Route Discount.  Do you see that?

2            A.   I do.

3            Q.   Do you have any knowledge as to these services?

4            A.   Yes, I do.

5            Q.   Can you tell me what they are?

6            A.   Top Spots was a rack, a 36 pocket rack that was

7        at over 250 locations throughout Orlando and Kissimmee,

8        and we had some down in South Florida as well.

9            Q.   And who owned that rack?

10           A.   Image Marketing.

11           Q.   And was there -- and did Image Marketing lease

12       space in that rack to other places?

13           A.   Yes.

14           Q.   And did Image Marketing maintain lease

15       agreements with the vendors or people who put stuff in

16       the rack?

17           A.   Could you repeat that?  I'm sorry.

18           Q.   Well, you said it was a 36 space rack; correct?

19           A.   Correct.

20           Q.   So I assume -- again, I'm not a marketer, but I

21       assume there's 36 --

22           A.   Yes.

23           Q.   -- little places --

24           A.   There's 36 pockets in there, yes, and other

25       companies were in those racks.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 118

1          Q.   So those other companies that are in those

2    little pockets, do they sign a lease with Image

3    Marketing?

4          **A.   It was not a lease.**

5          Q.   How do you work it?

6          **A.   It was depending on if the client -- specific**

7    **client wanted that service, it was available to them.  So**

8    **yes, they would have paid for that service.**

9          Q.   So you -- I'm trying to figure out did Image

10   Marketing lease those little rack spots to only it's

11   clients, or --

12         **A.   Anyone that wanted to be in that rack.**

13         Q.   So anyone that wanted to be in that rack, I

14   call you up and say, Mr. Deming, I would like to be in

15   that rack in "X" hotel, and you'd say, great.  Would you

16   say, here's your lease for that rack or do you just say,

17   it cost you $1,000 a month?

18         **A.   I would sit down and to talk to you and**

19   **understand all the services you like, and if you would**

20   **just want to go with that rack, it would be negotiated on**

21   **price.**

22         Q.   And that's fine.

23         **A.   Yes.**

24         Q.   But I'm just trying to figure out do you sign a

25   lease with somebody to go in that rack?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 119

1        A.   No.

2        Q.   So of the 36 people, you come to some

3    understanding and just invoice that person?

4        A.   Correct.

5        Q.   And again, I'm not in marketing, so I assume is

6    there any like in a grocery store, like is there a place

7    on the shelf you want to be as opposed to -- like I've

8    always heard in a grocery store you want to be right in

9    the middle.  You don't want to be in the bottom of the

10   rack or the top.

11       **A.   Correct.  That was our job in the relationships**

12   **we had with each individual property, to determine the**

13   **best placement for that rack based on our relationships**

14   **to make sure it was filled, make sure it was there, make**

15   **sure it was present, make sure it wasn't behind the**

16   **counter, make sure it worked when the concierge wasn't**

17   **there.  So yes.**

18       Q.   I guess what I mean by that is if there's 36

19   spots in there, was everyone charged the same thing for a

20   spot, or did you get charged more if you were on the

21   front row as opposed --

22       **A.   Charged more for the front row, also if you had**

23   **multiple placements.**

24       Q.   So -- okay.  So you might get discounts if you

25   have multiple placements or something like that?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 120

1          A.   Not necessarily, no.

2          Q.   Okay.  But assuming there's 36 people and 36

3     spots, is everyone in the first row charged a little

4     more --

5          A.   Yes.

6          Q.   -- than everybody in the second row is charged

7     a little less than the first row?

8          A.   It's considered prime placement, yes.

9          Q.   And what is the prime placement considered, the

10     front row?

11          A.   Prime placement would be considered front row.

12          Q.   Okay.  Is there any placements that are bad?

13          A.   No.

14          Q.   Okay.  Did you -- or does Image Marketing keep

15     track of the location within these racks where the

16     clients are?

17          A.   We did.

18          Q.   So if I were to ask you where was Simon

19     Property Group in a rack, could you tell me?

20          A.   Yes.  I don't have the locations in front of me

21     so I can't answer on behalf of that, but I can tell you

22     that Simon Property was in those racks.

23          Q.   Okay.  And all I'm trying to ask you is there a

24     way, if I wanted to find out where they are, I should be

25     able to look at some document that --

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 121

1          A.    Correct.  Correct.

2          Q.    Okay.  And we talked yesterday, Takitik did

3    some distribution as well; correct, of material for Simon

4    Property Group?

5          A.    I can't speak on behalf of Takitik.

6          Q.    Did Image Marketing do some delivery on behalf

7    of Simon Property Group?

8          A.    Yes.

9          Q.    Did they distribute to the same locations?

10          A.    There was hundreds of locations.  There was

11    overlap locations.  I can't determine that because I

12    don't have that.

13          Q.    And what I'm trying to find out, if I say, Mr.

14    Deming, can you tell me the location where Event Planners

15    did its distribution to its clients, could you tell me

16    from looking at a list?

17          A.    Looking at a list, I could -- I don't have a

18    list in front of me, so I can't exactly tell you.

19          Q.    I understand.

20          A.    But yes, I mean.

21          Q.    I'm not trying to get from memory where you

22    distributed.  I'm just asking you if I wanted to find out

23    where Event Planners delivered it's collateral material,

24    is there a list somewhere that tells me that?

25          A.    I can't answer that if there is a list or is

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 122

1       not.  There's multiple lists.

2              Q.   When you were there at Event Planners, was

3       there a list?

4              A.   There was a master list, yes.

5              Q.   And was that master list utilized by Image

6       Marketing as well?

7              A.   There was basically, depending on which area,

8       there was multiple lists.  They were updated at different

9       times by distribution managers, so I can't answer on

10      behalf of all the lists that are there, but there were

11      lists, yes.

12             Q.   What I'm trying to figure out is whether it's

13      one or multiple.  Did Event Planners maintain it's list

14      and Image Marketing maintain it's own list, or did they

15      all work from the same group of lists?

16             A.   I would assume there would be two lists.

17             Q.   One for each company?

18             A.   Correct.

19             Q.   And said "assume," do you know?

20             A.   I can't answer that question like 100 percent

21      positive.

22             Q.   Do you know who did the distribution for Event

23      Planners, who physically took the distribution?

24             A.   The distribution would have been done through

25      multiple individuals that were referenced earlier that

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 123

1    worked for Event Planners and Image Marketing.

2        Q.   You told me you -- and if I'm mistaken, you and

3    Tim are the only employees of Event Planners; correct?

4        A.   The only two officers.

5        Q.   Were there -- in addition to officers now, were

6    there employees of Event Planners?

7        A.   There were no employees at Event Planners.

8        Q.   Okay.  So who did the delivery for the Event

9    Planners?

10       A.   It would be the representatives.  There's a lot

11   of cross work, we all worked in the same office, so you

12   know, it would have been myself, Tommy, Tim, Deanna --

13       Q.   The same employees that you heard Takitik use

14   yesterday, the same employees Image Marketing had?

15       A.   Whatever direction that our client or Tim or

16   account representative for that told us to do, told me

17   personally to do for my personal, I did.

18       Q.   You did your own delivery?

19       A.   We all -- I participated in distribution.

20       Q.   For which company?

21       A.   For both companies.

22       Q.   Event Planners?

23       A.   Yes.

24       Q.   Can you tell me the name of a hotel that you

25   delivered something to for me?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 124

1          A.    Rosen Plaza.

2          Q.    Which one?  There's several on I-Drive, isn't

3     there?

4          A.    There's -- Rosen owns, I believe, five

5     properties in Orlando.

6          Q.    Is there -- if I say the Rosen Plaza on

7     I-drive, is there only one?

8          A.    There's Rosen Plaza and there's Rosen Center.

9          Q.    Okay.  Which one, the Rosen Plaza?

10         A.    Both.

11         Q.    Any other hotels you recall delivering to?

12         A.    We -- Marriott World Center.

13         Q.    Down in Lake Buena Vista?

14         A.    Correct.  Hampton Inn.

15         Q.    Which Hampton Inn?

16         A.    There was multiple Hampton Inns.

17         Q.    Do you -- can you give me a name of a couple?

18         A.    International Drive, Lake Buena Vista,

19     Sheraton.  I mean, there's hundreds of hotels that we

20     distributed.

21         Q.    That you personally took the stuff to?

22         A.    Myself and the other representatives.

23         Q.    Yeah.  But I'm interested in the ones that you

24     took them to, not your representatives.  If I said, Mr.

25     Deming, did you personally deliver some collateral

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a4773a

Ryan Deming - 9/21/2012

Page 125

1        marketing material to a hotel, and if your answer is,

2        yes, and I said, well, which ones, what would the answer

3        be?

4              **A.   All of them.**

5              Q.   You distributed to all the hotels on the list?

6              **A.   Every -- yeah.  I mean, yeah.  I mean, there's**

7        **hundreds of hotels.**

8              Q.   Okay.

9              **A.   So my job, you know, at one point in time, I**

10       **was most likely in one of those hotels.**

11             Q.   Okay.

12                  MR. BRAND:  Brian --

13                  MR. BLAIR:  You need a break?

14                  MR. BRAND:  Yeah.

15                  MR. BLAIR:  Can we take a break, Ricky?

16                  CAMERA OPERATOR:  Okay.  We're of the record.

17       The time now is 1:58.

18                  (Whereupon, a recess was taken at 1:58 p.m. and

19       proceedings resumed at 2:11 p.m.)

20                  CAMERA OPERATOR:  Okay.  We're back on the

21       record.  The time is 2:11.

22                  (Whereupon, a document was marked as

23       Plaintiff's Exhibit T for Identification.)

24       BY MR. BLAIR:

25             Q.   Mr. Deming, I'm going to show you what's

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 126

1    titled, Tim Herman's emails from LL sent folder, which I

2    would assume would be Lynnette Lauria's sent folder.  And

3    it's email dated 9/17/2008 and it's been marked as

4    Exhibit T.  Ask you to take a look at that real quick.

5        **A.   Okay.**

6        Q.   And do you recognize the "from" email address

7    Tim@image-marketing.com?

8        **A.   I do.**

9        Q.   Was that Tim Herman's email at Image Marketing?

10       **A.   Yes, it was.**

11       Q.   And it's signed TIMO.  Is that what he went by?

12       **A.   I've seen that in reference TIMO.**

13       Q.   And have you ever seen this email before?

14       **A.   I have not, no.**

15       Q.   It talks about someone named Caroline calling,

16   I guess, either Tim or Image Marketing.

17       **A.   Uh-huh.**

18       Q.   Did you ever work with anyone named Caroline --

19       **A.   I don't recall the name Caroline.**

20       Q.   Okay.  And it talked about, I guess, Tim acting

21   -- he said, we acted like we didn't know about EP.  Is EP

22   Event Planners, do you know?

23       **A.   I would assume Event Planners, but EP, I mean,**

24   **I'm just guessing.**

25       Q.   Do you know why Mr. Herman would be acting like

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 127

1     he didn't know who Event Planners was?

2          A.   I can't speak on behalf of Tim, so I don't know

3     why he --

4          Q.   Do you know what he's trying to accomplish in

5     this email?

6          A.   I have no idea what he's trying to accomplish.

7          Q.   I'm also going to show you a -- what appears to

8     be a handwritten note.

9          A.   Okay.

10         Q.   And we're going to mark it as Exhibit U,

11    Plaintiff's U.  Just ask you to read that for me.

12         A.   Read it?

13         Q.   Yeah, so I can ask you some questions about it.

14         A.   Okay.

15              (Whereupon, a document was marked as

16              Plaintiff's Exhibit U for Identification.)

17    BY MR. BLAIR:

18         Q.   Okay.  It is to a Ryan from Lynnette; correct?

19         A.   It appears to be to Ryan, yes.

20         Q.   And do you recall receiving this note from a

21    Lynnette?

22         A.   I don't recall receiving this note from

23    Lynnette.

24         Q.   Is there any other person at either Event

25    Planners or Image Marketing, either Image companies named

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 128

1    Ryan?

2         A.   There's not.

3         Q.   And do you know anyone other than Lynnette

4    Lauria that's named Lynnette?

5         A.   No.

6         Q.   And do you have any idea what this note is

7    about?

8         A.   It looks like it's regarding charges, how

9    services were provided.  I know it's a fact there was an

10   email that I was copied on regarding -- from one of the

11   mall executives about having to split up invoices certain

12   ways properly up to 22 times.  So like I said, there's

13   you know, this was most likely due to one of the services

14   provided on behalf of Image Marketing.

15        Q.   You said you were -- or saw an email from an

16   executive?

17        A.   There was type of email regarding something to

18   Tim regarding -- from one of the mall managers, I can't

19   recall the name, regarding how to process an invoice and

20   different ways to get the job done so it wouldn't have to

21   be slit up or it could be split up to 22 ways.  I can't

22   recall that email in front of me, but I do recall seeing

23   something that made reference to this.

24        Q.   So if I understand you correctly, someone at

25   Simon, you can't recall who, told Tim to split up

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                                        Page 129
  1     billing?

  2          A.   I can't recall who it was from.

  3          Q.   Right.

  4          A.   I was cc'd on the email.  But yes, I was --

  5     yes, this is in order to provide the services and to

  6     cover the areas that need to be covered for the malls

  7     that was at their direction of how it was to be invoiced

  8     and processed.

  9          Q.   But I'm trying -- was it from Simon?

 10          A.   It was from somebody at Simon.

 11          Q.   And it was to Tim?

 12          A.   I believe it was to Tim.  I know I was cc'd on

 13     it.  I did see the email.

 14          Q.   I mean, did it indicate why billings had to be

 15     split up?

 16          A.   That's up to Simon.  I guess -- I don't know if

 17     it's Simon policy, but I -- that would be the directive

 18     of whoever sent the email.

 19          Q.   And when you say "split up," is that similar to

 20     what we talked about yesterday with Mr. Takio that it

 21     would be billed through different companies?

 22          A.   I'm assuming so, yes.

 23          Q.   And you said up to 22 ways?

 24          A.   That was Simon.  I don't know what that meant,

 25     I just know that that was an email.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 130

1          Q.   So it's referencing splitting bills up --

2          A.   However Simon does their billing to get

3      services done, that's what was referenced there.

4          Q.   And were you involved in any of these bill

5      splitting decisions?

6          A.   No.

7          Q.   Almost done with Event Planners.  Did Event

8      Planners have a list of routes that it delivered material

9      to?

10          A.   There was multiple lists of routes that were

11      updated, revised, audited, checked from distribution

12      managers, both companies.  You know, I can tell you that

13      all the parties listed in the suit that there was no --

14      referencing earlier, there was no, at one specific time,

15      that that company was being distributed at the same time

16      at a different time, this could be probably relate back

17      to the email splitting up to 22 ways, so I'm assuming

18      that's what that was regarding, but I don't know.  I

19      didn't make that decision when it came because it was not

20      my -- Simon wasn't my account.

21          Q.   And all I'm trying to figure out, say Event

22      Planners, say there was deliveries --

23          A.   Correct.

24          Q.   -- did someone in Event Planners go Mr. X, you

25      go here, and Mr. Y, you go here.  How was that determined

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 131

1      where the deliveries or who did them?

2           A.   Each week, based on what needed fulfillment,

3      based on which area needed to be covered throughout the

4      State of Florida with hundreds of properties, it varied

5      every day.

6           Q.   Right.  But someone had to tell a driver where

7      to go; correct?  I mean, the driver didn't get a list of

8      300 hotels and start delivering, did they?

9           A.   Our distribution managers and the people that

10     provided the distribution services on behalf of the

11     companies were well trained, had knowledge of where the

12     hotels were located, and they, my best judgment, they

13     performed the work and did the distribution that needed

14     to be done for the client.

15          Q.   Who was the distribution manager for Event

16     Planners?

17          A.   Distribution manager, there wasn't really a

18     title for it.  I mean, we all wore separate -- I mean,

19     we're just all considered a -- we all worked together.

20     So I wouldn't say there's a distribution manager.

21          Q.   I mean, someone had to -- okay.  Who

22     distributed the actual product, everybody?

23          A.   We all did.

24          Q.   Well, you would agree there had to be some

25     coordination of who's going to do what; correct?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 132

1        A.   We all kind of coordinated and spoke about it,

2    where we were going to go and do that.  But there was no

3    formality to it.  We covered the areas and we covered the

4    hotels and the area and made sure that everything was

5    billed upon.

6        Q.   And how many hotels or -- I shouldn't even say

7    hotels.  How many locations were on the distribution list

8    for Event Planners?  They shared a list; correct?

9        A.   There is a master list that we -- that was used

10   with both companies.

11       Q.   And let's just say you did distributions during

12   the week.  I mean, I assume everyone just didn't have a

13   list and just started going.  I mean, did you say, you

14   take I-Drive, you take Jacksonville, you take Tampa?

15       A.   We all shared it.  If a concierge called or

16   someone needed more information, we went over there and

17   fulfilled that request.

18       Q.   So you didn't go to all the locations all the

19   time?

20       A.   We hit all the locations.

21       Q.   Every time?

22       A.   Every time.

23       Q.   And how often would you deliver material?

24       A.   Every week.

25       Q.   Did Event Planners deliver things that were

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 133

1       different from what Image Marketing delivered?

2           A.   It -- in regards to a specific account or?

3           Q.   Well, let's just take a location.  Let's just

4       say we're going to the World Center Marriott.  Would

5       someone from Event Planners come and deliver their

6       collateral material, and two hours later, someone from

7       Image Marketing come and deliver their collateral

8       material?

9           A.   It was never done -- the routes were never

10      established at the same time, same day, separate times.

11          Q.   Okay.  So every week, someone --

12          A.   There would have been no duplicate services at

13      the same route or same time at any given time between any

14      of the companies listed that you referenced in this

15      lawsuit.

16          Q.   But I'm just trying to -- so would someone form

17      Event Planners, in our hypothetical World Marriott, visit

18      that hotel once a week and someone from Image Marketing

19      also visit that hotel once a week?

20          A.   I can't answer if it's the same week or if it's

21      the same day, but definitely different times -- different

22      time periods.

23          Q.   There were physically two different deliveries,

24      one for each company?

25          A.   We had -- yes.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 134

1          Q.   Okay.  Did Event Planners ever do any business

2     with Lynnette Lauria individually apart from RJL

3     Services?

4          A.   No.

5          Q.   Did Event Planners ever do any business with

6     Robert Lauria individually?

7          A.   No.

8          Q.   Did Event Planners ever do any business with

9     Sarah Lagi?

10         A.   No.  It did come to my understanding afterwards

11    that she assisted, after I left in 2010, somewhere with

12    Tim, I don't know what capacity.

13         Q.   Okay.  Do you know -- so you don't know

14    anything about her employment?

15         A.   I believe she works at Westgate.  She attended

16    a couple mixer Monday events.

17         Q.   But as far as employment with Image

18    Marketing --

19         A.   No, I know nothing about that.

20         Q.   But while you were at Event Planners, you did

21    not retain Ms. Lagi to do anything?

22         A.   No.

23         Q.   Did Event Planners ever work with Rachel Lauria

24    in any capacity?

25         A.   No.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 135

1         Q.   Did -- are you familiar with anyone named R.

2    Irving?

3         A.   **Never heard of him.**

4         Q.   Did Event Planners ever work with Eric Lagi?

5         A.   **No.**

6         Q.   How about his company, like was it Lagi

7    Productions or Eric Lagi Productions?

8         A.   **Never heard of it until the documents that you**

9    **produced.**

10        Q.   I just -- you haven't looked at all my client's

11   documents yet, so --

12        A.   **No, I'm referring to the -- I do recognize the**

13   **name and the parties mentioned.**

14        Q.   Okay.  Has Event Planners ever done any work

15   with Lydia Gilmore?

16        A.   **No.**

17        Q.   And I'm just going to give you names, with the

18   understanding that the question is:  Has Event Planners

19   done any business with "X," and that way I don't have to

20   keep --

21        A.   **Are we doing these individual on a personal**

22   **or --**

23        Q.   If you can tell me personal or both, because I

24   don't know if they might own companies.  Like Lydia

25   Gilmore, obviously, she works for Simon Property Group.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 136

1        A.    Correct.  I've seen the name, never met her.

2        Q.    Okay.  Do you know who Cindy Harding is?

3        A.    No.

4        Q.    How about Elizabeth Laggoon?

5        A.    No.

6        Q.    Or Laggoon.  Greg Livingston?

7        A.    Greg Livingston was my partner with the

8    original company In View Marketing of Central Florida.

9        Q.    How about Edgar Lozada?

10        A.    The name rings a bell.  I don't know Edgar.

11        Q.    How about EDL Management?

12        A.    I noticed that in the suit as one of the

13    parties.  I'm not familiar with EDL Management.

14        Q.    What about Michael Moran?  Michael J. Moran.

15        A.    Michael J. Moran was one of the partners in the

16    Mobile For Hire when we tried to get that going, but in

17    that capacity, that's no longer.

18        Q.    How about Event Planners ever done any business

19    or employed Joseph Aintabi?

20        A.    Not to my knowledge, no.

21        Q.    Has Event Planners ever done any business with

22    or employed Target Distribution?

23        A.    I have never heard of Target Distribution.

24        Q.    Has Event Planners ever employed or done

25    business with a James or Patricia Barbarino?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 137

1          A.   Never heard those names, no.

2          Q.   Has Event Planners ever done business with or

3     employed Deborah Batchelor?

4          A.   No.

5          Q.   Do you know Ozzie Dominguez?

6          A.   It rings a bell.  I believe he was Miami -- the

7     Dadeland Mall.

8          Q.   Are you familiar with a gentleman named Anthony

9     M. Edwards?

10         A.   No.

11         Q.   Has Event Planners ever employed or done

12    business with George Fakhaory?

13         A.   Yes, we've done business with George Fakhaory.

14         Q.   In what capacity?

15         A.   He would host trade shows that we would be,

16    basically, co -- we co-hosted trade shows together with

17    him.

18         Q.   And has Event Planners ever employed or done

19    business with Katalin Takio?

20         A.   No.

21         Q.   Has Event Planners ever done business with or

22    employed Susan Ortega?

23         A.   No.

24         Q.   How about J&S Multimedia?

25         A.   Done business with.  J&S is Travel Host, yes,

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                              Page 138
   1          there were several events that we would kind of

   2          co-sponsor and host together as a friendly industry

   3          relationship.

   4               Q.   Was that through Event Planners or Image

   5     Marketing?

   6               A.   Image Marketing.

   7               Q.   How about Brian Peters, have you ever employed

   8     or done business with Brian Peters?

   9               A.   Just through Florida Mall.

  10               Q.   As a mall manager for Simon Property?

  11               A.   Correct.

  12               Q.   How about have you heard of the name Andrea

  13     Rodriguez?

  14               A.   The name rings a bill.  I believe she may have

  15     been a marketing manager at Sawgrass.

  16               Q.   Does the company PR Works --

  17               A.   Never heard of it.

  18               Q.   Have you ever heard of someone named T. Ruiz?

  19               A.   No.

  20               Q.   They're listed as a salesperson at XLM

  21     Marketing.  Does that ring a bell?

  22               A.   No.

  23               Q.   Does XLM Marketing ring a bell?

  24               A.   No.

  25               Q.   Never heard of it?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                      Page 139

  1           A.    Just in reading the documents in your suit.

  2           Q.    Thearon Scurlock, do you know --

  3           A.    Thearon Scurlock, he was marketing manager for

  4     Florida Mall at one time.

  5           Q.    And has Event Planners ever employed him or

  6     done business with him apart from Simon Property Group?

  7           A.    No.

  8           Q.    How about Susan Thomas, have you heard of --

  9           A.    No.

 10           Q.    Have you ever heard of a company named Arnell,

 11     Inc.?

 12           A.    No.

 13           Q.    John Vanhara?

 14           A.    No.

 15           Q.    John Weed.

 16           A.    Yes.   John Weed has handled trade shows.   Don't

 17     know the scope of his business.

 18           Q.    So Event Planners has never done business with

 19     or hired John Weed to do anything?

 20           A.    No.

 21           Q.    Ever heard of a Digital Multi-Media &

 22     Marketing?

 23           A.    No.

 24           Q.    So is it fair to say that Event Planners has

 25     not hired them to do anything?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 140

1       A.   Correct.

2       Q.   And Excell Services?

3       A.   No.

4       Q.   Never heard of it?

5       A.   Just through your documents.

6       Q.   Event Planners never hired them for anything?

7       A.   No.

8       Q.   How about Hat Marketing?

9       A.   Hat Marketing, I'm familiar with Kevin Brett.

10      Q.   Has Event Planners ever hired Hat Marketing to

11  do anything?

12      A.   No.

13      Q.   Has Image Marketing ever hired Hat Marketing to

14  do anything?

15      A.   Tim had worked with Kevin through some

16  projects.  I can't answer that question, because I can't

17  recall.

18      Q.   Okay.  How about Marketing Resource Network,

19  have you ever heard of that company?

20      A.   I have.

21      Q.   And what do you know about them?

22      A.   That was the name of the first consulting

23  company before RJL that I do remember seeing that

24  consulted Tim.

25      Q.   So did Event Planners pay resource -- or

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 141

1        Marketing Resource Network to coach Tim as well?

2            A.   I believe so.

3            Q.   Do you know who owns that?

4            A.   That's owned by Robert Lauria and Lynnette

5        Lauria.

6            Q.   Do you know what Robert Lauria does?

7            A.   He's an executive in some type of corporation,

8        I don't know the name of it.

9            Q.   Do you know if he sells light bulbs?

10           A.   That does sound familiar.  Sylvania.

11           Q.   But he's not with marketing in Sylvania, is he?

12           A.   I do not know.

13           Q.   So you don't know his qualifications?

14           A.   I do not.

15           Q.   How about M. Lauria & Associates, Inc., have

16       you ever heard of that company?

17           A.   No.

18           Q.   How about Orange Thorpe Investments?

19           A.   No.

20           Q.   How about Pointe Distribution?

21           A.   Pointe Distribution, in reference to one of the

22       Takitik companies, yeah.

23           Q.   Has Event Planners ever done any business with

24       Pointe Distribution?

25           A.   We all do business together.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 142

1        Q.   And what type of business would Pointe
2   Distribution do for Event Planners?
3        A.   I can't speak on behalf of Pointe Distribution,
4   but I know there was so many things that we did together
5   under the Takitik name and Pointe Distribution regarding
6   marketing.
7        Q.   Right.  But if I say what did Event Planners do
8   with Pointe Distribution, you know, can you tell me what
9   your business did with Pointe Distribution?
10       A.   It would have to do with distribution services.
11       Q.   So they would be distributing this collateral
12   material as well?
13       A.   Correct.
14       Q.   Is it different collateral material?
15       A.   Pointe had Takitik -- that was a part of that
16   company.  They had other clients, so I don't know what
17   materials they were distributing.
18       Q.   Does Event Planners have any of its marketing
19   collateral that it delivered in its possession currently?
20       A.   I'm sorry?
21       Q.   In other words, if I said, I want to see a
22   sample of what Event Planners distributed, do you have
23   any of that in your possession?
24       A.   That would be in the possession of the
25   documents that were originally turned over.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 143

1          Q.   That are in Jason Herman's possession?

2          A.   Yes.

3          Q.   So is it fair to say you don't have possession

4    of those, Mr. Jason Herman does?

5          A.   They're in -- the original pieces would be,

6    yes.

7          Q.   Have you been able to obtain copies?

8          A.   Yes.

9          Q.   Of those pieces?

10         A.   We went through and documented everything

11   that's in those boxes that we did go through.

12         Q.   Well, what I'm trying to figure out is he has

13   samples of what your company delivered; correct?

14         A.   Correct.

15         Q.   If I were to ask you for copies of those, would

16   I be able to get them from you or do I have to go to Mr.

17   Herman and get them?

18         A.   I would be able to produce them.

19         Q.   Okay.  Have you ever heard of someone named

20   Andrea Rodriguez that worked for PR works?

21         A.   No.

22         Q.   Have you ever heard of XLM Excell?

23         A.   No.

24         Q.   So is it fair to say that Event Planners didn't

25   do any business with XLM Excell?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 144

1          A.    Correct.

2          Q.    And how about XLM Marketing?

3          A.    No.

4          Q.    And other than this consulting service that RJL

5     allegedly provided to Mr. Herman, did Event Planners do

6     any other type of business with RJL Services?

7          A.    No.

8          Q.    Are you aware if RJL -- in your capacity as

9     corporate representative of Event Planners, Image

10    Marketing, and Image Marketing of Florida, are you aware

11    of RJL distributing any collateral material?

12         A.    No.

13         Q.    To your knowledge, did they distribute any

14    collateral material?

15         A.    No.

16         Q.    Have you ever seen any advertising material

17    produced by RJL Services?

18         A.    No.

19         Q.    Have you ever seen any advertising material

20    produced or created by Lynnette Lauria?

21         A.    Individually, no.  I mean, there may have been

22    like emails that were sent, send email blasts out,

23    whatever, relevant to stuff, but most of that came

24    (inaudible), so no.

25         Q.    And let me clarify, apart from Simon Property

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
                                                        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 145

1        Group.

2             A.   Okay.  No.

3             Q.   Okay.  And have you ever seen any advertising

4        material created by either Sarah Lagi or Rachael Lauria?

5             A.   No.

6             Q.   Have you ever seen any advertising material

7        created by Robert Lauria?

8             A.   No.

9             Q.   Have you ever seen any advertising material

10       created by Snouthound or Arnell?

11            A.   No.

12            Q.   Are you aware if Snouthound or Arnell delivers

13       any collateral marketing --

14            A.   I'm not aware of that.

15            Q.   Are you aware of whether Sarah Lagi or Rachel

16       Lauria delivers any collateral material?

17            A.   I'm not aware of that.

18            Q.   If you earned income from Event Planners, was

19       that reported on your income taxes for the appropriate

20       year?

21            A.   Correct.

22            Q.   Okay.  I wanted to ask you about the Kids Eat

23       Free card.

24            A.   Okay.

25            Q.   You were present yesterday when Mr. Takio

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 146

1        talked about his company Takitik; is that correct?

2            A.   Correct.

3            Q.   Who actually owned the Kids Eat Free, I guess,

4        trademark?

5            A.   **Image Marketing originally had registered for**

6        **the trademark Kids Eat Free.**

7            Q.   So who owned the rights to that program?

8            A.   **There was not really any rights to apply for a**

9        **trademark.**

10           Q.   In whose name was the trademark applied for,

11       Image Marketing Group, Inc.?

12           A.   **Correct.**

13           Q.   Or Image Marketing of Florida, LLC?

14           A.   **Correct.  Image Marketing of Florida, LLC.**

15           Q.   Okay.  And I'm going to talk about Image

16       Marketing of Florida, LLC so --

17           A.   **Got it.**

18           Q.   -- put on your corporate representative hat,

19       sir.  How was then Takitik able to sell a program that

20       effectively the trademark was owned by Image Marketing of

21       Florida?

22           A.   **It was clearly a trademark that was registered.**

23       **Takitik managed all the contracts, day-to-day business of**

24       **the Kids Eat Free card.**

25           Q.   Did Image Marketing of Florida, Inc. receive

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                      Page 147

 1        any compensation from the Kids Eat Free cards since it

 2        owned the trademark?

 3             A.   Refer to compensation on the trademark?

 4             Q.   In other words, Kids Eat Free, the program,

 5        generates income; correct?

 6             A.   Correct.

 7             Q.   Okay.  Did that -- any of that income go to you

 8        either through one of the Image Marketing companies?

 9             A.   To me personally?

10             Q.   Or one of your companies.

11             A.   To Image Marketing, yes.  I mean, we had

12        basically any in-market sales through different channels,

13        yes, we would.

14             Q.   You would share in the profits?

15             A.   I would not share in the profits of Takitik.

16             Q.   No.  What I'm saying, when the Kids Eat Free

17        card generated income, did part of that income go into

18        one of your companies, Image Marketing or Event Planners?

19             A.   Into Image Marketing.

20             Q.   And in turn, you would take money out of Image

21        Marketing; correct, like a pay?

22             A.   Yeah, we would take draws, I mean, based on all

23        the income.

24             Q.   Okay.  And so we don't have to rehash all the

25        Image Marketing of Florida, LLC versus Image Marketing
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 148

1     Group, Inc., were all the employees that you went over

2     for Image Marketing Group, Inc. this morning, the same

3     employees that were of Image Marketing of Florida, LLC?

4          A.   Not all of them.

5          Q.   Okay.

6          A.   I can't recall the ones that -- there may have

7     been some overlap, but I cannot recall.

8          Q.   How about this:  Did Image Marketing of

9     Florida, LLC have any employees other than the ones you

10    listed earlier today?  Meaning Denise Tucker, Babette

11    Picanol --

12         A.   Not that I can recall.

13         Q.   Okay.  There was also a dba registered Event

14    Planners USA for Image Marketing of Florida, LLC, did you

15    have any knowledge of that?

16         A.   No.

17         Q.   It happened in May of, I think, 2011.  And you

18    were gone by that time?

19         A.   I was gone.

20         Q.   Did Image Marketing of Florida, LLC have any

21    distribution responsibilities for the Kids Eat Free card?

22         A.   In regards to?

23         Q.   Distributing it to locations.

24         A.   There was orders that were taken, and yes.

25         Q.   And do you recall what Image Marketing of

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                   9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 149

1      Florida, LLC was paid for that?

2          A.   I do not recall that.

3          Q.   Is there an agreed upon rate, like a dollar a

4      card or anything of that nature?

5          A.   I cannot recall that.

6          Q.   And I assume Image Marketing of Florida, LLC

7      shared all the computers that everybody else did?

8          A.   Correct.

9          Q.   And did Image Marketing of Florida, LLC

10     maintain a separate bank account from Image Marketing

11     Group?

12         A.   No, it's all the same bank.

13         Q.   Was the Image Marketing of Florida, LLC bank

14     account at SunTrust as well?

15         A.   Correct.

16         Q.   Did it have any other accounts at any other

17     financial institutions?

18         A.   No.

19         Q.   Did it file income tax returns?

20         A.   Yes.

21         Q.   Was it filed by the same accountant you

22     mentioned earlier?

23         A.   Mollica & Jenson.

24         Q.   And did Image Marketing of Florida, LLC conduct

25     regular or annual meetings?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 150

1          A.    No.

2          Q.    Did it maintain a corporate meeting minute book

3     or anything of that nature?

4          A.    No.

5          Q.    Were any personal expenses paid out of -- for

6     either you or Mr. Herman -- paid out of Image Marketing

7     of Florida, LLC's account?

8          A.    No.

9          Q.    Was it a cash business in such that you would

10    use a lot of petty cash?

11         A.    No.

12         Q.    Did Image Marketing of Florida, LLC maintain a

13    PO box different from the one we discussed this morning?

14         A.    No.

15         Q.    Do you have any knowledge, as the corporate

16    representative of either of the Image companies, of a

17    computer being taken by Mr. Brignolo?

18         A.    **Any knowledge of that?**

19         Q.    Other than what maybe Mr. Takio's told you.

20         A.    **That was brought to my attention by Tim Herman.**

21         Q.    What did Mr. Herman tell you?

22         A.    **That Tommy had stolen documents and computers,**

23    **whatever, and started his own company.**

24         Q.    A competing company?

25         A.    **Yes.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 151

1         Q.   Were you able to verify whether, in fact, that

2    was true?

3         **A.   Yes.  There was a police report that was filed.**

4         Q.   Was there ever a determination of the police

5    report whether he actually took it or was it just filed?

6         **A.   I didn't read the police report, so I can't**

7    **answer.**

8         Q.   And we talked about earlier rather than saying

9    Image Marketing Group and Image Marketing of Florida,

10   since it was a name change, can we make the agreement

11   that when I ask you about Image, is it the same thing?

12        **A.   Correct.**

13        Q.   Okay.  So today when we talked about the four

14   or five areas of what Image Marketing did, the technical

15   tracking, the email blasts, and all that, that applies to

16   both companies?

17        **A.   Correct.**

18        Q.   And Image was compensated for these services

19   by, I think you told me, agreed upon negotiated rates

20   with the clients?

21        **A.   Correct.**

22        Q.   Was there any -- or is there any type of

23   documentation that sets forth what those negotiated rates

24   were for each company?

25        **A.   It was specific to each client.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 152

1          Q.   And what I'm just trying to figure out, if I

2     had 2 or 300 clients and everyone was a different rate,

3     I'd have a hard time keeping track of it.  So what I'm

4     trying to figure out is how did Image Marketing keep

5     track of all those different rates?

6          **A.   Each client was specific.  For example, Simon**

7     **Mall was -- requested us to not represent any other**

8     **malls.  It was exclusive.**

9          Q.   Okay.

10         **A.   When you're representing a client exclusive,**

11    **which we did with all the restaurants, that there's to be**

12    **a steak house, we would give them the first right of**

13    **refusal.  If they wanted exclusive, it would be a**

14    **different rate.  If they wanted different services, it'd**

15    **be a different rate.  So no, there's not a specific**

16    **structure.**

17         Q.   Is there a note in any of the company files,

18    you know, XYZ Steak House rate or anything like that?

19         **A.   There's no set rate.**

20         Q.   Because what I'm trying to figure out is if the

21    invoices I look at for any of those services I've seen,

22    it doesn't tell you the volume really that's done or the

23    length --

24         **A.   Sir, for each client on distribution varied.**

25         Q.   So how much volume did you know Simon Property

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 153

1    Group had?

2         A.   **Thousands and thousands and thousands of pieces**

3    **of collateral from every mall.  It was a lot of work.**

4         Q.   But wouldn't you have to know the volume in

5    order to negotiate the rate?

6         A.   **Not necessarily.**

7         Q.   So if Florida Mall just said, I want you to

8    distribute collateral material to the -- down the I-4

9    corridor, how would you determine that rate?

10        A.   **We would, basically -- that the rate would be**

11   **negotiated on whatever the account representative sold**

12   **that service for.**

13        Q.   So it was just whatever that account person

14   wanted to charge?

15        A.   **Absolutely.**

16        Q.   When any of these individuals, that you

17   mentioned was employed by Image, delivered, say for

18   example, Mr. Brignolo, did the company reimburse him for

19   mileage?

20        A.   **It was included in reimbursements; correct.**

21        Q.   So I assume if there was deliveries by anybody

22   in the company, so far I've heard the only one who has a

23   company car is Mr. Herman -- everybody used their own

24   personal vehicle?

25        A.   **Let me -- Tommy used -- he would have**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 154

1      reimbursements, but Tommy used the company vehicle, the

2      van.

3           Q.   Okay.  Did anyone else use the distribution van

4      other than Tommy Brignolo?

5           A.   Every party listed previously, yes.

6           Q.   And how many vans were there?

7           A.   There were two vans.

8           Q.   Okay.  Were there any advertisements on the

9      van?

10          A.   Yes.

11          Q.   What was the advertisement?

12          A.   There was Florida Mall.  There was Sun Cruise

13     Casino.  There was Advantage Car Rental.

14          Q.   And how much did you charge Sun Coast [sic]

15     Casino for their van advertisement?

16          A.   Can't recall the exact amount.  I would like to

17     say approximately 1,500 a month.

18          Q.   Does 750 sound right?

19          A.   I don't recall the exact number.

20          Q.   What was the other person that advertized on

21     the van?

22          A.   Advantage Rental Car.

23          Q.   And how much did you charge Advantage Rental

24     Car?

25          A.   That wasn't my account, so I don't know exactly

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 155

1        what that was charged.

2             Q.   Okay.  And what did Advantage Rental Car --

3        what type of advertisement, was it a wrap, like a van

4        wrap that we see around town now?

5             A.   It was on the window.  On the side panel.

6             Q.   A little sticker?

7             A.   No, it encompassed the whole side of the window

8        on a Caravan.

9             Q.   And they were paid, do you think, how much --

10       or you don't know how much?

11            A.   I would assume, approximately, as much as Sun

12       Cruise was paying for those two placements.

13            Q.   And -- okay.  So Sun Cruise had a half van --

14            A.   Sun Cruise had the other side of the vehicle.

15            Q.   And how much did they pay for a half of a

16       vehicle?

17            A.   Like I said, I assume probably 1500.  I don't

18       recall.

19            Q.   And did Simon Property Group have a vehicle

20       advertisement?

21            A.   They had a vehicle advertisement on the back

22       window.

23            Q.   How much did they pay for just a little window?

24            A.   They paid for prime placement on the back --

25       excuse me, of the vehicle, I want to say approximately

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 156

1      1500.

2           Q.    Okay.  So Sun Cruise Casino pays 1500 for a

3      whole side?

4           A.    I can't recall the exact number for Sun Cruise

5      Casino.  They were all on one side.

6           Q.    But you believe it would be 1500?

7           A.    It would be most likely comparable.

8           Q.    And then, on the back window, for a little

9      sticker, you charge $1500?

10          A.    It wasn't a little sticker.  It encompassed the

11     whole back of the vehicle.  It was a prime placement that

12     Florida Mall was on.  So it would -- the pricing would

13     obviously differ.

14               (Whereupon, a document was marked as

15          Plaintiff's Exhibit V for Identification.)

16     BY MR. BLAIR:

17          Q.    I'm going to show you what's been marked as

18     Plaintiff's Exhibit V.  Ask you if you recognize that

19     nice logo there?

20          A.    I do.

21          Q.    And your company charged the Florida Mall $1500

22     for that?

23          A.    Approximately, $1500, I don't have an exact

24     number, but pretty close to that number.

25          Q.    Yet the -- your other client got half a van for

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                     Page 157

  1        the same price; is that what you testified to?

  2             A.   I don't know the exact number --

  3                  MR. BRAND:  Objection.  Asked and answered.

  4        BY MR. BLAIR:

  5             Q.   Did you -- were those -- who at Sun Coast -- or

  6        Cruises or Sun Coast [sic] Casino Cruises did you deal

  7        with?

  8             A.   Sun Cruise Casino, that was one of Tim's

  9        account, I believe his name is Gary Haynes.

 10             Q.   In your opinion, as a full service marketing

 11        firm, the advertisement on Exhibit V is properly priced

 12        at $1500?

 13                  MR. BRAND:  Objection.  Asked and answered.

 14             I'm sorry, also he wasn't sure about the number,

 15             you're now putting words into his mouth.

 16                  THE WITNESS:  I'm not sure of the numbers.

 17             Mind if I take a break and get some fresh air?

 18                  MR. BLAIR:  Can I finish this line --

 19                  THE WITNESS:  Yes.

 20                  MR. BLAIR:  -- it'll be just a couple minutes.

 21                  (Whereupon, a document was marked as

 22             Plaintiff's Exhibit W for Identification.)

 23        BY MR. BLAIR:

 24             Q.   I'm going to show you what's been marked as

 25        Plaintiff's Exhibit W and ask you if you recognize that
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                          Page 158
  1     contract?

  2          A.   I have seen this type of contract before --

  3          Q.   Okay.

  4          A.   -- from Simon.  I can't recall exactly this

  5     contract.

  6          Q.   Okay.  Do you see on area 5, the scope of

  7     service?

  8          A.   Area 5?

  9          Q.   Do you see that?

 10          A.   Yes.

 11          Q.   It says, For purposes of a vehicle signage

 12     package on two vans wrapped with a Florida Mall logo;

 13     correct?

 14          A.   Correct.

 15          Q.   What is your understanding of "two vans

 16     wrapped," what would that be?

 17          A.   Two vans wrapped?

 18          Q.   Would it be more than a sticker in the back

 19     window?

 20          A.   It was the whole back of the window had the

 21     Florida Mall logo on it.  I can't describe what -- define

 22     "wrap with the Florida Mall logo," that's what's here.

 23          Q.   Sir, this is your company --

 24          A.   I understand that.  And you know, it was no

 25     disguise.  I mean, every Florida Mall representative rode
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                            9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 159

1    around with us that produced -- Simon sent this contract

2    to us.  And I'm assuming that every person that worked

3    with Florida Mall and rode around with us to the hotels

4    saw the Florida Mall logo on the back of the van.  I

5    didn't type "wrapped," Florida Mall typed wrap, so.

6         Q.   Sir, I'm not asking you who rode around with

7    you and who was aware of it.  I'm just asking, as your

8    company providing this service, what is you understanding

9    of your company providing two wrapped vans with the

10   Florida Mall logo mean to you as the corporate

11   representative of this company?

12        A.   I would assume that -- to me it's the Florida

13   Mall logo is on the van.

14        Q.   Not wrapped --

15        A.   However defined printed wrapped stuff on there.

16        Q.   Okay.  Who made up these wraps for the Sun

17   Coast [sic] Cruise Casino, who made them?

18        A.   Express Signs & Graphics.

19        Q.   And who do you work with there?

20        A.   Ralph Deschulo [phonetic].

21        Q.   How much does he charge to get a wrap?

22        A.   I have --

23             MR. BRAND:  Objection.

24             THE WITNESS:  I'm not printing it.  I don't

25   know how much it would cost to wrap the vehicle.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)        9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 160

1      BY MR. BLAIR:

2           Q.   That company doesn't bill you for that?

3           **A.   They -- again, in the document request stuff,**

4      **there's PO's in there regarding the services.  I don't**

5      **know how much it exactly cost.**

6           Q.   So the PO for the car wraps is in there, is

7      that what you said?

8           **A.   Yes, there would be -- yeah.**

9           Q.   Okay.  And does this contact refresh your

10     recollection as to how much you charged Simon Property

11     Group for that sticker in the back window?

12          **A.   Yes, it does.**

13          Q.   Do you know if it appeared on more than one

14     van?

15          **A.   Two vans.**

16          Q.   Do you know that?

17          **A.   Yes.**

18          Q.   Does the other picture in Exhibit V, is that

19     the other van or is that the same picture?

20          **A.   I'm sorry, I didn't know there was two pictures**

21     **here.  Are you referring to this picture?**

22          Q.   Yeah.

23          **A.   I can't determine what that is.  It doesn't**

24     **look like a van.**

25          Q.   Do you know how long that sticker has been on

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 161

1        the window of that van?

2            A.   I believe it was replaced a couple times.  I

3        can't recall.

4            Q.   And do you recall ever replacing any van

5        stickers on, not a wrap, but a van sticker on the back

6        window for any of your other clients of Image Marketing?

7            A.   No.

8            Q.   And other than the three or four van wraps that

9        you went over with me for Sun Coast [sic] Casino -- I

10       forget who else you told me -- Rental Car --

11           A.   Advantage Rental Car.

12           Q.   -- and Simon, did you do any other type of

13       logos or wraps on vehicles?

14           A.   To my knowledge, after I left, I wasn't

15       involved in the business, so I don't know after 2010, so

16       maybe.

17           Q.   And you said that you believed that $1500 was a

18       reasonable amount to pay for that placement?

19           A.   Absolutely.

20           Q.   And what are you basing that on, sir?

21           A.   I'm basing it on the traffic counts, the

22       exposure that this van and vehicles was utilized

23       statewide for the purposes of conducting Image Marketing

24       work at multiple events and hotels, so I think it's fair

25       to say it's very reasonable.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 162

1           Q.   And you believe the other people who have a

2       half a van paid the same price that Simon Property did

3       for that placement?

4           **A.   Again, I can't recall the exact number, but if**

5       **you're going to refer to prime placement in regards to**

6       **which logo would be more prevalent and recognized, I**

7       **would say Florida Mall had the most presence on that**

8       **vehicle.**

9           Q.   And you said, based upon the tracking, that's

10      the value use of the tracking of the traffic that was

11      generated by that?

12          **A.   It's a moving billboard, so I can't determine**

13      **the traffic counts, but I can tell you that it was**

14      **basically a moving billboard advertisement.**

15          Q.   And you believe that the back window is a

16      better location than a full side wrap, is that your

17      opinion?

18          **A.   My opinion?**

19          Q.   Yes, sir.

20          **A.   I don't wrap vehicles and I don't --**

21          Q.   Well, you just testified it's prime --

22          **A.   It depends -- Florida Mall is very clearly**

23      **placed on the back of that window.  I can see Florida**

24      **Mall, so it depends on the graphics of the wrap on how I**

25      **would determine -- I don't have anything to compare it**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 163

1      to.

2           Q.   Okay.  Well, you said it was in prime

3      placement.  And I don't wrap vans either, so I'm just

4      trying to figure out.  I assume there's the front, the

5      back, the two sides and the roof, fair to state?

6           **A.   Right.**

7           Q.   Is one placement better than the other?

8           **A.   I believe the back window placement is better**

9      **than either one of the two side panels.**

10          Q.   And what are you basing that on if you've only

11     wrapped two vehicles?

12          **A.   Because the back window's larger than the two**

13     **side windows and it's a lot easier to see the logo**

14     **driving down the road if you're -- you have more cars**

15     **behind you than you do beside you.**

16          Q.   And is it your understanding that the other

17     people that did the logo placement on the van, was it a

18     sticker in the side window or a wrap of the car?

19          **A.   It was a sticker placed on the side window.**

20               MR. BLAIR:  Okay.  We can take a break now.

21               CAMERA OPERATOR:  Okay.  We're off record.  The

22          time now is 2:56.

23               (Whereupon, a recess was taken at 2:56 p.m. and

24          proceedings resumed at 3:17 p.m.)

25               CAMERA OPERATOR:  Okay.  We're back on record.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 164

1        Time now is 3:17.

2    BY MR. BLAIR:

3        Q.   Mr. Deming, you earlier testified that your

4    understanding was that a police report had been filed

5    against Mr. Brignolo; is that correct?

6        A.   **That's my understanding.**

7        Q.   Do you know where that was filed?  Is it with

8    the Orange County Sheriff?

9        A.   **I don't know which -- I believe it was.  I**

10   **didn't file it.**

11       Q.   Tim Herman filed it?

12       A.   **Yes.  I'd like to actually reference back**

13   **because my memory was jogged regarding Advantage Rental**

14   **Car regarding the vehicle sponsorship.**

15       Q.   Okay.

16       A.   **Part of the compensation for that ad was**

17   **Advantage providing us company vehicles every -- brand**

18   **new company vehicles every three months.  So that was**

19   **part of the compensation for that ad placement as well.**

20       Q.   So Advantage would give Image Marketing free

21   vehicles?

22       A.   **Correct.**

23       Q.   And who drove those vehicles?

24       A.   **I drove them.  Tommy -- all parties would drive**

25   **them at any given time.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 165

1          Q.   Were they like leases or did they give you all

2     vehicles?

3          A.   **They would give us the vehicle.**

4          Q.   And again, under the -- as you're appearing for

5     the corporate representative for both Image Marketing

6     Group, Inc. and Image Marketing of Florida, with the

7     understanding that it's basically a name change, one in

8     the same --

9          A.   **Correct.**

10         Q.   -- can you tell me the largest client of Image

11    Marketing?

12         A.   **Simon Property.**

13         Q.   What percentage of Image Marketing's work was

14    Simon Property Group?

15         A.   **I can't put an exact figure on it, but a large**

16    **portion of work was done and performed for Simon Property**

17    **Group.**

18         Q.   Would it be over 50 percent?

19         A.   **Absolutely.**

20         Q.   Would it be over 60 percent?

21         A.   **I don't know an exact number, but it was a lot**

22    **of work.**

23         Q.   Okay.  What was the, to your knowledge, the

24    next biggest client of Image Marketing?

25         A.   **Orlando Magic, Florida Dolphin Tours.**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 166

1          Q.   And do you know, approximately, how much of

2     Image Marketing's work was for the Magic and how much was

3     for Florida Dolphin Tours?

4          A.   It's really hard to put an exact percentage on

5     it, because we all had multiple roles with that.

6          Q.   And what did you do for the Orlando Magic?

7     When I say "you," Image.

8          A.   Image, that was an account that we represented

9     in multiple capacities from direct ticket sale contracts

10    to distribution to events to reward -- what's the name of

11    it -- award ceremonies based on production of sales that

12    was games.  There was a lot of work.

13         Q.   When you say "distribution" for the Orlando

14    Magic, what type of distribution did Image do?

15         A.   Distribution of their game schedules.

16    Distribution of -- trying to recall here.  There was

17    presentations, multiple presentations.  There was --

18    there was a large scope of all the services that we

19    provided for Orlando Magic as well.

20         Q.   And where were the -- like the schedules, for

21    example, where were they delivered, to the same type of

22    hotels and stuff?

23         A.   To hotels.  To anywhere we could get them.

24         Q.   And was the hotel distribution list for the

25    Orlando Magic schedule the same as the master list for

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 167

1      Image Marketing Group?

2          A.   No.

3          Q.   And how did you determine the scope say, for

4      example, where you delivered the Orlando Magic schedule?

5          A.   **The scope was based on -- each property had a**

6      **different role, whether it was selling tickets, it was**

7      **just marketing through the distribution of the game**

8      **fliers, through the Top Spot racks.  I mean, every**

9      **property and/or company had a different role on how the**

10     **Orlando Magic was represented on behalf of Image**

11     **Marketing.**

12         Q.   And the Top Spot racks, those were owned by

13     Image?

14         A.   **Correct.**

15         Q.   And as far as inside of Image Marketing, did

16     you and Mr. Herman have any defined roles or were you

17     just servicing your accounts and he was servicing his

18     accounts?

19         A.   **Correct.**

20         Q.   The latter, you just serviced your own

21     accounts?

22         A.   **Yes.  I mean, there was overlap.  If he**

23     **instructed me to do something regarding one of his**

24     **accounts, I would do that.**

25         Q.   Did Image Marketing deliver collateral material

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 168

1        for Simon Property Group to the Miami area?

2            A.   Yes.

3            Q.   Did it deliver collateral material for Simon

4        Property Group to like the West Palm, Boca Raton area?

5            A.   Yes.

6            Q.   Did it deliver collateral material for Simon

7        Property Group to the Jacksonville area?

8            A.   Up to between Jacksonville and Daytona Beach,

9        in that area.

10           Q.   Okay.  Did it also deliver collateral material

11       for Simon Property Group to Tampa?

12           A.   Yes.

13           Q.   And when we say, for example, Tampa or Miami,

14       were there stops along the way?

15           A.   Yes, there were stops.

16           Q.   Is there anywhere else that Image Marketing

17       delivered collateral material for Simon Property Group?

18           A.   Naples, which was considered Southwest Florida,

19       Ft. Myers.  It was statewide.  It was everywhere.

20           Q.   And you said you had personally delivered the

21       material yourself.  Was the -- how long would it take you

22       to say deliver something to Naples, do that route?

23           A.   That was done -- I mean, I was down there a

24       week at a time or it was all monthly.

25           Q.   I mean, when you went down to the Naples area,

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 169

1      did you stay overnight?

2          A.   Yes.

3          Q.   When you went down to the Miami area, did you

4      stay overnight?

5          A.   Yes.

6          Q.   When you went to the Daytona/Jacksonville area,

7      did you stay overnight?

8          A.   Yes.

9          Q.   Where did you stay?

10         A.   Let's see here.  I would stay wherever

11     Priceline gave me the best rate.  Let's see here.  I've

12     stayed at property Hyatt on the Coconut Point property.

13     It was -- I forget the name.

14         Q.   The Hyatt Coconut Point?

15         A.   No, it was another that was owned by Hyatt.

16         Q.   Hyatt One Place?

17         A.   Hyatt Place, I believe, was the name of it.

18     I've stayed at the Courtyard.

19         Q.   Did you use credit cards when you stayed?

20         A.   Yes, I did.

21         Q.   Which credit card did you use?

22         A.   The company credit card.

23         Q.   And that would have been American Express?

24         A.   At one point, there was an American Express.

25     It was either that or the Visa issued to the bank

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 170

1        account.

2             Q.   When other individuals at Image Marketing

3        delivered down to those areas, would they stay overnight

4        as well?

5             A.   **They would.**

6             Q.   And I'm just using Mr. Brignolo for example.

7        If he went down to the Naples area and stayed, would he

8        use the company credit card as well?

9             A.   **Yes.**

10            Q.   And how did Image Marketing bill, was it a

11       weekly or monthly?

12            A.   **It depended on the terms of the client.**

13            Q.   And I think were these terms written down

14       anywhere?

15            A.   **There was no -- it was depending on the client**

16       **whether it was -- they wanted to pay for the service for**

17       **the entire quarter, per service, it varied with each**

18       **client.**

19            Q.   Did Image Marketing provide Simon Property

20       Group any services in Puerto Rico?

21            A.   **I believe Tim provided -- attended some stuff**

22       **in Puerto Rico, I do recall seeing that.**

23            Q.   So he traveled to Puerto Rico?

24            A.   **He traveled a lot of places.**

25            Q.   And you said you recalled seeing that, did you

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a4773 9a

Ryan Deming - 9/21/2012

Page 171

1    see it on a bill or do you know that Tim Herman traveled

2    to Puerto Rico on behalf of Simon Property Group?

3         A.   I can guarantee that he did attend a trade show

4    in Puerto Rico.

5         Q.   And did he use the company credit card for that

6    trip?

7         A.   Yes.

8         Q.   And do you recall when, approximately, that

9    was?

10        A.   I don't have an exact date.

11        Q.   Do you know year?

12        A.   I believe it was multiple times.  It would have

13   been obviously prior to my departure.

14        Q.   So if I saw a bill from Image Marketing that

15   had, attend Puerto Rico trade show June 2009, is it safe

16   to assume that he traveled sometime before that bill?

17        A.   I would assume that, yes.

18        Q.   Did Image Marketing Group provide services for

19   Simon Property Group in any Latin American countries?

20        A.   Tim would have been responsible for that,

21   because again, I did not travel on behalf of Simon

22   outside the State of Florida.  Tim covered the

23   international representation.

24        Q.   And did Mr. Herman use the corporate card on

25   all his trips?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 172

```
 1          A.   Yes.

 2          Q.   And did Mr. Herman -- or excuse me, did anyone

 3     from Image Marketing Group ever travel to the United

 4     Kingdom on behalf of Simon Property Group?

 5          A.   Yes.

 6          Q.   And who traveled there?

 7          A.   Tim Herman, and I believe Thomas Brignolo had

 8     joined him on that trip.

 9          Q.   Do you recall what the purpose of that trip

10     was?

11          A.   It was multiple trade shows that were being

12     attended to.  I don't recall exact the name of them.

13          Q.   And would they have used the company credit

14     card for that as well?

15          A.   Most likely would have, yes.

16          Q.   Other than the concierge gift referral program,

17     the distribution of what I would call collateral

18     marketing materials, the email blast, and the logo on the

19     van, did Image Marketing Group provide any other services

20     to Simon Property Group?

21          A.   Absolutely.

22          Q.   Can you tell me what those are?

23          A.   We provided the training for the guest service

24     companies, the relationships that we had built with

25     variety of property management companies, hoteliers,
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 173

1        several guest service companies, the management with

2        those companies, training their employees on a new mall

3        store opening, for example, or an upcoming event.  We

4        were the best at what we did.  We had a great -- there

5        was a relationship business.

6              Q.   And --

7              A.   We also --

8              Q.   I'm sorry.  When you say training guest

9        services, did you train somebody at Simon or somebody at

10       the hotels about Simon?

11             A.   We trained the -- either hotel employees, front

12       line, and/or one of the contracted guest service

13       companies that managed the guest services in those

14       properties.  Those companies, for example, Expedia All

15       Guest Service, Virgin Holidays, the list goes on.

16             Q.   You would train those companies about Simon

17       Property Group?

18             A.   Absolutely.

19             Q.   And did Simon pay for those services?

20             A.   Yes, they did.

21             Q.   And do you know what those would be indicated

22       on on a bill?  Like how would you tell what those -- I

23       mean, training services?

24             A.   Tim created the invoices for that account, so I

25       don't know exactly how it was defined.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 174

```
 1          Q.   Anything else?

 2          A.   Image Marketing hosted monthly industry

 3     professional events called mixer Mondays, which would

 4     take place at several different restaurants, client or

 5     non-client of Image Marketing.  Would average 100 plus

 6     tourism industry professionals that we had relationships

 7     with, that we're building relationships with, that would

 8     ultimately result in representing our clients at.

 9     There's no one -- I love doing events.

10          We did very -- we did multiple events and this

11     is something that we've done because we could touch,

12     talk, and feel to who we're dealing with as opposed to

13     sitting behind a desk and doing facebook and sending out

14     advertisements with that.  So that's one way we

15     advertised and marketed, not only our clients, but we

16     developed new relationships and new -- acquired new

17     clients through these different events.

18          Q.   When you say "events," what is an event?

19          A.   Okay.  Several -- it depends on what type of

20     event.  You could have a FAM event.  For example, we host

21     a FAM event, several with Simon Property Groups with all

22     properties.  We brought on a new property, we would put

23     invitations together.  We would invite the concierges out

24     to the mall.  Most likely the restaurant would come in

25     and provide food.  We'd educate them on the service, and
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a4773a

Ryan Deming - 9/21/2012

Page 175

1        the incentive program that we had in place.

2               That was either hosted on our behalf or

3        something that we coordinated with one of the

4        associations to a particular market to that mall.  We

5        hosted Summer Bash Event, which we had multiple vendors

6        that came out and sponsored the event, which we would

7        have 2 to 3,000 front line hospitality employees come out

8        to as a token of our appreciation.

9               Through the contacts and relationships that we

10       built and maintained those relationships that we built,

11       like I said earlier, each property was our job to manage

12       those relationships.  It wasn't just dropping off a piece

13       of collateral.  If they wanted to do that, I'm sure Simon

14       could have hired a courier service for a lot less than

15       what they charged us.  We handled those relationships and

16       cultivated those relationships and opened numerous stores

17       that Simon could never have done on their own.

18            Q.   As far as the distribution of materials are you

19       familiar with a company called Kenney Communications?

20            A.   I am.

21            Q.   And are you familiar with a company called

22       FPIS?

23            A.   I am.

24            Q.   And what do those companies do?

25            A.   They provide brochure racks in multiple hotel

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                                    Page 176
   1      properties throughout the State of Florida.

   2           Q.   Do you know if those companies just own the

   3      racks or do they deliver stuff for the racks?

   4           A.   I can't speak on behalf of the companies, I'm

   5      familiar with what they do.  Where the racks are at.

   6      I've seen them through my distribution processes in

   7      several different hotels and with several different

   8      clients.

   9           Q.   Is it common for a hotel to give either Image,

  10      Kenney Communications, or FPIS an exclusive rack in a

  11      hotel?  In other words, no other racks could be in there?

  12           A.   Absolutely.

  13           Q.   So if Kenney Communications has a rack and

  14      let's just say Hampton Inn 1, is it typical for Hampton

  15      Inn 1 allow an Image rack in there or does Hampton Inn

  16      say, no, I have an exclusive with Kenney?

  17           A.   I don't know the contract relationship between

  18      Kenney and that specific hotel.  Again, we had racks in

  19      -- I can guarantee you, in both locations that Kenney and

  20      FPIS had their racks as well.

  21           Q.   In hotels?

  22           A.   Hotels, welcome centers.

  23           Q.   Did you have any -- or did Image have any type

  24      of contractual relationship with either Kenney

  25      Communications or FPIS to use their racks?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 177

1          A.    No.

2          Q.    So is it fair to say that you would not be able

3     to place any of Simon Property Group's collateral

4     material in either a Kenney Communication or FPIS rack?

5          A.    No.

6          Q.    Did you ever deliver any type of -- other than

7     this concierge referral card, did you ever deliver any

8     type of marketing material to front desk personnel?

9          A.    Yes.

10          Q.    What type of material?

11          A.    **Mall directories.  In reference to a specific**

12     **client?**

13          Q.    Well, I'm sorry, Simon Property Group.

14          A.    **Coupon booklets, pens, bags, frill cards,**

15     **brochures, newsletters, mall openings, invitations to one**

16     **of our events that we organized for Simon, description**

17     **sheet that we put together for Simon to explain the**

18     **incentive program, and multiple.  Whatever Simon and**

19     **their property management provided us to distribute and**

20     **represent them on behalf of, we fulfilled that.**

21          Q.    And all the materials that you just described

22     to me, pens, coupon books, did Image Marketing create

23     those?

24          A.    **Some were created, some were not created.**

25          Q.    If they were not created, how did Image

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                      Page 178
 1        Marketing get that material?

 2             A.   It was picked up from the specific Simon Mall

 3        location's warehouse.

 4             Q.   Okay.  And what materials did Image Marketing

 5        Group create for Simon Property Group?

 6             A.   On speaking from my behalf and my involvement,

 7        pens, bags, printing of all types of collateral.

 8             Q.   And as far as the bags and the pens, did you

 9        all print those in-house?

10             A.   No, it was through a company called Logo Mark,

11        I believe the name of it was.

12             Q.   Is that -- where is Logo Mark located?

13             A.   They're out of the State of Florida, I believe.

14        I just remember seeing the name.

15             Q.   I noticed that Image Marketing Group does

16        business as Florida Tourism Distribution Services; is

17        that correct?

18             A.   As to reference to what?

19             Q.   I noticed that Image Marketing Group, Inc. had

20        a dba of Florida Tourism Distribution Services.

21             A.   Correct.

22             Q.   What did Florida Tourism Distribution Services

23        do?

24             A.   It performed the distribution and marketing

25        parallel to Image Marketing, determined at different
```

First Choice Reporting & Video Services
Worldwide Scheduling
www.firstchoicereporting.com                                    800.939.0093

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)

9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 179

1      times for distribution when we expanded statewide.  So it

2      was created once we did go beyond the scope of outside of

3      Central Florida when we were going to be opening up South

4      Florida.  So we wanted to kind of -- it was just easier

5      to separate, so we were distributing around the State of

6      Florida, we'll call this part Florida Tourism

7      Distribution Services.

8          Q.   And so by it's name, it was solely a

9      distribution service?  Is that all it did was distribute

10     collateral material to hotels and places?

11         A.   Well, again, it was Image Marketing -- we did

12     multiple things besides just distribute collateral.  We

13     trained, we hosted events, we had multiple things just

14     beyond simple distribution.

15         Q.   So did --

16         A.   Which we did for the properties in South

17     Florida.

18         Q.   Florida Tourism Distribution Services hosted

19     events and things like that for Simon Property Group?

20         A.   Correct.

21         Q.   I mean, so to cut to the chase, they did the

22     same thing as Image Marketing Group, Inc. or Image

23     Marketing of Florida?

24         A.   It was -- it was set up and it was when we

25     expanded statewide.  We expanded our scope of services

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 180

1    statewide to different markets.  In regards to what it

2    did, yes.  I mean, it was the same type of.

3        Q.   And you indicated that Image Marketing Group

4    was not a cash business; correct?

5        A.   Correct.

6        Q.   In 2008, sir, did you file an income tax

7    return?

8        A.   Yes.

9        Q.   Do you recall listing your income at

10   approximately $16,000, does that sound about right?

11       A.   As a --

12       Q.   Your total income for 2008.

13       A.   I don't recall.  I don't have it in front of

14   me.

15       Q.   I'm not going to introduce this, it's just got

16   information.  Does that refresh your recollection?

17       A.   Yes, this would be --

18       Q.   Is that your 2008 tax return?

19       A.   I can't verify it because I don't have my

20   personal copy in front of me and there's no signature on

21   this.

22       Q.   Is the address on there your accountant and

23   things like that?

24       A.   The address is correct.

25       Q.   Is that your Social Security number?  But don't

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                                    Page 181
  1      repeat it.
  2           A.   Yes, it is.
  3           Q.   And the preparer's name at the bottom, is that
  4      your accountant?
  5           A.   I'm sorry?
  6           Q.   Second page.
  7           A.   That is the accountant that prepared the
  8      return, but there's no signature from Michael Mollica on
  9      this document so I can't verify that.
 10               (Whereupon, documents were marked as
 11               Plaintiff's Composite Exhibit X for Identification.)
 12      BY MR. BLAIR:
 13           Q.   I'm going to show you what's been marked as
 14      Plaintiff's Exhibit X, just one large composite of
 15      checks.  And I'm not going to read all of these into the
 16      record, it's just a stack of check after check, Bates
 17      number ST-IMG01943.
 18           A.   Okay.
 19           Q.   And these are all checks made out to you, sir,
 20      are they not?
 21           A.   They are made out to me.
 22           Q.   And what is this for?
 23           A.   This would most likely be for a draw or for
 24      employment check.
 25           Q.   This is your pay; correct?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9ea47739a

Ryan Deming - 9/21/2012

Page 182

1      A.   Correct.

2      Q.   And all the checks are from 2008; correct?

3      A.   Yes.

4      Q.   And you received that money, did you not?

5      A.   It's written to me.  Was not written by me.  I

6   cannot verify all the signatures on this -- I mean, some

7   do look like mine.  Some do not look like mine.  Some are

8   not mine.  But yes, they do appear they all have been

9   written to me.

10     Q.   And each of them has a deposit ticket beside

11   it.  Do you see that?

12     A.   This bottom portion?

13     Q.   Yes.

14     A.   Yes, it does.

15     Q.   And it says "for deposit only"?

16     A.   It does.

17     Q.   Do you recognize that account number?

18     A.   That is my personal account number.

19     Q.   And you would agree with me that for 2008,

20   these checks total far in excess of 16,000, don't they?

21     A.   I didn't add up the exact amount, but I'm

22   assuming.  I can go and add them up now.

23     Q.   Well, I've added them up.  They're 46,500.  You

24   can take the time if you want.

25     A.   I mean, obviously, it looks like it would

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 183

1      appear to be more than, yes, 16,000.

2          Q.   And is there -- assuming that is your tax

3      return for 2008, is there any reason this income was not

4      reported?

5          A.   I can't verify that's the original tax return

6      that was reported because there's no signature of mine

7      verifying that.

8          Q.   But if that is your tax return --

9          A.   That would be what Michael Mollica, at his

10     discretion as a certified financial accountant, would

11     have filed on my behalf.

12         Q.   Okay.  And you had also earlier testified that

13     -- you had also earlier testified that Ms. Lauria

14     provided consulting services through RJL?

15         A.   Correct.

16         Q.   And Image was not a cash business; correct?

17         A.   Correct.

18         Q.   I want to show you what I will mark as

19     Plaintiff's Exhibit Y, I believe.

20         A.   Okay.

21              (Whereupon, documents were marked as

22         Plaintiff's Composite Exhibit Y for Identification.)

23     BY MR. BLAIR:

24         Q.   Which are, again, a composite of checks

25     starting with ST-IMG01852.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                      9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 184

1        A.    Okay.

2        Q.    And they're a series of checks.  If you would

3    just kind of go through and see if you recognize your

4    signature at least on some of them.

5        A.    We're going to have to go through these one by

6    one.

7        Q.    There appear to be several signatures, some

8    yours and some Tim Herman?

9        A.    Can you start with the first, 1852?

10       Q.    Sure.

11            MR. BRAND:  Wait.  Wait.  Wait.  Just back up,

12            because the question is, as I understood it, was --

13            MR. BLAIR:  Do you recognize your signature on

14            some of these checks.

15            MR. BRAND:  Yeah, but it was in correlation

16            with, I think you were asking Mr. Deming if this was

17            a cash business and what you produced was checks,

18            nothing -- I understand a "cash business" meaning

19            dollars coming in.  Am I wrong on --

20    BY MR. BLAIR:

21       Q.    The question was pending was:  Do you recognize

22    your signature on some of these checks?

23       A.    I do not recognize my signature or my

24    handwriting on any of these checks.

25       Q.    Well, let's just start with the first one --

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 185

1        A.    Okay.

2        Q.    -- which is ST-IMG01852.

3        A.    Okay.

4        Q.    It's made out to cash; correct?

5        A.    It's -- I can't even verify that's a "C."  It

6    looks like "dash" to me.  But yes, I would assume that

7    would be cash.

8        Q.    In the lower left-hand corner, it says, petty

9    cash, Lynnette; correct?

10       A.    That seems to -- yes.

11       Q.    And is it your signature on this check?

12       A.    It does not appear to be my signature on this

13   check.

14       Q.    Do you recognize the signature?

15       A.    It -- no, it's broken up and there's two

16   signatures on this.  There's a deposit slip, which I do

17   recognize as possibly Babette Picanol.

18       Q.    And do you know why Ms. Picanol would be

19   endorsing this check?

20       A.    Babette handled a lot of the day-to-day

21   operations, some accounting, assisted Tim with a lot of

22   things.

23       Q.    Did she ever assist you with anything?

24       A.    Yes.  She was basically -- she acted as an

25   office manager in the company as well, ran errands, ran

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 186

1          to the bank and post office, yeah.

2               Q.   And did you supervise Ms. Picanol?

3               A.   We all supervised Ms. Picanol, but mainly, it

4          was under Tim's -- he dealt with her mostly.  But yes, I

5          mean, I saw Ms. Picanol on a day-to-day basis.

6                    (Interruption by outside noise.)

7          BY MR. BLAIR:

8               Q.   And the only reason I ask, if there's a cash

9          business, would there be an occasion for Ms. Picanol to

10         go get $5,200?

11              A.   Not with my approval, no.

12              Q.   The second check, which is ST-IMG01728, it also

13         appears to be the same gash or cash for $5,000.  Do you

14         see that?  It's check number 2053.

15              A.   Yes, I do.  Yes, this one.

16              Q.   And on the corner it says, Ryan, temporary

17         loan?

18              A.   Yes, I see that.

19              Q.   Did you ever have a temporary loan from Image

20         Marketing Group?

21              A.   No.

22              Q.   And is that your signature in the bottom

23         right-hand corner of the check?

24              A.   It is not.

25              Q.   And do you recognize the signature on the back?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 187

1          A.   The deposit slip, it appears to be Babette

2     Picanol.

3          Q.   To your knowledge, did Ms. Picanol ever steal

4     from Image Marketing Group?

5          A.   There is accusations made that, yes, she did.

6          Q.   And who brought that to your attention?

7          A.   That was brought up to my attention by Tim

8     after I had questioned him on a couple of things.

9          Q.   While you were at Image?

10         A.   Yes.

11         Q.   Did you all ever do any investigation?

12         A.   She was -- he had conducted something with the

13    bank.  He had a relationship with the bank branch

14    manager, so he did inquire on some specific checks.  I

15    don't recall exactly what checks, but yes, that was done.

16         Q.   Was there an outcome of the investigation?

17         A.   She was terminated.

18         Q.   Was a police report ever filed?

19         A.   I don't believe there was a police ever filed.

20         Q.   Okay.  The next check is check number 1992,

21    Bates number ST-IMG01636.  Do you see that check?

22         A.   I do.

23         Q.   And it says BMW in the corner; correct?

24         A.   Yes.

25         Q.   And it's made out to cash as well?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 188

1        A.    Correct.

2        Q.    And I assume that's not your signature?

3        A.    That is not my signature.

4        Q.    Do you know what this check was for?

5        A.    I have no idea.

6        Q.    Was there any BMW at Image Marketing other than

7   Tim Herman?

8        A.    Tim Herman drove a BMW, and yes, Babette drove

9   a BMW as well.  Company vehicle, I believe.

10       Q.    The next check is check number 2035, Bates

11   number ST-IMG01668.

12       A.    Okay.

13       Q.    And it appears to be for cash as well.

14       A.    Correct.

15       Q.    And it says Tim loan.

16       A.    I see that.

17       Q.    And I assume there's only one Tim that worked

18   there; is that correct, Tim Herman?

19       A.    Uh-huh.

20       Q.    Does that appear to be his signature?  Do you

21   know?

22       A.    I cannot verify that.

23       Q.    Do you know if Tim Herman had a loan from Image

24   Marketing Group?

25       A.    I'm not aware of a loan.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)
9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                        Page 189
      1           Q.   You've never seen any documentation?

      2           A.   No.

      3           Q.   Next check number 2048, Bates number

      4      ST-IMG01680.

      5           A.   Yes.

      6           Q.   And also is for cash and it says, Tim temporary

      7      loan.  Is that your signature on that check?

      8           A.   I can't verify that's my signature.

      9           Q.   Is there a reason you can't verify that's your

     10      signature?

     11           A.   Because it's broken up and I've seen different

     12      -- it's very clear that there's similarities and I know

     13      my signature because I sign it every day and I definitely

     14      did not write this check.  And there's another signature

     15      on there, so no, I cannot verify that's my signature.

     16           Q.   And maybe so we don't bore everyone to death

     17      here, is there any one of these checks that are your

     18      signature that you recognize?

     19           A.   I did go through them.  Again, it's broken up,

     20      and looking at these documents and the multiple

     21      signatures that appear that may be close to mine, I can

     22      tell you with confidence that I cannot tell you that any

     23      of these signatures are mine.

     24           Q.   After reviewing the checks, do you have any

     25      knowledge as to what they're for irrespective of what it
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 190

1    says in the corner?  I mean, in other words, you've

2    already told me that you're unaware of any loan and a lot

3    of them say "temporary loan."  So are you aware of what

4    any of these checks are for?

5        A.   I am not aware of what any of these checks are

6    for.

7        Q.   Okay.  How about the last three, ST-IMG1548,

8    1569, and 2009 to RJL?

9        A.   Which one does it start on?

10       Q.   Oh, I'm sorry.  1548.  The last three.

11       A.   The last -- okay.  Starting at 1569.  1348?

12       Q.   Okay.  I'm sorry.

13       A.   Okay.  I found it.

14       Q.   Let's just do 1369 -- you're right.  1369,

15    1466, 1548 --

16       A.   Which one are you going to start at?

17       Q.   1369.  Do you -- 1569 in 2009, are any of those

18    your signatures?

19       A.   Again, I can't verify this is my signature

20    because there's multiple signatures here and it appears

21    to be close to mine, but I can't verify it's mine.

22       Q.   Is there anything I can do to, without calling

23    a handwriting expert, to help this issue with verifying

24    if that's your signature?  Like a signature card from the

25    bank.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 191

1           A.   I have my driver's license.  I mean, obviously,

2      it's a very hard signature, as you can see, to duplicate.

3      And you can see very clearly that it's apparent there's

4      signatures here that would resemble a couple of ways that

5      are signed, but there's pieces of it that were made when

6      the copies were made that are missing the pieces, so I

7      cannot verify that any of these signatures are mine.

8           Q.   I had seen some correspondence in the files

9      that were produced that Florida Tourism Distribution

10     Services had exclusive services on certain routes like

11     I-4 from Dayton through St. Petersburg for rack

12     distribution.

13          A.   Okay.

14          Q.   Is that accurate?

15          A.   In regards to exclusivity, the only exclusivity

16     that I can refer to is that we represented Simon Malls

17     exclusively.

18          Q.   In other words, you're --

19          A.   I'm sorry.

20          Q.   You're unaware of any like exclusivity that

21     Florida Tourism Distribution Services had with respect to

22     a location, meaning we're the only ones that can put

23     literature there, nobody else, did you all have any type

24     of relationship like that?

25          A.   No.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                              9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 192

1        Q.   Did you all distribute to rest areas?

2        A.   Yes.

3        Q.   And I assume you had no exclusivities in those

4   locations either?

5        A.   No.

6             (Whereupon, documents were marked as

7        Plaintiff's Composite Exhibit Z for Identification.)

8   BY MR. BLAIR:

9        Q.   I'm just going show you what's been marked as

10   Exhibit Z, which is a composite of some invoices from

11   Florida Tourism Distribution Services.

12        A.   Okay.

13        Q.   And ask you if you have seen those before?

14        A.   I have never seen this before.

15        Q.   Or do you know who registered the dba Florida

16   Tourism Distribution Services?

17        A.   I believe that would have been myself.

18        Q.   Despite that fact, you've never seen these

19   before?

20        A.   I have never seen these before.

21        Q.   And are you able to tell me with surety what

22   these services were, other than reading them?

23        A.   Other than reading them, I can provide my best

24   definition of what they read.

25        Q.   I mean, I can read, like for example, Miami

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 193

1          International Airport racks, September 2007, that's $400.

2      But do you know for a fact that that was done?

3              A.    If I know if that was done?

4              Q.    Yeah.

5              A.    I mean, there were several things that were

6      done in the Miami International Airport area, so.

7              Q.    I'm just trying to find out if you have

8      knowledge of the services that were provided in this

9      bill?

10             A.    The way it's described, again, depending on

11     whoever created this invoice, how they determined how

12     that description was read, I can't guess for them, so.

13             Q.    That's what I'm just trying to figure out.

14             A.    Yeah, I don't know.

15             Q.    In reviewing the services provided in these

16     bills and then the amounts being charged, do you believe

17     these to be reasonable charges?

18             A.    There's no reasonable charge to anything that

19     we do, because everything was done and can't be compared

20     to apples to apples, so I can't answer that question.

21             Q.    And I went through a long list of people with

22     you with one of your other companies.

23             A.    Yeah.

24             Q.    Event Planners.

25             A.    Yeah.

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                   9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 194

1          Q.   And to save you from boredom, and if you want

2     me to repeat them I will, but did any of those

3     individuals, other than RJL Services, provide or have any

4     relationship, professional relationship with Image

5     Marketing Group like all -- Lynnette Lauria, Sarah Lagi,

6     all those people?

7          **A.   Did they have any other --**

8          Q.   Did you all conduct business either for or with

9     any of those individuals, other than RJL Services?

10         **A.   Tim would have conducted business with**

11    **Lynnette, the capacity, Simon Property Group.**

12         Q.   Other than that?

13         **A.   Not that I'm aware of.**

14         Q.   Give me just two seconds here.  And I also went

15    through a bunch of companies like Orange Thorpe

16    Investments and things.  The same question, to your

17    knowledge, and other than RJL Services, did Image

18    Marketing conduct business with any of the companies we

19    went through other than Simon Property Group and RJL

20    Services?

21         **A.   No.**

22              MR. BRAND:  You want to hear the companies?

23              THE WITNESS:  Sure.  If you could list the

24         companies so I could put them on record.

25    BY MR. BLAIR:

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 195

1        Q.   Yeah.  Sure.  I have my list.  XLM Marketing?

2        **A.   No.**

3        Q.   XLM Excell?

4        **A.   No.**

5        Q.   Target Distribution, did you all do work with

6     Target Distribution?

7        **A.   No.**

8        Q.   Takitik?

9        **A.   Yes, of course.**

10       Q.   We talked about that.  Snouthound Enterprises?

11       **A.   No.**

12       Q.   RJL Services?

13       **A.   Yes.**

14       Q.   Which is what we've discussed?

15       **A.   Yes.**

16       Q.   PR Works?

17       **A.   No.**

18       Q.   Pointe Distribution?

19       **A.   Yes.**

20       Q.   And that was through --

21       **A.   Takitik's companies.**

22       Q.   Takitik.  Orange Thorpe Investments?

23       **A.   No.**

24       Q.   Marketing Resource Network?

25       **A.   That was the company, to my knowledge, before**

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 196

1      RJL.

2           Q.   And the work would have been the same,

3      consulting services?

4           A.   Same services.

5           Q.   Marketing Assistance, Inc.?

6           A.   No.

7           Q.   J&S Multimedia, you said you co-sponsored a

8      couple of events?

9           A.   Yeah.  We have a friendly industry

10     relationship, yes.

11          Q.   Other than that, nothing?

12          A.   Nothing.

13          Q.   Image -- well, that's you.  Hat Marketing, LLC?

14          A.   Yes.

15          Q.   And was that just assisting -- what --

16          A.   That was same relationship I had.  Hat

17     Marketing.  I'm not going to try to explain what they

18     did, that's in the UK.  But in regards to outside the

19     State of Florida and the scope of the marketing, I can't

20     answer that.

21          Q.   Excell Services?

22          A.   No.

23          Q.   Eric Lagi Productions?

24          A.   No.

25          Q.   EDL Management?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 197

1        A.   No.

2        Q.   I think you did with DT Printing Solutions?

3        A.   Yes.

4        Q.   And it was just with the assistance of

5   distributing the materials?

6        A.   Yes, under Takitik.

7        Q.   Digital Multi-Media & Marketing?

8        A.   No.

9        Q.   Arnell, Inc.?

10       A.   No.

11       Q.   Do you want me to go through the people for you

12   as well?

13       A.   Is it the same people that you went through?

14       Q.   Joseph Aintabi?

15       A.   No.

16       Q.   Target Distribution?

17       A.   Oh, let me rephrase back with Joseph.  It came

18   to my knowledge that after my departure, Joseph may have

19   helped out with Tim's distribution services.

20       Q.   But not to your knowledge -- I mean, in other

21   words, after the fact you had knowledge of that?

22       A.   I didn't watch him do it, so.

23       Q.   James and Patricia Barbarino?

24       A.   No.

25       Q.   Deborah Batchelor?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 198

1          A.   No.

2          Q.   Ozzie Dominguez, other than through Simon

3     Property Group?

4          A.   No.  Only through Simon Property Group.

5          Q.   Anthony M. Edwards?

6          A.   No.

7          Q.   George Fakhaory?

8          A.   Through GMF Consulting.

9          Q.   Is that what we talked about earlier?

10         A.   Yes.

11         Q.   Lydia Gilmore, other than through Simon

12    Property Group?

13         A.   No.

14         Q.   Cindy Harding?

15         A.   No.

16         Q.   Elizabeth Laggoon?

17         A.   No.

18         Q.   Lynnette Lauria, other than through either XLM

19    Marketing or RJL Services --

20         A.   No.

21         Q.   -- and Simon Property Group?

22         A.   No.

23         Q.   Rachel Lauria?

24         A.   No.

25         Q.   Robert Lauria, other than through RJL Services?

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

```
                                                   Page 199

  1          A.   No.

  2          Q.   Sarah Lagi?

  3          A.   No.

  4          Q.   Eric Lagi?

  5          A.   No.

  6          Q.   Edgar Lozada?

  7          A.   No.

  8          Q.   Michael Moran?

  9          A.   Just through that company that was discussed

 10     earlier.  Losing my train of thought.

 11          Q.   Brian Peters?

 12          A.   Through the Simon Property Group only.

 13          Q.   And Susan Ortega?

 14          A.   Through J&S Media.

 15          Q.   Andrea Rodriguez?

 16          A.   Name rings a bell, but --

 17          Q.   PR Works?

 18          A.   No.

 19          Q.   T. Ruiz?

 20          A.   No.

 21          Q.   Thearon Scurlock?

 22          A.   Through Simon Property Group.

 23          Q.   Susan Thomas?

 24          A.   No.

 25          Q.   And John Weed?
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 200

1          A.    Through -- just through the industry.

2          Q.    And you had said Hat Marketing is over in

3    England.  Do you know what Hat -- what business you --

4    your company and Hat Marketing did together?

5          A.    There was business, but I cannot speak on

6    behalf of Hat Marketing or what exactly was done, because

7    that was out of the scope of what was under -- not in my

8    scope.

9          Q.    Whose scope was it under?

10         A.    That would have been under Tim's.

11              MR. BLAIR:  No further questions.

12              MR. SADAKA:  Nothing.

13              MR. BRAND:  Nothing from me.

14              CAMERA OPERATOR:  This is the end of the

15    deposition of Ryan Deming.  The time now is 4:05 and

16    we're off the record.

17              (Whereupon, the video recorded deposition

18    concluded at 4:05 p.m.)

19

20

21

22

23

24

25

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Page 201

1                         CERTIFICATE OF REPORTER

2
        STATE OF FLORIDA
3       COUNTY OF ORANGE

4
            I, Betsy J. Shatto, FPR, do hereby certify that I was
5
        authorized to and did stenographically report the
6
        foregoing video recorded deposition of Ryan Deming; that
7
        a review of the transcript was requested; and that the
8
        foregoing transcript, pages 1 through 200, is a true
9
        record of my stenographic notes.
10
            I FURTHER CERTIFY that I am not a relative, employee,
11
        attorney or counsel of any of the parties' attorneys or
12
        counsel connected with the action, nor am I financially
13
        interested in the action.
14
            Dated this 4th day of October, 2012 at Orlando,
15
        Orange County, Florida.
16

17

18
                              *Betsy J. Shatto*
19
        _____
                              BETSY J. SHATTO, FPR
20

21

22

23

24

25

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

Ryan Deming - 9/21/2012

Page 202

1                         CERTIFICATE OF OATH

2

3       STATE OF FLORIDA
        COUNTY OF ORANGE
4
            I, Betsy J. Shatto, FPR and Notary Public, State of
5
        Florida, certify that the witness, Ryan Deming,
6
        personally appeared before me on the 21st day of
7
        September, 2012 and was duly sworn.
8

9           WITNESS my hand and official seal this 4th day of
10      October, 2012.

11

12

13                                  _Betsy J. Shatto_
14                          BETSY J. SHATTO, FPR
                            AND NOTARY PUBLIC -
15                          STATE OF FLORIDA
                            COMMISSION #EE 139647
16                          EXPIRES:  OCTOBER 19, 2015

17

18

19

20

21

22

23

24

25

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)                                    9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                                        Page 203

  1                         ERRATA PAGE

  2            DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

  3     IN RE:    SIMON PROPERTY GROUP V. LYNNETTE LAURIA, ET AL.
                  6:11-cv-1598-GAP-KRS
  4     TAKEN:    RYAN DEMING; SEPTEMBER 21, 2012

  5     Please sign, date, and return this sheet to our office.
        If additional lines are required for corrections, attach
  6     additional sheets.

  7     At the time of the reading and signing of the deposition,
        the following changes were noted:
  8
        PAGE    LINE       CHANGE            REASON
  9     _____

 10     _____

 11     _____

 12     _____

 13     _____

 14     _____

 15     _____

 16     _____

 17     _____

 18     _____

 19     _____

 20     _____

 21     _____

 22     Under penalty of perjury, I declare that I have read my
        deposition and that it is true and correct subject to any
 23     changes in form or substance entered here.

 24     _____
        DATE                                RYAN DEMING
 25     CC:  BRIAN C. BLAIR, ESQ.
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a

```
                                                      Page 204

    1


    2


    3
                October 4, 2012
    4
                Craig A. Brand, Esquire
    5           The Brand Law Firm, P.A.
                2937 S.W. 27th Avenue, Suite 101
    6           Miami, Florida  33133


    7
                IN RE: Simon Property Group v. Lynnette Lauria, et al.
    8
                Dear Mr. Brand:
    9
                This letter is to advise you that the transcript of your
   10           client, Ryan Deming, taken in the above-styled case on
                September 21, 2012, has been completed and is awaiting
   11           his reading and signing.

   12           Please have him contact our office at (407)830-9044 to
                make arrangements to read and sign the deposition
   13           transcript.  Our office hours are 9:00 a.m. to 5:00 p.m.,
                Monday through Friday.
   14
                If the transcript is not signed by the witness within 30
   15           days after this letter has been furnished, we will then
                process the transcript without a signed errata page.  If
   16           your client wishes to waive their signature, please have
                him sign his name at the bottom of this letter and return
   17           it to our office.

   18           Your prompt attention to this matter is appreciated.

   19           Sincerely,

   20           Betsy J. Shatto, FPR
                First Choice Reporting & Video Services, Inc.
   21
                I do hereby waive my right to read and sign.
   22


   23           _____
   24           Ryan Deming

   25           cc:  Brian C. Blair, Esquire
```

Electronically signed by Betsy Shatto (201-313-886-1503)
Electronically signed by Betsy Shatto (201-313-886-1503)          9fe8d661-fa6f-48d2-a272-6b9e4a47739a