# EXHIBIT AA

Page 148

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:11-cv-1598-GAP-KRS

VOLUME III of III

SIMON PROPERTY GROUP, INC.,

      Plaintiff,

      -vs-

LYNNETTE LAURIA, et al.,

      Defendants.

*   *   *   *   *   *   *   *   *   *   *   *

DEPOSITION OF:     LYNNETTE LAURIA

DATE TAKEN:      SEPTEMBER 25, 2012

TIME:           1:33 P.M.

PLACE:          200 S. ORANGE AVENUE
                 SUITE 2300
                 ORLANDO, FLORIDA 32801

REPORTED BY:      MICHELLE PULIDO STUBBEN,
                 COURT REPORTER, CLR,
                 NOTARY PUBLIC

*   *   *   *   *   *   *   *   *   *   *   *

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)        8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 149

```
 1                    A P P E A R A N C E S

 2   BRIAN C. BLAIR, ESQUIRE
     COLEMAN W. WATSON, ESQUIRE
 3        Baker & Hostetler, LLP
          200 S. Orange Avenue, Suite 2300
 4        Orlando, Florida 32801
          (bblair@bakerlaw.com)
 5
                APPEARING ON BEHALF OF THE PLAINTIFF
 6
     THOMAS A. SADAKA, ESQUIRE
 7        NeJame, LaFay, Jancha, Ahmed, Barker &
          Joshi & Moreno, P.A.
 8        189 South Orange Avenue, Suite 1800
          Orlando, Florida 32801
 9
                And
10
     CRAIG A. BRAND, ESQUIRE
11        The Brand Law Firm, P.A.
          2937 S.W. 27th Avenue, Suite 101
12        Miami, Florida 33133

13              APPEARING ON BEHALF OF THE DEFENDANTS

14
     ALSO PRESENT:
15        Ricky Dyer - Videographer
          Ryan Deming
16        Dale Takio
          Dave Donaway
17

18

19

20

21

22

23

24

25
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 150

1                    C O N T E N T S

2    TESTIMONY OF LYNNETTE LAURIA (continued)

3            Direct Examination by MR. BLAIR..........152

4            Cross-Examination by MR. BRAND...........270

5            Cross-Examination by MR. SADAKA..........277

6            Redirect Examination by MR. BLAIR........281

7            Recross Examination by MR. BRAND........287

8    CERTIFICATE OF REPORTER...........................289

9    CERTIFICATE OF OATH...............................290

10   ERRATA SHEET......................................291

11   SIGNATURE LETTER..................................292

12   EXHIBITS.....................................ATTACHED

13

14                        -   -   -   -   -

15

16

17

18

19

20

21

22

23

24

25

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

```
                                                    Page 151

  1                      EXHIBITS
  2   NUMBER              DESCRIPTION                 PAGE
  3   Plaintiff's Exhibit 7
               Invoices............................  193
  4   Plaintiff's Exhibit 8
               Expenses............................  197
  5   Plaintiff's Exhibit 9
               Notice..............................  202
  6   Plaintiff's Exhibit 10
               Set of contracts....................  205
  7   Plaintiff's Exhibit 11
               Checks..............................  208
  8   Plaintiff's Exhibit 12
               E-mail..............................  211
  9   Plaintiff's Exhibit 13
               E-mail..............................  213
 10   Plaintiff's Exhibit 14
               Invoice.............................  216
 11   Plaintiff's Exhibit 15
               Invoice.............................  217
 12   Plaintiff's Exhibit 16
               Invoices............................  218
 13   Plaintiff's Exhibit 17
               Notice of taking depo...............  227
 14   Plaintiff's Exhibit 18
               PR Works contract...................  233
 15   Plaintiff's Exhibit 19
               Contract............................  248
 16   Plaintiff's Exhibit 20
               Contract............................  249
 17   Plaintiff's Exhibit 21
               Contract............................  251
 18   Plaintiff's Exhibit 22
               Contract............................  253
 19   Plaintiff's Exhibit 23
               Contract............................  254
 20   Plaintiff's Exhibit 24
               Contract............................  257
 21   Plaintiff's Exhibit 25
               Contract............................  261
 22   Plaintiff's Exhibit 26
               Contract............................  262
 23   Plaintiff's Exhibit 27
               Letter to file......................  265
 24   Plaintiff's Exhibit 28
               Memo to file........................  269
 25
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 152

1           (Proceedings continued from Volume II.)

2            DIRECT EXAMINATION (cont'd)

3           THE VIDEOGRAPHER:  Okay.  We are back on the

4       record.  The time now is 1:34.

5   BY MR. BLAIR:

6       Q.  Okay.  Ms. Lauria, during lunch, did you

7   discuss your testimony with anyone other than your

8   lawyer?

9       **A.   No.**

10      Q.  Prior to today, have you discussed any

11  testimony -- or in this case, with Mr. Tim Herman?

12      **A.   No.**

13      Q.  Prior to your testimony today, have you

14  discussed your testimony with either Mr. Takio or

15  Mr. Deming?

16      **A.   No.**

17      Q.  Have you discussed your testimony with your

18  husband or your daughters?

19      **A.   My testimony?**

20      Q.  I mean, have you discussed -- put it this

21  way -- the case with your husband or your daughters?

22      **A.   The case in general?**

23      Q.  Yeah.

24      **A.   Of course.**

25      Q.  Have you discussed the case in general with

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 153

1    either Mr. Herman, Mr. Takio or Mr. Deming?

2        **A.   No.**

3        Q.   You had -- we had talked about one of the

4    contracts here earlier and they had a scope of service

5    that was delivering some material to OIA and Miami

6    International Airport; do you recall that?

7        **A.   OIA and Miami International, yes.**

8        Q.   Where was the material delivered at the

9    airport?

10       **A.   Just the information area.**

11       Q.   Okay.  And is there -- I have not been to the

12   airport in a long time.  Is there like a --

13       **A.   Information desk.**

14       Q.   Okay.  Is it on a certain -- is there more

15   than one?

16       **A.   Departure floor -- or I take that back.**

17   **Arrival floor.**

18       Q.   At both airports?

19       **A.   Uh-huh.**

20       Q.   Is that a yes?

21       **A.   Yes.**

22       Q.   And what was delivered to the airport?

23       **A.   It was more -- we take directory and just**

24   **talk -- when I was at the airport, talk to the people**

25   **there.  I don't remember them having a lot of room to**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 154

1    **store things, but it was just a reminder Florida Mall**

2    **is the closest to the airport, blah, blah, blah, and**

3    **here is a directory.**

4        Q.   And -- and when you delivered the marketing

5    material that Simon Property Group, I guess, produced,

6    how did you get that?

7        **A.   Are you talking the mall directory; I assume**

8    **you are?**

9        Q.   Yes.

10       **A.   They are right in the storage room or**

11   **marketing director's office.**

12       Q.   So you would take those and use them for your

13   company; is that correct?

14       **A.   Yes.**

15       Q.   And then you would bill Simon back for

16   delivering some material?

17       **A.   I would bill Simon back, but that was the**

18   **same type of -- directories were delivered to all of**

19   **the brochure companies or the Image Marketing, all of**

20   **them.**

21       Q.   You said brochure companies.  Did Simon

22   Property Group employ any other brochure companies

23   other than RJL Services?

24       **A.   Yeah.  There is Kenny Communications, and**

25   **FPIS -- I think that is the right name -- and another**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                        8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 155

1   one, I think it was CMT, in the south.  They don't

2   service this area.  It is south Florida.

3       Q.   And as far as Kenny Communications, FPIS and

4   CFT, did Simon Property Group have service agreements

5   with those companies?

6       A.   You would have to discuss that with the

7   malls.

8       Q.   Okay.  Were those services retained then

9   through the malls?

10      A.   Yes.

11      Q.   You were not directly responsible for that in

12  your job at Simon Property Group?

13      A.   No.  I mean, I started a lot of that when I

14  was at Florida Mall, but I went -- once I left my

15  responsibility, I left it behind.

16      Q.   Okay.  And when you were the mall manager at

17  Florida Mall, did you interact with these companies to

18  deliver materials for your mall?

19      A.   When I was the director of marketing there, I

20  worked with Kenny and FPIS.

21      Q.   Okay.  And what would they deliver for the

22  Florida Mall?

23      A.   They would deliver rack brochures and/or

24  directories to the racks that they owned.  FPIs was

25  hotels; Kenny is turnpike.  She may have some mall --

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 156

1    **some hotels too.  I don't remember for sure.**

2         Q.   Do you recall how much FPIS charged Simon

3    Property Group to deliver information to its racks?

4         **A.   No, I do not.**

5         Q.   Do you know if it was more or less than RJL?

6         **A.   I have no idea, but I think it would be less**

7    **because it was just putting racks in the brochures and**

8    **walking out of the store.**

9         Q.   And --

10        **A.   With many other --**

11        Q.   Sorry.  Go ahead.

12        **A.   -- rack brochures.**

13        Q.   And how would RJL Services provide different

14   from that?

15        **A.   Walking up and talking to the people.**

16        Q.   So that is the difference; you talked to them

17   as opposed to just putting them in the rack?

18        **A.   Handed them to people, not just put them in a**

19   **rack and assume a customer was going to take them.**

20        Q.   Sure.  Do you know how much Kenny

21   Communications charged Simon Property Group for the --

22        **A.   I would have no idea anymore.**

23        Q.   Do you recall if it was more or less than

24   RJL?

25        **A.   Again, I would say less because they had**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 157

1   **distribution on just the turnpike -- the -- the rest**

2   **stops on the turnpike.  She may have a few hotels but**

3   **very few.**

4       Q.   Okay.  And again, I apologize; I don't know

5   if I understand this.  When you were down in, say,

6   Naples or Estero delivering to Coconut Point, did you

7   deliver material related to that mall or other malls?

8       A.   **Primarily to Coconut Point.**

9       Q.   So you would go down, say for example, to

10  Estero and deliver Coconut Point literature to hotels

11  in the area?

12      A.   **Uh-huh.  Yes.**

13      Q.   Okay.  Did Simon Property Group have a policy

14  about moonlighting?

15      A.   **Moonlighting?**

16      Q.   Holding a job other than for Simon Property

17  Group while you are employed with Simon Property Group?

18      A.   **If they did, I'm unaware of that.  The only**

19  **one I know about is you could not work for a**

20  **contractor.  You could not work for the security -- you**

21  **could not be a employee of the mall and work for the**

22  **security company or the housekeeping company.**

23      Q.   Could you do business with those companies

24  while you are employed with Simon Property Group?

25      A.   **I have no idea.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 158

1    Q.   We saw, also, some contracts we talked about
2  today as exhibits that were contracts, I think, with
3  XLM and RJL Services.  Did you try to have contracts in
4  your files for every year you provided services?  I'm
5  just trying to figure out if there is more contracts
6  than what I have.
7    **A.   You have -- probably have what was in my**
8  **file.**
9    Q.   Okay.  And how was the rate determined for
10  the services that RJL/Arnell provided?
11    **A.   I based it on the rates that we were being**
12  **charged by the PR firm and also by, pretty much, Image**
13  **Marketing, because they were the other company that was**
14  **doing direct contact with the hotels.**
15    Q.   Is there a reason you did not base it on the
16  rates provided by Kenny Communications to FPIS?
17    **A.   Again, because theirs was just a drop off and**
18  **a brochure holder, the brochure holder could be in a**
19  **back hall.  It could be in the entrance lobby of the**
20  **hotel.**
21    Q.   Okay.  Are you familiar with a web site
22  called simonpropertyinc.com?
23    **A.   Yes.**
24    Q.   Okay.  Can you tell me about that web site?
25    **A.   After we had found out that Tommy -- I forget**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 159

1    **his last name -- had contacted Simon, Tim and I wanted**

2    **to see if we could find out what kind of information he**

3    **had given them.**

4         Q.   When you say Tommy, would that be Tommy

5    Brignolo?

6         **A.   Yes, that sounds right.**

7         Q.   So who created the Simon Property, Inc., web

8    site, you or Tim, or did somebody else?

9         **A.   Web site?  I don't know.**

10        Q.   I'm sorry.  The e-mail address, who created

11   the e-mail address, simonpropertyinc.com?

12        **A.   I might have done that.**

13        Q.   Okay.  Do you know or are you guessing?  I

14   just don't want you to guess.

15        **A.   I don't -- I don't remember for sure.  I'm**

16   **sorry.**

17        Q.   Do you know who paid for the -- the e-mail

18   address -- creating the e-mail address?

19        **A.   I don't remember for sure.  I'm sorry.**

20        Q.   And was there ever any e-mail sent from that

21   e-mail address to anyone at Simon Property Group?

22        **A.   I don't believe.**

23        Q.   Was there anyone -- did anyone send -- I

24   guess, did you or Mr. Herman send e-mail from that

25   e-mail address to anybody?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 160

1     **A.    Yes.**

2     Q.    Okay.  And who was it sent to?

3     **A.    Tommy.**

4     Q.    And who -- do you know who sent the message?

5     **A.    I believe Tim and I were together when it was**

6     **sent.**

7     Q.    Okay.  So you two authored it together

8     somewhere when it was sent?

9     **A.    Well, yeah, I guess authored together.  We**

10    **were there when it --**

11    Q.    Okay.

12    **A.    Yeah.**

13    Q.    And where were you sending this e-mail from,

14    your home, his home?

15    **A.    Not either of our homes.  It must have been**

16    **his office or my office.  I assume his office.**

17    Q.    Do you remember or --

18    **A.    Or it could have been -- it could have been a**

19    **restaurant.**

20            **No, I don't remember.**

21    Q.    And do you remember the sum and substance of

22    the e-mail that you sent Mr. Brignolo?

23    **A.    Something about, could you send the**

24    **information that you sent to Simon.**

25    Q.    Did you-all pretend to be a security

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 161

1   personnel from Simon Property Group?

2       A.   I don't think so.  I think it was -- I think

3   it was, like, an auditor or something that it came out

4   as.

5       Q.   And did Mr. Brignolo send you anything in

6   response to that e-mail?

7       A.   I don't believe so.

8       Q.   Okay.  Did Image Marketing Group, Inc.,

9   provide any services to Simon Property Group while you

10  were employed there?

11      A.   Did Image Marketing -- yes.

12      Q.   What type of services did they provide?

13      A.   They ran the concierge referral program for

14  Florida Mall for a number of years, and then when we

15  expanded the program to Miami, they ran that one, and

16  then Coconut Point decided that they wanted to get

17  involved, so I believe they hired Image Marketing

18  separately.

19      Q.   And what is your understanding of the

20  concierge referral program?

21      A.   It was going out, signing up concierges to

22  actually refer customers to the property.  They would

23  have a card that they would bring, which allowed the

24  customer to get a coupon book for discounts at the

25  property, and then the Image Marketing would track the

First Choice Reporting & Video Services

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                              8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 162

1    **number of referrals by concierge and reimburse them --**

2    **not reimburse them, but reward them financially for**

3    **having sent the customer to the mall.**

4        Q.   And do you know where those concierge

5    referral cards were allegedly delivered to?

6        **A.   They were delivered to the hotels around the**

7    **malls.**

8        Q.   Okay.  So you said the Florida Mall, Miami,

9    and Coconut Point, so they would --

10       **A.   And Dadeland Mall.**

11       Q.   And Dadeland?

12       **A.   And Sawgrass, for a short time.  And Boca.**

13       Q.   So billing for Image Marketing Group, Inc.

14   for the concierge referral -- concierge referral

15   program should be for the Florida Mall, the Miami, I

16   guess, International Mall, Coconut Point, Dadeland

17   Mall, Sawgrass, and Boca -- Towne Center, Boca Raton?

18       **A.   Yes.**

19       Q.   Did they deliver these concierge referral

20   cards to any other mall, to your knowledge?

21       **A.   Not off the top of my head.  Those are the**

22   **ones I remember.**

23       Q.   And who determined what hotels these cards

24   were delivered to?

25       **A.   They -- Image Marketing had -- they would go**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 163

1   to malls and sign up customers.  It was their -- sign

2   up concierge to be part of the program.  That was

3   their -- we did not tell them what malls to go -- or

4   hotels to go to.

5        Q.   Are you aware that any of them were the same

6   hotels that RJL Services was delivering material to?

7        A.   Could possibly be.

8        Q.   Any reason why --

9        A.   I'm sure it would be some of them.

10       Q.   Any reason why you would not just have Image

11  deliver a couple more pieces of paper to the same

12  malls?

13       A.   That is what we ended up doing in 2010.

14       Q.   How long did you deliver it where you were

15  both going possibly to the same hotel; how many years

16  was that?

17       A.   Four or five.  The con -- the concierge

18  referral program was primarily to go in, sign a

19  concierge up, or front desk person up, to hand out

20  referral cards and do a rebate program.

21       Q.   Other than the concierge referral program --

22  I want to be very specific -- to your knowledge, did

23  you hire Image Marketing Group to deliver any other

24  type of marketing collateral?

25       A.   I believe we did gift bags.  They did fliers.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 164

1    **They did concierge events for us.  Is that what you are**

2    **looking for?**

3         Q.   I want to know -- you know -- you hired them,

4    I assume, or someone hired them under your direction or

5    control -- what their scope of services were.

6         **A.   They did concierge events, if the malls**

7    **wanted.  They represented Simon Malls at trade shows,**

8    **if there was not a representative that we could send.**

9         Q.   Okay.  And when he would direct them to

10   attend a trade show; would that be you?

11        **A.   Not necessarily; could be the mall directly.**

12        Q.   Okay.  Did the mall have to get approval for

13   you?

14        **A.   Not if it was under their spending limit, no.**

15        Q.   Did anyone from RJL Services or Arnell ever

16   attend any trade shows --

17        **A.   No.**

18        Q.   -- on behalf of Simon Property Group?

19        **A.   No.**

20        Q.   Okay.  Did -- these gift bags and other

21   things that Image Marketing Group, Inc., was delivering

22   for Simon Property Group, would these be to some of

23   these same hotels that RJL Services was delivering to?

24        **A.   Possibly.**

25        Q.   Okay.  Did you do anything while you were

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                  8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 165

1    employed at Simon Property Group to see if there was

2    any overlap?

3        A.    No, I did not.

4        Q.    Did Image Marketing of Florida, LLC ever

5    provide any services to Simon Property Group?

6        A.    Didn't you just ask me that question?

7        Q.    I asked you about Image Marketing Group, Inc.

8        A.    To me, it was all one and the same.

9        Q.    So you don't have any distinct -- as far as

10   you know --

11       A.    Image Marketing was Image Marketing.  I don't

12   know.

13       Q.    Okay.  Did DT Printing Solutions ever provide

14   any services to Simon Property Group?

15       A.    I believe that that was the -- one of the

16   companies that Tim asked if we could bill -- if he

17   could send bills to us through -- for the services, as

18   opposed to just all going into Image.

19       Q.    Okay.  That incident --

20       A.    I don't remember exactly what -- what was

21   being billed and what was going on, you know.

22       Q.    That didn't seem suspicious to you?

23       A.    As I told you before, when he talked to me

24   about it, I got the impression that what he was trying

25   to do was build credit and/or possibly for tax purposes

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 166

1   **have monies going into different companies.**

2       Q.   Okay.  So you didn't inquire what he was

3   doing; you just said fine?

4       **A.   No.  I don't -- I didn't require -- or**

5   **inquire.**

6       Q.   Did you tell anyone at Simon Property Group

7   that, hey, this is the same service that is being

8   billed for another company?

9       **A.   No.**

10      Q.   Okay.  Are you -- did you verify that Image

11  Marketing and DT Printing Solutions were not providing

12  duplicate services?

13      **A.   I was told -- no.  They were not -- in my**

14  **mind, they were not providing the same service.**

15      Q.   Did you -- did you try to verify that,

16  looking at the bills or anything of that nature?

17      **A.   I -- you know what, I have not seen the bills**

18  **in ages.  I would have to see the bills to know what --**

19  **I don't remember exactly what was being billed for**

20  **what.**

21      Q.   I'm just asking you, back then, did you look

22  at bills -- no bill --

23      **A.   When they would come and tell --**

24      Q.   Let me finish.

25      **A.   I'm sorry.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 167

1      Q.   Just to see if they were providing the same

2   services?

3      **A.   Yes, I would ask that question.**

4      Q.   And who would you ask that of?

5      **A.   Tim.**

6      Q.   And it is your belief that DT Printing

7   Solutions is owned by Mr. Herman?

8      **A.   I assumed so.**

9      Q.   Okay.  Did you do anything to verify that?

10      **A.   No.**

11      Q.   Okay.  The services that you described for me

12   that Image Marketing provided, it was your

13   understanding that DT Printing was providing the same

14   services?

15      **A.   Same time, I believe.  He was doing different**

16   **routings of -- oh what do you call it -- for vacation**

17   **homes -- receptive tour operators, things like that,**

18   **and it wasn't a referral program.  It was a**

19   **distribution.**

20      Q.   Okay.  I'm confused then.  So what did -- DT

21   Printing Solutions, what did they provide for Simon

22   Property Group then?

23      **A.   Tim came to me at one point and said he was**

24   **able now to distribute to vacation home -- the welcome**

25   **bags for vacation homes and for receptive tour, which**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                     8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 168

1  means your information is put into a bag that is given

2  to somebody that is not staying at a hotel.

3          So I know he was doing that, then he had also

4  told me at one point that he was able to secure a

5  routing of -- like, gas stations, restaurants, things

6  like that where you have the brochures in a -- lobbies.

7      Q.   Okay.  So essentially, did the same thing as

8  Image Marketing, just different routes?

9      A.   Different routes, but I don't remember what

10  was what without seeing it.

11     Q.   Okay.  Did Simon Property -- or did -- excuse

12  me.  Did Event Planners USA, Inc., provide any services

13  to Simon Property Group?

14     A.   I believe that we ordered some pens through

15  them, paper -- you know, pens, paper, cups, and they --

16  they might have -- I would have to see invoices.  I

17  don't remember all of that.  I'm sorry.  It was years

18  ago.

19     Q.   How about this, did Event Planners USA, Inc.,

20  provide any distribution of collateral material?

21     A.   Again, he was dividing up the bills between a

22  number of companies, and I don't know if that was one

23  of them or not.

24     Q.   Do you know who owns Event Planners USA,

25  Inc.?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 169

1       A.    I don't know.  I assume it was Tim.

2       Q.    Did you do anything to verify that?

3       A.    No.

4       Q.    Okay.  Did HAT Marketing, LLC provide any

5    services to Simon Property Group?

6       A.    Yes, they did.

7       Q.    What did HAT Marketing do?

8       A.    HAT Marketing is a company in London who did

9    representations for Simon, Florida Mall, originally,

10   plus a number of other attractions in Orlando to tour

11   operators and groups within London, as opposed to me

12   going over, like I used to, and having to do the trade

13   shows myself.  They would do the trade shows, World

14   Travel Mart, all of that.  It was cheaper to employ

15   them for a year than for me to go over two weeks and do

16   the shows myself.  They would spend one day a month

17   doing that.

18            In my office, you should have been able to

19   find where in the U.K. -- you would log into Expedia,

20   and you would see -- go to Disney, Shop Florida Mall.

21   He was able to get us into things like that.

22      Q.    And who retained HAT Marketing, LLC?

23      A.    I did, when I was marketing director of

24   Florida Mall.

25      Q.    Okay.  Who -- who retained Event Planners

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

```
                                                 Page 170
 1    USA, Inc.; did you authorize them?
 2         A.   Yes.
 3         Q.   Okay.  Was it a mall manager or was it you;
 4    that is what I'm trying to figure out?
 5         A.   I don't remember if it was the Florida Mall
 6    or -- no.  I would have done it.
 7         Q.   DT Printing Solutions?
 8         A.   I would have done that.
 9         Q.   Okay.  Did a company named Point
10    Distribution, LLC provide any services to Simon
11    Property Group?
12         A.   They also did distribution to a route and
13    service -- the receptive tour.  The receptive tour and
14    the vacation home might have been two separate routes.
15         Q.   So it is your understanding that Point
16    Distribution --
17         A.   As I said, I would have to see the bills to
18    try to figure it out.
19         Q.   Okay.  Do you recall entering into any type
20    of contract with Point Distribution, LLC on behalf of
21    Simon Property Group?
22         A.   I believe we had service agreements a long
23    time ago, yes.
24         Q.   Was it Simon's policy to always have service
25    agreements with these types of vendors?
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 171

1       **A.    Yes.  After a certain dollar amount, yes.**

2       Q.    And did Point Distribution, LLC's

3    contracts meet that threshold amount?

4       **A.    I think in total it met it, but not per mall.**

5       Q.    Do you know how Simon's policy treated that?

6       **A.    $5,000 per mall.**

7       Q.    So it is not your recollection that it

8    exceeded 5,000 per mall?

9       **A.    I don't know.**

10       Q.    Okay.  Did you enter into an agreement on

11    behalf of Simon Property Group with HAT Marketing, LLC?

12       **A.    We just talked about that.**

13       Q.    I asked about Point Distribution.

14       **A.    You asked about HAT Marketing.**

15       Q.    Did you?  I'm sorry.  Can you repeat your

16    answer, please?

17       **A.    That was the one in Britain.**

18       Q.    Yeah.  But did you enter into a contract,

19    like a --

20       **A.    Yes, we did.**

21       Q.    How about Event Planners?

22       **A.    I thought we just spoke about that one too.**

23    **I'm sorry, sir, you're --**

24       Q.    Well, I was just asking you -- okay.  How

25    about another one.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 172

1           Did you enter into a written contract while

2    at Simon Property Group with Event Planners USA?

3        **A.    I said I think there was a service agreement.**

4        Q.   Did you enter into service agreements each

5    year with these entities?

6        **A.    That, I cannot tell you.**

7        Q.   Okay.  How about Takitik, Inc., did that

8    provide any services to Simon Property Group?

9        **A.    I believe that was one of the ones that the**

10   **regular distribution was billed to, but I don't**

11   **remember for sure if that's what it was.**

12       Q.   And what is a regular distribution, what

13   route was that?

14       **A.    The hotels.**

15       Q.   And do you recall where they delivered?

16       **A.    No, I do not.**

17       Q.   Do you recall what they delivered?

18       **A.    It would be the same merchandise, the same**

19   **type of information we discussed with the other**

20   **malls -- the other distribution companies.**

21       Q.   Fair to say, that all these companies are

22   distributing the same information?

23       **A.    Yes, but to different places.**

24       Q.   Okay.  How about, do you know who the owner

25   of Takitik, Inc., is?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 173

1    A.   I believe it is Dale, but I'm not positive.

2    Q.   Did you enter into any agreement with

3  Takitik, Inc., to provide services for Simon Property

4  Group?

5    A.   Again, I don't know if a service agreement

6  was done or not.

7    Q.   How did these companies -- if they were

8  distributing material, how did -- how did the material

9  get to them for distribution?

10    A.   Normally, they would pick it up at the malls,

11  or the malls would ship it to them.

12    Q.   And if they were coming to a mall to pick it

13  up, how -- would they just go to the mall office?

14    A.   Mall office and/or guest services.  Sometimes

15  the stock areas of the mall -- the back rooms, the

16  maintenance areas.

17    Q.   How about Florida Tourism Distribution

18  Services, did they provide any services to Simon

19  Property Group?

20    A.   I don't remember that name.

21    Q.   You don't know the name?

22    A.   I said, I don't remember it.

23    Q.   Does FTDS sound familiar?

24    A.   It does, but I don't remember anything

25  specific about it.  I'm sorry.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 174

1     Q.    Okay.  How about Target Distribution, did it

2  provide any services to Simon Property Group?

3     **A.    Again, I don't remember that one.**

4     Q.    TJI, did that company provide any services to

5  Simon Property Group?

6     **A.    Yes.**

7     Q.    And what services did it provide?

8     **A.    That was Tim breaking out part of the route**

9  **and having it billed to his own company, separate from**

10 **his partners.**

11    Q.    Did his partners know about that, to your

12 knowledge?

13    **A.    I don't have a clue.**

14    Q.    And we were talking about breaking out

15 routes.  Is the route, the route we have been talking

16 about all day, which is the Orlando to Tampa, because

17 you were delivering to -- well, let me back up.  Let me

18 just back up.

19          Do you know what routes these companies were

20 delivering for Simon Property Group?

21    **A.    They were doing Orlando, north and south of**

22 **Orlando.  They were doing south Florida.  And they were**

23 **doing the west coast, south -- southwest.**

24    Q.    And how far -- what do you consider

25 southwest, like --

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 175

1    A.   Southwest, they were working for Coconut

2  Point.

3    Q.   So, for example, Image Marketing Group would

4  be in southwest Florida delivering paper for Simon

5  Property Group?

6    A.   Uh-huh.

7    Q.   And the same month, your company would be

8  down there doing it?

9    A.   I said I dropped folders -- I dropped

10  brochures off.  They were doing the concierge program

11  around the mall itself -- the hotels around the

12  properties -- the concierge referral program.

13    Q.   Okay.  So that is all they were doing, and

14  these gift bags?

15    A.   Uh-huh.

16    Q.   Is that a yes?

17    A.   Dropping off information to the concierge,

18  signing them up for the referral program, giving them

19  gift bags, if there were gift bags that month to hand

20  out.

21    Q.   Okay.  Were they doing rack distribution for

22  Simon Property Group?

23    A.   Not indirect, per se, no.

24    Q.   Well, I'm just trying to find out, ma'am;

25  what they were delivering?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 176

1       **A.    Rack cards.**

2       Q.    Why don't you tell me what they were

3   delivering.

4       **A.    Rack cards.**

5       Q.    Rack cards.

6       **A.    Or brochures -- some malls -- I explained**

7   **earlier, that some malls use rack brochures, some malls**

8   **use directories, but the general term is rack**

9   **brochure -- rack brochure distribution.**

10      Q.    Which could be rack cards, brochures or

11  directories?

12      **A.    Yes.**

13      Q.    And all I'm trying to find out, ma'am, what

14  were they delivering different from your company to

15  these areas?

16      **A.    Probably nothing.**

17      Q.    Okay.  That is all I wanted to know.

18          Same thing with the southwest Florida market.

19      **A.    Except they were doing -- well, I need to**

20  **finish it.  Except they were doing the concierge and**

21  **they were doing the referral program.  They were not**

22  **visiting every hotel along the way.  They were doing**

23  **the hiring of concierge.  They were signing up of**

24  **concierge, the tracking of programs.**

25      Q.    You keep saying the concierge and referral

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 177

1    program; isn't that the same thing where they would

2    give cards to concierge and then they would refer

3    people?

4          A.    Concierge referral.

5          Q.    And so other than that, were they delivering

6    the same thing to these areas that your company was?

7          A.    Other than that, yeah, the other information

8    they were delivering, yes.

9          Q.    Okay.  And that would include the Tampa

10   markets and I-4?

11         A.    They did not do Tampa and I-4.

12         Q.    Okay.  So they did Coconut Point, you said?

13         A.    On I-4, they did not do Tampa, I-4.

14         Q.    Okay.  South Florida, what would they do in

15   south Florida?

16         A.    Miami, up through Boca.

17         Q.    Same place as your company was delivering?

18         A.    Probably some of them, probably not some of

19   them.

20         Q.    Do you know?

21         A.    No, I don't know.

22         Q.    Okay.  And you said north and south Orlando;

23   what does that encompass?

24         A.    I believe they delivered as far north as up

25   toward Altamonte, maybe even a little further up to

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                        8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 178

1    those that begin with D -- I don't know those -- Deland

2    or something up there, down through Kissimmee, possibly

3    even further south than that.

4         Q.   Any of the same areas that your company was

5    delivering to?

6         A.   Yes.

7         Q.   So back to TJI, you said that was just a

8    breakdown of the route, but other than billing under

9    another company, was it providing the same services as

10   all these other companies we've talked about?

11        A.   Yes.

12        Q.   All right.  How about -- strike that.

13             And I apologize if I have asked you this.

14   Did TJI and Simon Property Group enter into any type of

15   service agreement, to your knowledge?

16        A.   I don't remember that.

17        Q.   How about EDL Management, did it provide any

18   services to Simon Property Group?

19        A.   I believe that was just one that Tim asked me

20   to have -- as -- as the others just bill -- we are

21   going to bill services through this one for a while --

22   this company.  I assumed it was one of his companies.

23        Q.   And Arnell -- if I ask you about Arnell,

24   Inc., did it provide services to Simon Property Group,

25   is it fair to say that whatever RJL provided Arnell did

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 179

1    the same thing?

2        A.   No.  I think we discussed earlier that

3    Arnell -- when I opened Arnell, most of that is on the

4    list of what we need to reimburse for.

5        Q.   Okay.  Well, did Arnell provide any services

6    to Simon Property Group?

7        A.   No.  Except -- and I'm going to except that

8    too.  Except for reimbursements of money spent to cover

9    expenses for Simon.

10       Q.   I'm not -- can you explain that?  I don't

11   understand what you are talking about.

12       A.   Yes.  When things were purchased or money was

13   spent in Simon's name, some of that was billed back

14   through Arnell.

15       Q.   And who made those purchases?

16       A.   I did on behalf of the malls.

17       Q.   Did the malls or your boss or supervisor

18   authorize those purchases?

19       A.   Did not authorize it, but went to the events

20   that were bought.

21       Q.   Didn't Simon Property Group cut back and not

22   want those things purchased?

23       A.   Right.  But however, my managers did know

24   that they wanted to go and asked me to take care of

25   getting them there.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 180

1    Q.   So you just felt like you could charge it and

2  reimburse the client?

3    **A.   I'll tell you, the last one I did, my boss**

4  **was at.**

5    Q.   Who was your boss?

6    **A.   Lydia Gilmore.**

7    Q.   Did she know how you purchased the event?

8    **A.   No.  She just knew it was purchased.  She did**

9  **not want to know the details.**

10    Q.   I asked you earlier if she knew what you were

11  doing and you told me no, right?

12    **A.   She didn't.  She did not want to know the**

13  **details, but she knew she was at the events and it was**

14  **purchased.**

15    Q.   So these were events that you believe should

16  be purchased, so you purchased them on your own accord,

17  not with the approval of your company --

18    **A.   I spoke with her.**

19    Q.   Ma'am, let me finish, please.

20        So you did not purchase them with the

21  approval of your company, correct?

22    **A.   I spoke with her about that event.  I spoke**

23  **with the mall manager about that event, and it was**

24  **decided it was a good event for two of our properties**

25  **to be at.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 181

1      Q.   Okay.

2      A.   And from that event, one of our people in San

3   Juan was appointed to the board of directors of the

4   most prestigious hospital in San Juan.  Came out of our

5   sponsored event.

6      Q.   I appreciate that, but I did not ask you

7   about the event.

8      A.   Well, I'm sorry.  I thought I wanted to

9   explain a little more about it.

10     Q.   I just wanted to know if your company

11  approved those purchases.

12     A.   My boss knew about it and was in agreement

13  that we should spend the money for it.

14     Q.   On that one thing or all of them?

15     A.   On that one thing in particular, because it

16  just came to my mind.  I would have to look at the list

17  and I could tell you pretty much what everything else

18  was for, and who knew and who approved.

19     Q.   We'll do that, then.

20     A.   Okay.

21     Q.   Did you submit authorization for the company

22  for those purchases?

23     A.   No.  That one was not large enough that I was

24  just --

25     Q.   Why didn't you just put it on the company

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 182

1    credit card then; you had it, right?

2        A.    We were not allowed to do that at that point

3    in time.  We were not allowed to sponsor.  No matter

4    how good it was for the company, we were not allowed to

5    sponsor events unless it was signed up for at the

6    beginning of the year and approved.

7        Q.    So it was against company policy then,

8    correct?

9        A.    Yes.

10       Q.    Did Snouthound Enterprises provide any

11   services to Simon Property Group?

12       A.    That is PR work -- PR work that I did.

13       Q.    And when you say the PR work, was that the

14   international?

15       A.    Yes, and domestic that I -- was sent to

16   concierge.

17       Q.    Did it provide any delivery we talked

18   about --

19       A.    Yes.  Yes.

20       Q.    Okay.  So what did Snouthound deliver?

21       A.    Instead of paying XLM for delivery for

22   Rachael's portion, I paid it to Snouthound so that I

23   wouldn't have to write a check to her.

24       Q.    So when your daughter, Rachael Lauria,

25   delivered the marketing collateral, we discussed

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 183

1    earlier along her route, you paid her through

2    Snouthound?

3         A.   Not through the whole period, but after -- I

4    don't know -- maybe 2008, 2009, I started doing that,

5    yes.

6         Q.   Okay.  How about, did Marketing Resource

7    Network provide services to Simon Property Group?

8         A.   Yes.

9         Q.   Before I leave Snouthound, was it

10   disclosed -- did you disclose to your company that

11   Snouthound Enterprises was owned by your daughter

12   Rachael?

13        A.   No, I did not.

14        Q.   Who owns Marketing Resource Network?

15        A.   That was the company -- that was the name of

16   the company when we first started.

17        Q.   Did you --

18        A.   It was a sole proprietor or -- sole

19   proprietorship or something like that.

20        Q.   And who was the sole proprietor behind the

21   name?

22        A.   Robert.

23        Q.   Did you disclose to your company that --

24        A.   No, I did not.

25        Q.   -- Robert Lauria owned Marketing Resource

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

```
                                            Page 184
 1   Network?
 2        A.   No, I did not.
 3        Q.   What services did Marketing Resource Network
 4   provide to Simon Property Group?
 5        A.   That was mostly around the beginning of the
 6   opening of the mall, and it was collateral, giveaways,
 7   things like that, and that is when we started
 8   originally with the distribution.
 9        Q.   Does marketing -- strike that.
10             Did Robert Lauria provide those services?
11        A.   No.
12        Q.   Who provided them?
13        A.   I did most of them myself.
14        Q.   Did Mr. Lauria employ people to provide the
15   services?
16        A.   Not at that time.
17        Q.   Okay.  How about XLM Marketing, did that
18   entity provide any services to Simon Property Group?
19        A.   Same as XLM or -- it was just a D/B/A for
20   RJL.
21        Q.   It wasn't a D/B/A for Arnell?
22        A.   RJL.
23        Q.   Okay.  So, in essence, it is the same
24   services as --
25        A.   Exactly.
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 185

1     Q.   It is just billed under a different name?

2     **A.   Well, it changed.  I guess I changed the logo**

3  **and changed the name.**

4     Q.   I'm just trying to -- so I don't have to ask

5  you if it is two different things or?

6     **A.   No.  I changed the logo and therefore changed**

7  **the name.**

8     Q.   And is XLM Excell the same thing?

9     **A.   Yes.**

10    Q.   Excell Services?

11    **A.   Yes.**

12    Q.   I have seen that on --

13    **A.   Yes.  I don't remember that one, but yes.**

14    Q.   So XLM Marketing, XLM Excell, and Excell

15  Services are really just RJL?

16    **A.   Uh-huh.**

17    Q.   Is that a yes?

18    **A.   Yes.**

19    Q.   How about J&S Multimedia, did that do any --

20  or provide any services to Simon Property Group?

21    **A.   Yes.**

22    Q.   What did it do?

23    **A.   We purchased advertising from them as the**

24  **parent company of Travelhost, Orlando.  They**

25  **distributed to their hotels, like Loews Hotels,**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 186

1    **Universal.  They had private distribution there, so**

2    **that all the distribution we did to those hotels, they**

3    **did.  Plus I think they had the Peabody, and I can't**

4    **remember.  They had two or three hotels that they were**

5    **exclusive at, plus we bought advertising through them.**

6         Q.   And as far as the material that J&S

7    Multimedia distributed, was it the same that we have

8    been talking about all day?

9         **A.   Yes, it was.**

10        Q.   It would have been either material created or

11   that Simon --

12        **A.   Came from the malls, yes.**

13        Q.   Did you -- do you know if J&S Multimedia

14   distributed on the same routes as any of the other

15   companies that was doing distribution for Simon

16   Property Group?

17        **A.   My understanding was that the hotels they**

18   **distributed to were exclusive to them.  No one else**

19   **could distribute in room.**

20        Q.   So it was in room, as opposed to, like, a

21   rack?

22        **A.   It would go in with their -- with their**

23   **magazines.**

24        Q.   Okay.  So this was an advertising in a

25   magazine?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 187

1    A.   It was just in -- inserted into the magazine.

2    Q.   Okay.

3    A.   In room.

4    Q.   Okay.  So they did not deliver, like, the

5    mall directories or anything like that?

6    A.   They would go to the concierge, but they also

7    did inserts into the magazine.

8    Q.   Okay.  How about a company named FCDS, did

9    that provide services to Simon Property Group?

10   A.   Yes.  I think that was Susan's company for a

11   while, and instead of billing it through J -- JNS, she

12   was doing it separately on her own.  Susan is the owner

13   of J&S, or part owner.

14   Q.   Do you know why she chose to bill it that

15   way?

16   A.   No.

17   Q.   Did you ask?

18   A.   Not really.  She was -- they were both her

19   companies.

20        MR. BRAND:  Brian, rest room break?

21        MR. BLAIR:  Sure.  Five-minute break.

22        THE VIDEOGRAPHER:  Okay.  Off the record.

23        Time is 2:11.

24        (Break taken from 2:11 p.m. to 2:19 p.m.)

25        THE VIDEOGRAPHER:  We are back on the record.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 188

1        The time now is 2:19.

2   BY MR. BLAIR:

3        Q.   While you were at Simon Property Group,

4   who -- who originally hired Image Marketing, to your

5   knowledge, like, to do business with Simon?

6        **A.   I did.**

7        Q.   Okay.  Why did you hire Image Marketing

8   Group?

9        **A.   Because they had the best global.  It was --**

10  **it was out for bid with three companies.  I don't**

11  **remember the name of the other two.  They had the best**

12  **referrals, and it was a decision we made to go with**

13  **them.**

14       Q.   Okay.  Do you know if Image Marketing had any

15  other, what we call, distribution clients, like Simon

16  Property Group?

17       **A.   Yes, because they had referrals from other**

18  **companies.**

19       Q.   Okay.  Did you ask for a representative

20  sample of their other distribution clients?

21       **A.   I spoke with some of the other distribution**

22  **clients.**

23       Q.   Do you recall who they were?

24       **A.   No.  That was 11 years ago -- ten years ago.**

25  **No.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                              8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 189

1      Q.   Do you know if DT Printing Solutions has any

2   other clients other than Simon Property Group?

3      **A.   I have no idea.**

4      Q.   Do you know if Event Planners USA has any

5   clients other than Simon Property Group?

6      **A.   No idea.**

7      Q.   Do you know if HAT Marketing has any other

8   clients other than Simon Property Group?

9      **A.   That one I do know.  Yes, they do.**

10      Q.   Do you know the name of any clients?

11      **A.   I believe Gatorland was one of their clients.**

12   **Was it Dolphin Tours?  And I can't be positive about**

13   **that.  Gator is the one that comes to mind right off**

14   **the top of my head, but I know he had eight or nine**

15   **because we all signed up at the same time.**

16      Q.   When you say he, who is he?

17      **A.   Kevin Brett.**

18      Q.   Do you know if Point Distribution has any

19   other clients other than Simon Property Group?

20      **A.   No, I don't.**

21      Q.   Do you know if Takitik, Inc. has any clients

22   other than Simon Property Group?

23      **A.   No.**

24      Q.   Do you know if Florida Tourism Distribution

25   Group has any clients other than Simon Property Group?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

```
                                                    Page 190
 1        A.    No.

 2        Q.    How about Target Distribution?

 3        A.    No.  I don't even know the name Target

 4   Distribution.

 5        Q.    How about TJI, do you know if it has any

 6   other clients?

 7        A.    No, I don't know that.

 8        Q.    Do you know if RJL Services has any other

 9   clients other than Simon Property Group?

10        A.    No -- other than what we talked about

11   earlier, they did some for Saks.  No.

12        Q.    How about Arnell, Inc., did it have any other

13   distribution clients --

14        A.    No.

15        Q.    -- other than Simon Property Group?

16        A.    No.  No.

17        Q.    How about Snouthound Enterprises, did it have

18   any other distribution groups other than Simon?

19        A.    No.

20        Q.    So I assume XLM Marketing, XLM Excell, and

21   XLM Services also did not have any other clients other

22   than Simon?

23        A.    Other -- no.

24        Q.    Do you know if J&S Multimedia does any other

25   distribution for any other clients other than Simon
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 191

1    Property Group?

2         A.   I would assume, but I don't really know for

3    sure.

4         Q.   And you said PR -- excuse me -- FCDS, do you

5    know if it has any other distribution clients?

6         A.   Again, I would assume they do, but I don't

7    know.

8         Q.   How about Marketing Resources Network, does

9    that have any other distribution clients?

10        A.   No.   The company is no longer in existence.

11        Q.   How about a company named PR Works, are you

12   familiar with that?

13        A.   Yes.

14        Q.   What type --

15        A.   That was a D/B/A of SEI -- Snouthound.

16        Q.   Okay.   And do you know how -- all the

17   companies that we talked about just now with their

18   client list, that did distribution for Simon Property

19   Group, do you know how they obtained the rates -- or

20   the rates that they use in billing Simon Property

21   Group?

22        A.   No.

23        Q.   Did you negotiate any rates with these

24   companies?

25        A.   No.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 192

1       Q.   Okay.  And what I'm trying to figure out is

2   if someone -- say, Takitik is charging you, whatever,

3   $1,000 a month to deliver its collateral material, how

4   did that rate -- how did you and Takitik or Simon

5   Property Group reach that rate?

6       **A.   I -- these are people I dealt with for a long**

7   **time and assumed -- I felt that they were doing it**

8   **based on number of distribution points.  Did I go back**

9   **and check to make sure that is how it is being done?**

10  **No, I did not.**

11      Q.   You -- so you just gave your rate and said it

12  looks good to me?

13      **A.   Yes, exactly.**

14      Q.   When RJL Services provided its distribution,

15  did it -- did it bill hourly, flat fee?

16      **A.   Flat fee.**

17      Q.   And do you recall what that was?

18      **A.   I think it was 40, $50 per hotel.**

19      Q.   Just for identification purposes, I'm going

20  to show you a stack of bills from RJL Services.

21      **A.   Yes.**

22      Q.   And are these bills that you recognize?

23      **A.   Yes.  These are consulting bills, but I**

24  **billed them as distribution because that is what I was**

25  **asked to do.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 193

1      Q.   Okay.  So you -- image -- you did not --
2  excuse me.  RJL did not provide any distribution
3  services for Image Marketing?
4      **A.   No.  Uh-uh.**
5      Q.   Okay.  So why did you bill it as hours
6  distribution?
7      **A.   Because they were in a distribution business**
8  **and Tim asked me to bill it as distribution because he**
9  **thought it would be easier on his taxes to have it all**
10  **as one -- one kind of expense.**
11      Q.   Again, that did not seem strange to you?
12      **A.   Not particularly.  I assumed they were both**
13  **business deductions, so however he wanted to report it.**
14      Q.   And on the back, did -- excuse me.  The
15  exhibit I'm going to give you is number --
16           THE REPORTER:  Seven.
17           (Plaintiff's Exhibit 7 was marked for
18      identification.)
19  BY MR. BLAIR:
20      Q.   Plaintiff 7, and just for the record, it is
21  SPG 0015 to SPG 00023.  Did -- did you bill Image
22  Marketing -- strike that.
23           So this was a consulting -- at least the
24  first invoices that are to Image Marketing are all for
25  consulting; is that what you testified?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 194

1        A.    Uh-huh.

2        Q.    And did you bill Image Marketing for your

3   consulting on an hourly -- or a monthly basis; how did

4   that work?

5        A.    I billed them on an hourly basis.

6        Q.    Okay.

7        A.    At this point in time, early on, I did it as

8   a retainer.  This was afterwards, and this was much

9   more -- at this point, it was scoping out projects for

10  them, coming up with client lists, doing interviews

11  with them, that kind of stuff, so this was billed

12  hourly.  Putting together some budgeting.

13       Q.    So if I were to ask you on the first one,

14  which is SPG 0015, and say --

15       A.    Uh-huh.

16       Q.    -- how many hours did you spend, I see a

17  quantity of 20 or a unit price of 100.

18       A.    Unit price $100 an hour.

19       Q.    Okay.  So you just did 20 hours of consulting

20  in January?

21       A.    Uh-huh.

22       Q.    Is that a yes?

23       A.    Yes.  I'm sorry.

24       Q.    And in the back, there is an invoice -- or

25  two invoices to J&S Multimedia, SPG 0022 and 00023; do

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 195

1    you see those?

2         A.    Yes, I do.

3         Q.    Okay.  Are these the services that you

4    provided to J&S Multimedia?

5         A.    Yes, they were.

6         Q.    Okay.  I'm on SPG 00023; it talks about

7    employee screening.

8         A.    Yes.  They had a position open, Susan wanted

9    help, and going through those and trying to figure

10   out -- she was having trouble hiring people and keeping

11   people in positions, so she asked me to go through and

12   help her figure out which type of people would be best

13   suited; how do you -- how do you figure that out from a

14   resume and how do you prescreen on a phone call to find

15   somebody that is going to last more than four or

16   five months in a position.

17        Q.    And there is a compensation study for --

18        A.    Yes.

19        Q.    -- who?

20        A.    For her magazine.

21        Q.    Her employees?

22        A.    Yes.

23        Q.    How many employees does she have?

24        A.    Well, the sales position that she was mostly

25   concerned with too.  She was paying -- she had doubled

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 196

1   their salary, and it was costing her an awful amount of

2   money, and I went in and told her that I felt the

3   compensation plan that included an incentive to bring

4   in new business made more sense than a straight salary,

5   so I did a number of different scenarios for her on how

6   to do that.

7       Q.   Did you prepare a written compensation study?

8       A.   Yes, I did.

9       Q.   And as far as the SPG 0022 bill, the one

10  previous to that, it is again to J&S Multimedia.  Can

11  you -- obviously, I can read what is there, but can you

12  give me a layman's --

13      A.   Yes.  New concept development.  She was being

14  paid a lot in barter, and what she would do is give her

15  barter away, which was just giving money away, so I was

16  trying to explain to her how she could use barter to

17  set up either a web site and sell it or to use it with

18  hotels or other retail to -- incentivise her employees

19  with that, as opposed to just giving it to people; how

20  she can create income out of her barter.

21           And then I also set up Google alerts to try

22  to help her find new business coming into the areas.

23  She did not have a PR agency so I helped her figure out

24  how to do her releases so that she would get more

25  publicity for the -- for the charity work that she did,

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 197

1    **because she supported a lot of charities, and I also**

2    **helped her in putting together a sales training package**

3    **that she could use for her new employees.**

4        Q.   And do you know how many employees her

5    company had, including sales?

6        **A.   Five, six, something like that.**

7        Q.   Okay.  And you don't find it -- is J&S

8    Multimedia a marketing company?

9        **A.   They own a magazine.**

10       Q.   Okay.  Is that a market -- marketing?

11       **A.   It is advertising in magazines.**

12       Q.   Okay.

13       **A.   Actually, they own a number of magazines, I**

14   **believe.**

15           MR. BLAIR:  Let's mark this one first as

16       Plaintiff's 8.

17           (Plaintiff's Exhibit 8 was marked for

18       identification.)

19   BY MR. BLAIR:

20       Q.   Have you seen that one before?

21       **A.   Yes, I put that together.**

22       Q.   And are these the -- you've given me this at

23   a previous meeting; are these the expenses that you

24   believe Simon Property Group should reimburse Arnell,

25   Inc., for?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                              8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 198

1          A.    Yes.  RJL Services for, yes.

2          Q.    And why?

3          A.    Top one and two.  Those were advertisements

4     paid on behalf of Plaza Carolina in San Juan.  It was

5     towards the end of the year and I got a call from a

6     gentleman named Chip Harding and Christine Duben (ph)

7     that we were short of our SBV goal, which was Simon

8     Brand Ventures' income goal, and we needed to create

9     extra income through buying advertising and getting a

10    portion of that back from the advertisers.

11         Q.    Why didn't you just submit that through Simon

12    Property --

13         A.    Because --

14         Q.    Let me finish, ma'am.

15               Why didn't you submit that through Simon

16    Property Group?

17         A.    Because we were looking at a November time

18    frame.  We could not get this through in time because

19    it was -- it was -- it would have had to have gone --

20    they don't have their own PR agent -- their own

21    advertising agency down here at that point in time, so

22    we could not charge it to a credit card.  It was too

23    big to charge to the Simon credit card.  We had to get

24    it paid at the beginning of September so they could cut

25    checks to us so that we could have those checks entered

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 199

1    into the system by the end of December for the malls to

2    get credit for the money coming back.

3              So the only way to do it was for me -- and I

4    had another couple of other companies pay these bill

5    and then bill them back to the property.

6         Q.   And you think that is proper?

7         A.   When you are told by people that we need to

8    get money into -- I don't think it was proper that I

9    was asked to do it.

10        Q.   You were asked to do it by who?

11        A.   I was asked to do it.  I was told that the

12   malls -- that the region in the malls needed extra

13   money to make their SBV goal.

14        Q.   And did someone tell you to charge these to

15   your personal account?

16        A.   No.  They just told me to get it done.

17        Q.   Okay.  So item number one, Simon Property did

18   not approve that, did they -- did it?

19        A.   I guess in the technical term.

20        Q.   Okay.

21        A.   That it was charged against my credit card,

22   no.

23        Q.   Okay.

24        A.   Would I have bought $20,000 of advertising in

25   San Juan?  No.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 200

1       Q.    Okay.  And I'm not going to go through all of

2   these, but I see, like, for example, six, seven and

3   eight on Exhibit 8 are wine lockers?

4       **A.    Uh-huh.  Yes.  Which were used by everybody**

5   **in the company to entertain for sponsorships.  The wine**

6   **locker was given to us as an added value by Travelhost**

7   **Magazine, and it was expected to be filled.  Again, no**

8   **one ever asked how I got it filled.  It was just**

9   **expected to be filled.**

10      Q.    Okay.  Do you use those wine lockers?

11      **A.    Of course, I did, just like everybody else.**

12      Q.    Who was everybody else?

13      **A.    Brian Peters, Lydia Gilmore; executives from**

14  **Simon were taken there for dinner.**

15      Q.    And did you tell them I'm submitting it and

16  paying for this on my personal credit card and billing

17  the company back for it?

18      **A.    No, I did not.**

19      Q.    Did you seek approval from Simon Property for

20  any of these?

21      **A.    No.**

22      Q.    I see a lot of these dates are from '07 and

23  '08 and '09 --

24      **A.    Uh-huh.**

25      Q.    -- and why didn't you go back after the fact

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 201

1    and submit them; anything would have prevented that?

2        A.   Go back and submitted them after the fact?

3        Q.   I mean, if you bought $10,000 worth of radio

4    advertising, why didn't you go back and say, hey, guys,

5    I could not get this run through in time, will you

6    approve this?

7        A.   They --

8        Q.   I mean, you told me, number one, was you

9    could not get a check cut in time, correct?

10       A.   Yes.

11       Q.   Okay.  So why did want you pay for it in your

12   credit card and then go back through the proper

13   channels and say, Simon Property Group, I'm submitting

14   $10,500 worth of radio buys, will you approve it?

15       A.   Okay.

16       Q.   Why didn't you do it?

17       A.   I don't know why I did not do it that way,

18   but I didn't.

19       Q.   Okay.  Did you seek after-the-fact approval

20   for any of the items on Exhibit 8?

21       A.   No.

22       Q.   Okay.  I think I'm done with RJL Services.  I

23   guess we are trying to keep a neat ship.  I am going to

24   have you put your hat on for Arnell, Inc.

25            Are you appearing today on behalf of Arnell,

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 202

1    Inc., as corporate representative?

2        **A.   Yes.**

3        Q.   And I know we've talked about Arnell, Inc., a

4    little bit, so I'm trying to not have to ask you the

5    same questions again.

6            It did maintain its own bank account,

7    correct?

8        **A.   Yes.**

9        Q.   And before I go any further, I would like to

10   show you a notice of taking videotaped deposition

11   for -- hold on.  This is RJL again.  Okay.  It says

12   Arnell -- sorry -- and/or RJL Services, D/B/A, Excell

13   Marketing, and ask if you have seen it before.

14       **A.   Yes, I have.**

15           **(Plaintiff's Exhibit 9 was marked for**

16        **identification.)**

17   BY MR. BLAIR:

18       Q.   And we'll mark it as Exhibit Plaintiff's 9.

19           Did you do anything to prepare for your

20   deposition today on behalf of Arnell, Inc.?

21       **A.   In what matter, do you mean?**

22       Q.   Did you review documents from Arnell, Inc.?

23   Did you speak to any employees of Arnell, Inc.,

24   anything of that nature, other than talking to your

25   attorney?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 203

1      A.   No.

2      Q.   Okay.  And does Arnell, Inc., have any

3   employees?

4      A.   No.

5      Q.   Okay.  And to your knowledge, the only -- it

6   did not provide any services, correct?  We just talked

7   about the income reimbursement.  Is that the only thing

8   that you believe Arnell provided to Simon Property

9   Group?

10     A.   Yes.

11     Q.   Okay.  And as far as any, whatever business

12  it may have been, was it on the same laptop computer

13  that is in the river?

14     A.   Yes, it was.

15     Q.   And did Arnell have any type of business card

16  or anything of that nature?

17     A.   No.

18     Q.   Did it have an occupational license?

19     A.   No.

20     Q.   Any type of marketing literature it would

21  hand out to promote its business?

22     A.   No.

23     Q.   Did it maintain a web site?

24     A.   No.

25     Q.   Did it maintain any e-mail accounts or e-mail

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 204

1    addresses?

2         A.   I don't believe so.

3         Q.   And when Arnell, Inc. did distribution, I

4    assume for RJL Services, like, it was part of RJL

5    Services, correct?

6         A.   Yes.  I said Arnell didn't do anything.

7         Q.   Okay.  Was -- Arnell, Inc., did it file

8    income tax returns?

9         A.   As underneath the umbrella of RJL.

10        Q.   Okay.  And does it -- Arnell, Inc., have any

11   officers or directors?

12        A.   My daughter Sarah.

13        Q.   Other than her, is there anyone else that is

14   an officer or director?

15        A.   No, there is not.

16        Q.   And do you -- why were you designated to

17   appeared today instead of her as the corporate

18   representative?

19        A.   Because she did not know anything about the

20   company at all.

21        Q.   Did Arnell ever pay Sarah Lagi any money?

22        A.   I believe I did pay her out of that.

23        Q.   Did Arnell issue her a W2 or 1099?

24        A.   Yes.  I believe it would be a 1099.

25        Q.   And I would like to show you what we'll mark

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 205

1    as Exhibit 10, which is a composite of contracts, and

2    take a moment to look at those.

3        **A.    We have already seen these, haven't we?  Yes,**

4    **we saw them earlier today, didn't we?**

5        Q.    I believe they had XLM on them.

6            MR. BLAIR:  Okay.  We'll just withdraw

7        Plaintiff's Exhibit 10 for now and mark it

8        something else.

9            (Plaintiff's Exhibit 10 was marked for

10       identification.)

11   BY MR. BLAIR:

12       Q.    I'm going to remark as Plaintiff's Exhibit 10

13   a composite exhibit, which is a number of invoices from

14   Arnell, Inc., that are Bates numbered SPG 00054, I

15   think, consecutively, through SPG 00084, and ask you if

16   you recognize those.

17       **A.    Yes.**

18       Q.    Okay.  And you earlier testified that Arnell,

19   Inc., did not provide any services; is that correct?

20       **A.    Yes.**

21       Q.    So I don't want to go through these one by

22   one if I don't have to.  Is it accurate to say that

23   none of these services in these invoices were not

24   provided?

25       **A.    No.  I'm not going to say that.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 206

1       Q.    Okay.  So would you tell me which --

2       **A.    I'm doing that right now.**

3       Q.    Okay.

4       **A.    This is a duplicate.  Do you want both of**

5   **them in here?**

6       Q.    Let's just -- why don't you read which one is

7   a duplicate and that way, we'll keep it together.  That

8   is -- SPG 0069 is a duplicate?

9       **A.    And 70.**

10      Q.    Okay.

11      **A.    I don't know what that is.**

12      Q.    I think it is an internal approval, but I

13  don't know.

14      **A.    Okay.  These are 00061.**

15      Q.    Hold on.  These -- these are ones that what?

16      **A.    That were reimbursements for expentures --**

17  **expenditures.**

18      Q.    Okay.  61?

19      **A.    61, 64.**

20      Q.    Okay.

21      **A.    66, 67, 69 or 70, they are the same, and 75.**

22          **You need them again?**

23      Q.    I got them.  Okay.  So let's eliminate the

24  ones that you did not go through.  Is it fair to say

25  that those were for services that were not provided?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 207

```
 1       A.    (Witness nods head.)

 2       Q.    Is that a yes?

 3       A.    Yes.  I'm sorry.

 4       Q.    And as far as the ones that are expensed

 5   reimbursement, are those also covered on exhibit --

 6       A.    Yes, those amounts would be included in

 7   there.

 8       Q.    In Exhibit Number 8?

 9       A.    Yes.

10       Q.    Okay.  So what these were things you felt

11   were necessary so you charged them on your personal

12   account and then rebilled them back through Simon?

13       A.    Right.

14       Q.    Okay.

15       A.    The amounts would not tie together because,

16   obviously, I upcharged for credit card and all of that,

17   and on that, I did not, so...

18       Q.    So on the Arnell bills, which is Plaintiff's

19   Exhibit 10, you upcharged?

20       A.    Yes.

21       Q.    Okay.  And you said -- I don't understand,

22   you said for credit card?

23       A.    Credit card charges, margin, whatever, on

24   that, I took it out incomplete.

25       Q.    On Exhibit 8?
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 208

```
 1       A.   Yes.  What I'm saying is, those are the exact
 2  amount.  When I did the calculations, I did it on the
 3  exact amount.
 4       Q.   When you paid your daughter, Sarah Lagi, out
 5  of Arnell, was there any agreements to what her
 6  compensation might be?
 7       A.   Not really.
 8       Q.   Okay.  And what I'm trying to figure out is,
 9  as far as Robert, your husband, Rachael and Sarah, your
10  two daughters, was there any agreement as to what they
11  would be paid for their services?
12       A.   No.  It wasn't around -- well, Robert,
13  nothing in -- per se, and the girls, I don't know.  It
14  was 750, 1,000, something like that.
15       Q.   A month?
16       A.   Yes.
17       Q.   Did they keep track of any of their time or
18  anything of that nature?
19       A.   If they did, I did not ask them for it.
20       Q.   Okay.  So you basically just paid them 750,
21  1,000.  Was it the same or did it change?
22       A.   I think it was normally the same.
23            (Plaintiff's Exhibit 10 was marked for
24        identification.)
25  BY MR. BLAIR:
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 209

1      Q.   Okay.  I would like to show you these two

2   checks that are from Arnell, Inc., and they are Bates

3   number ST-Arnell 00085 and 00055?

4      **A.   Uh-huh.**

5      Q.   And they are to your daughter Sarah --

6      **A.   Uh-huh.**

7      Q.   -- and Rachael, and --

8      **A.   Well, that is to Robert, not Rachael.**

9      Q.   I'm sorry, Robert for $5,000 from Arnell,

10   check number 1036.  Do you know what that was for?

11      **A.   Probably distribution.**

12      Q.   From the company?

13      **A.   Uh-huh.**

14      Q.   Was he an officer?

15      **A.   Well, no, but it was a -- it is an LLC, so it**

16   **would -- flow to our tax -- according to my accountant**

17   **at that point, it flows to your income anyway.**

18      Q.   I thought you just said Robert didn't get

19   paid for anything?

20      **A.   He got distribution.  I mean, I wrote it out**

21   **in his name, rather than -- because I signed the**

22   **checks, so I wrote it in his name, rather than write it**

23   **in my name.  I was still uncomfortable writing a check**

24   **in my name and signing my name.**

25      Q.   Okay.  So did you and Robert take

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 210

1  distribution from RJL?

2      A.   Yes.

3      Q.   Did you have a normal or standard

4  distribution, like 5,000 every month?

5      A.   No, I don't believe so.

6      Q.   Okay.  I'm also going to show you --

7      A.   Okay.  And this one you wanted?

8      Q.   Yes, ma'am.  It is check number 094 to your

9  daughter, Sarah Lagi?

10     A.   Yes.

11     Q.   Do you know what that check would be for,

12  since it is pretty specific, $766.45?

13     A.   Yes.  I think it would have been around $800

14  minus taxes.

15     Q.   And that was her pay, you believe?

16     A.   Yes.

17     Q.   Was that her standard pay?

18     A.   That is when I was paying her as an employee

19  with the -- whatever the other one was -- W2.

20     Q.   Okay.

21     A.   And not as contract employee.

22     Q.   And then when she turned to a 1099 employee,

23  did her salary change?

24     A.   Might have, yeah.  I would not have paid her

25  that amount, probably.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 211

1      Q.   Do you recall what it was?

2      **A.   As I said, I thought it was 750 or 1,000.  I**

3   **don't remember exactly.**

4      Q.   Were both your daughters paid the same

5   amount?

6      **A.   I don't believe so.**

7      Q.   Why is that?

8      **A.   Because Sarah's route was larger than**

9   **Rachael's, and Sarah did more work with the web site,**

10   **the Facebook and Twitter.**

11          **(Plaintiff's Exhibit 12 was marked for**

12       **identification.)**

13   BY MR. BLAIR:

14      Q.   I would like to show you a copy that we'll

15   mark as Plaintiff's Exhibit 12, and it appears to be an

16   e-mail from --

17      **A.   Yes.**

18      Q.   --  Susan Thomas to yourself?

19      **A.   Uh-huh.**

20      Q.   Have you -- can you take time to read the

21   e-mail?

22      **A.   Yes.**

23      Q.   And did -- this is obviously the fictional

24   Susan Thomas we talked about?

25      **A.   Yes, it is.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 212

1      Q.   Did XLM Marketing ever acquire Excell

2  Services?

3      **A.   No.**

4      Q.   Why did you feel the need to send this

5  e-mail?

6      **A.   Because it was changing the name.**

7      Q.   But why did you feel the need to send it to

8  yourself?

9      **A.   So that there would be a record.**

10     Q.   So it would appear like an --

11     **A.   Yes.**

12     Q.   -- independent company to your employer?

13     **A.   Uh-huh.**

14     Q.   Is that a yes?

15     **A.   Well, yes.  If anybody would have saw it,**

16 **nobody would have noticed it until this happened.**

17     Q.   Okay.  While you were employed at Simon

18 Property Group, did Takitik do any Web listing for any

19 of the Florida malls?

20     **A.   I believe -- no.  No.**

21     Q.   No?

22     **A.   I -- I believe that what happened is there**

23 **were -- there was an invoice, or a couple of invoices,**

24 **maybe one, and I don't like how it was phrased, so I**

25 **put that in instead.  I redid the invoice and put down**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 213

1   **what was missing.**

2        Q.   So your testimony is that you altered

3   Takitik's invoice?

4        **A.   Yes, I did.**

5        Q.   Okay.  I'm going to show you an exhibit that

6   we'll mark as Plaintiff's Exhibit 12 --

7             THE REPORTER:  13.

8             (Plaintiff's Exhibit 13 was marked for

9        identification.)

10  BY MR. BLAIR:

11       Q.   -- 13.  I'm sorry.  And I don't know what to

12  ask you this question under, so I'll just ask you if

13  you recognize this e-mail.

14       **A.   I don't recognize it, but I understand what**

15  **it is saying.**

16       Q.   Okay.  Is that your e-mail address at the

17  top?

18       **A.   Yes.**

19       Q.   And you are sending it to Mr. Takio, correct?

20       **A.   Yes.**

21       Q.   And you are providing him with what appears

22  to be the Simon Property Group credit card?

23       **A.   Yes.**

24       Q.   What was that for?

25       **A.   So he could run the charges for the two**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 214

1    companies.

2        Q.    For?

3        A.    For bills that he had sent me.

4        Q.    And this was distribution?

5        A.    I would have to see the -- the invoice.  I

6    don't know what the invoice is right now, but this was

7    just -- this was sent out frequently to people

8    saying -- to go ahead and do that, and to do it in this

9    fashion because we could only charge $5,000 at a time.

10   So I don't know what the amounts of the invoices were,

11   but if one was for more than 5,000, I might have asked

12   him to split them separately -- differently.

13       Q.    And this is in June of 2010, right?

14       A.    Uh-huh.

15       Q.    Is that a yes?

16       A.    Yes.  I'm sorry.  Yes.

17       Q.    And you are telling him the next month to go

18   ahead and bill it, right?

19       A.    To go ahead -- because I was going to be

20   gone, probably, and to just go ahead and bill it

21   without me.

22       Q.    Does it say you are going to be gone?

23       A.    Well, no, but I'm just telling him to -- next

24   month to sign -- he could go ahead and do the same

25   thing next month in that breakdown.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page  215

1       Q.    Regardless of what he did?

2       **A.    Well, it would be the same service each**

3  **month.**

4       Q.    So?

5       **A.    And this is two weeks earlier, so I'm just**

6  **saying, next month, don't wait for me to get back to**

7  **you on it; you can go ahead and put it through.**

8       Q.    And when all -- your companies were doing

9  distribution, if I understood your testimony earlier,

10  everyone had their own routes, correct?

11      **A.    Uh-huh.**

12      Q.    Is that correct?

13      **A.    Yes.**

14      Q.    And everyone covered a different territory?

15      **A.    Yes.**

16      Q.    And therefore, in theory, there should not be

17  any duplications of services; is that correct?

18      **A.    Yes.**

19      Q.    And when your company performed these

20  services, was it billed under RJL, XLM?

21      **A.    It was not billed under RJL.**

22      Q.    Okay.  It was billed under XLM?

23      **A.    XLM.**

24      Q.    So if there is a bill from XLM, it is a

25  bill -- or XLM Services or XLM Excell, they are all the

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 216

1    same company?

2        **A.   Yes.**

3        Q.   Okay.  I would like to show you a copy of a

4    bill that I'll mark Plaintiff's Exhibit 14, which is

5    Bates number SPG 0090 and 00091.

6            (Plaintiff's Exhibit 14 was marked for

7        identification.)

8            THE WITNESS:  Okay.

9    BY MR. BLAIR:

10       Q.   And take a moment.  One appears to be an

11   invoice from XLM, and one appears to be an invoice from

12   XLM Marketing, correct?

13       **A.   Oh, I'm sorry.  I did not realize it was --**

14   **yes.**

15       Q.   Both for December?

16       **A.   Yes.**

17       Q.   Both for same locations, are they not?

18       **A.   No.  The only one that is the same is**

19   **Sawgrass -- one for Boca, Sawgrass, Plaza Carolina, and**

20   **the other is Sawgrass, Florida Mall, Dadeland, Miami.**

21       Q.   Why would they be delivering for the same

22   location then in the same month?

23       **A.   You mean Sawgrass?**

24       Q.   Yes, ma'am.

25       **A.   I don't know why that one I would have**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 217

1    **charged that much more for.**

2         Q.   Okay.  And there is a sales person by the

3    name of T. Ruiz on there; do you see that?

4         **A.   Yeah.  No.**

5         Q.   Who is that?

6         **A.   That was just a name I put in there.**

7         Q.   Okay.  But you would agree that it does

8    appear that you are sending a bill out from two

9    different companies, at least, for delivering the

10   fourth quarter shopping guide to --

11        **A.   And I have a duplication of one mall.**

12        Q.   Okay.  I'm sorry, did you say that any of

13   your companies deliver up in the Jacksonville area?  I

14   can't recall.

15        **A.   No.**

16        Q.   Okay.  So I'm going to show you an invoice

17   I'm going to mark as Plaintiff's Exhibit 15.

18             (Plaintiff's Exhibit 15 was marked for

19        identification.)

20   BY MR. BLAIR:

21        Q.   It is an invoice from XLM Marketing,

22   SPG 00152, for delivering something to the Jacksonville

23   market; do you see that?

24        **A.   Yes.**

25        Q.   Did that occur then?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 218

1       A.    No.  But --

2       Q.    There is an Arnell invoice behind it, but I

3  believe that is the one you sent?

4       A.    I'm not sure.  Was there another invoice for

5  this month, March 25th for April?

6       Q.    Only invoice I see is the one attached to

7  behind it, which appears to be for the same --

8       A.    Okay.  This is Jacksonville through Miami, so

9  it is not the whole invoice.  I just put Jacksonville

10  still down through Miami.

11      Q.    And how about the one behind it SPG 00 --

12      A.    We already discussed that, that was not.

13      Q.    Done.

14            Any of it, right?

15      A.    Right.

16      Q.    I'm going to show you what I'll mark as

17  Plaintiff's Exhibit -- composite Exhibit 16, which is

18  three invoices from XLM Excell, Bates number SPG 00452,

19  SPG 00450, and SPG 00462 and ask you to take a look at

20  those.

21            (Plaintiff's Exhibit 16 was marked for

22        identification.)

23  BY MR. BLAIR:

24      Q.    Let me know when you have had a chance to

25  review them.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 219

1       **A.   What was attached to this one?**

2       Q.   It was an Arnell bill, that you said had not

3  been -- you want to look at it?

4       **A.   Yes, please.**

5            MR. BLAIR:  We stapled them.  It was not

6       attached, just for the record.

7            THE WITNESS:  It was not attached at all,

8       ever?

9  BY MR. BLAIR:

10      Q.   We did it today, not you.

11      **A.   Okay.  All right.  This one is not coded for**

12 **payment.**

13      Q.   Which one is this one?  You have to identify

14 it for the record.

15      **A.   I'm so sorry.  00462 is not coded for**

16 **payment.**

17      Q.   Okay.  That is not my question.

18           My question was, do you recognize the bills?

19      **A.   I do, but I'm just saying this didn't go**

20 **through the system.**

21      Q.   It does say -- it does say paid on it,

22 correct?

23      **A.   That might say paid up there, but there is no**

24 **stamp on here, such as these, that show that it was**

25 **ever paid.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 220

1      Q.   So the 00450 and 00452 have been coded for
2   payment, correct?
3      **A.   Yes.**
4      Q.   And are they for the same services?
5      **A.   Different malls.**
6      Q.   Different malls?
7      **A.   One is 073517348.  I'm not going to be able**
8   **to remember these names, but 0735 is Miami area, 4839,**
9   **I don't remember where that is -- Towne center, Boca**
10  **Raton.  Thank you.**
11     Q.   So would the agreement with Simon Property
12  Group be, if I were to figure out what your -- you
13  would agreed to charge, would I look at those two
14  invoices, which are Bates number 450 and 452, and add
15  them together; that is what you were charging?
16     **A.   That is what was being charged, yes.  That**
17  **was for all of the directory, the pamphlets that we saw**
18  **and the distributions down there, and they are**
19  **different amounts, and they are different amounts**
20  **because it depends on what the malls could afford.**
21     Q.   Okay.  So you didn't charge the malls
22  uniformly?
23     **A.   No.**
24     Q.   Okay.  So if one made more money, you would
25  charge them more money?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 221

 1      A.   It was the only way it could be done.

 2      Q.   When you say it could be done, what could be

 3   done?

 4      A.   It was the only way all of the bills were

 5   paid for.  If they were joint programs, the malls that

 6   could afford to pay, paid more than the malls that

 7   couldn't afford to pay.  Miami International paid

 8   almost nothing for anything that was done for them.

 9      Q.   Okay.  Okay.  How -- how did you determine

10   what a mall could afford?

11      A.   They have an income with fixed expenditures

12   and whatever was left was what they were able to pay

13   toward anything else that was going on.  Same with

14   advertising, if there was a group ad -- and in Orlando,

15   frequently Florida Mall paid for group ads, that

16   included Leesburg and Seminole Town Center, because

17   those malls did not have the money to pay for it, so

18   Florida Mall would be charged fully for the

19   advertising.

20      Q.   And who set the budget for each of these

21   malls?

22      A.   Depends on income the stores give them.  The

23   money for this does not come from Simon.  The money

24   from this comes from the stores.

25      Q.   And who was in charge of making that

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 222

1  budget -- marketing budget?

2      A.   It is down on their lease.  Their income

3  comes from their lease.

4      Q.   I understand the income.  I asked about the

5  marketing budget for the mall.  Who is in charge of

6  setting the marketing budget for the mall?

7      A.   There -- setting the marketing budget, you

8  have your income, then corporate marketing tells each

9  mall what percent corporate marketing is going to take,

10  then you have fixed expenses after that of salaries,

11  benefits, all of those kinds of things, and then

12  whatever is left is what the mall has to spend locally.

13      Q.   Well, are you involved in that process?

14      A.   On -- on an approval level, in most cases,

15  yes.  If there was not a marketing director, I was much

16  more involved.

17      Q.   And do you recall in certain malls where

18  there was not a marketing director where you were

19  actively involved?

20      A.   Oh, off and on, we had marketing directors

21  coming and going all the time.

22      Q.   Were there any of the malls where you were

23  charging these services to?

24      A.   Some of them did not have a marketing

25  director at a specific point in time.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 223

1        Q.   Okay.

2        **A.   But they have -- you know, other times they**

3    **had -- I mean, that is just normal business.  They**

4    **don't -- not all jobs are filled all the time.**

5             MR. BLAIR:  Can we take a five-minute break,

6        not a 25-minute break?

7             THE VIDEOGRAPHER:  Okay.  We are off the

8        record.  The time is 3:05.

9             (Break taken from 3:05 p.m. to 3:17 p.m.)

10            THE VIDEOGRAPHER:  Okay.  We are back on the

11       record.  The time now is 3:17.

12   BY MR. BLAIR:

13       Q.   Okay.  Did XLM -- which I understand is -- is

14   a D/B/A for Arnell?

15       **A.   RJL.**

16       Q.   RJL.

17            Did XLM or RJL ever attend any trade shows

18   out of state?

19       **A.   No.**

20       Q.   So if there were a bill for a trade show out

21   of state, is that --

22       **A.   It is probably an offset to one of the other**

23   **charges that I feel should be reimbursed.**

24       Q.   Okay.  Other than that, you did not attend

25   the trade show, right?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 224

```
 1        A.   Not and bill it separately.  I have attended

 2   many trade shows but not -- and billed them.

 3        Q.   But I'm talking about for XLM or RJL --

 4        A.   No.

 5        Q.   -- in that capacity, you did not attend a

 6   trade show, correct?

 7        A.   No.

 8        Q.   Okay.  Did -- RJL or any of the companies we

 9   have discussed, Arnell, XLM, Snouthound, did they do

10   any turnpike distribution?

11        A.   Uh-huh.  Uh -- yes, turnpike.  Not --

12   there's -- hotels off of turnpikes, not in the turnpike

13   rest area.

14        Q.   All right.  And would those be on the list

15   that you gave me earlier today as an exhibit?

16        A.   That is a partial list.  I don't know if

17   everything is listed there or not.

18        Q.   Okay.  Are you familiar with the Kids Eat

19   Free card program?

20        A.   Minimally.

21        Q.   Okay.  Did Simon Property Group ever get

22   involved in the Kids Eat Free program?

23        A.   I remember talking to Dale once about

24   sponsoring the back -- putting an ad on the back

25   sleeve, and I think we did that for a period of time,
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page  225

1   not terribly long.

2        Q.   Okay.

3        A.    Then I know that there was a discussion

4   between the Florida Mall -- and I don't remember if

5   it -- if it was Dale or not, regarding possibly us

6   buying Kids Eat Free cards to give with gift with

7   purchase for our -- or when people spent X amount

8   number dollars, gift with purchase, or if they bought a

9   gift card, gift with purchase, but I don't know if that

10  ever happened.

11       Q.   You don't recall ever buying cards from Kids

12  Eat Free to distribute?

13       A.   At the mall?

14       Q.   Or to giving -- how about this:  Do you ever

15  recall authorizing Takitik or the Kids Eat Free program

16  to purchase, say, 1,000 cards and allow them to

17  distribute at their discretion for the Florida Mall or

18  Simon Property Group?

19       A.    Florida Mall may have done that.  They would

20  not have needed my permission to do that.  I don't mean

21  that, but...

22       Q.   Who would have negotiated the arrangement

23  between Kids Eat Free/Takitik and Simon Property Group?

24       A.    I believe I remember being involved in the

25  conversation about advertising on the sleeve.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 226

1     Q.   Okay.

2     **A.   As I said, I remember that there were**

3   **discussions.  I don't remember that I was necessarily**

4   **involved in the discussions about using the gift with**

5   **purchases, but I'm not aware that that happened.**

6     Q.   Okay.  And when you say advertisement on the

7   sleeve, you said that was for a short period of time,

8   to your recollection?

9     **A.   I don't remember.  Six months, a year, or**

10  **something like that.  It wasn't -- it wasn't -- I don't**

11  **believe it was for a long, long time.**

12    Q.   And did you -- were you the one that

13  negotiated the rate for the -- I guess, the advertising

14  on the sleeve for Simon Property Group for -- of the

15  Kids Eat Free cards?

16    **A.   I believe it was -- this was the deal.  We**

17  **are going to sell the sleeve for this number of**

18  **dollars; would you like it or not?**

19    Q.   Okay.  And would that deal --

20    **A.   Just like in an advertisement ad.**

21    Q.   Was that deal presented to you or somebody

22  else?

23    **A.   I think it was presented to me, and I went to**

24  **the mall.**

25    Q.   You say you went to the mall for what?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page  227

1        A.    For their input.  It was for Florida Mall.

2        Q.    And you are also appearing today on behalf --

3    behalf of Snouthound Enterprises, correct --

4        A.    Yes.

5             (Plaintiff's Exhibit 17 was marked for

6          identification.)

7    BY MR. BLAIR:

8        Q.    -- as the corporate representative.

9             And I'm going to mark as Plaintiff's

10   Exhibit 17, and ask if you have seen that notice of

11   taking deposition before.

12       A.    Yes, I did see this.

13       Q.    Did you do anything to prepare for your

14   deposition on behalf of Snouthound, such as reviewing

15   any records or the like?

16       A.    No.

17       Q.    Did you talk to your daughter,

18   Rachael Lauria, about anything regarding Snouthound

19   Enterprises?

20       A.    No.  This came out after she was already in

21   Europe, and she just returned this morning, so I did

22   not have a chance to speak to her about it.

23       Q.    And what did Snouthound Enterprises do?

24       A.    I'm not sure what the company was set up to

25   do originally, but I had been doing a lot of PR work,

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page  228

1    and billing it, and I said to Rachael, why don't I just

2    have the -- the PR work come to you in payment of what

3    you are doing for me with the distribution.  And for a

4    while, because of what the fee was, she was paying her

5    sister out of it, so that I was not getting the income.

6    She was getting the income and she was booking the

7    expense of paying Sarah as a contractor employee.

8            So they did distribution, and then when I got

9    further along, I started doing the PR work, that I

10   showed you earlier, and I billed that through PR Works,

11   which was a D/B/A of Snouthound.

12       Q.   So was Sarah Lagi an employee of Snouthound,

13   then?

14       A.   Not an employee, a contractor service.

15       Q.   So she got a 1099?

16       A.   I assume so.  Rachael's tax person probably

17   did that.

18       Q.   And as the corporate representative of

19   Snouthound, you don't know that?

20       A.   No.  I'm sorry.  As I said, I got this and

21   she was out of the country, so I don't know for sure if

22   it was a 1099, but I do know Rachael uses a tax

23   professional, so I assume she did get one.

24       Q.   And the amount that Rachael paid her sister,

25   Sarah, how was that determined?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                                           8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 229

1    A.   Again, I told her, and I think it was about

2  $750 a month -- 750 or a thousand.

3    Q.   So you told Rachael, what, to pay Sarah?

4    A.   Yes.

5    Q.   Does Snouthound have any employees?

6    A.   No.

7    Q.   Who are the officers of Snouthound?

8    A.   I believe Rachael is the only officer I know

9  of.

10    Q.   Okay.  As a corporate representative, do you

11  know if Snouthound conducts regular meetings?

12    A.   No.

13    Q.   It does not or you don't know?

14    A.   I think -- no, I don't think it does.  It

15  does not.

16    Q.   Does it maintain a corporate meeting book or

17  anything of that nature?

18    A.   No.

19    Q.   Does it have any business cards, to your

20  knowledge?

21    A.   Not to my knowledge, no.

22    Q.   Did they have a web site?

23    A.   No.

24    Q.   Did Snouthound Enterprises have its own

25  computer that it utilized for billing purposes?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 230

1      A.    No.

2      Q.    Did Snouthound Enterprises have an e-mail

3   account?

4      A.    **Only the one I set up for PR Works.**

5      Q.    Do you know if Rachael Lauria utilized that

6   e-mail account?

7      A.    **She didn't even know about it.**

8      Q.    So did -- you said earlier, I believe,

9   Snouthound Enterprises did perform some services for

10  Simon Property Group?

11     A.    **As PR Works, yes.**

12     Q.    And would that be distribution services?

13     A.    **Distribution services.**

14     Q.    Anything else?

15     A.    **PR work.**

16     Q.    That would be public relations work?

17     A.    **Which I did, yes.**

18     Q.    Okay.  And did you bill that through

19  Snouthound Enterprises?

20     A.    **I did, towards the end; I did not all the way**

21  **through, but toward the end, maybe the last year and a**

22  **half or so, I was billing to SEI.**

23     Q.    Through?

24     A.    **Snouthound Enterprises.**

25     Q.    Okay.  And you were billing that to Simon

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                      8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 231

1    Property Group?

2        **A.    Yes.**

3        Q.    And the PR -- the public relations work, was

4    that international work?

5        **A.    That was the international work that we spoke**

6    **about before.**

7        Q.    And that was basically sending e-mails to

8    people in other countries?

9        **A.    Doing press releases and sending the e-mails.**

10       Q.    To people in other countries?

11       **A.    Giving interviews and sending photos and**

12   **things like that, that they needed.**

13       Q.    And what did you base the value of those

14   services on; in other words, how did you determine the

15   appropriate charge to charge Simon Property Group?

16       **A.    Well, I kind of went off what it cost one**

17   **mall for PR and charged that amount for all of the**

18   **properties.**

19       Q.    You said --

20       **A.    Our malls are paying between, on the small**

21   **side, $750 per mall, to the large malls that are paying**

22   **almost $4,000 a month.**

23       Q.    Paying who for what?

24       **A.    Bitner Goodman.  And before that, we had**

25   **three or four malls that were paying $4,000 a month to**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 232

1    **numerous agencies.**

2        Q.   And how big is Bitner Goodman?

3        **A.    How big is it?**

4        Q.   It is a national marketing company?

5    International?

6        **A.    It's -- it is a Florida based PR agency.**

7    **They do -- they do work across the country.**

8        Q.   Are they large?  Do you consider them a large

9    company?

10       **A.    Moderate size.   They are not large.**

11       Q.   Okay.  But they are nationwide?

12       **A.    After they picked up Premium Outlets, they**

13   **went nationwide.**

14       Q.   Okay.  So you are charging as much as a

15   nationwide company?

16       **A.    For one mall, and I was doing seven or eight**

17   **malls.  And no -- they charge -- Florida Mall pays**

18   **$4,000 a month, I believe.  Boca pays $4,000 a month.**

19   **Dadeland pays 4,000 a month.  I did not charge anywhere**

20   **near that much money.**

21       Q.   But you based basically the amount of your

22   services -- you looked at what Bitner Goodman was

23   charging and --

24       **A.    And the agencies we used prior to that.**

25       Q.   And you determined that your value based upon

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 233

1    those --

2        A.   Was much less expensive than what one mall

3    would be paying.

4        Q.   Do you know if your qualifications were the

5    same as Bitner Goodman?

6        A.   I have been doing PR for 20 years.

7        Q.   That is not my question, ma'am.

8             Do you know if your qualifications are as

9    good as Bitner Goodman?

10        A.   I believe, yes, they are.  I have been

11    offered a position many times at PR agencies, so I

12    believe I have good skills at that.

13        Q.   Have you been offered a position at Bitner

14    Goodman?

15        A.   Not at Bitner Goodman, no.

16             (Plaintiff's Exhibit 18 was marked for

17          identification.)

18    BY MR. BLAIR:

19        Q.   I'm going to show you what is marked as

20    Plaintiff's Exhibit 18, which is a copy of several

21    contracts from PR Works to several Simon malls.  They

22    are Bates numbered SPG 00545, 546, 547, 548.

23        A.   Yes.

24        Q.   And ask you if you recognize those contracts?

25        A.   Yes.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 234

1      Q.   Who created those contracts?

2      **A.   I did.**

3      Q.   On the back, they are signed on behalf of

4   someone from PR Works named A.C. Rodriguez.

5      **A.   Yes.  That is just a name I signed.**

6      Q.   Okay.  That is you making up a name?

7      **A.   Yes.**

8      Q.   Did the --

9      **A.   Yes.  I'm sorry.**

10     Q.   That's fine.

11          Did PR Works ever have a business at 5563

12   Kendall Drive, Miami, Florida?

13     **A.   No.**

14     Q.   And is that your signature approving your own

15   contract?

16     **A.   Yes, which is fine to do.**

17     Q.   Okay.  As far as the first contract, SPG 545

18   and 546, it has a scope of services?

19     **A.   Uh-huh.**

20     Q.   And it says provide PR service as per

21   attached Colombia, Venezuela, Puerto Rico, Brazil,

22   Chile, and Peru?

23     **A.   Uh-huh.**

24     Q.   I did not see an Exhibit A.  Do you know if

25   that was on Exhibit A or exhibit -- the exhibit?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 235

1      A.   It would have been a spreadsheet, like the

2   one I gave you earlier, of e-mail addresses.

3      Q.   But it would not tell you what PR services

4   you would be providing to those e-mail addresses?

5      A.   No.

6      Q.   And on the bottom it has -- excuse me, not on

7   the bottom.  On page -- paragraph two of the first page

8   of SPG 00545, it has a charge of 1,800 per month?

9      A.   Right.

10      Q.   Is that -- is that what you were indeed

11   charging?

12      A.   I believe, yes.

13      Q.   Okay.  And the next contract, which is part

14   of the same exhibit, SPG 00547 and 548?

15      A.   Uh-huh, yes.

16      Q.   Is also signed by A.C. Rodriguez; do you see

17   that?

18      A.   Yes, I do.

19      Q.   And I assume that is the same --

20      A.   Yes.

21      Q.   -- signature you signed, correct?

22      A.   Yes.

23      Q.   Okay.  And there is no such woman as -- or

24   man as Andreas Rodriguez?

25      A.   Right.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 236

1    Q.   Is that Andrea or Andreas?  Andrea --

2  Andrea Rodriguez; is that who it says?

3    **A.   Andrea, yep.**

4    Q.   Okay.  And then it -- same thing, in the

5  scope of services, it says provide PR services as per

6  attached proposal in Colombia, Venezuela, Puerto Rico,

7  Chile, Brazil and UK; do you see that?

8    **A.   Correct.**

9    Q.   And do you know if the -- did you, in fact,

10  submit a proposal for that work?

11    **A.   No.**

12    Q.   And to the -- what is your testimony as to

13  the work that would be provided under this contract?

14    **A.   It would be in that exhibit over there that**

15  **we looked at earlier, the press releases that went out,**

16  **as also the -- a list of some of the people that it was**

17  **sent to.**

18    Q.   So you are referring to Exhibit 3?

19    **A.   Yes, I believe it was.**

20    Q.   And you would send advertisements to

21  individuals or companies on an e-mail list?

22    **A.   Yes.  Or here we go.  It is 000 -- I'm**

23  **sorry -- 00180 -- it's examples of that.**

24    Q.   On Exhibit 3?

25    **A.   On Exhibit 3.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ab2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 237

1          -- through 00196; those are examples of the

2     kinds of things that went on.  Oh, and the list -- I

3     think it was in here, too, wasn't it?  And the list is

4     on 00209 and 00210.

5          Q.   Okay.

6          A.   Of Exhibit 3.

7          Q.   And did you ever communicate with any of the

8     individuals on that list that you just provided with

9     the e-mail addresses?

10         A.   Uh-huh.

11         Q.   Okay.  Is that a yes?

12         A.   Yes.  I'm sorry.

13         Q.   Okay.  And other than yourself, did you

14     submit Exhibit 18 to anyone at Simon Property Group for

15     approval?

16         A.   No.

17         Q.   And how did you come to know Tim Herman?

18         A.   He was introduced to me by somebody in the

19     tourism industry when we first moved here.  Oh, no.  I

20     believe the first time I met him, he might have been

21     working with another company.  It was -- it was early

22     2001, maybe.

23         Q.   Do you know -- or do you even know now

24     Tim Herman's ed -- educational background?

25         A.   No.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                     8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 238

1       Q.   Do you know if he has a college education?

2       A.   No.

3       Q.   Do you know what his experience is in

4  marketing, other than running Image Marketing?

5       A.   No.

6       Q.   Okay.  Do you know if he has any type of

7  training in marketing or advertising?

8       A.   No, I don't know if he has training.

9       Q.   And do you know how many employees Image

10  Marketing has?

11      A.   Not for sure.

12      Q.   And did you ever work with anyone at Image

13  Marketing other than Mr. Herman?

14      A.   Yes.

15      Q.   Who did you work with?

16      A.   Ryan Deming, Tommy Bigenola [sic].

17      Q.   Brignolo?

18      A.   Brignolo.

19           A woman, I cannot remember her name.

20  Short --

21      Q.   Babette Piccano (ph)?

22      A.   I remember Babette.  I did not really work

23  with her.  And Diana -- Dina --

24      Q.   Marshburn?

25      A.   I'm sorry?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 239

1      Q.    Marshburn?  Mashburn?

2      **A.    Is that her name?  Dina?**

3      Q.    I have heard it.

4      **A.    I don't know.  Short -- short woman.**

5      Q.    Okay.

6      **A.    I worked with her.**

7      Q.    Okay.  Do you know what Mr. Demings'

8  educational background is?

9      **A.    Yeah.  Actually, I think I -- he has**

10  **mentioned that he went to Rollins, I believe.**

11      Q.    Okay.  Do you know what his -- do you know if

12  he has a college degree?

13      **A.    No, I do not.**

14      Q.    Do you know what his experience is in

15  marketing?

16      **A.    I -- just what I have seen, the work that**

17  **they -- he and Tim have done.**

18      Q.    Okay.  And do you know that he -- Tim and him

19  are actually the ones performing the work, or could it

20  be one of their employees?

21      **A.    Could be one of their employees.**

22      Q.    Okay.  Do you know if Mr. Deming has any

23  special training or expertise in, say, marketing or

24  advertising?

25      **A.    I just know that they do a good job**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 240

1    marketing, and...

2         Q.   Did any of your malls when you were the

3    vice president for the Florida region ever complain

4    about their services?

5         A.   I had -- Miami International Mall would

6    complain that they did not see Image Marketing very

7    much, or they did not get very much results back from

8    them; however, flip side of that, I would get from

9    Image Marketing, they would call and try and set up

10   appointments and would never get calls back, so I was

11   on the phone frequently with the mall manager trying to

12   figure out what was going on with that.  A couple of

13   times Dadeland Mall had issues, but Ozzie was very

14   active in talking with Tim about what was -- if

15   anything was going on.

16        Q.   Ozzie, Ozzie Dominguez?

17        A.   Yes.  He interacted quite a lot, I believe,

18   with Tim.

19        Q.   Any other malls complain?

20        A.   I believe Coconut Point was extremely happy.

21   I never heard a thing from Florida Mall.  They never

22   said anything to me.  Boca, I don't know, because Boca

23   was kind of -- she was not very engaged.  It -- she had

24   her guest services person han dling that, so I -- I

25   don't know how they felt.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 241

1      Q.   When the Miami International Mall complained

2   that they never saw Image Marketing, did you ever do

3   any investigation yourself?

4      **A.   I called Image Marketing right away, then I**

5   **called Maria back and said I have been talking to Image**

6   **and they say this is the problem.  It went back and**

7   **forth.  She was going to talk to the marketing director**

8   **and it just went on like that.**

9      Q.   Did you ever do anything to verify that Image

10  Marketing was providing you the services it represented

11  it was providing?

12     **A.   The -- I'm sorry?**

13     Q.   Like, did you ever go ride along with them to

14  see if they were doing what they were supposed to be

15  doing?

16     **A.   The mall should have asked to do that, not I.**

17     Q.   I'm just asking if you did.

18     **A.   I didn't, no.  But I do know that they did**

19  **take some of the marketing directors with them, whether**

20  **they did Miami International or not, I don't know.**

21     Q.   But you, personally, did not ride along with

22  them, did you?

23     **A.   No.**

24     Q.   Did you -- do you ever either buy or rent a

25  car for Tim Herman?  Did you rent him a BMW or let him

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                      8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 242

1    drive your BMW, anything like that?

2        A.    No.

3        Q.    Did any of your companies ever rent

4    Mr. Herman a BMW?

5        A.    No.

6        Q.    Did -- how did you be-- come to know

7    Mr. Deming; was it through Tim Herman?

8        A.    That, and cons -- tourism events in Orlando.

9    Actually, I'll take that back.  Ryan was the person who

10   came over and did the presentation for Florida Mall.

11       Q.    What type of presentation did he do?

12       A.    To get our business with concierge program.

13       Q.    Is that in the form of a PowerPoint or?

14       A.    Yes.  He had a -- he had a booklet with all

15   kinds of photos of events they had done, their

16   collateral pieces, regular proposal.

17       Q.    How did you come to know Mr. Takio?

18       A.    I believe I met Dale at a tourism event.  I

19   don't really remember meeting -- sorry -- Dale.  I

20   don't really remember the first time I met him.

21       Q.    How about, do you know Mr. Takio's

22   educational background?

23       A.    No, I do not.

24       Q.    Do you know whether his -- whether he has a

25   college degree?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)
8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 243

1       **A.   No, I do not.**

2       Q.   Do you know whether he has any experience or

3    expertise or certifications, for example, in marketing

4    or advertising?

5       **A.   No, I can't say I specifically do.**

6       Q.   Okay.  When you hired Image Marketing to do

7    work for Simon Property Group, did you ask for any type

8    of qualifications or anything of that nature?

9       **A.   As I said, I discussed it with customers that**

10   **they had that they did.**

11      Q.   And which customers of theirs did you discuss

12   it with?

13      **A.   Oh, Lord, we are talking 11 years ago.  I**

14   **don't remember specifically who I called.  They had a**

15   **list of people that they worked with.  It seems like**

16   **there was a couple of restaurants that I spoke with.**

17   **They had a good reputation in the community -- the**

18   **tourism community for their -- their -- their concierge**

19   **reward programs.**

20      Q.   So you did not ask for any qualifications,

21   though?

22      **A.   What -- are you talking educational**

23   **qualifications?  No.**

24      Q.   CV, resume?

25      **A.   What CV?**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 244

1      Q.   Curriculum vitae, resume, anything like that,

2   did you ask for a resume?

3      **A.   Individual -- no.  I was more worried about**

4   **the kind of work the company performed, and therefore,**

5   **I interviewed, talked with the companies they worked**

6   **with and spoke with people in the industry that knew**

7   **them.**

8      Q.   Did you ask for a client list on any of them?

9      **A.   I did and I called two or three clients on**

10  **their list.**

11     Q.   Did you talk to anybody that they did

12  distribution for?

13     **A.   That is what they did distribution with their**

14  **concierge program.**

15     Q.   Okay.  Do you know if they did any

16  collateral -- other than the concierge program, any

17  collateral distribution of materials?

18     **A.   Yes.**

19     Q.   Did they?

20     **A.   Yes.  They had their own small hot spot**

21  **collateral programs, programs that they would do on**

22  **concierge desk, things like that.**

23     Q.   Do you know a gentleman by the name of

24  Joseph Aintabi?

25     **A.   I don't.  That does not sound familiar.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 245

1        Q.    How about Anthony M. Edwards?

2        **A.    That doesn't sound familiar.**

3        Q.    He is listed as a manager of Snouthound; does

4    that refresh your memory?

5        **A.    Oh, I did not know him by Anthony.**

6        Q.    Tony Edwards?

7        **A.    Yeah.**

8        Q.    Is that --

9        **A.    It was someone who was involved with my**

10   **daughter.**

11       Q.    Her significant other?

12       **A.    A long time ago.  Thank God.**

13       Q.    How about a George Fakhaory?

14       **A.    Oh, George Fakhaory, yes.  He used to work**

15   **for Dollar Rent a Car.**

16       Q.    Did you -- have you ever done any business

17   with George Fakhaory?

18       **A.    I have done trade shows with him.**

19       Q.    I mean, have you hired him on behalf of Simon

20   Property Group?

21       **A.    I don't believe so.  Separately, no.**

22       Q.    Have you done business with him through any

23   of your companies, RJL, Snouthound?

24       **A.    Not that I -- no.**

25       Q.    Okay.  How about Edgar Lozada, do you know

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 246

1    who that is?

2         A.    **That does not familiar to me.**

3         Q.    How about Andrea Rodriguez, which I believe

4    is --

5         A.    **No.**

6         Q.    Okay.  And did -- I apologize, if I have

7    asked you this.

8              Did Snouthound keep its own bank account?

9         A.    **Yes.**

10        Q.    And do you know who had access to that bank

11   account?

12        A.    **Rachael.**

13        Q.    Anybody else?

14        A.    **Not that I know of.**

15        Q.    Do you know if Rachael used that account for

16   personal expenses?

17        A.    **I don't know that.**

18        Q.    When you billed Simon Property Group through

19   SEI, was it billed on an hourly basis, monthly basis,

20   retainer?

21        A.    **I guess -- I guess that would depend on what**

22   **the bill was for.**

23        Q.    You didn't have any set arrangement?

24        A.    **Well, when it was the normal PR, it would be**

25   **a monthly cost, but again, as I said, I have other**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 247

1   things I was going through, offsets to expenses, and

2   that would not necessarily be -- that would be written

3   differently.

4       Q.   Did Marketing Resources Network ever provide

5   any services to Event Planners?

6       A.   Might have billed some of the consulting work

7   to Event Planners.

8       Q.   And that was the consulting work we talked

9   about earlier?

10      A.   Yes.

11      Q.   Helping Tim?

12      A.   Uh-huh.

13      Q.   What type -- I know you said that you helped

14  them with forecasting and budgeting.  What -- what else

15  did you help them with?

16      A.   With going over his presentations, his

17  communication skills.  He had an excellent rapport with

18  people, but he did not always come off as professional

19  as he needed to when he started working with higher,

20  bigger companies, so we worked a lot on that.

21      Q.   Okay.

22      A.   Their concierge -- I'm sorry, because I know

23  someone in here used to be a concierge.  Concierge, it

24  is a relationship.  They are not concerned about what

25  educational or how you look or how you dress; it is a

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 248

1    **relationship, as is most of marketing.**

2          MR. BLAIR:  Let's take another five minutes

3       and we'll probably have another five minutes and

4       we are done.

5          THE VIDEOGRAPHER:  Off the record.  The time

6       is 3:44.

7          (Break taken from 3:44 p.m. to 3:54 p.m.)

8          THE VIDEOGRAPHER:  Okay.  We are back on the

9       record.  The time now is 3:54.

10         (Plaintiff's Exhibit 19 was marked for

11      identification.)

12   BY MR. BLAIR:

13      Q.   Ms. Lauria, I'm going to show you some

14   contracts I have premarked, and just ask you if you

15   recognize the contract.

16      **A.   Yes.**

17      Q.   Okay.  Who created that contract?

18      **A.   I did.**

19      Q.   Okay.  And are you aware if the services in

20   that contract were provided?  And it is Bates numbered

21   SPG 01586.

22      **A.   Yeah -- the Web listing -- yeah, I think**

23   **there was Web listings of some kind.  I believe so,**

24   **yes.**

25      Q.   Are you guessing, or do you know?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 249

1        A.    I'm going to say yes.

2        Q.    Okay.  Would you turn the page on the center

3    of the page, and there is a signature on there that is

4    for Point Distribution, and it appears to be

5    Dale Takio?

6        A.    That is mine.

7        Q.    You signed this contract?

8        A.    Yes, I did.

9        Q.    And did Mikael Thygesen?

10       A.    No, he did not.

11       Q.    Did you cut and paste his signature on that

12   one too?

13       A.    Yes, I did.

14       Q.    And are you -- did you -- do you know if

15   Point Distribution billed Simon Property Group in

16   accordance with this contract?

17       A.    Yes, probably.

18       Q.    Probably or do you know?

19       A.    Yes.

20            (Plaintiff's Exhibit 20 was marked for

21         identification.)

22   BY MR. BLAIR:

23       Q.    Okay.  I'll show you what has been premarked

24   as Plaintiff's Exhibit 20.  And I'll ask you if you

25   recognize that contract.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 250

1       A.    These are contracts I made up.

2       Q.    Okay.  Do you know --

3       A.    Yes.  Yes.

4       Q.    Do you know -- and it is Bates number

5   SPG 01588.  Do you know if those services were

6   provided?

7       A.    This is -- yes.  This is when I asked Tim if

8   he would go ahead and start dropping off all of this

9   information to the hotels for me -- the taking over the

10  valets, the bellmen, all that kind of stuff that some

11  of the smaller hotels.

12      Q.    And do you know if these services were

13  provided?

14      A.    I can't verify that they were.

15      Q.    Okay.  And on the second page there, again,

16  appears to be a signature of Mr. Takio?

17      A.    Yes.

18      Q.    Is that your signature?

19      A.    It is.

20      Q.    Why did you feel the need to sign

21  Mr. Takio's signature?

22      A.    Again, these were in my file, just to cover

23  me, and I just signed them and did them and threw them

24  in my file.  I never sent them to anybody and never

25  gave them to anybody for payment.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 251

1       Q.   Well, this is not your company, correct?

2       **A.   What is not my company?**

3       Q.   Point Distribution?

4       **A.   No.**

5       Q.   Then why would you need to forge -- put

6    somebody else's signature on a contract for business

7    that was not yours?  Why didn't you just have Mr. Takio

8    sign?

9       **A.   I don't know.  I don't know why I didn't.**

10      Q.   Did you ever ask Mr. Takio to sign them?

11      **A.   No.**

12           **(Plaintiff's Exhibit 21 was marked for**

13       **identification.)**

14   BY MR. BLAIR:

15      Q.   I'll show you what has been premarked as

16   Plaintiff's Exhibit 21.  This is a contract, Bates

17   numbered SPG 01595, again with Point Distribution.

18      **A.   Same -- this is the same.**

19      Q.   Same contract?

20      **A.   No-no.  No.  It is the same -- I did the same**

21   **thing.**

22      Q.   Okay.  You signed Mr. --

23      **A.   Yes, I did.**

24      Q.   -- Takio's name?

25      **A.   Yes, I did.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                     8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 252

1    Q.    And is that your signature on there?

2    **A.    Yes, it is.**

3    Q.    And again, you don't own an interest in Point

4    Distribution?

5    **A.    No, I don't.**

6    Q.    Is there anything that prevented you from

7    having Mr. Takio sign it?

8    **A.    No, there wasn't.**

9    Q.    Did you seek approval of this contract?

10   **A.    No, I did not.**

11   Q.    Did you seek approval of the other prior two

12   exhibits we just talked about, which would be

13   Plaintiff's 19 and 20?

14   **A.    No, I did not.**

15   Q.    Do you know if, in fact, the services in

16   Exhibit 21 were provided?

17   **A.    I -- yes, I believe they were provided.**

18   Q.    And how did you verify that?

19   **A.    I did not verify it, but...**

20   Q.    Okay.  So how do you know they were provided?

21   **A.    Because I trusted that they were providing**

22   **the services.**

23   Q.    But other than trusting them, you did not do

24   anything to verify, like go out and see if, in fact --

25   **A.    No, I did not.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 253

1          (Plaintiff's Exhibit 22 was marked for

2      identification.)

3    BY MR. BLAIR:

4         Q.    And I'm going to show you what has been

5    marked as Plaintiff's Exhibit 22, which is a contract,

6    Bates number SPG 02343, and ask you if you recognize

7    that.

8         A.    Yes.

9         Q.    And that is a contract between TJI and it

10   appears to be shopping center name is left blank; do

11   you see that?

12        A.    Shopping center name is Florida region, yes.

13        Q.    Okay.  Do you know what region that covered?

14        A.    I believe it was south Florida.

15        Q.    And do you know if, in fact, that -- that

16   work that is set forth in the scope of services was

17   done?

18        A.    Yes, this is the mini menus that Tim did.

19        Q.    And other than Tim telling you it was done,

20   did you do anything other than seeing --

21        A.    I have seen them at hotels, yes.

22        Q.    Did you ever call any of these hotels to make

23   sure that --

24        A.    Well, I saw this one at the Dadeland

25   Marriott.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                        8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 254

1      Q.    Okay.  And if you look on page two of the

2   contract, it is signed by TJ Imann?

3      **A.    No.  That is what he put down for signing it.**

4      Q.    Who is he?

5      **A.    Tim.**

6      Q.    So Mr. Herman, that is his -- his --

7      **A.    I believe he did, because he didn't want --**

8   **this is the one I was telling you about.  He didn't**

9   **want -- he didn't want it to be part of his company.**

10      Q.    He didn't want Mr. Deming and Mr. Takio to

11   know?

12      **A.    He -- yes.**

13      Q.    You think that was fair?

14      **A.    It's -- it is not my company.**

15      Q.    So you just signed whatever he said?

16      **A.    I -- no.  Did I sign whatever he said?  No.**

17   **But this was something he was doing with his company,**

18   **that he was doing the work for me.  Whether or not how**

19   **they had their company set up, I did not know.**

20      Q.    And did Mikael Thygesen approve this?

21      **A.    No, he did not.**

22      Q.    Did you cut and paste his signature on that?

23      **A.    Yes, I did.**

24           **(Plaintiff's Exhibit 23 was marked for**

25            **identification.)**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 255

1   BY MR. BLAIR:

2        Q.   I'll show you what has been marked as

3   Plaintiff's Exhibit 23.

4        **A.   Yes.**

5        Q.   And it is a contract, Bates number SPG 02349.

6        **A.   Yes.**

7        Q.   And I'll ask you if you recognize that.

8        **A.   Yes.**

9        Q.   Did you create that?

10       **A.   Yes.**

11       Q.   And I think I might have forgot.  Did you

12   create all the contracts we have been talking about?

13       **A.   Yes.**

14       Q.   Okay.  Again, this is a contract between TGI

15   and --

16       **A.   Yes.**

17       Q.   -- Plaza Carolina, Sawgrass Mills, Florida

18   Mall?

19       **A.   Yes.**

20       Q.   And do you know, in fact, if the scope of

21   services in this contract were provided?

22       **A.   These were the hot spots.  I saw the**

23   **brochures.**

24       Q.   Where did you see them?

25       **A.   He showed me the examples and I approved the**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 256

1    **artwork.**

2        Q.   Do you know if he distributed, though -- let

3    me back up.

4            Who is he?  Tim Herman?

5        **A.   Tim Herman.**

6        Q.   Okay.  Other than him showing you the menu,

7    did you see them out anywhere?

8        **A.   No, I did not.**

9        Q.   Did you try to verify if he, in fact,

10   delivered that?

11       **A.   No, I did not.  And Plaza Carolina is on**

12   **there because of a clause thing.**

13       Q.   A clause thing, can you explain that?

14       **A.   Yes.  Plaza Carolina, because of some of the**

15   **laws in Puerto Rico, did not have to pay some of the**

16   **corporate overhead that other malls did, so, therefore,**

17   **they picked up expenses.**

18       Q.   And is the mall --

19       **A.   To keep it up.**

20       Q.   Is the mall manager compensated off of his or

21   her budget?

22       **A.   Off their budget?**

23       Q.   Yeah.

24       **A.   No.**

25       Q.   Okay.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 257

1      A.   Only if they go over budget, they are dinged.

2      Q.   So you are assigning an expense to a mall in

3  which the mall manager got no benefit; is that what I

4  heard you say?

5      A.   Yes.

6      Q.   And if you look on page two, which is SPG

7  02350, it is just TJ Imann; is that Mr. Herman again?

8      A.   Yes.

9      Q.   Is that your signature?

10     A.   My signature is on the other side, yes.

11          (Plaintiff's Exhibit 24 was marked for

12       identification.)

13  BY MR. BLAIR:

14     Q.   I'm going to show you a contract that has

15  been marked Plaintiff's Exhibit 24, and ask you if you

16  recognize that; it is a contract Bates number SPG

17  01372.

18     A.   Yes.

19     Q.   And it is between Image Marketing and the

20  Florida regional malls?

21     A.   Yes.

22     Q.   And again, do you know what malls that

23  covered?

24     A.   This was for how much?  This would be --

25  well, it says right here, doesn't it?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 258

1          **Oh, my God, what the heck?**

2     Q.   Your husband told me I needed new lights

3  yesterday.

4     **A.   Did he, really?**

5     Q.   Yeah.

6          (Whereupon, a discussion was held off the

7      record.)

8          THE WITNESS:  It is the Miami malls and the

9      Miami and Orlando.

10  BY MR. BLAIR:

11     Q.   Okay.  Just for the record, since it is a

12  camera, the -- the lights fell out of the ceiling.

13  Okay.

14          It says it's for a concierge.  It is a type

15  of service.  At the top, it says concierge referral

16  service, Miami International, Dadeland and Boca; is

17  that --

18     **A.   That was those three malls, yes.**

19     Q.   And do you know, in fact, if the services

20  that were set forth in the contract were provided?

21     **A.   Yes.**

22     Q.   And other than asking Mr. Herman, how did

23  you --

24     **A.   The malls were giving him information, so I**

25  **knew this is what we were talking about earlier.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                              8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 259

1       Q.   Did you ever call the mall managers and say

2   are you getting this information?

3       **A.   Yes.  Ozzie Domingos at Dadeland, as I said,**

4   **was in frequent communication with him.  You said you**

5   **had stuff from Maria, so yes, I know that they were**

6   **working down there.**

7       Q.   And what is -- what is that mini menu?

8       **A.   It is a small menu, like this big, that you**

9   **would stick in your pocketbook and open up.  You see**

10  **them on hotel lists.**

11      Q.   Is it for a specific restaurant?

12      **A.   They are like the restaurant ones you see.**

13      Q.   But I mean -- well, I have not seen one.  Is

14  it for like --

15      **A.   It is for the mall.**

16      Q.   Okay.  So it shows you the menus that are in

17  the mall?

18      **A.   Not menus.  It is called a mini menu, but**

19  **restaurants started them, basically, but this is for**

20  **the mall, so they would have a real short listing of**

21  **the stores and maybe a map on how to get there.**

22      Q.   So it is not a restaurant menu?

23      **A.   No, it is not.**

24      Q.   It is a mini listing of the mall?

25      **A.   But they are called mini menus**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 260

1       Q.   And it also references an exhibit.  Do you

2   know if there is an exhibit attached to the contract,

3   and it is number two, criteria -- I'm sorry?

4       **A.   That is on all of these.  There is nothing**

5   **there.**

6       Q.   Okay.  And do you know if, in fact, Image

7   Marketing billed Simon Property in accordance with this

8   contract?

9       **A.   I believe so.**

10      Q.   And are you guessing or have you done

11  anything to verify that?

12      **A.   Well, I don't have the invoices to know that**

13  **this was billed exactly like this.  They are not in**

14  **front of me.**

15      Q.   When you got invoices from any of the

16  marketing or any of the companies, did you pull up the

17  contract to verify if it was in accordance with it?

18      **A.   No.**

19      Q.   Okay.  On page two, it is signed on behalf of

20  Image Marketing by Timothy Herman?

21      **A.   Uh-huh.**

22      Q.   Is that Mr. Herman's signature?

23      **A.   I believe so.**

24      Q.   Okay.  And did Mikael Thygesen approve this?

25      **A.   No.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Page 261

1      Q.   Did you cut and paste his signature on there?

2      **A.   Yes, I did.**

3      Q.   Did you seek approval of this contract with

4   anyone from Simon Property Group?

5      **A.   No.**

6           **(Plaintiff's Exhibit 25 was marked for**

7       **identification.)**

8   BY MR. BLAIR:

9      Q.   I'll show you what has been marked as

10   Plaintiff's Exhibit 25, which is a contract, Bates

11   number SPG 00904, and ask you if you recognize that?

12      **A.   Yes.**

13      Q.   Did you create this contract?

14      **A.   Yes.**

15      Q.   And it appears to be between Image Marketing

16   and Florida region malls/Dadeland malls/Boca Raton/

17   Miami International?

18      **A.   Yes.**

19      Q.   And do you know if, in fact, the services in

20   this contract were provided?

21      **A.   Again, I said I did see Dadeland malls**

22   **because I stayed at the Marriott there, so I did see**

23   **theirs.**

24      Q.   What about all the other malls?

25      **A.   The other malls, I don't know for sure.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 262

1        Q.    Okay.   And on the back -- this next, page

2    SPG 00905, it seems to be signed by Tim Herman, again?

3        **A.    Okay.**

4        Q.    Do you know if that is Tim Herman's

5    signature?   It appears to be a little different from

6    the last one.

7        **A.    No, I don't.**

8        Q.    Okay.   Do you know who signed this contract,

9    which is Exhibit 25?

10       **A.    Well, I would have either mailed it off or**

11   **somebody in his office, so I'm not sure.**

12       Q.    Did you mail contracts to Mr. Herman?

13       **A.    Yes, I did.   These, I did.**

14       Q.    And did Mikael Thygesen approve these?

15       **A.    No.**

16       Q.    Did you cut his signature and past it onto

17   this?

18       **A.    Yes, I did.**

19            **(Plaintiff's Exhibit 26 was marked for**

20        **identification.)**

21   BY MR. BLAIR:

22       Q.    Okay.   I'll show you what has been marked as

23   Plaintiff's Exhibit 26 to your deposition, which is a

24   contract, Bates number SPG 01575, and ask you if you

25   recognize that?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 263

1        A.    Yes.

2        Q.    Did you create this contract?

3        A.    Yes, I did.

4        Q.    And it appears to be between Point

5    Distribution and Florida Mall -- Florida regional

6    malls/Plaza Carolina; do you see that?

7        A.    Yes.

8        Q.    And it says it is for a Shop Caribbean

9    directly with Web?

10       A.    Uh-huh.

11       Q.    Do you know if, in fact, these services were

12   provided?

13       A.    No.

14       Q.    Okay.  And on the second page of Exhibit 26,

15   it appears to be signed by Mr. Takio?

16       A.    Yes.

17       Q.    Did Mr. Takio sign those?

18       A.    No.

19       Q.    Is that your signature?

20       A.    Yes, it is.

21       Q.    And is that your signature approving the

22   contract?

23       A.    Yes, it is.

24       Q.    And did you seek approval from Simon Property

25   Group for this contract?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 264

1       A.    No.

2       Q.    Now, some of these, like this last, 26, it

3  says tourism marketing formally XLM; is this when --

4  when you said that, I guess, Mr. Herman took over?

5       A.    It was about that same time, yes.

6       Q.    What were the time frames that your

7  companies, whether it be RJL, Arnell, Snouthound, XL,

8  were doing distribution for Simon Property Group?

9       A.    I'd say '04 -- '03 '04, something like that

10  through '10.

11       Q.    2010?

12       A.    Uh-huh.

13       Q.    And when was -- Image Marketing and Point

14  Distribution and all these other companies that were

15  not affiliated with you, when were they doing

16  distribution services?

17       A.    Well, they were doing some of them, you know,

18  through the whole period, and then I would ask them to

19  expand the service.  I don't know when, sometime late

20  2010.

21       Q.    Okay.  If you had hired Image Marketing to do

22  the distribution and they are a qualified marketing

23  company, why would you need to do it -- your companies?

24       A.    Because for the malls to get the benefit of

25  the doubt of having as much exposure, Tim's companies

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page  265

1   tended to distribute during the day.  I had my family

2   out there.  They were nights and weekends.  Different

3   people work at those -- at different times.  I mean,

4   there are so many people, the changes in the hotels.  I

5   just feel and always have felt the most -- the most --

6   the more information you can get out to the more

7   people, the more people they are going to refer to the

8   mall.  It obviously worked.  Sales went through the

9   roof at Florida Mall, more than they did at any other

10  property in Florida for a number of years.

11       Q.   And in six years, you can't give me one

12  person's name or face that could verify you or your

13  family was ever there?

14       A.   I walked in and out of hotels every day of my

15  career, and no, I don't know people's names when I

16  walked in.  I would walk in and read a nametag and

17  speak to the person and walk out.  The next time I go

18  in, it might be someone different.  I stayed at hotels

19  over and over again and had the same people service me,

20  and I don't know remember their names.

21       Q.   That is all I need to know.

22       A.   It does not make that I'm a bad marketing

23  person because I don't remember names.

24            (Plaintiff's Exhibit 27 was marked for

25       identification.)

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 266

1    BY MR. BLAIR:

2        Q.   I'm going to show you what has been marked as

3    Exhibit 27, which is a letter to the file, that is

4    Bates number SPG 00402; do you see that?

5        **A.   Yes.**

6        Q.   Okay.  And are you the one that typed this

7    letter to the file?

8        **A.   Yes, I did.**

9        Q.   Okay.  And it says that the enclosed

10   agreement for the term June 1, 2010 through May 31,

11   2011 was XLM, XL Marketing, Shop Florida distribution

12   shopping guide and web guide does not contain three

13   competitive bids due to the fact that XLM offers an

14   exclusive service.

15       **A.   Uh-huh.**

16       Q.   Do you see that?

17       **A.   Yes, I do.**

18       Q.   Okay.  Does XLM offer some type of exclusive

19   service?

20       **A.   Those exhibits?**

21       Q.   What are you pointing -- Exhibit 3?

22       **A.   Yes.**

23       Q.   Nobody else does that?

24       **A.   Nobody else puts those together ever.**

25       Q.   I understand you put them together, but does

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 267

1    anybody else do that?

2         A.   Oh, I guess I could have hired someone else

3    to do it.

4         Q.   Did you -- did you send the task out in

5    Exhibit 3 for a competitive bid?

6         A.   To re -- no, not to put it altogether again,

7    no.

8         Q.   Okay.  So if you send it out, someone could

9    have responded, correct?

10        A.   Yes.

11        Q.   So it is not true that it is exclusive, is

12   it?

13        A.   It would have had to be completely redone.

14        Q.   That is not my question.

15        A.   Okay.  Then it is not exclusive, but it would

16   have had to be completely redone.

17        Q.   All right.  And then the second -- or the

18   last paragraph of that memo to file, on Exhibit 27,

19   says the shopping guide and distribution in hotels and

20   airports are proprietary and serviced only by XLM

21   Excell Marketing.  Do you see that?

22        A.   Yes.  I do.

23        Q.   Did XLM Marketing have proprietary rights to

24   hotels and airports?

25        A.   To distribute those because they are the only

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 268

1    **person that had that, yes.**

2        Q.   What is your understanding of proprietary

3    rights to something?

4        **A.   That that design and the -- the creative for**

5    **that was something that XLM had done.**

6        Q.   Do you have the rights to reproduce these

7    logos, ma'am?  I mean, do you own the rights to

8    reproduce people's trademarks and logos?

9        **A.   You are allowed to do that, yeah.**

10       Q.   Okay.  And did you consult with any of these

11   individuals or businesses in these advertisements,

12   Exhibit 3, to see if they wanted to be advertised

13   through your service?

14       **A.   No.  Are you speaking each individual store?**

15       Q.   Yes.

16       **A.   They paid into the fund, so I assume they**

17   **wanted to be advertised.**

18       Q.   Through your company?

19       **A.   Through any company that was advertising.**

20   **They don't care who is advertising as long as they are**

21   **getting the information out and the people are coming**

22   **into the stores to make purchases.**

23       Q.   Were you able to track how many people came

24   into various malls based upon your efforts in

25   Exhibit 3?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 269

1        A.    No more than I can track -- I can track how

2    many come in from an advertisement and Travelhost

3    magazine or where in magazine.

4        Q.    So the answer would be no?

5        A.    No.

6        Q.    Okay.  And as far as another marketing

7    company, could they have created something else --

8        A.    Yes.

9        Q.    -- in Exhibit 3 and delivered it to hotels

10   and airports?

11       A.    Yes.

12            (Plaintiff's Exhibit 28 was marked for

13            identification.)

14   BY MR. BLAIR:

15       Q.    I'm going to show you what has been marked as

16   Plaintiff's Exhibit 28, which is a memo, appears to the

17   file, dated May 8, 2007, and it is Bates number SPG

18   01496, and ask you if you recognize that.

19       A.    Not necessarily.  I'm looking at this one.  I

20   did not sign it.

21       Q.    So you did not create Exhibit 28?

22       A.    I can't say that I did.  I don't remember.

23   It is from 2007.  I don't remember.  I did not sign it.

24   It is generic on a computer.  I don't -- I don't know

25   if I did this or not.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                        8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 270

1     Q.   And do you know, irrespective of Exhibit 28,

2  whether Florida Distribution Services has exclusive

3  service on Interstate 4 from Daytona to --

4     **A.   I do not know.**

5     Q.   Okay.  And do you know if FTDS owns racks in

6  hotels and rest areas?

7     **A.   I do not know.**

8     Q.   Okay.

9          MR. BLAIR:  That is all I have questions.

10         MR. BRAND:  I have a few questions.

11         MR. SADAKA:  Are you okay?

12         THE WITNESS:  I'm concerned something is

13     going to drop on my head.

14         MR. SADAKA:  No.

15         MR. BRAND:  I'm going to put my vest on.

16         THE WITNESS:  Good thing I'm surrounded by

17     lawyers.

18         MR. BRAND:  Right.  Me too.

19               CROSS-EXAMINATION

20  BY MR. BRAND:

21     Q.   Mr. Lauria, can I call you Lynnette?

22     **A.   You certainly can.**

23     Q.   Okay.  Thank you very much.

24         My name is Craig Brand, and I'm going to ask

25  you to remember what it is I'm about to say, because

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 271

1    I'm going to try to short-circuit everything by kind of

2    putting in some definitions.

3            I represent Ryan Deming, individually,

4    Florida Kids Eat Free Card -- or Florida Tourism

5    Distribution Services, as Kids Eat Free Card,

6    Dale Takio, individually, Image Marketing of Florida,

7    Image Marketing Group, which you know as Image.  There

8    is another Image that is owned by Tim Herman.  I don't

9    represent Tim and I don't represent whatever company

10   Tim is owning.  Event Planners USA, TD Printing

11   Solutions, HAT Marketing, which you pointed out was

12   Kevin, Point Distribution and Takitik.  I'm going to

13   ask when I refer to yourself or to the companies that

14   you are related to, that would be between the companies

15   involving yourself or the ones involving your daughters

16   -- daughters.  With that said, I have just a few

17   questions.

18            I'm going to use a term improper

19   renumeration, and for improper renumeration, I'm going

20   to mean any type of kickbacks, wrongful commissions,

21   monies for services intended not to be fulfilled,

22   monies wrongfully received or distributed.

23       **A.    Uh-huh.**

24       Q.    Okay.  And instead of saying all that, I'm

25   just going to say improper renumeration or

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 272

1   renumeration.

2       **A.    Okay.**

3       Q.   First question, are you aware of any of my

4   clients, the clients I've just mentioned, giving any

5   kind of improper renumeration to yourself or any of the

6   companies that you are involved in or related to?

7       **A.    No.**

8       Q.   Perfect.

9            Are you aware of any of my clients ever

10  receiving any kind of improper renumeration from

11  yourself or any of the companies that you are related

12  to?

13      **A.    No.**

14      Q.   Am I correct to state that when you were

15  dealing with the image companies, for the most part,

16  you were dealing with Tim Herman?

17      **A.    Yes.**

18      Q.   Did Tim Herman lead you to believe that the

19  image companies was his?

20      **A.    Yes.**

21      Q.   Am I also correct to say that when dealing

22  with Mr. Deming or Mr. Takio, as it related to anything

23  involving Tim Herman, is it fair to say that Mr. Herman

24  would be the one who always presented himself as the

25  boss or the controlling person?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page  273

1          A.    Yes.

2          Q.    Would it -- under that same -- that same

3    premise, would it be fair to say that Mr. Herman did

4    his best or gave the appearance to be keeping

5    Mr. Takio or Mr. Deming away from yourself or Simon

6    properties and dealing just directly with him?

7          **A.    Yes.  If -- if Dale -- if I were ever to go**

8    **to their office and Dale was there, he would have Dale**

9    **leave and then talk with me.**

10         Q.    Okay.  Are you aware of Mr. Herman --

11   Tim Herman ever coming to you and informing you that he

12   was trying to set up a separate company to exclude his

13   partners or Mr. Herman -- I mean, Mr. Deming and

14   Mr. Takio from it?

15         A.    Yes.

16         Q.    Did he inform you that he was doing that

17   without the knowledge of Dale or Ryan?

18         A.    Yes.

19         Q.    And did he want to separately bill Simon

20   under this new company to the exclusion of Ryan and

21   Dale?

22         A.    Yes.

23         Q.    As to work done or performed by Ryan Deming,

24   Dale Takio, or the companies that they were involved

25   in, as it relates to Simon properties, are you aware of

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 274

1    them not performing the services that they billed for?

2        A.    No.

3        Q.    Are you aware of Simon properties getting the

4    benefit of the services provided by Dale or Ryan or

5    their respective companies?

6        A.    I believe -- yes.

7        Q.    Are you aware of any complaints from any of

8    Simon's properties stating that Ryan Deming has not

9    performed the services promised or billed for?

10       A.    The only complaints I got were the ones I

11   mentioned earlier, and that was by Image Marketing.

12       Q.    Are you aware of any of the Simon properties

13   complaining that Dale Takio did not perform any of the

14   services he provided?

15       A.    No.

16       Q.    Are you aware if Simon properties ever

17   complained that the Kids Eat Free card were -- were not

18   as promised by Dale Takio or his -- his respective

19   companies?

20       A.    I'm sorry, could you say that again?

21       Q.    Yeah.  Are you aware if Simon properties ever

22   complained that the Kids Eat Free card --

23       A.    I'm not aware that Simon Property Group had

24   anything to do with the Kids Eat Free card except

25   advertising on the sleeve.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                        8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 275

1       Q.   Perfect.  Not -- am I also correct to state

2    that none of my clients had any participation or any

3    knowledge of any of the actions that Simon properties,

4    the plaintiff in this lawsuit, is accusing you or your

5    related companies?

6               MR. BLAIR:  Object as to form.

7               MR. BRAND:  Let me rephrase that.

8               THE WITNESS:  Yes, please.

9    BY MR. BRAND:

10      Q.   No problem.  Am I correct that none of my

11   clients had any knowledge of any of the actions that

12   the plaintiff is accusing you of?

13              MR. BLAIR:  Object as to form.

14   BY MR. BRAND:

15      Q.   In other words, establishing companies under

16   families' names in order to bill Simon properties for

17   work that was or was not done?

18              MR. BLAIR:  Object as to form.

19              THE WITNESS:  I believe I understand your

20         question.  May I restate it to you?

21              MR. BRAND:  Sure.

22              THE WITNESS:  You are asking me if they or

23         their companies understood what I was doing with

24         my companies.

25   BY MR. BRAND:

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 276

1       Q.   Correct.

2            MR. BLAIR:  Object to form.

3            THE WITNESS:  Okay.  Am I supposed to answer

4       or not?

5            MR. SADAKA:  You can answer.

6            THE WITNESS:  Geez.  No, they did not.

7  BY MR. BRAND:

8       Q.   Okay.

9       **A.   To my knowledge.**

10      Q.   The documents -- the exhibits that we went

11  through, especially as related to Point Distribution,

12  you never informed Mr. Takio that you were signing his

13  name?

14      **A.   No, I did not.**

15      Q.   Okay.

16      **A.   May I clarify that also?**

17      Q.   Sure.

18      **A.   Once again, those were in files in my office**

19  **and never used for any purpose.  I created those in a**

20  **moment of panic when I thought I was going to be**

21  **audited but was never asked for them.**

22      Q.   And my clients did not pay you any type of

23  kickback or wrongful renumeration for any of the

24  services that they may have done on the -- on behalf of

25  Simon properties?

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 277

1        **A.    No.**

2             MR. BRAND:  Okay.  I have nothing further.

3             MR. BLAIR:  I have a few follow-ups unless it

4        is your turn.

5             MR. SADAKA:  It is mine.  I have one

6        question.

7             MR. BLAIR:  Okay.

8                      CROSS-EXAMINATION

9   BY MR. SADAKA:

10       Q.   I believe it is Exhibit 8.  You can -- okay.

11  I'll show it to you.  It is entitled miscellaneous

12  expenses, RJL Services.

13       **A.    Yes.**

14       Q.   Is this a document you created?

15       **A.    Yes, I did.**

16       Q.   And what was the purpose -- for what purpose

17  was that document created?

18       **A.    To show monies that I had spent because of --**

19  **because of Simon's inability to separate malls that**

20  **needed to have certain services done and malls that**

21  **were just everyday run-of-the-mill jobs that did not**

22  **need to be involved as much.  And rather than continue**

23  **to fight the battle and continue to not win, I did not**

24  **want to see particular malls fail, and so therefore, I**

25  **went ahead and did what I had to do to get it done, and**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                              8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 278

1    **these are the costs.**

2         Q.   Okay.  How many pages is that document?

3              MR. BLAIR:  Want to use the real exhibit?

4              MR. SADAKA:  That is okay.

5              THE WITNESS:  Four pages.

6    BY MR. SADAKA:

7         Q.   And those entries are actually numbered,

8    aren't they?

9         **A.   Yes, they are.  Uh-huh.**

10        Q.   And how many separate entries are there?

11        **A.   141.**

12        Q.   Okay.  And as you sit here today, do you have

13   personal recollection of all of those items that you

14   have listed as billed for?

15        **A.   Pretty much so, yes.**

16        Q.   Okay.  Did you Lynnette Lauria, as an

17   individual, get any personal benefit or gain of any of

18   those entries on Exhibit 8?

19        **A.   I drank some of the wine.**

20        Q.   When you drank some of the wine, were you

21   there with individuals from Simon properties?

22        **A.   Simon properties or vendor -- people that we**

23   **were trying to become sponsors for us, you know, taking**

24   **people out, entertaining them to get them to give us**

25   **money.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 279

1        Q.    Okay.  So even the wine that you drank, it
2    was --
3        **A.    Yes.**
4        Q.    -- in the context of an event to benefit
5    Simon properties?
6        **A.    Many times, I was told that I should not**
7    **expense my travel expenses -- meals because we were on**
8    **a budget, and we were not supposed to spend money for**
9    **meals, but if we did not spend money, as I was told, it**
10   **is cheaper to keep you, so...**
11       Q.    But even the meals you expensed, were those
12   your own -- were those meals that you took a mall
13   manager or a marketing personnel out from those
14   respective malls?
15       **A.    Those people -- and I believe there was ones**
16   **when I took Sarah Simon out and spent an atrocious**
17   **amount of money.  There was one where I took --**
18       Q.    There is Rachel's, I'm sure, on there too,
19   isn't there?
20       **A.    Tim Earnest to Rachel's because he requested**
21   **that I take him there and after --**
22       Q.    And who is he?
23       **A.    He was or probably still is -- I don't**
24   **know -- executive vice president of operations for**
25   **Simon.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 280

1      Q.    Okay.  So you --

2      **A.    My boss's boss because --**

3      Q.    So that was put on your personal credit card?

4      **A.    Yes, it was.**

5      Q.    And could you very well submit -- or could he

6    submit a charge for an adult entertainment facility on

7    his corporate card?

8      **A.    I don't know if he could, but I certainly was**

9    **not going to put it on mine.**

10     Q.    Okay.  So again, just to conclude, all of the

11   -- well, actually, isn't there also a charge on there

12   for lawn care service done at the in -- Miami

13   International?

14     **A.    Yes, there is.**

15     Q.    And what was the purpose of that?

16     **A.    I got a call from the mall managers stating**

17   **that they had the opportunity to hold a very large**

18   **function in their mall -- not parking lot, but a grass**

19   **area outside of the mall; however, it needed to have**

20   **the lawn mowed within a day or two.  He did not accept**

21   **credit cards and Simon corporate had told her they**

22   **could not give her a check, and is there any way I**

23   **could help get this done because it was going to be,**

24   **like, $35,000 in income, so I charged it to my credit**

25   **card.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 281

1      Q.   Okay.  Well, they did not take credit cards?

2      **A.   I'm sorry, I wrote a check.**

3      Q.   Okay.

4      **A.   It's right here, $3,500.**

5      Q.   Okay.  And so all of the entries that are on

6   Exhibit 8 were all for the benefit of Simon, were they

7   not?

8      **A.   Yes, they were.**

9           MR. SADAKA:  Okay.  I have nothing further.

10                REDIRECT EXAMINATION

11   BY MR. BLAIR:

12      Q.   Ms. Lauria, let me be very clear about

13   Exhibit 8.

14      **A.   Yes.**

15      Q.   Simon Property Group did not approve any of

16   those, did they?

17      **A.   Did not approve --**

18      Q.   Meaning?

19      **A.   I believe Tim Earnest approved me taking him**

20   **to Rachel's.  I mean, he asked me to go.  He expected**

21   **me to pay the bill.  I assume that's approved.**

22      Q.   I understand that you paid.  I just want to

23   know that if anything on Exhibit 8, you submitted to

24   the company for proper procedures for approval?

25      **A.   No.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)

8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 282

1        Q.   Thank you.  And let me ask you about a couple
2   of the entries here.  37, you and Tim Herman at Vines.
3   Isn't -- Tim Herman, isn't he your client?  I mean,
4   shouldn't he be taking you to dinner?
5        **A.   You know, yes.  No.  I'm not going to say**
6   **yes.  I once in a while picked up meals when I went out**
7   **with people who were our partners in business.  He also**
8   **brought me some Magic and made that introduction which**
9   **got us $50,000 in sponsorship per year for a play area.**
10       Q.   130, the spa.  Did you have a good time
11  there?
12       **A.   Lydia was there.**
13       Q.   I did see that.  You were there, weren't you?
14       **A.   Yes.**
15       Q.   Well, you said you did not derive any
16  benefit.  You sure enjoyed a lot of --
17       **A.   Oh, I did.  I did.**
18       Q.   Okay.
19       **A.   Yeah.**
20       Q.   You enjoyed a lot of eating and drinking,
21  didn't you?  Lots of eating and drinking there.
22       **A.   I have to be very honest.  I resent that**
23  **comment.**
24       Q.   The vendor --
25       **A.   Many of those eatings were when I was**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 283

1   **traveling on business and was explained that I was not**

2   **supposed to put it through my expense report.  You can**

3   **look at my expenses reports.  They are not listed**

4   **there.**

5        Q.   And didn't Simon Property Group tell you they

6   were cutting back on things, like were are on

7   Exhibit 8?

8        **A.   Like, eating on a business trip?**

9        Q.   That is not the answer.

10        Did they tell you that they were cutting back

11   on these, ma'am, the things that you have on Exhibit 8?

12        **A.   Some of them.**

13        Q.   Okay.

14        **A.   As general statement for all malls.**

15        Q.   Okay.  You said at one time that Mr. Deming

16   came on behalf of Simon -- I mean -- excuse me -- Image

17   Marketing to give you some presentation; in fact, that

18   is why you hired them -- for his presentation?

19        **A.   Yes.**

20        Q.   Okay.  Did he tell you at that presentation

21   that it is not my company; it is Mr. Herman's company?

22        **A.   I don't believe we went through the ownership**

23   **of the company.  He came as a representative of the**

24   **company.**

25        Q.   And do you know -- when we talk about DT

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 284

1    Printing, Event Planners, FTDS, Image Marketing,

2    Takitik, Target Distribution, Point Distribution, do

3    you know who did the actual services for Simon Property

4    Group; in other words, do you know if it was Mr. Takio

5    or somebody else?

6         A.    Which individual person or I --

7         Q.    Correct.

8         A.    I knew that they had a group of employees,

9    that were doing services.

10        Q.    Okay.  In other words, do you know who

11   performed the services?

12        A.    No, I do not.

13        Q.    Okay.  And what I'm trying to figure out then

14   is, how did you verify that all those companies did

15   everything they said?

16        A.    Can I verify?

17        Q.    Did -- Mr. Brand asked you --

18        A.    We have gone over this before.  I did not go

19   out and check, nor did I have time to go out and check

20   each hotel or any other thing.  All right?

21        Q.    So other than Mr. Brand -- I mean -- excuse

22   me -- Mr. Deming, Mr. Takio and Mr. Herman telling you

23   they did them?

24        A.    Or the malls individually who they were doing

25   it for.

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 285

1       Q.   Okay.  And also, just so we are clear on

2   Exhibit 4, the amounts; is this the amount that you

3   indicated should be repaid to Simon Property Group

4   minus the expenses on Exhibit 8?

5       **A.   It was an offer that we put together.  It was**

6   **not accepted, and that is not what I'm saying is owed**

7   **right now because -- I'm not going down that road with**

8   **that.**

9       Q.   Okay.  So you don't recall me -- recall

10  meeting me and Mr. Donaway in your attorney's office

11  approximately a year ago?

12      **A.   And it was an offer that we made.**

13      Q.   You didn't admit that this money had to be

14  paid back as an offer; is that your testimony now,

15  ma'am, under oath?

16      **A.   We offered to pay this back.  I do not know**

17  **that this is necessarily something I need to pay back.**

18  **This is commission on business I brought to them, some**

19  **of it being Simon, some of it not being Simon business.**

20      Q.   And you are referring to additional income

21  from Image?

22      **A.   Yes.**

23      Q.   So do you believe you should pay any money

24  back that is set forth in Exhibit 4?

25          THE WITNESS:  I'd like to speak with you

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 286

 1        before I answer that question.

 2              MR. BLAIR:  She -- no.  It is a yes or no.

 3              MR. SADAKA:  I think you have answered that

 4        it was done for the purpose of negotiating a

 5        settlement.

 6              MR. BLAIR:  Are you going to coach her

 7        anymore, Tom?

 8              MR. SADAKA:  I could.  I mean, she has

 9        already answered that.  I didn't coach her --

10              THE WITNESS:  That is what I said; I put that

11        together as an offer that you did not accept.

12   BY MR. BLAIR:

13        Q.   Okay.  That is not my offer, ma'am, so I'm

14   just -- I'm not involved with the suit, so I'm just

15   trying to figure out.

16              So your testimony is today that Exhibit 4 is

17   nothing more than an offer?

18        **A.   Yes, that is what it was.**

19        Q.   That is your testimony under oath?

20              MR. SADAKA:  Object to the form; asked and

21        answered.

22   BY MR. BLAIR:

23        Q.   You can answer.  Is that your testimony under

24   oath, ma'am?

25        **A.   I -- yes.**

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 287

```
 1          MR. BLAIR:  Okay.  No further questions.

 2          MR. SADAKA:  Nothing further.

 3          MR. BRAND:  I just have one more.

 4                    RECROSS-EXAMINATION

 5  BY MR. BRAND:

 6      Q.   We talked to Mr. -- Mr. Blair kept talking

 7  about negativities as to whether or not there was any

 8  complaints by -- for any of the work done my clients,

 9  or whether you were independently able to verify.  Let

10  me flip that around.

11          Did the malls ever tell you anything positive

12  about my client services?

13      A.   Many times, I went to Florida Mall's

14  marketing people and said, you do what you need to do,

15  if you think the services are what you want; they

16  continued to go with it.  It was nothing I said that

17  needed to.

18          Coconut Point thought the services were so

19  great that they signed on.  Edison Mall wanted to sign

20  on after they saw what was going on at Coconut Point.

21  I can tell you that.  Ozzie seemed to enjoy the service

22  down there a great deal.  There was an issue at the

23  very end.  The issue was Tommy not calling on certain

24  hotels that he said he had called on, and not

25  delivering the brochures he said that he was
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 288

1    **delivering, and the hotel called and said that they had**

2    **not.  That was the complaint I was getting from them.**

3    **That is all.**

4            MR. BRAND:  Thank you.  I have nothing else.

5            MR. SADAKA:  That is it.

6            THE VIDEOGRAPHER:  Okay.  This is the end of

7        the deposition of the corporate representative.

8        The time now is 4:35, and we are off the record.

9            THE REPORTER:  Is it a read or waive?

10           MR. SADAKA:  Read.

11           Did you want this transcribed?

12           MR. BLAIR:  Yes.

13           THE REPORTER:  And did you want Mr. Lauria as

14        well?

15           MR. BLAIR:  E-mail, dirty ASAP.

16           (Deposition concluded at 4:15 p.m.)

17

18

19

20

21

22

23

24

25

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 289

1          REPORTER'S CERTIFICATE.

2

3    STATE OF FLORIDA

4    COUNTY OF ORANGE

5

6              I, MICHELLE PULIDO STUBBEN, Court Reporter

7    and Notary Public, certify that I was authorized to and

8    did stenographically report the foregoing deposition of

9    LYNNETTE LAURIA; that a review of the transcript was

10   requested; and that the transcript, Pages 152 through

11   288, is a true record of my stenographic notes.

12             I FURTHER CERTIFY that I am not a relative,

13   employee, attorney, or counsel of any of the parties'

14   attorneys or counsel connected with the action, nor am

15   I financially interested in the action.

16             The certification does not apply to any

17   reproduction of the same by any means unless under the

18   direct control and/or direction of the reporter.

19             DATED October 3, 2012.

20

21

22          _____

23          MICHELLE PULIDO STUBBEN, Court Reporter

24

25

First Choice Reporting & Video Services
www.firstchoicereporting.com          Worldwide Scheduling          800.939.0093

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 290

1                   CERTIFICATE OF OATH

2

3    STATE OF FLORIDA
     COUNTY OF ORANGE
4

5              I, MICHELLE PULIDO STUBBEN, Notary Public,

6    State of Florida, certify that LYNNETTE LAURIA

7    personally appeared before me and was duly sworn on

8    September 25, 2012.

9

10             WITNESS my hand and official seal this

11   September 25, 2012.

12                  Personally Known:

13        Or Produced Identification:  Yes

14    Type of Identification Produced:  Driver's License

15

16

17   _____
     MICHELLE PULIDO STUBBEN
18   MY COMMISSION #EE 833702
     EXPIRES:  MARCH 8, 2014
19   Bonded Through National
     Notary Association
20

21

22

23

24

25

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

Page 291

1          E R R A T A   S H E E T
   IN RE:  SIMON PROPERTY GROUP, INC., vs LYNNETTE LAURIA,
2  et al.
   DEPOSITION OF:  LYNNETTE LAURIA
3  TAKEN:  September 25, 2012

4  DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

5  Please sign, date, and return this sheet to our office.
   If additional lines are required for corrections,
6  attach additional sheets.

7  At the time of the reading and signing of the
   deposition, the following changes were noted:
8
   PAGE      LINE       CHANGE            REASON
9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 Under penalty of perjury, I declare that I have read my
   deposition and that it is true and correct subject to
23 any changes in form or substance entered here.

24 SIGNATURE OF DEPONENT:  _____

25 DATE:  _____

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)          8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb

Lynnette Lauria - 9/25/2012

```
                                                    Page 292

  1   October 3, 2012
      THOMAS A. SADAKA, ESQUIRE
  2   NeJame, LaFay, Jancha, Ahmed, Barker &
      Joshi & Moreno, P.A.
  3   189 South Orange Avenue, Suite 1800
      Orlando, Florida 32801
  4
      IN RE:  SIMON PROPERTY GROUP, INC., vs LYNNETTE LAURIA,
  5   et al.

  6   Dear Mr. Sadaka:

  7   This letter is to advise you that the transcript of
      your client, LYNNETTE LAURIA, taken in the above-styled
  8   case on September 25, 2012, has been completed and is
      awaiting her reading and signing.

  9

 10   Please have her contact our office at (407)830-9044 to
      make arrangements to read and sign the deposition
 11   transcript.  Our office hours are 9:00 a.m. to 5:00
      p.m., Monday through Friday.

 12

 13   If the transcript is not signed by the witness within
      30 days after this letter has been furnished, we will
 14   then process the transcript without a signed errata
      page.  If your client wishes to waive their signature,
 15   please have her sign her name at the bottom of this
      letter and return it to our office.

 16

 17   Your prompt attention to this matter is appreciated.

 18
      Sincerely,
 19
      Michelle Pulido Stubben
 20   First-Choice Reporting & Video Services
      333 N. Ferncreek Avenue
 21   Orlando, Florida 32803

 22
      I do hereby waive my right to read and sign.
 23
      _____
 24         LYNNETTE LAURIA

 25
```

Electronically signed by michelle pulido (101-385-016-6089)
Electronically signed by michelle pulido (101-385-016-6089)                    8f4f7fb1-d1bf-4b03-ac2f-ab3fc8bf6efb