**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SIMON PROPERTY GROUP, INC.,**

    **Plaintiff,**

v.                                                                                            **Case No: 6:11-cv-1598-Orl-31KRS**

**LYNNETTE LAURIA, ROBERT JAMES LAURIA, SARAH LAGI, RJL SERVICES, LLC, ARNELL, INC., SNOUTHOUND ENTERPRISES, LLC, IMAGE MARKETING GROUP, INC., EVENT PLANNERS USA, INC., POINTE DISTRIBUTION, LLC, TAKITIK, INC., HAT MARKETING, LLC, DT PRINTING SOLUTIONS, LLC, TIMOTHY HERMAN, RYAN DEMING, DALE TAKIO, IMAGE MARKETING OF FLA, INC. and IMAGE MARKETING OF FLORIDA, LLC,**

    **Defendants.**

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 261) filed by Defendants Ryan Deming ("Deming") and Dale Takio ("Takio"), the response (Doc. 299) filed by the Plaintiff, Simon Property Group, Inc. ("Simon"), and the reply (Doc. 306) filed by Deming and Takio.

    **I.**    **Background[1]**

Simon is a publicly traded real estate company that owns and operates malls throughout the United States and Puerto Rico. Defendant Lynnette Lauria ("Lauria") is a former longtime

---

[1] Except where noted, it appears from the record that what follows is undisputed.

Simon employee who worked in various marketing positions. Defendants Deming and Takio (collectively, the "Movants"), owned and operated a number of marketing companies, along with Defendant Timothy Herman ("Herman").

In 2000, Lauria was named Marketing Director for the Florida Mall in Orlando. In 2005, she was promoted to Regional Director of Marketing in Florida. In 2007, Lauria received another promotion, becoming Vice President, Mall Marketing for the Florida and Puerto Rico Regions. In that position, Lauria oversaw Simon's outside marketing efforts in Florida and Puerto Rico. Among other things, she was responsible for locating outside marketing and advertising companies to provide general marketing services, Internet advertisements, brochure rack distribution and concierge services. She was also responsible for negotiating service agreements with these companies.

At some point, Lauria began awarding some of Simon's marketing and advertising work to a series of companies, including RJL Services LLC ("RJL"), Arnell, Inc. ("Arnell"), Snouthound Enterprises, LLC ("Snouthound") and a variety of fictitious business entities, including Marketing Resource Network, XLM Marketing, Excell Services, XLM Excell, and PR Works (collectively, the "Lauria Companies"). All of these entities were owned by or associated with Lauria, her husband and/or her daughters. Lauria did not disclose to Simon that she was awarding work to companies that were associated with her or her family members, and she did not require the Lauria Companies to go through Simon's competitive bidding process before awarding them work. After awarding the work to the Lauria Companies, Lauria also – in her capacity as a Simon employee – approved invoices for work they purportedly performed for Simon. In many cases, Lauria herself had created the invoices that she subsequently approved.

In addition to her dealings with the Lauria Companies, beginning in 2003, Lauria also awarded marketing work to a series of companies owned and operated by Deming, Takio, and Herman, including Image Marketing FLA, Inc., Image Marketing of Florida, LLC, Image Marketing Group, Inc., Event Planners USA, Inc., DT Printing Solutions, LLC, Hat Marketing, LLC, Pointe Distribution, LLC, Takitik, Inc., Deming Kids Eat Free, Takio Kids Eat Free, EDL Management, Florida Tourism Distribution Services, Target Distribution, and TJI. Lauria fabricated service agreements with some of these companies by cutting-and-pasting the signature of her superior at Simon onto the agreements to give the false impression that they had been approved. (Doc. 299-30 at 103-118). Between 2003 and September 2011, Simon paid approximately $2.4 million to companies controlled by Deming, Takio, and/or Herman.

In June 2011, Simon received an email from Thomas Brignolo ("Brignolo"), who used to work with Herman, Deming, and Takio, alleging that they were assisting Lauria in defrauding Simon. Among other things, Brignolo claimed that some of the companies under the control of Herman, Deming, and Takio were charging Simon ten times what they charged other clients for comparable services and paying kickbacks to Lauria in exchange for giving them this business.

Simon subsequently launched an investigation, during which it discovered Lauria's interest in the Lauria Companies and a number of forged and fraudulent invoices from the companies she had hired. At some point after the investigation commenced, Lauria and Herman purchased the domain name "simonpropertyinc.com." They then emailed Brignolo from a "simonpropertyinc.com" e-mail address, pretending to be a Simon auditor and asking Brignolo to send them all the information he had provided to Simon.

On August 8, 2011, Simon terminated Lauria's employment for the activities at issue in this lawsuit. The next day, by her own admission, Lauria took her personal laptop computer –

which contained business records for the Lauria Companies – and threw it in a river. When asked why she threw the laptop away, Lauria admitted that she was trying to get rid of evidence that might be used against her and her family in a lawsuit.

On September 30, 2011, Simon filed the instant suit against Lauria, her husband and daughters, and several of the Lauria Companies. Subsequently, Simon amended its complaint to add allegations against Herman, Deming, and Takio, as well as a number of the companies under their control. Simon alleges that Lauria orchestrated a massive fraud in which she used the Lauria Companies and other associated entities to charge Simon exorbitant fees -- in excess of $1,125,000 -- for little or no services, directing those fees to herself and her family members. Simon also alleges that Herman, Deming, Takio were part of the scheme, and that their companies performed little or no work in exchange for the more than $2 million in payments they received from Simon.

Lauria admits engaging in self-dealing but denies any other wrongdoing, such as paying for work not done or work that was intentionally overpriced. Herman failed to answer, and a default was entered against him on September 28, 2012. (Doc. 216). Deming and Takio deny any wrongdoing and, by way of the instant motion, seek summary judgment as to all of the claims against them.

### II. Legal Standard

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986) (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

### III. Analysis

In its Second Amended Complaint (Doc. 147), Simon asserts the following claims against Deming and Takio[2]: aiding and abetting breach of fiduciary duty (Count II); fraud (Count III); civil conspiracy (Count IV); conversion (Count V); and Civil RICO (counts VII and VIII). Although these causes of action vary as to their required elements, they all have at their core the same allegation: that Lauria orchestrated a scheme by which she stole an enormous sum of money

---

[2] Most of these claims are asserted against additional Defendants besides the Movants.

- 5 -

from Simon, while Deming, Takio, and their related companies participated in that scheme and shared some of its proceeds.

Although they seek judgment as to each of these counts, Deming and Takio do not challenge most of the elements that distinguish one claim from another. Rather, they simply argue that Simon has presented no evidence that they knew about or assisted in committing any wrongdoing that may have occurred.

For example, to prevail against the Movants on its claim in Count II for aiding and abetting a breach of fiduciary duty, Simon must demonstrate (1) a fiduciary duty on the part of Lauria to Simon; (2) a breach of this duty; (3) knowledge of the breach by Deming and Takio; and (4) substantial assistance or encouragement of the wrongdoing by Deming and Takio. *See Sensormatic Electronics Corp. v. TAG Co. US, LLC*, 632 F.Supp.2d 1147, 1192 (S.D. Fla. 2008). In the instant motion, while not necessarily admitting it, Deming and Takio do not dispute that Lauria owed a fiduciary duty to Simon, or that she breached that duty. They do, however, dispute the "knowledge" and the "substantial assistance or encouragement" elements of this cause of action.

Similarly, to prevail on it fraud claim, Simon must establish that (1) the Movants made a false statement regarding a material fact; (2) they knew or should have known the representation was false; (3) they intended that the representation induce Simon to act on it; and (4) Simon suffered damages in justifiable reliance on the representation. *See Webb v. Kirkland*, 899 So. 2d 344, 346 (Fla. 2d DCA 2005). Deming and Takio deny submitting false invoices to Simon, but for purposes of the instant motion, they are not challenging the fourth element – *i.e.*, that Simon suffered damages.

Normally, the Court analyzes summary judgment motions count by count. However, the Movants here are making essentially the same argument in regard to each count. Therefore, in the interest of efficiency, the Court will analyze the fundamental issue -- the Movants' knowledge and participation -- rather than separately analyzing each cause of action.

**The Movants' Companies**

In differing combinations, Herman, Deming, and Takio controlled a number of marketing companies and advertising companies that were hired by Lauria. In most cases, the business was owned and operated by Herman and one of the two Movants. Deming and Herman were the president and vice president, respectively, of Defendant Image Marketing Group, Inc. Herman was the president and Deming was the vice president of Defendant Event Planners USA, Inc., and they were the sole members of Defendant Image Marketing Group of Florida, LLC. Herman was the president of Defendant Image Marketing FLA, Inc. For simplicity's sake, these entities will be referred to collectively as the "Image Companies".

Takio was the CEO and Herman was the president of Defendant Takitik, Inc. ("Takitik"). Takitik was the managing member of Defendant Pointe Distribution, LLC and DT Printing Solutions. These entities will be referred to collectively as the "Takitik Companies".

At some point, Takio was replaced as CEO of Takitik by his wife. Aside from that, it does not appear from the record that anyone other than Herman, Deming and Takio owned or controlled the Image Companies or the Takitik Companies. Simon alleges, and the Movants do not dispute, that Herman and Deming[3] owned equal shares of the companies they managed and that Herman and Takio owned equal shares of the companies they managed.

---

[3] Deming testified that, as between himself and Herman, "It was a 50/50 relationship, so everything was 50/50." (Doc. 299-25 at 20).

Lauria hired these companies (and a number of related fictitious entities, or d/b/as) to provide marketing and advertising services for Simon, including distribution of promotional literature, concierge events,[4] printing services, website advertising, and representation at trade shows. Simon argues that the services purportedly provided by these entities were duplicative of one another, and that it would make no sense to hire multiple companies controlled by the same individuals to do the same job.

As the Movants admit (Doc. 261 at 3), Simon had a number of policies and procedures in place that Lauria was obligated to follow when dealing with outside vendors and service providers. These policies and procedures included a prohibition on dealing with relatives and what are referred to as the "Competitive Bidding Procedures". Simon's Competitive Bidding Procedures varied depending on the value of goods or services being obtained, with the requirements becoming more burdensome as the amounts at issue increased. For goods and services valued up to $5,000, Lauria was required only to document her decision as to why one vendor or service provider was chosen rather than another, by attaching any proposals, emails, or other written documentation to the purchase order or service agreement. For goods or services exceeding $5,000 but less than $10,000, in addition to documenting her choice, Lauria was required to obtain three competitive bids and to regularly compare the prices of the chosen vendors or service providers against others in their fields. Lauria was also obligated to create a service agreement with vendors or suppliers when the goods and services they were to provide was expected to exceed $5,000. Where the products or services were to exceed $10,000, Lauria was required to complete all of the preceding requirements and to use a formal competitive bidding process.

---

[4] A number of Simon's marketing efforts targeted hotel concierges, in an effort to persuade them to recommend that hotel guests visit Simon malls.

Simon also gave Lauria a company credit card for her to use to pay vendors and suppliers (only). She was allowed to spend up to $5,000 per transaction and up to $60,000 per month on the credit card. Simon's Accounts Payable department was required to approve all transactions exceeding $5,000. Lauria was also prohibited from splitting a single transaction into separate transactions so as to avoid the $5,000 limit.

Simon alleges that Herman and the Movants set up most if not all of the Image Companies and the Takitik Companies solely so that they could split the Simon "work" among them. By doing so, they were able to keep most of the payments below the $5,000 threshold that would (1) require Lauria to obtain bids from other vendors before awarding the work and (2) require approval from Accounts Payable to pay for the work. In their reply to Simon's response, Deming and Takio do not respond to this argument.

**Alleged Overbilling**

Brignolo, who sent the e-mail to Simon that first alerted the company to Lauria's self-dealing and alleged fraud, worked with Herman for the Image Companies, primarily doing deliveries, for seven and a half years.[5] Brignolo also said he worked for at least some of the Takitik companies, (Doc. 299-21 at 9), and Takio testified that Brignolo was an employee of Takitik (Doc. 299-23 at 40). Brignolo testified that one of the Image Companies, Defendant Event Planners USA, Inc. ("Event Planners"), was never actually operational and never, to his knowledge, performed any services for Simon. (Doc. 299-21 at 9-10, 24). Simon alleges, and the Movants do not dispute, that Event Planners billed Simon for $289,160.62 from 2005 to 2008. Simon produced cancelled checks showing that Event Planners paid $8,300 to Herman, $6,500 to

---

[5] Brignolo testified that the Image Companies and the Takitik Companies were small operations, never having more than one or two other employees aside from himself during the years he worked for them.

Deming, $20,300 to Defendant RJL Services (which was controlled by Lauria) and $1,000 to Lauria herself. (Doc. 299-37).

He also testified that the Image Companies billed Simon for sponsorship of events known as "Monday Mixers" that were not actually intended to provide any publicity to Simon. (Doc. 299-21 at 16). He testified that Image Marketing billed Simon for advertising on two vans although Simon's logo was only actually placed on one van, and that Simon was paying $1,500 a month to have its logo in the back window while other clients would only pay $500 per month for advertising covering the entire van. (Doc. 299-21 at 16-17). He also testified that Simon was double-billed by Image Marketing, with services that should have been included in the price paid on one invoice billed separately on another invoice. (Doc. 299-21 at 16). And he testified that Simon was being billed approximately $15,000 per month for a package of services for which other Image Marketing clients paid only $500 to $1,000 per month. (Doc. 299-21 at 15-16). Finally, he testified that through his tenure with Image Marketing, he was allowed to do the books for every client except Simon. (Doc. 299-21 at 15-16).

Herman testified that, while the Image Companies did prepare some invoices for work performed for Simon, Lauria would also prepare invoices for the Image Companies to turn in to Simon. Herman contends that the Lauria-prepared invoices were legitimate, created to pay for additional work being performed beyond what had been approved by Simon. However, it appears that by Herman's own admission, the amounts of these Lauria-prepared invoices were not based on the amount of work done by the Image Companies so much as they were based on the amount of money left in the marketing budgets of Simon malls:

> We [prepared] our regular invoicing. Again, other than that, [Lauria] would create a lot of the invoices **to pay us for the malls for the amounts of money that they had available at that time.** So wherever the money would come from, she would literally create

> a lot of their own invoices and put them in the files to cover the charges that were – of work that we were doing, but a lot of times, we did not even know what those were being listed as. We knew what we were doing work-wise. We were doing the work. We just did not know what she was listing those invoices under.

(Doc. 299-27 at 63-64) (emphasis added).

In its response to the instant motion, Simon asserts that, aside from the testimony of the principals, the only (non-testimonial) evidence produced to document the $2.3 million worth of work allegedly performed by the Image Companies and the Takitik Companies for Simon over the course of eight years were (1) photocopies of three coupons that Herman apparently printed off the website of the Orlando Tourist Information Bureau and (2) what appear to be four brochures for Simon-owned malls. (Doc. 299 at 3-4). In addition to arguing that such evidence falls well short of what should have been available if the relationship between Simon and the Defendants' companies had been legitimate, Simon contends that nothing in the coupons or the brochures suggests that the Image Companies or the Takitik Companies had anything to do with their design, production, or distribution. Deming and Takio do not respond to this argument.

**Alleged Kickbacks**

Between 2006 and 2011, the Image Companies and the Takitik Companies, combined, paid approximately $400,000 to Lauria and to Defendant RJL, which she controlled.[6] According to Simon, both Takio and Deming stated in their depositions that Lauria, through RJL, was providing consulting services to several of the Defendants, including Takitik and Event Planners.[7]

---

[6] The amount paid to Lauria and RJL is taken from the report (Doc. 299-19) of Simon's forensic accountant, Rex Homme. Homme's report is the subject of a motion in limine (Doc. 294) that has not yet been resolved. However, it does not appear that the Movants dispute that their companies paid this amount to Lauria and RJL.

[7] Simon fails to include a citation to the deposition transcripts where Takio and Deming made such a statement; however, in their reply neither Takio nor Deming disputes having so testified.

(Doc. 299-20 at 8). Simon contends that these payments were kickbacks, and that several pieces of evidence support this conclusion.

The first such piece of evidence is an e-mail (Doc. 233-32 at 7) dated March 2, 2009 from Lauria to Takio. Titled "March Invoices" and including five documents as attachments, the e-mail was sent from "lynnettelauria@hotmail.com" rather than from Lauria's Simon e-mail account. The attachments (which apparently were not themselves produced in discovery) have either "Takitik" or "Pointe Distribution" in their names. The body of that e-mail reads as follows:

> Good morning.
>
> Here is the paperwork for March. Two of the invoices can be run today.
>
> If there is anyway, can I get at least half of mine by next Monday?
>
> Talk to you soon.
>
> Thanks.

(Doc. 299-32 at 7). Simon argues that this e-mail demonstrates Takio's knowledge of and participation in Lauria's scheme in several ways. Simon argues that it shows Lauria was producing invoices for Takio to turn back in to her on behalf of Takitik and Pointe Distribution. If Takitik and Pointe Distribution were actually performing the billed work, Simon contends, those companies rather than Lauria would be the ones to generate the invoices. In addition, if the invoices were legitimate, there would be no reason not to run them all immediately, whereas splitting them up allowed them to stay below the dollar amounts that would trigger additional scrutiny at Simon.

Simon also argues that the fact that the e-mail came from a private account rather than Lauria's work account is evidence that Takio knew his arrangement with Lauria had to be kept

- 12 -

secret from her employer.[8] And Lauria's request to "get at least half of mine by next Monday" is clearly, according to Simon, a reference to her kickback.

Simon points to at least half a dozen other e-mails with similar attachments (all sent from Lauria's hotmail account) in which she told Takio that the attachments were the invoices for a particular month and informed him which ones could be run on which dates. For example, in a February 2009 e-mail with five attached documents, Lauria wrote "Here are the invoices for February. Two of them can be run today." (Doc. 299-32 at 4). In an e-mail dated August 3, 2009 with three attachments, Lauria told Takio "Here are the invoices for August. You can run the $3,000 for Takitik and the $2,000 for Pointe Distribution today," adding, "If possible, can you bring the check tonight?" (Doc. 299-32 at 13). And in a August 29, 2009 email to "Tim and Dale," Lauria stated "Hope all is going well. Here are the invoices for September. You can run the Pointe and Takio on September 2, both to the card ending in 3130." (Doc. 299-32 at 15). She added "Would it be possible for you to just mail my check and any receipts I need to sign to the house?". (Doc. 299-32 at 15).

In their reply to Simon's argument regarding those e-mails, the Movants argue that "[a]ll of these e-mails have been explained under oath by Takio and Lynnette Lauria as representing no wrongdoing by Takio." (Doc. 306 at 8). However, the Movants do not provide a citation to these explanations, so the Court is unable to consider them. Even if Takio and Lauria have provided innocent explanations for the e-mails, at this stage of the proceedings the Court is obligated to consider all the inferences drawn from this evidence in the light most favorable to Simon.

---

[8] Simon produced an e-mail sent by Takio to Lauria's Simon account, as evidence that he knew she had a work account. (Doc. 299-32 at 5-6). The e-mail sent to Lauria's Simon account was work-related, but it did not include attachments and did not address anything having to do with Lauria's self-dealing. The Court also notes that the e-mail to Lauria's Simon account was sent from "dale@image-marketing.com", while the e-mails sent to Lauria's hotmail account came from "dtakio@comcast.net."

At his deposition, in addition to testifying that Simon was being overcharged by Image Marketing, Brignolo testified that he believed that Lauria was being paid kickbacks by Herman. (Doc. 299-21 at 17). As evidence, Brignolo pointed to a text message he received from Herman, instructing him to "try to run before if possible, because [the] moneys [sic] still have not arrived … 1,650, because we ran it so late and Lynnette has used already." (Doc. 299-21 at 16). Asked to explain what the text meant, Brignolo testified:

> A. I was on the road visiting the concierge. [Herman] needed me to go back to the office to run a credit card. That's what he means "to run."
>
> Q. Try to run the credit card?
>
> A. Run a credit card charge through the machine, because the funding hasn't come through and Lynnette had already taken her funds.
>
> Q. Meaning her cut?
>
> A. Her cut.

(Doc. 299-21 at 16).

Finally, Simon contends that any assertion that Lauria was providing consulting services in exchange for the payments from the Movants' companies is simply not credible because of the enormous sums involved. At $100 per hour (the fee purportedly charged for Lauria's marketing consultation), Lauria would have had to perform approximately 1000 hours of consulting in 2006 and 2007, when she was also employed full time by Simon.

**Veil Piercing**

It is undisputed that Lauria never hired the Movants directly, and that Simon never paid any money to the Movants themselves. However, Simon argues that the entities controlled by Herman, Deming, and Takio should be treated as a single entity, and the corporate veil should be

pierced to allow the imposition of liability on Herman and the Movants individually for any wrongdoing committed under the auspices of those companies.

To pierce the corporate veil under Florida law, a plaintiff must establish by a preponderance of the evidence that (1) the defendant dominated and controlled the entity to an extent negating its independent existence; (2) the corporate form was used fraudulently or for improper purpose; and (3) such fraudulent or improper use injured the claimant. *In re Hillsborough Holdings Corp.*, 166 B.R. 461, 468-69 (Bankr.M.D.Fla. 1994). Simon has clearly produced sufficient evidence to raise a genuine issue as to the second and third elements. As for the first, Simon alleges and the Movants do not dispute that the Movants' various closely held entities lacked the usual indicia of a legitimate corporation, such as holding board meetings and keeping minutes, and took other actions suggestive of a lack of separation, such as making undocumented transfers between the companies. (Doc. 299 at 15-16). The record also shows that, in addition to having common ownership and control, many of the Movants' entities shared office space and employees. Beyond this, the Movants have not pointed to any evidence contradicting Simon's allegations that the Movants' entities had no independent existence. Accordingly, the Court finds that a genuine issue of material fact exists as to whether the corporate veil may be pierced in this case.

### IV. Conclusion

In sum, though there is no "smoking gun," Simon has produced sufficient evidence to demonstrate the existence of a genuine issue of material fact as to whether Lauria was stealing from her employer and whether Deming and Takio participated in the scheme. The evidence against Lauria – the admitted self-dealing and the falsification of documents, the impersonation of a Simon auditor, the destruction of her laptop, and the inability to produce objective evidence that

her companies or the other Defendants' companies performed any work – is enough to establish the existence of a genuine issue as to whether she was orchestrating such a scheme.

Construing all inferences in favor of Simon, Brignolo's testimony is enough to show that Simon was vastly overcharged, double-billed, and billed for services that were never performed or that would not have benefited Simon, all by the Image Companies, of which Deming was an officer and an owner.  It is undisputed that Image Marketing, Pointe Distribution, Takitik, and Event Planners – some of which were owned and operated by Deming, and some of which were owned and operated by Takio -- paid tens of thousands of dollars (in the case of Image Marketing, hundreds of thousands of dollars) to RJL, a company controlled by Lauria, and that there is little if any of the documentation and other non-testimonial evidence that one would expect to exist if the work was actually performed in exchange for these payments.  It should go without saying that it is not the usual course of affairs for one company to be doing work for another company while simultaneously (and surreptitiously) making payments to the individual at that other company who made the hiring decisions.  Although there may be an innocent explanation for this unusual arrangement, it is not unreasonable to infer that Lauria recruited Herman, Deming and Takio into a scheme to steal from Simon, and the payments back to RJL were the mechanism by which Lauria got her share.  Such an inference is reinforced by, among other things, the e-mails between Lauria and Takio in which she makes repeated requests for her money.  Finally, as noted above, to the extent the Movants seek to rely on the corporate shield to avoid personal liability, Simon has

demonstrated the existence of a genuine issue of material fact as to whether the corporate veil should be pierced in regard to the Image Companies and the Takitik Companies.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 261) is **DENIED.**

**DONE** and **ORDERED** in Orlando, Florida on April 18, 2013.

*[signature]*

**GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Parties